```
                    IN THE UNITED STATES DISTRICT COURT
                          FOR THE DISTRICT OF COLUMBIA


 - - - - - - - - - - - - - - - - - )

 UNITED STATES OF AMERICA          *

      vs.                          *  CASE NO. 21-MJ-10

 CHRISTOPHER ALBERTS               *

 - - - - - - - - - - - - - - - - - )

                              Grand Jury 21-1

                              United States District Courthouse
                              333 Constitution Avenue, NW
                              Washington, DC 20001

                              Monday, January 11, 2021



           The testimony of DALLAN HAYNES was taken in the

 presence of a full quorum of the Grand Jury, commencing at

 10:30 a.m., before:

           BRANDON REGAN
           Assistant United States Attorney








      Reported by:

      Roxanne Parsons
```

FREE STATE REPORTING, INC.
Court Reporting  Transcription
D.C. Area 301-261-1902
Balt. & Annap. 410-974-0947

E X H I B I T

| Exhibit No. | Description | Marked |
|---|---|---|
| 1 | Map | 4 |

```
 1                      P R O C E E D I N G S
 2    (Whereupon
 3                          DALLAN HAYNES
 4    was called as a witness and, after first being duly sworn
 5    by the Foreperson of the Grand Jury, was examined and
 6    testified as follows:)
 7                           EXAMINATION
 8           BY MR. REGAN:
 9       Q.   Officer Haynes, good morning.
10       A.   Good morning.
11       Q.   Can you please state and spell your name for the
12    record?
13       A.   Officer Dallan Haynes, D-a-l-l-a-n  H-a-y-n-e-s.
14       Q.   And where do you work?
15       A.   At the Metropolitan Police Department at the Fifth
16    District.
17       Q.   And how long have you worked there?
18       A.   Almost four years.
19       Q.   I want to direct your attention to January 6 of
20    this year, so last week.  Were you on duty that day?
21       A.   I was.
22       Q.   Where were you working?
23       A.   I was deployed to the Capitol in regards to the
24    attempt to overtake the Capitol.
25       Q.   And that day, were you assigned specifically to
```

1    the Civil Disturbance Unit to handle the protests that were
2    taking place?
3         A.   I was.
4         Q.   And where specifically at the Capitol were you
5    posted?
6         A.   When I first got there, I was on the north side.
7         Q.   And at some point, did you change locations?
8         A.   Yes.  We moved towards the crowd, moved from the
9    north side to the west side.
10        Q.   And can you see the map on the screen in front of
11   you?
12        A.   I can.
13        Q.   I'm directing your attention at what we'll call
14   Grand Jury Exhibit 1.
15             (Grand Jury Exhibit 1 marked for identification.)
16             BY MR. REGAN:
17        Q.   Can you indicate where on the map it was that you
18   were first located?
19        A.   I believe we were around there when we first got
20   there.
21        Q.   And just because they can't see where you're
22   pointing, could you indicate roughly on the map?
23        A.   Yes.  Right about there.
24        Q.   They can't see where you're pointing, so --
25        A.   Oh.

1          MR. REGAN.  If anyone -- all right.  I can't see
2  it on mine.
3          BY MR. REGAN:
4      Q.  Okay.  And then can you indicate where it is that
5  you moved next?  Sorry about that.
6      A.  Yup.  So then we moved this way and then stationed
7  there for a brief time, and then ended up pushing west.
8      Q.  Now, at roughly 6:00 p.m. that evening, is that
9  where you were posted, where you indicated generally on the
10 map?
11     A.  Yes.
12     Q.  Can you describe for the grand jurors just
13 generally what's taking place at the time at that location?
14     A.  There was a lot of people around all yelling and
15 screaming at us, obscenities, just mad at us, other people
16 thanking us for our services.  It was something out of a
17 movie.  As it got dark, people starting getting on bullhorns
18 and became a little more agitated towards us as more and
19 more of us arrived.
20     Q.  And to begin that day, isn't it true that Congress
21 was in session and Vice President Pence was sitting as the
22 speaker -- or excuse me, the President of the Senate in
23 order to count electoral votes?
24     A.  Yes.
25     Q.  And at 1800 that evening, Vice President Pence was

