UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA | : |
| | : |
| v. | : Case No. 1:21-cr-26 (CRC) |
| | : |
| CHRISTOPHER MICHAEL ALBERTS, | : |
| Defendant. | : |

### GOVERNMENT'S OPPOSITION TO
### DEFENDANT'S MOTION TO SUPPRESS EVIDENCE

The United States of America respectfully opposes Defendant Christopher Michael Alberts's Motion to Suppress Evidence, ECF No. 74. As the body-worn camera footage of Alberts's January 6, 2021 arrest makes clear, Metropolitan Police Department ("MPD") officers acted well within their statutory and constitutional authority when they recovered a 9-mm pistol with a round of hollow-point ammunition in the chamber and containing a fully-loaded, large-capacity magazine from a holster on Defendant's right hip, and another fully-loaded large-capacity magazine in a separate holster on his left hip. Alberts's arguments for suppression are based on a misstatement or misunderstanding of the events leading to the recovery of the firearm, and impute malicious intent to an officer solely based on a mistake in the transcription of his grand jury testimony. Because there was reasonable suspicion to conduct a pat-down search of Alberts and probable cause to seize the weapon and arrest him for unlawfully possessing a firearm on Capitol grounds, and, alternatively, probable cause to arrest him for violating a curfew order (and conduct a pat-down search incident to arrest), his motion to suppress should be denied.

### BACKGROUND

On January 6, 2021, a large crowd, including Alberts, gathered on restricted Capitol

grounds and forced its way to the exterior façade of the Capitol Building as a joint session of Congress convened to certify the vote count of the Electoral College for the 2020 Presidential Election. ECF No. 1-1 at 1. As discussed elsewhere, Alberts brandished a wooden pallet-type object and used it as a makeshift battering ram as he stormed up the Northwest Steps at 1:54 p.m., charging the police line, making physical contact with the officers, and attempting to break through their position. *See* ECF No. 69 at 3. Some rioters eventually rushed past those officers and forced entry into the Capitol; others remained outside attacking officers and attempting to breach the building elsewhere. *Id.*

As a result of the riot and breach of the Capitol, District of Columbia Mayor Muriel Bowser declared a public emergency, which resulted in a District-wide curfew commencing at 6:00 p.m. on January 6, 2021. *Id.*; *see also* Ex. A (Declaration of Public Emergency – Citywide Curfew). The curfew also was announced on local media, Twitter, and through a cellphone alert called a WEA (Wireless Emergency Alert), which informed individuals with mobile phones in the alert area that a curfew would be in effect beginning at 6:00 p.m. *See* Ex. B, C. At approximately 6:00 p.m., officers broadcast over a loudspeaker that the rioters remaining on Capitol grounds were violating the Mayor's curfew order. *Id.* They continued to broadcast that message for approximately one hour. *Id.* Alberts, among others, knew of the curfew, but did not leave. *See* Ex. D (https://archive.org/details/jwL4L5gsoQGRwto4a at 13:49) ("like we had to leave the Capitol at 6:00 and they were done, but now they're going back and counting votes").

At around 7:25 p.m., MPD Officer Dallan Haynes was among a group of uniformed officers enforcing the curfew by escorting individuals past an MPD line in a parking lot on Capitol grounds. *Id.* MPD body-worn camera footage shows the circumstances surrounding Alberts's arrest. *See* Ex. E (Ofc. Haynes body-worn camera footage); *see also* Ex. F. (Sgt. Robinson body-

worn camera footage). As rioters begrudgingly moved past, one officer states, "you've got to go or you're getting arrested. They gave the order. Why are you walking towards me? Get out!" Ex. E at 4:24. Soon, Alberts can be seen walking by. *Id.* at 4:35. Alberts or another individual states, "We're going bro," an officer responds, "Doesn't look like it. Get out!" and Alberts replies, "You ain't gotta clobber me. I'm moving." *Id.* at 4:42. Then, just five seconds later, the officer reaches towards Alberts, and Alberts is quickly taken to the ground. *Id.* at 4:47; *see also* Ex. F at 0:16.

> Alberts:  What are you … fucking … ow!
>
> Officer Haynes:  Gun! Gun!
>
> Alberts:  Fuck!
>
> Officer Haynes:  Gun right here! Right here! Gun!

Ex. E at 4:47 to 5:03.

The officers then recovered the loaded firearm from Alberts. Officer Haynes repeatedly described the events leading up to Alberts's arrest, beginning just a few minutes after the incident:

> [Officer Haynes]:  As I was moving him out, I saw a bulge on his hip. And as I was moving, my baton hit, and I heard a metal, and I told the guys behind me, he's got a gun on him, and I took him down.

*Id.* at 8:21 – 8:32.

