**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| | : | |
| **v.** | : | **Case No. 1:21-cr-26 (CRC)** |
| | : | |
| **CHRISTOPHER MICHAEL ALBERTS,** | : | |
| | : | |
| **Defendant.** | : | |

**GOVERNMENT'S OPPOSITION TO DEFENDANT'S**
**MOTION TO TRANSFER VENUE**

Defendant Christopher Michael Alberts, who is charged with committing nine crimes at

the U.S. Capitol on January 6, 2021, has moved to transfer venue in this case to "another

jurisdiction," which apparently rests in "Nebraska or North Dakota." *See* ECF No. 86 at 1, 25.

Alberts fails to establish that he "cannot obtain a fair and impartial trial" in this district, Fed. R.

Crim. P. 21(a), and, accordingly, the Court should deny his motion.[1]

---

[1] Every judge of this Court to have ruled on a motion for change of venue in a January 6
prosecution has denied the motion. *See United States v. Gillespie*, No. 22-cr-60, ECF No. 41
(D.D.C. Nov. 29, 2022) (BAH); *United States v. Bender*, No. 21-cr-508, ECF No. 78 (D.D.C. Nov.
22, 2022) (BAH); *United States v. Sandoval*, No. 21-cr-195, ECF No. 88 (Nov. 18, 2022) (TFH);
*United States v. Nordean, et al.,* No. 21-cr-175, ECF No. 531 (Nov. 9, 2022) (TJK); *United States
v. Eicher*, No. 22-cr-38, 2022 WL 11737926 (D.D.C. Oct. 20, 2022) (CKK); *United States v.
Nassif*, No. 21-cr-421, 2022 WL 4130841 (D.D.C. Sep. 12, 2022) (JDB); *United States v. Brock*,
No. 21-cr-140, 2022 WL 3910549 (D.D.C. Aug. 31, 2022) (JDB); *United States v. Jensen*, No. 21-
cr-6 (Aug. 26, 2022) (Minute Entry) (TJK); *United States v. Williams*, No. 21-cr-618, ECF No. 63
(D.D.C. Aug. 12, 2022) (ABJ); *United States v. Herrera*, No. 21-cr-619, ECF No. 54 (D.D.C.
August 4, 2022) (BAH); *United States v. Garcia*, No. 21-cr-129, 2022 WL 2904352 (D.D.C. July
22, 2022) (ABJ); *United States v. Rusyn, et al.*, No. 21-cr-303 (July 21, 2022) (Minute Entry)
(ABJ); *United States v. Bledsoe*, No. 21-cr-204 (July 15, 2022) (Minute Order) (BAH); *United
States v. Rhodes, et al.,* No. 22-cr-15, 2022 WL 2315554 (D.D.C. June 28, 2022) (APM); *United
States v. Williams*, No. 21-cr-377 (June 10, 2022) (Minute Entry) (BAH); *United States v.
McHugh*, No. 21-cr-453 (May 4, 2022) (Minute Entry) (JDB); *United States v. Hale-Cusanelli*,
No. 21-cr-37 (Apr. 29, 2022) (Minute Entry) (TNM); *United States v. Webster*, No. 21-cr-208,
ECF No. 78 (D.D.C. Apr. 18, 2022) (APM); *United States v. Alford*, 21-cr-263, ECF No. 46
(D.D.C. Apr. 18, 2022) (TSC); *United States v. Brooks*, No. 21-cr-503, ECF No. 31 (D.D.C. Jan.
24, 2022) (RCL); *United States v. Bochene*, 579 F. Supp. 3d 177 (D.D.C. 2022) (RDM); *United
States v. Fitzsimons*, No. 21-cr-158 (D.D.C. Dec. 14, 2021) (Minute Order) (RC); *United States v.*

**BACKGROUND**

On January 6, 2021, a Joint Session of the United States House of Representatives and the United States Senate convened to certify the vote of the Electoral College of the 2020 U.S. Presidential Election.  While the certification process was proceeding, a large crowd gathered outside the United States Capitol, entered the restricted grounds, and forced entry into the Capitol building.  As a result, the Joint Session and the entire official proceeding of the Congress was halted until law enforcement was able to clear the Capitol of hundreds of unlawful occupants and ensure the safety of elected officials.

That day, Alberts arrived on Capitol grounds prepared for battle.  He wore a bullet proof vest containing metal plates, camouflage fatigues, a gas mask, a tactical radio, and holsters containing a fully loaded firearm and magazines with 25 rounds of hollow-point ammunition. Alberts brandished a wooden pallet-type object and used it as a makeshift battering ram as he stormed up the Northwest Steps at 1:54 p.m., charging the police line, making physical contact with the outnumbered officers, and attempting to break through their position.  *See* ECF No. 69 at 3.  Some rioters eventually rushed past those officers and forced entry into the Capitol; others remained outside attacking officers and attempting to breach the building elsewhere.  *Id.*  Alberts remained on restricted Capitol grounds throughout the afternoon, yelling at officers that the Constitution permitted the rioters to "overthrow [the] government and reinstate a new government for the people," throwing a water bottle at officers, and later threatening that the assembled mob "are going to come back even more, and we're not coming back peacefully, and we're not coming back unarmed."  Still present near the Capitol after a citywide curfew had gone into effect, Alberts

---

*Reffitt*, No. 21-cr-32 (D.D.C. Oct. 15, 2021) (Minute Order) (DLF); *United States v. Caldwell*, 21-cr-28, ECF No. 415 (D.D.C. Sept. 14, 2021) (APM).

was found in possession of a firearm and arrested at around 7:25 p.m.

Based on his actions on January 6, 2021, the defendant is charged with nine crimes: (1) civil disorder; (2) assaulting, resisting, or impeding certain officers; (3) entering and remaining on restricted grounds with a deadly weapon; (4) disorderly or disruptive conduct within Capitol grounds with a deadly weapon; (5) engaging in physical violence in restricted grounds; (6) unlawful possession of a firearm on Capitol grounds; (7) disorderly conduct within Capitol grounds; (8) physical violence within Capitol grounds; and (9) carrying a pistol without a license. These offenses arise from his assault of officers from the U.S. Capitol Police on the Northwest Steps to the Capitol Building and unlawfully carrying a loaded handgun and 25 rounds of ammunition on Capitol grounds.  ECF No. 34.

Alberts now moves for a change of venue.  *See* ECF No. 86.  He contends that prejudice should be presumed in this district for several reasons: (1) pretrial publicity surrounding the events of January 6; (2) the characteristics of the D.C. jury pool; (3) the results of surveys of registered voters; and (4) the purported frequency of search terms related to the January 6, 2021 riot by D.C. residents.  Each of the defendant's arguments is without merit, and his motion should be denied.

## **ARGUMENT**

The Constitution provides that "[t]he trial of all Crimes . . . shall be held in the State where the said Crimes shall have been committed."  U.S. Const. Art. III, § 2, cl. 3.  The Sixth Amendment similarly guarantees the right to be tried "by an impartial jury of the State and district wherein the crime shall have been committed."  U.S. Const. amend. VI.  These provisions provide "a safeguard against the unfairness and hardship involved when an accused is prosecuted in a remote place." *United States v. Cores*, 356 U.S. 405, 407 (1958).  Transfer to another venue is constitutionally required only where "extraordinary local prejudice will prevent a fair trial."  *Skilling v. United*

*States*, 561 U.S. 358, 378 (2010); *see* Fed. R. Crim. P. 21(a) (requiring transfer to another district if "so great a prejudice against the defendant exists in the transferring district that the defendant cannot obtain a fair and impartial trial there").

The primary safeguard of the right to an impartial jury is "an adequate voir dire to identify unqualified jurors." *Morgan v. Illinois*, 504 U.S. 719, 729 (1992) (italics omitted). Thus, as other judges of this Court have unanimously determined in the context of January 6 cases, the best course when faced with a pretrial publicity claim is ordinarily "to proceed to voir dire to ascertain whether the prospective jurors have, in fact, been influenced by pretrial publicity." *United States v. Campa*, 459 F.3d 1121, 1146 (11th Cir. 2006) (en banc). "[I]f an impartial jury actually cannot be selected, that fact should become evident at the voir dire." *United States v. Haldeman*, 559 F.2d 31, 63 (D.C. Cir. 1976) (en banc). And, after voir dire, "it may be found that, despite earlier prognostications, removal of the trial is unnecessary." *Jones v. Gasch*, 404 F.2d 1231, 1238 (D.C. Cir. 1967).

