UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | |
| v. : | Case No. 21-cr-26 (CRC) |
| : | |
| CHRISTOPHER MICHAEL ALBERTS, : | |
| Defendant. | |

**DEFENDANT CHRISTOPHER ALBERTS'S REPLY TO GOVERNMENT'S
OPPOSITION TO DEFENDANT'S MOTION TO TRANSFER VENUE**

COMES NOW Defendant Christopher Michael Alberts ("Defendant" or "Alberts") and replies to the Government's Opposition to Defendant's Motion to Transfer Venue by reiterating that he cannot obtain a fair and impartial trial in this district, and that the Court should transfer the case to an impartial venue.

**BACKGROUND**

The government asserts that, on January 6, 2021, "Alberts arrived on Capitol grounds prepared for battle" because "[h]e wore a bullet proof vest containing metal plates, camouflage fatigues, a gas mask, a tactical radio, and holsters containing a fully loaded firearm and magazines with 25 rounds of hollow-point ammunition." ECF No. 90 at 2. However, as Defendant has argued in his Motion to Suppress Evidence (ECF No. 74) and on which a hearing will be held, the firearm and ammunition that were allegedly seized were seized after a search of Alberts's person without probable cause or reasonable suspicion.

Moreover, the government states that Alberts was present near the Capitol after a citywide curfew had gone into effect. However, various law enforcement agencies had begun threatening, pushing, and manhandling protestors before the alleged curfew had been announced at the Capitol. ECF No. 74 at 2. Officers have provided statements alleging that the curfew was

already in place when they searched Alberts, but videos show that the encounter occurred before the curfew while officers were herding protestors away and threatening to implement a curfew. *Id.*

## ARGUMENT

The government notes that dozens of January 6-related cases have filed motions for change of venue, and that "[e]very judge of this Court . . . has denied the motion." ECF No. 90 at 1 n.1. The government uses this information to support its argument that a fair and impartial trial can be held in this district, arguing that "[t]here is simply no reason to believe that, out of an eligible jury pool of nearly half a million, '12 impartial individuals could not be empaneled.'" *Id.* at 7 (quoting *Skilling v. United States*, 561 U.S. 358, 382 (2010). However, the government fails to recognize that far more than twelve impartial individuals are required to prosecute the January 6 trials that have already occurred, the ones that are currently ongoing, and the hundreds of those remaining, including the instant case.

In a venue with the characteristics of those in the District of Columbia jury pool, with substantial pretrial publicity that continues to the present day, and with evidence of juror partiality, voir dire is unnecessary to uncover "so great a prejudice against the defendant" that would require transferring the case to a district in which Alberts may receive a fair and impartial trial. *See Skilling*, 561 U.S. at 378.

### I. The Pretrial Publicity Related to January 6 Supports a Presumption of Prejudice in This District

#### A. The Skilling Factors Support a Presumption of Prejudice in the Instant Case

While the Constitution generally requires criminal trials to "be held in the State where the said Crimes shall have been committed," U.S. Const. Art. III, § 2, cl.3, the venue is constitutionally required to be transferred when "extraordinary local prejudice will prevent a fair

trial." *Skilling*, 561 U.S. at 378.  While voir dire is generally utilized to recognize and remove jury bias, "prejudice to the defendant's rights may be presumed" in "extreme circumstances." *United States v. Haldeman*, 559 F.2d 31, 63 (D.C. Cir. 1967).  The *Skilling* factors which district courts generally weigh to analyze whether a change of venue is warranted are: (1) the size and characteristics of the community; (2) the nature and extent of the pretrial publicity; (3) the proximity between publicity and the trial; and (4) evidence of juror partiality.  *Skilling*, 561 U.S. at 382-83.  All of these factors warrant a change of venue in this case.

       **1. The Size and Characteristics of the District of Columbia Create Inherent Bias Against January 6 Defendants**

The government acknowledges that "[t]he relevant question is . . . whether [the District of Columbia] is large enough that an impartial jury can be found."  ECF No. 90 at 7.  The government explains that the District of Columbia has "more than four times as many people as the parish in *Rideau*," and that the Court in *Mu'Min v. Virginia*, 500 U.S. 415, 429 (1991) "cited a county population of 182,537 as supporting the view [that] an impartial jury could be selected." *Id.*  The government contends that "[t]here is simply no reason to believe that, out of an eligible jury pool of nearly half a million, '12 impartial individuals could not be empaneled.'" *Id.* (quoting *Skilling*, 561 U.S. at 382).

