UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
Case No.: 21-CR-026 (CRC)

UNITED STATES OF AMERICA,
    Plaintiff,
v.                                      Case No. 21-cr-026 (CRC)
CHRISTOPHER MICHAEL ALBERTS
    Defendant.
_____/

ALBERTS AFFIRMATIVE DEFENSES

COMES NOW, Defendant, CHRISTOPHER MICHAEL ALBERTS, (hereinafter, "Defendant" or "Alberts"), by and through undersigned counsel, with these affirmative defenses. Each of the following affirmative defenses are supported by evidence in this case:

1) The Second Amendment Right to Bear Arms in Self Defense;

2) Justifiable Use of Force;

3) Necessity;

4) The First Amendment right to petition government for redress, and to free speech, press, and assembly, and

5) Civil Disobedience, with regard to the gun counts and the purported curfew in this case.

Defendant proffers each of these affirmative defenses, and lays out the basic factual basis for each below. Defendant requests an evidentiary hearing to determine any additional facts necessary for establishing these defenses at trial.

**1. The Second Amendment to the United States Constitution** provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II.

In the seminal case of *District of Columbia v. Heller*, 554 U.S. 570, 628-29 (2008), the Supreme Court determined that the Second Amendment protects "the right of law-abiding, responsible citizens to use arms in defense of hearth and home." The "central" aspect of this right is the "right to self-defense." Id. at 628.  Two years after *Heller*, in *McDonald v. City of Chicago, Illinois*, 561 U.S. 742, 778 (2010), the Supreme Court reiterated that the Second Amendment is a fundamental right, applicable to the states pursuant to the Due Process Clause of the Fourteenth Amendment.

Then in *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S.Ct. 2111 (2022), the Court analyzed the constitutionality of a New York firearm licensing scheme that dated to 1911, concerning the public carrying of a concealed firearm. Under that law, in order to obtain a permit to carry a concealed handgun in public, an applicant was required to demonstrate "proper cause," i.e., "a special need for self-protection distinguishable from that of the general community." Id. at 2122-23.

"[W]e hold," wrote the Supreme Court, "that when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively, protects that conduct. To justify its regulations, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."

"[T]he Second Amendment, like the First and Fourth Amendments, codified a preexisting right," neither "granted by the Constitution" nor "dependent upon that instrument for its existence." Heller, 554 U.S. at 592, 128 S.Ct. 2783; *see also id*. at 599, 128 S.Ct. 2783

(explaining that "the Second Amendment was not intended to lay down a 'novel principl[e]' but rather codified a right 'inherited from our English ancestors.' ") (quoting *Robertson v. Baldwin*, 165 U.S. 275, 281 (1897)). Accordingly, the Second Amendment is "enshrined with the scope [it was] understood to have when the people adopted [it]." *Heller*, 554 U.S. at 634-35. *See also People v. DeWitt*, 275 P.3d 728, 733 (Colo.App.2011) ("[A] defendant charged with POWPO may raise as an affirmative defense that he or she possessed a weapon for the constitutionally protected purpose of defending his or her home, person, or property.").

**2. Justifiable Use of Force.**  Alberts will show at trial that some of his alleged conduct on Jan. 6, including the acts constituting the government's claims of "assault," occurred in circumstances where law enforcement officers were engaging in excessive force—justifying self defense and defense of others.  Officers were unlawfully shooting protestors in the face with rubber bullets and pepperballs and launching flash-bang grenades at protestors without warning. Alberts himself was unlawfully hit by such munitions, and suffered non-life-threatening injuries while protesting for fair and transparent elections on January 6.

It is a violation of every police policy manual to shoot people in the head, face, or neck with less-than-lethal munitions, as such headshots can (and have) caused death.  Alberts will show that at the time he allegedly lifted up an object against police (described in Count 2), Alberts was seeking to protect himself and others from injury or death from illegal, excessive use of force by law enforcement officers.  See *United States v. Feola*, 420 U.S. 671 (1975).

**3. Necessity.** Alberts will also show that his actions on Jan. 6 were done in necessity. See *United States v. Bailey*, 444 U.S. 394 (1980) (escaped prisoner may argue necessity and duress on grounds his prison was dangerous, but his necessity defense fades with every day he does not

seek to surrender himself to non-dangerous facility; otherwise, every trial under § 751(a) (escape) would be converted into a hearing on the current state of the federal penal system).

To invoke the necessity defense, a defendant colorably must show that: (1) he was faced with a choice of evils and chose the lesser evil; (2) he acted to prevent imminent harm; (3) he reasonably anticipated a direct causal relationship between their conduct and the harm to be averted; and (4) he had no legal alternatives to violating the law. *United States v. Aguilar*, 883 F.2d 662, 693 (9th Cir.1989), cert. denied, 498 U.S. 1046 (1991).

