```
 1                IN THE UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF COLUMBIA
 2
        - - - - - - - - - - - - - - - x
 3      THE UNITED STATES OF AMERICA,
                                          Criminal Action No.
 4                   Plaintiff,           1:21-cr-00026-CRC-1
                                          Tuesday, April 11, 2023
 5      vs.                               9:15 a.m.

 6      CHRISTOPHER ALBERTS,

 7                   Defendant.
        - - - - - - - - - - - - - - - x
 8

 9      _____

10                 TRANSCRIPT OF JURY IMPANELMENT
            HELD BEFORE THE HONORABLE CHRISTOPHER R. COOPER
11                   UNITED STATES DISTRICT JUDGE
        _____
12
        APPEARANCES:
13
        For the United States:      JORDAN ANDREW KONIG, ESQ.
14                                   U.S. DEPARTMENT OF JUSTICE
                                     P.O. Box 55
15                                   Ben Franklin Station
                                     Washington, DC 20044
16                                   (202) 305-7917
                                     jordan.a.konig@usdoj.gov
17
                                     SAMUEL DALKE, ESQ.
18                                   DOJ-USAO
                                     228 Walnut Street, Suite 220
19                                   Harrisburg, PA 17101
                                     (717) 221-4453
20                                   samuel.s.dalke@usdoj.gov

21                                   SHALIN NOHRIA, ESQ.
                                     UNITED STATES ATTORNEY'S OFFICE
22                                   601 D Street NW
                                     Suite Office 6.713
23                                   Washington, DC 20001
                                     (202) 344-5763
24                                   shalin.nohria@usdoj.gov

25

        (CONTINUED ON NEXT PAGE)
```

1    APPEARANCES (CONTINUED):

2    For the Defendant:      **JOHN M. PIERCE, ESQ.**
                        **ROGER ROOTS, ESQ.**

3                              **JOHN PIERCE LAW P.C.**
                        21550 Oxnard Street

4                        Suite 3rd Floor OMB #172
                        Woodland Hills, CA 91367

5                        (213) 400-0725
                        jpierce@johnpiercelaw.com

6                        rroots@johnpiercelaw.com

7

8    Court Reporter:        Lisa A. Moreira, RDR, CRR
                        Official Court Reporter

9                        U.S. Courthouse, Room 6718
                        333 Constitution Avenue, NW

10                      Washington, DC  20001
                      (202) 354-3187

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    P R O C E E D I N G S
 2            THE COURTROOM DEPUTY:  Your Honor, we're on the
 3    record for Criminal Case 21-26, United States of America vs.
 4    Christopher Alberts.
 5            Counsel, please approach the lectern and identify
 6    yourselves for the record starting with the government.
 7            MR. KONIG:  Good morning, Your Honor; Jordan Konig
 8    for the United States.  I'm joined again by Assistant United
 9    States Attorney Samuel Dalke and Assistant United States
10    Attorney Shalin Nohria.
11            THE COURT:  All right.  Good morning, everybody.
12            MR. PIERCE:  Good morning, Your Honor; John Pierce
13    on behalf of defendant, Christopher Alberts.  I'm joined by
14    my partner, Roger Roots.
15            MR. ROOTS:  And I, of course, have a complicated
16    situation, Your Honor.  I'm still on duty in the -- Judge
17    Cooper's trial downstairs --
18            THE COURT:  Judge Kelly's.
19            MR. ROOTS:  Yes, Judge Kelly's trial.
20            THE COURT:  I wish I could be at two places at
21    once.
22            MR. ROOTS:  So he starts at 9:30 this morning.
23    I'm going to slide out there, if I have your permission.
24    And what I'd like to do -- I think Mr. Pierce is going to
25    handle the jury selection, opening statements.
```

```
 1              I would like to introduce myself to the jurors at

 2     some point, and I'm going to try to move back and forth

 3     until the Proud Boys -- I believe it's in its final two

 4     days, I believe.  And so with your permission, I'd like to

 5     do that.

 6              THE COURT:  So long as that's fine with your

 7     client, that's fine with me.

 8              MR. ROOTS:  Okay.  Thank you.

 9              THE COURT:  All right.  Just a couple of

10     preliminary matters before -- Lauren, is our panel ready

11     or --

12              THE COURTROOM DEPUTY:  No.

13              THE COURT:  Not quite.  How long do you think we

14     have?

15              THE COURTROOM DEPUTY:  Probably about 15 minutes.

16              THE COURT:  15 minutes?  Okay.

17              Let's deal with a few preliminary matters.

18              Mr. Konig, you suggested yesterday that the Court

19     may want to inquire with the defendant as to the plea offers

20     that have been extended in the case and to confirm that he

21     has declined those and is prepared to go to trial.

22              Having thought about it, it's not my regular

23     practice to do, but given the length of the pretrial

24     proceedings here, the fact that there have been a number of

25     counsel changes, I agree with you that that makes sense.
```

1          So if you could, just put on the record the offers

2     that were extended.  And I know I'm hitting you out of the

3     blue.  Take your time.

4          MR. KONIG:  It will take me just a second to bring

5     it up on my computer.

6          (Pause)

7          THE COURT:  Okay.  While we are doing that, I have

8     received a witness list or a proposed witness list from the

9     defendant that appears to be -- it's three and a half pages,

10    single-spaced.  I'm not sure if it was filed, but I've been

11    provided it.  There appear to be over 150 witnesses on this

12    list.

13         Mr. Pierce, do you want to address what this is?

14         MR. PIERCE:  Mr. Roots will address it, if that's

15    okay, Your Honor.

16         MR. ROOTS:  Yes.  My understanding is we've sort

17    of thrown it together.  A lot of them are police with body

18    cam files.  In discovery we believed -- obviously we're not

19    likely to call probably the majority of those, but we did,

20    just in anticipation of potentials, we put them on a list.

21         THE COURT:  Okay.  At our pretrial conference we

22    went through the government's witnesses.  I came up with an

23    estimate of how long this trial will last.  I said I'm going

24    to tell the jury it's going to last through the week,

25    potentially a little bit into next week; and I asked you

1     whether that was okay, and you said that was okay.

2             All right.  Obviously that's inconsistent with 150

3     witnesses.

4             MR. ROOTS:  Yes, we're --

5             THE COURT:  And I'm not going to read 150 names to

6     the jury as to potential witnesses this morning.  Okay?

7             So you have two choices.  You can go back and give

8     me a realistic list of anticipated witnesses that you would

9     like me to read to the jury this morning, or I'm not going

10    to read any witnesses to the jury.  All right?  And then we

11    can talk about later who you're actually planning to call

12    and who you're not planning to call.

13            MR. ROOTS:  Okay.  Well, many of them, like I

14    said, I believe are officers who were on the west side of

15    the Capitol and in the area -- I believe we don't have

16    officers --

17            THE COURT:  Are these folks under subpoena?  Have

18    there been requests?  Are they available?  Did they view

19    what -- the assault that is at issue in this case?  All

20    right.

21            So ask yourself all those questions, and then come

22    back and tell me who you really anticipate calling in this

23    case.  Okay?

24            MR. ROOTS:  Understood.

25            THE COURT:  This is not well taken.

1          MR. KONIG:  Your Honor, I apologize.  This is

2     going to be a little haphazard.  I thought I printed this

3     out, and I could not find it in my binder.

4          But I will state for the record that the

5     government -- again, there are nine pending charges against

6     the defendant.  Plea offers were extended --

7          THE COURT:  I'm sorry, Mr. Pierce and Mr. Roots,

8     this is somewhat important so let's have your attention.

9     Okay?

10          MR. PIERCE:  I'm sorry.

11          MR. KONIG:  Plea offers were extended to the

12     former counsel for Mr. Alberts on June 28, 2021, and May 26,

13     2022.

14          The proposed plea agreement would be the defendant

15     pleading guilty to Counts 2 and 6 of the second superseding

16     indictment.  Count 2 charges, of course, 18 USC 111(a)(1),

17     inflicting bodily injury on certain officers.  Count 6

18     charges unlawful possession of a firearm on Capitol grounds,

19     violation of 40 United States Code Section 5104(e)(1)(A)(i).

20          The government advised the defendant at the time

21     that a violation of 18 United States Code Section 111(a)(1)

22     carries a maximum sentence of eight years imprisonment, a

23     fine of $250,000 or twice the pecuniary gain or loss from

24     the offense, a term of supervised release of not more than

25     three years, an obligation to pay any applicable interest or

1   penalties on fines or restitutions not timely made; and that

2   a violation of 40 United States Code 5104(e)(1)(A)(i)

3   carries a maximum sentence of five years imprisonment, a

4   fine of $250,000 or twice the pecuniary gain or loss of the

5   offense, a term of supervised release of not more than three

6   years, an obligation to pay applicable interest or penalties

7   on fines and restitution not timely made.  There would be a

8   $100 special assessment per felony offense.

9        The government preliminarily estimated that the

10  defendant would face a sentencing guideline range of 30 to

11  37 months of imprisonment, a fine of $6,000 to $60,000; and

12  the defendant would have been required to agree to pay

13  restitution in the amount of $2,000.

14       The proposed offer expired initially July 29,

15  2021, but the government re-sent the offer paperwork to

16  Alberts's new counsel, who is his former counsel, on May 26,

17  2022, which reopened discussions of a potential plea with an

18  expiration date of June 10, 2022.

19       Defendant at that time confirmed he did not wish

20  to enter into such an agreement.

21       THE COURT:  And remind me, who was Mr. Alberts's

22  counsel as of May and June of 2022?

23       MR. KONIG:  I believe that it was -- in May of

24  2021 I believe it was either -- I think it was Mr. Orenberg

25  or Mr. Kiyonaga; and in 2022, I believe it was Mr. Ferguson.

| | |
|---|---|
| 1 | Applicable to each of the nine offenses for -- |
| 2 | THE COURT:  I don't think that's necessary. |
| 3 | Mr. Alberts, the purpose of this is just to make |
| 4 | sure that you received those plea offers and that you |
| 5 | declined them and knowingly have decided to go to trial. |
| 6 | THE DEFENDANT:  Yes, Your Honor.  I've received |
| 7 | them with both of those attorneys, looked over them, and |
| 8 | I've decided to go to trial. |
| 9 | THE COURT:  Great.  Thank you. |
| 10 | All right.  There are probably multiple ways to do |
| 11 | this.  My system is to have counsel draw two numbers out of |
| 12 | the bowl.  That will be the alternate seats.  Okay?  And |
| 13 | only we will know who the alternate seats are. |
| 14 | So, Mr. Pierce, do you want to, since you're the |
| 15 | defense, come and draw a number. |
| 16 | MR. PIERCE:  Just pick one number? |
| 17 | THE COURT:  Pick one.  Don't say it out loud. |
| 18 | Show it to me.  This will be Alternate No. 1. |
| 19 | And Government Counsel, Alternate No. 2... |
| 20 | Okay.  All right.  So this will be a good way to |
| 21 | test our bat phones.  There is a button in the middle of the |
| 22 | receiver.  Press the button. |
| 23 | (The following is a bench conference |
| 24 | held outside the hearing of the public) |
| 25 | THE COURT:  Mr. Pierce, can you hear me? |

```
 1              MR. PIERCE:  Yes, Your Honor.
 2              THE COURT:  Mr. Alberts, can you hear me?
 3              Mr. Dalke, can you hear me?
 4              MR. DALKE:  Yes, Your Honor.
 5              THE COURT:  All right.  They're working.
 6              Okay.  This will be sealed from the transcript.
 7     Alternate No. 1 is Seat 6, and Alternate No. 2 is Seat 4.
 8              (This is the end of the bench conference)
 9              THE COURT:  And, again, Counsel, the seats are 1
10     through 7 left to right on the front row, 8 through 14 left
11     to right on the top row.
12              MR. PIERCE:  I'm sorry, Your Honor.  I apologize.
13     Just one preliminary matter.  I wanted to alert the Court so
14     there's no surprises, and for the government as well.
15              So I am planning to have somebody functioning as
16     an assistant with me, essentially a paralegal assistant who
17     is a very well-known sort of controversial figure in
18     politics.  This is not intended to create any kind of
19     spectacle or anything like that.  It's hard to find good
20     help on this side of these cases.  And it's Laura Loomer.
21     And so as was typically -- you know, the jury would not need
22     to be made aware of who assistants or paralegals, et cetera,
23     were.
24              I'm just wondering if the Court, you know, thinks
25     that we should identify her in light of her notoriety.
```

1              THE COURT:  Is Ms. Loomer -- Ms. Loomer is a

2      politician, if I --

3              MR. PIERCE:  Well, she ran for Congress twice.

4      She lost.

5              THE COURT:  Is she a paralegal by profession?

6              MR. PIERCE:  I don't know if she is a certified

7      paralegal or anything like that.  I mean, she is -- you

8      know, she's very helpful to me with respect to, you know,

9      managing exhibits and things like that.  So I'd like to --

10     you know, I'd like to be able to have her at counsel table.

11             MR. KONIG:  It's hard for me to address this

12     because I'm sort of inside the bubble.  And so I know of

13     Ms. Loomer's notoriety, and people like me either -- I think

14     would have very strong feelings about her either positively

15     or negatively; and that would concern me, that it would

16     introduce an element to our jury selection.

17             It's also not clear what services she'll be

18     performing, what necessary services she'd be performing

19     here, particularly in light of the fact that, you know,

20     there's already a paralegal or an assistant assisting, plus

21     a technology person assisting.

22             I mean, she can always sit in the back of the

23     courtroom, you know, if she wants to.

24             THE COURT:  All right.  Mr. Pierce, why does she

25     need to sit at counsel table?  Assuming there's some --

1    first of all, what service is she providing other than the

2    paralegal who has been here and is working on the case?

3              MR. PIERCE:  Well, I mean, you know, as the

4    Court -- I'm not --

5              THE COURT:  You can't just have anybody come sit

6    at counsel table.  Right?

7              MR. PIERCE:  I understand.  She will be there

8    solely and specifically to help, you know, juggle documents

9    and look at exhibits and make sure that, you know, I have

10   everything that I need.  I mean, that's not my strong suit,

11   and so, you know, I can use all the help I can get on that

12   front.

13             It is in no way, shape, or form anything other

14   than her performing those services.  It's not meant to

15   create --

16             THE COURT:  Those are services other than the

17   paralegal that you have?

18             MR. PIERCE:  Well, we have -- I mean, it's the

19   same sort of services, but, you know, we do -- we do have

20   multiple -- you know, with Mr. Roots in trial, the Proud

21   Boys trial, and, you know, simultaneously, you know, as she

22   sits here doing things to, you know, assist him.  And also

23   we have numerous filings and lots of cases throughout the

24   country that she's --

25             THE COURT:  All right.  I'll let her sit at

1    counsel table.

2               MR. PIERCE:  Okay.

3               THE COURT:  We'll need to somehow -- will she be

4    here today?

5               MR. PIERCE:  She's flying today.  She'll be here

6    tomorrow.

7               MR. KONIG:  Your Honor, may I be heard?

8               Again, she's not a member of this bar.  It's not

9    clear to me -- and Ms. Lambert is certainly a capable

10   paralegal who we've been working with on all of these

11   January 6th cases.

12              You know, I don't think it would be appropriate

13   for, for example, Mr. Alberts's fiancee to be sitting here.

14   And Ms. Loomer appears to be serving as essentially an

15   advocate, a nonlegal advocate, and that's really her

16   function.  And so I think it would be improper.

17              THE COURT:  All right.  Let me noodle over

18   this one.  We'll -- I'll reference -- I'll tell you what,

19   Mr. Pierce, when you introduce yourself and your team and

20   the defendant and Mr. Roots, if he's not here, tell the jury

21   that you might be joined by someone -- by a paralegal named

22   Laura Loomer.  Okay?

23              That way if any juror has a negative reaction, we

24   will know about it before the end of the day, all right, and

25   we can voir dire.  Okay?

1          Okay.  Mr. Pierce, do you have a real witness list

2     for me to read?

3          MR. PIERCE:  Well, I suppose I have a realer

4     witness list.  So we took a crack at trying to cut it down

5     by half, which still perhaps might not be well taken.

6          THE COURT:  Yes, I'm not going to do that.

7          MR. PIERCE:  All right.  With respect to the --

8          THE COURT:  Tell you what, how about character

9     witnesses?  Who are your character witnesses?  You mentioned

10    those the other day.  Are we calling character witnesses?

11         MR. PIERCE:  Yes, we're going to call...

12         (Pause)

13         MR. PIERCE:  So we have two character witnesses,

14    Your Honor:  Melissa Miller and Vanessa Torres.

15         THE COURT:  And was he with anyone that day?  Is

16    there anyone who saw, heard, standing next to him what was

17    going on that you plan on calling to testify about the

18    alleged assault?

19         MR. PIERCE:  I mean, he came to the 6th by

20    himself, but there were people around him, of course.

21         THE COURT:  Okay.  And have you talked to those

22    people?  Are they going to testify in this courthouse?

23         (Pause)

24         MR. PIERCE:  Yes.  There will be four of those

25    individuals, Your Honor.

```
 1                    THE COURT:  Okay.

 2                    MR. PIERCE:  First is David Sumrall, S-U-M-R-A-

 3        L-L.

 4                    THE COURT:  S-U-M-R-A-L-L?

 5                    MR. PIERCE:  Yes, sir.

 6                    THE COURT:  Okay.

 7                    MR. PIERCE:  Second is Joseph Thomas.

 8                    THE COURT:  All right.

 9                    MR. PIERCE:  And then there are two Capitol Police

10        officers, Officer Atkinson and Officer Martino.

11                    THE COURT:  Mark -- spell the last name.

12                    MR. PIERCE:  I believe it's M-A-R-T-I-N-O.

13                    THE COURT:  Martino.  Okay.

14                    MR. KONIG:  Just a few brief notes, Your Honor.

15                    First, I want to note for the record and

16        officially request from defense counsel pursuant to

17        Paragraph 9 of the Court's pretrial order, which requires a

18        proffer or a turnover of reverse *Jencks* material no later

19        than Friday before the witness is to testify.  So, you know,

20        to the extent there's any *Jencks* material from those

21        proposed witnesses, we would like it turned over.

22                    I should also note that at least as to

23        Mr. Sumrall, I'd ask for some sort of proffer that

24        Mr. Sumrall has firsthand knowledge of January 6th.  My

25        understanding is he has -- he's somebody who I believe
```

1    created a documentary about the events of January 6th but

2    was not himself at the events of January 6th or near the

3    defendant.

4            And I believe Mr. Thomas is another January 6th

5    defendant, and I don't know if he has personal knowledge.

6            And as to Officers Atkinson and Martino, they're

7    Capitol Police officers.  I don't know if they've been

8    subpoenaed or contacted for their testimony.  I just wanted

9    to note that for the record.

10           THE COURT:  All right.  Noted for the record.

11   We'll cross that bridge if we have to.

12           MR. KONIG:  Also, just one other matter outside of

13   the -- two other matters outside of the proposed witness

14   list.

15           One of them is I'd request the Court to ask

16   Mr. Alberts to take off what appears to be a military honor

17   medal that he's wearing today.  I don't think that's

18   appropriate -- I mean, it's certainly -- again, he should be

19   congratulated and thanked for his service, but I don't think

20   it's appropriate for the venire panel or the jury.

21           And also, to the extent the Court was inclined to

22   address some of the preliminary matters we've discussed --

23           THE COURT:  So I'm prepared to do that.  I don't

24   want to keep the jury waiting.  So at this point I think

25   I'll do that at the break.

1          Mr. Alberts, just as sort of a general commentary

2     first, all right?  People have strong feelings about January

3     6th.  All right?  It was a national event.  There are

4     debates on both sides of the fence as to what it was and why

5     it happened and the precipitating causes.  Okay?

6          That's not why we're here.  We are here to

7     determine whether you committed the offenses with which

8     you've been charged.

9          And I know that that may be difficult for lay

10    people to understand, the differences between a court of law

11    and, you know, a television debate or a documentary or a

12    college lecture or whatever.  Okay?  And there are certain

13    rules.  There are rules of evidence, and there are rules of

14    decorum that apply in a courtroom that may not apply outside

15    the courtroom.  All right?

16         And one of those rules is that generally we don't

17    let folks engage in expressive speech and political speech

18    and appeal to the sympathies of the jury.  And I know you're

19    a veteran.  If you were to testify, I'm sure that would come

20    out.  If you call a character witness, I'm sure that would

21    come out.  And I know that you're proud of your service.  We

22    all honor your service and those of other veterans.  Okay?

23         But you can't wear your military medal in the

24    courtroom.

25              THE DEFENDANT:  Can I address the Court, Your

1    Honor?

2              THE COURT:  Talk to your lawyer about that.  All

3    right?

4              (Pause)

5              MR. PIERCE:  Yes, Your Honor.

6              So with all respect, you know, we -- for the

7    record, we object to that.  And I would just like to sort of

8    point out that, you know, I really don't think it should be

9    taken as any kind of political expression that -- you know,

10   that he served.  Right?  You know --

11             THE COURT:  And maybe that was wrong, if I

12   suggested that it's a political statement.  But it's a way

13   to express a message to the jury about who he is and why

14   they should sympathize with him.

15             MR. PIERCE:  And a final just quick point, Your

16   Honor.

17             THE COURT:  All right.

18             MR. PIERCE:  I think, from Mr. Alberts's

19   standpoint, in terms of fairness, I believe he remembers --

20   I didn't really pay attention -- Mr. Haynes had a service-

21   related pin on his lapel, you know, and Congress folks walk

22   around with their service-related --

23             THE COURT:  I understand.  If you want to put it

24   next to your heart, put it in your pocket, that's fine.  But

25   you can't display it.  I'm sorry.

```
 1                All right.  Our panel is ready.

 2                There are a couple of members of the audience.  I

 3    believe we won't need that last row, but if for some reason

 4    the jury panel fills up that last row, we may have you step

 5    outside while we do the initial introductions.  But you

 6    should be okay there.

 7                (Venire enters courtroom)

 8                THE COURT:  Okay.  Everyone can be seated.

 9                (Pause)

10                THE COURT:  Okay.  Good morning, ladies and

11    gentlemen.

12                VENIRE IN UNISON:  Good morning.

13                THE COURT:  Good morning, ladies and gentlemen.

14                VENIRE IN UNISON:  Good morning.

15                THE COURT:  All right.  Welcome to the United

16    States District Court for the District of Columbia.  My name

17    is Christopher Cooper, and I will be the presiding judge in

18    this matter.

19                You've already met Ms. Jenkins.  To my right here

20    is our court reporter.  Members of my staff over to the

21    left; the parties in this case who you will be introduced to

22    in a moment.

23                Thank you in advance for your service and for your

24    patience.  This is the next phase of jury selection.  It

25    usually takes the better part of a day.  I will try to make
```

1    it as efficient as possible and not keep you waiting around.

2    But the purpose of this phase is to pick a fair and

3    impartial jury of 12 of you and two alternates.  All right?

4         You should all have an index card and a pen or a

5    pencil.  Does everyone have a card?

6         VENIRE IN UNISON:  Yes.

7         THE COURT:  All right.  The first thing I would

8    like for you to do is to write your four-digit juror number

9    on the upper right-hand corner of your index card.

10        And I will proceed to ask you a number of

11   questions.  I think there are 41 questions in all.  Each of

12   the questions are a "yes" or "no" question or calls for a

13   "yes" or "no" answer.

14        If your answer to any question is "yes," write

15   down the number of the question on your card.  Do not write

16   down "yes" or "no."  Do not write down the reasons for your

17   answer.  Just write down the question number on your card.

18        When we have finished asking all of the questions,

19   we'll collect the cards, and then we will call each one of

20   you up individually.  And I will ask you some follow-up

21   questions about the answers that you've provided, and

22   counsel will have an opportunity to ask brief follow-up

23   questions as well, if they wish.

24        All right.  This is a criminal case.  The name of

25   the case is *United States vs. Christopher Alberts*.  The

1    defendant, Mr. Alberts, is from Hartford County, Maryland.

2         The case arises out of Mr. Albert's conduct on the

3    U.S. Capitol grounds an January 6, 2021.  Mr. Alberts is

4    charged with nine criminal offenses.

5         The charges include obstructing, impeding, or

6    interfering with a law enforcement officer lawfully engaged

7    in the performance of their official duties incident or

8    during the commission of a civil disorder; forcibly

9    assaulting, resisting, opposing, impeding, intimidating, or

10   interfering with law enforcement officers; entering or

11   remaining on restricted grounds with a deadly or dangerous

12   weapon; disorderly or disruptive conduct on restricted

13   grounds with a deadly or dangerous weapon; engaging in

14   physical violence on restricted grounds; unlawful possession

15   of a firearm on Capitol grounds; disorderly and disruptive

16   conduct on Capitol grounds with the intent to impede or

17   disturb the orderly conduct of Congress; physical violence

18   within Capitol grounds; and carrying a pistol within the

19   District of Columbia without a license.

20        Mr. Alberts denies the charges against him and has

21   pleaded not guilty to all of the charges.

22        Before I ask you any questions, for the next step

23   I'd like everyone to stand and raise their right hand to be

24   sworn.

25        (Venire sworn)

 1              THE COURT:  All right.  Question 1:  Based on my

 2     conversations with the lawyers, I expect the presentation of

 3     evidence in this case to conclude by the end of this week or

 4     early next week.  The typical trial day lasts from about

 5     9:30 to 5:00 p.m. with 15-minute breaks in the morning and

 6     in the afternoon, and an hour- or hour-and-15-minute break

 7     for lunch.

 8              Do any of you have any difficulty with hearing,

 9     seeing, understanding the English language, or do you have

10     any other health condition that could impair your ability to

11     sit as a juror and devote your full attention to this trial

12     given the schedule I've just described?

13              If the answer to that question is yes, please

14     write 1 on your card.

15              I believe we have a question.  If anyone has any

16     questions, feel free to raise your hand.  Ms. Jenkins will

17     bring you a microphone.

18              Ma'am, second row on the right?  Did you have a

19     question?

20              PROSPECTIVE JUROR:  No, I had a --

21              THE COURT:  Are you okay?

22              PROSPECTIVE JUROR:  Yes, Your Honor.

23              THE COURT:  All right.  Question 2:  Apart from

24     your general knowledge of the events of January 6, 2021, do

25     you know or have you heard or read anything or watched any

1    videos about Mr. Alberts's alleged activities on January 6th

2    as I've just described them?

3                So if you think you know anything about

4    Mr. Alberts or about this case, please write 2 on your card.

5                Question 3:  Do you or anyone you are close to

6    live or work in the area of the Capitol building located on

7    First Street Southeast in Washington, or are you otherwise

8    closely familiar with the area?

9                Question 4:  Were you at or near the U.S. Capitol

10   on January 6, 2021?  If yes, write 4 on your card.

11               Question 5:  The government is represented in this

12   case by prosecutors from the Justice Department here in

13   Washington and the U.S. Attorney's Office in Pennsylvania.

14   I will now ask government counsel to introduce themselves

15   and their trial team.

16               MR. KONIG:  Good morning, ladies and gentlemen.

17   Thank you for being here.  My name is Jordan Konig.  I'm

18   joined at counsel table with Samuel Dalke and Shalin Nohria.

19               I'm also joined at counsel table with Kasia

20   Kozaczuk, our paralegal; and Special Agent Christopher

21   Streeter.

22               THE COURT:  Okay.  Do you know Mr. Konig or any

23   other members of the prosecution's trial team?  If you know

24   or think you know any of these folks, please write 5 on your

25   card.

1          Okay.  Mr. Pierce, would you like to introduce the

2     defendant and the remainder of your trial team.

3          MR. PIERCE:  Yes, Your Honor.  Thank you.

4          Good morning, ladies and gentlemen.  My name

5     is John Pierce.  I'm lead counsel for the defendant,

6     Mr. Christopher Alberts.  I also have a partner named Roger

7     Roots who is in another trial this morning but will be

8     joining us hopefully in the next day or two.

9          This is our paralegal, Em Lambert, our trial

10    technician, Caitlin Stevens.  I will also be joined -- have

11    an assistant at the counsel table tomorrow named Laura

12    Loomer.

13          Thank you very much.

14          THE COURT:  Do you know or think you might know

15    any -- Mr. Pierce, Mr. Alberts, or anyone on the defense's

16    trial team in this case?  If yes, please write 6 on your

17    card.

18          Question 7:  Please take a moment to look at other

19    potential jurors, members of the jury panel.  Do you

20    recognize or think that you might know any of the other

21    potential jurors in this case?  If yes, write 7.

22          Question 8:  During the presentation of evidence,

23    you may hear testimony from or about the following people.

24    That doesn't mean that they will testify, but there's a

25    possibility that they will testify or that you may hear

1     testimony about them.

2             I'm just going to name the names.  If you think

3     you know any of these folks, write 8 on your card.  And just

4     to jog your memory, you may want to write the name of the

5     person you think you might know.

6             Captain Jessica Baboulis, B-A-B-O-U-L-I-S, from

7     the U.S. Capitol Police.  Shauni Kerkhoff, K-E-R-K-H-O-F-F,

8     also from the Capitol Police.  Sergeant Adam DesCamp, D-E-S-

9     C-A-M-P, from the Capitol Police.  Agent Christopher

10    Streeter from the FBI.  Officer Dallas Bennett from the

11    Metropolitan Police Department.  Sergeant Philip Robinson,

12    also from MPD.  Dallan, D-A-L-L-A-N, Haynes, formerly of

13    MPD.  Franklyn Then, T-H-E-N, also from MPD.  And Inspector

14    Lanelle Hawa, H-A-W-A, from the United States Secret

15    Service.  Melissa Miller.  Vanessa Torres.  David Sumrall,

16    S-U-M-R-A-L-L.  Joseph Thomas.  An officer from the Capitol

17    Police whose last name is Atkinson, A-T-K-I-N-S-O-N.  And

18    Mark Martino, M-A-R-T-I-N-O.

19            If you know any of those folks or think you might

20    know them, please write 8 on your card.

21            No. 9:  Please take a moment to look at my staff

22    and other courtroom staff.  Do you know any member of the

23    Court's staff, or do you know me?  If yes, write 9 on your

24    card.

25            Question 10:  If you are selected for this jury, I

1    will instruct you that your job is to determine whether the

2    defendant committed the charged offenses beyond a reasonable

3    doubt based on the evidence presented, and that you are not

4    to consider the potential punishment the defendant could

5    receive if he is found guilty.  Would you have any

6    difficulty or hesitation following that instruction?

7          If you would have any difficulty or hesitation

8    following that instruction, please write 10 on your card.

9          Question 11:  The government has the burden of

10   proving Mr. Alberts guilty beyond a reasonable doubt, and he

11   is presumed innocent unless and until the government meets

12   that burden.  This burden of proof never shifts to the

13   defendant.

14         Would you have any difficulty or hesitation with

15   respecting this allocation of the burden of proof?  If yes,

16   indicate 11 on your card.

17         12:  Because Mr. Alberts is presumed innocent, he

18   need not testify nor offer any evidence.  Do you think his

19   decision not to testify, to call witnesses, or to put on any

20   evidence -- and I don't know if he will or will not -- but

21   if he were to choose to do so, would that make you think he

22   is more likely to be guilty?  If yes, write 12 on your card.

23         Question 13:  There has been what's called an

24   indictment in this case.  An indictment is not evidence of a

25   crime.  It merely initiates the case and is a formal way of

1    presenting the charges.  Would the fact that an indictment

2    charged Mr. Alberts with a crime lead you to believe that he

3    is guilty or make it difficult for you to apply the

4    presumption of innocence?  If yes, write 13 on your card.

5                14:  Under certain circumstances the government

6    can obtain authorization from a judge to search a premises

7    or electronic media to obtain evidence, like emails, text

8    messages, videos, letters, financial information, et cetera.

9    I will instruct you that any evidence that is presented to

10   you at trial was legally obtained and that you may consider

11   it.  Do you have any concerns about your ability to follow

12   that instruction?  If yes, write 14 on your card.

13               If you were selected as a juror in this case, I

14   will instruct you to avoid all media coverage, including

15   radio, TV, podcasts, social media, et cetera, and not to use

16   the Internet with regard to this case for any purpose.  So

17   no independent research about this case or trying to find

18   out the facts of the case that are not presented here in

19   open court.

20               I will also instruct you that you cannot engage in

21   the use of social media with respect to this case, so

22   blogging, sending Tweets, et cetera, regarding the case

23   while you are on the jury.

24               Do you have any reservations or concerns about

25   your ability or willingness to follow that instruction?  If

1    yes, write 15 on the card.

2          Question 16:  Jurors are the sole judges of the

3    facts, but they have a duty to follow the principles of law

4    as the judge instructs.  Even if the jury disagrees with or

5    dislikes a rule of law or does not understand the reasons

6    for some of the rules, it is the jury's duty to follow the

7    rules that the judge provides.  Would you have any

8    difficulty following my legal instructions, whatever they

9    may be?  If yes, write 16.

10          Okay.  Question 17:  Do you live or work at or

11   near the U.S. Capitol building or its grounds?  If yes,

12   write 17 on your card.

13          Question 18:  As I described, Mr. Alberts has been

14   charged with nine crimes relating to Congress's meeting at

15   the United States Capitol on January 6, 2021, to certify the

16   Electoral College vote for president of the United States.

17          Do you have such strong feelings about the events

18   of January 6th or those who have been charged with crimes

19   for their participation in those events that it would be

20   difficult for you to follow the Court's instructions and

21   render a fair and impartial verdict if you are chosen as a

22   juror?

23          All right.  If there's something about -- if you

24   have such strong feelings about January 6th that you don't

25   think you can be a fair and impartial juror, write 18 on

1    your card.

2                Question 19:  Have you closely followed the news

3    about what happened at the United States Capitol on January

4    6th?

5                Question 20:  Have you watched any portion of the

6    television coverage of the hearings by the House Select

7    Committee on January 6th or have you read that committee's

8    final report?

9                Question 21:  Were you, your family, or your close

10   friends particularly affected by the events at the Capitol

11   on January 6th or the response to those events?

12               Question 22:  Do you have any strong personal

13   feelings or opinions about the outcome of the 2020

14   presidential election such that they would impact your

15   ability to be fair and impartial in this case?  So such

16   strong feelings about the 2020 election that they would

17   impair your ability to be fair and impartial to Mr. Alberts

18   in this case, write 22 on your card.

19               23:  Do you have an opinion about people who

20   believe that the 2020 election was stolen, corrupt, or

21   fraudulent that would make it difficult for you to serve as

22   a fair and impartial juror in this case?

23               24:  Do you think that your political views or

24   those of someone close to you would affect your ability to

25   serve as a fair and impartial juror in this case?

1    25:  This case involves allegations about the

2    possession of a handgun.  Do you have such strong feelings

3    or opinions about firearms that you cannot put them aside

4    and serve as a fair and impartial juror in this case?

5            Question 26:  Do you currently maintain or have

6    you ever applied for a license to carry a firearm?

7            Okay.  I'm now going to ask you a series of

8    questions that relate to you, members of your immediate

9    family, and your close personal friends.

10           And when I say "members of your immediate family,"

11   this is not, you know, your second cousin from Peoria who

12   you only see on Thanksgiving or sort of casual

13   acquaintances.  These are folks who you are close to that

14   might somehow influence your opinion in a matter like this.

15   Okay?

16           Question 27:  Has any member of that group ever

17   been arrested or charged for any offense other than a

18   traffic offense?  If yes, 27.

19           28:  Has any member of that group ever served as a

20   witness in any judicial proceeding?  So you, members of your

21   immediate family, or very close personal friends.

22           29:  Has any member of that group been the victim

23   of or a witness to a crime?

24           Question 30:  Has any member of that group ever

25   worked in any aspect of the legal profession, so as a

1    lawyer, a prosecutor, a criminal defense attorney, a

2    paralegal, a court reporter, investigator, et cetera?  Any

3    member of that group ever worked in the legal profession?

4    If yes, write 30.

5         31:  Has any member of that group ever been

6    employed by or applied for employment with or received

7    training by any law enforcement agency whatsoever?  So

8    local, state, federal, obviously the FBI, Homeland Security,

9    Secret Service, any law enforcement agency training,

10   employment, or applications for employment.  If yes, write

11   31.

12        32:  Has any member of that group ever served in

13   the military?

14        Question 33:  Has any member of that group worked

15   for the legislative branch of the United States?  And not

16   just for the House or the Senate, but any sort of

17   constituent members of the legislative branch, like the

18   Architect of the Capitol, the Sergeant At Arms, or any

19   entity related to the legislative branch of the federal

20   government.

21        34:  Has any member of that group been the subject

22   of any investigation or legal action by a government agency,

23   or do you have any case pending in state or federal court?

24   Question 34.

25        Question 35:  Have you had any experience as a

1    juror in a previous trial, either a jury trial or before the

2    grand jury?  So any prior jury experience whatsoever, write

3    35 on your card.

4         36:  As I noted, several witnesses in this case

5    will be law enforcement officers.  I will instruct you that

6    the testimony of a law enforcement officer is to receive no

7    greater or no lesser consideration simply because the

8    witness is a law enforcement officer.

9         Would you have any difficulty following that

10   instruction?  If yes, write 36 on your card.

11        37:  Have you had any unpleasant experiences with

12   a defense attorney or a defense investigator or with a

13   prosecutor or a government investigator, whether here in

14   D.C. or elsewhere, that would make it difficult for you to

15   be a fair and impartial juror in this case?

16        So any negative experiences with defense lawyers

17   or prosecutors or folks affiliated with them, please write

18   37 on your card.

19        38:  Have you ever filed or had a lawsuit of any

20   kind filed against you by anyone in state or federal court?

21   So if you've been the plaintiff or the defendant in a

22   lawsuit, please write 38 on your card.

23        Question 39:  Do you have any moral, religious, or

24   ethical beliefs that prevent you from sitting in judgment of

25   another person?  If yes, write 39 on your card.

1           Question 40:  As I said, the presentation of the

2    evidence in this case may go into next week.  After the

3    close of the evidence, the jury will deliberate until it has

4    reached a decision.  I cannot tell you how long

5    deliberations will be because that is determined by the

6    jury.  Would serving as a juror in this case based on that

7    schedule be an extreme hardship for you?

8           And when I say "extreme hardship," I recognize

9    that jury service is inconvenient for everyone, and that it

10   keeps you away from certain professional obligations and

11   social obligations and family, but that is not an extreme

12   hardship.  All right?

13          And I will also say that if I were to excuse any

14   of you based on an extreme hardship, your name would go back

15   into the hopper, and you would be called for another panel

16   in the not-so-distant future.

17          So with those caveats in mind, if you believe that

18   service would nevertheless present an extreme hardship,

19   please write 40 on your card.

20          And finally, my last question, 41, is what I call

21   a catch-all question.  If there is any reason that I have

22   not asked you about that you think would make it difficult

23   for you to be a fair and impartial juror in this case,

24   please write 41 on your card, and we can discuss that

25   individually.

```
 1              All right.  Any questions?

 2              All right.  Ms. Jenkins, would you mind collecting

 3    everyone's cards.

 4              THE COURTROOM DEPUTY:  Ladies and gentlemen, if

 5    you can pass your cards down to the end.  I will put them in

 6    order; so don't worry about them, but if you can pass them

 7    down to the end and any pens that you may have received.

 8    Thank you.

 9              (Pause)

10              THE COURT:  I know that jury selection takes a

11    long time and is inconvenient so I try not to have jurors

12    waiting around unnecessarily, but it's just the nature of

13    the exercise that there will be some waiting.