1   still located on the Capitol grounds, correct?
2        A.   Yes.
3        Q.   At some point, did the authorities where you were
4   located -- and were you also with D.C. National Guard?
5        A.   Yes.
6        Q.   At some point, did the authorities start
7   broadcasting over a loud speaker that the protestors who
8   were still present were not permitted to be there and were
9   violating the Mayor's curfew order?
10       A.   Yes.
11       Q.   For roughly how long was that message broadcast?
12       A.   For about an hour.
13       Q.   And after that hour of broadcasting over the loud
14  speaker, were there still protestors present on Capitol
15  grounds?
16       A.   Yes.
17       Q.   At around 7:25 p.m., after that hour of
18  broadcasting, did you and your unit start to close in on the
19  group in an effort to start making arrests?
20       A.   We did.
21       Q.   Now, before we talk about the specifics of the
22  arrest, did you ultimately arrest an individual named
23  Christopher Michael Alberts?
24       A.   I did.
25       Q.   And was that arrest for illegally carrying a

1      firearm on U.S. Capitol property?

2          A.   It was.

3          Q.   How was Mr. Alberts identified?

4          A.   Initially, verbally, and then confirmed with his

5      driver's license.

6          Q.   Now, let's talk about what led up to the arrest.

7      When you first saw the defendant, where generally on that

8      map was he?

9          A.   He was a little more towards the center, about

10     right there.

11         Q.   And if you want to just make an X there.

12              And the area with the light green shading on that

13     map, that indicates the grounds of the U.S. Capitol complex,

14     correct?

15         A.   Yes.

16         Q.   When you first saw the defendant, was he in a

17     place where you were able to tell whether or not the people

18     around could hear what was being broadcast over the

19     speakers?

20         A.   Yes.

21         Q.   And that was that same message, that they were

22     supposed to vacate the Capitol grounds?

23         A.   Correct.

24         Q.   What was the defendant wearing when you saw him?

25         A.   He was wearing a Camel backpack as well as a black

```
 1   hat.
 2        Q.   And was he also wearing a bulletproof vest?
 3        A.   He was.  It was black in color.
 4        Q.   Black in color, you said?
 5        A.   Yes.
 6        Q.   Did he have a gas mask attached to his backpack?
 7        A.   He did.
 8        Q.   What led you to believe that the defendant was
 9   carrying a firearm?
10        A.   As we began to push the people out, I sighted
11   bullets on his right hip.
12        Q.   And what did you do after you noticed the bullets
13   on his right hip?
14        A.   I moved in behind him and went to nudge him with
15   my -- what we call baton, our big stick, and I nudged him
16   and, while nudging him, I tapped that bulge with the end of
17   my baton.
18        Q.   And what did you notice when you tapped it?
19        A.   I felt resistance and heard a (thumping sound),
20   you know, a tap noise.
21        Q.   And based on your training and experience as a law
22   enforcement officer, was that consistent with what you
23   expected to be a firearm?
24        A.   Yes.
25        Q.   Was the defendant detained at this point?
```

```
1         A.   He was.
2         Q.   And after the defendant was detained, was he
3    searched?
4         A.   Yes.
5         Q.   Was the firearm seated in a hip holster on his
6    right hip where you originally observed that bulge?
7         A.   It was.
8         Q.   Was that a black 9mm Taurus G2c semiautomatic
9    firearm?
10        A.   Yes.
11        Q.   At the time the firearm was seized, did it have a
12   round in the chamber?
13        A.   It did.
14        Q.   And did it have 12 rounds in the magazine?
15        A.   It did.
16        Q.   In addition to the firearm with the magazine and
17   13 rounds of ammunition, was a second 12-round -- magazine
18   with 12 rounds of ammunition found in a separate holster on
19   the defendant?
20        A.   Yes, it was located on his left hip.
21        Q.   So, in total, the defendant had the handgun, two
22   magazines, and 25 rounds of ammunition?
23        A.   Correct.
24        Q.   And just to clarify, when I say seated, those were
25   all contained sort of on his hip in holsters attached to his
```

1  pants?

2      A.   Correct.

3      Q.   Was a records check performed to determine whether

4  the defendant had a license to carry a pistol in the

5  District of Columbia?

6      A.   There was.

7      Q.   And what was the results of that search?

8      A.   He met negative.

9      Q.   After the defendant was arrested, did he provide a

10 statement to law enforcement after being read his rights?