> [Officer Haynes]:  As we were clearing everyone out, he was one of the last to leave, and I saw a bulge on his hip. And as I was … So I noticed a bulge on his hip and as I was moving him out, holding my baton, knocked it and felt metal and told the guys, do a take down on him, we brought him to the ground, and got a gun off of him.

*Id.* at 11:03 – 11:24.

> [Officer Haynes]:  We were clearing everyone out, from right here, and he was one of the last to leave, and as I was moving him out, I saw a bulge on his right hip, moved my baton, moved him, knocked it, felt metal, told the other guys, "hey he's got a gun," we do a take down, got the gun off of him.
>
>             ***
>
> [Other Officer]:  Had they already been warned to leave at the time?

>[Officer Haynes]:  Yes.

*Id.* at 12:27 – 12:52.

>[Officer Haynes]:  As I moved him out, I used my baton, moved him, and knocked the right side, and it made a hard sound, so I did a take down on him.

*Id.* at 13:56 – 14:07.

Officer Haynes provided the same description of Alberts's arrest in a January 7, 2021 affidavit supporting criminal charges. *See* ECF No. 1-1 at 2. He explained,

>As I approached ALBERTS from his rear, I noticed a bulge on ALBERTS' right hip. Based on my training and experience, I recognized the bulge was consistent with that of a hand gun. While pushing ALBERTS towards the line, I tapped the bulge with my baton and felt a hard object that I immediately recognized to be a firearm.

*Id.* Officer Haynes testified to the same events before the grand jury on January 11, 2021. *See* Ex. G at 8 (Corrected Grand Jury Transcript) ("As we began to push the people out, I saw a bulge on his right hip … I moved in behind him and went to nudge him with my – what we call baton, our big stick, and I nudged him and, while nudging him, I tapped that bulge with the end of my baton … I felt resistance and heard a (thumping sound), you know a tap noise"); *see also* Ex. H (Declaration of Jacqueline Bryant).

The presence of a bulge on Alberts's right hip, consistent with the shape of a handgun, is further confirmed by open-source video taken prior to Alberts's arrest. As Alberts heckles a line of uniformed officers while speaking into a bullhorn, a bulge is apparent. *See* Ex. D at 13:12 – 16:10.



## ARGUMENT

### I. THE MOTION TO SUPPRESS EVIDENCE SHOULD BE DENIED.

The physical evidence seized from the defendant's person – in particular, the fully loaded gun from his hip holster – should not be suppressed, because the officers had reasonable articulable suspicion to detain and frisk Alberts (or, as Officer Haynes did here, tap his right side with a baton). The Fourth Amendment provides that "[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause." U.S. CONST. amend. IV. The Fourth Amendment requires that "all seizures, even ones involving 'only a brief detention short of traditional arrest,' be founded upon reasonable, objective justification." *United States v. Gross*, 784 F.3d 784, 786 (D.C. Cir. 2015) (quoting *United States v. Brignoni-Ponce*, 422 U.S. 873, 878 (1975)). A seizure occurs "only when the officer, by

5

means of physical force or show of authority, has in some way restrained the liberty of a citizen." *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968). A seizure of a person only occurs either when (1) the person is restrained by police use of willful physical force intended to effectuate restraint; or (2) the person actually submits to a display or show of police authority sufficient to cause a reasonable person to believe that he was not free to terminate the encounter with the police. *See California v. Hodari D.*, 499 U.S. 621, 626, 628-29 (1991) (seizure under the Fourth Amendment occurs either upon "a laying on of hands or application of physical force to restrain movement" or actual submission to a show of authority); *Brower v. Inyo*, 489 U.S. 593, 596-97 (1989) (violation of Fourth Amendment occurs when there is an "intentional acquisition of physical control," and a "Fourth Amendment seizure . . . [occurs] only when there is a governmental termination of freedom of movement through means intentionally applied").

Here, Alberts was among a group of people who had been unlawfully present on restricted Capitol grounds, and was unlawfully violating the Mayor's curfew order when he walked past Officer Haynes. Officer Haynes observed a bulge on Alberts's right hip. An officer may frisk or pat down an individual when the officer has a "reasonable belief based on specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant the officer in believing that the suspect is dangerous and the suspect may gain immediate control of weapons." *Michigan v. Long*, 463 U.S. 1032, 1049-50 (1983) (internal quotation marks omitted) (quoting *Terry*, 392 U.S. at 21). "The reasonableness of a frisk ... depends on 'whether a reasonably prudent [officer] in the circumstances would be warranted in the belief that his safety or that of others was in danger.'" *United States v. Washington*, 559 F.3d 573, 576 (D.C. Cir. 2009) (quoting *Long*, 463 U.S. at 1050) (alteration in original). The analysis is based on the totality of the circumstances. *See Illinois v. Wardlow*, 528 U.S. 119, 123 (2000). This more limited type of stop