## I.      The Pretrial Publicity Related to January 6 Does Not Support a Presumption of Prejudice in This District.

The defendant contends that a change of venue is warranted based on pretrial publicity related to January 6 and those accused of wrongdoing at the Capitol that day. ECF No. 86 at 3-5, 8-9. But "[t]he mere existence of intense pretrial publicity is not enough to make a trial unfair, nor is the fact that potential jurors have been exposed to this publicity." *United States v. Childress*, 58 F.3d 693, 706 (D.C. Cir. 1995); *see Murphy v. Florida*, 421 U.S. 794, 799 (1975) (juror exposure to "news accounts of the crime with which [a defendant] is charged" does not "alone presumptively deprive[] the defendant of due process"). Indeed, "every case of public interest is almost, as a matter of necessity, brought to the attention of all the intelligent people in the vicinity, and scarcely any one can be found among those best fitted for jurors who has not read or heard of it, and who

4

has not some impression or some opinion in respect to its merits." *Reynolds v. United States*, 98 U.S. 145, 155-56 (1878).  Thus, the "mere existence of any preconceived notion as to the guilt or innocence of an accused, without more," is insufficient to establish prejudice.  *Irvin*, 366 U.S. at 723.  "It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court."  *Id.*

Contrary to Alberts's contention, federal courts do not "regularly grant and uphold motions to change venue due to pretrial publicity."  ECF No. 86 at 4.  "Notably, only once has the Supreme Court found a presumption of prejudice; in *Rideau v. Louisiana*[.]"  *United States v. Brock*, 2022 WL 3910549, at *6.  There, the Supreme Court recognized that only in a narrow category of cases is prejudice presumed to exist without regard to prospective jurors' answers during voir dire.  *See Rideau v. Louisiana*, 373 U.S. 723 (1963).  In *Rideau*, the defendant's confession—obtained while he was in jail and without an attorney present—was broadcast three times shortly before trial on a local television station to audiences ranging from 24,000 to 53,000 individuals in a parish of approximately 150,000 people.  *Id.* at 724 (majority opinion), 728-29 (Clark, J., dissenting).  The Court concluded that, "to the tens of thousands of people who saw and heard it," the televised confession "in a very real sense *was* Rideau's trial—at which he pleaded guilty to murder."  *Rideau*, 373 U.S. at 726.  Therefore, the Court "d[id] not hesitate to hold, without pausing to examine a particularized transcript of the voir dire," that these "kangaroo court proceedings" violated due process.  *Id.* at 726-27.

Since *Rideau*, the Supreme Court has emphasized that a "presumption of prejudice . . . attends only the extreme case," *Skilling*, 561 U.S. at 381, and the Court has repeatedly "held in other cases that trials have been fair in spite of widespread publicity," *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 554 (1976).  In the half century since *Rideau*, the Supreme Court has never

presumed prejudice based on pretrial publicity. *Brock*, 2022 WL 3910549, at *6; *but see Estes v. Texas*, 381 U.S. 532 (1965) (presuming prejudice based on media interference with courtroom proceedings); *Sheppard v. Maxwell*, 384 U.S. 333 (1966) (same).  In fact, courts have declined to transfer venue in some of the most high-profile prosecutions in recent American history.  *See In re Tsarnaev*, 780 F.3d 14, 15 (1st Cir. 2015) (capital prosecution of Boston Marathon bomber); *Skilling*, 561 U.S. at 399 (fraud trial of CEO of Enron Corporation); *United States v. Yousef*, 327 F.3d 56, 155 (2d Cir. 2003) (trial of participant in 1993 World Trade Center bombing); *United States v. Moussaoui*, 43 F. App'x 612, 613 (4th Cir. 2002) (unpublished) (terrorism prosecution for conspirator in September 11, 2001 attacks); *Haldeman*, 559 F.2d at 70 (Watergate prosecution of former Attorney General John Mitchell and other Nixon aides).

In *Skilling*, the Supreme Court considered several factors in determining that prejudice should not be presumed where former Enron executive Jeffrey Skilling was tried in Houston, where Enron was based.  *Skilling*, 561 U.S. at 382-83.  First, the Court considered the "size and characteristics of the community."  *Id.* at 382.  Unlike *Rideau*, where the murder "was committed in a parish of only 150,000 residents," Houston was home to more than 4.5 million people eligible for jury service.  *Id.* at 382.  Second, "although news stories about Skilling were not kind, they contained no confession or other blatantly prejudicial information of the type readers or viewers could not reasonably be expected to shut from sight."  *Id.*  Third, "over four years elapsed between Enron's bankruptcy and Skilling's trial," and "the decibel level of media attention diminished somewhat in the years following Enron's collapse."  *Id.* at 383.  "Finally, and of prime significance, Skilling's jury acquitted him of nine insider-trading counts," which undermined any "supposition of juror bias."  *Id.*

Although these *Skilling* factors are not exhaustive, courts have found them useful when

considering claims of presumptive prejudice based on pretrial publicity.  *See, e.g.*, *In re Tsarnaev*, 780 F.3d at 21-22; *United States v. Petters*, 663 F.3d 375, 385 (8th Cir. 2011).  And contrary to the defendant's contention, those factors do not support a presumption of prejudice in this case.

### A.      Size and characteristics of the community

The defendant does not meaningfully address the first *Skilling* factor, which is the size and characteristics of the community.  Although the District of Columbia is smaller than Houston, where the *Skilling* court found no presumption of prejudice, the District's population is nearly 700,000.  Although this District may be smaller than most other federal judicial districts, it has a larger population than two states (Wyoming and Vermont), and more than four times as many people as the parish in *Rideau*.  The relevant question is not whether the District of Columbia is as populous as the Southern District of Texas in *Skilling*, but whether it is large enough that an impartial jury can be found.  In *Mu'Min v. Virginia*, 500 U.S. 415, 429 (1991), the Court cited a county population of 182,537 as supporting the view than an impartial jury could be selected.  And *Skilling* approvingly cited a state case in which there was "a reduced likelihood of prejudice" because the "venire was drawn from a pool of over 600,000 individuals."  *Skilling*, 561 U.S. at 382 (quoting *Gentile v. State Bar of Nev.*, 501 U.S. 1030, 1044 (1991)).  "While it is not the largest district in the country, the size of the Washington, D.C. jury pool weighs against transfer in this instance."  *Garcia*, 2022 WL 2904352, at *8 (considering motion to transfer venue in a January 6 case).  There is simply no reason to believe that, out of an eligible jury pool of nearly half a million, "12 impartial individuals could not be empaneled."  *Skilling*, 561 U.S. at 382.

### B.      Nature of the pretrial publicity

Contrary to Alberts's claim, it is untrue that "[a]ll news sources have given close scrutiny to the defendant's arrest and to all subsequent events in this case, in an attempt to secure

defendant's conviction."  ECF No. 86 at 8.  Although his conduct on January 6 and subsequent prosecution received a smattering of attention in the local and national press, that coverage was not extensive and Alberts's case does not involve a "confession or other blatantly prejudicial information of the type readers or viewers could not reasonably be expected to shut from sight." *Skilling*, 561 U.S. at 382.  Even news stories that are "not kind," *Skilling*, 561 U.S. at 382, or are "hostile in tone and accusatory in content," *Haldeman*, 559 F.2d at 61, do not alone raise a presumption of prejudice.  As in *Skilling* and *Haldeman*, the news coverage of Alberts is "neither as inherently prejudicial nor as unforgettable as the spectacle of Rideau's dramatically staged and broadcast confession."  *Id.*  Indeed, although any media characterizations of Alberts would be inadmissible, the photos and videos of Alberts that have been disseminated would be both admissible and highly relevant at trial.  *Compare Sheppard*, 384 U.S. at 360 (noting that information reported by the media was "clearly inadmissible" and that "[t]he exclusion of such evidence in court is rendered meaningless when news media make it available to the public"), *with Murray v. Schriro*, 882 F.3d 778, 805 (9th Cir. 2018) ("There was no inflammatory barrage of information that would be inadmissible at trial.  Rather, the news reports focused on relaying mainly evidence presented at trial."); *Henderson v. Dugger*, 925 F.2d 1309, 1314 (11th Cir. 1991) ("[B]ecause we have found [the defendant's] confessions were admissible, the damage if any from the [pretrial] publicity is negligible.").