However, the government fails to recognize that none of the individuals in the cited cases were tried simultaneously with over eight hundred other defendants being charged with similar or identical claims arising from the same event.  The cited cases involved few "high-profile individuals," and each required only twelve impartial individuals out of the entire eligible population of their respective districts.  While Alberts's trial also requires only twelve impartial individuals, his trial will follow multiple January 6-related trials.  *See* CAPITOL BREACH CASES, U.S. DEP'T OF JUST., https://www.justice.gov/usao-dc/capitol-breach-cases (last accessed Nov. 7,

2022). The government even recognizes that a total of 239 prospective jurors underwent examination for the first five January 6-related jury trials, which required a total of sixty "impartial" jurors to be found. *See* ECF No. 90 at 29-33. Presumably, these prospective jurors will not be invited to participate in jury selection for other January 6 defendants. If every single January 6 defendant were to exercise their Sixth Amendment rights to jury trials, then approximately 48,000 individuals would be summoned as potential jurors, and over 9,600 impartial individuals would need to be identified.

### a. The Number of Federal Employees Who Reside in the District of Columbia Supports a Change of Venue

The government contends that being employed by the federal government does not "render a person incapable of serving as an impartial juror in determining his guilt." ECF No. 90 at 14. Further, the government states that "many federal employees were nowhere near the Capitol on January 6 given the 'maximum telework' policy of many federal agencies at the time. And the storming of the Capitol on January 6 was not aimed at the federal government in general, but specifically at Congress' certification of the electoral vote." *Id.*

Despite the "maximum telework" policy in place on January 6, 2021, the government employees who were employed in D.C. and who had previously worked in D.C. offices likely viewed their workplaces and the government, as a whole, as being under attack, as did many residents of D.C.

Moreover, even if every federal employee was disqualified from serving on the jury in this case, the remaining available pool of participants would be significantly less than the nearly 700,000 D.C. residents when considering the residents that have already been disqualified from or have served on juries in the January 6-related cases that have already undergone jury trials.

### b. The District of Columbia's Political Makeup Supports a Change of Venue

The government cites, among other cases, *United States v. Haldeman*, 559 F.2d 31, 63 (D.C. Cir. 1976) and *United States v. Stone*, No. 19-cr-0018 (ABJ), 2020 WL 1892360 (D.D.C. Apr. 16, 2020) to argue that the "Court should not presume that every member of a particular political party is biased simply because this case has a political connection." ECF No. 90 at 16. Further, the government states that "the Court in *Stone* rejected the argument that jurors 'could not possibly view [Roger Stone] independently from the President' because of his role in the presidential campaign or that 'if you do not like Donald Trump, you must not like Roger Stone.'" *Id.* (quoting *Stone*, 2020 WL 1892360, at *30-*31).

However, as mentioned above, this case is one of hundreds involving the events on January 6, which members of the Democratic party continue to view as an attack by right-wing extremists. One particular news article claims that, on January 6, 2023, "Senior Democrats . . . led a large and poignant gathering on the steps of the US Capitol in Washington to commemorate the 'solemn day' on the second anniversary of the deadly January 6 insurrection by extremist supporters of Donald Trump." Richard Luscombe, *Democrats Commemorate January 6 Attack with Tears and Silence at US Capitol*, THE GUARDIAN (Jan. 6, 2023), https://www.theguardian.com/us-news/2023/jan/06/democrats-commemorate-january-6-attack-with-tears-and-silence-at-us-capitol. Whether members of the Democratic party can view the January 6 protestors independently from Donald Trump or not, they do view the protestors as "violent" "extremist[s]" and "rioters," and they claim that "[m]any more will forever be scarred by the bloodthirsty violence of the insurrection of this mob." *Id.*

### c.  The Impact of January 6 on Washington, D.C. Supports a Change of Venue

The government argues that because "January 6 is now two years in the past" and "[m]any D.C. residents do not live or work near the Capitol where the roads were closed and the National Guard was deployed," that "[t]here is no reason to believe that the District's entire population of nearly 700,000 people was so affected by these events that the Court cannot seat an impartial jury." ECF No. 90 at 17.  Yet, as mentioned above, the events of January 6 are still "commemorate[d] . . . with tears and silence." *Luscombe*, *supra.*  D.C. residents still view the events of January 6 as an attack on their homes and workplaces, even if they don't live or work near the Capitol itself.