The evidence will show that defendant Alberts was faced with a choice of evils. Alberts believed in good faith that the 2020 presidential election was improperly conducted and processed and that he could either do nothing or ascend to his nation's Capitol and lift up his voice with others in protest. Alberts was aware of deadly and dangerous antifa rioting that had gone on before at Trump events in D.C. Alberts reasonably anticipated that he and other protestors for fair elections would face threats of violence on Jan. 6 and that his armed presence would protect himself and fellow protestors from potentially deadly attacks. The harm was imminent; and prior stop-the-steal protests in D.C. had resulted in stabbings and assaults against protestors for transparent elections. Alberts knew he had no alternative; the established government had abandoned fair play and even-handed treatment of pro-Trump participants.

Necessity is, essentially, a utilitarian defense. See Note, *The State Made Me Do It: The Applicability of the Necessity Defense to Civil Disobedience*, 39 Stan.L.Rev. 1173, 1174 (1987). It therefore justifies criminal acts taken to avert a greater harm, maximizing social welfare by allowing a crime to be committed where the social benefits of the crime outweigh the social costs of failing to commit the crime. *See, e.g., Dorrell*, 758 F.2d at 432 (recognizing that "the policy underlying the necessity defense is the promotion of greater values at the expense of lesser

values") (citation omitted). Pursuant to the defense, prisoners could escape a burning prison, *see, e.g., Baender v. Barnett*, 255 U.S. 224, 226, 41 S.Ct. 271, 272, 65 L.Ed. 597 (1921); a person lost in the woods could steal food from a cabin to survive, see Posner, *An Economic Theory of the Criminal Law*, 85 Colum.L.Rev. 1193, 1205 (1985); an embargo could be violated because adverse weather conditions necessitated sale of the cargo at a foreign port, see The William Gray, 29 F.Cas. 1300, 1302 (C.C.D.N.Y. 1810); a crew could mutiny where their ship was thought to be unseaworthy, see *United States v. Ashton*, 24 F.Cas. 873, 874 (C.C.D.Mass. 1834); and property could be destroyed to prevent the spread of fire, *see, e.g., Surocco v. Geary*, 3 Cal. 69, 74 (1853).

4**. The First Amendment right to petition government for redress, and to free speech, press, and assembly** enshrines and protects Alberts' right to ascend to the nation's Capitol and join others in making their protests concerning the 2020 election known.  On Jan. 6, 2021, Alberts did what hundreds of thousands of others have done before: he made his presence known on Capitol Hill, and lifted up his voice in spirited protest against perceived government evils.  Alberts exemplified the heroism of advocacy against all odds, carrying a megaphone to inspire and express his political opinions.  The First Amendment protects even vile, threatening, violent, or anti-government speech and expression so long as such expression does not knowingly call for imminent lawless violence in circumstances where such violence is reasonably likely to cause imminent violence.

Since time immemorial, state authorities everywhere have called advocacy against government "terrorism," "sedition," "rebellion," or "civil disorder."  Yet Alberts plainly advocated adherence to the Constitution and was well within his First Amendment rights to assemble, advocate, petition, demonstrate and protest on January 6.

**5. "Civil disobedience" is the willful violation of a law, undertaken for the purpose of social or political protest**. *Cf. Webster's Third New International Dictionary* 413 (unabridged, 1976) ("refusal to obey the demands or commands of the government" to force government concessions). See Note, *Applying the Necessity Defense to Civil Disobedience Cases*, 64 N.Y.U.L.Rev. 79, 79-80 & n. 5 (1989). The Constitution enshrines the bedrock principle that government may never deprive people of their lives, liberty, or property without due process of law, yet Alberts was stampeded, attacked, and tackled on January 6 merely for being in a public place the government didn't want him to be.

Curfews, stay-at-home orders, shelter-in-place commands and other totalitarian government decrees are anathema to the most basic civil liberties Americans hold. In America, the citizen is sovereign *over* government; not the other way around. And when Alberts and others were unlawfully pushed to leave areas where they had a right to be, they had the right—perhaps even the duty—to obstruct, defy, and resist.

Dated: April 8, 2023

Respectfully Submitted,

*/s/ John M. Pierce*
John M. Pierce
John Pierce Law, P.C.
21550 Oxnard Street
3rd Floor,
PMB 172 Woodland Hills, CA 91367
jpierce@johnpiercelaw.com
(213) 279-7648
Attorney for Defendant

CERTIFICATE OF SERVICE

I hereby certify that on April 8, 2023, a true and accurate copy of the forgoing was electronically filed and served through the ECF system of the U.S. District Court for the District of Columbia.