14              So I'm going to, in a minute, let some of you go

15    to come back later at an appointed time, but before I do

16    that, just a few cautionary instructions.  I know that it is

17    tempting, when you go outside, to call your friends and

18    loved ones to tell them what kind of case you've been

19    selected for or potentially selected for or to do research

20    about the case.

21              You know, please resist that urge.  Do not discuss

22    the case with anybody or do any independent research about

23    the case.  All right?

24              Because if you do that, it deprives Mr. Alberts of

25    the right to a trial based simply on the evidence that's
```

1    presented.  So it's a very important instruction.

2              I think it's fine to, you know, tell folks that

3    you've been selected for a criminal case, even a January 6th

4    case, but please don't go into any other facts.

5              If, for some reason, you were to read an article,

6    just disregard the article if you can connect it to this

7    case.

8              There is a chance that there may be members of the

9    media around the courthouse.  Please do not discuss the case

10   with anybody, including any of those folks, including other

11   members of the jury panel.

12             Okay.  With that, if you are seated in the jury

13   box or in the first row on my right, just stay seated, and

14   we're going to have you wait in another courtroom.  Correct?

15   And then we're going to bring you up individually.

16             If you are in the next three rows behind the first

17   row on my right, we're going to excuse you and have you come

18   back at noon.  All right?  And we may not get to you right

19   when we come back.  We have to sneak in a lunch break in

20   there as well.  But we're definitely not going to need you

21   until noon, so feel free to leave the building, do whatever

22   it is you need to do, and come back and take -- we'll bring

23   you back at noon, and Ms. Jenkins will direct you after

24   that.

25             If you're on the left side of the courtroom, my

1    left, same instructions.  We'll need to see you back at

2    2:00.  All right?

3              Any questions?

4              THE COURTROOM DEPUTY:  Ladies and gentlemen,

5    before you leave you're going to report to Courtroom 29,

6    which is on the opposite end of this hallway when you come

7    back at your respective time.  Courtroom 29.

8              (Remaining venire exit courtroom)

9              THE COURT:  All right.  Please have a seat.

10             Just looking at the jury form, I see an attorney

11   with the U.S. Attorney's Office.  I see someone who works

12   for the Architect of the Capitol and someone who works for

13   the Library of Congress.

14             Talk amongst yourselves.  I'm happy to voir dire

15   them, if you want, but if you'd agree, I'd just as soon

16   release those folks so they're not waiting around.

17             (Pause)

18             MR. DALKE:  Your Honor, I think there was also a

19   public defender on the list.

20             THE COURT:  Someone from PDS?

21             MR. DALKE:  Yes, Juror No. 868.

22             THE COURT:  Yes, I don't -- that's not necessarily

23   disqualifying --

24             MR. DALKE:  Okay.

25             THE COURT:  -- if they're not representing the

 1   defendant in the case.

 2            MR. DALKE:  Understood, Your Honor.

 3            THE COURT:  Okay.

 4            MR. DALKE:  The government would have no problem

 5   excusing the prosecutor as well as the Architect of the

 6   Capitol.  I'd be interested potentially hearing from the

 7   person at the Library of Congress.  I don't know if they're

 8   remote or where they worked or what their role was, but I

 9   think that would be a preliminary gut from the government,

10   Your Honor.

11            THE COURT:  Okay.

12            MR. DALKE:  Certainly those two, no problem

13   excusing them.

14            THE COURT:  Mr. Pierce, I assume you don't have a

15   problem with that.

16            MR. PIERCE:  Yes, Your Honor.  I believe there

17   are -- you know, it looks like there are numerous attorneys

18   for the government.

19            THE COURT:  That doesn't get you there.  I mean,

20   we wouldn't be able to pick a jury if we didn't have

21   attorneys, including attorneys for the government, in

22   criminal cases in D.C.

23            MR. PIERCE:  Just repeat the ones that you

24   mentioned, Your Honor?  I'm sorry.

25            THE COURT:  It's Juror No. 364, who says she's an

1    attorney with the U.S. Attorney's Office, who is obviously

2    prosecuting the case.  And 380, who is in construction

3    management with the Architect of the Capitol.

4              MR. PIERCE:  No problems.

5              THE COURT:  All right.  Ms. Jenkins, I don't know

6    if they're amongst the ones that are still here or whether

7    we excused them, but you can let 364 and 380 know that

8    they've been excused.

9              THE COURTROOM DEPUTY:  Can you give me a line

10   item?

11             THE COURT:  Yes, hold on.

12             364 is Juror No. 58 on the list, and 380 is Juror

13   9 on the list.

14             MR. PIERCE:  So I just had a question, Your Honor,

15   just as a matter of just fact.  Are the jurors required to

16   be wearing masks, or is it optional?

17             THE COURT:  It is optional, or do we require --

18             THE COURTROOM DEPUTY:  We require it.

19             THE COURT:  We require it because of the confines

20   of the jury room and because obviously they're not here

21   voluntarily like we are.

22             MR. PIERCE:  Of course.

23             THE COURT:  But when they're questioned, I will

24   invite them to take off their masks.

25             MR. PIERCE:  Okay.  Thank you, Your Honor.

```
 1                    THE COURTROOM DEPUTY:  Your Honor, Juror No. 0064.

 2                    THE COURT:  Okay.  Good morning, ma'am.

 3                    Everyone be seated.

 4                    All right.  You're Ms. Wright?

 5                    PROSPECTIVE JUROR 0064:  Yes, hi.

 6                    THE COURT:  Good morning.  Feel free to slip your

 7       mask off, if you'd like.

 8                    All right.  You're our lead-off batter.  It says

 9       here you are retired.  You're far too young to be retired.

10                    PROSPECTIVE JUROR 0064:  That's correct.

11                    THE COURT:  What did you do before you retired?

12                    PROSPECTIVE JUROR 0064:  I was in urban planning,

13       city planning.

14                    THE COURT:  Okay.  And in --

15                    PROSPECTIVE JUROR 0064:  In Montgomery County,

16       Maryland.  I worked for the Montgomery County Planning

17       Department.

18                    THE COURT:  Okay.  And do you have a significant

19       other?

20                    PROSPECTIVE JUROR 0064:  Yes.  I'm married.

21                    THE COURT:  And what does your husband do?

22                    PROSPECTIVE JUROR 0064:  He is an attorney.  He

23       does mainly land use and real estate transactions.

24                    THE COURT:  Okay.  Has he ever practiced criminal

25       law?
```

```
 1              PROSPECTIVE JUROR 0064:  Nope.

 2              THE COURT:  No, all right.

 3              You answered yes to a few of my questions.  You

 4    followed the January 6th hearings to some extent?

 5              PROSPECTIVE JUROR 0064:  To some extent.  I saw a

 6    little bit of it on TV.  I did not follow it in depth.

 7              THE COURT:  Okay.  Any takeaways from the portions

 8    that you did see?

 9              PROSPECTIVE JUROR 0064:  I thought it was a very

10    thorough discussion of the issue, and -- you know, it's a

11    very contentious issue, and I think they did a thorough

12    discussion.

13              THE COURT:  Okay.  Anything about what you saw

14    make you uncomfortable being a juror in a January 6th case?

15              PROSPECTIVE JUROR 0064:  No, I feel very

16    comfortable.

17              THE COURT:  Okay.  Someone in -- either you or a

18    close friend or family member has been the victim of a crime

19    or the witness to a crime.  Tell me about that.  And if

20    there's something sensitive, we can do it on the --

21              PROSPECTIVE JUROR 0064:  No.  I had my car stolen

22    probably 25 years ago.

23              THE COURT:  Okay.  And you know folks who have

24    worked in the legal field.  Other than your husband?

25              PROSPECTIVE JUROR 0064:  My father-in-law is a
```

```
 1    retired lawyer.
 2              THE COURT:  Okay.  And what was his practice?
 3              PROSPECTIVE JUROR 0064:  Mainly wills and trusts.
 4              THE COURT:  Okay.  And you know some folks who
 5    have served in the military?
 6              PROSPECTIVE JUROR 0064:  Yes.  My brother was in
 7    the military, and my father-in-law.
 8              THE COURT:  Okay.  Which branches?
 9              PROSPECTIVE JUROR 0064:  The Army.  My father-in-
10    law was at the Battle of the Bulge in World War II.
11              THE COURT:  Wow.
12              And finally 38, you've either filed a lawsuit or
13    had a lawsuit filed against you.  Tell us about that.
14              PROSPECTIVE JUROR 0064:  Well, in the world of
15    planning, you periodically have lawsuits filed, and I was
16    party to lawsuits that were filed on some land-use issues.
17              THE COURT:  Okay.  Nothing that went to trial, I
18    take it?
19              PROSPECTIVE JUROR 0064:  No.
20              THE COURT:  Counsel, any brief follow-up?
21              MR. DALKE:  Good morning.  Just one question.  You
22    mentioned some January 6th coverage or seen some January 6th
23    coverage.  I don't know if it was a documentary or TV show,
24    but do you know which channel or what documentary it was, if
25    you recall?
```

1          PROSPECTIVE JUROR 0064:  I think I saw it on the

2    Internet.  I don't think I saw it on TV.  I think I followed

3    it or read about it in *The Washington Post*.

4          I actually don't remember in detail.  Probably

5    read about it in the *Post* or saw something online on the

6    *Post* about that.

7          MR. DALKE:  And do you recall whether it would

8    have been like video, visual, or more of an article format?

9          PROSPECTIVE JUROR 0064:  Probably more of an

10   article.

11         MR. DALKE:  Thank you.

12         MR. PIERCE:  Good morning, ma'am.

13         PROSPECTIVE JUROR 0064:  Hello.

14         MR. PIERCE:  Just a couple of quick questions.

15         Do you have any strong feelings about guns or the

16   possession of guns that you think would create an issue for

17   you being fair in a case like this?

18         PROSPECTIVE JUROR 0064:  No, I don't.  You know, I

19   have fired guns.  And we -- as a young person, my son fired

20   guns, and, you know, I have no strong feelings about guns.

21         MR. PIERCE:  Have you yourself attended any sort

22   of, like, protests, you know, sort of political-type

23   protests --

24         PROSPECTIVE JUROR 0064:  No.  I'm very apolitical.

25         MR. PIERCE:  Did you follow any of the protests

1    on, you know, media, you know, about January 6th?  Did you

2    follow any of the protests that were occurring in the summer

3    of 2020 sort of throughout the country?

4              PROSPECTIVE JUROR 0064:  Oh, the Black Lives

5    Matter protests?  Yes.  Yes, I mean, it was hard not to be

6    aware of them.

7              I didn't, you know, follow them closely, but, you

8    know, if you turned on the TV or turned on your computer, it

9    was impossible not to hear about them.

10             MR. PIERCE:  Okay.  And as -- if you sort of keep

11   those two sort of sets of protests in mind, do you have any

12   strong views about whether the 2020 protests were right or

13   wrong or whether January 6th was right or wrong?

14             PROSPECTIVE JUROR 0064:  No.  I'm one of the few

15   people in Washington who basically stays out of politics.

16   I'm really apolitical.

17             MR. PIERCE:  And then with respect to the -- final

18   question.  With respect to the January 6th -- I think you

19   mentioned you might have watched some of the committee

20   hearings.

21             PROSPECTIVE JUROR 0064:  Either -- I didn't watch

22   them.  I probably saw articles or clips from them in the

23   *Washington Post*.  I do read the *Washington Post*.

24             MR. PIERCE:  And did you form any view about sort

25   of the fairness of those hearings one way or another?

1    PROSPECTIVE JUROR 0064:  They seemed thorough, but

2    I don't really have any thought about whether, you know,

3    they were fair or unfair.  They seemed quite thorough.

4         MR. PIERCE:  Thank you.

5         THE COURT:  All right.  Ma'am, you can step down.

6    Thanks.

7         PROSPECTIVE JUROR 0064:  Okay, thanks.

8         THE COURT:  Okay.  Any challenge to 64?

9         MR. DALKE:  Not for cause, Your Honor, no.

10        THE COURT:  Mr. Pierce, any challenge to 64?

11        MR. PIERCE:  Yes, Your Honor.  And not actually

12   based on what we heard from her, but, you know, we're

13   obviously taking a look at social media with respect to

14   these individuals, and there are some very, very visceral

15   social media posts that indicate I think that she's actually

16   not being entirely forthright.

17        She has social media posts that are very, very

18   strong on gun control -- and we can put these up, if you'd

19   like -- but say "Gun Control Now."  We have strong support

20   for Black Lives Matter, supporting those protests, and so --

21        THE COURT:  All right.  So a couple of

22   observations.

23        First of all, on the follow-up, all right, the

24   reason that we ask the questions in questionnaire form is to

25   narrow the issues that are subject to follow-up.  So, for

1    instance, if she answered no on the question about, you

2    know, the fact that this is a firearms offense, would that

3    make it difficult for her to be impartial, you know, if we

4    followed up on every question that jurors answered "no" to,

5    we're going to be here all day; and we're not going to be

6    here all day.  All right?

7              Mr. Dalke, how do you want to deal with -- if

8    there's some social media issue like this that calls --

9    perhaps calls into question the juror's veracity on the

10   stand?

11             MR. DALKE:  Your Honor, I'm not aware of any --

12             THE COURT:  I didn't hear anything that she said

13   that would be the basis for a challenge for cause.

14             MR. DALKE:  And the government's not aware of any.

15   There's nothing on the record that would make her unfair or

16   partial; she's not mentioned anything that would make her

17   unfair or partial.

18             If they want to exercise a strike on her, they

19   certainly can.  If they have social media that they want to

20   show her, they can certainly show her and ask.  I don't

21   think that would be improper necessarily.

22             But I don't think just based on the arguments --

23   argument by defense counsel, that she should be struck on

24   some unknown, unshown, undisclosed social media.  It's not

25   proper.  There's no basis in the record for it.

```
 1              THE COURT:  Okay.  I'm going to -- we've got to
 2      keep this moving.  I'm going to provisionally deny your
 3      challenge for cause.  We're going to provisionally qualify
 4      64.
 5              She is now gone.  She's coming back.  If you want
 6      to pass the Court up any information you have that calls
 7      into question the veracity of her answers, feel free to do
 8      that, and I'll bring her back if I agree with you and voir
 9      dire her on those -- on that evidence.  All right?
10              So for now, 64 is qualified.
11              And, again, let's keep the follow-up limited to
12      the questions that are at issue by affirmative answers.
13      That's the whole purpose.
14              THE COURTROOM DEPUTY:  Your Honor, Juror No. 2021.
15              THE COURT:  Good morning, sir.
16              PROSPECTIVE JUROR 2021:  Good morning.
17              THE COURT:  How are you doing?  Feel free to slip
18      your mask off, if you'd like.
19              All right.  It says here you're a special police
20      officer; is that right?
21              PROSPECTIVE JUROR 2021:  Yes.
22              THE COURT:  And where are you assigned?
23              PROSPECTIVE JUROR 2021:  World Bank.
24              THE COURT:  Have you been assigned to any other
25      government agencies over the years?
```

47

```
1                    PROSPECTIVE JUROR 2021:  No.
2                    THE COURT:  How long have you been a special
3        police officer?
4                    PROSPECTIVE JUROR 2021:  Three years.
5                    THE COURT:  What did you do before that?
6                    PROSPECTIVE JUROR 2021:  I was a private security
7        officer at that point.
8                    THE COURT:  And where was that?
9                    PROSPECTIVE JUROR 2021:  Same place.
10                   THE COURT:  Same place, okay.
11                   And are you married?  Do you have a significant
12       other?
13                   PROSPECTIVE JUROR 2021:  Yes, married.
14                   THE COURT:  And what does she do?
15                   PROSPECTIVE JUROR 2021:  She's a phlebotomist.
16                   THE COURT:  Okay.  You answered yes to a few of my
17       questions.
18                   No. 3, you live or work near Capitol Hill.
19                   PROSPECTIVE JUROR 2021:  Yes, say -- I think World
20       Bank is not that close, it's just -- I was just there.
21                   THE COURT:  Other than the World Bank --
22                   PROSPECTIVE JUROR 2021:  Other than the World
23       Bank --
24                   THE COURT:  -- that's your only connection?
25                   THE COURT REPORTER:  I'm going to ask you to
```

```
 1    wait --
 2              PROSPECTIVE JUROR 2021:  Okay.  I'm sorry.
 3              THE COURT:  Question 17, same question, you work
 4    near the Capitol grounds?  That's the World Bank?
 5              PROSPECTIVE JUROR 2021:  Yes.
 6              THE COURT:  Question 19, you closely followed the
 7    news about January 6th?
 8              PROSPECTIVE JUROR 2021:  Yes.
 9              THE COURT:  How closely?
10              PROSPECTIVE JUROR 2021:  Very closely.
11              THE COURT:  Let me rephrase.  Just at the time, or
12    have you followed closely since the last -- over the last
13    two years?
14              PROSPECTIVE JUROR 2021:  Yes, over the last few
15    years.
16              THE COURT:  Okay.  And how do you get your news
17    about January 6th?  From the Internet?
18              PROSPECTIVE JUROR 2021:  Internet, podcasts, news
19    stations, and stuff like that.
20              THE COURT:  Okay.  So obviously, you know, a lot
21    of people came to D.C.  A lot of things happened on January
22    6th for different reasons.  You know, it's a matter of
23    national reporting.  But the reason that we're here is to
24    decide whether Mr. Alberts did what the government has
25    charged him with.
```

1          Do you think you could put aside what you know

2    generally about January 6th and give this fellow a fair

3    trial based just on the evidence, or not?

4          PROSPECTIVE JUROR 2021:  I'm pretty sure I can.

5          THE COURT:  Okay.  And why do you say that?

6          PROSPECTIVE JUROR 2021:  Well, I mean, I can

7    take the information in and decide that way -- I mean,

8    everybody -- I mean --

9          THE COURT:  Let me put it like this:  If you were

10   sitting in his chair, would you want you to be on the jury?

11         PROSPECTIVE JUROR 2021:  No.

12         THE COURT:  No?

13         PROSPECTIVE JUROR 2021:  No.

14         THE COURT:  Why not?

15         PROSPECTIVE JUROR:  Because I have -- I mean, I'm

16   not even sure if I came across a video of maybe what he may

17   have done.  I don't know.  But I wouldn't be surprised if I

18   did.  But I probably lost the memory of that because I've

19   watched, again, so much of it.

20         THE COURT:  Let me rephrase it.  If you were

21   sitting in his chair, would you want yourself to be on the

22   jury?  Would you be a fair and impartial juror in this case?

23         PROSPECTIVE JUROR 2021:  No.

24         THE COURT:  You don't think so?

25         PROSPECTIVE JUROR 2021:  No, I don't think so.

```
 1              THE COURT:  All right.  You're excused.

 2              PROSPECTIVE JUROR 2021:  All right.

 3              THE COURT:  Okay.  The Court will strike Mr. Byers

 4    sua sponte.

 5              THE COURTROOM DEPUTY:  Your Honor, Juror No. 1146.

 6              THE COURT:  Good morning, ma'am.

 7              PROSPECTIVE JUROR 1146:  Good morning.

 8              THE COURT:  You're Ms. Libera?

 9              PROSPECTIVE JUROR 1146:  Yes.

10              THE COURT:  Feel free to slip your mask off.

11              It says here you work for the D.C. government, the

12    Office of Employment Services.

13              PROSPECTIVE JUROR 1146:  That's correct.

14              THE COURT:  Okay.  Tell us briefly what you do.

15              PROSPECTIVE JUROR 1146:  I am an auditor.  I do

16    fiscal and problematic monitoring of federally funded work

17    force development programs.

18              THE COURT:  Okay.  And do you have a significant

19    other?

20              PROSPECTIVE JUROR 1146:  I'm engaged, yes.

21              THE COURT:  I'm sorry?

22              PROSPECTIVE JUROR 1146:  I'm engaged.

23              THE COURT:  So congratulations.

24              PROSPECTIVE JUROR 1146:  Thank you.

25              THE COURT:  What does your fiance do?
```

 1              PROSPECTIVE JUROR 1146:  He's a personal trainer.

 2              THE COURT:  You answered yes to a few of my

 3     questions.  No. 3, you live or work near Capitol Hill?

 4              PROSPECTIVE JUROR 1146:  I previously did.  I was

 5     living on Hill East on January 6th.

 6              THE COURT:  Okay.  How far was your house from the

 7     Capitol?

 8              PROSPECTIVE JUROR 1146:  Between -- about two

 9     miles.

10              THE COURT:  Okay.  Did you personally witness any

11     of the events that took place at the Capitol that day?

12              PROSPECTIVE JUROR 1146:  No, I did not.

13              THE COURT:  Did your house receive any property

14     damage or anything like that?

15              PROSPECTIVE JUROR 1146:  No.  But I did live right

16     next to Stadium Armory, so we had National Guard in our

17     neighborhood for quite a while.

18              THE COURT:  And you say you've closely followed

19     the news about January 6th.  Just at the time it happened,

20     or in the last two years since?

21              PROSPECTIVE JUROR 1146:  Primarily at the time it

22     happened, and then less closely but have still been seeing

23     some news about it in the two years since.

24              THE COURT:  Okay.  And you did not answer yes to

25     the question about the House hearings.  You didn't watch any

1    of those?

2            PROSPECTIVE JUROR 1146:  I did not watch the House

3    hearings.

4            THE COURT:  Okay.  And when you follow the news,

5    where do you generally get your news from?

6            PROSPECTIVE JUROR 1146:  *The New York Times* and

7    the *Washington Post*.  And then I have seen a lot of video

8    clips; so those have been primarily linked through theirs,

9    but it could have been any number of news sources.

10           THE COURT:  It says you've either maintained or

11   applied for a license to carry a firearm.

12           PROSPECTIVE JUROR 1146:  Oh, no, I must have

13   written down the wrong one.

14           THE COURT:  Oh, I'm sorry, I read it wrong.  I'm

15   sorry.

16           27, either you or someone you know or who is close

17   to you has been arrested or charged for an offense.

18           PROSPECTIVE JUROR 1146:  Yes.  My fiance had a

19   DUI.

20           THE COURT:  Okay.  And you know folks who have

21   worked in the legal profession?

22           PROSPECTIVE JUROR 1146:  Yes, my soon-to-be

23   father-in-law is a defense attorney here in D.C.  My soon-

24   to-be stepfather-in-law is a lawyer and works for the

25   National Law Review Board or the National Labor Review

1    Board, excuse me.  And one of my best friend's husband is a

2    lawyer in New York state for New York state government.

3             THE COURT:  Your father-in-law who is your soon-

4    to-be father-in-law who is a defense lawyer, is he in

5    private practice, or does he work for the Federal Public

6    Defender's office or the --

7             PROSPECTIVE JUROR 1146:  I believe he's in private

8    practice.

9             THE COURT:  And does he practice in D.C.?

10            PROSPECTIVE JUROR 1146:  He does.

11            THE COURT:  Do you know if he represents any

12   January 6th defendants?

13            PROSPECTIVE JUROR 1146:  He has.

14            THE COURT:  Okay.  Do you know who they are?

15            PROSPECTIVE JUROR 1146:  No, I do not know names.

16            THE COURT:  Have you spoken to him about the

17   January 6th investigation or anything about January 6th

18   criminal cases?

19            PROSPECTIVE JUROR 1146:  Not in specifics.  I did

20   see him last week for Passover and had mentioned that I had

21   jury duty coming up.  He said it might be likely that there

22   was a January 6th case that might be part of the summons,

23   and he mostly was discussing the process of considering a

24   fair and impartial trial.

25            THE COURT:  Okay.  What's his name?

```
1                    PROSPECTIVE JUROR 1146:  Steve Kiersh.

2                    THE COURT REPORTER:  Could you spell that for me?

3                    PROSPECTIVE JUROR 1146:  K-I-E-R-S-H.

4                    THE COURT:  We're all familiar with Mr. Kiersh.

5                    So we ask these questions so if there's someone

6        who might unduly influence your views about the prosecution

7        one way or the other, that could be a basis for

8        disqualification.  Would you -- would that scenario apply to

9        you?

10                   PROSPECTIVE JUROR 1146:  I do not believe so, no.

11                   THE COURT:  Okay.  Thank you.

12                   Follow-up, Counsel.

13                   I'm sorry, you wanted to say something else?

14                   PROSPECTIVE JUROR 1146:  I was sitting outside.  I

15       realized two things about my question card.

16                   One, I should have indicated yes for the military

17       question.  I have a good friend who is in the military, but

18       as I was scrolling through folks, I forgot.

19                   I also should have asked -- not that this needs an

20       answer, but the question about the sentencing impacting the

21       ability to be a fair judge.  That is a no, but I realize I

22       did not ask if it was -- if the death penalty was a

23       potential penalty, because I do believe that I would have

24       difficulty being impartial if that was the case.

25                   THE COURT:  I don't think you have to worry about
```

 1    it.

 2              PROSPECTIVE JUROR 1146:  I didn't think that was

 3    the case, but I realized that was an assumption, and so I

 4    didn't want to be perjuring myself.

 5              THE COURT:  Briefly, Mr. Dalke.

 6              MR. DALKE:  No questions, thank you.

 7              THE COURT:  Mr. Pierce?

 8              MR. PIERCE:  Just a couple of questions.

 9              Good morning, ma'am.

10              PROSPECTIVE JUROR 1146:  Good morning.

11              MR. PIERCE:  You mentioned you were close to the

12    proximity of the Capitol on January 6th.  You were living

13    there?

14              PROSPECTIVE JUROR 1146:  Yes.  I was living at

15    18th and East Capitol Street, which is about two miles from

16    the Capitol.

17              MR. PIERCE:  Okay.  In light of that and in light

18    of the fact I think you said there were National Guard

19    around --

20              PROSPECTIVE JUROR 1146:  Yes.  I lived half a

21    block from the National Armory where the National Guard got

22    stationed out of.

23              MR. PIERCE:  In light of those things, would you

24    say that you were -- you personally were affected

25    emotionally or in some fashion by January 6th?

1           PROSPECTIVE JUROR 1146:  I will say that the day

2    itself was a little bit scary, but I separated that from an

3    ability to be an impartial judge.  Obviously it's up for you

4    to decide whether that's something you want, but I'm an

5    auditor by trade; so while that day itself, when it was hard

6    to tell what was going on and was in relatively close

7    proximity, it was scary.  But I don't necessarily carry that

8    with -- to individual judgment.

9           MR. PIERCE:  Understood.  Have you reached a

10   personal view about that day and what it means to you?

11          PROSPECTIVE JUROR 1146:  A personal view, yes.

12   and --

13          MR. PIERCE:  What is that?

14          PROSPECTIVE JUROR 1146:  Just that on large it was

15   scary that there were people at the Capitol, and I disagree

16   with the thought process that the election was stolen.

17          MR. PIERCE:  And a final question.  The judge

18   asked you, and I think you said that you've just kind of --

19   it was a clerical error that you mentioned that you had

20   applied for firearms or something.

21          PROSPECTIVE JUROR 1146:  Yes.  I have not ever

22   applied for a firearm.

23          MR. PIERCE:  Your reaction, you know, seemed very

24   definite when, you know -- when asked if -- you said, "No, I

25   have not."

1              Do you have -- do you have strong views about guns

2      or firearms that you think would affect your ability to be

3      fair in a case that involves gun-related charges?

4              PROSPECTIVE JUROR 1146:  It's for you to decide.

5      I believe I have strong beliefs, but that they don't affect

6      my ability to be fair and impartial; so it's hard to know

7      how to answer the question.

8              MR. PIERCE:  And just a final follow-up.

9              PROSPECTIVE JUROR 1146:  Yes.

10             MR. PIERCE:  What are those beliefs about guns,

11     firearms?

12             PROSPECTIVE JUROR 1146:  Oh.  I would like to see

13     there be more just -- more of a process for folks to be

14     medically cleared and for there to be a little bit more

15     licensing around gun control.

16             MR. PIERCE:  Okay.  Thank you.

17             THE COURT:  Okay.  Thank you, ma'am.  You can step

18     down.

19             PROSPECTIVE JUROR 1146:  Thank you.

20             THE COURT:  Okay.  Any challenge to 1146?

21     Mr. Dalke?

22             MR. DALKE:  No challenge, Your Honor.

23             THE COURT:  And you can use the mic -- just make

24     sure it's on -- from the table.

25             Mr. Pierce?

```
 1                    MR. PIERCE:  No, Your Honor.

 2                    THE COURT:  Okay.  1146 is qualified.

 3                    THE COURTROOM DEPUTY:  Your Honor, Juror No. 1590.

 4                    THE COURT:  Good morning, sir.

 5                    PROSPECTIVE JUROR 1590:  Good morning.

 6                    THE COURT:  Mr. Dusseau?

 7                    PROSPECTIVE JUROR 1590:  That's right.

 8                    THE COURT:  All right.  It says here you work in

 9      governmental affairs for Comcast?  And you can remove your

10      mask.

11                    PROSPECTIVE JUROR 1590:  Oh, sure.

12                    THE COURT:  And so are you a lobbyist?  Is that

13      fair?

14                    PROSPECTIVE JUROR 1590:  I'm mostly in advocacy

15      and campaigns.

16                    THE COURT:  Okay.  Do you have a significant

17      other?

18                    PROSPECTIVE JUROR 1590:  I have a girlfriend.

19                    THE COURT:  And what does she do?

20                    PROSPECTIVE JUROR 1590:  She works for a national

21      501(c)(4).  It's called Asian American Power Networks.  It's

22      politics.

23                    THE COURT:  Okay.

24                    All right.  You answered yes to a number of

25      questions, including Mr. -- I'm sorry, No. 18, which
```

1    basically asks whether there's something about the nature of

2    the charges that would give you pause about being a fair and

3    impartial juror.

4              Why did you answer yes to that question?

5              PROSPECTIVE JUROR 1590:  Well, I -- for one, I --

6    before Comcast I was in Democratic politics for the

7    Democratic party for the last 16, 17 years.

8              THE COURT:  All right.

9              PROSPECTIVE JUROR 1590:  So I think I already just

10   sort of have an opinion on it before the case -- I even knew

11   what the case was.

12             THE COURT:  Well, obviously a lot of people have

13   an opinion about January 6th.  I would be surprised if you

14   didn't have an opinion about January 6th.

15             But the question is:  Notwithstanding whatever

16   past political affiliations or activities you've engaged in,

17   can you give this fellow a fair trial based on the nature of

18   the charges?  And be honest with me.

19             PROSPECTIVE JUROR 1590:  I think I could.

20             THE COURT:  And why do you say that?

21             PROSPECTIVE JUROR 1590:  I mean, I think I could

22   be impartial about the nature of the charges.

23             THE COURT:  You've followed the news about January

24   6th closely and have watched the House hearings at least?

25             PROSPECTIVE JUROR 1590:  Yes.

```
 1              THE COURT:  All right.  Any takeaways from the

 2     hearing or the coverage that might influence your ability to

 3     be fair?

 4              PROSPECTIVE JUROR 1590:  Not beyond my political

 5     views, no.

 6              THE COURT:  Okay.  So a lot of people came to

 7     Washington on January 6th, did a lot of different things for

 8     many different reasons.  It is certainly not illegal to

 9     exercise one's First Amendment right to hear the president

10     speak -- the former president.

11              This case is not a referendum on January 6th

12     generally.  It's not a referendum on the 2020 election.

13     It's only about whether Mr. Alberts is guilty or not guilty

14     of the things that the government has charged him with.  All

15     right?  And that's a pretty narrow inquiry.

16              And, again, I want you to be honest.  Can you give

17     this fellow a fair up-and-down trial notwithstanding, you

18     know, your political affiliations?

19              PROSPECTIVE JUROR 1590:  I can be impartial about

20     the charges, but that's a tough question for me to answer.

21              I would say yes.

22              THE COURT:  Okay.  Obviously there was some

23     hesitation.  Let me put it this way.  If you were sitting in

24     Mr. Alberts's seat, would you want you to be a juror in your

25     case?
```

```
 1                    PROSPECTIVE JUROR 1590:  I would not.

 2                    THE COURT:  All right.  Thank you, sir.  You can

 3       step down.

 4                    PROSPECTIVE JUROR 1590:  Okay.  Thank you very

 5       much.

 6                    THE COURT:  All right.  The Court will strike 1590

 7       for cause based on his, I think, frank answers about the

 8       effect of his political views and activities.

 9                    MR. PIERCE:  Your Honor, are we going to get maybe

10       like a 10- or 15-minute bathroom break at some point?

11                    THE COURT:  Yes, but we're not quite there yet,

12       unless you tell me you need to go to the bathroom.

13                    THE COURTROOM DEPUTY:  Your Honor, Juror No. 637.

14                    THE COURT:  Good morning, ma'am.

15                    PROSPECTIVE JUROR 0637:  Good morning.

16                    THE COURT:  How are you?  You can slip your mask

17       off.

18                    You're Ms. Moyer?

19                    PROSPECTIVE JUROR 0637:  Yes.

20                    THE COURT:  It says here you're a senior principal

21       strategist with something called Frameworks Institute.  Tell

22       us what it is.

23                    PROSPECTIVE JUROR 0637:  It's a culture and

24       communications research organization.  We research a bunch

25       of different social issues but then help advocates
```

1    communicate more effectively about them.

2              THE COURT:  Give me a couple of examples of the

3    issues you advocate for.

4              PROSPECTIVE JUROR 0637:  I work on climate change.

5    We do lots of work on early childhood development and

6    family -- child and family well-being, public health issues.

7              THE COURT:  Any criminal-justice-related issues?

8              PROSPECTIVE JUROR 0637:  Yes, we do.  I haven't

9    been tasked with many of those projects, but as an

10   organization that's a topic we take on, yes.

11             THE COURT:  Okay.

12             PROSPECTIVE JUROR 0637:  Like reform, criminal

13   justice reform.

14             THE COURT:  Okay.  And do you have a significant

15   other?

16             PROSPECTIVE JUROR 0637:  Yes.

17             THE COURT:  And what do they do?

18             PROSPECTIVE JUROR 0637:  He's a -- he works in

19   climate change policy, too.  He works at ecoAmerica.

20             THE COURT:  That's private sector?

21             PROSPECTIVE JUROR 0637:  No, it's a nonprofit.

22             THE COURT:  Nonprofit?

23             PROSPECTIVE JUROR 0637:  Yes.

24             THE COURT:  All right.  You answered yes to a few

25   of my questions.  You live or work near Capitol Hill?

```
 1                    PROSPECTIVE JUROR 0637:  Yes, I do.  I live on
 2       Capitol Hill.
 3                    THE COURT:  All right.  How close to the Capitol?
 4                    PROSPECTIVE JUROR 0637:  It's just probably under
 5       a mile.
 6                    THE COURT:  Okay.  Did you personally observe any
 7       of the events on January 6th?
 8                    PROSPECTIVE JUROR 0637:  Not right at the Capitol
 9       building.  I was walking to Home Depot on that day, and I
10       saw folks in red hats, and I kind of knew that was
11       happening.
12                    When the mayor instated the curfew, Home Depot
13       closed down, and so I walked home.  So I was in the --
14       broadly speaking, the vicinity, but not at the Capitol
15       building that day.
16                    THE COURT:  Okay.  And did your home or your
17       residence experience any property damage that day?
18                    PROSPECTIVE JUROR 0637:  No.
19                    THE COURT:  No.  And you've followed January 6th
20       closely?
21                    PROSPECTIVE JUROR 0637:  Yes.  I've generally
22       followed the news closely, and I watched the hearings
23       afterwards.
24                    THE COURT:  Okay.  Any takeaways from the hearings
25       about January 6th generally?
```

```
1              PROSPECTIVE JUROR 0637:  Just it felt like a

2     very significant event, really unfortunate, and scary and

3     sad and -- it's hard to sum up, I guess.

4              THE COURT:  Would those feelings about January 6th

5     generally keep you from giving Mr. Alberts an up-and-down

6     fair trial?

7              PROSPECTIVE JUROR 0637:  I don't think so.  I feel

8     strongly that a person is innocent until proven guilty, and

9     there's specific evidence to look at in a particular case,

10    and I would -- I certainly have, like, political positions

11    and opinions and have followed -- have ideas about the event

12    broadly speaking, but would try to take an individual case

13    on its own merits and be as impartial as I could be.

14             THE COURT:  And you're pretty confident you could

15    do that?

16             PROSPECTIVE JUROR 0637:  Yes.

17             THE COURT:  Okay.

18             All right.  You know folks who have worked in the

19    legal profession or with law enforcement or served in the

20    military.

21             Starting from the top.

22             PROSPECTIVE JUROR 0637:  So my best friend's a

23    lawyer.  I think she works -- she works at a -- in corporate

24    law, something to do with -- I'm not really clear what she

25    does.  She's a lawyer.
```

 1            THE COURT:  She doesn't do criminal law?

 2            PROSPECTIVE JUROR 0637:  No.

 3            THE COURT:  Okay.  And law enforcement?

 4            PROSPECTIVE JUROR 0637:  So I have an uncle who is

 5     a cop, and my -- a close friend that I grew up with that I

 6     haven't actually seen in years, but my mom's best friend's

 7     son is also a police officer.

 8            THE COURT:  Okay.

 9            PROSPECTIVE JUROR 0637:  And my uncle on the other

10     side served in the military for several decades.

11            THE COURT:  Have you spoken to any of those folks

12     about January 6th?

13            PROSPECTIVE JUROR 0637:  No.

14            THE COURT:  Okay.

15            PROSPECTIVE JUROR 0637:  With my best friend I

16     have, but not -- nothing specific.  We talk on a regular

17     basis.

18            THE COURT:  Okay.  Mr. Dalke?

19            MR. DALKE:  No questions.  Thank you.

20            THE COURT:  Mr. Pierce?

21            MR. PIERCE:  Just a couple.

22            Morning, ma'am.

23            PROSPECTIVE JUROR 0637:  Morning.

24            MR. PIERCE:  So you mentioned you were out going

25     to Home Depot at some point on January 6th.  You saw some

1    folks with red hats coming by, and you figured you knew what

2    was going on essentially based on that?

3            PROSPECTIVE JUROR 0637:  I knew that there were --

4    I don't remember what details I knew, but I knew that there

5    was an event happening at the -- there were kind of protests

6    at the Capitol.  I think over the course of the day we

7    learned more about what was happening, but I knew there was

8    a thing happening at the Capitol.

9            MR. PIERCE:  And do you -- I'm sure most people

10   do, but do you have strong feelings about the fact that

11   there were red hats that jump out at you for, you know...

12           PROSPECTIVE JUROR 0637:  It was -- I mean, it was

13   how I was associating folks with that event.  I knew that,

14   you know, the MAGA hats were worn by Trump supporters, and

15   that that's what the focus of that protest was.

16           MR. PIERCE:  And did you yourself feel scared or

17   frightened in the course of that day being out and about?

18           PROSPECTIVE JUROR 0637:  No.  I think -- it was a

19   little disconcerting that we knew the mayor instated a

20   curfew, so it was -- I didn't feel like scared myself or in

21   danger at all.  I felt a little bit like:  This is strange.

22   What's going on here?  Something kind of big is happening.

23           I would say that's how I would describe it.

24           MR. PIERCE:  Okay.  And then you did say, I

25   believe, you know, that you have developed some feelings of

 1    your own about January 6th.  I'm sure we all have.  But can

 2    you please very briefly summarize what those are?

 3              PROSPECTIVE JUROR 0637:  I feel like -- I mean, it

 4    feels like a day where a public institution was threatened,

 5    and that feels scary in kind of a symbolic way to me.  And I

 6    guess I -- it's really hard to sum it up.

 7              I think it's really unfortunate.  And I think

 8    there is -- it was kind of a momentous occasion and symbolic

 9    in the sense that it drew out how divided we are in this

10    moment as a country and how desperate, I guess, a lot of

11    folks are feeling about the state of our country, politics.

12              That kind of came to a head on that day, and in a

13    way that made me kind of take it more seriously, too, I

14    guess, and that I feel like still -- we're still kind of

15    experiencing the fallout of it.  We haven't really reckoned

16    with what we learned that day and what we all need to keep

17    learning from it.

18              MR. PIERCE:  Thank you.

19              THE COURT:  All right.  Thank you, ma'am.  You can

20    step down.

21              Okay.  Any challenge for cause for 637?

22              MR. DALKE:  Not from the government.

23              MR. PIERCE:  Yes, Your Honor.  We would move to

24    strike for cause based on her sort of personal feelings

25    about January 6th, threat to the institution and having, you

```
 1        know, sort of personal experience.