11     A.   He did.

12     Q.   In that statement, did the defendant acknowledge

13 that at the time he was being apprehended, he had heard the

14 previous warnings to leave and was being pushed by officers

15 towards the exit?

16     A.   Yes.

17     Q.   Did the defendant also admit to having the firearm

18 on his person, along with the two magazines and the

19 ammunition?

20     A.   Yes.

21          MR. REGAN.   I don't have any further questions

22 for Officer Haynes, but if any of the grand jurors do?

23          Yes, sir.   If you could just come up to the mike.

24 Sorry.

25          GRAND JUROR.   Did the -- did he express any

1    intent for being present, other than the demonstration?

2             WITNESS.   What do you mean by intent?

3             GRAND JUROR.   Well, intent for use of the firearm
4    or --

5             MR. REGAN.   I'm just going to jump in and reword
6    the question, just to make sure that the transcript is
7    clear.

8             BY MR. REGAN:

9        Q.   During the defendant's interview with law
10   enforcement, did he state that he had brought the firearm
11   with him for personal protection?

12       A.   He did.

13       Q.   And did he also state that it wasn't his intent to
14   use the firearm for any purposes during the protest?

15       A.   Correct.

16            MR. REGAN.   Does that answer your question, sir?

17            GRAND JUROR.   It does.

18            MR. REGAN.   Any other questions from the grand
19   jury?

20            All right.   Hearing none, Officer Haynes, if you
21   want to just step out for me?

22            (Whereupon, the witness was excused at 10:38 a.m.
23   and was subsequently recalled at 12:08 p.m.)

24            MR. REGAN.   Officer Haynes, you can take the
25   stand again.

```
 1                FOREPERSON.  Do I need to swear him in again?
 2                MR. REGAN.  I'm just going to remind him that
 3    he's under oath.
 4                FOREPERSON.  Okay.
 5                MR. REGAN.  Go ahead and take the stand, Officer
 6    Haynes.  I remind you that you are under oath.
 7                BY MR. REGAN:
 8        Q.   Officer Haynes, can you see that on your screen?
 9        A.   Yes.
10        Q.   What I'm going to ask you to do is step down.  You
11    can come to the ELMO.
12        A.   Sorry.
13        Q.   Just for purposes of the record, I'm going to ask
14    you to mark up the map so we can clarify the testimony from
15    earlier.
16             On the map, can you put the number 1 where it is
17    that you were first posted that day on January 6th?
18        A.   Right about here.
19        Q.   And then can you draw a dotted line and then end
20    it with the number 2 where you were posted at around 1800
21    that day?
22                GRAND JUROR.  Can he --
23                MR. REGAN.  If you could just place it up a
24    little bit?
25                GRAND JUROR.  Thank you.
```

1           BY MR. REGAN:

2      Q.   And then, if you could, with an X indicate where

3 it is that you saw the defendant where he was ultimately

4 apprehended, generally, in that vicinity.

5           And just to be certain, that X, that's within the

6 green shaded box that indicates the jurisdictional bounds of

7 the U.S. Capitol?

8      A.   Correct.

9           MR. REGAN.  Does anybody have any questions for

10 the officer, based on that?

11          GRAND JURORS.  No.

12          WITNESS.  You want me to sign that?

13          MR. REGAN.  If you want, just initial --

14          All right.  Officer, that's all the questions I

15 have for you.  If you could just take a step out, I will

16 collect that.

17          GRAND JUROR.  Thank you very much.

18          (Whereupon, the witness was excused at 12:11 p.m.

19 on January 11, 2021.)

20

21

22

23

24

25

***C E R T I F I C A T E***

           We hereby certify that the foregoing is a true and accurate transcript, to the best of our skill and ability, from my notes of this proceeding.

February 24, 2021                     _____
Date                                  Max Mason
                                      Transcriber


COURT REPORTER:                       _____
                                      Roxanne Parsons
                                      Reporter

FREE STATE REPORTING, INC.
Court Reporting  Transcription
D.C. Area 301-261-1902
Balt. & Annap. 410-974-0947