and search for weapons – known as a "*Terry* stop" or "*Terry* frisk" – "require[s] only that officers have a 'minimal level of objective justification.'" *United States v. Goddard*, 491 F.3d 457, 460 (D.C. Cir. 2007) (quoting *INS v. Delgado*, 466 U.S. 210, 217 (1984)). Reasonable suspicion, the standard for a *Terry* stop or frisk, is "considerably less than proof of wrongdoing by a preponderance of the evidence" and "obviously less demanding than that for probable cause." *United States v. Sokolow*, 490 U.S. 1, 7 (1989).

As this Court has explained, an officer is justified in conducting a brief frisk of an individual's waistband area if he observes an abnormal bulge. *See United States v. Veney*, 444 F. Supp. 3d 56, 66 (D.D.C. 2020), *aff'd*, 45 F. 4th 403 (D.C. Cir. 2022). Here, once Officer Haynes noticed the bulge on Alberts's right side, Officer Haynes had reasonable articulable suspicion to believe that the defendant was armed and dangerous, and could thus be lawfully detained and frisked. *Id.* That is, the bulge on Alberts's right hip provided reasonable suspicion to believe that Alberts was "dangerous and … [could] gain immediate control of a weapon." *Veney*, 444 F. Supp. 3d at 66 (quoting *Long*, 463 U.S. at 1049); *see also Pennsylvania v. Mimms*, 434 U.S. 106, 111-12 (1977) (regarding the "propriety of the search once the bulge in the jacket was observed. . . . Under the standard enunciated in [*Terry*, 392 U.S. 1], … there is little question the officer was justified. The bulge in the jacket permitted the officer to conclude that [the defendant] was armed and thus posed a serious and present danger to the safety of the officer. In these circumstances, any man of 'reasonable caution' would likely have conducted the 'pat down.'").

Where an officer feels something during the frisk or pat down (without having manipulated it) that the officer has probable cause to believe is contraband, the officer may seize the contraband. *Minnesota v. Dickerson*, 508 U.S. 366, 373 (1993) (the "plain touch doctrine"). In this case, Officer Haynes felt an object when he tapped the bulge on Alberts's right side. Based on the feel of the

7

object and the sound his baton made when he tapped it, Officer Haynes believed it to be a gun. This provided probable cause for police to search the defendant's waistband, seize the gun, and arrest the defendant. Therefore, the seizure of the evidence on the defendant's person was lawful and should not be suppressed.

Even ignoring the presence of the bulge on Alberts's right hip, the MPD officers had probable cause to arrest Alberts for violating the Mayor's curfew order. Alberts was still in the vicinity of the Capitol hours after the Capitol Building had been breached by violent rioters. Despite the loudspeaker warnings, text messages, and verbal admonitions provided by the MPD officers, Alberts still was present at a Capitol parking lot nearly 90 minutes after the curfew went into effect. Even if he was in the process of leaving the vicinity, his presence provided sufficient probable cause for his arrest. *See Tinius v. Choi*, No. 21-cv-907 (ABJ), 2022 WL 899238, at *17 (D.D.C. Mar. 28, 2022). It then was lawful for the officers to conduct a search incident to arrest, at which time the firearm would have been discovered. *See United States v. Robinson*, 414 U.S. 218, 234 (1973). Accordingly, the firearm would be admissible on that alternative basis. *See United States v. Holmes,* 505 F.3d 1288, 1293 (D.C. Cir. 2007) (citing *Nix v. Williams*, 467 U.S. 431, 444 n.5 (1984)).

## II. ALBERTS'S ALLEGATION OF EXCESSIVE FORCE DOES NOT PROVIDE A BASIS FOR SUPPRESSION

Alberts urges that the search that led to the discovery of his firearm and additional extended magazine was "conducted with excessive force (including potentially deadly force): a savage, brutal, unannounced, unprovoked baton blow to the back of Alberts's head." ECF No. 74 at 1. The body-worn camera footage of Officer Haynes and Sergeant Robinson does not support that description. Although it is not clear whether Officer Haynes or any other officer struck Alberts during the brief moment when Alberts was taken to the ground, Alberts does say to the officers

8

after he was taken to the ground that he was "whacked on the head," and asks, "Was a whack in the head necessary, though?" Ex. F at 1:16 & 1:53. However, there is no indication that Alberts was "brutally bludgeoned on the head by Officer Haynes," ECF No. 74 at 12, or otherwise subjected to excessive force. At no point does Alberts appear to be "stunned on the ground," as he now contends. *Id. See* Ex. E and Ex. F. No head injury is visible in the body-worn camera footage, Alberts did not complain about any head injury in any further body-worn camera footage, and Alberts did not allege the officers used improper force when he spoke to MPD officers in a voluntary interview later that evening. No head injuries were visible during that recorded interview.