The defendant also contends that the nationally televised hearings of the U.S. House of Representatives Select Committee to Investigate the January 6th Attack on the United States Capitol ("Select Committee") support a change of venue.  *See* ECF No. 86 at 9.  The defendant points out that the televised coverage of the first hearing on June 9, 2022 was simulcast at a public

park in D.C.[2]  *Id.*  But exposure of the Congressional investigation into January 6 was not limited to D.C.  Instead, the hearings were carried on national networks across the country.  In similar circumstances, the D.C. Circuit affirmed the denial of a change of venue where the defendants— who were high-ranking members of the Nixon administration—complained that they were prejudiced by news coverage of the Watergate-related hearings.  *Haldeman*, 559 F.2d at 62-64 & nn.35, 43.  The Court of Appeals observed that "a change of venue would have been of only doubtful value" where the "network news programs and legislative hearings" related to Watergate were "national in their reach."  *Id.* at n.43.

Moreover, the 20 million viewers of the June 9, 2022 hearing represent only about six percent of the total U.S. population.  The defendant has not pointed to any evidence that D.C. residents were more likely to have watched that hearing than citizens in other parts of the country. And even if D.C. residents tuned in at a higher rate, it is still likely that a substantial majority of D.C. residents did not watch the hearings, much less attend a public viewing.  Moreover, the hearings focused on the events of January 6 as a whole, not on the actions of Alberts.  There is no reason to believe that coverage of the hearings created in D.C. such a degree of bias against this particular defendant that an impartial jury cannot be selected.

Additionally, a careful voir dire—rather than a change of venue—is the appropriate way to address potential prejudice from the Select Committee hearings.  "[V]oir dire has long been recognized as an effective method of routing out [publicity-based] bias, especially when conducted in a careful and thoroughgoing manner."  *In re Nat'l Broadcasting Co.*, 653 F.2d 609, 617 (D.C.

---

[2] Despite Alberts's contention, there is no evidence that the "city government sponsor[ed] a viewing of the hearings at a public park."  *Id.*  The source of Alberts's claim is a caption from a photo on the website, "the Gateway Pundit," that states, in part, "Washington DC residents watch the J6 Misinformation Unselect Committee Hearing on a giant screen at a public park.  The potential jury seem hypnotized by the propaganda."

Cir. 1981).  After a careful voir dire, this Court can select a jury from those residents who either did not watch the hearings or who, despite having watched the hearing, give adequate assurances of their impartiality.  *See Haldeman*, 559 F.3d at 62 n.35 (rejecting claim of prejudice even though "several jurors" had "seen portions of the televised Senate hearings" related to Watergate).

The defendant asserts that a fair trial cannot be had in D.C. because of the volume of news coverage of January 6.  ECF No. 86 at 9.  He contends, incorrectly and without support, that "it appears that virtually every household in the District of Columbia, and thus virtually every prospective juror, has been exposed to a constant barrage of inflammatory accounts, detailing in a manner highly prejudicial to the defendant every occurrence in this matter that has arisen since the defendant's arrest."  *Id.*  Alberts specifies no local coverage of his alleged crimes at all.  But even "massive" news coverage of a crime does not require prejudice to be presumed.  *Haldeman*, 559 F.2d at 61.  And a comparatively small percentage of the news coverage of January 6 has focused on Alberts.  Unlike most cases involving pretrial publicity, where the news coverage focuses on the responsibility of a single defendant (as in *Rideau* or *Tsarnaev*) or small number of co-defendants (as in *Skilling* and *Haldeman*), the events of January 6 involved thousands of participants and have so far resulted in charges against more than 900 people.  The Court can guard against any spillover prejudice from the broader coverage of January 6 by conducting a careful voir dire and properly instructing the jury about the need to determine a defendant's individual guilt.

And, in any event, any threat of such spillover prejudice is not limited to Washington, D.C. because much of the news coverage of January 6 has been national in scope.  *See Haldeman*, 559 F.2d at 64 n.43 (observing that "a change of venue would have been of only doubtful value" where much of the news coverage was "national in [its] reach" and the crime was of national interest);

*United States v. Bochene*, No. 21-cr-418-RDM, 2022 WL 123893, at *3 (D.D.C. Jan. 12, 2022) ("The fact that there has been ongoing media coverage of the breach of the Capitol and subsequent prosecutions, both locally and nationally, means that the influence of that coverage would be present wherever the trial is held." (internal quotation marks omitted)).  Indeed, many of the news stories that identify Alberts were published by media organizations with national circulation, not purely local outlets.  *See, e.g.,* Andrew Egger & Audrey Fahlberg, *The Storming of the Capitol: Trump Supporters Pushed Past Barriers and Police Officers to Disrupt Congress' Counting of the Electoral College Votes,* Jan. 7, 2021, https://thedispatch.com/p/the-storming-of-the-capitol?utm_source=url (Alberts quoted as stating, "the people that were here today are going to come back even more, and we're not coming back peacefully, and we're not coming back unarmed.");
*Maryland News: Alleged U.S. Capitol Rioter Christopher Alberts To Appear In Court Thursday*, Jan. 28, 2021, https://www.cbsnews.com/baltimore/news/alleged-u-s-capitol-rioter-christopher-albert-to-appear-in-court-thursday/; Hannah Rabinowitz, *Maryland Man Pleads Not Guilty to Bringing Loaded Gun to Capitol Insurrection,* Feb. 25, 2021, https://www.cnn.com/2021/02/25/politics/capitol-insurrection-loaded-handgun/index.html.  As a poll cited by Alberts demonstrates, the number of potential jurors exposed to "[a] lot" of news coverage of January 6 differs only slightly between Washington, D.C. (33%) and Atlanta (30%). *United States v. Garcia*, No. 21-cr-129, 2022 WL 2904352, at *14 (D.D.C. July 22, 2022) (ABJ).  Thus, the nature and extent of the pretrial publicity do not support a presumption of prejudice.

### C.    Passage of time before trial

In *Skilling*, the Supreme Court considered the fact that "over four years elapsed between Enron's bankruptcy and Skilling's trial."  *Skilling*, 561 U.S. at 383.  In this case, two years have elapsed since the events of January 6, including Alberts's arrest, and another month will elapse

before trial.  This is far more than in *Rideau*, where the defendant's trial came two months after his televised confession.  *Rideau*, 373 U.S. at 724.  Although January 6 continues to be in the news, the "decibel level of media attention [has] diminished somewhat," *Skilling*, 561 U.S. at 383.  Moreover, only a relatively small percentage, if any, of the recent stories have mentioned Alberts, and much of the reporting has been national is scope, rather than limited to Washington, D.C.

> ### D.     The jury verdict

Because Alberts has not yet gone to trial, the final *Skilling* factor—whether the "jury's verdict . . . undermine[s] in any way the supposition of juror bias," *Skilling*, 561 U.S. at 383—does not directly apply.  But the fact that *Skilling* considered this factor to be "of prime significance," *id.*, underscores how unusual it is to presume prejudice before trial.  Ordinarily, a case should proceed to trial in the district where the crime was committed, and courts can examine after trial whether the record supports a finding of actual or presumed prejudice.  In short, none of the *Skilling* factors supports the defendant's contention that the Court should presume prejudice and order a transfer of venue without even conducting voir dire.

The defendant suggests, through the purported "Expert Witness Report" prepared by convicted January 6 rioter Treniss Evans, that this factor actually *supports* his claim of prejudice because the other jury trials involving January 6 defendants have resulted in prompt and (until recently) unanimous guilty verdicts.  ECF No. 86 at 27.  But although the *Skilling* indicated that a split verdict could "undermine" a presumption of prejudice, it never suggested that a unanimous verdict—particularly a unanimous verdict in a separate case involving a different defendant—was enough to establish prejudice.  The prompt and unanimous guilty verdicts in other January 6 jury trials resulted from the strength of the government's evidence.  Moreover, juries in two recent January 6 trials have either been unable to reach a verdict on certain counts, *see United States v.*

*Williams*, No. 21-cr-618 (D.D.C.), or have acquitted on some counts, *see United States v. Rhodes, et al.*, No. 22-cr-15, ECF No. 410 (D.D.C. Nov. 29, 2022).  This indicates that D.C. jurors are carefully weighing the evidence and not reflexively convicting January 6 defendants on all charges.  And, as explained below, the jury selection in those cases actually indicates that impartial juries can be selected in this district.

## II.    The Characteristics of the District of Columbia's Jury Pool Do Not Support a Change of Venue.

The defendant devotes the majority of his motion to an argument that a D.C. jury cannot be impartial because of various alleged characteristics of the District's jury pool: the prevalence of federal employees in the District, the political makeup of the District's electorate, and the impact of January 6 on D.C. residents.[3]  ECF No. 86 at 5-11.  None of these claims has merit.