Moreover, despite the government's claims that, "using the first five jury trials as exemplars, the voir dire that took place undermines the defendant's claim that prejudice should be presumed," *Id.* at 29, the January 6 jury trials that have already occurred indicate the intense bias felt by District of Columbia residents.  For instance, during Guy Reffitt's jury selection, several potential jurors "spoke passionately about their fear during the attack on the Capitol and their disgust toward its perpetrators." Katelyn Polantz et al., *Jury Pool for First Capitol Riot Trial Still Stung by Attack*, CNN (Feb. 28, 2022), https://www.cnn.com/2022/02/28/politics/reffitt-january-6-trial-jury-pool.  Some stated "outright that they could not be impartial toward Reffitt." *Id.*  One passionately declared that he "felt like it was an attack on [his] home," and another stated that "Everybody who went in there is already guilty. . . . They should be prosecuted to the max." *Id.*

Similarly, during Stewart Rhodes's jury selection, "it became clear that for many DC residents, the emotions of January 6 are still raw."  Holmes Lybrand & Hannah Rabinowitz, *DC*

*Residents Say They Can Be Impartial As Potential Jurors in Oath Keepers Trial But Emotions Remain Raw Over Jan. 6 Attack*, CNN (Sept. 27, 2022), https://www.cnn.com/2022/09/27/politics/oath-keepers-trial-jurors-january-6/index.html. Multiple potential jurors felt biased against January 6 defendants because of the proximity of the January 6 events to the potential jurors' homes. *Id.* Others called the events "disconcerting," and another cried. *Id.*

While it is clearly apparent that many January 6 defendants chose to forego jury trials, the jury selections that have already occurred have demonstrated the difficulty in finding impartial jurors in the District of Columbia. As of January 6, 2023, "[m]ore than 725 defendants have been arrested in nearly all 50 states and the District of Columbia"; "[a]pproximately 165 individuals have pleaded guilty to a variety of federal charges, from misdemeanors to felony obstruction, many of whom will face incarceration at sentencing"; "[a]pproximately 70 federal defendants have had their cases adjudicated and received sentences"; and "[t]he FBI continues to seek the public's help in identifying more than 350 individuals believed to have committed violent acts on the Capitol grounds." ONE YEAR SINCE THE JAN. 6 ATTACK ON THE CAPITOL, U.S. DEP'T OF JUST., https://www.justice.gov/usao-dc/one-year-jan-6-attack-capitol (last accessed Jan. 12, 2023). The outcomes of the closed January 6 cases likely increase the bias that the remaining January 6 defendants are guilty in the minds of District of Columbia residents who may have previously been impartial.

### 2. The Nature of the Pretrial Publicity in the District of Columbia Creates Inherent Bias Against January 6 Defendants

The government contends that a fair trial may be held in the District of Columbia despite the volume of news coverage of January 6. ECF No. 90 at 9. While "Alberts's case does not involve a 'confession or other blatantly prejudicial information of the type readers or viewers

could not reasonably be expected to shut from sight,'" *Id.* at 8 (quoting *Skilling*, 561 U.S. at 382), the coverage of January 6, the January 6 House Select Committee, Donald Trump's subpoena by the January 6 Committee, new arrests, guilty pleas, convictions, and sentences has remained relentless in Washington, D.C. January 6 is likely to remain a staple of daily news articles, as some tout that "the Justice Department still announces multiple new arrests each week, and hundreds more rioters have been identified but not yet charged. Federal prosecutors have told D.C. District Court Chief Judge Beryl Howell that it's 'not an unreasonable expectation' that more than 2,000 cases could be filed." Sarah D. Wire, *Ripples for Years to Come: What the Jan. 6 Cases Mean for the Judicial System*, LOS ANGELES TIMES (Oct. 31, 2022), https://www.latimes.com/politics/story/2022-10-31/jan-6-cases-weigh-on-dc-court.