 2                   THE COURT:  Okay.  I'm going to overrule that.  So

 3        let that be a guide, Mr. Pierce.

 4                   MR. PIERCE:  Yes, sir.

 5                   THE COURT:  All right.  Let's do one more and then

 6        take a brief bio break.

 7                   THE COURTROOM DEPUTY:  Okay.

 8                   Your Honor, Juror No. 1715.

 9                   THE COURT:  Step right up, ma'am.  All right.

10        Feel free to slip your mask off.

11                   You're Ms. Daulton; is that correct?

12                   PROSPECTIVE JUROR 1715:  That's correct.

13                   THE COURT:  All right.  It says here that you are

14        director of social work at Children's Law Center?

15                   PROSPECTIVE JUROR 1715:  Yes.

16                   THE COURT:  Is that right?

17                   PROSPECTIVE JUROR 1715:  That's correct.

18                   THE COURT:  Okay.  How long have you been doing

19        that?

20                   PROSPECTIVE JUROR 1715:  Children's Law Center?

21        Approximately 12 years, a little over 12 years.

22                   THE COURT:  All right.  Do you have a significant

23        other?

24                   PROSPECTIVE JUROR 1715:  I do.

25                   THE COURT:  And what do they do?
```

1          PROSPECTIVE JUROR 1715:  He works at the Office of

2     Transition Initiatives with USAID.

3          THE COURT:  All right.  You answered yes to a

4     number of my questions, including 41, the catch-all.

5          Why don't we start there.  Why did you answer yes

6     to that?

7          PROSPECTIVE JUROR 1715:  I wasn't sure if you had

8     asked a question that addressed this.  So on Friday I need

9     to appear in D.C. Superior Court from 11:00 to 12:30, and I

10    have a partial excuse.  Unfortunately the time says 11:30 to

11    12:30, which is an error, but...

12         THE COURT:  So what is the appearance related to?

13         PROSPECTIVE JUROR 1715:  It's for a child welfare

14    case.

15         THE COURT:  And is it something that you can

16    continue?

17         PROSPECTIVE JUROR 1715:  I cannot.  I am not the

18    lawyer.  I can ask the lawyer.

19         THE COURT:  And are you a party to that case?  No,

20    you would be a witness based on your work; is that right?

21         PROSPECTIVE JUROR 1715:  Actually, so I'm an agent

22    of the lawyer, so I am a social worker who works with the

23    guardian ad litem in that case.

24         THE COURT:  Okay.  And give me the times again.

25         PROSPECTIVE JUROR 1715:  From 11:00 to 12:30.

```
 1                  THE COURT:  Okay.  You live or work near the

 2        Capitol?

 3                  PROSPECTIVE JUROR 1715:  I work at 501 Third

 4        Street Northwest.  I wasn't sure what was considered

 5        "close."

 6                  THE COURT:  It says you have an opinion about

 7        people who believe that the presidential election was

 8        stolen, et cetera, that might make it hard for you to serve.

 9        Why did you answer yes to that one?

10                  And relatedly, you have political views that you

11        think might make it hard for you to serve.

12                  PROSPECTIVE JUROR 1715:  Well, I'm liberal in my

13        politics.  I'm a bit emotional about what happened on

14        January 6th.  I feel like -- I think that protesting and

15        demonstrations in general are okay, as somebody who does

16        that, but I -- I'm --

17                  THE COURT:  You're struggling a little bit.

18                  PROSPECTIVE JUROR 1715:  I am struggling a little

19        bit, yes, because what happened here was an emotional event

20        in my city, and my politics are pretty liberal, and...

21                  THE COURT:  Right.  So many people have feelings

22        about January 6th.  Many people have strong feelings about

23        what happened generally, on both sides of the political

24        spectrum.  All right?

25                  This case is not a referendum about January 6th
```

 1    generally or the 2020 election or whether there were

 2    irregularities, et cetera.  Right?  It's an exercise in

 3    determining whether Mr. Alberts is guilty or not guilty of

 4    the things that he's charged with.  Right?

 5            So the question is:  Can you put aside your

 6    political views and your strong feelings about January 6th

 7    and give this gentleman an up-or-down fair trial?  And I

 8    want you to be honest with me and give me --

 9            PROSPECTIVE JUROR 1715:  Yes, I think I can.  I

10    believe in the court system and the jury process.

11            THE COURT:  Okay.  And you're pretty confident

12    about that?

13            PROSPECTIVE JUROR 1715:  Everybody has biases, but

14    yes, I feel pretty confident that I would intentionally

15    listen to the information presented and do my best to be

16    impartial in making decisions.

17            THE COURT:  And follow the instructions that I

18    give you?

19            PROSPECTIVE JUROR 1715:  Absolutely.

20            THE COURT:  Okay.

21            All right.  You or someone close to you has served

22    as a witness in a judicial proceeding?  Is this related to

23    your job?

24            PROSPECTIVE JUROR 1715:  Yes.

25            THE COURT:  Okay.  Has someone in that group been

1    the victim of a crime or witness to a crime?

2            PROSPECTIVE JUROR 1715:  I've been mugged.

3            THE COURT:  Okay.  Do you feel that -- was your --

4    was the case resolved?

5            PROSPECTIVE JUROR 1715:  Yes.  There wasn't an

6    official case.

7            THE COURT:  Anything about your treatment in that

8    case by the police, by prosecutors, by defense lawyers make

9    you hesitate to become involved in a criminal matter?

10           PROSPECTIVE JUROR 1715:  No.

11           THE COURT:  Okay.  And you have prior jury

12    experience?

13           PROSPECTIVE JUROR 1715:  Yes.

14           THE COURT:  How many times?

15           PROSPECTIVE JUROR 1715:  Three times.

16           THE COURT:  Here or in Superior Court?

17           PROSPECTIVE JUROR 1715:  Twice in Superior Court

18    and once in Boston court some time ago.  I don't remember

19    which court.

20           THE COURT:  Okay.  Taking the last first, what

21    kind of cases were they, to the extent you remember?

22           PROSPECTIVE JUROR 1715:  So I ended up being an

23    alternate on the last one, and so I don't really remember

24    the specifics.  I do think it was related to possession of

25    substances.

```
 1                  The time before that was a trial for two gentlemen

 2       related to a stolen vehicle and the U.S. Postal Service.

 3                  And I remember it was a criminal case in Boston,

 4       but it was so long ago, Your Honor, I don't recall.

 5                  THE COURT:  Were you -- obviously not the one you

 6       were an alternate on, but were you a foreperson in any of

 7       those cases?

 8                  PROSPECTIVE JUROR 1715:  No.

 9                  THE COURT:  No.  And did the jury reach a verdict

10       in the ones that you wound up serving on?

11                  PROSPECTIVE JUROR 1715:  Yes.

12                  THE COURT:  All right.  Mr. Dalke?

13                  MR. DALKE:  Good morning, Ms. Daulton.

14                  PROSPECTIVE JUROR 1715:  Good morning.

15                  MR. DALKE:  I think just questions on two topics.

16                  In the cases that the juries reached the verdict

17       on, did it reach for the government or the defense?

18                  PROSPECTIVE JUROR 1715:  I think there were

19       multiple charges, and there were two gentlemen, so not every

20       charge was -- he wasn't found guilty on every charge.  On

21       some of the charges.  Or they.

22                  I don't remember exactly the specifics, but there

23       were multiple charges, two gentlemen.

24                  MR. DALKE:  Some convictions and some not?

25                  PROSPECTIVE JUROR 1715:  That's correct.
```

```
 1                    MR. DALKE:  In your work, day-to-day work, are you

 2        involved with law enforcement?

 3                    PROSPECTIVE JUROR 1715:  Not day-to-day, no.

 4                    MR. DALKE:  Thank you.

 5                    MR. PIERCE:  Good morning, ma'am.

 6                    PROSPECTIVE JUROR 1715:  Good morning.

 7                    MR. PIERCE:  Just a couple of quick questions.

 8        You mentioned transition aid initiative.  What is that?

 9                    PROSPECTIVE JUROR 1715:  So he works for the

10        government in countries that are -- it's really funny you're

11        asking me this question because he literally just asked me

12        this question:  What do I do?

13                    So basically promoting democracy in countries

14        where there are not democracies, so, for example, Ukraine.

15                    MR. PIERCE:  And I apologize if I missed it, but

16        you said that's a government position, or no?  That's

17        private sector?

18                    PROSPECTIVE JUROR 1715:  Well, so right now he's

19        considered a contractor for the office of transition

20        initiatives, so -- but yes, that's part of USAID, which is a

21        federal government body.

22                    MR. PIERCE:  Okay.  And then you were forthright

23        about your politics, and you did say you would do your best

24        despite that to be impartial.

25                    PROSPECTIVE JUROR 1715:  Yes.
```

1          MR. PIERCE:  I certainly appreciate that.  I was

2    just -- I'm going to take a risk of borrowing a question

3    from the judge here.  If you were in Mr. Alberts's seat,

4    would you want yourself as a juror in this case?

5          PROSPECTIVE JUROR 1715:  Yes, I think so.

6          MR. PIERCE:  Okay.  Thank you.

7          THE COURT:  All right, ma'am.  You can step down.

8    All right.  Mr. Dalke?

9          MR. DALKE:  Not moving for cause, Your Honor.

10         THE COURT:  Mr. Pierce?

11         MR. PIERCE:  No, Your Honor.

12         THE COURT:  All right.  1715 is qualified.

13    Why don't we take a ten-minute break.  It's 11:23,

14    let's come back at 11:35.

15         (Recess taken)

16         MR. KONIG:  If it's appropriate, I wanted to raise

17    one quick matter before the Court.

18         I notice that there are observers in the

19    courtroom, friends and relatives of the defendant, and I

20    just -- to the extent -- and certainly it's appropriate, but

21    I don't know if it's appropriate to remind them that they

22    shouldn't be speaking with prospective jurors in the case,

23    to make clear the rules of the Court.

24         And also, I don't know -- I haven't done this in a

25    while, but I don't know if Rule's 615 invocation applies to

1    jury selection or not, but I wanted to just flag that to the

2    Court.

3              THE COURT:  Mr. Pierce, just instruct them not to

4    speak with any jurors, just out of an abundance of caution.

5    Okay?

6              MR. PIERCE:  Oh, well, no, absolutely.  And I

7    actually wanted to follow on with what Mr. Konig said --

8              THE COURT:  Sure.

9              MR. PIERCE:  -- which is -- and I don't -- I don't

10   want to give any specific names, but there are a lot of

11   people that have strong feelings about me, right, and so,

12   like, these individuals who are observing, when they go out

13   in the hallway, they should not be like, you know, calling

14   lawyers, like, names and, like, attacking lawyers, because

15   it's just -- I'm a big boy.  I can take it.  But it's, like,

16   a distraction.

17             THE COURT:  Is there a specific incident you have

18   in mind?

19             MR. PIERCE:  There is one I have in mind, but I'd

20   really rather -- I'd really rather not.

21             THE COURT:  Take that up with government counsel

22   if there really is an issue in that regard.

23             MR. PIERCE:  Okay.

24             THE COURT:  And it's an interesting academic

25   question.  I don't know if the rule against witnesses begins

```
 1    at jury selection.  I tend to think not so...
 2              Mr. Pierce, once the first witness is sworn, no
 3    one that potentially could be a witness should observe.
 4    Okay?
 5              MR. PIERCE:  Yes, Your Honor.
 6              THE COURTROOM DEPUTY:  Your Honor, Juror No. 0077.
 7              THE COURT:  All right.  Good morning, ma'am.
 8              PROSPECTIVE JUROR 0077:  Good morning.
 9              THE COURT:  Feel free to slip your mask off.
10              PROSPECTIVE JUROR 0077:  Do I have to?
11              THE COURT:  You don't have to, but -- do we have a
12    clear mask for Ms. Floyd?
13              THE COURTROOM DEPUTY:  Yes.
14              THE COURT:  All right.  We're going to get you a
15    clear mask.  We just want to make sure that everyone hears
16    you.
17              PROSPECTIVE JUROR 0077:  Okay.
18              THE COURT:  All right.  Thank you for your
19    patience.
20              It says here you're an accountant with the German
21    American school; is that right?
22              PROSPECTIVE JUROR 0077:  German International
23    School, yes.
24              THE COURT:  German International School.
25              How long have you been doing that?
```

```
 1                PROSPECTIVE JUROR 0077:  Three years.

 2                THE COURT:  What did you do before that?

 3                PROSPECTIVE JUROR 0077:  I was an accountant at an

 4     investment firm.

 5                THE COURT:  Do you have a significant other?

 6                PROSPECTIVE JUROR 0077:  No.

 7                THE COURT:  And we don't ask you that to get in

 8     your business.

 9                PROSPECTIVE JUROR 0077:  Gotcha.

10                THE COURT:  We just ask to get that person's

11     profession, if you do.  Okay?

12                You answered yes to a number of my questions.

13                No. 19, you've closely followed the news about

14     what happened on January 6th?

15                PROSPECTIVE JUROR 0077:  Yes.

16                THE COURT:  21, you say you or someone you know

17     closely was particularly affected by the events of January

18     6th.  Why did you say that?

19                PROSPECTIVE JUROR 0077:  Well, I have a family

20     member that's a police officer with the Metropolitan Police

21     Department, leg was broken in the insurrection.

22                THE COURT:  So he was there that day?

23                PROSPECTIVE JUROR 0077:  He was there that day.

24                THE COURT:  How close of a family member?

25                PROSPECTIVE JUROR 0077:  Close.
```

1          THE COURT:  So that's a little too close to home

2     for you to be a juror in this case, you think?  Or you tell

3     me.

4          PROSPECTIVE JUROR 0077:  I guess that means -- I

5     don't know.  I have an opinion about it, just like anybody

6     else does.  I don't know if it would be fair or partial if I

7     already have an opinion about it based on that scenario.

8          THE COURT:  Okay.

9          PROSPECTIVE JUROR 0077:  So I would listen to the

10     facts and make an opinion, but obviously I've been

11     personally affected by it knowing that I had a family member

12     that was injured during that time.

13          THE COURT:  Let me ask this question:  If you

14     were to listen to all the evidence and you thought that

15     Mr. Alberts was not guilty of the charges against him, that

16     the government had not proved its case, would you hesitate

17     to render that verdict because of what happened to your

18     brother?

19          PROSPECTIVE JUROR 0077:  No.

20          THE COURT:  Okay.  23, you have an opinion about

21     folks who believe that the 2020 presidential election was

22     stolen, et cetera, that might make it hard for you to serve.

23     Why did you answer yes to that?

24          PROSPECTIVE JUROR 0077:  Because I don't believe

25     in what they stood for when they were doing that.

1          THE COURT:  Okay.

2          PROSPECTIVE JUROR 0077:  I don't believe that the

3     election was a fraud, and anybody that was involved in that

4     whole process and being involved in the insurrection is just

5     guilty by association pretty much.

6          THE COURT:  Okay.  All right.  Ma'am, you can step

7     down.

8          PROSPECTIVE JUROR 0077:  Thank you.

9          One last question.  I'm going to step out, I know,

10    but I also have a doctor's appointment.  I didn't put that

11    on there, so I don't know if that plays a role.

12         THE COURT:  Thank you.

13         PROSPECTIVE JUROR 0077:  Thank you.

14         THE COURT:  You can go out the front, and

15    Ms. Jenkins will give you further instructions.

16         All right.  The Court will strike 77 for cause

17    based on her brother's connection to the events, his broken

18    leg, as well as her answers regarding guilt by association.

19         THE COURTROOM DEPUTY:  Your Honor, Juror No. 0298.

20         THE COURT:  Step right up, sir.  Good morning.

21         PROSPECTIVE JUROR 0298:  Good morning.

22         THE COURT:  Feel free to slip your mask off.

23         PROSPECTIVE JUROR 0298:  Okay.

24         THE COURT:  All right.  You're Mr. Bright?

25         PROSPECTIVE JUROR 0298:  Yes.

```
 1                    THE COURT:  And you're a budget analyst at the
 2         National Gallery of Art; is that correct?
 3                    PROSPECTIVE JUROR 0298:  Correct.
 4                    THE COURT:  All right.  How long have you been
 5         doing that?
 6                    PROSPECTIVE JUROR 0298:  I've been working at the
 7         gallery --
 8                    THE COURT:  If you can move a little closer to the
 9         microphone.
10                    PROSPECTIVE JUROR 0298:  Oh, sorry.  I've been
11         working at the gallery for about two and a half years.
12                    THE COURT:  Okay.  What did you do before that?
13                    PROSPECTIVE JUROR 0298:  Before then I was with
14         the Pension Benefit Guaranty Corporation, still doing budget
15         work.
16                    THE COURT:  Do you have a significant other?
17                    PROSPECTIVE JUROR 0298:  No.
18                    THE COURT:  You answered yes to a few of my
19         questions.  You live or work near Capitol Hill?
20                    PROSPECTIVE JUROR 0298:  Since I work at the
21         National Gallery, I say that's probably close.  I was
22         teleworking at the time, but...
23                    So that's some confusion.
24                    THE COURT:  Okay.  So you were not there that day?
25                    PROSPECTIVE JUROR 0298:  No.  I was working from
```

1    home.

2              THE COURT:  Okay.  Were any of your co-workers

3    working that day, and were they affected at all by --

4              PROSPECTIVE JUROR 0298:  Yes.  My co-workers were

5    there.  We were open that day.  But the crowd completely

6    passed by the gallery.

7              THE COURT:  Okay.  And 31, you know folks who have

8    either worked for or have applied to work for some law

9    enforcement agency?  And you say DOJ.

10             PROSPECTIVE JUROR 0298:  Yes, I used to work

11   there.

12             THE COURT:  You used to work there?

13             PROSPECTIVE JUROR 0298:  Yes.

14             THE COURT:  In what capacity?

15             PROSPECTIVE JUROR 0298:  As a budget analyst for

16   the justice management division.

17             THE COURT:  And just so counsel knows, justice

18   management division is the division that oversees budget and

19   financial analysis for the entire department, correct?

20             PROSPECTIVE JUROR 0298:  Correct.

21             THE COURT:  All right.  Mr. Dalke?

22             MR. DALKE:  No questions, Mr. Bright.  Thank you.

23             THE COURT:  Mr. Pierce?

24             MR. PIERCE:  Good morning, sir.

25             Just real quick, is there any reason that you

1   think you could not be fair or impartial for Mr. Alberts in

2   this case in terms of applying the facts to the law --

3   finding the facts and following the judge's instructions?

4           PROSPECTIVE JUROR 0298:  No, no issues with

5   impartiality.

6           THE COURT:  Okay.  Thank you, sir.  You can step

7   down.

8           PROSPECTIVE JUROR 0298:  Do I just step out?

9           THE COURT:  Yes.  Why don't you go out the front,

10  and Ms. Jenkins will give you further instructions.

11          PROSPECTIVE JUROR 0298:  Okay.  Thank you.

12          THE COURT:  Okay.  Any challenge to 298?

13          MR. DALKE:  Not from the government.

14          MR. PIERCE:  No, Your Honor.

15          THE COURT:  298 is qualified.

16          THE COURTROOM DEPUTY:  Your Honor, Juror No. 0819.

17          THE COURT:  Okay.  Good morning, ma'am.

18          PROSPECTIVE JUROR 0819:  Good morning.

19          THE COURT:  Step right up.

20          You're Ms. Choi; is that right?

21          PROSPECTIVE JUROR 0819:  Yes, that's correct.

22          THE COURT:  Okay.  And you are a lawyer with -- in

23  the office of the DNI; is that right?

24          PROSPECTIVE JUROR 0819:  Yes.

25          THE COURT:  How long have you been doing that?

1          PROSPECTIVE JUROR 0819:  Since January.  And

2     before that I was at Arnold & Porter.

3          THE COURT:  And what was your practice at A&P?

4          PROSPECTIVE JUROR 0819:  I was in the

5     international trade group, but I am aware that your wife may

6     work there.

7          THE COURT:  Yes, she does.  Did you work with her?

8          PROSPECTIVE JUROR 0819:  I did not.

9          THE COURT:  Okay.  Do you know her personally?

10          PROSPECTIVE JUROR 0819:  No.

11          THE COURT:  Okay.  Do you have a significant

12     other?

13          PROSPECTIVE JUROR 0819:  Yes.

14          THE COURT:  And what do they do?

15          PROSPECTIVE JUROR 0819:  May I approach the bench,

16     Your Honor?

17          THE COURT:  Sure.

18          I'll tell you what, while we get your phone why

19     don't we go to other questions.

20          PROSPECTIVE JUROR 0819:  Okay.

21          THE COURT:  You answered yes to three of my

22     questions.  You live or work near Capitol Hill?

23          PROSPECTIVE JUROR 0819:  Yes.  At the time of

24     January 6th, I was living a mile from Capitol Hill.  We've

25     since moved, but we still live a mile from the Capitol.

1          THE COURT:  And were you home that day?

2          PROSPECTIVE JUROR 0819:  I was not home that day.

3    I was visiting my mother in northern Virginia.  But my

4    husband was home on that day.

5          THE COURT:  Okay.  Did he observe any of the

6    activities on the Capitol grounds that day?

7          PROSPECTIVE JUROR 0819:  Not -- no, he did not.

8    We did avoid --

9          THE COURT:  Personally observe?

10         PROSPECTIVE JUROR 0819:  He did not personally

11   observe, no.

12         THE COURT:  Okay.  Did your home suffer any

13   property damage?

14         PROSPECTIVE JUROR 0819:  No.

15         THE COURT:  And you answered yes to 32, a member

16   of the group, you, close friend, or relative have served in

17   the military?

18         PROSPECTIVE JUROR 0819:  If that was the question,

19   then that was not -- I must have mistaken the answer.

20   That's not my --

21         THE COURT:  Maybe worked in law enforcement or

22   worked in the legislative branch?

23         PROSPECTIVE JUROR 0819:  Yes, we have -- I have

24   two close personal friends who are attorneys for the Office

25   of Legislative Counsel in the Senate.

1          THE COURT:  Okay.  Were they in the Senate that

2     day?

3          PROSPECTIVE JUROR 0819:  They were not there that

4     day.

5          THE COURT:  Okay.  Have you spoken to them about

6     their experiences on January 6th or January 6th generally?

7          PROSPECTIVE JUROR 0819:  Just generally.

8          THE COURT:  Okay.

9          PROSPECTIVE JUROR 0819:  Yes, Your Honor.

10          THE COURT:  We obviously ask that question because

11     of the possibility that someone you're close to that's been

12     affected could, you know, cause some bias on your part.

13          Is there a reason for concern in that regard with

14     respect to these people?

15          PROSPECTIVE JUROR 0819:  No, there's not.

16          THE COURT:  Okay.  Your job at ODNI, are you

17     involved in domestic terrorism at all?  Not are you involved

18     in it, but does your work involve domestic terrorism?

19          PROSPECTIVE JUROR 0819:  Understood.

20          No, it does not.

21          THE COURT:  All right.  We're going to go to the

22     phones.  We're under seal.

23          (The following is a bench conference

24           held outside the hearing of the public)

25     ████████████████████████████████████████████

1 ████████████████████████████████

2 ████████████████████████████████████

3 ██████████████████████████

4 ██████████████████████████████

5 ██████████████████

6          (This is the end of the bench conference)

7          THE COURT:  Okay.  Mr. Dalke, any follow-up?

8          MR. DALKE:  Just briefly.  With your background

9 and experience in the legal training, could you follow the

10 judge's instructions if you were a juror in this case?

11          PROSPECTIVE JUROR 0819:  Yes.

12          MR. DALKE:  And could you set aside your legalese

13 and your legal background and just base it on what's in this

14 courtroom and the jury instructions and nothing else?

15          PROSPECTIVE JUROR 0819:  Yes.

16          MR. DALKE:  Thank you.

17          MR. PIERCE:  Good morning, ma'am.

18          PROSPECTIVE JUROR 0819:  Good morning.

19          MR. PIERCE:  When were you at DNI?  What years?

20          PROSPECTIVE JUROR 0819:  I just started in

21 January, so I've been there since January 2023.

22          MR. PIERCE:  And I heard the judge's question and

23 your answer regarding whether you were involved in any work

24 with respect to domestic terrorism, et cetera.

25          Have you been involved in any work regarding the

1   surveillance -- and I'm not suggesting you're engaging in it

2   yourself -- but have you been involved in, you know, work

3   regarding any surveillance of American citizens?

4           PROSPECTIVE JUROR 0819:  My work -- my portfolio

5   does not directly involve any sort of surveillance, any sort

6   of election security, any sort of counterintelligence or

7   insider threat work.  But my office is involved in all that;

8   so to the extent we do advise clients on various matters

9   that touch on those areas, I can't guarantee that I might

10  not also help other attorneys who advise on those

11  portfolios.

12          MR. PIERCE:  And to follow-up really quickly,

13  Ms. Choi, is there any reason we should be concerned about

14  your impartiality or ability to be fair in this case?

15          PROSPECTIVE JUROR 0819:  I think I've explained

16  everything that would give me pause.

17          MR. PIERCE:  Okay.

18          PROSPECTIVE JUROR:  And so no.

19          MR. PIERCE:  I'm sorry, I do have one quick

20  question that I think I should ask on the phone based on

21  consent.

22              (The following is a bench conference

23               held outside the hearing of the public)

24  ██████████████████████████████████████████

25  ██████████████████████████████████████████



9          (This is the end of the bench conference)

10          THE COURT:  Okay.  Ma'am, thank you very much.

11  You can step down.

12          Mr. Dalke?

13          MR. DALKE:  No strike for cause, Your Honor.

14          THE COURT:  Mr. Pierce?

15          MR. PIERCE:  No, Your Honor.

16          THE COURT:  819 is qualified.

17          THE COURTROOM DEPUTY:  Your Honor, Juror No. 2165.

18          THE COURT:  Good afternoon, or good morning still.

19          PROSPECTIVE JUROR 2165:  Good morning.

20          THE COURT:  Tell me your name.

21          PROSPECTIVE JUROR 2165:  Judy Battle.

22          THE COURT:  Battle.  Okay.

23          All right.  It says here that you're not currently

24  employed; is that correct?

25          And you can slip your mask off.

```
 1                    PROSPECTIVE JUROR 2165:  I'm retired.

 2                    THE COURT:  Okay.  You can take your mask off so

 3         we can all hear you.

 4                    PROSPECTIVE JUROR 2165:  Retired.

 5                    THE COURT:  And where did you last work before you

 6         retired?

 7                    PROSPECTIVE JUROR 2165:  U.S. Department of

 8         Transportation.

 9                    THE COURT:  And what was your job at

10         Transportation?

11                    PROSPECTIVE JUROR 2165:  Correspondence analyst.

12                    THE COURT:  Slip it all the way down.

13                    PROSPECTIVE JUROR 2165:  Correspondence analyst.

14                    THE COURT:  Correspondence analyst.  All right.

15         And so you returned correspondence that people wrote to the

16         department, and you drafted correspondence back; is that

17         right?

18                    PROSPECTIVE JUROR 2165:  Yes.

19                    THE COURT:  All right.  You answered yes to a

20         number of my questions.  Have you -- you watched part of

21         those hearings in the House of Representatives about January

22         6th?

23                    PROSPECTIVE JUROR 2165:  Yes.

24                    THE COURT:  And what did you think of those?

25                    PROSPECTIVE JUROR 2165:  Interesting.
```

```
 1                    THE COURT:  Uh-huh.

 2                    27 -- and why do you say they were interesting?

 3      What was interesting about them?

 4                    PROSPECTIVE JUROR 2165:  I believe they were very

 5      detailed.

 6                    THE COURT:  Uh-huh.  So obviously those dealt with

 7      January 6th as a whole, right?

 8                    PROSPECTIVE JUROR 2165:  Yes.

 9                    THE COURT:  And so a lot of people have feelings

10      about January 6th, but we're here to assess whether this

11      young man is guilty or not guilty.  Do you think you would

12      be able to do that despite what you may think about or what

13      you heard about in those hearings?

14                    PROSPECTIVE JUROR 2165:  Yes.

15                    THE COURT:  Okay.  Someone -- either you or

16      someone close to you has been arrested or charged with some

17      offense.  Why did you answer yes to that one?

18                    PROSPECTIVE JUROR 2165:  Some members of my

19      family.

20                    THE COURT:  Okay.  Someone close in your family?

21                    PROSPECTIVE JUROR 2165:  Yes.

22                    THE COURT:  All right.  We don't need to go into

23      detail, but have you -- were they charged in Washington,

24      D.C.?

25                    PROSPECTIVE JUROR 2165:  No.
```

```
1                    THE COURT:  No.  And do you feel that they were
2       treated fairly in that case?
3                    PROSPECTIVE JUROR 2165:  I was young then so I
4       don't really remember.
5                    THE COURT:  Okay.  And is this you or somebody in
6       your family?
7                    PROSPECTIVE JUROR 2165:  My brother.
8                    THE COURT:  Your brother.
9                    You know folks who have worked in the legal field?
10                   PROSPECTIVE JUROR 2165:  Yes.
11                   THE COURT:  Who do you know?
12                   PROSPECTIVE JUROR 2165:  My niece.
13                   THE COURT:  What kind of law does she practice?
14                   PROSPECTIVE JUROR 2165:  I'm trying to remember.
15      I think it's -- it's not criminal, I know that much.
16                   THE COURT:  Okay.  You know folks who have worked
17      for the legislative branch, who have worked for Congress?
18                   PROSPECTIVE JUROR 2165:  Yes.
19                   THE COURT:  Who is that?
20                   PROSPECTIVE JUROR 2165:  They don't work there
21      anymore.  They retired years ago.
22                   THE COURT:  Years ago?
23                   PROSPECTIVE JUROR 2165:  Yes.
24                   THE COURT:  And you have prior jury experience?
25                   PROSPECTIVE JUROR 2165:  I just got off jury
```

 1    Wednesday of last week in D.C.

 2              THE COURT:  Over in Superior Court?

 3              PROSPECTIVE JUROR 2165:  Grand jury.

 4              THE COURT:  Lightning struck twice.

 5              Grand jury or --

 6              PROSPECTIVE JUROR 2165:  Grand jury.

 7              THE COURT:  Have you been on a trial jury before?

 8              PROSPECTIVE JUROR 2165:  Many times.

 9              THE COURT:  Anything about those experiences make

10    you hesitate to be on another jury?

11              PROSPECTIVE JUROR 2165:  No.  I was on grand jury

12    federal for two years.

13              THE COURT:  Federal grand jury for two years?

14              PROSPECTIVE JUROR 2165:  Before I retired.

15              THE COURT:  But that was before January 6th?

16              PROSPECTIVE JUROR 2165:  Yes.

17              THE COURT:  Okay.  Were you the foreperson of any

18    of the juries that you've served on?

19              PROSPECTIVE JUROR 2165:  The deputy foreperson of

20    the last one.

21              THE COURT:  The deputy foreperson of the grand

22    jury?

23              PROSPECTIVE JUROR 2165:  D.C., yes.

24              THE COURT:  Okay.  Mr. Dalke.

25              MR. DALKE:  Good morning.

1          PROSPECTIVE JUROR 2165:  Good morning.

2          MR. DALKE:  I may have just missed this, and I

3      apologize if it's a repeat.  When you were the deputy

4      foreperson of the grand jury, the grand jury that most

5      recently convened, did you handle any cases related to

6      January 6th at all?

7          PROSPECTIVE JUROR 2165:  No.

8          MR. DALKE:  Okay.

9          THE COURT:  I think her answer was that it was

10     before January 6th.

11         MR. DALKE:  I apologize.  I may have just misheard

12     that.  I wanted to clarify.

13         The second question was, you mentioned an issue or

14     a case with law enforcement and your brother some time back.

15     Have you formed any beliefs about law enforcement based on

16     how your brother was treated or how that case was handled at

17     all?

18         PROSPECTIVE JUROR 2165:  As I said, I was maybe 2

19     or 3 at the time.  I don't remember.

20         MR. DALKE:  Okay.  Thank you.

21         THE COURT:  Mr. Pierce.

22         MR. PIERCE:  I don't have any questions, Your

23     Honor.

24         THE COURT:  Okay.  Thank you, ma'am.  You can step

25     down.

```
 1                    PROSPECTIVE JUROR 2165:  Thank you.

 2                    THE COURT:  All right.  Any challenge?

 3                    MR. DALKE:  Not from the government.

 4                    MR. PIERCE:  No, Your Honor.

 5                    THE COURT:  2165 is qualified.

 6                    THE COURTROOM DEPUTY:  Your Honor, Juror No. 1848.

 7                    THE COURT:  Okay.  Good morning, ma'am.

 8                    PROSPECTIVE JUROR 1848:  Good morning.

 9                    THE COURT:  How are you?

10                    PROSPECTIVE JUROR 1848:  Fine.

11                    THE COURT:  Ms. Arthur; is that correct?

12                    PROSPECTIVE JUROR 1848:  Yes.

13                    THE COURT:  I don't have an occupation listed for

14      you.  Are you working currently?

15                    PROSPECTIVE JUROR 1848:  Yes.

16                    THE COURT:  Where do you work?

17                    PROSPECTIVE JUROR 1848:  The Congressional Budget

18      Office.

19                    THE COURT:  Okay.  If you could move a little

20      close to --

21                    PROSPECTIVE JUROR 1848:  The Congressional Budget

22      Office.

23                    THE COURT:  CBO.

24                    So let's start there.  Obviously that's not the

25      House or the Senate, but it serves both bodies.
```

```
1              PROSPECTIVE JUROR 1848:  Yes.

2              THE COURT:  Is there something about your

3    connection to or about your occupation that would make you

4    hesitate to be a juror in a J6 case?

5              PROSPECTIVE JUROR 1848:  Well, I do work for a

6    nonpartisan agency, and this is kind of a partisan trial, so

7    that could be problematic for me.

8              THE COURT:  Why is that?

9              PROSPECTIVE JUROR 1848:  Well, I mean, if it were

10   to be known that I was a juror and the case went -- how I

11   voted, I guess, I would be a little bit concerned about

12   that.

13             THE COURT:  Okay.  Well, would that prospect keep

14   you from voting one way or the other?

15             PROSPECTIVE JUROR 1848:  No.

16             THE COURT:  All right.

17             PROSPECTIVE JUROR 1848:  But it would just

18   potentially be -- you know, if someone wanted to discredit a

19   cost estimate that I provided to -- for legislation, you

20   know, we try -- again, we are a nonpartisan agency.  We

21   would like -- we want people to realize that the information

22   we provide to Congress is nonbiased and nonpartisan.

23             THE COURT:  Okay.  When you say it's partisan, the

24   courts aren't partisan.  You're not voting for one party or

25   the other or given --
```

```
1                    PROSPECTIVE JUROR 1848:  Well, I mean --
2                    THE COURT:  Let me finish so that the court
3         reporter can pick up both of us.
4                    But obviously there are political overtones to
5         January 6th.  I assume that's what you mean.
6                    PROSPECTIVE JUROR 1848:  Yes.
7                    THE COURT:  Okay.  And so do you think you could
8         put those aside in determining whether this fellow is guilty
9         or not guilty of the crimes charged?
10                   PROSPECTIVE JUROR 1848:  Yes, that's not a
11        question.
12                   THE COURT:  Okay.  Great.
13                   All right.  You answered yes to a number of
14        questions.  You say you have a medical procedure scheduled
15        next Thursday and Friday?
16                   PROSPECTIVE JUROR 1848:  Yes.
17                   THE COURT:  Is that something that you could
18        postpone?
19                   PROSPECTIVE JUROR 1848:  I've already postponed it
20        once.  It's probably not a good idea to try and postpone it
21        again.
22                   THE COURT:  And will that procedure require post-
23        procedure recovery or --
24                   PROSPECTIVE JUROR 1848:  No.
25                   THE COURT:  You would be available the following
```

1    Monday?

2            PROSPECTIVE JUROR 1848:  The following Monday I

3    would be available, but next Thursday and Friday I would

4    not.

5            THE COURT:  Got it, okay.

6            Do you have a significant other?

7            PROSPECTIVE JUROR 1848:  No.

8            THE COURT:  You answered yes to Question 8.  You

9    think you might have recognized a potential witness in the

10   case?

11           PROSPECTIVE JUROR 1848:  No.  I put a question

12   mark next to it simply because, you know, I come in and out

13   of Capitol buildings so I recognize Capitol Police.  So I

14   might not know their names, but I might know their faces if

15   they were to come into the courtroom.

16           THE COURT:  Gotcha.

17           And you've obviously -- you've followed the news

18   about what happened at the Capitol, and you've watched some

19   of the January 6th House Select Committee hearings?

20           PROSPECTIVE JUROR 1848:  Yes.  Yes, I did.

21           THE COURT:  Okay.  So we ask those questions

22   obviously because it's important that jurors put out of

23   their minds facts that they already know about the events

24   generally and focus on the facts related to this particular

25   event.

```
 1                PROSPECTIVE JUROR 1848:  Yes.

 2                THE COURT:  And there are lots of people that came

 3      to D.C. and did lots of different things for different

 4      reasons.

 5                Do you think that would be a concern for you?

 6                PROSPECTIVE JUROR 1848:  I don't know, honestly.

 7      I mean, I do have strong opinions about January 6th.

 8                THE COURT:  And what are those opinions?

 9                PROSPECTIVE JUROR 1848:  Well, I think that it was

10      an abomination, what happened.  I'm personally deeply

11      offended as an American.

12                THE COURT:  Okay.  So serving on a jury -- I'll

13      ask the same question -- a little too close to home or --

14                PROSPECTIVE JUROR 1848:  It is close to home.  I

15      mean, I work in congressional buildings.  I mean, I walk

16      past -- I ride my bike past the Capitol every single day

17      when I go into the office.  I'm very proud of my service for

18      the Congress, and so yeah, that was a very emotional thing.

19                THE COURT:  Okay.

20                All right.  You can step down.

21                PROSPECTIVE JUROR 1848:  Okay.

22                THE COURT:  All right.  The Court will strike 1848

23      for cause based on her occupation and her answers reflecting

24      a more than ordinary personal interest in January 6th.

25                THE COURTROOM DEPUTY:  Your Honor, Juror No. 1556.
```

```
 1                  THE COURT:  Okay.  Good afternoon, ma'am.

 2                  PROSPECTIVE JUROR 1556:  Hello.

 3                  THE COURT:  Thank you for your service.  Thank you

 4       for your patience.

 5                  You're Ms. Banks; is that right?

 6                  PROSPECTIVE JUROR 1556:  Yes, that is.

 7                  THE COURT:  Okay.  It says here that you are the

 8       vice president of communications for something called Global

 9       Strategy Group.  Tell us what that is.

10                  PROSPECTIVE JUROR 1556:  I'm a communications

11       consultant for a public affairs and polling firm here in

12       D.C.

13                  THE COURT:  Okay.  Do you have a significant

14       other?