Any use of force by the officers here cannot serve as a basis for the suppression of Alberts's loaded firearm. Although the issue does not appear to have been considered by the D.C. Circuit Court of Appeals, the Seventh Circuit determined that the use of excessive force does not require the suppression of evidence where the use of force did not itself cause the discovery of the evidence at issue. *See United States v. Watson*, 558 F. 3d 702, 705 (7th Cir. 2009); *but see United States v. Edwards*, 666 F.3d 877, 886-87 (4th Cir. 2011) (applying exclusionary rule where the government did not establish inevitable discovery and evidence was obtained using dangerous and sexually invasive search).

In any case, the use of force here was not improper. The Supreme Court has recognized that "the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham v. Connor*, 490 U.S. 386, 396 (1989). Thus, a court reviewing the reasonableness of the use of force must look to "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id*. at 397. The factors to be

9

considered include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id*. at 396; *see also United States v. Leake*, No. 19-cr-194 (KBJ), 2020 WL 3489523, at *1 (D.D.C. June 26, 2020).

Any force applied to Alberts while the officers were recovering the gun from his side holster was reasonable given the circumstances. *See Graham*, 490 U.S. at 396. Officers were clearing the Capitol grounds after a violent breach of the Capitol Building and enforcing a curfew that had been in effect for 90 minutes. Alberts, a large man wearing, among other things, a radio kit and a body armor vest containing metal plates, was reasonably believed to be carrying a weapon in a crowd, and Officer Haynes yelled, "Gun! Gun!" to alert the other officers. *See* Ex. E at 4:47. The alleged baton blow – which cannot be seen on the body-worn camera footage of Officer Haynes or Sergeant Robinson – would have been momentary, and limited to the time the officers were attempting to gain control of Alberts and recover the deadly weapon. Any such contact did not lead to the discovery of the firearm, but instead was incident to the recovery of that gun.*

### III. ALBERTS'S CHALLENGE TO OFFICER HAYNES'S GRAND JURY TESTIMONY DOES NOT JUSTIFY SUPPRESSION

Alberts also contends that suppression is appropriate because Officer Haynes allegedly "recognized that his search and seizure of Alberts on Jan. 6 was illegal, and therefore, Officer Haynes *changed his story* between Jan. 7 and Jan. 11." ECF No. 74 at 5 (emphasis in original). Alberts urges that "the obvious purpose of Haynes' change of testimony was to try to trick this Court into upholding this unlawful search and seizure." *Id.* at 8. He is incorrect on both counts.

The video evidence shows – and Officer Haynes repeatedly has explained – that Officer

---

* Regardless, a defendant's criminal prosecution is not the proper procedural vehicle to advance an excessive force claim. Although such a claim would lack merit for the reasons given in the main text, Alberts should bring any such claim under 42 U.S.C. § 1983.

Haynes observed a bulge on Alberts's right hip, nudged Alberts with his baton, and recognized the feel and sound of a firearm (which is unlawful to carry on Capitol grounds). The single answer that Alberts cites as evidence that Officer Haynes intended to "trick this Court" was, instead, transcribed incorrectly. *See* Exs. G & H. Officer Haynes actually testified that he "*saw a bulge*" on Alberts's right hip. Ex. H at ¶ 4. Indeed, the original grand jury transcript otherwise was consistent with Haynes's prior statements and affidavit. For example, in response to the question initially transcribed as "what did you do after you noticed the *bullets* on his right hip," Officer Haynes responded, in part, "I tapped *that bulge* with the end of my baton." *See* ECF No. 74-1 at 8. Later, Officer Haynes confirmed that the firearm was "seated in a hip holster on [Alberts's] right hip *where [he] originally observed that bulge*." *Id.* at 9. The magazine, which contained the additional bullets, was found in a separate holster on Alberts's *left* hip. *Id.* There simply is no evidence that Officer Haynes testified untruthfully. Accordingly, the circumstances surrounding the recovery of Alberts's firearm do not call for suppression of any evidence.

## CONCLUSION

For the reasons stated above and for any other reason presented at the hearing or in the record, the United States requests that the defendant's Motion to Suppress be DENIED.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
DC Bar No. 481052

*/s/ Jordan A. Konig*
JORDAN A. KONIG
Supervisory Trial Attorney, Tax Division,
U.S. Department of Justice
Detailed to the U.S. Attorney's Office
P.O. Box 55, Washington, D.C. 20044
202-305-7917 (v) / 202-514-5238 (f)
Jordan.A.Konig@usdoj.gov