### A.    The number of federal employees who reside in the District of Columbia does not support a change of venue.

The defendant argues that the Court should presume prejudice in this District because the jury pool would contain a high percentage of federal government employees or their friends and family members.  *Id.* at 5-6.  He contends,

> This disproportionately government-involved jury pool knows that their lives and their careers depend on the federal government being large and expensive.  If Republican firebrands ever gain traction, their entire lives and careers will be ended, and they will need to earn their livings by producing goods and services in the private sector.  Jurors of this trial are being asked to sit in judgement [sic] of a case where their answer returning a verdict of "not guilty" is a loss for their employer or the institution driving their livelihood and community.

---

[3] Alberts's self-described "expert" further contends that transfer of venue is required because "[c]ompared to other cities, D.C. jury pool is disproportionately African American.  A majority believe January 6 defendants are 'White Supremacists.'"  ECF No. 86 at 30.  But Alberts's motion provides no support for the view that transfer can ever be justified by the racial makeup of the venue, and such argument has long been rejected.  *See United States v. Chapin*, 515 F.2d 1274, 1286 (D.C. Cir. 1975).  Indeed, transferring venue for the purpose of obtaining a jury pool with fewer racial minorities would be inappropriate and would raise serious constitutional concerns.

*Id.* at 6.  He also urges, without discernible relevance to his motion, that "lobbyist spending has disproportionately benefited the democrat [sic] party," that a majority of witnesses before congressional committees are government employees, and that many Americans believe that government funds are being misspent and that their taxes are too high.  *Id.* at 5-6; *see also id.* at 27-28.  But the defendant does not explain how merely being employed by the federal government (or any of the other factors he cites) would render a person incapable of serving as an impartial juror in determining his guilt.  Although some federal employees, such as the U.S. Capitol Police, were affected by the events of January 6, many others were neither directly nor indirectly impacted. Indeed, many federal employees were nowhere near the Capitol on January 6 given the "maximum telework" policy of many federal agencies at the time.  And the storming of the Capitol on January 6 was not aimed at the federal government in general, but specifically at Congress' certification of the electoral vote.  There is therefore no reason to believe that federal employees with little or no connection to the events at the Capitol could not be impartial in this case.  *See United States v. Bochene*, No. CR 21-418 (RDM), 2022 WL 123893, at *2 (D.D.C. Jan. 12, 2022) (January 6 defendant's claim that federal employees would "have a vested interest in supporting their employer" was "exactly the kind of conjecture that is insufficient to warrant transfer prior to jury selection").

Even assuming (incorrectly) that every federal employee is affected by improper bias, the Court could draw a jury from those District residents who are not employed by the federal government.  According to the Office of Personnel Management, around 141,000 non-Postal Service employees worked in Washington, D.C., in 2017.  OPM, Federal Civilian Employment, available    at    https://www.opm.gov/policy-data-oversight/data-analysis-documentation/federal-employment-reports/reports-publications/federal-civilian-employment/.    But    many    federal

employees who work in the District live outside the District and would not be part of the jury pool. And the District has nearly 700,000 residents. Thus, even if every federal employee were disqualified, the Court would be able to pick a jury in this District.

**B.      The District of Columbia's political makeup does not support a change of venue.**

The defendant contends that he cannot obtain a fair trial in the District of Columbia because more than 90 percent of its voters voted for the Democratic Party candidate in the 2020 Presidential Election. ECF No. 86 at 6-7. The en banc D.C. Circuit rejected a nearly identical claim in *Haldeman*, where the dissent concluded that a venue change was required because "Washington, D.C. is unique in its overwhelming concentration of supporters of the Democratic Party," and the Democratic candidate received 81.8 percent and 78.1 percent of the vote when Richard Nixon ran for President in 1968 and 1972, respectively. *Haldeman*, 559 F.2d at 160 (MacKinnon, J., concurring in part and dissenting in part). The majority rejected the relevance of this fact, observing that authority cited by the dissent gave no "intimation that a community's voting patterns are at all pertinent to venue." *Id.* at 64 n.43; *see also United States v. Chapin*, 515 F.2d 1274, 1286 (D.C. Cir. 1975) (rejecting the argument that "because of [the defendant's] connection with the Nixon administration and his participation in a 'dirty tricks' campaign aimed at Democratic candidates and with racial overtones, a truly fair and impartial jury could not have been drawn from the District's heavily black, and overwhelmingly Democratic, population"); *Brock*, 2022 WL 3910549, at *6 (rejecting same claim in a January 6 case).

If "the District of Columbia's voting record in the past two presidential elections" is not "at all pertinent to venue" in a case involving high-ranking members of a presidential administration, *Haldeman*, 559 F.2d at 64 n.43, it cannot justify a change of venue here. To be sure, *some* potential jurors might be unable to be impartial in January 6 cases based on

disagreement with the defendants' political aims.  But whether individual prospective jurors have such disqualifying biases can be assessed during voir dire.  This Court should not presume that every member of a particular political party is biased simply because this case has a political connection.  Indeed, the Supreme Court has stated in the context of an election-fraud trial, that "[t]he law assumes that every citizen is equally interested in the enforcement of the statute enacted to guard the integrity of national elections, and that his political opinions or affiliations will not stand in the way of an honest discharge of his duty as a juror in cases arising under that statute." *Connors v. United States*, 158 U.S. 408, 414 (1895).  The same is true here.  The District's voting history does not establish that this Court will be unable to select "an unbiased jury capable of basing its verdict solely on the evidence introduced at trial."  *Haldeman*, 559 F.2d at 70.

To the contrary, as the nation's capital and seat of the federal government, the District has been home to its fair share of trials in politically charged cases.  High-profile individuals strongly associated with a particular party, such as Marion Barry, John Poindexter, Oliver North, Scooter Libby, Roger Stone, and Steve Bannon have all been tried in the District.  *See United States v. Barry*, 938 F.2d 1327 (D.C. Cir. 1991); *United States v. Poindexter*, 951 F.2d 369 (D.C. Cir. 1991); *United States v. North*, 910 F.2d 843 (D.C. Cir. 1990); *United States v. Libby*, 498 F. Supp. 2d 1 (D.D.C. 2007); *United States v. Stone*, No. 19-cr-0018 (ABJ), 2020 WL 1892360 (D.D.C. Apr. 16, 2020); *United States v. Bannon*, No. 21-cr-670 (CJN).  Indeed, the Court in *Stone* rejected the argument that jurors "could not possibly view [Roger Stone] independently from the President" because of his role in the presidential campaign or that "if you do not like Donald Trump, you must not like Roger Stone."  2020 WL 1892360, at *30-*31.  Similarly here, the fact that most District residents voted for a candidate other than Donald Trump does not mean those residents could not impartially consider the evidence against those charged in connection with the events on

January 6.

### C.   The impact of January 6 on Washington D.C. does not support a change of venue.

The defendant contends that a D.C. jury cannot be impartial because D.C. residents have been particularly affected by events surrounding January 6.  ECF No. 86 at 10-11.  But January 6 is now two years in the past.  Many D.C. residents do not live or work near the Capitol where the roads were closed and the National Guard was deployed.  There is no reason to believe that the District's entire population of nearly 700,000 people was so affected by these events that the Court cannot seat an impartial jury here.

Indeed, courts routinely conclude that defendants can receive a fair trial in the location where they committed their crimes, despite the fact that some members of the community were victimized.  *See Tsarnaev*, 780 F.3d at 15 (Boston Marathon bombing); *Skilling*, 561 U.S. at 399 (Enron collapse); *United States v. Yousef*, 327 F.3d 56, 155 (2d Cir. 2003) (1993 World Trade Center bombing); *United States v. Moussaoui*, 43 F. App'x 612, 613 (4th Cir. 2002) (unpublished) (September 11, 2001 attacks, including on the Pentagon).  In *Skilling*, the Supreme Court rejected the contention that Enron's "sheer number of victims" in the Houston area "trigger[ed] a presumption of prejudice."  *Skilling*, 561 U.S. at 384 (quotation omitted).  "Although the widespread community impact necessitated careful identification and inspection of prospective jurors' connections to Enron," the voir dire was "well suited to that task."  *Id.*  In this case too, voir dire can adequately identify those D.C. residents who were so affected by January 6 that they cannot impartially serve as jurors.  There is no reason to presume prejudice.

### III.   The Polls Submitted by the Defendant Do Not Support a Change of Venue.

Through his citation to an online article and other arguments, Alberts appears to rely on two polls conducted at the request of defendants in other cases.  *See* ECF No. 86 at 7, 11-12.  He

also urges that "Google Trends" analytics of searches for terms including "Proud Boys," "Jan 6th Committee," and "White Supremacist" show that a D.C. jury cannot be unbiased.  None of these sources support a change of venue.