Moreover, while news of January 6 and the Select Committee hearings were televised nationally, their effects on venues outside of Washington, D.C. was nominal compared to that of D.C., as is exemplified by the Google search data provided by Alberts. ECF No. 86, Exhibits A-H. For instance, the residents of the District of Columbia overwhelmingly search the terms "Proud Boys," "Seditious Conspiracy," "Sedition," "Select Committee," "Jan. 6th Committee," "Insurrection," "Capitol Riot," and "White Supremacist" more than any other state in the nation. This demonstrates that the nationally televised information regarding January 6 is most willfully consumed and engaged with in Washington, D.C.

As mentioned above, the more January 6 defendants that plead guilty and become convicted of crimes identical to those which Alberts faces, the more likely that publicity of those cases will lead the jury pool to assume that Alberts should be found guilty as well. The government claims that "a careful voir dire – rather than a change of venue – is the appropriate way to address potential prejudice from the Select Committee hearings." ECF No. 90 at 9. The

government also contends that "[t]he Court can guard against any spillover prejudice from the broader coverage of January 6 by conducting a careful voir dire and properly instructing the jury about the need to determine a defendant's individual guilt." *Id.* at 10.  Further, the government posits that "any threat of such spillover prejudice is not limited to Washington, D.C. because much of the news coverage of January 6 has been national in scope." *Id.*  However, as mentioned above, courts have struggled to retain enough "impartial" jurors for the January 6-related trials that have already occurred because potential jurors view the event *as a whole* as an attack on their homes, and they presume that each defendant had a role in making the jurors feel unsafe.

### 3. The Passage of Time Before Trial Creates Inherent Bias Against January 6 Defendants

The government notes that "two years have elapsed since the events of January 6, including Alberts's arrest, and another month will elapse before trial." *Id.* at 11-12.  The government argues that, because this elapsed time "is far more than in *Rideau*" and "the 'decibel level of media attention [has] diminished somewhat,'" that enough time will have elapsed to reduce juror bias. *Id.* at 12.  However, as mentioned above, January 6 and all related occurrences remain prominent in the news *nearly every day*.  The amount of time that has passed does not diminish the "raw emotions" that D.C. residents still feel.  *See* Lybrand & Rabinowitz, *supra.*

### 4. The Jury Verdicts in Prior Cases Create Inherent Bias Against January 6 Defendants

While Alberts has not yet faced a biased jury, the Courts have experienced difficulty securing impartial juries in the January 6-related cases that have already occurred, as mentioned above.  While "juries in two recent January 6 trials have either been unable to reach a verdict on certain counts, . . . or have acquitted on some counts," ECF No. 90 at 12-13, this has not been the

case for the overwhelming majority of January 6 defendants. Furthermore, while Stewart Rhodes was acquitted of Conspiracy to Obstruct an Official Proceeding and Conspiracy to Prevent an Officer from Discharging Any Duties, he was convicted of the more serious charges of Seditious Conspiracy, Obstruction of an Official Proceeding, and Tampering with Documents and Proceedings. *See* CAPITOL BREACH CASES: RHODES, ELMER STEWART III, U.S. DEP'T OF JUST., https://www.justice.gov/usao-dc/defendants/rhodes-elmer-stewart-iii (Nov. 30, 2022). Moreover, securing an impartial jury will likely only become more difficult as the jury pool dwindles and as potential jurors become more biased upon being bombarded with continuous January 6-related news coverage.

## **CONCLUSION**

For the foregoing reasons, Defendant's Motion to Change Venue should be granted.

Dated: January 12, 2023

Respectfully Submitted,
/s/ John M. Pierce
John M. Pierce
John Pierce Law, P.C.
21550 Oxnard Street
3rd Floor, PMB 172
Woodland Hills, CA 91367
jpierce@johnpiercelaw.com
(213) 279-7648
*Attorney for Defendant*

## **CERTIFICATE OF SERVICE**

I hereby certify that, on January 12, 2023, this reply was filed via the Court's electronic filing system, which constitutes service upon all counsel of record.

/s/ John M. Pierce
John M. Pierce