15                  PROSPECTIVE JUROR 1556:  I do.

16                  THE COURT:  And what do they do?

17                  PROSPECTIVE JUROR 1556:  They are -- they are an

18       attorney for -- they do corporate litigation for Blank Rome.

19                  THE COURT:  Okay.  You answered yes to a few of my

20       questions.  You live or work near Capitol Hill?

21                  PROSPECTIVE JUROR 1556:  I do.  I live on H Street

22       Northeast.

23                  THE COURT:  Okay.  Were you home that day?

24                  PROSPECTIVE JUROR 1556:  I was not.  I was in

25       Montana.
```

1          THE COURT:  Did your home suffer any property

2     damage as a result of January 6th?

3          PROSPECTIVE JUROR 1556:  No.

4          THE COURT:  You've obviously followed the news

5     about January 6th, and you've watched portions of the House

6     hearings.  You know, we ask those questions because

7     obviously people have general knowledge about January 6th;

8     they've followed the news.

9          And the question is:  Could you put aside what you

10    may know about the events generally and give this fellow a

11    fair trial based on just the evidence for or against him?

12    Do you think you could do that?

13         PROSPECTIVE JUROR 1556:  I do.

14         THE COURT:  And bear with me.

15         You know folks who have worked in the legal

16    profession?

17         PROSPECTIVE JUROR 1556:  Yes, my partner.

18         THE COURT:  Okay.  And where do they -- they are

19    at Blank Rome.  Sorry.

20         Anyone else?

21         PROSPECTIVE JUROR 1556:  A variety of his friends

22    from law school.

23         THE COURT:  Any of them work in criminal law?

24         PROSPECTIVE JUROR 1556:  No, sir.

25         THE COURT:  And you know folks who work for

1    Congress?

2              PROSPECTIVE JUROR 1556:  I do.  I am a former

3    congressional staffer.  I worked for Senator Jon Tester as

4    his communications director until 2018, and I have a variety

5    of acquaintances from Capitol Hill.

6              THE COURT:  Okay.  Have you spoken with either

7    Senator Tester or any former colleagues from his office or

8    other acquaintances about January 6th generally or

9    particularly their experiences that day?

10             PROSPECTIVE JUROR 1556:  I have not spoken with

11   anyone in Senator Tester's office about the events of

12   January 6th.

13             I have spoken with some of my former colleagues

14   who were on Capitol Hill that day, but they were not in

15   Senator Tester's office.

16             THE COURT:  Okay.  And were any of them sort of

17   particularly affected by what happened that day as far as

18   you know?

19             PROSPECTIVE JUROR 1556:  The experience -- the

20   conversation that I had was with the communications director

21   for Senator Manchin at the time, who I checked in that day

22   and asked him if he was okay, and he let me know that he was

23   safe in his office.

24             THE COURT:  Great.

25             Mr. Dalke?

```
1                    MR. DALKE:  No questions, Ms. Banks.  Thank you.

2                    THE COURT:  Mr. Pierce?

3                    MR. PIERCE:  Good afternoon, Ms. Banks.

4                    PROSPECTIVE JUROR 1556:  Hello.

5                    MR. PIERCE:  Just real quick.  Have you developed

6         any strong personal views about January 6th?

7                    PROSPECTIVE JUROR 1556:  I would say that I have

8         an opinion about the events that happened that day.

9                    MR. PIERCE:  Just briefly, what's your opinion?

10                    PROSPECTIVE JUROR 1556:  I believe that there were

11        people who stormed the Capitol and that there were -- I have

12        a feeling about the loss of life that happened that day, and

13        I'm bothered by that.

14                    MR. PIERCE:  You feel that despite that,

15        that you'd be able to hear the evidence with respect to

16        Mr. Alberts and apply the instructions that the judge has

17        given you and reach a verdict that's based on the evidence

18        and not your personal feelings?

19                    PROSPECTIVE JUROR 1556:  I do.  I think that it's

20        really important that people are given fair trials.

21                    MR. PIERCE:  Thank you.

22                    THE COURT:  Thank you, ma'am.  You can step down.

23                    Any challenge?

24                    MR. DALKE:  Not from the government, Your Honor.

25                    THE COURT:  Mr. Pierce?
```

```
 1                    MR. PIERCE:  No, Your Honor.

 2                    THE COURT:  1556 is qualified.

 3                    THE COURTROOM DEPUTY:  Your Honor, Juror No. 2180.

 4                    THE COURT:  Good afternoon, ma'am.  Thank you for

 5          your patience.

 6                    PROSPECTIVE JUROR 2180:  Thank you.

 7                    THE COURT:  You're Ms. Burdeshaw?

 8                    PROSPECTIVE JUROR 2180:  That's me.

 9                    THE COURT:  All right.  It says here you're in

10          marketing with something called Axonius.  Tell us what

11          Axonius is.

12                    PROSPECTIVE JUROR 2180:  Axonius is a cyber

13          security company.

14                    THE COURT:  Okay.  You answered yes to a number of

15          my questions, including 1 and 40, which is the extreme

16          hardship question.  Why did you answer yes to that?

17                    PROSPECTIVE JUROR 2180:  Yes, sir.

18                    THE COURT:  Why did you answer yes to those?

19                    PROSPECTIVE JUROR 2180:  Oh, I am hosting a

20          conference on Thursday that I've been planning for several

21          months, and we're going to have several high-ranking

22          government officials there.

23                    THE COURT:  Is that something someone can stand in

24          for you, or no?

25                    PROSPECTIVE JUROR 2180:  I have back-up if I need
```

```
 1    it, but it would require me to work very late nights to get
 2    them prepped.
 3              THE COURT:  I'll tell you what, if you could just
 4    go right behind that door, we're going to have a brief
 5    discussion.
 6              PROSPECTIVE JUROR 2180:  Okay.
 7              THE COURT:  So, Counsel, my general practice
 8    on sort of hardships that could be changed is to go
 9    ahead and provisionally qualify her, assuming she's
10    otherwise qualified, put her at the back of the list and
11    dismiss her -- or keep her in the pool only if we need her
12    at the end.
13              Any objection to doing it that way?
14              MR. DALKE:  No, Your Honor.
15              THE COURT:  Okay.  Bring her back.
16              Mr. Pierce?
17              MR. PIERCE:  No objection.
18              THE COURT:  Okay.
19              All right.  Ma'am, you've followed the news about
20    January 6th, obviously, and you've watched some of the House
21    hearings?
22              PROSPECTIVE JUROR 2180:  I did.
23              THE COURT:  We ask those questions because
24    obviously lots of people know about January 6th generally
25    and have views; and the question is whether they can
```

1    put that knowledge and those opinions aside and focus on

2    why we're here, which is the specific charges against

3    Mr. Alberts.

4            Do you think that would be a concern for you?

5            PROSPECTIVE JUROR 2180:  I think I could.

6            THE COURT:  And be honest with me.

7            PROSPECTIVE JUROR 2180:  Yeah, I do.

8            THE COURT:  You do?

9            PROSPECTIVE JUROR 2180:  Yes.

10           THE COURT:  All right.  You can step down.

11           PROSPECTIVE JUROR 2180:  Okay.

12           THE COURT:  All right.  The Court will strike 2180

13   for cause based on her answer to the Court's question in

14   light of her hardship in any event.  She perhaps could have

15   been rehabilitated, but it's not worth it.

16           THE COURTROOM DEPUTY:  Your Honor, Juror No. 0614.

17           THE COURT:  Good afternoon, ma'am.

18           PROSPECTIVE JUROR 0614:  Good afternoon.

19           THE COURT:  You're Ms. Henderson?

20           PROSPECTIVE JUROR 0614:  Yes, sir.

21           THE COURT:  All right.  Thank you for your

22   patience.

23           It says here you're a surgical coordinator with

24   Anderson Orthopedic Clinic.

25           PROSPECTIVE JUROR 0614:  Yes, sir.

```
1                    THE COURT:  Do you have a medical background?

2                    PROSPECTIVE JUROR 0614:  Not really, no.  I just

3        schedule surgery.

4                    THE COURT:  You're a scheduler?  Okay.

5                    Do you have a significant other?

6                    PROSPECTIVE JUROR 0614:  No, sir.

7                    THE COURT:  No.  How long have you worked for

8        Anderson Orthopedic?

9                    PROSPECTIVE JUROR 0614:  Since 2016.

10                   THE COURT:  Okay.  What did you do before that?

11                   PROSPECTIVE JUROR 0614:  I worked at a CPA's

12       office.

13                   THE COURT:  Okay.  All right.  You answered yes to

14       a number of my questions.  I think that's Question 1.  You

15       may have a health issue or scheduling issue?  Tell me about

16       that.

17                   PROSPECTIVE JUROR 0614:  Yes.  So I'm being

18       treated for -- I can't remember what the name of it is --

19       edema in my eye, macular edema.

20                   THE COURT:  Okay.

21                   PROSPECTIVE JUROR 0614:  And I do have an

22       appointment on Friday to get that checked because I am --

23       like if I cover this eye --

24                   THE COURT:  This is something new, or is this

25       something that you've been treated for previously?
```

1          PROSPECTIVE JUROR 0614:  I've been treated for it

2     since last year.

3          THE COURT:  Okay.  And you have one doctor that

4     you go to for it?

5          PROSPECTIVE JUROR 0614:  Yes, sir.

6          THE COURT:  If you were selected on the jury,

7     could you postpone this appointment for a couple of weeks?

8          PROSPECTIVE JUROR 0614:  Sure.

9          THE COURT:  Okay.

10          PROSPECTIVE JUROR 0614:  And then the other thing

11     is in 2021 I was hit by a car, so sitting and standing for

12     long periods of time are weird.  Sometimes I have to stand

13     up to work out all the kinks, and sometimes I have to sit

14     down.

15          THE COURT:  So the jury would probably go for an

16     hour and a half in the morning, and then a break, and then

17     an hour and a half before lunch, and then another break in

18     the afternoon, and folks can get up and stretch between

19     witnesses or if you just needed to stretch.  Would that be

20     sufficient if you were on the jury?

21          PROSPECTIVE JUROR 0614:  Usually, if I need

22     about -- I can do it for like about a half hour at a time,

23     and then at that point I would need to stand up.

24          THE COURT:  All right.  And how long would you

25     need to stand up for?

```
1          PROSPECTIVE JUROR 0614:  Well, I've been standing
2     for the past 15 or 20 minutes so...
3          THE COURT:  All right.  So just be honest with me.
4     If you were on the jury, given that schedule, do you think
5     you could handle it, or would it be hard?
6          PROSPECTIVE JUROR 0614:  It would be difficult,
7     but, I mean, you do what you have to do.
8          THE COURT:  Well, I don't want you to do what you
9     have to do.  I don't want to, like, you know, put you in
10    discomfort.
11         PROSPECTIVE JUROR 0614:  Literally at my job, I
12    get up -- I'm able to walk around at my job.  So I get up,
13    and if I'm on the phone, I will walk around the room.
14    People just ignore me at this point.
15         THE COURT:  You can step down, ma'am.
16         PROSPECTIVE JUROR 0614:  Oh, okay.
17         THE COURT:  Thanks.
18         All right.  The Court will strike 614 sua sponte
19    based on her health issues.
20         THE COURTROOM DEPUTY:  Your Honor, Juror No. 0232.
21         THE COURT:  Good afternoon, ma'am.  You're
22    Ms. Josephs; is that correct?
23         PROSPECTIVE JUROR 0232:  Yes.
24         THE COURT:  Okay.  Thank you for your patience.
25         I don't have an occupation listed for you.  Where
```

1    do you work?

2              PROSPECTIVE JUROR 0232:  I'm not working right

3    now.  I'm a teacher by trade.

4              THE COURT:  Okay.  So you were a teacher the last

5    time you worked?

6              PROSPECTIVE JUROR 0232:  Yes.

7              THE COURT:  What grade did you teach?

8              PROSPECTIVE JUROR 0232:  Preschool.

9              THE COURT:  And do you have a significant other?

10             PROSPECTIVE JUROR 0232:  I do.  I'm married.

11             THE COURT:  What does your husband do?

12             PROSPECTIVE JUROR 0232:  He works for a community

13   development organization.  It's not federal.

14             THE COURT:  Okay.  You answered yes to a couple of

15   my questions.  You think you may have recognized someone

16   else in the venire, in the panel.

17             PROSPECTIVE JUROR 0232:  Another juror is my

18   daughter's teacher.

19             THE COURT:  Okay.  And just other than being your

20   daughter's teacher, do you know her closely?

21             PROSPECTIVE JUROR 0232:  I don't know him closely,

22   no.

23             THE COURT:  Okay.  We ask that question obviously

24   if -- because if two people who know each other are on the

25   same jury, one might exercise undue influence over the

```
 1    other.  Would that be an issue in this case?
 2              PROSPECTIVE JUROR 0232:  That would not be an
 3    issue.
 4              THE COURT:  Okay.  You watched some of the
 5    committee hearings?
 6              PROSPECTIVE JUROR 0232:  I did.
 7              THE COURT:  And any takeaways based on what you
 8    did see?
 9              PROSPECTIVE JUROR 0232:  Sure.
10              THE COURT:  Briefly.
11              PROSPECTIVE JUROR:  I had some takeaways.
12              THE COURT:  Briefly.
13              PROSPECTIVE JUROR 0232:  I just was obviously very
14    upset that people lost their lives.
15              THE COURT:  Right.  So obviously people have
16    feelings about January 6th.  Some have very strong feelings,
17    have seen a lot of coverage.
18              You know, January 6th in general is not on trial
19    here.  This young man is on trial.  And do you think that
20    you would be able to put aside -- and tell me honestly --
21    your feelings about January 6th generally and give this
22    fellow a fair trial based on just the evidence for or
23    against him?
24              PROSPECTIVE JUROR 0232:  I do.
25              THE COURT:  Okay.  And you've been a juror before?
```

```
1              PROSPECTIVE JUROR 0232:  I have.

2              THE COURT:  Tell us about that.  How many times?

3              PROSPECTIVE JUROR 0232:  Just once; and I was an

4    alternate, so I didn't get to deliberate.  But I was there

5    for the trial.  It was just a short couple-day trial.

6              THE COURT:  Okay.  So I take it nothing about that

7    experience makes you hesitate to be a juror again?

8              PROSPECTIVE JUROR 0232:  No.

9              THE COURT:  Okay.  Counsel?

10             MR. DALKE:  No questions, Ms. Josephs.  Thank you.

11             THE COURT:  Mr. Pierce?

12             MR. PIERCE:  Good afternoon, Ms. Josephs.

13             PROSPECTIVE JUROR 0232:  Good afternoon.

14             MR. PIERCE:  Just very quickly.  In light of the

15   views you just articulated that -- you know, your takeaways

16   from, you know, watching the committee meetings, et cetera,

17   and I certainly appreciate the fact that you said you could

18   be fair and impartial, if you were Mr. Alberts, would you be

19   hesitant to have yourself as a juror in light of those

20   viewpoints on January 6th?

21             PROSPECTIVE JUROR 0232:  No.

22             MR. PIERCE:  Thank you.

23             THE COURT:  Thank you.  You can step down.

24             PROSPECTIVE JUROR 0232:  Okay.  Thank you.

25             THE COURT:  All right.  Any challenge?
```

```
 1              MR. DALKE:  Not from the government, Your Honor.

 2              MR. PIERCE:  No, Your Honor.

 3              THE COURT:  232 is qualified.

 4              THE COURTROOM DEPUTY:  Your Honor, Juror No. 0415.

 5              THE COURT:  Step right up, ma'am.  Good afternoon.

 6              PROSPECTIVE JUROR 0415:  Thank you.

 7              THE COURT:  You're Ms. Lea?

 8              PROSPECTIVE JUROR 0415:  Yes.

 9              THE COURT:  Okay.  You're a landscape architect?

10              PROSPECTIVE JUROR 0415:  Yes, retired.

11              THE COURT:  Great.  Do you have a significant

12      other?

13              PROSPECTIVE JUROR 0415:  Yes.

14              THE COURT:  And what do they do?

15              PROSPECTIVE JUROR 0415:  He works for a think

16      tank.

17              THE COURT:  Which one?

18              PROSPECTIVE JUROR 0415:  CSIS.

19              THE COURT:  Tell us what that is.

20              PROSPECTIVE JUROR 0415:  Center for Strategic and

21      International Service -- Studies.

22              THE COURT:  Got it.

23              PROSPECTIVE JUROR 0415:  He's in global health.

24              THE COURT:  Okay.  You answered yes to a few of my

25      questions.  You live or work near Capitol Hill?
```

```
1                PROSPECTIVE JUROR 0415:  Yes.

2                THE COURT:  How --

3                PROSPECTIVE JUROR 0415:  Work, but retired, yes.

4                THE COURT:  How close to the Capitol?

5                PROSPECTIVE JUROR 0415:  Well, I'm on North

6   Carolina Avenue between First and Second, about three blocks

7   from the corner.

8                THE COURT:  And were you home on January 6th?

9                PROSPECTIVE JUROR 0415:  We were.

10               THE COURT:  Did you personally observe any of the

11  activities on the Capitol grounds that day?

12               PROSPECTIVE JUROR 0415:  Yes.  We walked our dog

13  over late in the afternoon.

14               THE COURT:  Okay.  What do you remember personally

15  observing?

16               PROSPECTIVE JUROR 0415:  Being kind of astonished

17  by what was going on.

18               We didn't get very -- we didn't go very close to

19  the Capitol building itself.  We just stood on the corner

20  near the Library of Congress.

21               THE COURT:  Okay.  The reason we ask that question

22  is that it's important for jurors to make a decision based

23  only on the things that they see here in court and hear here

24  in court.

25               Do you think you could put aside what you may have
```

1    seen personally that day, or even in, you know, videos or

2    news coverage, and just reach a verdict based on the

3    evidence in this trial?

4               PROSPECTIVE JUROR 0415:  I think I can do that,

5    yes.

6               THE COURT:  Okay.  And you've watched some of the

7    coverage of the hearings -- of January 6th, including the

8    congressional hearings; is that right?

9               PROSPECTIVE JUROR 0415:  Yes.

10              THE COURT:  Any takeaways briefly from the

11   hearings or the parts that you watched?

12              PROSPECTIVE JUROR 0415:  I thought the information

13   was well-presented, interesting.  Again, kind of shocking

14   that we are going through this.

15              THE COURT:  So similar question:  Do you think

16   that your views about January 6th generally, do you think

17   you could put those aside and give this fellow a fair trial

18   based on the evidence for or against him?

19              PROSPECTIVE JUROR 0415:  Yes, I think so.

20              THE COURT:  Okay.  And you have prior jury

21   experience?

22              PROSPECTIVE JUROR 0415:  I do.

23              THE COURT:  How many times, roughly?

24              PROSPECTIVE JUROR 0415:  Only once in federal

25   court.  It was in 2011, I think.

```
1              THE COURT:  If you could move a little closer to

2    that microphone.

3              PROSPECTIVE JUROR 0415:  Oh, sure.

4              It was in about 2011, maybe 2012; and it was a

5    trial of multiple defendants accused of bribing a foreign

6    government for an arms deal.

7              THE COURT:  Okay.  And were you the foreperson of

8    that jury, by any chance?

9              PROSPECTIVE JUROR 0415:  No, uh-uh.

10             THE COURT:  And did the jury reach a verdict?

11             PROSPECTIVE JUROR 0415:  No, we did not.  We were

12   deadlocked.

13             THE COURT:  Deadlocked.

14             Is there anything -- well, let me ask you this:

15   Was the jury deadlocked based on what you view as sort of

16   honest disagreements, or were there hold-out jurors, in your

17   view?

18             PROSPECTIVE JUROR 0415:  There was one hold-out

19   juror that didn't agree with how the defendants had been

20   charged.

21             THE COURT:  Okay.

22             All right.  Is there anything -- is there anything

23   about that experience that makes -- that would make you

24   hesitate to be on a jury again?

25             PROSPECTIVE JUROR 0415:  No.
```

```
 1                    THE COURT:  Okay.

 2                    All right.  Counsel?

 3                    MR. DALKE:  No questions, Ms. Lea.  Thank you.

 4                    PROSPECTIVE JUROR 0415:  Uh-huh.

 5                    MR. PIERCE:  Good afternoon, Ms. Lea.

 6                    PROSPECTIVE JUROR 0415:  Hi.

 7                    MR. PIERCE:  Just a couple -- just two questions,

 8      I think.

 9                    You mentioned you were walking your dog in the

10      afternoon near the Capitol.

11                    PROSPECTIVE JUROR 0415:  Yes.

12                    MR. PIERCE:  And so you observed, I think you

13      said, what was going on there --

14                    PROSPECTIVE JUROR 0415:  Uh-huh.

15                    MR. PIERCE:  -- from your standpoint.  You saw

16      some things.

17                    THE COURT:  I'm sorry, let me interrupt.

18                    Do you remember about what time you were walking

19      your dog?

20                    PROSPECTIVE JUROR 0415:  I think it was about

21      4:00.

22                    THE COURT:  4:00.

23                    PROSPECTIVE JUROR 0415:  I think so.

24                    THE COURT:  And when did you get back home after

25      4:00?
```

```
1          PROSPECTIVE JUROR 0415:  We didn't stay very long.

2     I would say 4:30.

3          THE COURT:  Go ahead.

4          MR. PIERCE:  Did you have any personal or sort of

5     emotional reaction or sort of trauma you felt like you had

6     in terms of being scared or frightened or anything like

7     that?

8          PROSPECTIVE JUROR 0415:  No, not scared.  Again,

9     kind of astonished to see what was going on.  And the people

10    that we were sharing the corner with were many people that

11    were Trump supporters wearing Trump paraphernalia and did

12    seem to be very laid back.  It was kind of -- that was kind

13    of astonishing, watching what was going on at the Capitol

14    and then having this sort of semi-party atmosphere.

15         MR. PIERCE:  Right.  And then finally, I think you

16    used the word -- you said "shocking" whenever you were

17    talking about one of your takeaways, I think, from watching

18    the committee, you know, hearings, et cetera.

19         What do you mean by that specifically, "shocking"?

20         PROSPECTIVE JUROR 0415:  This is the committee

21    hearings?

22         MR. PIERCE:  I think you said one of your

23    reactions was, "it's shocking that we're going through

24    this," and I was just curious what you meant by that.

25         PROSPECTIVE JUROR 0415:  What did I mean by that?
```

```
1              I don't know what I mean by that.  It was just a
2        lot of information to absorb.  I don't know.  I can't really
3        describe any better.
4              MR. PIERCE:  No worries.
5              Okay.  Thank you very much, ma'am.
6              THE COURT:  Okay, ma'am.  Thank you very much.
7        You can step down.
8              PROSPECTIVE JUROR 0415:  Thank you.
9              THE COURT:  All right.  Any challenge?
10             MR. DALKE:  Not from the government, no, Your
11       Honor.
12             MR. PIERCE:  No, Your Honor.
13             THE COURT:  415 is qualified.
14             THE COURTROOM DEPUTY:  Your Honor, Juror No. 0726.
15             THE COURT:  Okay.  Good afternoon, ma'am.
16             PROSPECTIVE JUROR 0726:  Hi.
17             THE COURT:  Have a seat, and feel free to slip
18       your mask off.
19             PROSPECTIVE JUROR 0726:  All right.
20             THE COURT:  You're Ms. James?
21             PROSPECTIVE JUROR 0726:  Yes.
22             THE COURT:  And you're a physician?
23             PROSPECTIVE JUROR 0726:  What?
24             THE COURT:  Are you a physician?
25             PROSPECTIVE JUROR 0726:  I am not.
```

```
1                    THE COURT:  You are not.  Okay.  I think I'm
2        confusing you with someone then.  Hold on.
3                    You're retired?
4                    PROSPECTIVE JUROR 0726:  Yes.
5                    THE COURT:  Okay.  And what was your occupation
6        before you retired?
7                    PROSPECTIVE JUROR 0726:  Full-time mom and a
8        tutor.
9                    THE COURT:  Okay.  And do you have a significant
10       other?
11                   Do you have a significant other?  Are you married?
12                   PROSPECTIVE JUROR 0726:  Yes, I am married.
13                   THE COURT:  And what does your husband do?
14                   PROSPECTIVE JUROR 0726:  He's retired.  He was a
15       cartographer.
16                   THE COURT:  Cartographer?
17                   PROSPECTIVE JUROR 0726:  Cartographer.
18                   THE COURT:  For the government or private sector?
19                   PROSPECTIVE JUROR 0726:  For the government,
20       federal.
21                   THE COURT:  All right.  You answered yes to a
22       number of my questions, including No. 4.  You were at or
23       near the Capitol on January 6th?
24                   PROSPECTIVE JUROR 0726:  Yes, I was.
25                   THE COURT:  Where were you?
```

```
1              PROSPECTIVE JUROR 0726:  I was participating in

2     the march.

3              THE COURT:  In the protest of the election?

4              PROSPECTIVE JUROR 0726:  In the march, yes.

5              THE COURT:  Okay.  In what capacity?

6              PROSPECTIVE JUROR 0726:  As a participant.  In

7     what capacity?

8              THE COURT:  Yes.

9              PROSPECTIVE JUROR 0726:  I was there for the

10    reason the protest was on.  They were protesting the results

11    of the election.

12             THE COURT:  And did you hear the president's

13    speech on The Ellipse?

14             PROSPECTIVE JUROR 0726:  Parts of it, yes.  I was

15    at a distance, so I could not hear all.

16             THE COURT:  Okay.  And without telling me whether

17    you entered into restricted area, did you then march to the

18    Capitol following the speech?

19             PROSPECTIVE JUROR 0726:  We marched to the area of

20    the Capitol outside.  We did not go any further than the

21    lawn.

22             THE COURT:  Okay.  And did you personally observe

23    any of the events that went on in the restricted area or in

24    the Capitol building --

25             PROSPECTIVE JUROR 0726:  No.
```

1          THE COURT:  Okay.  Ma'am, let me finish before you

2     answer so that the court reporter can pick it up.

3          PROSPECTIVE JUROR 0726:  I'm sorry.

4          THE COURT:  So the answer's no?  Was your answer

5     no, you didn't personally observe any of the --

6          PROSPECTIVE JUROR 0726:  No, I did not.

7          THE COURT:  -- activities?

8          All right.  You answered yes to a number of other

9     questions.

10         One is about the presumption of innocence.  I will

11    instruct you that your job is to determine whether the

12    defendant committed the charged offenses beyond a reasonable

13    doubt, and you're not to consider any potential punishment.

14         And I asked would you have any difficulty or

15    hesitation following that instruction, and you said yes.

16    Why did you answer yes to that?

17         PROSPECTIVE JUROR 0726:  I would be hesitant

18    because of what I have learned from other news sources as to

19    what was going on.  And I can say personally, I left a

20    little early, and when I came home, my husband was listening

21    to the news, and what I heard was totally opposite of what I

22    experienced when I was there.

23         THE COURT:  Okay.  But I think the point of that

24    question is about punishment.  And so the question is:  If

25    this young man were to be found guilty, it would be the

1   Court that would determine what his sentence would be.  And

2   I think the question is designed to see whether the jurors

3   can follow that instruction.

4       Would you be not likely to vote guilty because of

5   a concern about the length of the sentence?

6       PROSPECTIVE JUROR 0726:  No.

7       THE COURT:  No?  Okay.

8       All right.  You answered yes to Question 18, which

9   is:  Is there anything about the nature of the charges that

10  would make you feel that you couldn't be an impartial juror?

11      You answered yes to that.  Why?

12      PROSPECTIVE JUROR 0726:  Again, because of the

13  things that I have read and heard and believe that are

14  usually opposed to what mainstream media has been putting

15  out.

16      THE COURT:  Okay.  And do you think -- and give me

17  an honest answer -- could you put those feelings aside and

18  give Mr. Alberts and give the government a fair hearing?

19  And if the evidence suggested that he was guilty of one or

20  more of the offenses, would you have a problem convicting

21  him, or no?

22      PROSPECTIVE JUROR 0726:  If all things are fair,

23  no.

24      THE COURT:  What do you mean by "if all things are

25  fair"?

```
 1                     PROSPECTIVE JUROR 0726:  It would be a challenge.

 2                     THE COURT:  Okay.  And do you think you could

 3      overcome that challenge, or would it be hard for you to?

 4                     PROSPECTIVE JUROR 0726:  I could, yes.

 5                     THE COURT:  You know folks who work for law

 6      enforcement?

 7                     PROSPECTIVE JUROR 0726:  Yes.  I have a niece

 8      retired from the MPD, and my son was an MP in the Army.

 9                     THE COURT:  And your niece was retired before

10      January 6th?

11                     PROSPECTIVE JUROR 0726:  Yes.

12                     THE COURT:  Okay.  So she wasn't there that day?

13                     PROSPECTIVE JUROR 0726:  She was --

14                     THE COURT:  She was not there that day?

15                     PROSPECTIVE JUROR 0726:  She was not.

16                     THE COURT:  Okay.  Counsel?

17                     MR. DALKE:  Good afternoon.

18                     PROSPECTIVE JUROR 0726:  Hello.

19                     MR. DALKE:  Following on the judge's questions, do

20      you know anyone personally who was charged relating to the

21      events of January 6th?

22                     PROSPECTIVE JUROR 0726:  No.

23                     MR. DALKE:  Have you formed beliefs about what

24      occurred at the march and the rally on January 6th?

25                     PROSPECTIVE JUROR 0726:  Have I...?
```

```
1              MR. DALKE:  Have you formed beliefs?

2              PROSPECTIVE JUROR 0726:  I just know what I saw.

3       It's not a belief.  It's a fact.

4              MR. DALKE:  Based on what you saw, do you have an

5       opinion about whether or not protesters should have been

6       charged for the conduct and the events on January 6th?

7              PROSPECTIVE JUROR 0726:  In the sense that as I

8       mentioned before about fairness.  I see a disparity in the

9       way some people are treated as opposed to others who commit

10      far more heinous things.

11             MR. DALKE:  Do you believe that some of the

12      protesters who were charged relating to the events on

13      January 6th are innocent?

14             PROSPECTIVE JUROR 0726:  Repeat, please.

15             MR. DALKE:  Do you believe that some of the

16      protesters, some of the people who marched to the Capitol on

17      January 6th, should not have been charged?

18             PROSPECTIVE JUROR 0726:  I'd have to know what

19      specifically they're being charged with and if there is

20      proof.

21             As I said, I did not see any of the things that

22      are reported.  I did not see anything like that.

23             MR. DALKE:  Can you give me an example of

24      something that you saw that was reported that you didn't

25      believe happened?
```

1        PROSPECTIVE JUROR 0726:  I don't believe that

2    there were -- that there was not infiltration and people who

3    were inciting some of the things that I have read about in

4    the mainstream media.

5        MR. DALKE:  So it's your belief that there were

6    others who had infiltrated the protest or egged rioters on

7    or did things to further the events of the day.  Is that

8    fair?

9        PROSPECTIVE JUROR 0726:  Yes.  And there is -- as

10   I understand and have seen, there are other film clips that

11   support that but has been left out of what is in the

12   mainstream media.

13       MR. DALKE:  What compelled you to join the march

14   on the Capitol on January 6, 2021?

15       PROSPECTIVE JUROR 0726:  If there's enough proof

16   to convince me that the election was not fair; it was

17   rigged.  That there was -- there's also evidence that there

18   were people collecting ballots, that there was a mysterious

19   change of the way the election was going overnight.

20       How far do you want me to go?

21       MR. DALKE:  As far as you're comfortable.

22       THE COURT:  I think that's sufficient, Counsel.

23   Any further questions?

24       MR. DALKE:  I think the only last question would

25   be:  Do you believe that it was wrong for Congress to

1    certify the election on January 6, 2021?

2                 PROSPECTIVE JUROR 0726:  Yes.

3                 MR. DALKE:  Thank you.

4                 THE COURT:  Mr. Pierce, briefly.

5                 MR. PIERCE:  No questions, Your Honor.

6                 THE COURT:  Okay.  Ma'am, just one final question.

7    You've referred a number of times to crimes that have been

8    committed otherwise that weren't taken as seriously or not

9    all of the footage that you've seen is consistent with what

10   your experiences were.

11                The question here is not January 6th generally or

12   who should have been charged in other cases.  The question

13   simply is whether Mr. Alberts did the things that the

14   government has alleged beyond a reasonable doubt.  And the

15   question is:  Could you set your feelings about all those

16   other things aside and consider the government's evidence

17   impartially and reach an unbiased decision just based on the

18   evidence before you?

19                PROSPECTIVE JUROR 0726:  Possibly.

20                THE COURT:  Put a percentage on it.  How sure are

21   you?  Because Mr. Alberts is entitled to a fair trial, but

22   the government is also entitled to a fair trial.

23                So you think you'd have trouble considering the

24   government's evidence in a fair and balanced way?

25                PROSPECTIVE JUROR 0726:  I could consider it, yes.

1           THE COURT:  You could?

2           PROSPECTIVE JUROR 0726:  Yes.

3           THE COURT:  And you're sure about that?

4           PROSPECTIVE JUROR 0726:  I can consider it.

5           THE COURT:  Thank you.  You can step down.

6           You can step down.  Thank you.

7           PROSPECTIVE JUROR 0726:  All right.

8           THE COURT:  All right.  Mr. Dalke?

9           MR. DALKE:  Your Honor, the government would --

10          THE COURT:  Hold on.

11          (Pause)

12          MR. DALKE:  I apologize.

13          The government would move to strike this potential

14   juror for cause.  She has deep-seated beliefs, joined the

15   very protest and conduct that we're going to be talking

16   about, may have been an eyewitness to Mr. Alberts, who the

17   majority of his events on January 6th were on the West

18   Front, which would have been, based on the vague description

19   of what she described, where she could have seen, right,

20   moving up those steps adjoining the scaffolding.

21          She believes Congress was wrong to act on the

22   certification.  On the judge's redirect, she said only twice

23   that she could consider the evidence, not that she could be

24   impartial or fair.

25          She was never kind of -- to the extent the judge

1    was probing whether she could be brought back, in the

2    government's view she never got brought back.  She had a

3    vague answer and, I think, largely was, you know, cagey

4    about some of the responses.

5              THE COURT:  Okay.  Mr. Pierce.

6              MR. PIERCE:  Yes, Your Honor.  We respectfully

7    disagree.  It's kind of the goose-and-gander principle.  I

8    mean, we're going to have lots of folk who we're going to

9    have to peremptorily strike because we think they have

10   strong feelings.

11             So, you know, she said that she could be fair, and

12   we think she should be -- you know, millions of other folks

13   have similar points of view.

14             THE COURT:  All right.  Close call, but I'll

15   qualify her.  I think she barely got rehabilitated.  She

16   was -- she paused, but at the end of the day she said that

17   she could put her feelings aside and give the government a

18   fair shake, and so obviously you can use a peremptory

19   against her, if you like.

20             All right.  It is quarter to 1:00.  Should we take

21   a 45-minute break?

22             Ms. Jenkins, is that enough?

23             We will plan to be back at 1:35.  And if we're a

24   little bit after that, bear with us.  But we'll take our

25   lunch break and reconvene in about 45, 50 minutes.

```
1              MR. DALKE:  Your Honor, if I could just --
2              THE COURT:  Yes.
3              MR. DALKE:  I apologize.
4         I just wanted to note for the record.  I didn't
5    personally see it, but I think we've had another example in
6    this past -- a juror who was disqualified walked out of the
7    room, that some individuals towards the back of the room did
8    mention or talk to them again.
9              THE COURT:  Okay.  I'm not sure who all you folks
10   are, and -- but just make sure not to interact with jurors.
11   Okay?  It's very important that we, you know, have these
12   folks protected from any influences throughout the trial.
13   All right?
14             All right.  We're adjourned.
15             (Lunch break)
16
17
18
19
20
21
22
23
24
25
```

```
 1                A F T E R N O O N   S E S S I O N
 2            THE COURT:  All right.  Counsel, we have 11
 3     qualified by my count, which is not quite the progress that
 4     we usually will have made by this point, but we'll see how
 5     it goes.  We'll just slog on.
 6            Counsel, so I take it we're keeping all of our
 7     peremptories?
 8            MR. PIERCE:  Yes, Your Honor.
 9            THE COURT:  Okay.
10            MR. PIERCE:  Just a quick question, Your Honor.
11            So there are going to be at least one for sure
12     witness that was qualified that, you know, per Your Honor's
13     suggestion, we might want to show you some things --
14            THE COURT:  Okay.
15            MR. PIERCE:  -- to reopen --
16            THE COURT:  Feel free to pass it up, and share it
17     with the government.
18            MR. PIERCE:  Yes.  I think it's just social media.
19     I mean, we can bring it up on the screen.
20            We can do it whenever you want.
21            THE COURT:  Well, we're going to have to make a
22     ruling before we bring them all back in as a group, which
23     may be this afternoon, depending on how much we get through.
24            MR. PIERCE:  Yes, Your Honor.
25            MR. DALKE:  Let the parties discuss at the
```

```
 1     afternoon break, and we can --

 2               MR. PIERCE:  Okay.

 3               THE COURT:  Okay.

 4               (Pause)

 5               THE COURTROOM DEPUTY:  Your Honor, Juror No. 1731.

 6               THE COURT:  Step right up, ma'am.  How are you?

 7     Good afternoon.

 8               PROSPECTIVE JUROR 1731:  Hello.

 9               THE COURT:  Thank you for your patience.

10               PROSPECTIVE JUROR 1731:  Sure.

11               THE COURT:  You are Ms. Baker; is that right?

12               PROSPECTIVE JUROR 1731:  I am.

13               THE COURT:  And you are a physician?

14               PROSPECTIVE JUROR 1731:  I am.

15               THE COURT:  What kind of physician are you?

16               PROSPECTIVE JUROR 1731:  Pediatric

17     anesthesiologist.

18               THE COURT:  A lot of epidurals.

19               PROSPECTIVE JUROR 1731:  Used to.

20               THE COURT:  And you're still practicing?

21               PROSPECTIVE JUROR 1731:  No.  I just retired.

22               THE COURT:  Do you have a significant other?

23               PROSPECTIVE JUROR 1731:  Yes.

24               THE COURT:  And what do they do?

25               PROSPECTIVE JUROR 1731:  He's a physician as well.
```

```
 1                    THE COURT:  Okay.

 2                    PROSPECTIVE JUROR 1731:  He's a neonatologist.

 3                    THE COURT:  You answered yes to a number of my

 4      questions.  You've followed the news about January 6th?

 5                    PROSPECTIVE JUROR 1731:  Yes, uh-huh.

 6                    THE COURT:  And watched some of those house

 7      hearings; is that right?

 8                    PROSPECTIVE JUROR 1731:  That's correct.

 9                    THE COURT:  So part of the reason we ask those

10      questions is to make sure that folks are comfortable putting

11      aside what they know about the events generally from

12      coverage and, you know, from the hearings and whatnot to

13      assess the evidence that's presented just about Mr. Alberts.

14                    PROSPECTIVE JUROR 1731:  Sure.

15                    THE COURT:  Would that be a concern for you at

16      all?  And be honest with me.

17                    PROSPECTIVE JUROR 1731:  What was that first

18      question that I put a question mark by?  I think it was 18.

19                    THE COURT:  Right.  Is there something about the

20      nature of the charges that would make it difficult for you

21      to follow my instructions and render an impartial verdict?