Alberts first relies on a poll conducted by John Zogby Strategies to urge that "88% of District of Columbia registered voters believed that if a defendant went inside the Capitol building on January 6, 2021, he should be convicted of obstruction of justice and civil disorder."  ECF No. 86 at 7.  The defendant also indirectly relies on a poll conducted by Select Litigation, a private litigation consulting firm, at the request of the Federal Public Defender for the District of Columbia.  *Id.* at 11-12.  Neither poll supports the defendant's request for a venue transfer.

A.     **Courts have repeatedly declined to find a presumption of prejudice based on pretrial polling without conducting voir dire.**

The defendant argues that this Court should find a presumption of prejudice based on polls of prospective jurors.  But "courts have generally rejected the notion that such polling can serve as a substitute for voir dire."  *United States v. Ballenger*, No. 21-cr-719 (JEB), 2022 WL 16533872, at *3 (D.D.C. Oct. 28, 2022) (denying motion to transfer venue of a January 6 case).  As one circuit has observed, the Supreme Court's emphasis on the important role of voir dire in addressing pretrial publicity "undercuts" the "argument that poll percentages . . . decide the question of a presumption of prejudice."  *Tsarnaev*, 780 F.3d at 23; *see Mu'Min*, 500 U.S. at 427 (observing that, "[p]articularly with respect to pretrial publicity, . . . primary reliance on the judgment of the trial court makes good sense").

Indeed, the D.C. Circuit has rejected a claim of presumed prejudice based on the results of a pre-voir dire survey.  *Haldeman*, 559 F.2d at 64.  In *Haldeman*, seven former Nixon administration officials (including the former Attorney General of the United States) were prosecuted for their role in the Watergate scandal.  *Id.* at 51.  According to a poll commissioned

by the defense in that case, 93 percent of the Washington, D.C. population knew of the charges against the defendants and 61 percent had formed the opinion that they were guilty.  *Id.* at 144, 178 n.2 (MacKinnon, J., concurring in part and dissenting in part).  Recognizing that the case had produced a "massive" amount of pretrial publicity, *id.* at 61, the D.C. Circuit nevertheless held that the district court "was correct" to deny the defendants' "pre-voir dire requests for . . . a change of venue," *id.* at 63-64.  The Court of Appeals observed that the District Court "did not err in relying less heavily on a poll taken in private by private pollsters and paid for by one side than on a recorded, comprehensive voir dire examination conducted by the judge in the presence of all parties and their counsel."  *Id.* at 64 n.43; *see Jones*, 404 F.2d at 1238 (observing that it is "upon the voir dire examination," and "usually only then, that a fully adequate appraisal of the claim [of local community prejudice] can be made" (quotation omitted)).

Other circuits have similarly rejected attempts to elevate polling results over voir dire.  In *United States v. Campa*, a pre-trial survey found that 69 percent of respondents were prejudiced against anyone charged with spying on behalf of Cuba, as the defendants were.  *Campa*, 459 F.3d at 1157 (Birch, J., dissenting).  The en banc Eleventh Circuit affirmed the denial of a motion for change of venue, explaining that "[w]hen a defendant alleges that prejudicial pretrial publicity would prevent him from receiving a fair trial, it is within the district court's broad discretion to proceed to voir dire to ascertain whether the prospective jurors have, in fact, been influenced by pretrial publicity."  *Id.* at 1146 (majority opinion).

Similarly, in *United States v. Rodriguez*, 581 F.3d 775 (8th Cir. 2009), a poll indicated that 99 percent of respondents had heard about the brutal rape and murder with which the defendant was charged, nearly 88 percent of those respondents believed he was guilty, and about 42 percent of respondents had a strongly held opinion of his guilt.  *Id.* at 786; Brief for the Appellant, *United*

*States v. Rodriguez*, No. 07-1316 (8th Cir.), 2008 WL 194877, at *19.   Nonetheless, the Eighth

Circuit found no presumption of prejudice, observing that a district court was not required "to

consider public opinion polls when ruling on change-of-venue motions." *Rodriguez*, 581 F.3d at

786.   And the court held that, in any event, the poll did not "demonstrate widespread community

prejudice" because the "media coverage had not been inflammatory," two years had passed since

the murder, and "the district court concluded that special voir dire protocols would screen out

prejudiced jurors." *Id.*

There are good reasons to rely on voir dire, rather that public-opinion polls, when assessing

whether prejudice should be presumed.   First, polling lacks many of the safeguards of court-

supervised voir dire, including the involvement of both parties in formulating the questions.

Surveys that are not carefully worded and properly conducted can produce misleading results, such

as by asking leading questions or providing the respondents with facts that will influence their

responses.   *See Campa*, 459 F.3d at 1146 (noting problems with "non-neutral" and "ambiguous"

questions).   Second, polling lacks the formality that attends in-court proceedings under oath, and

it does not afford the court the "face-to-face opportunity to gauge demeanor and credibility."

*Skilling*, 561 U.S. at 395.   Third, polls ordinarily inform the court only the extent to which

prospective jurors have heard about a case and formed an opinion about it.   But that is not the

ultimate question when picking a jury.   A prospective juror is not disqualified simply because he

has "formed some impression or opinion as to the merits of the case."   *Irvin v. Dowd*, 366 U.S.

717, 722 (1961).   Instead, "[i]t is sufficient if the juror can lay aside his impression or opinion and

render a verdict based on the evidence presented in court."   *Id.* at 723.   But pre-trial surveys are

poorly suited to answering that ultimate question, which is best asked in the context of face-to-

face voir dire under oath.   *See Rosales-Lopez v. United States*, 451 U.S. 182, 188 (1981) (observing

that the trial judge's function in voir dire "is not unlike that of the jurors later in the trial" because "[b]oth must reach conclusions as to impartiality and credibility by relying on their own evaluations of demeanor evidence and of responses to questions").

In sum, federal courts have shown an overwhelming preference for assessing prejudice through court-supervised voir dire rather than through public opinion polls.  And the defendant has not offered any reason to depart from that usual practice here.  Thus, this Court need not give substantial weight to the polling when considering whether to presume prejudice.  And, as explained below, the polls cited by the defendant do not support a presumption of prejudice in any event.  "Even if polling could serve as a substitute safeguard for voir dire, the data presented by Defendant[] would not counsel transfer."  *Ballenger*, 2022 WL 16533872, at *3 (considering Select Litigation poll).

### B.    The Select Litigation poll does not demonstrate pervasive prejudice in the District of Columbia.

Contrary to the defendant's contention, the Select Litigation poll does not support a presumption of prejudice in this District.  As an initial matter, the Select Litigation poll selected only one comparator jurisdiction—the Atlanta Division of the Northern District of Georgia.  The defendant has not requested a transfer to that district or division, but instead asks this Court for a transfer to "Nebraska or North Dakota," jurisdictions with which he has no discernible ties, and without any explanation.  ECF No. 86 at 25.  The Select Litigation survey tells the Court nothing about the views or media exposure of prospective jurors in that district.  The poll therefore cannot show that selecting an impartial jury would be any more difficult in the District of Columbia than in the defendant's preferred district.  *See Haldeman*, 559 F.2d at 64 n.43 (observing that a change of venue "would have been only of doubtful value" where the pretrial publicity was national in scope).

Furthermore, to the extent the poll is useful at a more general level in comparing the District of Columbia to other districts, the poll indicates that levels of media exposure to the events of January 6 are not significantly different in Atlanta than in Washington, D.C. *Ballenger*, 2022 WL 16533872, at *4. The defendant points out that 71 percent of respondents in D.C. said they had formed the opinion January 6 arrestees were "guilty" of the charges brought against them. *See* ECF No. 86 at 11. The survey failed, however, to identify (much less define) any of the charges brought against the defendant. It also failed to provide respondents with the option of saying they were "unsure" about guilt, even though such an option is required by professional standards that apply in this area. *See* American Society of Trial Consultants, Professional Standards for Venue Surveys at 9, available at https://www.astcweb.org/Resources/Pictures/Venue%2010-08.pdf ("Respondents must be made aware that they can say they do not know or have no opinion."). The survey instead gave respondents a binary choice between "guilty or not guilty." *Brock*, 2022 WL 3910549, at *7. Yet even without being provided the appropriate options, "almost 50% of respondents in Washington, D.C. volunteered that they did not have a fixed opinion, answering either "[d]epends" or "[d]on't know/[r]efused" (suggesting that at least half of the venire has no preconception of guilt, let alone an unshakable one)." *Id.* This shows that, even in response to a poorly worded question, more than a quarter of the District's residents realized the need to keep an open mind about guilt.