22                    PROSPECTIVE JUROR 1731:  That was it?

23                    I would just say that I've, of course, followed

24      the events on January 6th and I think, like most Americans,

25      have strong feelings about that.  That's my hesitation.
```

1              THE COURT:  Okay.  Just briefly describe your

2     general feelings or opinions about what happened on January

3     6th.

4              PROSPECTIVE JUROR 1731:  I think it was a

5     travesty.  I think the --

6              THE COURT:  And when you say "it," you mean the

7     events at the Capitol?

8              PROSPECTIVE JUROR 1731:  The events at the

9     Capitol.  The events at the Capitol.

10             THE COURT:  Okay.

11             PROSPECTIVE JUROR 1731:  That's what I'm talking

12    about entirely right now.

13             Trespassing, the degradation of the Capitol

14    itself, invasion of people's offices, I thought all that was

15    terrible.

16             THE COURT:  Okay.  So a lot of -- obviously a lot

17    of people came to D.C. that day from all over the country

18    for all different reasons and did different things.

19             PROSPECTIVE JUROR 1731:  Yes.

20             THE COURT:  You know, despite how you might feel

21    about the event in general, the question is whether you

22    would be able to assess the evidence both for and against

23    Mr. Alberts and make a decision whether he is guilty or not

24    guilty just on the crimes that he has been charged with.  Do

25    you think you can do that?

```
 1                    PROSPECTIVE JUROR 1731:  I think I can.  I think I

 2      can.

 3                    I think I can try to evaluate evidence, but I will

 4      have -- I wanted to be honest to say I had strong feelings

 5      about the event itself.

 6                    THE COURT:  Sure.

 7                    Okay.  And could you follow my instructions?

 8                    PROSPECTIVE JUROR 1731:  Yes.

 9                    THE COURT:  Counsel?

10                    MR. DALKE:  Good afternoon, Dr. Baker.  No

11      questions, thank you.

12                    THE COURT:  Mr. Pierce?

13                    MR. PIERCE:  Good afternoon, Dr. Baker.

14                    PROSPECTIVE JUROR 1731:  Hello.

15                    MR. PIERCE:  And so in light of what you just

16      described, if you were sitting in Mr. Alberts's shoes, would

17      you be comfortable having yourself as a juror in this case?

18                    PROSPECTIVE JUROR 1731:  I think so.

19                    MR. PIERCE:  Okay.  Thank you.

20                    THE COURT:  Thank you.  You can step down.

21                    PROSPECTIVE JUROR 1731:  Okay.  Thank you.

22                    THE COURT:  All right.  Any challenge to 1731?

23                    MR. DALKE:  Not from the government, Your Honor,

24      no.

25                    MR. PIERCE:  I know it's an uphill battle with
```

```
1    Your Honor, but I think her language such as, you know,

2    "terrible," "degradation" -- she said she would try to

3    evaluate the evidence.  It seemed just a little bit

4    wishy-washy.

5            THE COURT:  I'll overrule your objection.  I was

6    pretty comfortable that she would be able to set aside

7    whatever feelings she has about the events generally.  So

8    1731 is qualified.

9            So interesting process, huh, Mr. Alberts?

10           THE DEFENDANT:  Yes, sir, a little different.

11           THE COURT:  Yes.

12           THE DEFENDANT:  I've never been in a court of law

13   like this, so it's definitely new.

14           (Discussion off the record)

15           THE COURTROOM DEPUTY:  Your Honor, Juror No. 0741.

16           THE COURT:  All right.  Step right up, sir.

17           PROSPECTIVE JUROR 0741:  Hello.

18           THE COURT:  How are you?  Thank you for your

19   patience.

20           PROSPECTIVE JUROR 0741:  Of course.

21           THE COURT:  You're Mr. Irwin?

22           PROSPECTIVE JUROR 0741:  Yes.

23           THE COURT:  Okay.  It says you're a consultant

24   with Oliver Wyman; is that right?

25           PROSPECTIVE JUROR 0741:  Correct.
```

```
 1              THE COURT:  All right.  Tell these folks what

 2      Oliver Wyman is.

 3              PROSPECTIVE JUROR 0741:  It's a global consulting

 4      firm across industries.  My company was recently acquired by

 5      them.

 6              THE COURT:  Okay.  And do you have a significant

 7      other?

 8              PROSPECTIVE JUROR 0741:  Yes.

 9              THE COURT:  And what do they do?

10              PROSPECTIVE JUROR 0741:  She's retired.

11              THE COURT:  What did she do before she retired?

12              PROSPECTIVE JUROR 0741:  She worked both for our

13      company and then previously as a CFO of a political action

14      committee for a senator.

15              THE COURT:  Which senator?

16              PROSPECTIVE JUROR 0741:  John Kerry.

17              THE COURT:  John Kerry.  And do you consult in

18      particular fields or industries?  What's your specialty?

19              PROSPECTIVE JUROR 0741:  Primarily defense,

20      aerospace, government contractors that deal with the

21      government.

22              THE COURT:  Okay.  So are you -- do you have

23      government agency clients, or are all of your clients in the

24      private sector?

25              PROSPECTIVE JUROR 0741:  Only a very few
```

1          government clients.  Primarily a little bit of work at the

2          Department of Defense, a little bit of work at NASA.

3                    THE COURT:  But not Department of Justice or FBI?

4                    PROSPECTIVE JUROR 0741:  No.

5                    THE COURT:  Okay.  You answered yes to a couple of

6          my questions.

7                    You followed the events of January 6th, and you

8          watched the congressional hearings; is that right?

9                    PROSPECTIVE JUROR 0741:  Correct.

10                   THE COURT:  We ask those questions because

11         obviously people have general knowledge about January 6th.

12         They may have strong feelings about it.  But the exercise

13         here is to assess the evidence that's introduced at trial --

14                   PROSPECTIVE JUROR 0741:  Correct.

15                   THE COURT:  -- and to put aside the other things

16         that they may know or think about January 6th.

17                   Do you think you would be able to do that?  Is

18         that a concern with you?

19                   PROSPECTIVE JUROR 0741:  It's not a concern for

20         me.

21                   THE COURT:  Okay.  And you know folks who have

22         worked for Congress?

23                   PROSPECTIVE JUROR 0741:  I included my wife in

24         that, just for completeness.

25                   THE COURT:  Anybody else?

```
1                    PROSPECTIVE JUROR 0741:  No, not close.

2                    THE COURT:  And you have prior jury experience?

3                    PROSPECTIVE JUROR 0741:  Yes, on a criminal trial

4        in D.C.

5                    THE COURT:  How long ago?

6                    PROSPECTIVE JUROR 0741:  Probably about four or

7        five years ago.

8                    THE COURT:  What do you remember about that trial?

9                    PROSPECTIVE JUROR 0741:  It was a car theft,

10       reckless driving case.

11                   THE COURT:  Did the jury reach a verdict?

12                   PROSPECTIVE JUROR 0741:  Yes.

13                   THE COURT:  And what was the verdict?

14                   PROSPECTIVE JUROR 0741:  Guilty.

15                   THE COURT:  And were you the foreperson of that

16       jury by any chance?

17                   PROSPECTIVE JUROR 0741:  No.

18                   THE COURT:  Anything about that experience make

19       you less likely to want to be a juror again?

20                   PROSPECTIVE JUROR 0741:  No.

21                   THE COURT:  No, okay.

22                   Counsel?

23                   MR. DALKE:  No questions, Mr. Irwin.  Thank you.

24                   THE COURT:  Mr. Pierce.

25                   MR. PIERCE:  No questions, sir.  Thank you.
```

```
 1                 THE COURT:  All right.  Thank you very much.  You
 2       can step down.
 3                 Any challenge?
 4                 MR. DALKE:  No, Your Honor.
 5                 THE COURT:  Mr. Pierce?
 6                 MR. PIERCE:  No, Your Honor.
 7                 THE COURT:  741 is qualified.
 8                 THE COURTROOM DEPUTY:  Your Honor, Juror No. 1569.
 9                 THE COURT:  All right.  Step right up, sir.  Good
10       afternoon.
11                 PROSPECTIVE JUROR 1569:  Good afternoon.
12                 THE COURT:  Feel free to slip your mask off.
13                 You're Mr. Hindi.
14                 PROSPECTIVE JUROR 1569:  Yes.
15                 THE COURT:  All right.  It says here you're a
16       program officer for the State Department.
17                 PROSPECTIVE JUROR 1569:  Yes, I am.
18                 THE COURT:  Tell these good folks what a program
19       officer does.
20                 PROSPECTIVE JUROR 1569:  We bring international
21       professionals to the United States to meet their
22       counterparts here.
23                 THE COURT:  Okay.  And do you have a significant
24       other?
25                 PROSPECTIVE JUROR 1569:  Do I have...?
```

1           THE COURT:  Do you have a significant other?

2           PROSPECTIVE JUROR 1569:  I do.

3           THE COURT:  And what do they do?

4           PROSPECTIVE JUROR 1569:  Works for the Navy.

5           THE COURT:  Okay.  You answered yes to a couple of

6    my questions.

7           You followed news coverage of January 6th and the

8    hearings at the House?

9           PROSPECTIVE JUROR 1569:  Yes.

10          THE COURT:  We ask that question because obviously

11   people have general knowledge of January 6th, but it's

12   important that people understand that this case is about the

13   guilt or innocence of this particular fellow.

14          And, you know, do you think you'd be able to

15   assess that based on the evidence that's just presented at

16   trial without regard to what you may have seen or heard

17   otherwise?

18          PROSPECTIVE JUROR 1569:  I do.

19          THE COURT:  And having watched the January 6th

20   hearings in particular, any takeaways briefly about what

21   happened on January 6th?

22          PROSPECTIVE JUROR 1569:  Not that they would be

23   relevant to anything that I can think of here.

24          THE COURT:  Okay.

25          PROSPECTIVE JUROR 1569:  I believe in due process.

```
 1          How's that?
 2                  THE COURT:  That's a fine answer.
 3                  You have prior jury experience?  Do you have prior
 4          jury experience?
 5                  PROSPECTIVE JUROR 1569:  Just one other case where
 6          I served as an alternate in New York.
 7                  THE COURT:  Okay.  Counsel?
 8                  MR. DALKE:  No questions, Mr. Hindi.  Thank you.
 9                  PROSPECTIVE JUROR 1569:  Thank you.
10                  THE COURT:  Mr. Pierce.
11                  MR. PIERCE:  No questions, Mr. Hindi.
12                  THE COURT:  All right, sir.  You can step down.
13                  PROSPECTIVE JUROR 1569:  Thank you.
14                  THE COURT:  Thank you.
15                  Any challenge?
16                  MR. DALKE:  Not from the government, no, Your
17          Honor.
18                  MR. PIERCE:  Not from the defense, Your Honor.
19          Thank you.
20                  THE COURT:  1569 is qualified.
21                  THE COURTROOM DEPUTY:  Your Honor, Juror No. 0909.
22                  THE COURT:  Good afternoon, ma'am.
23                  PROSPECTIVE JUROR 0909:  Hello.
24                  THE COURT:  Thank you for your patience.  You can
25          slip your mask off.
```

```
 1                    You're Ms. Jones?

 2              PROSPECTIVE JUROR 0909:  Yes.

 3              THE COURT:  Okay.  Nice to meet you.

 4              PROSPECTIVE JUROR 0909:  Nice to meet you.

 5              THE COURT:  You work at Children's Hospital?

 6              PROSPECTIVE JUROR 0909:  Yes.

 7              THE COURT:  And what do you do there?

 8              PROSPECTIVE JUROR 0909:  I'm patient registration.

 9              THE COURT:  Okay.  How long have you been doing

10    that?

11              PROSPECTIVE JUROR 0909:  For about nine months

12    now.

13              THE COURT:  So far so good?

14              PROSPECTIVE JUROR 0909:  Uh-huh.

15              THE COURT:  What were you doing before?

16              PROSPECTIVE JUROR 0909:  Patient registration at

17    Doctors Hospital.

18              THE COURT:  Do you have a significant other?

19              PROSPECTIVE JUROR 0909:  No.

20              THE COURT:  No.  And I don't ask that to get in

21    your business.  I just -- if they are employed, we like to

22    ask --

23              PROSPECTIVE JUROR 0909:  Okay.

24              THE COURT:  -- about that, too.  Okay?

25              All right.  You answered yes to two of my
```

1    questions.

2              First of all, you have some child care issues?  Do

3    you have kids?

4              PROSPECTIVE JUROR 0909:  Yes.

5              THE COURT:  How old?

6              PROSPECTIVE JUROR 0909:  17, 10, and 3.

7              THE COURT:  All right.  And you say that you have

8    to pick them up from school?

9              PROSPECTIVE JUROR 0909:  Yes.

10             THE COURT:  What time do they get off school?

11             PROSPECTIVE JUROR 0909:  One gets out at 3:00, and

12   the other two gets out at 3:20, 3:30.

13             THE COURT:  Okay.  So if you were on the jury in

14   this case, we would go at least until 4:30 in the afternoon,

15   possibly until 5:00.  On those days for the next week would

16   you be able to arrange for someone else to pick up your

17   kids?

18             PROSPECTIVE JUROR 0909:  I can try, but it's only

19   me.

20             THE COURT:  Do you have parents?  Do you have a

21   mom and dad?

22             PROSPECTIVE JUROR 0909:  Uh-huh.  They work.

23             THE COURT:  They work?

24             PROSPECTIVE JUROR 0909:  Uh-huh.

25             THE COURT:  So how hard -- who would you get to

```
1     pick them up, if you had to?

2               PROSPECTIVE JUROR 0909:  I can try my

3     grandparents.

4               THE COURT:  Your grandparents.  Are they in good

5     shape?

6               PROSPECTIVE JUROR 0909:  No, not really.  But they

7     still drive but...

8               THE COURT:  It would be tough for you --

9               PROSPECTIVE JUROR 0909:  Uh-huh.

10              THE COURT:  -- is that what I'm hearing?

11              PROSPECTIVE JUROR 0909:  Yes.

12              THE COURT:  All right.  You can step down.  Thank

13    you.

14              PROSPECTIVE JUROR 0909:  Thank you.

15              THE COURT:  All right.  The Court will strike 909

16    due to her child care issues.

17              THE COURTROOM DEPUTY:  Your Honor, Juror No. 0215.

18              THE COURT:  Good afternoon, ma'am.

19              PROSPECTIVE JUROR 0215:  Good afternoon.

20              THE COURT:  How are you?

21              PROSPECTIVE JUROR 0215:  Good.  And you?

22              THE COURT:  Doing well.

23              If you can slip your mask off, please.

24              All right.  You're Ms. Robinson?

25              PROSPECTIVE JUROR 0215:  Yes.
```

```
 1            THE COURT:  And I don't have any employment
 2    information down for you.  Are you working now?
 3            PROSPECTIVE JUROR 0215:  Yes.
 4            THE COURT:  Where do you work?
 5            PROSPECTIVE JUROR 0215:  Bright Horizons.
 6            THE COURT:  That's child care?
 7            PROSPECTIVE JUROR 0215:  Yes.
 8            THE COURT:  You answered yes to a couple of
 9    questions, including 1, Question No. 1.  Is there -- do you
10    have sort of a health issue?
11            PROSPECTIVE JUROR 0215:  Yes.
12            THE COURT:  Tell us about that.
13            PROSPECTIVE JUROR 0215:  I'm in recovery -- I'm
14    still in the healing process of having a retina detachment
15    in my right eye.  It's a process with it's like -- they
16    haven't -- the process is still ongoing where I still have
17    to constantly have the doctor visits and I'm taking
18    medication.  And right now I can't -- I wear a contact lens,
19    so -- I have it in the left eye, but I can't put nothing in
20    this eye because it's still healing.  So getting around is
21    kind of -- like my husband had to bring me today because
22    when I was sitting back there, the vision part of this eye
23    is kind of like fuzzy, like seeing -- like trying to see and
24    make out people and words and stuff is still kind of hard.
25    So I have, like, him to help me with getting around most of
```

```
 1      the time.
 2                  THE COURT:  If you were on the jury in this case
 3      would he be able to --
 4                  PROSPECTIVE JUROR 0215:  No.  He ain't gonna --
 5                  THE COURT:  Ma'am, ma'am, let me finish before you
 6      answer because she can't get it down if we're both talking
 7      at the same time.  Okay?
 8                  If you were on the jury, would your husband be
 9      able to bring you to court every morning?
10                  PROSPECTIVE JUROR 0215:  No, because he works.
11      Yeah.
12                  THE COURT:  Could you take public transportation
13      or get somebody else to take you?
14                  PROSPECTIVE JUROR 0215:  I can take public
15      transportation, yes.
16                  THE COURT:  All right.  Do you have any doctors'
17      appointments scheduled in the next week and a half?
18                  PROSPECTIVE JUROR 0215:  Yes.  Yes.
19                  My next one is scheduled for May the 2nd, May the
20      2nd.
21                  THE COURT:  May the 2nd, okay.
22                  Now, I don't know if you were -- you weren't
23      sitting in the juror box, but we have these screens.
24      They're like little TV screens, and that's where the
25      evidence would be displayed.
```

1            So you're going to be seeing videos.  You may be

2     seeing some documents.  Would it be difficult for you to see

3     those things if it were on a video screen about from here to

4     where that screen is right in front of you?

5            PROSPECTIVE JUROR 0215:  From this box?

6            THE COURT:  That one right in front of you.

7            PROSPECTIVE JUROR 0215:  Yes.  From this right

8     here?

9            THE COURT:  Yes, that one right there.

10           PROSPECTIVE JUROR 0215:  Yeah, the words and

11    stuff, it would be hard to make out what the words are

12    saying, yes.

13           THE COURT:  Okay.

14           PROSPECTIVE JUROR 0215:  Yes.

15           THE COURT:  You can have a -- you can step down.

16    You can step down.

17           PROSPECTIVE JUROR 0215:  Okay.  Thank you.

18           THE COURT:  All right.  The Court will strike 215

19    sua sponte because of her vision impairments.

20           THE COURTROOM DEPUTY:  Your Honor, Juror No. 0449.

21           THE COURT:  Good afternoon, ma'am.

22           PROSPECTIVE JUROR 0449:  Good afternoon.

23           THE COURT:  How are you?

24           PROSPECTIVE JUROR 0449:  Pretty good.  And

25    yourself?

```
 1                        THE COURT:  Good.

 2                        You can slip that mask off so we can all see your

 3       face.

 4                        PROSPECTIVE JUROR 0449:  Okay.

 5                        THE COURT:  All right.  You are Ms. Blacksheare;

 6       is that right?

 7                        PROSPECTIVE JUROR 0449:  Yes.

 8                        THE COURT:  And you are a case manager for the

 9       D.C. government.  The Attorney General?

10                        PROSPECTIVE JUROR 0449:  Yes, child support

11       division.

12                        THE COURT:  Child support, okay.

13                        How long have you been doing that?

14                        PROSPECTIVE JUROR 0449:  This will be my 24th

15       year.

16                        THE COURT:  Do you have a significant other?

17                        PROSPECTIVE JUROR 0449:  No.

18                        THE COURT:  No, okay.

19                        You answered yes to a number of my questions,

20       including 41, which is the hardship question or the catch-

21       all question.  Why did you answer yes to that one?

22                        PROSPECTIVE JUROR 0449:  This coming Friday, the

23       14th, at 12:00 noon I have an initial hearing in the probate

24       division for a family matter.

25                        THE COURT:  And how long do you think that will
```

1    last?  Any idea?

2         PROSPECTIVE JUROR 0449:  Well, from my information

3    that I was informed by the attorney, it's the initial

4    hearing, and it will likely be a court date set within two

5    weeks or that day.

6         THE COURT:  Okay.  And is that something that you

7    have to attend, or can your lawyer attend in your -- on your

8    behalf?

9         PROSPECTIVE JUROR 0449:  I have to attend.  I

10   don't have an attorney.

11        THE COURT:  You don't have a lawyer.  Okay.

12   That's in Superior Court?

13        PROSPECTIVE JUROR 0449:  Probate.

14        THE COURT:  In Superior Court?

15        PROSPECTIVE JUROR 0449:  Yes.

16        THE COURT:  Okay.

17        Okay.  You answered yes to a few more questions.

18   You followed the events of January 6th.  You followed the

19   news coverage?

20        PROSPECTIVE JUROR 0449:  Well, actually, it was on

21   television, and I was at that time still working from home,

22   and it was the news on television.

23        THE COURT:  Okay.  So other than watching it at

24   the time when it happened, how closely have you followed the

25   events in the last two years?

```
1           PROSPECTIVE JUROR 0449:  Basically what may be

2     covered in the evening news when I come home from work.

3           THE COURT:  Okay.

4           PROSPECTIVE JUROR 0449:  Because I'm back in the

5     office as of September.

6           THE COURT:  Right.  And if you were selected as a

7     juror in this case, do you think that you could put aside

8     all the other stuff that you've seen about January 6th on

9     the news and give your attention just to the evidence --

10          PROSPECTIVE JUROR 0449:  Yes.

11          THE COURT:  -- for and against this young man?

12          PROSPECTIVE JUROR 0449:  Yes.

13          THE COURT:  Okay.  And you have prior juror

14    experience?

15          PROSPECTIVE JUROR 0449:  Yes.

16          THE COURT:  How many times about?

17          PROSPECTIVE JUROR 0449:  Four.

18          THE COURT:  Four.  Let's take the last -- any of

19    them that you really remember?  What kinds of cases?

20          PROSPECTIVE JUROR 0449:  The last case was a -- at

21    Superior Court, and it was a gentleman with a gun charge.

22          Another case was attempted murder and rape case.

23          THE COURT:  Okay.  Let's take the gun case first.

24          Did the jury reach a verdict in that case?

25          PROSPECTIVE JUROR 0449:  No.
```

```
1              THE COURT:  Was it a hung jury?

2              PROSPECTIVE JUROR 0449:  Yes.

3              THE COURT:  Okay.  And was it a hung jury because

4     folks, you know, just agreed to disagree, or was there like

5     a holdout juror where one or more jurors just didn't

6     deliberate?

7              PROSPECTIVE JUROR 0449:  It was equally split.

8              THE COURT:  But people deliberated in good faith

9     and just couldn't reach a decision?

10             PROSPECTIVE JUROR 0449:  Yes.

11             THE COURT:  Okay.  And were you the foreperson of

12    that jury?

13             PROSPECTIVE JUROR 0449:  No.

14             THE COURT:  All right.  What about the attempted

15    murder and rape case?

16             PROSPECTIVE JUROR 0449:  No, never a foreperson.

17             THE COURT:  Okay.  And did the jury reach a

18    verdict in that case?

19             PROSPECTIVE JUROR 0449:  Yes.

20             THE COURT:  What was the verdict?

21             PROSPECTIVE JUROR 0449:  Innocent.

22             THE COURT:  Not guilty.  Okay.

23             And was there anything about those prior

24    experiences that would make you not want to be a juror

25    again?
```

```
 1                    PROSPECTIVE JUROR 0449:  No.

 2                    THE COURT:  Okay.  Counsel?

 3                    MR. DALKE:  No questions, Mrs. Blacksheare.  Thank

 4        you.

 5                    PROSPECTIVE JUROR 0449:  Thank you.

 6                    MR. PIERCE:  Good afternoon, ma'am.

 7                    PROSPECTIVE JUROR 0449:  Good afternoon.

 8                    MR. PIERCE:  You mentioned the gun case that you

 9        were involved in, where you were on a jury.  If I'm allowed

10        to ask --

11                    THE COURT:  You're not allowed to ask how she

12        voted.

13                    MR. PIERCE:  Okay, yes.

14                    Do you have strong feelings about firearms, the

15        ownership of firearms?

16                    PROSPECTIVE JUROR 0449:  Not really.  I've never

17        owned a firearm, so no, not really.

18                    MR. PIERCE:  Okay.  Do you have any -- do you have

19        any social media accounts in which you've sort of indicated

20        any negative feelings regarding gun ownership or the Second

21        Amendment?

22                    PROSPECTIVE JUROR 0449:  No, not on Facebook or

23        any other platforms.

24                    MR. PIERCE:  Okay.

25                    All right.  Thank you.
```

 1              THE COURT:  All right.  Ma'am, you can step down.

 2     Thank you.

 3              PROSPECTIVE JUROR 0449:  Thank you.

 4              THE COURT:  Okay.  Mr. Dalke?

 5              MR. DALKE:  Your Honor, no strike for cause.  I

 6     think there's a question as to hardship where the Court's

 7     headed with that with her proceeding this Friday.  She

 8     doesn't have an attorney.  I don't have a great sense of

 9     whether that could be continued, but I do think the legal

10     system is hard enough sometimes on pro se individuals.

11              But I don't know if this is one of those that we

12     can move to the back of the list like we did in the other --

13     because otherwise, she's qualified, I think.

14              THE COURT:  Okay.  Mr. Pierce?

15              MR. PIERCE:  We would stipulate to having her

16     removed for cause under different grounds, but we will

17     stipulate -- I can articulate this.

18              So she does have social media that's negative

19     about the Second Amendment and gun ownership, and we'd just

20     question her veracity on that.

21              THE COURT:  So if you have information about

22     something that you want to ask the juror about, why don't we

23     try to do that before we excuse the juror.  All right?

24              MR. PIERCE:  Yes, Your Honor.

25              THE COURT:  And you can go to the phones, and we

1    can figure out how to do it, but I think this is the second

2    time it's come up now.  It's probably just more efficient

3    just to get it done and to voir dire her about some evidence

4    that you independently know about.

5                MR. PIERCE:  And just for the record, Your Honor,

6    it's kind of moving fast so I did not know at the moment --

7                THE COURT:  I understand.  I understand.

8                I'm going to provisionally qualify her.  I'm going

9    to put her to the back of the list, and we'll use her only

10   if we need her.

11               I have no idea how long an initial probate hearing

12   in Superior will last.  It could be ten minutes.  It could

13   be two hours.  I just don't know.  But we're going at a slow

14   enough clip that I'm loathe to just get rid of jurors that

15   we may be able to keep ultimately, so we'll put her to the

16   back of the list.

17               THE COURTROOM DEPUTY:  Your Honor, Juror No. 1196.

18               THE COURT:  All right.  Step right up, sir.  Good

19   afternoon.

20               PROSPECTIVE JUROR 1196:  Good afternoon.

21               THE COURT:  You can feel free to slip your mask

22   off.

23               You're Mr. Lavens; is that correct?

24               PROSPECTIVE JUROR 1196:  Lavens.

25               THE COURT:  Lavens, okay.  Nice to meet you.

```
 1                   So I don't have employment information for you.
 2       Are you retired?
 3                   PROSPECTIVE JUROR 1196:  I am.
 4                   THE COURT:  Okay.  Where did you last work?
 5                   PROSPECTIVE JUROR 1196:  The State Department.
 6                   THE COURT:  Okay.  In what capacity?
 7                   PROSPECTIVE JUROR 1196:  I'm a chemical weapons
 8       expert.
 9                   THE COURT:  Okay.  And do you have a significant
10       other?
11                   PROSPECTIVE JUROR 1196:  I do; my wife.
12                   THE COURT:  And what does she do?
13                   PROSPECTIVE JUROR 1196:  She's a retired nurse.
14                   THE COURT:  All right.  You answered yes to a
15       couple of my questions.  You saw some of the House committee
16       hearings on January 6th?
17                   PROSPECTIVE JUROR 1196:  That's correct.
18                   THE COURT:  Any sort of overview takeaways of what
19       you -- from what you watched?
20                   PROSPECTIVE JUROR 1196:  Well, I mean, I think it
21       was a significant event on that day, and I was interested in
22       learning more about it.
23                   THE COURT:  Okay.  One of the reasons we ask that
24       question is to make sure that people can put aside what they
25       may know generally about January 6th and focus only on the
```

1    evidence that will be presented in this particular trial.

2              Is that -- would that be a concern for you at all?

3              PROSPECTIVE JUROR 1196:  No.  I could do that.

4              THE COURT:  Okay.  And you or someone close to you

5    has been the victim of or a witness to a crime?

6              PROSPECTIVE JUROR 1196:  Yes.  I was assaulted.

7              THE COURT:  How long ago?

8              PROSPECTIVE JUROR 1196:  Four years ago.

9              THE COURT:  Was that in Washington?

10             PROSPECTIVE JUROR 1196:  No, Detroit.

11             THE COURT:  Okay.  And any issues with the way

12   your case was handled either by the police or the

13   prosecution or maybe any defense attorneys that you may have

14   had?

15             PROSPECTIVE JUROR 1196:  No, no.

16             THE COURT:  Okay.  Counsel?

17             MR. DALKE:  Good afternoon, Mr. Lavens.

18             Briefly touching on the assault, were you injured

19   in that incident?

20             PROSPECTIVE JUROR 1196:  Minor, yes.

21             MR. DALKE:  Was there physical contact with you?

22             PROSPECTIVE JUROR 1196:  Yes.

23             MR. DALKE:  Would you be willing, if you're able

24   to, to give us an overview what kind of assault or what

25   happened?

1             PROSPECTIVE JUROR 1196:  Yes.  I mean, it's pretty

2     simple.  I was walking down the street, and a man who was

3     standing at a bus stop just turned around and whacked me on

4     my head.  I had no idea what prompted it.

5             And that was the beginning and the end of it.  I

6     never reported it.

7             MR. DALKE:  You mentioned some work in I think it

8     was chemical weapons, if I have that right.  In this case

9     there may be some testimony and some evidence of use of,

10    say, OC spray or pepper ball type of munitions.

11            When you mentioned chemicals, is that what you're

12    dealing with, or were you in some other -- I'm trying to get

13    a sense of your background with this case or something else.

14            PROSPECTIVE JUROR 1196:  Well, I mean, chemical

15    weapons are not defined as what's used for law enforcement.

16    So this would be, you know, things that would be fatal and

17    basically banned.

18            MR. DALKE:  Do you have experience or expertise in

19    the type of less-lethal munitions often used by law

20    enforcement in certain disorders or crowd control?

21            PROSPECTIVE JUROR 1196:  I've been exposed to

22    them.

23            MR. DALKE:  But as far as your work or educational

24    background, do you have expertise or familiarity based on

25    your work or educational background in those particular

1    areas?

2              PROSPECTIVE JUROR 1196:  No.

3              MR. DALKE:  Thank you.

4              THE COURT:  Sir, when you say you've been exposed

5    to less-lethal munitions used by law enforcement, you mean

6    physically exposed?

7              PROSPECTIVE JUROR 1196:  Yes.

8              THE COURT:  Under -- in what -- under what

9    circumstances?

10             PROSPECTIVE JUROR 1196:  Mask fit testing.

11             THE COURT:  Mask...

12             PROSPECTIVE JUROR 1196:  Gas mask fit testing.  In

13   Russia, they use actual tear gas.

14             THE COURT:  Counsel?

15             MR. PIERCE:  No questions, sir.

16             THE COURT:  All right.  You can step down.

17             Okay.  Any challenge?

18             MR. DALKE:  Not from the government, no, Your

19   Honor.

20             MR. PIERCE:  No, Your Honor.

21             THE COURT:  1196 is qualified.

22             Counsel, Juror 330 had an urgent health issue, so

23   she is going to be out of the pool.

24             THE COURTROOM DEPUTY:  Your Honor, Juror No. 0390.

25             THE COURT:  Good afternoon, ma'am.

```
 1                    PROSPECTIVE JUROR 0390:  Hi.

 2               THE COURT:  Thank you for your patience.  You'll

 3      want to turn that around so that you can --

 4               PROSPECTIVE JUROR 0390:  Yes.

 5               THE COURT:  If you can take your mask off.

 6               PROSPECTIVE JUROR 0390:  Okay.

 7               THE COURT:  We know one another, don't we?

 8               PROSPECTIVE JUROR 0390:  We do.

 9               THE COURT:  All right.  Ms. Bacon is an

10      acquaintance of a father of a very good friend of mine, and

11      we have socialized together upon occasion.

12                    All right.  Thank you for your service and your

13      patience.

14                    We do not have an occupation for you.  You're

15      retired; is that right?

16                    PROSPECTIVE JUROR 0390:  Yes.

17               THE COURT:  And where did you work before you

18      retired?

19                    PROSPECTIVE JUROR 0390:  I worked at National

20      Public Radio.  I've worked for a political commentator.

21                    THE COURT:  Which one?

22                    PROSPECTIVE JUROR 0390:  Mark Shields.

23               THE COURT:  All right.  You answered yes to a

24      number of my questions.  You obviously know me.  Is there

25      anyone else that you know?
```

1        PROSPECTIVE JUROR 0390:  No, not in this

2    courtroom.

3        THE COURT:  Okay.  You have followed the events of

4    January 6th closely, and you've watched some of those House

5    Select Committee hearings; is that right?

6        PROSPECTIVE JUROR 0390:  Yes.

7        THE COURT:  So we ask that question because

8    obviously many of us know about January 6th generally, from

9    the media and other sources, but, you know, we are here for

10   the trial of one person based on the evidence that will be

11   presented in this case either for or against Mr. Alberts.

12       And so the question is:  Do you think that you

13   would be able to put aside what you know generally about

14   January 6th and give this fellow a fair hearing based on the

15   evidence against him only?

16       PROSPECTIVE JUROR 0390:  I do.

17       THE COURT:  Okay.  And you know folks who have

18   worked in the legal profession?

19       PROSPECTIVE JUROR 0390:  Yes, many.

20       THE COURT:  Many lawyers.  All right.

21       So the reason we ask that --

22       PROSPECTIVE JUROR 0390:  No prosecutors that I

23   know.

24       THE COURT:  No prosecutors.  We ask that for a

25   number of reasons.  One is to sort of go into or to try to

1    discern whether you might be subject to any undue influence

2    by lawyers, particularly lawyers that practice in the area

3    of criminal law.

4                PROSPECTIVE JUROR 0390:  No.

5                THE COURT:  No concerns in that regard?

6                PROSPECTIVE JUROR 0390:  No, none at all.

7                THE COURT:  Okay.  And you know folks who have

8    worked for Congress?

9                PROSPECTIVE JUROR 0390:  I worked there myself.

10   My husband did a long, long time ago.

11               But no one in the current Congress.

12               THE COURT:  Okay.  So do you know any members or

13   staffers who were working on January 6, 2021?

14               PROSPECTIVE JUROR 0390:  No.

15               THE COURT:  And finally, you have prior jury

16   experience?

17               PROSPECTIVE JUROR 0390:  Yes.  Only in Superior

18   Court.

19               THE COURT:  Okay.  When was the last time you were

20   on a jury?

21               PROSPECTIVE JUROR 0390:  I'm not sure, but I'd say

22   about eight years ago.

23               THE COURT:  Do you remember that case?

24               PROSPECTIVE JUROR 0390:  Very well.

25               THE COURT:  What kind of case was it?

```
 1              PROSPECTIVE JUROR 0390:  It was a murder in the
 2    first degree with aggravated circumstances.  You don't ever
 3    forget that.
 4              THE COURT:  And did the jury reach a verdict?
 5              PROSPECTIVE JUROR 0390:  Yes.
 6              THE COURT:  And what was the verdict?
 7              PROSPECTIVE JUROR 0390:  Guilty.
 8              THE COURT:  And were you the foreperson of that
 9    jury by any chance?
10              PROSPECTIVE JUROR 0390:  No.
11              THE COURT:  Was there anything about your
12    experience in that jury that would make you hesitate to
13    serve on a jury again?
14              PROSPECTIVE JUROR 0390:  No, not at all.
15              THE COURT:  Okay.  Counsel?
16              MR. DALKE:  No questions.  Thank you, Ms. Bacon.
17              PROSPECTIVE JUROR 0390:  Thanks.
18              THE COURT:  Mr. Pierce?
19              MR. PIERCE:  Hi, Ms. Bacon.
20              PROSPECTIVE JUROR 0390:  Hi.
21              MR. PIERCE:  Did they -- that murder trial you
22    were involved with, did that involve the involvement of
23    firearms?
24              PROSPECTIVE JUROR 0390:  No.
25              MR. PIERCE:  Okay.  No further questions.
```

```
 1              THE COURT:  Okay.  Ms. Bacon, finally, one last
 2     question.  One of the reasons we ask whether a juror knows
 3     the judge or not is because at the end of the case I will
 4     give the jury an instruction which says that if I have said
 5     or done anything during the trial that would perhaps
 6     indicate to someone how I think the trial should be decided,
 7     the jurors are to disregard that.
 8              Do you think that you could follow that
 9     instruction?
10              PROSPECTIVE JUROR 0390:  Yes, I do.
11              THE COURT:  Okay.  Thank you.  You can step down.
12              PROSPECTIVE JUROR 0390:  Thank you.
13              THE COURT:  All right.  Any challenge?
14              MR. DALKE:  Not from the government, no, Your
15     Honor.
16              MR. PIERCE:  No challenge, Your Honor.
17              THE COURT:  Okay.  390 is qualified.
18              THE COURTROOM DEPUTY:  Your Honor, Juror No. 1037.
19              THE COURT:  Okay.  Good afternoon, ma'am.
20              PROSPECTIVE JUROR 1037:  Good afternoon.
21              THE COURT:  Okay.  You can slip your mask off, if
22     you'd like.
23              PROSPECTIVE JUROR 1037:  Okay.
24              THE COURT:  You're Ms. Owens?
25              PROSPECTIVE JUROR 1037:  Yes.
```

```
1                THE COURT:  All right.  Nice to meet you.

2                It says here you are not currently working; is

3     that correct?  Are you retired?

4                PROSPECTIVE JUROR 1037:  I'm retired, but I do run

5     a small business.

6                THE COURT:  Okay.  What's your business?

7                PROSPECTIVE JUROR 1037:  Hats.

8                THE COURT:  Hats?

9                PROSPECTIVE JUROR 1037:  Scarves, yes.

10                THE COURT:  Wow.  All right.  And before you

11    retired, what did you do?

12                PROSPECTIVE JUROR 1037:  A librarian.

13                THE COURT:  Okay.  Whereabouts?

14                PROSPECTIVE JUROR 1037:  D.C. public libraries.

15                THE COURT:  Okay.  And do you have a significant

16    other?

17                PROSPECTIVE JUROR 1037:  Deceased.

18                THE COURT:  Deceased?  Okay.

19                I'm sorry.

20                What did he do before he died?

21                PROSPECTIVE JUROR 1037:  Professor.

22                THE COURT:  Okay.

23                PROSPECTIVE JUROR 1037:  And he also worked with

24    Malawi government.

25                THE COURT:  Okay.  All right.  You answered yes to
```

```
 1     a few of my questions.  No. 3, you know someone who lives or

 2     works near Capitol Hill?

 3               PROSPECTIVE JUROR 1037:  I do.

 4               THE COURT:  Who is that?

 5               PROSPECTIVE JUROR 1037:  I do.

 6               THE COURT:  Oh, you do.  Okay.

 7               PROSPECTIVE JUROR 1037:  Yes.

 8               THE COURT:  And how close to the Capitol building

 9     do you live?

10               PROSPECTIVE JUROR 1037:  About a block.

11               THE COURT:  Uh-huh.  And were you home that day on

12     January 6th?

13               PROSPECTIVE JUROR 1037:  I was -- my business was

14     open.  I was there.

15               THE COURT:  Okay.  Did you personally observe any

16     of the activities that took place at the Capitol or on the

17     Capitol grounds that day?

18               PROSPECTIVE JUROR 1037:  Not on the grounds.

19               THE COURT:  Okay.  And did your home or business

20     suffer any property damage that day?

21               PROSPECTIVE JUROR 1037:  No.

22               THE COURT:  All right.  You've followed the news

23     about January 6th, and you watched some of those

24     congressional hearings; is that right?

25               PROSPECTIVE JUROR 1037:  Yes.
```

```
 1                THE COURT:  All right.  The reason we ask those

 2      questions is to make sure that folks can put aside what they

 3      may have seen about January 6th generally about what other

 4      people did or did not do, and focus on the evidence that's

 5      just about Mr. Alberts.