Understood in context, the Select Litigation poll does not indicate any higher degree of juror bias than in *Haldeman*, where the en banc D.C. Circuit found no presumption of prejudice. In *Haldeman*, 61 percent of respondents expressed a view that the defendants were guilty, as opposed to the 71 percent here. *See Haldeman*, 559 F.2d at 144, 178 n.2 (MacKinnon, J., concurring in part and dissenting in part). But the survey in *Haldeman* first asked respondents

whether they had formed an opinion about whether the indicted Nixon aides were guilty or innocent, giving options for both "No" (*i.e.* had not formed an opinion) and "Don't Know/No Opinion." *Id.* at 178 n.2. The survey then asked whether respondents thought the defendants were "guilty or innocent in the Watergate affair," giving options for "Not Guilty Until Proven" and "No Opinion/Don't Know." *Id.* Only after (a) being prompted to consider whether they could actually form an opinion, and (b) being reminded of the presumption of innocence, did 61% of respondents say "guilty." *Id.* Here, by contrast, respondents were not provided a "don't know" option, *see Brock*, 2022 WL 3910549, at *7, were not reminded of the presumption of innocence, and were asked only whether they thought the "several hundred people" arrested in connection with January 6 were "guilty."

When asked about guilt in the context of a criminal trial, however, respondents in the Select Litigation survey were far less likely to give an answer of "guilty." Question 5 asked them to "[a]ssume [they] were on a jury for a defendant charged with crimes for his or her activities on January 6" and then asked whether they were "more likely to vote that the person is guilty or not guilty." In response to this question, only 52 percent of D.C. respondents said "Guilty," ECF No. 86 at 11, and fully 46 percent volunteered a response of "Depends" or "Don't know/Refused." *Garcia*, 2022 WL 2904352, at *12. Thus, when asked to consider guilt or innocence in the context of a "defendant charged with crimes," as opposed to the "several hundred people . . . arrested," nearly half of D.C. residents were committed to keeping an open mind—even without being instructed on the presumption of innocence or being provided an option for "Do not know." This indicates, if anything, a lower degree of prejudice than was present in *Haldeman*.

The defendant points out that, according to the Select Litigation poll, 84 percent of D.C. respondents had an "unfavorable" view of "people arrested for participating in the events at the

U.S. Capitol on January 6." ECF No. 86 at 11. Although that is higher than the 54 percent of Atlantans with unfavorable views, it is quite similar to the results of a nationwide CBS poll, which found that 83 percent of respondents "[s]omewhat disapprove" or "[s]trongly disapprove" of the "actions taken by the people who forced their way into the U.S. Capitol on January 6." *See* CBS News Poll, December 27-30, 2021, Question 2, https://drive.google.com/file/d/ 1QNzK7xBJeWzKlTrHVobLgyFtId9Cgsq_/view. The defendant has not asked to be tried in Atlanta and has not provided any information about the views in Nebraska and North Dakota. And, in any event, the fact that many D.C. residents have a generally "unfavorable" view of people "arrested" on January 6 does not mean that an impartial jury cannot be selected in this jurisdiction.

### C.    The Zogby poll does not demonstrate pervasive prejudice in the District of Columbia.

Nor does the poll conducted by John Zogby Strategies at the request of another January 6 defendant, Gabriel Garcia, support a presumption of prejudice. As Judge Amy Berman Jackson explained when rejecting a motion to transfer venue in another January 6 case, "The Zogby survey contains poorly written questions that produced unreliable, uninformative answers." *Garcia,* 2022 WL 2904352, at *11. There are particularly strong reasons to doubt poll's reliability. For one thing, the poll does not provide the Court with all the information needed to assess its accuracy. The American Society of Trial Consultants' Professional Standards for Venue Surveys state the following:

> The trial consultant's presentation of survey results to a court shall include [t]he questionnaire that was used in the survey, identification of the primary persons who performed the work (including their qualifications), and descriptions of how each of the following standard steps for conducting a survey was completed:
> - Design of the survey instrument.
> - Determination of eligibility and sampling measures.
> - Training of interviewers and supervisors to conduct the interviewing.
> - Interviewing procedures.
> - Dates of data collection

    - Calculation of sample completion rate.
    - Tabulation of survey data.

American Society of Trial Consultants (ASTC), Professional Standards for Venue Surveys at 7, available at https://www.astcweb.org/Resources/Pictures/Venue%2010-08.pdf.

The Zogby poll fails to provide critical information, such as how the 400 survey participants were selected for the vaguely described "online survey" and whether they self-selected. *Garcia*, 2022 WL 2904352, at \*3; *see also United States v. Thomley*, No. 2:18-cr-18-KS-MTP, 2018 WL 5986754, at \*2 (S.D. Miss. Nov. 14, 2018) ("The Court is . . . troubled by [the polling firm's] failure to explain *how* they selected their sample. Did they obtain responses online or via social media? Did respondents self-select?").  Additionally, the explanation that is provided indicates that the poll was underinclusive, in that it was only of "Washington DC registered voters," ECF No. 86 at 7 n.10, whereas this Court's jury pool is generated based on voter registration, Department of Motor Vehicles records, and D.C. income tax forms.  Jury Selection Plan for the United States District Court for the District of Columbia for the Random Selection of Grand       and       Petit       Jurors       at       1,       available       at https://www.dcd.uscourts.gov/sites/dcd/files/JurySelectionPlan2016.pdf.    *Garcia*, 2022 WL 2904352, at \*11.  "This is a significant omission[.]"  *Id.*

Moreover, the Zogby poll uses a number of compound, non-neutral, and leading questions. *Id.*; *see also Campa*, 459 F.3d at 1131-32, 1146 (affirming district court's decision to reject venue survey that used "ambiguous" and "non-neutral" questions).  For example, one question asked respondents which description of January 6 "comes closer to your opinion," giving options only for (A) "a dire threat to the fabric of our nation and . . . the worst assault on US democracy since 9/11, Pearl Harbor, or even the Civil War" or (B) "unwise and caused senseless damage to the Capitol building and people's lives, some of which were lost, but the events were not

insurrectionist and did not pose a threat to US democracy."  *Garcia*, 2022 WL 2904352, at *11.

"This question puts words in the respondents' mouths and creates an artificial, binary choice between two highly inflammatory potential responses.  It does little to explore anyone's opinion; it merely exposes potential jurors to the sort of hyperbole defendant insists will render them incompetent to serve."  *Id.*

In addition, the Zogby poll is particularly unhelpful in determining whether transfer is warranted because it fails to provide a comparison with the defendant's preferred venues, Nebraska and North Dakota, or any other district.  According to the poll, nearly 55 percent of respondents indicated their views about January 6 were shaped more by national media sources.  *Garcia*, 2022 WL 2904352, at *14.  Thus, the Zogby poll fails to establish that the views of D.C. voters are substantially different than potential jurors in other jurisdictions.  *See Haldeman*, 559 F.2d at 64 n.43 (observing that "a change of venue would have been of only doubtful value" where much of the news coverage was "national in [its] reach" and the crime was of national interest).

Even if the Zogby poll's results are taken at face value, the poll does not support a presumption of prejudice in this district.  Defendant asserts that "88% of District of Columbia registered voters believed that if a defendant went inside the Capitol building on January 6, 2021, he should be convicted of obstruction of justice and civil disorder."[4]  ECF No. 86 at 7.  In fact, the Zogby poll relates to just January 6 defendant Gabriel Garcia, and shows that this belief was held by 125 (88%) of the 143 respondents who were (a) familiar with the events of January 6 *and* (b) familiar with the Proud Boys *and* (c) familiar with Gabriel Garcia himself.  *See Garcia*, No. 21-cr-129, ECF No. 54-1 at 27 (125 of 143).  When the respondents who lacked this familiarity

---

[4] As with the question about "insurrection," the question makes no effort to inform respondents about what is required for the government to prove the relevant criminal offenses.  *See* 18 U.S.C. § 1512(c)(2) (obstruction of justice); 18 U.S.C. § 231(a)(3) (civil disorder).

are accounted for, the percentage of overall respondents believing Garcia should be convicted if he entered the Capitol falls to 31 percent. *Id.* at 26-27 (125 of 401). That is hardly sufficient to support a presumption of prejudice against Garcia, much less the defendant in this case. Regardless, Alberts is not alleged to have entered the Capitol Building at all, and was not charged with obstruction of justice. So a poll question asking for an individual's views on "if a defendant went inside the Capitol building on January 6, 2021," is irrelevant here.