 6                Do you -- are you pretty sure you could do that?

 7                PROSPECTIVE JUROR 1037:  Yes.

 8                THE COURT:  Okay.  And you know folks who have

 9      worked in law enforcement in some capacity?

10                PROSPECTIVE JUROR 1037:  Yes.

11                THE COURT:  Who is that?

12                PROSPECTIVE JUROR 1037:  My family's very

13      military.

14                THE COURT:  Okay.

15                PROSPECTIVE JUROR 1037:  My nephew was Secret

16      Service for 25 years.

17                THE COURT:  Uh-huh.

18                PROSPECTIVE JUROR 1037:  My brother was CSM Army.

19      I have nephews and -- now who are military.

20                THE COURT:  Okay.

21                PROSPECTIVE JUROR 1037:  And some others retired.

22                THE COURT:  Okay.  Your nephew who works for the

23      Secret Service, does he currently work for the Secret

24      Service?

25                PROSPECTIVE JUROR 1037:  He retired.
```

```
 1                    THE COURT:  How long ago did he retire?

 2                    PROSPECTIVE JUROR 1037:  About four or five years

 3      ago.

 4                    THE COURT:  So before January 6, 2021?

 5                    PROSPECTIVE JUROR 1037:  Yes.

 6                    THE COURT:  All right.  There may be at least one

 7      representative of the Secret Service who testifies in this

 8      case.  All right?  And I will instruct the jury that the

 9      testimony of law enforcement officers should get no greater

10      weight or no lesser weight simply because they are a law

11      enforcement officer.

12                    Given your nephew's former employment and other

13      members of your family that have worked in law enforcement,

14      do you think that you could follow that instruction?

15                    PROSPECTIVE JUROR 1037:  Yes.

16                    THE COURT:  Okay.

17                    PROSPECTIVE JUROR 1037:  I also have a grandnephew

18      now, who is like my grandson, who's in the Army National

19      Guard currently.

20                    THE COURT:  Okay.

21                    All right.  Counsel?

22                    MR. DALKE:  Good afternoon, Ms. Owens.

23                    Very briefly, you mentioned a family member in the

24      Army National Guard.  Was that in -- here in D.C. or in

25      Virginia or Maryland?  Kind of where?  Do you have any more
```

1    details on that?

2          PROSPECTIVE JUROR 1037:  They work in the area.  I

3    think his base goes to the National Armory and to a base in

4    Maryland; just outside of Baltimore, I think.

5          MR. DALKE:  Thank you.  I appreciate it.

6          PROSPECTIVE JUROR 1037:  You're welcome.

7          THE COURT:  Mr. Pierce?

8          MR. PIERCE:  Good afternoon.

9          PROSPECTIVE JUROR 1037:  Hello.

10         MR. PIERCE:  Just on what I think was your last

11   answer to a question.  You have a nephew that was in the

12   D.C. guard, you said?

13         PROSPECTIVE JUROR 1037:  Army National Guard in

14   the D.C. area.

15         MR. PIERCE:  Okay.  Did he, by chance, serve on

16   January 6th at the Capitol, if you know?

17         PROSPECTIVE JUROR 1037:  Not that I'm aware of.

18         MR. PIERCE:  Okay.  And you mentioned that you

19   live and/or work -- I think both -- about a block from the

20   Capitol?

21         PROSPECTIVE JUROR 1037:  I do, yes.

22         MR. PIERCE:  And did the events of that day sort

23   of have any effect on you emotionally?  Did you feel

24   traumatized?  Did you feel scared or anything of that sort

25   that is something that would still stick with you today?

1          PROSPECTIVE JUROR 1037:  Not traumatized, but I

2     closed my business early that day because of the activities

3     at the Capitol.

4          MR. PIERCE:  Okay.  And despite that, you feel

5     that you could apply the evidence to Mr. Alberts's case and

6     be impartial based on the evidence and judge's instructions?

7          PROSPECTIVE JUROR 1037:  Yes.

8          MR. PIERCE:  Okay.  Thank you.

9          THE COURT:  Okay.  Thank you, ma'am.  You can step

10    down.

11         Any challenge?

12         MR. DALKE:  Not from the government, no, Your

13    Honor.

14         MR. PIERCE:  No, Your Honor.

15         THE COURT:  1037 is qualified.

16         THE COURTROOM DEPUTY:  Your Honor, Juror No. 1690.

17         THE COURT:  Good afternoon.

18         Mr. Boone, correct?

19         PROSPECTIVE JUROR 1690:  Yes.

20         THE COURT:  All right.  Have a seat.  Thank you

21    for your patience.

22         PROSPECTIVE JUROR 1690:  Sure.

23         THE COURT:  It says here you're the general

24    counsel of the Farm Credit Council.  Tell us what that is.

25         PROSPECTIVE JUROR 1690:  So we are a trade --

1    national trade association for lenders to farmers and

2    ranchers around the country.

3           THE COURT:  Okay.  In your work capacity, do you

4    get up to the Hill to lobby members and staff?

5           PROSPECTIVE JUROR 1690:  Not in my current

6    capacity.  I have in the past.

7           THE COURT:  Okay.  How long have you been at the

8    Farm Credit Council?

9           PROSPECTIVE JUROR 1690:  About 13 years.  I was on

10   their government affairs team for about a decade before

11   becoming general counsel.

12          THE COURT:  Okay.  Did you form personal

13   relationships with members and staff in that capacity?

14          PROSPECTIVE JUROR 1690:  Yes.

15          THE COURT:  Do you know any folks who were at the

16   Capitol on January 6th?

17          PROSPECTIVE JUROR 1690:  I guess sort of.  Not

18   personally, but yup.

19          THE COURT:  Have you spoken to those folks?

20          PROSPECTIVE JUROR 1690:  I have not.

21          THE COURT:  Okay.  Do you have a significant

22   other?

23          PROSPECTIVE JUROR 1690:  Yes.

24          THE COURT:  And what do they do?

25          PROSPECTIVE JUROR 1690:  My wife is a therapist.

```
 1              THE COURT:  Okay.  All right.  You answered yes to
 2    a few of my questions.  You live or work near Capitol Hill?
 3              PROSPECTIVE JUROR 1690:  Yes.  My trade
 4    association is located right by Union Station.
 5              THE COURT:  Okay.  Were you working that day?
 6              PROSPECTIVE JUROR 1690:  I was, but remote from
 7    home.
 8              THE COURT:  I'm sorry?
 9              PROSPECTIVE JUROR 1690:  Yes, I'm sorry.  I was
10    working, but not at that location; from my personal
11    residence.
12              THE COURT:  Okay.  So you didn't observe
13    personally any of the events of that day?
14              PROSPECTIVE JUROR 1690:  Correct, yes, sir.
15              THE COURT:  You've followed the coverage of
16    January 6th, I take it?  Yes?  Like many of us.
17              The reason we ask that question is because it's
18    important that jurors put aside, you know, things that
19    they've read or heard about the events generally or about
20    other cases and focus on the evidence that's going to be
21    presented here with respect to Mr. Alberts.
22              Do you think you can do that?
23              PROSPECTIVE JUROR 1690:  I do.
24              THE COURT:  Okay.  You know folks -- obviously
25    yourself -- other than yourself who are in the legal field?
```

```
 1                    PROSPECTIVE JUROR 1690:  Yes.

 2                    THE COURT:  Anyone practice criminal law?  Do you

 3        know any prosecutors?  Defense lawyers?

 4                    PROSPECTIVE JUROR 1690:  No.  I have an uncle who

 5        is licensed to practice in the State of Florida but doesn't

 6        do criminal law.  Trust and estates type work.

 7                    THE COURT:  All right.  And you have prior jury

 8        experience?

 9                    PROSPECTIVE JUROR 1690:  Correct.

10                    THE COURT:  How many times, about?

11                    PROSPECTIVE JUROR 1690:  Two that I can recall

12        here.

13                    THE COURT:  Do you recall either of those cases?

14                    PROSPECTIVE JUROR 1690:  Vaguely, yes.

15                    THE COURT:  Okay.  Criminal cases?

16                    PROSPECTIVE JUROR 1690:  Yes.  In both instances,

17        yes.

18                    THE COURT:  Okay.  Here in D.C.?

19                    PROSPECTIVE JUROR 1690:  Correct.

20                    THE COURT:  All right.  Do you remember what they

21        were about?

22                    PROSPECTIVE JUROR 1690:  Yes.  One -- I do.  Do

23        you want me to --

24                    THE COURT:  Sure.  Take the last one first.

25                    PROSPECTIVE JUROR 1690:  Most recent one several
```

1    years ago.  It was a high-speed chase through Southeast D.C.

2    involving an individual that was dealing with --

3              THE COURT:  Okay.  Did the jury reach a verdict?

4              PROSPECTIVE JUROR 1690:  They did.

5              THE COURT:  Do you remember what the verdict was?

6              PROSPECTIVE JUROR 1690:  I believe it was -- they

7    acquitted on one instance, at least on a lesser charge.

8              THE COURT:  Okay.  And were you the foreperson by

9    any chance?

10             PROSPECTIVE JUROR 1690:  I was.

11             THE COURT:  You were?

12             PROSPECTIVE JUROR 1690:  Yes.

13             THE COURT:  And how was that experience?

14             PROSPECTIVE JUROR 1690:  Enlightening.  It was

15   good.

16             THE COURT:  Folks got along?  Folks deliberated in

17   good faith?

18             PROSPECTIVE JUROR 1690:  They did.

19             THE COURT:  Okay.  And what about the one before

20   that?

21             PROSPECTIVE JUROR 1690:  I want to say armed

22   robbery in Georgetown, Ralph Lauren store.  And I believe

23   the individual was convicted.

24             THE COURT:  Okay.  Again, foreperson or no?

25             PROSPECTIVE JUROR 1690:  No.

```
 1                THE COURT:  All right.  Counsel?
 2                MR. DALKE:  No questions.  Thank you, Mr. Boone.
 3                PROSPECTIVE JUROR 1690:  Sure.
 4                THE COURT:  Mr. Pierce?
 5                MR. PIERCE:  No questions.  Thank you, sir.
 6                THE COURT:  All right, sir.  Thank you very much.
 7                PROSPECTIVE JUROR 1690:  Thank you.
 8                THE COURT:  You can step down, and Ms. Jenkins
 9     will give you further instructions.
10                Any challenge?
11                MR. DALKE:  Not from the government, no, Your
12     Honor.
13                MR. PIERCE:  Not from the defense, Your Honor.
14                THE COURT:  Okay.  So that was 1690.  1690 is
15     qualified.
16                THE COURTROOM DEPUTY:  Your Honor, Juror No. 0423.
17                THE COURT:  Good afternoon, sir.  Thank you for
18     your patience.  You can slip your mask off.
19                You're Mr. Martin?
20                PROSPECTIVE JUROR 0423:  Yes, I'm Mr. Martin.  I
21     have bronchitis.  Should I still --
22                THE COURT:  It's up to you.
23                PROSPECTIVE JUROR 0423:  Okay.
24                THE COURT:  Why don't you keep it on.
25                Counsel, is that okay?  All right.
```

```
 1              Why don't we start there.  You have bronchitis?

 2              PROSPECTIVE JUROR 0423:  Yes, sir.

 3              THE COURT:  Is it contagious?

 4              PROSPECTIVE JUROR 0423:  Yes, Your Honor.

 5              THE COURT:  All right.  Why don't you step down.

 6              PROSPECTIVE JUROR 0423:  Okay.

 7              THE COURT:  Okay.  Just for the record, 423 is

 8      excused.

 9              THE COURTROOM DEPUTY:  Your Honor, Juror No. 2088.

10              THE COURT:  Good afternoon, ma'am.  How are you?

11              PROSPECTIVE JUROR 2088:  Fine.

12              THE COURT:  You can slip your mask off so that we

13      can all see your face.

14              All right.  You're Ms. Hinchman?

15              PROSPECTIVE JUROR 2088:  Yes.

16              THE COURT:  And you're a manager at the National

17      Trust for Historic Preservation; is that right?

18              PROSPECTIVE JUROR 2088:  Correct.

19              THE COURT:  Okay.  How long have you been doing

20      that?

21              PROSPECTIVE JUROR 2088:  I've been with the

22      organization for 20 years.

23              THE COURT:  Okay.  Do you have a significant

24      other?

25              PROSPECTIVE JUROR 2088:  I do not.
```

 1          THE COURT:  Okay.  You answered yes to a number of

 2     questions, including 40, which is the hardship question.

 3     Why did you answer yes to that one?

 4          PROSPECTIVE JUROR 2088:  Sure.  My 80-year-old

 5     mother fell on Saturday and broke her hip, and she's now in

 6     the trauma unit at GW recovering from surgery and has some

 7     kind of infection that is delaying her discharge and is

 8     making her delusional and agitated.  And so my 81-year-old

 9     father is with her right now, and I've been trying to spend

10     as much time -- I'm very distracted because I'm worried

11     about her.

12          THE COURT:  Okay.  Fine.  You can step down.  Good

13     luck to your mother.

14          PROSPECTIVE JUROR 2088:  Thank you.

15          THE COURT:  All right.  The Court will strike 2088

16     for cause.

17          THE COURTROOM DEPUTY:  Your Honor, Juror No. 0027.

18          THE COURT:  Step right up.  Ma'am.

19          How are you?

20          PROSPECTIVE JUROR 0027:  Good.  How are you?

21          THE COURT:  Doing well.

22          You're Ms. Fekete?

23          PROSPECTIVE JUROR 0027:  I am.

24          THE COURT:  All right.  So you are a global total

25     rewards specialist for SAP?

```
 1                    PROSPECTIVE JUROR 0027:  I am.

 2                    THE COURT:  You can slip your mask off.

 3                    PROSPECTIVE JUROR 0027:  Oh, sorry.

 4                    THE COURT:  And SAP is the business operation

 5         software?

 6                    PROSPECTIVE JUROR 0027:  Yes.

 7                    THE COURT:  And what's a total rewards specialist?

 8                    PROSPECTIVE JUROR 0027:  We do like bonus planning

 9         for salespeople --

10                    THE COURT:  Okay.

11                    PROSPECTIVE JUROR 0027:  -- essentially.

12                    THE COURT:  All right.  Do you have a significant

13         other?

14                    PROSPECTIVE JUROR 0027:  I do.

15                    THE COURT:  And what do they do?

16                    PROSPECTIVE JUROR 0027:  He's an attorney.

17                    THE COURT:  Okay.  What sort of law does he

18         practice?

19                    PROSPECTIVE JUROR 0027:  Patent law.

20                    THE COURT:  Okay.  You answered yes to a few

21         questions.  You live or work near Capitol Hill?

22                    PROSPECTIVE JUROR 0027:  I used to, yes, so I was

23         down here regularly.

24                    THE COURT:  Did you work on Capitol Hill on

25         January 6, 2021?
```

```
1              PROSPECTIVE JUROR 0027:  No.  We lived nearby.

2              THE COURT:  All right.  You or someone close to

3    you has been charged with a criminal offense other than a

4    traffic offense.

5              PROSPECTIVE JUROR 0027:  I guess -- I don't know

6    about "charged" I guess is the real answer, but arrested

7    prior, yes.

8              THE COURT:  Okay.  Is that you or someone you

9    know?

10             PROSPECTIVE JUROR 0027:  My husband.

11             THE COURT:  Okay.  And did it not materialize?

12             PROSPECTIVE JUROR 0027:  I mean, it was a college

13   situation.

14             THE COURT:  Okay.  No worries.

15             And obviously your husband works in the legal

16   profession.  You know some other lawyers as a result of

17   that?

18             PROSPECTIVE JUROR 0027:  I mean --

19             THE COURT:  Anyone who practices criminal law?

20   Any prosecutors or defense lawyers?

21             PROSPECTIVE JUROR 0027:  Not that I would be close

22   with, no.

23             THE COURT:  And you have prior jury experience?

24             PROSPECTIVE JUROR 0027:  I do.

25             THE COURT:  Tell us about that.
```

```
1           PROSPECTIVE JUROR 0027:  It was the grand jury in,
2    I guess, D.C. Superior maybe two years ago.
3           THE COURT:  And positive experience?  Negative
4    experience?
5           PROSPECTIVE JUROR 0027:  I mean, it was long, but
6    it was --
7           THE COURT:  Nothing about that experience makes
8    you hesitate to be on a jury again, I take it?
9           PROSPECTIVE JUROR 0027:  No.
10          THE COURT:  All right.  Counsel?
11          MR. DALKE:  Good afternoon.  No questions.  Thank
12   you.
13          PROSPECTIVE JUROR 0027:  Thank you.
14          MR. PIERCE:  Good afternoon.
15          PROSPECTIVE JUROR 0027:  Hi.
16          MR. PIERCE:  Just very quickly.  You said you did
17   live here on Capitol Hill whenever January 6th took place?
18          PROSPECTIVE JUROR 0027:  At the time, yeah.
19          MR. PIERCE:  And did you observe anything that
20   occurred there with --
21          PROSPECTIVE JUROR 0027:  No.  I mean, we were
22   pretty much working from home that day, so just at home.
23          MR. PIERCE:  Okay.  And you didn't sort of suffer
24   any effects or sort of trauma or anything --
25          PROSPECTIVE JUROR 0027:  I mean, to be perfectly
```

1  frank, this was kind of our running route on a daily basis,

2  so just kind of having it blocked off after the fact was

3  kind of the only experience after the fact.

4           MR. PIERCE:  Okay.  Thank you so much.

5           THE COURT:  Okay.  Thank you.  You can step down.

6           PROSPECTIVE JUROR 0027:  Thank you.

7           THE COURT:  Any challenge?

8           MR. DALKE:  Not from the government.  Thank you,

9  Your Honor.

10           MR. PIERCE:  Not from the defense, Your Honor.

11           THE COURT:  27 is qualified.

12           THE COURTROOM DEPUTY:  Your Honor, Juror No. 0868.

13           THE COURT:  Hello.  How are you?

14           PROSPECTIVE JUROR 0868:  Well, thank you.

15           THE COURT:  Thank you for your patience.  You can

16  remove your mask.

17           You're Ms. Bresnahan --

18           PROSPECTIVE JUROR 0868:  Yes.

19           THE COURT:  -- is that right?

20           And you're a social worker at PDS?

21           PROSPECTIVE JUROR 0868:  I am.

22           THE COURT:  And how long have you been doing that?

23           PROSPECTIVE JUROR 0868:  Three years.

24           THE COURT:  And before that?

25           PROSPECTIVE JUROR 0868:  I worked at Community

```
 1    Connections as a mental health case manager.
 2              THE COURT:  Do you have a significant other?
 3              PROSPECTIVE JUROR:  I do.
 4              THE COURT:  And what do they do?
 5              PROSPECTIVE JUROR 0868:  He works at the State
 6    Department.
 7              THE COURT:  In what capacity?
 8              PROSPECTIVE JUROR 0868:  He's an analyst.
 9              THE COURT:  Okay.  You answered yes to a number of
10    my questions, including Question 10, which is the question
11    that the Court will instruct the jurors that they are to
12    disregard punishment in reaching their verdict.  You think
13    you might have a hard time following that?
14              PROSPECTIVE JUROR 0868:  I do.
15              THE COURT:  Why would you say that?
16              PROSPECTIVE JUROR 0868:  I think the role that I
17    do as a social worker at PDS, most of my clients are held at
18    the jail.  I keep in touch with a lot of my clients after
19    they're sentenced in the BOP, and so I'm very aware of the
20    realities of those places, and I think it would be very
21    difficult for me to remove the knowledge of what can happen
22    to people within the system.
23              THE COURT:  Even though PDS is a part of the
24    criminal justice system and has to give it due respect?
25              PROSPECTIVE JUROR 0868:  Yes.  I struggle a lot
```

```
 1   with my role being a part of a system that I don't
 2   necessarily believe in.
 3                THE COURT:  And you don't think you could put
 4   that aside based on the evidence presented with respect to
 5   Mr. Alberts?
 6                PROSPECTIVE JUROR 0868:  I just --
 7                THE COURT:  Or you have doubts about it?
 8                PROSPECTIVE JUROR 0868:  I just have doubts about
 9   my ability to.
10                THE COURT:  Okay.
11                All right.  You can step down.
12                All right.  The Court will strike 868 based on her
13   answers regarding potential punishment.
14                THE COURTROOM DEPUTY:  Your Honor, Juror No. 1486.
15                THE COURT:  Good afternoon, sir.
16                PROSPECTIVE JUROR 1486:  Good afternoon.
17                THE COURT:  Thank you for your patience.
18                How are you?
19                PROSPECTIVE JUROR 1486:  Good.
20                THE COURT:  Okay.  Are you Mr. Ellis?
21                PROSPECTIVE JUROR 1486:  Yes.
22                THE COURT:  And you're an insurance agent?
23                PROSPECTIVE JUROR 1486:  Yes.
24                THE COURT:  What kind of insurance?
25                PROSPECTIVE JUROR 1486:  Life insurance,
```

```
 1     disability, and long-term care.

 2              THE COURT:  All right.  Do you have a significant

 3     other?

 4              PROSPECTIVE JUROR 1486:  Yes.

 5              THE COURT:  What do they do?

 6              PROSPECTIVE JUROR 1486:  Wife.

 7              THE COURT:  What does she do?

 8              PROSPECTIVE JUROR 1486:  Oh.  She works in Council

 9     of Governments.

10              THE COURT:  The D.C. counsel of -- Metropolitan

11     Council of Governments?

12              PROSPECTIVE JUROR 1486:  COG.

13              THE COURT:  Yeah.  Tell these good folks what COG

14     does.

15              PROSPECTIVE JUROR 1486:  Council of Governments.

16              THE COURT:  And it's a multi -- it's a regional --

17              PROSPECTIVE JUROR 1486:  Quasi.

18              THE COURT:  Quasi-regional board that advises

19     various government entities on policy issues, right?

20              PROSPECTIVE JUROR 1486:  Yes.

21              THE COURT:  Okay.

22              All right.  You answered yes to a number of my

23     questions.  You've obviously followed some of the coverage

24     of January 6th; is that right?

25              PROSPECTIVE JUROR 1486:  Yes.
```

1          THE COURT:  Well, first of all, you answered yes

2     to 18, which is, is there something about the nature of the

3     charges that gives you -- that makes you hesitate about

4     being a fair and impartial juror in this case?  Did you

5     answer yes to that one?

6          PROSPECTIVE JUROR 1486:  Nature of the charges,

7     no.

8          THE COURT:  All right.  Let me read the question

9     again to you.

10          Mr. Alberts has been charged with nine crimes

11     relating to Congress's meeting at the United States Capitol

12     on January 6th.  Do you have such strong feelings about the

13     events of January 6th or those who have been charged with

14     crimes for their participation in those events that it would

15     be difficult for you to follow the Court's instructions and

16     render a fair and impartial verdict?  Did you answer yes to

17     that one?

18          PROSPECTIVE JUROR 1486:  Well, the first part of

19     it is what I was focusing on.

20          THE COURT:  Okay.  So just tell me about it.

21          PROSPECTIVE JUROR 1486:  So basically with the

22     January 6th, I was kind of perplexed about, you know, what

23     was going on and what I was looking at.

24          THE COURT:  Okay.  So obviously a lot of people

25     came to D.C. from different places for different reasons,

1    did different things.  I'm sure you've seen some of the

2    videos.

3              This trial is not about January 6th in general.

4    It's about what this fellow did or did not do on that day

5    and whether the government has proved its case beyond a

6    reasonable doubt.

7              Do you think that you could give Mr. Alberts a

8    fair trial based just on the evidence against him and my

9    instructions, apart from whatever you may think or have seen

10   about January 6th generally?

11             PROSPECTIVE JUROR 1486:  Yes.  I think that was

12   the question you asked.

13             THE COURT:  Okay.

14             PROSPECTIVE JUROR 1486:  I felt like you asked

15   that question.

16             THE COURT:  And you're pretty sure about that?

17             PROSPECTIVE JUROR 1486:  Yes.

18             THE COURT:  Okay.

19             Okay.  Counsel?

20             MR. DALKE:  Good afternoon, Mr. Ellis.

21             PROSPECTIVE JUROR 1486:  Good afternoon.

22             MR. DALKE:  No questions.  Thank you.

23             MR. PIERCE:  Good afternoon, Mr. Ellis.

24             PROSPECTIVE JUROR 1486:  Good afternoon.

25             MR. PIERCE:  Just to clarify one of your

1    statements or responses to make sure I understand.  You said

2    something to the effect of that you were perplexed about

3    what you were seeing, you know, with respect to seeing, I

4    guess, video or coverage of January 6th.

5              What did you specifically mean by "perplexed"?

6    Like what was your feeling?

7              PROSPECTIVE JUROR 1486:  Basically what I was

8    watching on the TV, I had kind of doubts about the validity

9    of it, of what I was watching on TV.

10             MR. PIERCE:  And when you say "doubts about the

11   validity of it," are you saying doubts about the way that

12   the media was portraying it, or what did you have doubts --

13             PROSPECTIVE JUROR 1486:  Well, that, yes.  Yes.

14             MR. PIERCE:  Okay.  Thank you very much.

15             I'm sorry, I apologize.  Just one more.

16             Have you now -- have those -- for lack of a better

17   way to put it, have those doubts now been resolved in some

18   fashion, or do you still have those sort of same --

19             PROSPECTIVE JUROR 1486:  They haven't been

20   resolved.  I still have them.

21             MR. PIERCE:  Thank you very much.

22             THE COURT:  Thank you very much, sir.  You can

23   step down.

24             PROSPECTIVE JUROR 1486:  Thank you.

25             THE COURT:  All right.  Any challenge?

```
 1              MR. DALKE:  Not from the government, no, Your

 2     Honor.

 3              MR. PIERCE:  Not from the defense, Your Honor.

 4              THE COURT:  Okay.  1486 is qualified.

 5              THE COURTROOM DEPUTY:  Your Honor, Juror No. 0719.

 6              THE COURT:  Good afternoon, ma'am.

 7              PROSPECTIVE JUROR 0719:  Hi.

 8              THE COURT:  Feel free to slip your mask off.

 9              You're Ms. Cole; is that correct?

10              PROSPECTIVE JUROR 0719:  Yes.

11              THE COURT:  It says here you're a legal assistant

12     with Arnold & Porter; is that correct?

13              PROSPECTIVE JUROR 0719:  That was when I filled

14     that out.  Now I'm a legal assistant at a smaller firm.

15              THE COURT:  All right.  Greener pastures, huh?

16              PROSPECTIVE JUROR 0719:  Yes.

17              THE COURT:  So the Court's wife is a partner at

18     Arnold & Porter.  Are you familiar with her?

19              PROSPECTIVE JUROR 0719:  Probably.

20              THE COURT:  Did you work with her at all?

21              PROSPECTIVE JUROR 0719:  No, probably not.

22              THE COURT:  Which group were you in?

23              PROSPECTIVE JUROR 0719:  Intellectual property.

24              THE COURT:  All right.  Do you have a significant

25     other?
```

```
 1                    PROSPECTIVE JUROR 0719:  No.

 2                    THE COURT:  How long have you lived in D.C.?

 3                    PROSPECTIVE JUROR 0719:  In the Maryland/D.C.

 4          area, about 17 or 18 years.

 5                    THE COURT:  Okay.

 6                    All right.  You answered yes to a few questions.

 7          You live or work near Capitol Hill.

 8                    PROSPECTIVE JUROR 0719:  Yes.  Well, I did at the

 9          time.

10                    THE COURT:  Yes.  You lived there?

11                    PROSPECTIVE JUROR 0719:  I live in Cleveland Park.

12                    THE COURT:  So you worked near Capitol Hill?

13                    PROSPECTIVE JUROR 0719:  I worked near the

14          Capitol.

15                    THE COURT:  Okay.  Were you at work that day?

16                    PROSPECTIVE JUROR 0719:  No, not in the office

17          anyway.

18                    THE COURT:  Okay.  You answered yes to Question

19          11, I believe, saying that the burden of proof belongs to

20          the government and never shifts.  Would you have any

21          difficulty or hesitation respecting that allocation of the

22          burden of proof?

23                    PROSPECTIVE JUROR 0719:  No.

24                    THE COURT:  So I'm going to give you your card.

25          So what's the number after 4?
```

```
1              PROSPECTIVE JUROR 0719:  It is 11.  I wrote down
2     10 or 11, but I got confused.
3              THE COURT:  Okay.  10 is the question about not
4     considering what punishment the defendant would receive if
5     he were found guilty.
6              You answered yes to that?
7              PROSPECTIVE JUROR 0719:  No, I did not.  That was
8     wrong.
9              THE COURT:  Okay.  So we're going to scratch that
10    and move to 17.  And if there's any question that I skip
11    that you think you may have answered yes to, you let me
12    know.  Okay?
13             17, living and working near the Capitol.
14             And 30, you know folks, obviously, in the legal
15    profession.
16             PROSPECTIVE JUROR 0719:  Yeah.
17             THE COURT:  Are you close to any prosecutors or
18    defense lawyers or anyone who practices in criminal law?
19             PROSPECTIVE JUROR 0719:  No.
20             THE COURT:  Okay.  And you know folks who have
21    served in the military?
22             PROSPECTIVE JUROR 0719:  Yes.  My father.
23             THE COURT:  Which branch?
24             PROSPECTIVE JUROR 0719:  He was Marines.
25             THE COURT:  Okay.  Counsel?
```

```
 1              MR. DALKE:  Good afternoon, Ms. Cole.

 2              In your work as a paralegal, did you ever work on

 3    criminal matters in a pro bono capacity or on a pro-bono-

 4    type case?

 5              PROSPECTIVE JUROR 0719:  Yes.

 6              MR. DALKE:  How many, and what were the nature of

 7    those cases?

 8              PROSPECTIVE JUROR 0719:  Just one, and it was

 9    vaguely assisting one of the associates to have a conviction

10    overturned.

11              MR. DALKE:  One of the associates who worked at

12    the firm?

13              PROSPECTIVE JUROR 0719:  Yes.

14              MR. DALKE:  Do you recall the nature of the

15    conviction?

16              PROSPECTIVE JUROR 0719:  No.

17              THE COURT:  Ms. Cole, if you could move a little

18    closer to that microphone so that we can all hear you.

19    Thanks.

20              MR. DALKE:  You don't recall the nature of the

21    conviction?

22              PROSPECTIVE JUROR 0719:  No.

23              MR. DALKE:  Do you recall whether it was

24    overturned through the work and legal advocacy that you were

25    part and that the firm was part of?
```

```
1              PROSPECTIVE JUROR:  By the time I had left
2     Arnold & Porter, we hadn't -- there hadn't been a decision
3     made.
4              MR. DALKE:  Your work on that case and dealing
5     with that client and that attorney, did it form any beliefs
6     in your mind about the criminal justice system or validity
7     of that conviction in extrapolating it out?  Just tell us a
8     little bit more.
9              PROSPECTIVE JUROR 0719:  No, it did not.  I pretty
10    much believe in our court system, as flawed as it may be.
11             MR. DALKE:  Appreciate it.  Thank you.
12             MR. PIERCE:  Good afternoon, Ms. Cole.  Just -- I
13    just really wanted to clarify because I think I got a little
14    mixed up.
15             Did we end up saying that on Question 11 she did
16    not answer yes, Your Honor?
17             You were talking about Questions 10 and 11, and --
18             THE COURT:  Just so the record is clear, did you
19    not mean to answer yes to 10 and 11; 10 regarding following
20    the instruction about the burden of proof, and 11 regarding
21    the potential for punishment not to be considered by the
22    jury?
23             PROSPECTIVE JUROR 0719:  Yes.  It was a mistake.
24             THE COURT:  Those are mistakes.
25             MR. PIERCE:  Okay.  Thank you.
```

1          THE COURT:  All right.  Thank you, ma'am.  You can

2     step down.

3          Anything else you want to add?

4          PROSPECTIVE JUROR 0719:  No.

5          THE COURT:  Okay.  You can step down.

6          All right.  Any challenge?

7          MR. DALKE:  Not from the government, no, Your

8     Honor.

9          MR. PIERCE:  Not from the defense, Your Honor.

10          THE COURT:  719 is qualified.

11          THE COURTROOM DEPUTY:  Your Honor, Juror No. 0971.

12          THE COURT:  Okay.  Good afternoon, sir.

13          PROSPECTIVE JUROR 0971:  Good afternoon.

14          THE COURT:  You're Mr. Baran?

15          PROSPECTIVE JUROR 0971:  Yes, that's correct.

16          THE COURT:  All right.  Nice to meet you.  Please

17     slip your mask off.

18          You're a business analyst with Amazon?

19          PROSPECTIVE JUROR 0971:  That is correct.

20          THE COURT:  Tell us a little bit more about that.

21     What's your area?

22          PROSPECTIVE JUROR 0971:  Yes, sir.  I work for the

23     experience team in order to make sure that our customers get

24     trustworthy orders from our sellers on Amazon.  So we do

25     that through tracking different mechanisms such as

1    counterfeit reduction and defect reduction, as well as make

2    sure the same apply to applicable laws for the regional in-

3    country level.

4              THE COURT:  Okay.  Do you have a significant

5    other?

6              PROSPECTIVE JUROR 0971:  Yes, I do.  I'm married.

7              THE COURT:  And what does your wife do?

8              PROSPECTIVE JUROR 0971:  She's a physician.

9              THE COURT:  You answered yes to a couple of my

10   questions, including 2.  You think you may have heard

11   something about this case?

12             PROSPECTIVE JUROR 0971:  I'm sorry?

13             THE COURT:  You think you may have heard something

14   about Mr. Alberts or this case?

15             PROSPECTIVE JUROR 0971:  Well, I mean, not

16   specifically about this case.  How I understood the question

17   was do I know Mr. Alberts.  The answer was no.  Or have I

18   heard something about the January 6th attacks, and that is

19   yes.  That is just through the media.  Nothing specifically

20   about this case though.

21             THE COURT:  Okay.  And you live or work near the

22   Capitol?

23             PROSPECTIVE JUROR 0971:  Yes, I do, at the

24   intersection of New Jersey and Massachusetts Avenue.

25             THE COURT:  And did you live there on January 6th?

```
 1                    PROSPECTIVE JUROR 0971:  No, I did not.

 2                    THE COURT:  Okay.  And either you or someone close

 3          to you has been arrested or charged with a nontraffic

 4          offense?

 5                    PROSPECTIVE JUROR 0971:  That is correct.

 6                    THE COURT:  Who is that?

 7                    PROSPECTIVE JUROR 0971:  That is my sister.

 8                    THE COURT:  And what sort of offense?

 9                    PROSPECTIVE JUROR 0971:  It was a DUI offense.

10                    THE COURT:  Okay.  We'll consider that a traffic

11          offense.

12                    PROSPECTIVE JUROR 0971:  Okay.

13                    THE COURT:  Mr. Dalke.

14                    MR. DALKE:  With your sister's experience in law

15          enforcement, do you feel like she was treated fairly by law

16          enforcement in that matter?

17                    PROSPECTIVE JUROR 0971:  I do.  She was driving

18          under the influence, and she was arrested and, you know,

19          convicted.

20                    MR. DALKE:  Thank you.  I appreciate your time.

21                    PROSPECTIVE JUROR 0971:  Thank you.

22                    MR. PIERCE:  Just to clarify -- I just wasn't

23          certain -- did you say that you did not read anything

24          specifically about Mr. Alberts's case?

25                    PROSPECTIVE JUROR 0971:  No, no.
```

```
 1                    MR. PIERCE:  Okay.  So you were referring to just
 2        reading coverage about January 6th?
 3                    PROSPECTIVE JUROR 0971:  Yes, just general
 4        coverage, sir.
 5                    MR. PIERCE:  Okay.  Thank you, sir.
 6                    THE COURT:  Thank you very much.  You can step
 7        down.
 8                    PROSPECTIVE JUROR:  Thank you.
 9                    THE COURT:  All right.  Any challenge?
10                    MR. DALKE:  Not from the government, no, Your
11        Honor.
12                    MR. PIERCE:  Not from the defense, Your Honor.
13                    THE COURT:  971 is qualified.
14                    Why don't we do one more, and then we'll take a
15        brief break.
16                    Lisa, are you doing okay?
17                    THE COURT REPORTER:  Yes.
18                    THE COURT:  All right.
19                    THE COURTROOM DEPUTY:  Your Honor, Juror No. 0227.
20                    THE COURT:  Good afternoon, ma'am.
21                    PROSPECTIVE JUROR 0227:  Good afternoon.
22                    THE COURT:  You're Ms. Belle?
23                    PROSPECTIVE JUROR 0227:  Yes.
24                    THE COURT:  Okay.  You can slip your mask off.
25                    PROSPECTIVE JUROR 0227:  Uh-huh.
```

```
1              THE COURT:  You work for GW.

2              PROSPECTIVE JUROR 0227:  Yes.

3              THE COURT:  And what does a distribution

4    supervisor do?

5              PROSPECTIVE JUROR 0227:  I'm the warehouse

6    supervisor with the hospital with the medical supplies.

7              THE COURT:  Okay.  And do you have a significant

8    other?

9              PROSPECTIVE JUROR 0227:  Yes.

10             THE COURT:  And what do they do?

11             PROSPECTIVE JUROR 0227:  He works at Howard

12   University.

13             THE COURT:  Okay.  And what's his position at

14   Howard?

15             PROSPECTIVE JUROR 0227:  He works at the desk at

16   far as the college.

17             THE COURT:  Okay.  You answered yes to a few of my

18   questions, including No. 2, which I think asked whether you

19   might know something about Mr. Alberts's case specifically?

20             PROSPECTIVE JUROR 0227:  Oh, no.  I misunderstood

21   that question.

22             THE COURT:  Okay.  Question 3, you live or work

23   near Capitol Hill?

24             PROSPECTIVE JUROR 0227:  I work at George

25   Washington Hospital, so I travel in this area a lot.
```

```
 1                    THE COURT:  Were you on Capitol Hill on January
 2      6th?
 3                    PROSPECTIVE JUROR 0227:  No, I was not.
 4                    THE COURT:  Okay.  And you or a close friend or
 5      family has been arrested or charged for some nontraffic
 6      offense?
 7                    PROSPECTIVE JUROR 0227:  Yes, my brother was.
 8                    THE COURT:  What was he charged with?
 9                    PROSPECTIVE JUROR:  He was charged with murder.
10      It was a murder case.  All right.
11                    THE COURT:  And was he convicted?
12                    PROSPECTIVE JUROR 0227:  Yes, he was.
13                    THE COURT:  And do you feel that he was treated
14      fairly through that process?
15                    PROSPECTIVE JUROR 0227:  I was not there through
16      his trial when I was like -- some of the trial dates I was
17      there with my mom and everyone.
18                    THE COURT:  Right.
19                    PROSPECTIVE JUROR 0227:  But I don't think he was
20      because of the attorney he had wasn't more supportive to his
21      case.
22                    THE COURT:  Okay.  Is there anything about your
23      brother's experience with the criminal justice system that
24      makes you hesitate to be involved in the criminal justice
25      system by way of being a juror?
```

```
1                PROSPECTIVE JUROR 0227:  Yes, I do.  When my
2     brother was injured there, they didn't notify my mom until
3     like two or three days later, and my brother could have
4     passed away in prison.  He was there multiple times through
5     injuries and everything.
6                THE COURT:  I guess my question is:  Do you have
7     feelings about the criminal justice system based on your
8     brother's case that would affect your ability to give the
9     government a fair shot in this case or to give Mr. Alberts a
10    fair shot in this case?
11               PROSPECTIVE JUROR 0227:  Yes, I do.
12               THE COURT:  You do.  And why would that translate
13    to this case?
14               PROSPECTIVE JUROR 0227:  Why would it translate to
15    this case?  Because it is -- it's different.  It's a
16    different case.  I must say that.  Because what I've seen
17    through, you know, the news and television and how I feel
18    about it, I don't think that I will want to be a part of it.
19               THE COURT:  Okay.  So you just don't trust the
20    criminal justice system --
21               PROSPECTIVE JUROR 0227:  No, I don't.  No, sir.
22               THE COURT:  Okay.  Thank you very much for your
23    honesty.
24               PROSPECTIVE JUROR 0227:  Yes, sir.
25               THE COURT:  You can step down.
```

```
1                PROSPECTIVE JUROR 0227:  Thank you.  Have a good
2      evening.
3                THE COURT:  You, too.
4                Okay.  The Court will strike 227 for cause.
5                All right.  Why don't we take a ten-minute break.
6      It's 3:10.  Let's reconvene at 3:20.
7                (Recess taken)
8                THE COURT:  All right.  Counsel, I have 23 by my
9      count with one provisional, No. 449, and then potentially
10     one voir dire issue.
11               Given the pace and where we are, I think it's
12     unlikely that we finish today.  I try not to stay much past
13     5:00.  But let's just keep going and see where we get.
14     Okay?
15               THE COURTROOM DEPUTY:  Your Honor, Juror No. 2129.
16               THE COURT:  Step right up, ma'am.
17               PROSPECTIVE JUROR 2129:  Hi.
18               THE COURT:  How are you?  Thank you for your
19     patience.
20               PROSPECTIVE JUROR 2129:  I'm good.  Thank you.
21               Sure.
22               THE COURT:  All right.  You're Ms. Brooks?
23               PROSPECTIVE JUROR 2129:  Yes.
24               THE COURT:  All right.  I don't have an occupation
25     down for you.  Are you retired?
```

```
 1                    PROSPECTIVE JUROR 2129:  I am.