## IV.    Voir Dire Is the Appropriate Means of Selecting an Impartial Jury.

In any U.S. jurisdiction, most prospective jurors will have heard about the events of January 6, and many will have various disqualifying biases. But the appropriate way to identify and address those biases is through a careful voir dire, rather than a change of venue based solely on pretrial polling and media analyses. As Judge Kelly explained while rejecting transfer of venue, "the experience of courts in this jurisdiction with January 6th trials, including this Court's own, bears out the general effectiveness of voir dire." *United States v. Nordean*, No. 21-cr-175, ECF No. 531 at 11 (D.C. Nov. 9, 2022) (TJK). As in *Haldeman*, there is "no reason for concluding that the population of Washington, D. C. [i]s so aroused against [the defendant] and so unlikely to be able objectively to judge [his] guilt or innocence on the basis of the evidence presented at trial" that a change of venue is required. *Haldeman*, 559 F.2d at 62.

The defendant relies on the impressions of "a courtroom observer"[5] who attended jury selection in the case of *United States v. Matthew Bledsoe*, No. 21-cr-204 (BAH) to urge that the D.C. jury pool is irredeemably biased and that only through undue "pressure[e]" exerted by the Chief Judge of this Court could a jury be seated in that case. ECF No. 86 at 12-13. This accusation

---

[5] The "courtroom observer" was Gabriel Garcia, who, as described above, currently is awaiting trial for his own alleged crimes on January 6, 2021. *See United States v. Garcia*, No. 1:21-cr-129 (ABJ).

against the Chief Judge is deeply unfair and belied by the actual jury selection in that case, which demonstrated an appropriate attempt to discern whether prospective jurors could be impartial.  It is beyond cavil that "the safeguard against a biased jury has always been the same: an 'extensive voir dire[.]'" *Garcia*, 2022 WL 2904352, at *6 (quoting *Haldeman*, 559 F.2d at 69).  "[C]oncerns about jurors who have fixed opinions or emotional connections to events, or who are vulnerable to improper influence from media coverage, are legitimate concerns. The court and the parties are diligently addressing them through the voir dire process." *Tsarnaev*, 780 F.3d at 17.

Alberts provides no support for his claim that careful voir dire is insufficient to ensure an impartial jury in this case.  The Supreme Court and the D.C. Circuit have long made clear that a careful voir dire is the appropriate way to address prejudicial pretrial publicity, except in those extreme cases where prejudice is presumed.  *See Skilling*, 561 U.S. at 381-82.  The Supreme Court observed in *Skilling* that voir dire was "well suited to th[e] task" of probing the crime's "widespread community impact." *Id.* at 384.  And the Court has said that "[i]t is fair to assume that the method we have relied on since the beginning"—*i.e.* voir dire—"usually identifies bias." *Patton v. Yount*, 467 U.S. 1025, 1038 (1984) (citing *United States v. Burr*, 25 F. Cas. 49, 51 (C.C.D. Va. 1807) (Marshall, C.J.)).  Similarly, the D.C. Circuit has said that "voir dire has long been recognized as an effective method of routing out [publicity-based] bias, especially when conducted in a careful and thoroughgoing manner."  *In re Nat'l Broadcasting Co.*, 653 F.2d 609, 617 (D.C. Cir. 1981); *see Haldeman*, 559 F.2d at 63 ("[I]f an impartial jury actually cannot be selected, that fact should become evident at the voir dire.").

## V.     The January 6-Related Jury Trials That Have Already Occurred Have Demonstrated the Availability of a Significant Number of Fair, Impartial Jurors in the D.C. Venire.

At this point, more than a dozen January 6 cases have proceeded to jury trials, and the Court in each of those cases has been able to select a jury without undue expenditure of time or

effort.  *See Murphy*, 421 U.S. at 802-03 ("The length to which the trial court must go to select jurors who appear to be impartial is another factor relevant in evaluating those jurors' assurances of impartiality."); *Haldeman*, 559 F.2d at 63 (observing that "if an impartial jury actually cannot be selected, that fact should become evident at the voir dire").  Instead, the judges presiding over nearly all of those trials were able to select a jury in one or two days.  *See United States v. Reffitt*, No. 21-cr-32, Minute Entries (Feb. 28 & Mar. 1, 2022); *United States v. Robertson*, No. 21-cr-34, Minute Entry (Apr. 5, 2022); *United States v. Thompson*, No. 21-cr-161, Minute Entry (Apr. 11, 2022); *United States v. Webster*, No. 21-cr-208, Minute Entry (Apr. 25, 2022); *United States v. Hale-Cusanelli*, No. 21-cr-37, Minute Entry (May 23, 2022); *United States v. Anthony Williams*, No. 21-cr-377, Minute Entry (June 27, 2022); *United States v. Bledsoe*, No. 21-cr-204, Minute Entry (July 18, 2022); *United States v. Herrera*, No. 21-cr-619, Minute Entry (D.D.C. Aug. 15, 2022); *United States v. Jensen*, No. 21-cr-6, Minute Entries (Sept. 19 & 20, 2022); *United States v. Strand*, No. 21-85, Minute Entry (D.D.C. Sept. 20, 2022); *United States v. Alford*, No. 21-cr-263, Minute Entry (Sept. 29, 2022); *United States v. Riley Williams*, No. 21-cr-618, Minute Entries (D.D.C. Nov. 7 & 8, 2022); *United States v. Schwartz*, No. 21-cr-178, Minute Entries (Nov. 22 & 23, 2022).  The only exceptions have been trials involving seditious conspiracy charges.  *See United States v. Rhodes, et al.*, No. 22-cr-15, Minute Entries (Sept. 27, 28, 29; Dec. 6, 7, 8, 9, 2022).  And, using the first five jury trials as exemplars, the voir dire that took place undermines the defendant's claim that prejudice should be presumed.

Voir dire in these other January 6 cases has not featured jury panelists with extensive knowledge about the alleged conduct by defendants on January 6.  As Judge Bates explained about other January 6 defendants seeking a transfer of venue,

> Despite their generalizations about the District of Columbia jury pool, the feelings towards them by many of the District's potential jurors are best captured by Don

Draper's now-memetic retort: "I don't think about you at all." *Mad Men: Dark Shadows* (AMC television broadcast May 13, 2012).

*Ballenger*, 2022 WL 16533872, at *4.

In *Reffitt*, the Court individually examined 56 prospective jurors and qualified 38 of them (about 68 percent of those examined). *See Reffitt*, No. 21-cr-32, ECF No. 136 at 121. The Court asked all the prospective jurors whether they had "an opinion about Mr. Reffitt's guilt or innocence in this case" and whether they had any "strong feelings or opinions" about the events of January 6 or any political beliefs that it would make it difficult to be a "fair and impartial" juror. *Reffitt*, No. 21-cr-32, ECF No. 133 at 23, 30. The Court then followed up during individual voir dire. Of the 18 jurors that were struck for cause, only nine (or 16 percent of the 56 people examined) indicated that they had such strong feelings about the events of January 6 that they could not serve as fair or impartial jurors.[6]

In *Thompson*, the Court individually examined 34 prospective jurors, and qualified 25 of them (or 73%). *See Thompson*, No. 21-cr-208, ECF No. 106 at 170, 172, 181, 190, 193. The court asked the entire venire 47 standard questions, and then followed up on their affirmative answers during individual voir dire. *Id.* at 4-5, 35. Of the nine prospective jurors struck for cause, only three (or about 9 percent of those examined) were stricken based on an inability to be impartial, as opposed to some other cause.[7]

---

[6] For those struck based on a professed inability to be impartial, *see Reffitt*, No. 21-cr-32, ECF No. 133 at 49-54 (Juror 328), 61-68 (Juror 1541), 112-29 (Juror 1046); ECF No. 134 at 41-42 (Juror 443), 43-47 (Juror 45), 71-78 (Juror 1747), 93-104 (Juror 432), 132-43 (Juror 514); ECF No. 135 at 80-91 (Juror 1484). For those struck for other reasons, *see Reffitt*, No. 21-cr-32, ECF No. 134 at 35-41 (Juror 313, worked at Library of Congress); ECF No. 134 at 78-93 and ECF No. 135 at 3 (Juror 728, moved out of D.C.); ECF No. 135 at 6-8 (Juror 1650, over 70 and declined to serve), 62-73 (Juror 548, unavailability), 100-104 (Juror 715, anxiety and views on guns), 120 (Juror 548, medical appointments); ECF No. 136 at 41-43 (Juror 1240, health hardship), 53-65 (Juror 464, worked at Library of Congress), 65-86 (Juror 1054, prior knowledge of facts).