 2                    THE COURT:  You're too young to retire.

 3                    You can slip your mask off, too.

 4                    PROSPECTIVE JUROR 2129:  Eight months.

 5                    THE COURT:  What did you do before you retired?

 6                    PROSPECTIVE JUROR 2129:  Property management.

 7                    THE COURT:  Property management.  Whereabouts?

 8                    PROSPECTIVE JUROR 2129:  In D.C.

 9                    THE COURT:  If you don't mind, slip that mask off

10       so everyone can see your face.

11                    In and around D.C.?

12                    PROSPECTIVE JUROR 2129:  It was a small company.

13       They own about seven residential properties in and around

14       D.C.

15                    THE COURT:  Okay.  Do you have a significant

16       other?

17                    PROSPECTIVE JUROR 2129:  My husband, yes.

18                    THE COURT:  And what does he do?

19                    PROSPECTIVE JUROR 2129:  He is in real estate

20       development.

21                    THE COURT:  Okay.  Private sector?

22                    PROSPECTIVE JUROR 2129:  Yes.

23                    THE COURT:  You answered yes to a few of my

24       questions.

25                    Do you live or work near Capitol Hill?
```

```
 1                    PROSPECTIVE JUROR 2129:  I live about seven blocks
 2     away.
 3                    THE COURT:  Okay.  Did you live there on January
 4     6th?
 5                    PROSPECTIVE JUROR 2129:  Yes.
 6                    THE COURT:  Were you home that day?
 7                    PROSPECTIVE JUROR 2129:  Oh, where was I?  Yes.
 8                    THE COURT:  Did you go down and take a look at
 9     what was going on?
10                    PROSPECTIVE JUROR 2129:  No.
11                    THE COURT:  No?  All right.
12                    PROSPECTIVE JUROR 2129:  No.
13                    THE COURT:  Did you experience any property
14     damage?
15                    PROSPECTIVE JUROR 2129:  No.
16                    THE COURT:  Seven blocks is pretty far.
17                    You followed the coverage of January 6th?
18                    PROSPECTIVE JUROR 2129:  Yes.
19                    THE COURT:  How closely, would you say?
20                    PROSPECTIVE JUROR 2129:  Just the news channels on
21     TV basically.  I don't read newspapers.
22                    THE COURT:  All right.  If you were selected as a
23     juror in this trial, do you think you could disregard all
24     the general stuff that you've seen about January 6th or what
25     other people may have done or not done and devote your
```

1    attention to the evidence against and for Mr. Alberts?

2              PROSPECTIVE JUROR 2129:  Through the case, I

3    could, sure.

4              THE COURT:  Okay.  And, finally, you have prior

5    jury service?

6              PROSPECTIVE JUROR 2129:  I have.

7              THE COURT:  How many times, about?

8              PROSPECTIVE JUROR 2129:  Well, I'm called every

9    two years.  I've served as a juror on -- I've served on two

10   juries, and I served grand jury at one time.

11             THE COURT:  Those two trial juries, starting with

12   the most recent, do you remember the case?

13             PROSPECTIVE JUROR 2129:  It was a case of an

14   employee suing the company that she worked for.

15             THE COURT:  So civil case?

16             PROSPECTIVE JUROR 2129:  Yes.

17             THE COURT:  And how did the jury find?

18             PROSPECTIVE JUROR 2129:  In favor of her, yes, the

19   employee.

20             THE COURT:  Were you the foreperson of that jury,

21   by any chance?

22             PROSPECTIVE JUROR 2129:  No, I wasn't.

23             THE COURT:  Okay.  What about the one before that?

24             PROSPECTIVE JUROR 2129:  That was a long time ago.

25   It was a gentleman that was charged with shooting someone in

```
1    a club.
2              THE COURT:  Okay.  And same question:  Did you all
3    reach a verdict?
4              PROSPECTIVE JUROR 2129:  If I remember, I think it
5    was against him.
6              THE COURT:  So a guilty verdict?
7              PROSPECTIVE JUROR 2129:  Yes.
8              THE COURT:  Same question.  Foreperson of that
9    jury?
10             PROSPECTIVE JUROR 2129:  No.
11             I was a foreperson on the grand jury.
12             THE COURT:  How was that experience?
13             PROSPECTIVE JUROR 2129:  It was amazing.  It was
14   like three months.  I was off my job for like three months
15   serving grand jury.
16             THE COURT:  Okay.  Counsel?
17             MR. DALKE:  No questions, Ms. Brooks.  Thank you.
18             PROSPECTIVE JUROR 2129:  You're welcome.
19             MR. PIERCE:  Good afternoon, ma'am.
20             PROSPECTIVE JUROR 2129:  Hi.
21             MR. PIERCE:  Just to clarify, do you have any
22   strong feelings about guns, firearms, that you think would
23   make it difficult to be fair and impartial?
24             PROSPECTIVE JUROR 2129:  No.
25             MR. PIERCE:  Okay.  Thank you.
```

```
1              THE COURT:  All right, ma'am.  You can step down.
2     Nice to meet you.
3              PROSPECTIVE JUROR 2129:  Okay.  Thank you.
4              THE COURT:  Okay.  Any challenge?
5              MR. DALKE:  Not from the government, no.
6              MR. PIERCE:  Not from the defense, Your Honor.
7              THE COURT:  2129 is qualified.
8              THE COURTROOM DEPUTY:  Your Honor, Juror No. 2157.
9              THE COURT:  Hello, ma'am.  Nice to meet you.
10             You are Ms. Bernola; is that right?
11             PROSPECTIVE JUROR 2157:  I am.
12             THE COURT:  Okay.  You can slip your mask off so
13    that we can all hear you.
14             And you're an insurance broker?
15             PROSPECTIVE JUROR 2157:  I am.
16             THE COURT:  Which lines do you specialize in?
17             PROSPECTIVE JUROR 2157:  Medicare, life,
18    annuities.
19             THE COURT:  Okay.
20             PROSPECTIVE JUROR 2157:  Health.
21             THE COURT:  And you answered yes to a number of my
22    questions, including 40, which is the hardship question.
23    Why did you answer yes to that?
24             PROSPECTIVE JUROR 2157:  I am self-employed, and I
25    have two events -- one this week and one next week -- that I
```

1    rely on for income.

2           THE COURT:  And when you say "events," what are

3    your events?

4           PROSPECTIVE JUROR 2157:  Well, the first one this

5    week is an actual appointment where I hope to enroll someone

6    in a plan.  And then next week I have an actual event where

7    I sit with a number of seniors and share information about a

8    particular carrier and set appointments.

9           THE COURT:  Okay.  So when I described hardship, I

10   said that jury service is an inconvenience for pretty much

11   everybody or many people, and --

12          PROSPECTIVE JUROR 2157:  You did.

13          THE COURT:  -- and if I were to excuse you, I

14   would put your name back into the hopper, and you'd be

15   called in the not-too-distant future.  So are these sorts of

16   meetings and events sort of routine occurrences in your

17   business, or are these the kinds of things that you have

18   every week or two?

19          PROSPECTIVE JUROR 2157:  Yes, they are.  I do --

20   well, because of the pandemic it has slowed quite

21   considerably.

22          THE COURT:  So that's not so much an extreme

23   hardship.  I understand it's inconvenient.

24          Would you disagree?

25          PROSPECTIVE JUROR 2157:  I do, but we can

1    disagree.

2              THE COURT:  Okay.  It wouldn't be the first time.

3              All right.  Let me ask you a few more questions.

4              You answered yes to Question 10, would you be able

5    to set aside the fact that it was the judge who decides what

6    the sentence would be if a defendant is found guilty, and

7    you said you might have trouble following that instruction.

8              PROSPECTIVE JUROR 2157:  Okay.  I misunderstood

9    that question.

10             THE COURT:  Okay.  Let me read the question.

11             If you were selected for this jury, I will

12   instruct you that your job is to determine whether the

13   defendant committed the charged offense beyond a reasonable

14   doubt based on the evidence presented and that you are not

15   to consider the potential punishment the defendant could

16   receive if he is found guilty.

17             Would you have difficulty following that

18   instruction?

19             PROSPECTIVE JUROR 2157:  No.

20             THE COURT:  Okay.  Question 13 asks -- describes

21   what an indictment is, and then it says:  Would the fact

22   that an indictment charged Mr. Alberts with a crime lead you

23   to believe that he is guilty or make it difficult for you to

24   apply the presumption of innocence?

25             And you answered yes to 13.

```
1              PROSPECTIVE JUROR 2157:  Well, I thought -- well,
2    when you gave a little bit of, I guess, a briefing before
3    that, you said that he had a gun that he didn't have
4    registered, and he was at the scene, and --
5              THE COURT:  So I said that he'd been -- he's been
6    charged with all those things.
7              PROSPECTIVE JUROR 2157:  Uh-huh.
8              THE COURT:  And those are just charges, and that
9    he is innocent until proven guilty.
10             Do you think you would have a hard time
11   considering the evidence fairly based on that?  Tell me the
12   truth.
13             PROSPECTIVE JUROR 2157:  I would.
14             THE COURT:  Okay.  You can step down.  You can
15   step down.
16             PROSPECTIVE JUROR 2157:  I'm what now?
17             THE COURT:  You can step down.  Thank you.
18             PROSPECTIVE JUROR 2157:  Oh.
19             THE COURT:  All right.  The Court will strike 2157
20   for cause.
21             THE COURTROOM DEPUTY:  Your Honor, Juror No. 1109.
22             THE COURT:  Okay.  Good afternoon, sir.
23             PROSPECTIVE JUROR 1109:  Good afternoon.
24             THE COURT:  Feel free to pull your mask off, if
25   you're comfortable doing that, so that we can hear you.
```

1    Okay?

2              You are Mr. Foley; is that correct?

3              PROSPECTIVE JUROR 1109:  Yes.

4              THE COURT:  And you're retired?

5              PROSPECTIVE JUROR 1109:  Yes.

6              THE COURT:  Okay.  And before you retired, what

7    did you do for a living?

8              PROSPECTIVE JUROR 1109:  I was working around a

9    church over at St. Dominic's in Southwest -- I was working

10   in different churches within our province in the Dominican

11   order.

12             THE COURT:  Okay.  So this is a Catholic order?

13             PROSPECTIVE JUROR 1109:  Yes.

14             THE COURT:  And are you a clergyman, or no?

15             PROSPECTIVE JUROR 1109:  I'm not clergy.  I'm like

16   a brother.

17             THE COURT:  You're a brother?

18             PROSPECTIVE JUROR 1109:  Yes.

19             THE COURT:  Okay.  And do you have a significant

20   other?

21             PROSPECTIVE JUROR 1109:  No.

22             THE COURT:  All right.  You filled out your card,

23   and you listed all the numbers and you wrote "no" next to

24   some of them and you left some of them blank.

25             PROSPECTIVE JUROR 1109:  Right.

1          THE COURT:  So the ones that you said "no" to are

2     "no" answers, and the ones you left blank are "yes" answers?

3     Is that fair?

4          PROSPECTIVE JUROR 1109:  Not really.  I'd say

5     they're a no.

6          THE COURT:  All right.  I'm going to show you a

7     card; and there are some that say "no" after them, and there

8     are some that don't say anything after them.

9          PROSPECTIVE JUROR 1109:  Okay.  I had no answer --

10    the ones that I didn't have "no" after, I just didn't have

11    any answers for it.

12         THE COURT:  Okay.  You understood all the

13    questions, right?

14         PROSPECTIVE JUROR 1109:  Yes, I did.

15         THE COURT:  Okay.  So when you were sitting out

16    there in the audience and I said that this case was about

17    January 6th, did anything in particular pop into your mind?

18         PROSPECTIVE JUROR 1109:  No.  I didn't have an

19    opinion of the whole thing.  I just heard what was going on.

20         You know, I'm not a judge.  I'm not a lawyer.  So

21    I just went along with what I heard.

22         THE COURT:  Okay.  Do you consider yourself

23    politically active?

24         PROSPECTIVE JUROR 1109:  No.

25         THE COURT:  Okay.  Have you followed what happened

1    on January 6th since it happened a couple of years ago?

2              PROSPECTIVE JUROR 1109:  I've listened, but I

3    don't have any opinion.  I don't know where it's going.

4              THE COURT:  Okay.

5              PROSPECTIVE JUROR 1109:  I listen, as I'm

6    interested in it, but I have no particular interest.  I just

7    don't really know what the whole thing is -- you know,

8    what's going on.

9              THE COURT:  Okay.  Do you have any feelings one

10   way or the other about potentially being on a jury in this

11   case?

12             PROSPECTIVE JUROR 1109:  About being on a jury?

13   I'd rather not be on a jury.

14             THE COURT:  Have you ever been on a jury before?

15             PROSPECTIVE JUROR 1109:  No.

16             THE COURT:  No, okay.

17             Mr. Dalke?

18             MR. DALKE:  There's a little confusion with the

19   questionnaire.  One or two follow-ups?

20             Would you have any issue sitting as a juror and

21   passing judgment on another human being in a case?

22             PROSPECTIVE JUROR 1109:  Let's see.  I guess I

23   could have the judgment because -- I guess I could depending

24   on what the topic is.

25             MR. DALKE:  So the topic in this case is --

1    involves events on January 6th at the Capitol and a firearm

2    and things of that nature.  Is that something that you'd be

3    able to hear that evidence and render a verdict of guilty,

4    convicted, or not?

5              PROSPECTIVE JUROR 1109:  Let's see.  It probably

6    wouldn't have any -- any opinion because I wouldn't know the

7    whole topic of the situation.

8              MR. DALKE:  Well, if you were selected as a juror,

9    the only thing that you could use in making that

10   determination is what happens here in this courtroom, all

11   right, and what the judge tells you.

12             PROSPECTIVE JUROR 1109:  Well then, I'd have an

13   opinion.  Then that would be definite on the opinion, yes.

14             MR. DALKE:  Have you previously served in the

15   military, the Armed Forces, at all?

16             PROSPECTIVE JUROR 1109:  No.

17             MR. DALKE:  The Court's indulgence, Your Honor,

18   for one minute.

19             (Pause)

20             MR. DALKE:  One last question.  In passing

21   judgment in this case, would you be able to put out of your

22   mind the idea that if there's a conviction, that that person

23   would go to jail, and just decide this case on the facts

24   that are presented in this courtroom without regard of

25   whether someone would go to jail or not at the end of the

1    day?

2                    PROSPECTIVE JUROR 1109:  I think I could pass

3    judgment on that, yes.  Definitely.

4                    MR. DALKE:  Thank you.  Appreciate it.

5                    THE COURT:  Sir, you live at -- near 6th and E

6    Southwest?

7                    PROSPECTIVE JUROR 1109:  Yes.

8                    THE COURT:  Do you consider that Capitol Hill?

9                    PROSPECTIVE JUROR 1109:  I don't think that's

10   Capitol Hill, no.

11                   THE COURT:  Okay.  All right.

12                   MR. PIERCE:  No questions, Your Honor.

13                   THE COURT:  All right.  Sir, you can step down.

14                   PROSPECTIVE JUROR 1109:  Okay.  Thank you.

15                   THE COURT:  Thank you very much.

16                   Counsel?

17                   MR. DALKE:  Your Honor, the government does think

18   a for-cause strike could be appropriate in this case.  I

19   think, when you combine the apparent inability to follow the

20   instructions on the card in the first half of the voir dire

21   in addition with the questioning both from the Court and

22   counsel, it seemed like there might be some difficulty

23   understanding the question or asking the question that was

24   asked, even in a slow, deliberate manner.

25                   I think there is some concern from the government

1   that over the course of a week-long trial with the amount of

2   evidence and argument that's likely to be heard with this

3   particular witness, Your Honor...

4            THE COURT:  Mr. Pierce?

5            MR. PIERCE:  Yes, we respectfully disagree with

6   that, Your Honor.  I think he's a little bit older and maybe

7   doesn't speak as fast as the rest of us, but I think he

8   seems like he would be a very fair juror.

9            THE COURT:  I am actually going to strike him.

10  I'm going to sustain the government's objection.  It's the

11  combination of his inability to follow the instructions in

12  filling out the card, and he didn't answer any questions

13  "yes."  Which is fine.  Sometimes that happens.  But I sense

14  some cognitive deficiencies based on the answers that he

15  gave and filling out the form.  So somewhat reluctantly, I

16  will strike him.

17           THE COURTROOM DEPUTY:  Your Honor, Juror No. 1513.

18           THE COURT:  Okay.  Good afternoon, ma'am.

19           PROSPECTIVE JUROR 1513:  Good afternoon.

20           THE COURT:  Nice to meet you.  Thank you for your

21  patience.  You can slip your mask off.

22           You're Ms. Chiu?

23           PROSPECTIVE JUROR 1513:  Correct.

24           THE COURT:  And you work in the environmental

25  division of the Justice Department?

1          PROSPECTIVE JUROR 1513:  Yes.

2          THE COURT:  You're an attorney?

3          PROSPECTIVE JUROR 1513:  Yes.

4          THE COURT:  And are you -- do you litigate or do

5     you consult?

6          PROSPECTIVE JUROR 1513:  I'm in the law and policy

7     shop, consult.

8          THE COURT:  And how long have you been doing that?

9          PROSPECTIVE JUROR 1513:  Three years.

10         THE COURT:  Okay.  And have you ever litigated?

11         PROSPECTIVE JUROR 1513:  Yes.

12         THE COURT:  Okay.  In what capacity?

13         PROSPECTIVE JUROR 1513:  Let's see.  I've been an

14    attorney for over 20 years, and I worked in private practice

15    for the first eight years doing various types of litigation,

16    including insurance defense and car accidents and so forth.

17         THE COURT:  Where did you work?  What firm?

18         PROSPECTIVE JUROR 1513:  I worked at a firm called

19    Jackson & Campell, Bonner Kiernan Trebach & Crociata, and

20    Sourvell Jackson Colten & Dugan.

21         THE COURT:  Okay.  Do you have a significant

22    other?

23         PROSPECTIVE JUROR 1513:  No.

24         THE COURT:  Okay.  You answered yes to only one of

25    my questions, which is No. 20 about you've watched some of

1      the January 6th hearings.

2             PROSPECTIVE JUROR 1513:  Yes.

3             THE COURT:  And any takeaways from those hearings

4      about January 6th generally?

5             PROSPECTIVE JUROR 1513:  I thought it was very

6      comprehensive.  I found that question odd only because I

7      can't really imagine how anyone hasn't seen any coverage of

8      it.  And those were the main takeaways.

9             THE COURT:  Okay.  Do you think you would be able

10     to put aside what you know about January 6th generally,

11     either from general press coverage or from the January 6th

12     hearings, and consider only the evidence presented at trial

13     if you were selected as a juror?

14            PROSPECTIVE JUROR 1513:  Yes.

15            THE COURT:  Counsel?

16            MR. KONIG:  Good afternoon, Ms. Chiu.

17            PROSPECTIVE JUROR 1513:  Good afternoon.

18            MR. KONIG:  You said you worked at some law firms

19     and now at ENRD.

20            In between those law firms and ENRD, have you had

21     any other work within the government?

22            PROSPECTIVE JUROR 1513:  Yes, I was -- before ENRD

23     I was with the Department of Labor for 12 years.

24            MR. KONIG:  Okay.  And in any of those roles, have

25     you done any work in the criminal law area?

1           PROSPECTIVE JUROR 1513:  I have not.

2           MR. KONIG:  Okay.  And have you had any roles on

3    any pro bono matters criminally?

4           PROSPECTIVE JUROR 1513:  No.

5           MR. KONIG:  Okay.  And do you feel comfortable, if

6    you were selected to be on the jury here, in only applying

7    the law as provided to you by Judge Cooper and not taking

8    any knowledge you have from your 20 years of experience into

9    the jury room?

10           PROSPECTIVE JUROR 1513:  The question was would I

11    be able to do that?  Yes.

12           MR. KONIG:  Yes.

13           Okay.  Thank you.

14           PROSPECTIVE JUROR 1513:  Uh-huh.

15           MR. PIERCE:  I don't have any questions.  Thank

16    you, Your Honor.

17           THE COURT:  Okay.  Thank you very much, ma'am.

18    You can step down.

19           Any challenge?

20           MR. DALKE:  Not from the government, no, Your

21    Honor.

22           MR. PIERCE:  No, Your Honor.

23           THE COURT:  Okay.  1513 is qualified.

24           THE COURTROOM DEPUTY:  Your Honor, Juror No. 2192.

25           THE COURT:  Step right up, sir.

```
 1                    PROSPECTIVE JUROR 2192:  Thank you.

 2                    THE COURT:  How are you?

 3                    PROSPECTIVE JUROR 2192:  Doing okay.  How are you?

 4                    THE COURT:  Doing well.

 5                    THE COURTROOM DEPUTY:  Watch the mic.

 6                    PROSPECTIVE JUROR 2192:  Sure.

 7                    THE COURT:  You can slip your mask off, if you'd

 8       like.  You're Mr. Gold?

 9                    PROSPECTIVE JUROR 2192:  Yes.

10                    THE COURT:  And it says here you work for DCPS.

11                    PROSPECTIVE JUROR 2192:  Yes.

12                    THE COURT:  What do you do for DCPS?

13                    PROSPECTIVE JUROR 2192:  I'm a teacher.

14                    THE COURT:  What do you teach?

15                    PROSPECTIVE JUROR 2192:  Fourth grade.

16                    THE COURT:  Whereabouts?

17                    PROSPECTIVE JUROR 2192:  In Tenleytown.

18                    THE COURT:  Do you have a significant other?

19                    PROSPECTIVE JUROR 2192:  Yes, I do.

20                    THE COURT:  And what do they do?

21                    PROSPECTIVE JUROR 2192:  She's a journalist.

22                    THE COURT:  For whom?

23                    PROSPECTIVE JUROR 2192:  CNBC.

24                    THE COURT:  What does she cover?

25                    PROSPECTIVE JUROR 2192:  She covers real estate
```

1    and climate.

2              THE COURT:  You answered yes to a number of my

3    questions, including No. 1.

4              PROSPECTIVE JUROR 2192:  Yes.

5              THE COURT:  Which involves sort of health-related

6    issues that might be a problem given the trial schedule that

7    I described.  Tell me about that.

8              PROSPECTIVE JUROR 2192:  So I have some medical

9    appointments later in the week for an issue that's come up

10   in the last couple of weeks.

11             THE COURT:  Okay.  And are those things that you

12   could postpone safely and easily?

13             PROSPECTIVE JUROR 2192:  Well, it's something that

14   I really would like to get an answer to.

15             THE COURT:  Okay.  And when are those

16   appointments?

17             PROSPECTIVE JUROR 2192:  Thursday afternoon and

18   Friday morning.

19             THE COURT:  Okay.  So, I mean, bottom line, you'd

20   be uncomfortable postponing those?

21             PROSPECTIVE JUROR 2192:  Yes.

22             THE COURT:  Okay.  You can step down.

23             PROSPECTIVE JUROR 2192:  Okay.  Thank you.

24             THE COURT:  All right.  The Court will strike 2192

25   because of his medical issues.

```
 1                    THE COURTROOM DEPUTY:  1427.

 2                    THE COURT:  All right.  Hello, ma'am.  How are

 3     you?

 4                    PROSPECTIVE JUROR 1427:  A little sleepy, but I'm

 5     okay.

 6                    THE COURT:  A little sleepy?  All right.  We'll

 7     try not to bore you too much.

 8                    You're Ms. Clark-Davis; is that right?

 9                    PROSPECTIVE JUROR 1427:  Correct.

10                    THE COURT:  You can take your mask off, if you'd

11     like.

12                    And you're a teacher with DCPS?

13                    PROSPECTIVE JUROR 1427:  Yes.

14                    THE COURT:  Whereabouts?

15                    PROSPECTIVE JUROR 1427:  Where in D.C.?

16                    THE COURT:  Yes.

17                    PROSPECTIVE JUROR 1427:  Northeast D.C.

18                    THE COURT:  And what grade do you teach?

19                    PROSPECTIVE JUROR 1427:  Second.

20                    THE COURT:  Do you have a significant other?

21                    PROSPECTIVE JUROR 1427:  Yes.

22                    THE COURT:  And what do they do?

23                    PROSPECTIVE JUROR 1427:  He works for DCPS.  I

24     mean, not DCPS -- DHS.

25                    THE COURT:  DHS.
```

```
 1                    PROSPECTIVE JUROR 1427:  Department of Human
 2        Services.
 3                    THE COURT:  D.C. Department of Human Services?
 4                    PROSPECTIVE JUROR 1427:  Correct.
 5                    THE COURT:  All right.  You answered yes to a
 6        number of my questions, including 40, which is the extreme
 7        hardship question.
 8                    Why did you answer yes to that?
 9                    PROSPECTIVE JUROR 1427:  For me, as a second grade
10        teacher, I work with some of the most struggling students,
11        and for me to miss two weeks of working with them is a big
12        loss for them; and so the hardship extends not just to me,
13        but it really affects them.
14                    And we are going on a break, but me not having
15        this week to give them the instructions that they need and
16        to prepare them for what they're doing over the break is
17        time lost and hard to get back.
18                    THE COURT:  Okay.  And I take it there would be a
19        substitute teacher, but --
20                    PROSPECTIVE JUROR 1427:  There would be a
21        substitute teacher, correct.
22                    THE COURT:  But he or she is just not you?
23                    PROSPECTIVE JUROR 1427:  Correct.
24                    THE COURT:  All right.  You also answered yes to
25        Question 2, which was anything about Mr. Alberts's case
```

1    particularly or his conduct you think you might know

2    something about?

3              PROSPECTIVE JUROR 1427:  Just from watching

4    television, not specifically him.

5              THE COURT:  Okay.

6              PROSPECTIVE JUROR 1427:  But, you know, just

7    watching the event that happened on January the 6th live on

8    TV and being a resident of the District, that's from my

9    perspective.

10             THE COURT:  Got it.

11             And you live or work near Capitol Hill?

12             PROSPECTIVE JUROR 1427:  I live not far, so in the

13   area.

14             THE COURT:  Were you home that day?

15             PROSPECTIVE JUROR 1427:  I was home that day.

16             THE COURT:  And did you observe personally any of

17   the events that went on at the Capitol?

18             PROSPECTIVE JUROR 1427:  No, not personally.

19             THE COURT:  Okay.  All right.  You answered yes to

20   Question 12.  Because Mr. Alberts is presumed innocent, he

21   need not testify or offer any evidence.  If he were to

22   choose to exercise those rights, would it make you think it

23   is more likely that he is guilty.

24             You answered yes to that Question.

25             PROSPECTIVE JUROR 1427:  Correct.

```
 1              THE COURT:  And why is that?
 2              PROSPECTIVE JUROR 1427:  Just, I guess -- I guess
 3    things that you've watched, and you just know -- well, you
 4    assume that a person who may not have a strong enough case
 5    or able to defend themselves well, they just don't want them
 6    to get on the stand.
 7              THE COURT:  Okay.  So what if I were to tell you
 8    that, you know, unlike what you might see on TV, it's the
 9    government that has the burden of proof.  Right?  And if a
10    defendant watches the government's case and doesn't think
11    the government has enough evidence, they can say, "We don't
12    think you proved your case," and sit down and not do
13    anything.
14              PROSPECTIVE JUROR 1427:  Yes.
15              THE COURT:  And that's a perfectly legitimate
16    thing for a defendant to do if they don't believe the
17    government has proven the case.
18              If that happens, and you don't think the
19    government proved their case, would you feel comfortable
20    voting not guilty?  Or would you still expect that person to
21    stand up and put on a defense?
22              PROSPECTIVE JUROR 1427:  I would still expect them
23    to get on the stand.
24              THE COURT:  Okay.  And you would hold that against
25    him?
```

```
1                    PROSPECTIVE JUROR 1427:  Yes.

2                    THE COURT:  All right.  You can step down.

3                    PROSPECTIVE JUROR 1427:  Okay.

4                    THE COURT:  Okay.  The Court will strike 1427 for

5         cause based on her answers to Question 12.  I'm glad she's

6         not teaching civics.

7                    All right.  I shouldn't have said that.

8                    Next one.

9                    THE COURTROOM DEPUTY:  1550.

10                   THE COURT:  Sir, right up here.

11                   All right.  You're Mr. Hartless; is that correct?

12                   PROSPECTIVE JUROR 1550:  Yes.

13                   THE COURT:  Thank you very much for your patience.

14                   It says here you're a data scientist with the CIA,

15        correct?

16                   PROSPECTIVE JUROR 1550:  Correct.

17                   THE COURT:  And how long have you been doing that?

18                   PROSPECTIVE JUROR 1550:  I've been there 23 years.

19                   THE COURT:  Okay.  Do you have a significant

20        other?

21                   PROSPECTIVE JUROR 1550:  Yes.

22                   THE COURT:  And what do they do?

23                   PROSPECTIVE JUROR 1550:  She is a biologist at the

24        Environmental Protection Agency.

25                   THE COURT:  Okay.  Very well.
```

1           Let's see, you answered yes to two of my

2    questions.  No. 30, you know folks who have worked in the

3    legal profession in some capacity?

4           PROSPECTIVE JUROR 1550:  Yes.  My brother-in-law,

5    Jim Clark, works as an attorney in New York State.

6           THE COURT:  Okay.  Does he practice criminal law?

7           PROSPECTIVE JUROR 1550:  No, no, it's like real

8    estate.

9           THE COURT:  Okay.  And you have prior grand jury

10   experience?

11          PROSPECTIVE JUROR 1550:  Yes; not in this court,

12   but the other one here in D.C.

13          THE COURT:  Superior Court?

14          PROSPECTIVE JUROR 1550:  Yes, uh-huh.

15          THE COURT:  Okay.  Anything about that experience

16   make you not want to be a juror again?

17          PROSPECTIVE JUROR 1550:  No.

18          THE COURT:  No.  You did not answer the questions

19   regarding following January 6th closely or watching the

20   House committee hearings on January 6th.  When I -- when you

21   were out in the audience and I said that this case was about

22   January 6th, did any initial impressions come to mind?

23          PROSPECTIVE JUROR 1550:  I mean, obviously it's in

24   the news everywhere.  I don't follow it closely so...

25          Obviously it was a surprise and impact for all of

```
 1     us so...
 2                 THE COURT:  Okay.
 3                 PROSPECTIVE JUROR 1550:  Just living in the
 4     District.
 5                 THE COURT:  Counsel?
 6                 MR. DALKE:  No questions.  Thank you,
 7     Mr. Hartless.
 8                 MR. PIERCE:  Good afternoon, sir.  Just a few
 9     quick questions about your work.
10                 What kind of data -- data scientist, I guess, is
11     the name of your position?
12                 PROSPECTIVE JUROR 1550:  Yes.
13                 THE COURT:  To the extent you can say.
14                 MR. PIERCE:  Of course.
15                 PROSPECTIVE JUROR 1550:  Sure, understood.
16                 MR. PIERCE:  Of course.
17                 PROSPECTIVE JUROR 1550:  I currently serve --
18     technically it's called a technical director position, so
19     it's about making technology choices that allow our people
20     to do the work they need to do.
21                 MR. PIERCE:  And, again, with the stipulation
22     obviously what you can say, but does your work involve any
23     sorts of programs that would involve the surveillance on
24     American citizens?
25                 MR. DALKE:  Objection, Your Honor.  I think we're
```

```
 1    getting far afield.  We didn't object the last time, but
 2    there's no bearing here.
 3              THE COURT:  Okay.  I'll sustain that.
 4              MR. DALKE:  Okay.
 5              MR. PIERCE:  No further questions.
 6              THE COURT:  Nothing further?
 7              MR. PIERCE:  I'm sorry, Your Honor.  Nothing
 8    further.
 9              THE COURT:  Mr. Hartless, you can step down.
10    Thank you.
11              Okay.  Any challenge?
12              MR. DALKE:  Not from the government, no, Your
13    Honor.
14              MR. PIERCE:  No, Your Honor.
15              THE COURT:  1550 is qualified.
16              THE COURTROOM DEPUTY:  Your Honor, Juror No. 1190.
17              THE COURT:  Good afternoon, sir.
18              PROSPECTIVE JUROR 1190:  Good afternoon.
19              THE COURT:  Thank you for your patience.
20              You're Mr. Ford?
21              PROSPECTIVE JUROR 1190:  Yes, I am.
22              THE COURT:  All right.  And you work as a
23    librarian at the Library of Congress; is that right?
24              PROSPECTIVE JUROR 1190:  Yes, I do.
25              THE COURT:  And did you hold that position on
```

```
 1    January 6th?

 2                 PROSPECTIVE JUROR 1190:  Yes, I did.

 3                 THE COURT:  And were you working that day?

 4                 PROSPECTIVE JUROR 1190:  Yes, I was.

 5                 THE COURT:  And did you observe any of the

 6    activities within the restricted area or on Capitol grounds

 7    or in the building that day?

 8                 PROSPECTIVE JUROR 1190:  On TV.  We were at home

 9    still.

10                 THE COURT:  You were at home?

11                 PROSPECTIVE JUROR 1190:  From COVID, yes.

12                 THE COURT:  Okay.  And how long have you worked at

13    the Library of Congress?

14                 PROSPECTIVE JUROR 1190:  Cumulatively, ten years.

15                 THE COURT:  Okay.  I want you to be honest and

16    forthcoming with me.  Would it be difficult for you to serve

17    impartially on a January 6th jury given your employer, or

18    would you be comfortable doing it?

19                 PROSPECTIVE JUROR 1190:  I'm just going to say I

20    probably would be partial.  I would very much like to say I

21    wouldn't be, but I would have -- I think I'd come down on

22    the side of partiality.  Biased.

23                 THE COURT:  Okay.  You can step down.  Thank you

24    very much.

25                 All right.  The Court will strike 1190 for cause
```

1    given his occupation.

2              I'm sorry, Ms. Jenkins, my next one is 767, but

3    it's 775 on my list.

4              THE COURTROOM DEPUTY:  There are a couple of

5    people who had numbers that weren't correct.

6              THE COURT:  Oh, I see, okay.

7              All right.  This is 775.  Got it.

8              THE COURTROOM DEPUTY:  Your Honor, Juror No. 0775.

9              THE COURT:  Okay.  Step right up, ma'am.  Have a

10   seat.  And you can take your mask off.

11             You're Ms. Toomer?

12             PROSPECTIVE JUROR 0775:  Yes.

13             THE COURT:  It's a pleasure to meet you.

14             PROSPECTIVE JUROR 0775:  Nice to meet you.

15             THE COURT:  All right.  So I don't have an

16   occupation for you on my slip.  Are you retired?

17             PROSPECTIVE JUROR 0775:  Unemployed.

18             THE COURT:  Excuse me?

19             PROSPECTIVE JUROR 0775:  Unemployed.

20             THE COURT:  You're unemployed?

21             PROSPECTIVE JUROR 0775:  Yes.

22             THE COURT:  What did you do the last time you

23   worked?

24             PROSPECTIVE JUROR 0775:  Security.

25             THE COURT:  Like a security guard?

```
1                    PROSPECTIVE JUROR 0775:  Yes.

2                    THE COURT:  Whereabouts?

3                    PROSPECTIVE JUROR 0775:  At PG Hospital.

4                    THE COURT:  Have you ever worked for a federal

5         government agency as a security guard?

6                    PROSPECTIVE JUROR 0775:  Code 3, and that was it.

7                    THE COURT:  Are you married, ma'am?

8                    PROSPECTIVE JUROR 0775:  Yes.

9                    THE COURT:  And what's your husband do?

10                   PROSPECTIVE JUROR 0775:  He's at DPW.

11                   THE COURT:  DP -- Department of Public Works?

12                   PROSPECTIVE JUROR 0775:  Yes.

13                   THE COURT:  Now, you did not answer yes to any of

14        my questions.  You understood the questions, right?

15                   PROSPECTIVE JUROR 0775:  I understood the

16        questions.

17                   THE COURT:  You just didn't have any yes answers?

18                   PROSPECTIVE JUROR 0775:  No.

19                   THE COURT:  When you were sitting out there and I

20        said this was a case about January 6th, anything come to

21        mind?

22                   PROSPECTIVE JUROR 0775:  I looked at it a little

23        bit, but not much, because I didn't like what was going on,

24        so I try to turn the channel and just pray, yes.

25                   THE COURT:  Have you been on a jury ever before?
```

```
1                PROSPECTIVE JUROR 0775:  No.

2                THE COURT:  Okay.  How do you feel about the

3    prospect of being on a jury in this case?

4                PROSPECTIVE JUROR 0775:  Nervous.

5                THE COURT:  Nervous.  That's natural.

6                If you were selected, would you be okay with that?

7                PROSPECTIVE JUROR 0775:  Yes, I would.

8                THE COURT:  Okay.

9                PROSPECTIVE JUROR 0775:  I would.  I wouldn't have

10   a problem.

11               THE COURT:  All right.  And you said when you

12   looked at January 6th you prayed because you didn't like

13   what you saw?

14               PROSPECTIVE JUROR 0775:  No.

15               THE COURT:  You didn't like what was going on?

16               PROSPECTIVE JUROR 0775:  No.

17               THE COURT:  All right.  So do you think you could

18   put that aside and give this young man a fair trial if you

19   were selected for this jury?