Similarly, in *Robertson*, the Court individually examined 49 prospective jurors and qualified 34 of them (or about 69 percent of those examined).  *See Robertson*, No. 21-cr-34, ECF No. 106 at 73.  The Court asked all prospective jurors whether they had "such strong feelings" about the events of January 6 that it would be "difficult" to follow the court's instructions "and render a fair and impartial verdict."  *Robertson*, No. 21-cr-34, ECF No. 104 at 14.  It asked whether anything about the allegations in that case would prevent prospective jurors from "being neutral and fair" and whether their political views would affect their ability to be "fair and impartial."  *Id.* at 13, 15.  The Court followed up on affirmative answers to those questions during individual voir dire.  Of the 15 prospective jurors struck for cause, only nine (or 18 percent of the 49 people examined) indicated that they had such strong feelings about the January 6 events that they could not be fair or impartial.[8]

In *Webster*, the Court individually examined 53 jurors and qualified 35 of them (or 66%), *Webster*, No. 21-cr-208, ECF No. 115 at 6, though it later excused one of those 35 based on hardship, *Webster*, No. 21-cr-208, ECF No. 114 at 217-18.  The Court asked all prospective jurors whether they had "strong feelings" about the events of January 6 or about the former President that

---

[7] For the three stricken for bias, *see Thompson*, No. 21-cr-208, ECF No. 106 at 51-53 (Juror 1242), 85-86 (Juror 328), 158-59 (Juror 999).  For the six stricken for hardship or inability to focus, *see Thompson*, No. 21-cr-208, ECF No. 106 at 44 (Juror 1513), 45 (Juror 1267), 49-50 (Juror 503), 50-51 (Juror 1290), 86-93 (Juror 229), 109-10 (Juror 1266).

[8] For those struck based on a professed inability to be impartial, *see Robertson*, No. 21-cr-34, ECF No. 104 at 26-34 (Juror 1431), 97-100 (Juror 1567); ECF No. 105 at 20-29 (Juror 936), 35-41 (Juror 799), 59-70 (Juror 696), 88-92 (Juror 429); ECF No. 106 at 27-36 (Juror 1010), 36-39 (Juror 585), 58-63 (Juror 1160).  For those struck for other reasons, *see Robertson*, No. 21-cr-34, ECF No. 104 at 23-26 (Juror 1566, hardship related to care for elderly sisters), 83-84 (Juror 1027, moved out of D.C.); ECF No. 105 at 55-59 (Juror 1122, language concerns), 92-94 (Juror 505, work hardship); ECF No. 106 at 16-21 (Juror 474, work trip); 50-53 (Juror 846, previously planned trip).

would "make it difficult for [the prospective juror] to serve as a fair and impartial juror in this case." *Webster*, No. 21-cr-208, ECF No. 113 at 19.  During individual voir dire, the Court followed up on affirmative answers to clarify whether prospective jurors could set aside their feelings and decide the case fairly.  *See, e.g., id.* at 32-33, 41-42, 54-56, 63, 65-66.  Only 10 out of 53 prospective jurors (or about 19%) were stricken based on a professed or imputed inability to be impartial, as opposed to some other reason.[9]  The *Webster* Court observed that this number "was actually relatively low" and therefore "doesn't bear out the concerns that were at root in the venue transfer motion" in that case.  *Webster*, No. 21-cr-208, ECF No. 115 at 7.

In *Hale-Cusanelli*, the Court individually examined 47 prospective jurors and qualified 32 of them (or 68%).  *Hale-Cusanelli*, No. 21-cr-37, ECF No. 91 at 106, 111.  The Court asked prospective jurors questions similar to those asked in the other trials.  *See Hale-Cusanelli*, No. 21-cr-37, ECF No. 90 at 72-74 (Questions 16, 20).  Of the 15 prospective jurors struck for cause, 11 (or 23 percent of those examined) were stricken based on a connection to the events of January 6 or a professed inability to be impartial.[10]

In these first five jury trials, the percentage of prospective jurors stricken for cause based on partiality was far lower than in *Irvin*, where the Supreme Court said that "statement[s] of

---

[9] Nine of the 19 stricken jurors were excused based on hardship or a religious belief.  *See Webster*, No. 21-cr-208, ECF No. 113 at 46 (Juror 1464), 49-50 (Juror 1132), 61 (Juror 1153), 68 (Juror 951), 78 (Juror 419); *Webster*, No. 21-cr-208, ECF No. 114 at 102-04, 207, 217 (Juror 571), 188 (Juror 1114), 191 (Juror 176), 203-04 (Juror 1262).  Of the ten other stricken jurors, three professed an ability to be impartial but were nevertheless stricken based on a connection to the events or to the U.S. Attorney's Office.  *See Webster*, No. 21-cr-208, ECF No. 113 at 58-60 (Juror 689 was a deputy chief of staff for a member of congress); 139-41 (Juror 625's former mother-in-law was a member of congress); 196-98 (Juror 780 was a former Assistant U.S. Attorney in D.C.).

[10] *See Hale-Cusanelli*, No. 21-cr-37, ECF No. 90 at 61-62 (Juror 499), 67-68 (Juror 872), 84-85 (Juror 206), 91-94 (Juror 653); ECF No. 91 at 2-5 (Juror 1129), 32 (Juror 182), 36 (Juror 176), 61-62 (Juror 890), 75-78 (Juror 870), 94-97 (Juror 1111), 97-104 (Juror 1412).  For the four jurors excused for hardship, *see Hale-Cusanelli*, No. 21-cr-37, ECF No. 90 at 77-79 (Juror 1524), 99 (Juror 1094); ECF No. 91 at 12 (Juror 1014), 31 (Juror 899).

impartiality" by some prospective jurors could be given "little weight" based on the number of other prospective jurors who "admitted prejudice." *Irvin*, 366 U.S. at 728.  In *Irvin*, 268 of 430 prospective jurors (or 62%) were stricken for cause based on "fixed opinions as to the guilt of petitioner." *Id.* at 727.  The percentage of partiality-based strikes in the first five January 6-related jury trials—between 9 percent and 23 percent of those examined—is far lower than the 62 percent in *Irvin*.  The percentage in these cases is lower even than in *Murphy*, where 20 of 78 prospective jurors (25%) were "excused because they indicated an opinion as to petitioner's guilt." *Murphy*, 421 U.S. at 803.  *Murphy* said that this percentage "by no means suggests a community with sentiment so poisoned against petitioner as to impeach the indifference of jurors who displayed no animus of their own." *Id.*  As in *Murphy*, the number of prospective jurors indicating bias does not call into question the qualifications of others whose statements of impartiality the Court has credited.

Far from showing that "an impartial jury actually cannot be selected," *Haldeman*, 559 F.2d at 63, the first five January 6-related jury trials confirmed that voir dire can adequately screen out prospective jurors who cannot be fair and impartial, while leaving more than sufficient qualified jurors to hear the case.  The Court should deny the defendant's request for a venue transfer and should instead rely on a thorough voir dire to protect the defendant's right to an impartial jury.

## **CONCLUSION**

For the foregoing reasons, the defendant's motion to transfer venue should be denied.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
DC Bar No. 481052

*/s/ Jordan A. Konig*
JORDAN A. KONIG
Supervisory Trial Attorney, Tax Division,
U.S. Department of Justice
Detailed to the U.S. Attorney's Office
For the District of Columbia
P.O. Box 55, Washington, D.C.  20044
202-305-7917 (v) / 202-514-5238 (f)
Jordan.A.Konig@usdoj.gov

*/s/ Samuel S. Dalke*
SAMUEL S. DALKE
Assistant U.S. Attorney
Middle District of Pennsylvania
Detailed to the U.S. Attorney's Office
For the District of Columbia
228 Walnut Street, Suite 220
Harrisburg, PA 17101
717-515-4095
Samuel.S.Dalke@usdoj.gov

## CERTIFICATE OF SERVICE

On this 5th day of January 2023, a copy of the foregoing Opposition to Defendant's Motion

to Transfer Venue was served upon all parties listed on the Electronic Case Filing (ECF) System.


By:     */s/ Jordan A. Konig*
JORDAN A. KONIG
Supervisory Trial Attorney, Tax Division,
U.S. Department of Justice
Detailed to the U.S. Attorney's Office
For the District of Columbia
P.O. Box 55, Washington, D.C.  20044
202-305-7917 (v) / 202-514-5238 (f)
Jordan.A.Konig@usdoj.gov