20               PROSPECTIVE JUROR 0775:  I can.  It depends on the

21   situation of did he have anything to do with it?  Was he --

22   did he have any involvement?  Did he damage anything or hurt

23   anybody?  Yes, I would have to have something --

24               THE COURT:  So if you were on this jury, the

25   government would present evidence about the things that he's
```

1    charged with, and he could present a case if he wanted -- he

2    doesn't have to -- and you would have to decide whether that

3    evidence convinced you beyond a reasonable doubt that he was

4    guilty not of just being there but doing what the government

5    says that he did.

6              Do you think you could do that?

7              PROSPECTIVE JUROR 0775:  Yes.

8              THE COURT:  Okay.  Counsel?

9              MR. DALKE:  Good afternoon, Ms. Butler Toomer.

10             PROSPECTIVE JUROR 0775:  Good afternoon.

11             MR. DALKE:  You mentioned prior work as a security

12   guard or security officer.

13             PROSPECTIVE JUROR 0775:  Yes.

14             MR. DALKE:  Did you carry a firearm or any weapons

15   during the course of that employment?

16             PROSPECTIVE JUROR 0775:  Yes, that's the first job

17   I had with Code 3 I did that.  I was an SPO.

18             MR. DALKE:  And what type of weapon or firearm do

19   you have?

20             PROSPECTIVE JUROR 0775:  It was a .38, automatic.

21             MR. DALKE:  You mentioned, I think, something

22   along the lines of you didn't like what was going on, turn

23   the channel.  Is there anything -- I know you explained you

24   could put that aside, but just for the parties'

25   understanding, what didn't you like?

```
1              PROSPECTIVE JUROR 0775:  I didn't like how they

2      went into the building and they were hurting the officers.

3              MR. DALKE:  From what you could see?

4              PROSPECTIVE JUROR 0775:  Yes.

5              MR. DALKE:  But if I heard you right, if you came

6      into this courtroom and were selected as a juror, you could

7      decide this case just based on the judge's instructions and

8      what you see and hear in this courtroom and nothing else?

9              PROSPECTIVE JUROR 0775:  Yes.

10             MR. DALKE:  And you can be fair and impartial in

11     this case?

12             PROSPECTIVE JUROR 0775:  Yes.

13             MR. DALKE:  Thank you.

14             PROSPECTIVE JUROR 0775:  You're welcome.

15             MR. PIERCE:  Good afternoon, ma'am.

16             PROSPECTIVE JUROR 0775:  How are you doing?

17             MR. PIERCE:  So I think you made a couple of

18     comments about, you know, depending on what you saw in terms

19     of what people did, you know, you might have an issue.

20             I didn't follow it perfectly, but just let me

21     clarify it.

22             If somebody was just at January 6th, do you think

23     that that would make them guilty, or would you be able to

24     take the evidence in, listen to the judge's instructions,

25     and be impartial about the verdict?
```

```
 1                    PROSPECTIVE JUROR 0775:  Yes.  I will check the
 2          evidence, but if someone's just there, no, I wouldn't say
 3          they did something wrong or they're guilty unless they did
 4          something.  And I'll listen to the judge.
 5                    MR. PIERCE:  Okay.  Thank you.
 6                    THE COURT:  All right, ma'am.  Thank you very
 7          much.  You can step down.
 8                    PROSPECTIVE JUROR 0775:  You're welcome.
 9                    THE COURT:  Any challenge?
10                    MR. DALKE:  No challenge from the government.
11                    MR. PIERCE:  No, Your Honor, no challenge.
12                    THE COURT:  775 is qualified.
13                    THE COURTROOM DEPUTY:  1243.
14                    THE COURT:  Okay.  Hello, ma'am.
15                    PROSPECTIVE JUROR 1243:  Hi.
16                    THE COURT:  How are you?
17                    If you could slip your mask off so that we can see
18          your face.
19                    You're Ms. Brady?
20                    PROSPECTIVE JUROR 1243:  Yes.
21                    THE COURT:  You're a program analyst with the FAA,
22          right?
23                    PROSPECTIVE JUROR 1243:  I am.
24                    THE COURT:  Tell us what a program analyst does.
25                    PROSPECTIVE JUROR 1243:  Oh, good question.
```

```
 1                    THE COURT:  Briefly.
 2                    PROSPECTIVE JUROR 1243:  Essentially I work in the
 3        policy department for the drug abatement division of the
 4        FAA, so I work in regulatory --
 5                    THE COURT:  Drug --
 6                    PROSPECTIVE JUROR 1243:  Drug and alcohol.
 7                    THE COURT:  Drug and alcohol?
 8                    PROSPECTIVE JUROR 1243:  Uh-huh.
 9                    THE COURT:  And do you have a significant other?
10                    PROSPECTIVE JUROR 1243:  I do not.
11                    THE COURT:  You answered yes to a few of my
12        questions.
13                    You were at or near the Capitol on January 6th?
14                    PROSPECTIVE JUROR 1243:  I live near the Capitol,
15        so I said yes to be safe.
16                    THE COURT:  Okay.  How close do you live?
17                    PROSPECTIVE JUROR:  I would say about a 20-minute
18        walk, about a mile.  I don't know if that's close but...
19                    THE COURT:  Well, it's all relative.
20                    I take it you did not personally observe any of
21        the events that took place at the Capitol --
22                    PROSPECTIVE JUROR 1243:  I did not.
23                    THE COURT:  -- that day?
24                    And you know folks who have worked for law
25        enforcement, or applied to work for law enforcement?
```

1          PROSPECTIVE JUROR 1243:  Yes.  So for that

2     question, my brother has applied twice to be in the Capitol

3     Police.  We have a close family friend who works for the

4     Capitol Police who has encouraged him to apply, which he did

5     twice.  It was just the application process.  It never got

6     further than that.

7          I believe the first time it was a government shut

8     down hiring freeze issue, but I don't know what happened the

9     second time.

10          THE COURT:  Okay.  Well, as I indicated at the

11     beginning, there will be witnesses in this case who are

12     Capitol Police officers.  At least one victim in the case, I

13     believe, alleged victim, is a Capitol Police officer.

14          Do you think that your brother's application or

15     the people that you know who work there would make it

16     difficult for you to sort of assess that evidence fairly?

17     And I want you to be honest with me.

18          PROSPECTIVE JUROR 1243:  I hesitate to say yes

19     because of my family friend, so...

20          THE COURT:  Was your family friend working that

21     day?

22          PROSPECTIVE JUROR 1243:  No.  Not to my knowledge,

23     no.

24          THE COURT:  Okay.  Have you spoken with your

25     family friend about the events of January 6th as they

```
 1            related to the Capitol Police?

 2                    PROSPECTIVE JUROR 1243:  I have not.

 3                    THE COURT:  Okay.  So why is it that you hesitate

 4            to say that you could be fair based on your relationship?

 5                    PROSPECTIVE JUROR 1243:  I think that I can be

 6            fair.  I hesitate only because I don't necessarily know the

 7            facts of the case or anything.

 8                    THE COURT:  Okay.  Let me ask you this:  If you

 9            sat through the evidence and you determined that the

10            government had not proven its case, would it be difficult

11            for you to nonetheless render a not guilty verdict knowing

12            that your friend works for the Capitol Police?

13                    PROSPECTIVE JUROR 1243:  Would it be difficult for

14            me?  No, I don't think so.

15                    THE COURT:  So you could still hold Mr. Alberts

16            not guilty even though you have a close friend who worked

17            for the law enforcement agency that may have been most

18            directly affected by January 6th?

19                    PROSPECTIVE JUROR 1243:  I think so, yes.

20                    THE COURT:  Okay.  Counsel?

21                    MR. KONIG:  Good afternoon, Ms. Brady.

22                    PROSPECTIVE JUROR 1243:  Hi.

23                    MR. KONIG:  I think you said you were a program

24            analyst with the FAA in drug interdiction.  Is that like

25            people who work at the FAA, like air traffic controllers?
```

1          PROSPECTIVE JUROR 1243:  No.  I work directly with

2     industry drug and alcohol, so it's more for pilots,

3     mechanics who work in the industry versus at the FAA.

4          MR. KONIG:  Okay.  And what generally does that

5     entail?

6          PROSPECTIVE JUROR 1243:  I'm sorry?

7          MR. KONIG:  What generally is that type of job?

8     Like if you were explaining it to somebody at a dinner party

9     and saying -- you know, kind of what do you do for a living?

10          PROSPECTIVE JUROR 1243:  Yes.  Essentially, since

11     I work in regulation, we are -- we answer a lot of questions

12     all day from the public about the drug and alcohol testing

13     regulation, people who have violated, people who have tested

14     positive who have questions about the process.  That's most

15     of my job probably.

16          MR. KONIG:  Okay.  And you said you had a close

17     family friend who works for the Capitol Police.  Do you feel

18     comfortable telling us what the name of that officer is?

19          PROSPECTIVE JUROR 1243:  Sure.  I don't know his

20     position exactly, but his name is Ricky Herrle, H-E-R-R-L-E.

21          MR. KONIG:  Okay.  Thank you.

22          THE COURT:  Again, just to follow up.  The fact

23     that your brother applied to the Capitol Police and you know

24     Officer Herrle, you're pretty sure that you could be

25     impartial based on the evidence in this case?

```
 1                    PROSPECTIVE JUROR 1243:  Yes.

 2                    THE COURT:  Okay.

 3                    PROSPECTIVE JUROR 1243:  Yes.

 4                    THE COURT:  Mr. Pierce?

 5                    MR. PIERCE:  Thank you, Your Honor.

 6                    Good afternoon, ma'am.

 7                    PROSPECTIVE JUROR 1243:  Hi.

 8                    MR. PIERCE:  And I apologize if I have your --

 9           it's been a long day, so I'm trying to stay focused here.

10                    So Officer Herrle was there that day, to your

11           understanding?

12                    PROSPECTIVE JUROR 1243:  I don't have knowledge of

13           that, no.  I don't know.

14                    MR. PIERCE:  You don't know one way or the other?

15                    PROSPECTIVE JUROR 1243:  Uh-uh.  I've never talked

16           to him about it.

17                    MR. PIERCE:  Okay.  If you happen to come to

18           learn during the course of the trial that he was there,

19           would that -- do you think that would affect your ability to

20           be impartial?

21                    PROSPECTIVE JUROR 1243:  I'm not sure.  I'm not --

22           I guess -- if I knew he was there?

23                    MR. PIERCE:  So let's say, for example, if you

24           came to learn from this point forward -- if you're selected

25           for the jury, and for whatever reason you came to learn that
```

1    he was there and in some fashion was, you know, affected by

2    what happened that day, it sounds to me like you think you

3    might have some issue with respect to being impartial, and

4    so I'm just trying to flesh it out.

5              PROSPECTIVE JUROR 1243:  Okay.

6              MR. PIERCE:  Do you think you'd be able to be fair

7    even if you learned that, or do you think -- to Mr. Alberts,

8    or do you think you'd have an issue being impartial?

9              PROSPECTIVE JUROR 1243:  I think, if I understand

10   the definition really of "impartial," which is I have facts

11   in front of me, I think I can be impartial regardless.  I

12   just wanted you to know that I do know someone.

13             THE COURT:  Thank you, ma'am.

14             MR. PIERCE:  Understood.

15             THE COURT:  You can step down.

16             PROSPECTIVE JUROR 1243:  Oh, okay.  Thank you.

17             THE COURT:  All right.  Any challenge?

18             MR. DALKE:  Not from the government, no, Your

19   Honor.

20             MR. PIERCE:  Not from defense, Your Honor.

21             THE COURT:  All right.  1243 is qualified.

22             THE COURTROOM DEPUTY:  Your Honor, Juror No. 1180.

23             THE COURT:  Good afternoon, ma'am.  Thank you for

24   your patience.

25             You can slip your mask off so that we can see you.

```
1              Your Ms. Sessler?

2              PROSPECTIVE JUROR 1180:  Yes.

3              THE COURT:  Okay.  And it says you're an

4    investment advisor for CapShift.  Tell us what CapShift is.

5              PROSPECTIVE JUROR 1180:  We're an impact investing

6    platform.  We help high net worth individuals connect with

7    private investments.

8              THE COURT:  Private...?

9              PROSPECTIVE JUROR 1180:  Credit investments.

10             THE COURT:  And do you have a significant other?

11             PROSPECTIVE JUROR 1180:  I do not.

12             THE COURT:  Okay.  You answered yes to two of my

13   questions, I believe, 20 and 30.

14             20 is you watched some of the House committee

15   hearings?

16             PROSPECTIVE JUROR 1180:  Correct.

17             THE COURT:  Any takeaways generally about January

18   6th from having watched those?

19             PROSPECTIVE JUROR 1180:  No, honestly.  I was in

20   Boston for work and in a hotel room kind of just flipping

21   through channels.  Some friends were texting about it.

22             THE COURT:  So do you think you might -- do you

23   think you would be able to put aside whatever you learned

24   from the hearings about January 6th generally and about any

25   press coverage that you've seen and consider only the
```

```
 1    evidence in this case for or against Mr. Alberts if you were

 2    selected as a juror?

 3              PROSPECTIVE JUROR 1180:  Yes, I believe so.

 4              THE COURT:  And you know folks who have worked in

 5    the legal field in some capacity?

 6              PROSPECTIVE JUROR 1180:  Correct.  One of my

 7    closest friends here in D.C. does a lot of refugee work.

 8              THE COURT:  Okay.  Does that person practice

 9    criminal law at all, to your knowledge?

10              PROSPECTIVE JUROR 1180:  She only does it on a pro

11    bono basis as a consultant.

12              THE COURT:  Okay.  Counsel?

13              MR. DALKE:  No questions.  Thank you, Ms. Sessler.

14              THE COURT:  Mr. Pierce?

15              MR. PIERCE:  No questions.  Thank you.

16              THE COURT:  All right.  Ms. Sessler, you can step

17    down.  Thank you very much.

18              Any challenge?

19              MR. DALKE:  No, not from the government.

20              MR. PIERCE:  No, not from the defense, Your Honor.

21              THE COURT:  1180 is qualified.

22              (Pause)

23              THE COURT:  All right.  Folks, it is about 4:20.

24    I think if we were to press on, we're going to be after 5:00

25    before we qualify everybody and exercise peremptories.  So
```

1    what I'd like to do is bring them back, release anyone that

2    we have stricken for cause, and then bring back tomorrow

3    morning those that we have qualified and those that we have

4    yet to question, and just finish up first thing in the

5    morning.  Is that okay?

6            MR. PIERCE:  Yes, Your Honor.

7            MR. KONIG:  Yes.

8            THE COURT:  All right.

9            And I think -- she may bring in one more.  She may

10   bring in one more; so if she does, we'll go through one

11   more.

12           (Pause)

13           MR. DALKE:  Not to make the matter complicated,

14   and we defer to the Court.  I think we're at 29, and we'd

15   only need to get to 32, 33, but I --

16           THE COURT:  Well, we need to get to about 34 or

17   35, because sometimes you tell everybody to come back, and

18   you don't get them.  We have to deal with Juror No. 1.  You

19   know, our hit rate today is about two out of three, so to

20   get five more we're going to need to question probably, you

21   know, eight to ten people.

22           So I think we'd be pressing it.  And I want to

23   give you folks a good opportunity to review your notes and

24   to exercise your strikes.

25           MR. DALKE:  I appreciate that, Your Honor.  I

1      wasn't trying to second guess.

2              THE COURT:  I know.  I know.  It's right on the

3      cusp.  I don't like to bring them back either, believe me.

4              And if we're not going to finish, I'd rather them

5      get out of here before 4:30 as opposed to keeping them until

6      5:15 and then telling them we're not going to finish.

7              MR. DALKE:  Tomorrow morning we would start at

8      9:30?

9              THE COURT:  Let's try to start as close to 9:00 as

10     possible.  Okay?  I'll tell them to be ready to go at 9:00.

11     And we'll just roll into openings right after we swear the

12     jury.

13             THE COURTROOM DEPUTY:  Your Honor, Juror No. 0969.

14             THE COURT:  All right.  Thank you for your

15     patience.  You're Ms. Margol?

16             PROSPECTIVE JUROR 0969:  Hey.

17             THE COURT:  Okay.  You can take your mask off, if

18     you're comfortable doing so.

19             And you're a dentist --

20             PROSPECTIVE JUROR 0969:  I am.

21             THE COURT:  -- is that right?

22             Do you have a significant other?

23             PROSPECTIVE JUROR 0969:  I do have a husband.

24             THE COURT:  And what does he do?

25             PROSPECTIVE JUROR 0969:  He's a resident at

1    Georgetown.  He's an ENT resident.

2              THE COURT:  You answered yes to a number of my

3    questions, including 12, which is the question:  Mr. Alberts

4    is presumed innocent, he therefore need not testify or offer

5    evidence.  Do you think his decision not to testify, if he

6    were to exercise that, or to present evidence would make you

7    think he's more likely to be guilty?

8              You answered yes to that question.  Why did you

9    answer yes to that question?

10             PROSPECTIVE JUROR 0969:  I'd like to think that if

11   somebody --

12             THE COURT:  If you could move closer.

13             PROSPECTIVE JUROR 0969:  Oh, sorry.

14             Just personally, I'd like to think that if I were

15   on trial or something and I were innocent, I would want an

16   opportunity to express that vocally.

17             THE COURT:  Right.  And so what if I were to tell

18   you or to remind you that it is the government's burden, and

19   many defendants get to the end of the government's case and

20   they hear the government's evidence, and they say, "They

21   didn't prove their case, so I don't have to say anything"?

22   Is that -- if I reminded you of that, would that change your

23   answer?

24             PROSPECTIVE JUROR 0969:  Logically, yes; but like

25   emotionally, probably not.  But if I could separate the

1    logic and the emotion, then yes.

2              THE COURT:  Okay.  You also answered yes to the

3    question about the nature of the charges and the fact that

4    this is a January 6th case, that you might have such strong

5    feelings that it might be difficult for you to serve as an

6    impartial juror.  Tell me about that.

7              PROSPECTIVE JUROR 0969:  I remember the whole day

8    well.  I remember the whole circumstance.  I've lived here

9    throughout the election.

10             THE COURT:  Right.

11             PROSPECTIVE JUROR 0969:  I just don't think --

12   even any kind of presence at that day, I just think it was

13   really disgraceful.  I don't want to be like too harsh, but

14   I just don't --

15             THE COURT:  And you'd have trouble putting these

16   feelings aside?

17             PROSPECTIVE JUROR 0969:  Under the circumstances,

18   I would.  You know, lives were lost in this.

19             THE COURT:  Okay.  Thank you for your honesty.

20             PROSPECTIVE JUROR 0969:  Yes, sorry.

21             THE COURT:  You can step down.

22             PROSPECTIVE JUROR 0969:  Thanks.

23             THE COURT:  All right.  The Court will strike 969.

24             All right.  Lauren, why don't you bring them all

25   back in.

```
1              THE COURTROOM DEPUTY:  I have to line them up so
2      it's going to be...
3              THE COURT:  Okay.
4              (Pause)
5              THE COURT:  And I'm sorry, ma'am, on the right, if
6      you could move to the left side of the courtroom, because we
7      may need that pew.  Thank you.
8              (Pause)
9              THE COURT:  Counsel, did you all discuss over the
10     afternoon break voir diring our first juror?  I think you
11     all were going to put your heads together about that.
12             MR. DALKE:  Defense counsel did show us I think
13     three items related to what appears to relate to Potential
14     Juror No. 1.  I think additional voir dire, two or three
15     minutes, might be appropriate with her.  I didn't see
16     anything that in the government's view would indicate, at
17     least in our mind, that they had a reason to strike her for
18     cause, but I'd like to maybe have an additional questioning
19     related to it.
20             THE COURT:  Should we hold her back and do that
21     now?
22             MR. DALKE:  We can do that right now, I think, if
23     defense still has those exhibits.  I don't think it would
24     take --
25             THE COURT:  All right.  After we dismiss everybody
```

1        for the evening, we'll ask her to stay, and we'll just

2        handle that now.

3                    MR. DALKE:  Thank you.

4                    THE COURT:  And if you want to put those up -- are

5        you able to put them up on the screen so that she can see

6        them?

7                    MR. PIERCE:  Yes, Your Honor.

8                    THE COURT:  And so the Court can see them as well.

9                    (Pause)

10                   THE COURTROOM DEPUTY:  Your Honor, the jury panel.

11                   (Venire enters courtroom)

12                   THE COURT:  All right.  Ladies and gentlemen,

13       welcome back.  Thank you, again, for your patience.

14                   I usually pick a jury in a day, but given the

15       nature of the charges and the questions and answers that

16       we've had to get through today, we did not quite make it.  I

17       think we could have gone until about 5:30 or so, but I know

18       that some of you have commitments.  And so what we're going

19       to do is break for the day.

20                   Ms. Jenkins is going to release some of you who

21       should call the jury office tonight to see whether you will

22       be needed for another panel tomorrow.  But if not, your

23       service is excused.

24                   For those that we do not call and for those who we

25       were unable to question at the bench, we're going to have

1    you return at 9:00 tomorrow morning.  We're just checking

2    our notes to make sure that we are releasing the correct

3    folks, so just bear with us for one minute.

4            And I'll just say that, you know, picking a jury

5    is more art than science.  There are lots of moving parts.

6    And sometimes we can predict exactly how many people we need

7    to get through and how long it will take, and sometimes

8    we're a little bit off, and we were just a little bit off

9    today.  I suspect it will only take us about an hour at most

10   tomorrow morning to finish the process.

11           Okay.  And for those who we do not release, please

12   remember my admonition not to discuss the case with anyone

13   or to do any independent research about the case.

14           THE COURTROOM DEPUTY:  Ladies and gentlemen, as I

15   call your number, you can please stand, and you can exit the

16   courtroom.

17           Juror No. 2021, Juror No. 1590, Juror No. 0077,

18   Juror No. 0380 is released, Juror No. 1848, Juror No. 2180,

19   Juror No. 0614, Juror No. 0909, Juror No. 0215, Juror No.

20   0330 was released, Juror No. 0423 was released, Juror No.

21   2088, Juror No. 0868, Juror No. 0227, Juror No. 2157, Juror

22   No. 1109, Juror No. 2192, Juror No. 1427, Juror No. 1190,

23   Juror No. 0969, and Juror No. 0364.

24           THE COURT:  Okay.  So the rest of you folks, we'll

25   see you back here -- Ms. Jenkins, where should they report

1    in the morning?

2              THE COURTROOM DEPUTY:  Report to the jury room on

3    the fourth floor.

4              THE COURT:  Report to the jury room, and let's be

5    ready to go by 9 a.m. tomorrow morning.  Okay?  Have a great

6    night.  We put in a long day.  I appreciate your patience

7    and your continued service.

8              And just Juror No. 64, Juror No. 1, if you could

9    just remain seated for one minute, please.

10             (Venire exits courtroom)

11             All right.  Have a seat, everybody.

12             Okay.  Ma'am, if you could come back and take the

13   stand, please.

14             Okay.  Thank you.  Some of the attorneys just had

15   a few more follow-up questions for you.

16             So, Mr. Pierce, if you would like to -- actually,

17   I think we need to wait for Ms. Jenkins; is that correct?

18             We need to wait for Ms. Jenkins?

19             Okay.  Let's chill out for a minute.  Once she

20   comes back, we'll get started.

21             Okay.  Mr. Pierce?

22             MR. PIERCE:  Good afternoon.

23             PROSPECTIVE JUROR 0064:  Hello.

24             MR. PIERCE:  It was good morning earlier.

25             So I just wanted to follow up on a couple of

1    points to just, you know, make sure that we have the facts

2    straight with respect to the questions I was asking you.

3            So if you recall earlier, I asked you if you had

4    strong feelings about firearms or guns that you felt might

5    make it difficult for you to be impartial with respect to

6    Mr. Alberts's case.  And if I recall correctly, you

7    indicated that you did not.

8            PROSPECTIVE JUROR 0064:  Correct.

9            MR. PIERCE:  And so I just want to bring up an

10   image from what we believe is your social media.  And I just

11   wanted to ask, is that your social media account, and is

12   that something that you posted to it?

13           PROSPECTIVE JUROR 0064:  Yes, that is mine.

14           MR. PIERCE:  Okay.  Do you, in fact, feel strongly

15   about gun control?

16           PROSPECTIVE JUROR 0064:  I don't remember when I

17   put that on my social media.  It was probably after some gun

18   violence situation.

19           I think that -- I don't remember why I put it on

20   my social media, to be perfectly honest.

21           I don't have real strong feelings about -- I don't

22   have any negative feelings about guns.  I mean, I grew up in

23   western Pennsylvania.  I went to summer camp where we had

24   rifle practice.  I was on the rifle team at my high school.

25   My kids went to the same camp.

1          I don't really have a problem with guns, per se.

2     Whenever big violent events happen in the world, I do get

3     upset, and I probably added that to my social media back at

4     the time.

5          MR. PIERCE:  Okay.  Thank you.

6          And just on one other point, if you recall

7     earlier, I sort of conceptually broke up into a couple of

8     buckets the -- you know, the protests that were occurring in

9     the summer of 2020.  You know, I think either you or I or

10    both of us colloquially referred to them as the BLM or Black

11    Lives Matter protest and then January 6th.

12         And I think that I asked you something to the

13    effect of, you know, did you have some view as to, you know,

14    one of those protests -- set of protests being justified or

15    right versus, you know, the other, et cetera.  And I believe

16    you answered that you, in fact, did not really have a view

17    that one or the other protest was, you know, justified or

18    not justified.

19         PROSPECTIVE JUROR 0064:  I'm not sure that's

20    exactly what I said.

21         MR. PIERCE:  Okay.

22         PROSPECTIVE JUROR 0064:  But, you know, I

23    understood the feelings behind both sets of protests.  I --

24    you know, I have to admit, people get passionate about

25    things so...

```
 1                    MR. PIERCE:  No, that is stipulated.

 2                    And I just did want to show you one more image --

 3                    PROSPECTIVE JUROR 0064:  Uh-huh.

 4                    MR. PIERCE:  -- from your -- what we believe is

 5          your social media account just to confirm.

 6                    Is that something that you posted on your social

 7          media, if you recall?

 8                    PROSPECTIVE JUROR 0064:  I did, yes.  That was

 9          something that was happening -- I actually didn't go down to

10          see it, but I heard that those words were painted on a

11          street in my town, and I -- you know, it was like a huge

12          event happening in my town.

13                    And yeah, I did post that on my social media.

14                    MR. PIERCE:  I appreciate it.

15                    And a final question.  Do you believe that --

16          again, I'll just say the protests of 2020 were in some

17          fashion more justified than people who protested on January

18          6th?

19                    PROSPECTIVE JUROR 0064:  I don't believe that the

20          protests were more or less justified.  I don't believe that,

21          you know -- I don't believe anyone should take any illegal

22          action during a protest; let's put it that way.

23                    You know, I understand the passion on all sides.

24                    MR. PIERCE:  Okay.  Thank you very much.  I really

25          appreciate that.
```

```
 1              THE COURT:  Mr. Dalke, any follow-up?  Or
 2   Mr. Konig?
 3              MR. KONIG:  Hi, Ms. Wright.
 4              PROSPECTIVE JUROR 0064:  Hi.
 5              MR. KONIG:  Good afternoon.
 6              Just really briefly, without regard to your views
 7   on what the law is right now or what the law should be, can
 8   you be fair to Mr. Alberts in this case applying the laws
 9   given to you by Judge Cooper?
10              PROSPECTIVE JUROR 0064:  Absolutely, I can.  I
11   would not have answered the questions that had been posed by
12   the judge in the way I did if I didn't feel that I could be
13   fair-minded.
14              MR. KONIG:  Okay.  Thank you.
15              THE COURT:  Just to be clear, you did not -- did
16   you attend any of the, quote-unquote, BLM protests in the
17   summer of 2020?
18              PROSPECTIVE JUROR 0064:  No, I did not attend any
19   of them.  In fact, I didn't even see the Black Lives Matter
20   painting until two or three months ago.  I hadn't been
21   downtown to that point to see it until about two to three
22   months ago.
23              THE COURT:  Okay.  And when did you post that?
24              PROSPECTIVE JUROR 0064:  I don't remember.
25   Honestly, probably when it was happening and when I heard
```

1    that this was happening in my town, I probably posted it.  I

2    don't remember.

3              THE COURT:  Is that a photograph that you took, or

4    is that a photograph that you found on the Internet

5    someplace?

6              PROSPECTIVE JUROR 0064:  No, I found it on the

7    Internet.

8              THE COURT:  Okay.  Thanks very much.  You can --

9    I'll tell you what, why don't you -- Ms. Jenkins, if she

10   could just step out just for a moment and I'll have a word

11   with counsel.

12             PROSPECTIVE JUROR 0064:  I just go out that way?

13             THE COURT:  Yes.

14             THE COURTROOM DEPUTY:  Yes.

15             THE COURT:  All right.  Mr. Pierce?

16             MR. PIERCE:  Yes, Your Honor.  We would move again

17   to have her struck for cause.

18             I think in the -- I mean, initially I think the

19   questions about honestly the veracity of her answers earlier

20   in terms of being, you know, she said the most apolitical

21   person in D.C., you know, et cetera, and I think that, you

22   know, this is -- the "Gun Control Now" picture at some point

23   was her profile picture, and I think that, you know, with

24   Mr. Alberts, you know, having a gun possession charge, et

25   cetera, involving the licensing, I think it's just too much

```
 1    bias to have her on the jury.

 2              THE COURT:  Mr. Konig?

 3              MR. KONIG:  Your Honor, I don't think that there's

 4    any basis to strike her for cause.  I think she stated she

 5    can be a fair and impartial juror.  I don't think that -- I

 6    mean, her statement initially and her statement again just

 7    now were that she had no strong feelings about firearms.

 8              That's all from the government.

 9              THE COURT:  Okay.  The Court will overrule the

10    objection.  She'll remain qualified.  I don't think either

11    of the posts question the veracity of her testimony earlier.

12    She acknowledged that she was aware of the BLM protests.  I

13    don't think, you know, having views about gun control are

14    necessarily, as she herself said, inconsistent with

15    recognizing that one can exercise their Second Amendment

16    rights to use and possess guns under the appropriate

17    circumstances.  So I don't see anything that requires her

18    disqualifications.

19              Ms. Jenkins, if you could bring her back.

20              Okay.  Ma'am, we will see you at 9:00 a.m. in the

21    morning.  Okay?

22              PROSPECTIVE JUROR 0064:  Okay.  Thank you.

23              THE COURT:  Have a good night.

24              THE COURTROOM DEPUTY:  Have a good day.

25              PROSPECTIVE JUROR 0064:  Thank you.  Thank you.
```

1          THE COURT:  Okay.  So I suspect it will take us

2     about an hour to finish up in the morning, so you should be

3     prepared to probably take a break, let them put their stuff

4     in the jury room, and then we'll come back and roll into

5     openings.

6          I know there are a few loose ends from I guess

7     it's yesterday -- it seems like a long time ago now --

8     regarding the filings that were made after the pretrial

9     conference.

10         With respect to the two expert notices, the Court

11    will exclude testimony from both experts.  As an initial

12    matter, I think both of the notices were untimely.  I

13    realize that I did not set a deadline for expert notices,

14    but Rule 16(b)(1)(C)(ii), I think, can fairly be read to

15    require disclosure sufficiently before trial to give the

16    government an opportunity to counter the expert testimony

17    notwithstanding a firm deadline from the Court.

18         Here the experts were noticed the weekend before a

19    Tuesday trial where the government had requested reciprocal

20    discovery, including expert notices, several months previous

21    in mid-January.  That timing is prejudicial to the

22    government because it would not give them enough time to

23    secure and prepare a counter expert.

24         As an alternative independent basis, the Court

25    also would exclude the testimony of both experts under Rules

1    401 and 403.

2          With respect to Mr. Hill, expert testimony on

3    excessive force by Capitol Police is not relevant to what

4    the Court understands to be the potential self-defense claim

5    by Mr. Alberts.  Whether officers violated certain policies

6    or standards in trying to control the crowd does not inform

7    whether Mr. Alberts reasonably believed that he faced

8    imminent threat of death or serious bodily harm or whether

9    he could have taken actions to avoid any such threat.

10          Any threat by the officers or from the officers

11   can be established through the videos and percipient witness

12   testimony.  There's not a need for an expert to say whether

13   the officers' actions violated some rule or standard.

14          Even if Mr. Hill were qualified to testify about

15   the rules of engagement governing Capitol Police officers

16   specifically, which the notices do not establish, and even

17   if Mr. Hill's proposed testimony had some marginal

18   relevance, it is still inadmissible under 403 because it

19   would risk confusing the jury about the relevant elements of

20   any self-defense claim, and that risk substantially

21   outweighs whatever probative value the testimony would have.

22          That said, Mr. Pierce, consistent with my practice

23   in other cases -- and it sounds like similar to what Judge

24   Kelly did in his case -- I have allowed the defense to call

25   as a summary witness, you know, a paralegal or another

1   consultant -- I don't know if Mr. Hill would fit this bill

2   or not -- through which the defense can introduce, you know,

3   video evidence from the voluminous discovery that has been

4   received that, you know, calls the jury's attention to

5   something that the government believes is relevant and

6   admissible and goes to its theory of the case.  All right?

7          So, you know, for example, in past cases, you

8   know, some defendants have claimed that, you know, they were

9   waved in, and I've said, "Look, you know, if you can show me

10   in the video where someone is waving your client in, feel

11   free to call a summary witness and ask them to point that

12   out."  Okay?

13          No opinions.  No editorials.  No expert testimony.

14   But to the extent that there are things within the videos

15   that you've been provided in discovery that you think are

16   admissible and would be helpful to the jury, I've allowed --

17   similar to the government's, you know, case agent, who has

18   pointed out things that are relevant to the government's

19   case, I've allowed the defense to do that as well.

20          So if Mr. Hill would like to fulfill that role or

21   is prepared to fulfill that role, I would welcome him to

22   provide testimony along those lines.  But, again, no

23   editorialization or nothing that goes to a defense that is

24   not a legally recognized or valid defense.

25          And then, you know, once those videos are in

1      evidence, counsel can make argument in closing as to what

2      import the jury should place on them.

3            With respect to Mr. Heller, he's being offered as

4      an expert in, quote, D.C. politics, D.C. community culture,

5      and the Second Amendment and D.C. gun regulation.  That

6      testimony purportedly supports Mr. Alberts's necessity and

7      Second Amendment defenses as described in the notice, but

8      neither of those defenses is legally valid based on the

9      facts of this case.

10            With respect to necessity, as we discussed

11      yesterday, if the defense is that Mr. Alberts had no choice

12      but to arm himself and enter the Capitol grounds to protest

13      the election, then that is not a proper necessity defense.

14      It's more in line with a jury nullification argument; and,

15      therefore, evidence that goes to a legally insufficient

16      defense is not relevant.

17            Again, that said, if the defendant testifies, and

18      you were to ask him, you know, "Why did you come to

19      Washington that day?" I would give him some leeway as to

20      what the answer would be.

21            But that doesn't mean he's entitled to an

22      instruction.  That doesn't mean that counsel can argue

23      necessity.  But it's hard to -- you know, unless he goes too

24      far, to stop him from saying, you know, "This is what

25      motivated me to come to Washington."  All right?

1          As for any Second Amendment defense, the Court has

2    already determined that the statutes under which Mr. Alberts

3    is currently charged do not violate the Second Amendment

4    under D.C. Circuit precedent.  So, again, arguing that the

5    defendant somehow had a right to disregard a lawful statute

6    would amount to an invitation to nullify the jury.

7          As a related matter, there were notices of a

8    number of affirmative defenses.

9          The Second Amendment and necessity we've already

10   mentioned.

11         With respect to the First Amendment defense, the

12   Court previously ruled that there is no First Amendment

13   right to engage in assaultive or other unlawful conduct.  So

14   Mr. Alberts's conduct on January 6th, to the extent it

15   involved physical violence or unlawful presence or unlawful

16   activities in a restricted area, is not protected by the

17   First Amendment.

18         I'm not quite sure I followed all of Mr. Roots's

19   argument yesterday about certain areas of the Capitol not

20   actually being restricted, but to the extent the defense

21   wants to argue that Mr. Alberts was not in a restricted area

22   or to counter the government's evidence that he was, in

23   fact, in a restricted area, you know, that's up to you.

24         And finally, with respect to the so-called

25   justification defenses, which I take to mean self-defense or

1    defense of others, as discussed yesterday, the defense can

2    seek to elicit admissible nonexpert testimony and other

3    admissible evidence that Mr. Alberts committed any assault

4    or any -- or engaged in any assaultive conduct in self-

5    defense.  And I will decide at the end of the evidence

6    whether there is sufficient evidence to give a self-defense

7    instruction consistent with the recognized elements of self-

8    defense in the context of assaulting a police officer in

9    this jurisdiction.

10           And I must say, I went and rewatched the

11   activities on the steps leading up to the west terrace, and

12   I don't see Mr. Alberts being subjected to any physical

13   force by the officers that I understand he is alleged to

14   have assaulted, nor do I see anything to suggest that he

15   could not have just turned around and avoided that

16   confrontation or that physical interaction or that

17   interaction.

18           So, you know, for those reasons it seems like the

19   more apparent defense is the one that Mr. Roots adverted to

20   yesterday, that the contact with the officers was either

21   nonexistent or accidental or incidental, and all of those

22   arguments would strike me as being inconsistent with a self-

23   defense defense.

24           But, you know, it's your case; it's not mine.  And

25   maybe you folks will point out things in the video that I

1    don't or I have yet to see.

2              Finally, there's a notice of a civil disobedience

3    defense, which, as far as I can tell, is not a recognized

4    affirmative defense in a criminal case as far as the Court

5    knows.

6              So that should dispose of the -- and I read the

7    belated opposition to the government's omnibus motion in

8    limine, and nothing in it altered the Court's rulings on

9    that motion in limine that I gave at the pretrial

10   conference.

11             So with that, there should be, you know, some

12   guardrails for openings.  Obviously don't go into any areas

13   in openings that the Court has excluded.

14             You know, sometimes, Mr. Pierce, in criminal cases

15   if you don't anticipate the defendant is going to -- if you

16   don't in good faith anticipate that the defendant is going

17   to testify, then you can't say what the jury is likely to

18   hear about things that only the defendant can testify about.

19   You follow me, right?

20             MR. PIERCE:  I do, Your Honor.

21             THE COURT:  Okay.

22             MR. PIERCE:  I mean, he is going to testify, but I

23   understand.

24             THE COURT:  Okay.  Counsel, anything else?  I'm

25   sure you're going to remind me of something, Mr. Konig.

1          MR. KONIG:  Just two very brief things.

2          The first is, I don't know if Mr. Roots is

3    doing opening or Mr. Pierce is doing opening, but I'd ask

4    Mr. Pierce to convey the Court's ruling to Mr. Roots if he

5    does intend to have Mr. Roots open.

6          And, secondly, we have provided our slides for our

7    anticipated opening for tomorrow; so we may need five

8    minutes before the opening so, if he has any objections to

9    put on the record, that he can do so outside the presence of

10   the jury.

11         THE COURT:  Sure.  Mr. Pierce, who's opening

12   tomorrow?

13         MR. PIERCE:  I intend to, Your Honor.

14         THE COURT:  Okay.  Great.

15         And if you have a PowerPoint or a demonstrative,

16   let Mr. Konig see it soon enough before so he can lodge any

17   objections in the morning.

18         MR. PIERCE:  Absolutely.

19         THE COURT:  All right.  Have a good night.  We'll

20   see you in the morning.

21         (Whereupon the hearing was

22          adjourned at 5:03 p.m.)

23

24

25

1                **CERTIFICATE OF OFFICIAL COURT REPORTER**

2

3              I, LISA A. MOREIRA, RDR, CRR, do hereby

4      certify that the above and foregoing constitutes a true and

5      accurate transcript of my stenographic notes and is a full,

6      true and complete transcript of the proceedings to the best

7      of my ability.

8          Dated this 24th day of April, 2023.

9

10                                /s/Lisa A. Moreira, RDR, CRR
                                  Official Court Reporter
11                                United States Courthouse
                                  Room 6718
12                                333 Constitution Avenue, NW
                                  Washington, DC 20001
13

14

15

16

17

18

19

20

21

22

23

24

25