```
1              IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF COLUMBIA
2
       - - - - - - - - - - - - - - - x
3      THE UNITED STATES OF AMERICA,
                                     Criminal Action No.
4                   Plaintiff,       1:21-cr-00026-CRC-1
                                     Wednesday, April 12, 2023
5      vs.                           9:33 a.m.

6      CHRISTOPHER ALBERTS,          *MORNING SESSION*

7                   Defendant.
       - - - - - - - - - - - - - - - x
8

9      _____

10                  TRANSCRIPT OF JURY TRIAL
            HELD BEFORE THE HONORABLE CHRISTOPHER R. COOPER
11                  UNITED STATES DISTRICT JUDGE
       _____
12
       APPEARANCES:
13
       For the United States:    JORDAN ANDREW KONIG, ESQ.
14                               U.S. DEPARTMENT OF JUSTICE
                                 P.O. Box 55
15                               Ben Franklin Station
                                 Washington, DC 20044
16                               (202) 305-7917
                                 jordan.a.konig@usdoj.gov
17
                                 SAMUEL DALKE, ESQ.
18                               DOJ-USAO
                                 228 Walnut Street, Suite 220
19                               Harrisburg, PA 17101
                                 (717) 221-4453
20                               samuel.s.dalke@usdoj.gov

21                               SHALIN NOHRIA, ESQ.
                                 UNITED STATES ATTORNEY'S OFFICE
22                               601 D Street NW
                                 Suite Office 6.713
23                               Washington, DC 20001
                                 (202) 344-5763
24                               shalin.nohria@usdoj.gov

25
       (CONTINUED ON NEXT PAGE)
```

(CONTINUED ON NEXT PAGE)

```
1    APPEARANCES (CONTINUED):

2    For the Defendant:          JOHN M. PIERCE, ESQ.
                                 ROGER ROOTS, ESQ.
3                                JOHN PIERCE LAW P.C.
                                 21550 Oxnard Street
4                                Suite 3rd Floor OMB #172
                                 Woodland Hills, CA 91367
5                                (213) 400-0725
                                 jpierce@johnpiercelaw.com
6                                rroots@johnpiercelaw.com

7
     Court Reporter:            Lisa A. Moreira, RDR, CRR
8                               Official Court Reporter
                                U.S. Courthouse, Room 6718
9                               333 Constitution Avenue, NW
                                Washington, DC  20001
10                              (202) 354-3187

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    P R O C E E D I N G S
 2            THE COURTROOM DEPUTY:  Your Honor, we're back on
 3   the record for Criminal Case 21-26, United States of America
 4   vs. Christopher Alberts.
 5            Counsel, please approach the lectern and identify
 6   yourselves for the record, starting with the government.
 7            MR. KONIG:  Good morning, Your Honor; Jordan Konig
 8   for the United States.  I'm joined again by Assistant United
 9   States Attorney Samuel Dalke.  I'm also joined via cell
10   phone by Assistant United States Attorney Shalin Nohria.  I
11   thank the Court for your courtesy and the courtesy of your
12   staff for virtually participating in the proceedings.  He
13   won't be participating.  He's a little under the weather and
14   appreciates to be able to listen in before he returns in
15   full health.
16            THE COURT:  Okay.  Good morning, everybody.
17            MR. PIERCE:  Good morning, Your Honor; John Pierce
18   on behalf of Defendant Alberts.  Mr. Roots will be back
19   shortly from the other trial.  And I did have one or two
20   housekeeping matters at some point I'd just like to raise.
21            THE COURT:  All right.  We've got jurors waiting.
22            MR. PIERCE:  Okay.
23            THE COURT:  Go ahead.
24            MR. PIERCE:  So number one is -- I remember when
25   you went through the process of juror selection, you said
```

1    something to the effect of with respect to the alternates,

2    to not use one's peremptory strikes initially, and I was

3    just -- I was hoping you could just re-explain.

4              THE COURT:  Yes.  Once we get a qualified pool,

5    before we bring them in, I'll go over the procedures once

6    again.

7              MR. PIERCE:  Okay.  And then secondly, with

8    respect to Ms. Miller -- and I did confer briefly with

9    Mr. Konig on this --

10             THE COURT:  Who is Ms. Miller?

11             MR. PIERCE:  So Ms. Miller is going to be a --

12   Defendant Alberts's fiancee, and she's going to be just a

13   character witness, and we were hoping and wondering, because

14   she's just a character witness, if she can also be in the

15   gallery, you know, to provide moral support, et cetera, if

16   that's okay?

17             THE COURT:  Mr. Konig?

18             MR. KONIG:  Yes, we certainly don't oppose as long

19   as her role in the case is limited to character testimony.

20   I don't think that would run afoul of the rule of

21   sequestration.

22             THE COURT:  Very well.

23             Okay.  So by my count, we ended up with 29

24   qualified jurors yesterday.  We had one who -- No. 449, who

25   has that probate appointment on Friday.  I'd like to let her

1    go to that, if possible.  So I don't think we will need her,

2    but why don't we just keep going and see if we can get to

3    about 35, which is 32 with a few buffers, and then go from

4    there.  All right?

5          Hold on, Lauren.  The next one is 359.  Is that

6    right?

7          THE COURTROOM DEPUTY:  Yes.

8          THE COURT:  Okay.

9          THE COURTROOM DEPUTY:  Your Honor, Juror No. 0359.

10         THE COURT:  Okay.  Step right up, sir.

11         PROSPECTIVE JUROR 0359:  Okay.

12         THE COURT:  Feel free to slip your mask off so we

13   can see and hear you.

14         PROSPECTIVE JUROR 0359:  Sure.

15         THE COURT:  You're Mr. Harris?

16         PROSPECTIVE JUROR 0359:  Yes.

17         THE COURT:  All right.  And it says here you're a

18   systems administrator for something called NetOps Solutions.

19         PROSPECTIVE JUROR 0359:  Correct.

20         THE COURT:  Tell us what that is.

21         PROSPECTIVE JUROR 0359:  NetOps is a cyber

22   security company, and -- well, various contracts at the

23   Pentagon.

24         THE COURT:  Okay.  Other than the defense

25   department, do you have any contracts with other federal

1    government agencies?

2                    PROSPECTIVE JUROR 0359:  No.

3                    THE COURT:  Okay.  Do you have a significant

4    other?

5                    PROSPECTIVE JUROR 0359:  Yes.

6                    THE COURT:  And what do they do?

7                    PROSPECTIVE JUROR 0359:  Retired teacher.

8                    THE COURT:  Teacher, okay.

9            You answered yes to a number of my questions.  You

10   live or work near Capitol Hill; is that right?

11                   PROSPECTIVE JUROR 0359:  Well, I live in Northwest

12   D.C., but I was raised in D.C.

13                   THE COURT:  Okay.  Do you live on Capitol Hill?

14                   PROSPECTIVE JUROR 0359:  No, I do not.

15                   THE COURT:  Okay.  Where is your office?

16                   PROSPECTIVE JUROR 0359:  Say that again?

17                   THE COURT:  Where is your office?

18                   PROSPECTIVE JUROR 0359:  My office is at the

19   Pentagon.

20                   THE COURT:  At the Pentagon.

21           All right.  You answered yes to Question 18, which

22   is the question that asks whether the nature of the charges

23   might make it difficult for you to serve as a fair and

24   impartial juror in this case.  And why did you answer yes to

25   that?  Or having strong feelings about January 6th.

```
1              PROSPECTIVE JUROR 0359:  Yes.  Being a District
2    resident, just the process of not having the rights -- of
3    course protesting is proper, but certain things I do not
4    agree with.
5              THE COURT:  Okay.  So obviously a lot of people
6    came to Washington on January 6th from all parts of the
7    country.  They came for different reasons.
8              PROSPECTIVE JUROR 0359:  Right.
9              THE COURT:  They did and did not do lots of
10   different things.
11             PROSPECTIVE JUROR 0359:  Right.
12             THE COURT:  You know, January 6th in general is
13   not on trial here, but this young man is on trial.  And so
14   the question is, could you put aside whatever feelings you
15   might have about the events generally or what other people
16   did and consider the evidence for and against Mr. Alberts
17   and render a partial verdict?  Be honest with me.
18             PROSPECTIVE JUROR 0359:  I would say it would be
19   difficult.
20             THE COURT:  It would be difficult.  All right.
21             Thank you very much for your honesty, and you can
22   step down.
23             All right.  The Court will strike Juror 359 for
24   cause based on his answer to Question 18.
25             THE COURTROOM DEPUTY:  Your Honor, Juror No. 1288.
```

```
1              THE COURT:  Good morning, ma'am.

2              PROSPECTIVE JUROR 1288:  Good morning.

3              THE COURT:  You can slip your mask off, if you'd

4     like.

5              PROSPECTIVE JUROR 1288:  Okay.

6              THE COURT:  You're Ms. Taylor?

7              PROSPECTIVE JUROR 1288:  Yes, uh-huh.

8              THE COURT:  All right.  I don't have occupation

9     information for you.  Are you retired, ma'am?

10             PROSPECTIVE JUROR 1288:  Yes, uh-huh.

11             THE COURT:  And where did you work before you

12    retired?

13             PROSPECTIVE JUROR 1288:  I worked at AARP for 25

14    years, and then I went to International Venture Capital

15    Association.

16             THE COURT:  Okay.  And do you have a significant

17    other?

18             PROSPECTIVE JUROR 1288:  Yes.

19             THE COURT:  And what do they do?

20             PROSPECTIVE JUROR 1288:  He's retired also.  He

21    worked in the school system, D.C. school system.

22             THE COURT:  Okay.  You answered yes to a number of

23    my questions, including the extreme hardship question, No.

24    40.

25             PROSPECTIVE JUROR 1288:  Uh-huh.
```

```
 1              THE COURT:  Why did you answer yes to that one?

 2              PROSPECTIVE JUROR 1288:  Well, my brother-in-law

 3     is a D.C. cop, and we've actually talked about this case a

 4     lot at Sunday family dinners.

 5              THE COURT:  Okay.  Was he at the Capitol on

 6     January 6th?

 7              PROSPECTIVE JUROR 1288:  Yes.

 8              THE COURT:  Was he particularly affected?  Was he

 9     injured?

10              PROSPECTIVE JUROR 1288:  No, he wasn't injured.

11     He was just there every day.

12              THE COURT:  He was --

13              PROSPECTIVE JUROR 1288:  He was there down at the

14     Capitol, uh-huh.

15              THE COURT:  Okay.  And do you think that hits a

16     little too close to home?  Would it make it hard for you to

17     serve as a juror?

18              PROSPECTIVE JUROR 1288:  I think so.  Yes, sir, I

19     do.

20              THE COURT:  All right.  You can step down.

21              PROSPECTIVE JUROR 1288:  All right.  Thank you.

22              THE COURT:  Thank you.

23              All right.  The Court will strike 1288 for cause

24     based on her brother's employment with MPD and his presence

25     at the Capitol on January 6th.
```

```
 1                    We're stumbling out of the blocks, Counsel.

 2                    THE COURTROOM DEPUTY:  Your Honor, Juror No. 0402.

 3                    THE COURT:  Good morning, sir.

 4                    PROSPECTIVE JUROR 0402:  Good morning.

 5                    THE COURT:  How are you?  You're Mr. Lewis?

 6                    PROSPECTIVE JUROR 0402:  Yes.

 7                    THE COURT:  And you operate your own trucking

 8       company; is that right?

 9                    PROSPECTIVE JUROR 0402:  Correct.

10                    THE COURT:  How long have you been doing that?

11                    PROSPECTIVE JUROR 0402:  About 30 years.

12                    THE COURT:  Okay.  Do you have a significant

13       other?

14                    PROSPECTIVE JUROR 0402:  Yes.

15                    THE COURT:  And what do they do?

16                    PROSPECTIVE JUROR 0402:  She works for the

17       Department of Transportation.

18                    THE COURT:  D.C. or federal?

19                    PROSPECTIVE JUROR 0402:  Federal.

20                    THE COURT:  She didn't have any involvement in

21       January 6th?

22                    PROSPECTIVE JUROR 0402:  No.

23                    THE COURT:  All right.  You answered yes to one of

24       my questions, No. 35.  You have prior jury experience?

25                    PROSPECTIVE JUROR 0402:  No, I have not.  That was
```

1    actually my wife.  She's actually in jury duty right now as

2    we speak in another courthouse.

3              THE COURT:  All right.  And you'd be all right

4    serving on a jury at the same time as she's serving?

5              PROSPECTIVE JUROR 0402:  Yes.

6              THE COURT:  Okay.  You've followed January 6th at

7    least somewhat, right?  Do you remember when it happened?

8              PROSPECTIVE JUROR 0402:  I mean, yes.  I'm aware

9    of it.

10             THE COURT:  Okay.  So when you were in the

11   audience yesterday, and I told you that this case was about

12   January 6th, did anything pop into your mind?

13             PROSPECTIVE JUROR 0402:  Not really, other than

14   what you see in the news.

15             THE COURT:  Okay.  Counsel?

16             MR. DALKE:  Good morning, Mr. Lewis.

17             PROSPECTIVE JUROR 0402:  Good morning.

18             MR. DALKE:  No questions, thank you.

19             THE COURT:  Mr. Pierce?

20             MR. PIERCE:  No questions, Your Honor.  Thank you,

21   sir.

22             THE COURT:  Okay.  Thank you, sir.  You can step

23   down.

24             All right.  Any challenge to 402?

25             MR. DALKE:  Not from the government, no, Your

```
 1   Honor.

 2              MR. PIERCE:  No, Your Honor.

 3              THE COURT:  All right.  402 is qualified.

 4              THE COURTROOM DEPUTY:  Your Honor, Juror No. 1595.

 5              THE COURT:  Good morning, ma'am.

 6              PROSPECTIVE JUROR 1595:  Good morning.

 7              THE COURT:  You can take your mask off.

 8              PROSPECTIVE JUROR 1595:  Okay.

 9              THE COURT:  You're Ms. Melvin?

10              PROSPECTIVE JUROR 1595:  Yes.

11              THE COURT:  All right.  It says here you're a crew

12   member at BurnBox.  Tell us what BurnBox is.

13              PROSPECTIVE JUROR 1595:  BurnBox is a pizza

14   company owned by --

15              THE COURT:  Pizza company?

16              PROSPECTIVE JUROR 1595:  Yes, sir.  It's owned by

17   two black owners named Sean and Ryan, and they also are the

18   owners of Smoothie King as well.

19              THE COURT:  How's the pizza?

20              PROSPECTIVE JUROR 1595:  It's real good.

21              THE COURT:  What's your favorite?

22              PROSPECTIVE JUROR 1595:  I build mine.  It has

23   crab meet.  You can have anything on it.  There's 24

24   toppings you get.

25              THE COURT:  All right.  I'll have to try it.
```

1           Do you have a significant other?

2           PROSPECTIVE JUROR 1595:  No, sir.

3           THE COURT:  No, okay.

4           You answered yes to a few of my questions,

5    including No. 2, which is the question about whether you

6    think you might know something about this case.  You think

7    you've heard of this case before, or Mr. Alberts?

8           PROSPECTIVE JUROR 1595:  I didn't put No. 2.  I

9    thought it was like thirty-something because when you were

10   talking about felonies and things like that and your close

11   relatives.

12          THE COURT:  Okay.  Is this your card, ma'am?  This

13   is not your card, is it?

14          PROSPECTIVE JUROR 1595:  No, that's not my number

15   at the top.

16          THE COURT:  Hold on.  All right.  I'll tell you

17   what, I'm not sure if I have your card, but why don't you

18   tell me which questions you remember answering yes to.

19          PROSPECTIVE JUROR 1595:  It was when you asked

20   about the felony of someone in your family.

21          THE COURT:  Yes, someone you know has been

22   charged --

23          PROSPECTIVE JUROR 1595:  Yes.

24          THE COURT:  -- or convicted of a crime?

25          PROSPECTIVE JUROR 1595:  Yes.

```
1            THE COURT:  Tell me about that.
2            PROSPECTIVE JUROR 1595:  My younger brother, his
3     name is Tyree Melvin.  I don't know so much of what's going
4     on, but I know he has charges in D.C., Maryland, and
5     Virginia --
6            THE COURT:  Okay.
7            PROSPECTIVE JUROR 1595:  -- that are open, and he
8     also have warrants and stuff out on him.  Right now he's in
9     Montgomery County jail.
10           THE COURT:  Okay.  You don't have to go into the
11    details.  But do you have any reason to believe that he was
12    not treated fairly in his cases one way or the other?
13           PROSPECTIVE JUROR 1595:  Yes.
14           THE COURT:  Uh-huh.  And would his experience with
15    the criminal justice system, you think, affect your ability
16    to serve on a jury in a different case?
17           PROSPECTIVE JUROR 1595:  No.
18           THE COURT:  No.  You wouldn't hold against
19    Mr. Alberts or the government any experience that your
20    brother may have --
21           PROSPECTIVE JUROR 1595:  No.
22           THE COURT:  Okay.  Have you followed January 6th
23    at all?
24           PROSPECTIVE JUROR 1595:  No.
25           THE COURT:  Not so much.  So when I asked
```

```
 1    whether -- I told you that the case was about January 6th,

 2    did anything pop into your mind one way or the other?

 3              PROSPECTIVE JUROR 1595:  Uh-uh, no.

 4              THE COURT:  No?  Okay.

 5              Counsel?

 6              MR. DALKE:  Good morning, Ms. Melvin.

 7              PROSPECTIVE JUROR 1595:  Good morning.

 8              MR. DALKE:  You were talking about the matters

 9    with your brother.  Do you know whether they involve the

10    MPD, the Metropolitan Police Department?

11              PROSPECTIVE JUROR 1595:  I think so.

12              MR. DALKE:  Do you have any particularly strong

13    feelings about the MPD in particular?

14              PROSPECTIVE JUROR 1595:  No.

15              MR. DALKE:  Do you know whether the U.S.

16    Attorney's Office in D.C. are the prosecutors on any of

17    those cases with your brother?

18              PROSPECTIVE JUROR 1595:  Not that I know of.

19              MR. DALKE:  Thank you.  I appreciate your time.

20              PROSPECTIVE JUROR 1595:  No problem.

21              MR. PIERCE:  No questions.  Thank you very much.

22              THE COURT:  Okay.  Thank you, ma'am.  You can step

23    down.

24              PROSPECTIVE JUROR 1595:  Thank you.

25              THE COURT:  So, Counsel, she wrote down the wrong
```

```
 1     number.  The only affirmative responses were 27 and 29, so
 2     she covered it.
 3               Any challenge to 1595?
 4               MR. DALKE:  Not from the government, no, Your
 5     Honor.
 6               MR. PIERCE:  Not from the defense, Your Honor.
 7               THE COURT:  Okay.  She is qualified.
 8               THE COURTROOM DEPUTY:  Your Honor, Juror No. 0551.
 9               THE COURT:  All right.  Step right up, sir.  Good
10     morning.
11               PROSPECTIVE JUROR 0551:  Good morning, Your Honor.
12               THE COURT:  You can slip your mask off.
13               THE COURTROOM DEPUTY:  Just be mindful of the
14     microphone.
15               PROSPECTIVE JUROR 0551:  Okay.
16               THE COURT:  You're Mr. Marsh?
17               PROSPECTIVE JUROR 0551:  I am, sir.
18               THE COURT:  And you're a lawyer with the
19     Department of Energy; is that right?
20               PROSPECTIVE JUROR 0551:  I am.
21               THE COURT:  What's your role there?
22               PROSPECTIVE JUROR 0551:  I'm a legislative and
23     regulatory attorney at the Department of Energy, but I've
24     only been there about two months.  I was at the Department
25     of Justice before that.
```

```
 1              THE COURT:  Where in DOJ?
 2              PROSPECTIVE JUROR 0551:  I was in the criminal
 3    division, narcotics and dangerous drugs section.
 4              THE COURT:  Mr. Konig is at Main Justice in the
 5    tax division.  You folks don't know each other, I take it?
 6              PROSPECTIVE JUROR 0551:  No, sir.
 7              THE COURT:  Okay.  Did any of your
 8    responsibilities in the criminal division involve January
 9    6th at all?
10              PROSPECTIVE JUROR 0551:  None of my
11    responsibilities, no.
12              THE COURT:  Okay.  Obviously this case is being
13    prosecuted by DOJ.  DOJ has lots of different lawyers that
14    do different things.  Do you think it would be a little too
15    close to home for you to sit as a juror on a January 6th
16    case?
17              PROSPECTIVE JUROR 0551:  I certainly know people
18    who have worked on these cases, Your Honor, but I don't know
19    whether that would impact my ability to serve as a juror.
20              THE COURT:  Well, you tell me.
21              PROSPECTIVE JUROR 0551:  That would not be the
22    main thing, Your Honor, that would impact my ability to
23    serve as a juror.  There are other responses that would.
24              THE COURT:  Okay.  Why don't you tell me what the
25    other things are.
```

1          PROSPECTIVE JUROR 0551:  Sure.  Up until recently

2     I lived on Capitol Hill for about eight years, and on

3     January 6th I was at home, and I went down that morning just

4     to kind of take a look at what was going on.  I went home

5     like everybody else, just went back to work.

6          And then when the news broke of what was

7     happening, my son was actually in a child care arrangement

8     maybe two blocks from the Capitol, and in retrospect I

9     should have just left him there.  But we saw what was

10    happening on the news.  The people were maybe -- you know,

11    there were bomb threats and all this stuff going on, so I

12    went and got him.  And the streets were empty.  There were

13    police everywhere, except for people fleeing the Capitol.

14          So I was pushing my son in a stroller, and we came

15    around a corner, and there were these two overweight guys

16    with beards and camouflage carrying spears, with me and my

17    son in a stroller.

18          They looked at me, and I looked at them.  They

19    went their way.  I went my way.  But that was a very

20    memorable experience.  And so as you might imagine, I have

21    pretty strong feelings about what happened that day.

22          I also reported one person who was a friend of a

23    friend through the FBI's portal who has been -- I don't

24    think he's been indicted, but he was investigated for his

25    participation.

1    THE COURT:  So obviously a lot of people came to

2    Washington that day from all different places for different

3    reasons, did different things, did not do different things.

4    PROSPECTIVE JUROR 0551:  Yes, sir.

5    THE COURT:  I take it by your answers you're not

6    familiar with Mr. Alberts or his case?

7    PROSPECTIVE JUROR 0551:  I am not.

8    THE COURT:  Okay.  And so I guess the question is,

9    could you -- and be honest with me -- you know, put aside

10   the experience that you had with your son that day in

11   assessing the guilt or innocence of this person as opposed

12   to what you may think about January 6th participants more

13   generally?

14   PROSPECTIVE JUROR 0551:  Yes.  Yes, Your Honor.  I

15   can follow the Court's instructions and be fair.

16   THE COURT:  And, again, you're not familiar with

17   any of the facts of this particular case?

18   PROSPECTIVE JUROR 0551:  I am not.  I've read news

19   coverage generally, but I can't think of anything regarding

20   the particular defendant.  It seems vaguely familiar, but,

21   you know, there's been a lot of news coverage.

22   THE COURT:  Okay.  You answered yes to 29, you or

23   a close friend or family member has been the victim or

24   witness to a crime.  Is this what you were referring to

25   earlier, or something else?

```
1              PROSPECTIVE JUROR 0551:  No, sir.  My mother's
2      home was burglarized a couple of years ago.
3              THE COURT:  Okay.  Was that in Washington?
4              PROSPECTIVE JUROR 0551:  In Washington State.
5              THE COURT:  Washington State?
6              PROSPECTIVE JUROR 0551:  Yes, sir.
7              THE COURT:  And was it solved?
8              PROSPECTIVE JUROR 0551:  It was not.
9              THE COURT:  And do you assign any fault or have
10     any problem with the way the case was handled either by the
11     police or the prosecutor's office?
12             PROSPECTIVE JUROR 0551:  No, sir.
13             THE COURT:  No.
14             And you know folks who have worked for Congress in
15     some capacity?
16             PROSPECTIVE JUROR 0551:  Yes, sir, as have I.
17             THE COURT:  I'm sorry, you worked for Congress?
18             PROSPECTIVE JUROR 0551:  I did.  My first job
19     after college was working for my congressman for my home
20     district, who is still a member of Congress today.
21             THE COURT:  Who is that?
22             PROSPECTIVE JUROR 0551:  Adam Smith, who is the
23     ranking member of the House Services Committee.
24             THE COURT:  Where is Mr. Smith from?
25             PROSPECTIVE JUROR 0551:  Washington State as well.
```

1    It used to be -- it was the Ninth District then, south of

2    Seattle.  And now he's in the Department of --

3            THE COURT:  Have you spoken with Congressman Smith

4    or anybody on his staff about January 6th?

5            PROSPECTIVE JUROR 0551:  No.  No, I have not.

6            THE COURT:  Okay.  Counsel?

7            MR. DALKE:  Good morning, Mr. Marsh.

8            PROSPECTIVE JUROR 0551:  Good morning.

9            MR. DALKE:  No questions.  Thank you.

10           MR. PIERCE:  Good morning, sir.

11           PROSPECTIVE JUROR 0551:  Good morning.

12           MR. PIERCE:  So you mentioned that you know, I

13   think you said, multiple DOJ lawyers who are handling

14   January 6th cases or who are involved in January 6th?

15           PROSPECTIVE JUROR 0551:  Yes.  It's such a big

16   category of cases that people have been detailed to them.

17   So, for example, there's an attorney in my previous office

18   who was detailed to a January 6th case.  There was some

19   overlap with his previous experience so he prosecuted one.

20           I know another attorney from my time in the

21   criminal division did something similar.

22           MR. PIERCE:  So we're talking about two that you

23   can recall.  Are there any more that you can recall?

24           PROSPECTIVE JUROR 0551:  Let's see.

25           I mean -- can I say names out loud, or do --

```
 1              MR. PIERCE:  I don't need to hear the names.  I

 2     was just curious kind of the number of lawyers or the number

 3     of DOJ personnel that are involved in January 6th, to your

 4     knowledge, that you know or had conversations with.

 5              PROSPECTIVE JUROR 0551:  I can think of three that

 6     I know that I've worked with.  And then there are others who

 7     may have worked on aspects of it that I don't know.

 8              MR. PIERCE:  And those are all attorneys?

 9              PROSPECTIVE JUROR 0551:  All attorneys, all on the

10     prosecution side.

11              MR. PIERCE:  Okay.

12              THE COURT:  Let me just interject.

13              Are those close friends, or just work

14     acquaintances?

15              PROSPECTIVE JUROR 0551:  Work acquaintances, Your

16     Honor.

17              THE COURT:  And have you spoken to any of those

18     folks about January 6th generally or the cases that

19     they've -- are handling?

20              PROSPECTIVE JUROR 0551:  Yes, Your Honor.  One of

21     them I saw at the office holiday party after he just

22     concluded his trial, and we spoke for maybe an hour in

23     detail about strategy, evidence, how the case developed, why

24     he was assigned to it.

25              I have a former military background.  I used to be
```

1    in the Navy, and he's a former Marine.  And the defendant in

2    that case was a former Air Force colonel.  And there was a

3    sort of military aspect to the evidence, and that's why he

4    was assigned.

5            THE COURT:  So, you know, one of the risks of

6    putting lawyers on juries -- and in D.C. we have to put

7    lawyers on our juries because we wouldn't have juries

8    otherwise.  But one of the risks is that they would, you

9    know, unduly influence the deliberations because of their

10   specialized knowledge, particularly if the knowledge is in

11   the same area as the case, which your criminal division

12   experience would be here.

13           Do you think that's a concern for you?

14           PROSPECTIVE JUROR 0551:  Only in the general

15   sense, Your Honor.  I was trained the same way when I was

16   prosecuting cases about that risk, about people with a legal

17   background on the panel.

18           But sitting here -- it's the first time I've ever

19   sat in this kind of thing -- I know I can be fair and

20   impartial and follow the Court's instructions.

21           THE COURT:  Okay.  Let me ask you this question.

22   If you were to serve on the jury and sit through the case

23   and be convinced that the government had not proven its case

24   beyond a reasonable doubt, would you have any concerns about

25   how a not guilty verdict would be received by the colleagues

1     that you know who have worked on January 6th cases or any of

2     your other former DOJ colleagues?

3               PROSPECTIVE JUROR 0551:  No, Your Honor.

4               MR. PIERCE:  So would you consider the -- so it

5     sounds like -- and I'm not going to ask about the details of

6     the conversations, but it sounds like that you had what you

7     said were discussions about a particular case, discussions

8     about evidence strategy, et cetera.  Is that fair?

9               PROSPECTIVE JUROR 0551:  That's right.

10              MR. PIERCE:  Okay.  Would you consider -- I mean,

11    as an attorney yourself -- this is not an ethics exam, but

12    would you consider as a DOJ -- let me back up.

13              Were you a DOJ attorney at the time that you had

14    those discussions?

15              PROSPECTIVE JUROR 0551:  I was.

16              MR. PIERCE:  Would you consider those discussions

17    to be either work product protected or attorney-client

18    privilege?

19              PROSPECTIVE JUROR 0551:  No, no.

20              MR. PIERCE:  And why is that?

21              PROSPECTIVE JUROR 0551:  I mean, it's funny.  Let

22    me make sure.  You said it's not an ethics exam.

23              MR. PIERCE:  I'm not trying to catch you.

24              PROSPECTIVE JUROR 0551:  So it was post-verdict,

25    post-sentencing, in a social environment in an office

1    holiday party sort of thing.

2          Yes, I just can't think of any way that work

3    product or privilege would attach to the conversation.  Two

4    colleagues -- I don't know if we had a beer, but kind of

5    almost like over a beer talking about here's how this whole

6    thing went, here's how we did what we did, here's how the

7    case --

8          MR. PIERCE:  Would you consider that information

9    that you learned and discussed to be confidential

10   information under the attorney ethics rules?

11         PROSPECTIVE JUROR 0551:  Sitting here now -- you

12   know, I wouldn't talk about -- I wouldn't talk about it

13   publicly, what I talked about with the DOJ colleague or how

14   they prosecuted a case.  But to what extent it's protected

15   by confidentiality, I'm not sure.

16         MR. PIERCE:  Okay.  And the experience with your

17   son, you mentioned.

18         PROSPECTIVE JUROR 0551:  Yes.

19         MR. PIERCE:  Young son in a stroller?

20         PROSPECTIVE JUROR 0551:  That's right.

21         MR. PIERCE:  Could you please just describe that

22   incident in a little bit more detail in terms of what

23   happened and sort of how it affected you?

24         PROSPECTIVE JUROR 0551:  Sure.  I mean, January

25   6th has been thought about and discussed, and we're all so

1    familiar with it, but there are so many aspects to it.

2    There are so many people involved.

3            And one of the things is Capitol Hill is a

4    neighborhood.  It was our home.  And for something that

5    just, you know, disruptive and violent and all of the things

6    that were happening in our neighborhood I think really left

7    a mark on a lot of the people who lived there at the time.

8    And, you know, smoke in the air, Metrobuses full of police

9    officers, and people fleeing the Capitol, just all the

10   things that are happening, and there's just this sort of

11   sense of lawlessness in our own neighborhood.

12           And to be there with a two-year-old at the time,

13   that's the memory that I take away from it the most.  And it

14   made me very angry at the time.

15           MR. PIERCE:  It made you very angry.

16           PROSPECTIVE JUROR 0551:  Very angry at the time,

17   yes.

18           MR. PIERCE:  Did you feel concerned on behalf of

19   the safety of your son at that moment?

20           PROSPECTIVE JUROR 0551:  Not -- I mean, in sort of

21   a general sense.  The people that we encountered didn't look

22   like they were going to attack a two-year-old in a stroller.

23           MR. PIERCE:  Thank you.

24           And then the person who you -- you mentioned that

25   you reported somebody for involvement in January 6th?

1          PROSPECTIVE JUROR 0551:  I did.  That's correct.

2          MR. PIERCE:  That was a friend?  Acquaintance?

3          PROSPECTIVE JUROR 0551:  A friend of a friend.

4          MR. PIERCE:  A friend of a friend.

5          Did you know that person?

6          PROSPECTIVE JUROR 0551:  I did.  I hadn't seen

7    them in a long time.

8          MR. PIERCE:  And why did you report him?

9          PROSPECTIVE JUROR 0551:  I was on a text thread

10   with some very close friends, and there was like photography

11   and photographs that were being released.  This was -- this

12   was January still of 2021, so not everyone had been

13   identified.  This was really early.

14          And someone sent on this text thread a close-up

15   picture of this person and said, "That's him.  He was

16   there."

17          And I asked, "Well, the FBI's trying to figure out

18   who was there.  Has anyone reported it?"

19          And everyone said no.

20          And "Look, you've got to report it.  I have no

21   idea whether they did anything or not, but we have to report

22   it."

23          So I went to the portal and reported it.

24          Several months later I got a call from an FBI

25   agent, and they worked up the case.  And then I read about

1  it in the news.  And there was subsequent law enforcement

2  activity, but I don't believe this person was charged.

3         MR. PIERCE:  Okay.  And then finally, Congressmen

4  Smith, I think you said.  I take it as him being a ranking

5  member, he's a Democrat?

6         PROSPECTIVE JUROR 0551:  He's a Democrat.

7         MR. PIERCE:  Okay.  Thank you very much, sir.

8         THE COURT:  Okay.  You can step down.

9         PROSPECTIVE JUROR 0551:  Thank you, Your Honor.

10         THE COURT:  Mr. Pierce?

11         MR. PIERCE:  Yes, Your Honor.  We would challenge

12  the witness for cause based on, you know, being at the DOJ

13  and having what sounded to me to be either having work-

14  product protected or attorney-client protected confidential

15  communication with a prosecutor about a particular DOJ case.

16  We think that brings in too much risk that he could, you

17  know, sort of influence the jury regarding evidence strategy

18  as a lawyer, et cetera.

19         Also, the experience with his son, he was angry

20  about it.  It has left a mark on him.  I'm not sure he could

21  actually be fair in that regard.

22         And then he did -- you know, he reported somebody

23  for January 6th.

24         And so for all those reasons, we move to strike.

25         THE COURT:  Mr. Dalke?

1          MR. DALKE:  Your Honor, we believe that he stated

2      a number of times that he could be fair and impartial in

3      this case.  The fact that he observed other individuals or

4      even believed other individuals to have committed crimes

5      doesn't mean that he would have a bias against Mr. Alberts

6      and believe that he'd committed crimes on January 6th.

7          I'll note that Ms. James, Juror No. 726, was

8      qualified when she was actually part of the January 6th

9      protest and stated that, I believe, the certification should

10     not have occurred and that she believed that the news

11     sources that reported on crimes at the Capitol were untrue.

12         So I believe that there's no basis to strike this

13     juror for cause.

14         THE COURT:  Okay.  There are a number of factors,

15     but I think he rehabilitated himself and said that he could

16     put aside his general perceptions of January 6th as well as

17     his association with former DOJ colleagues.  So obviously,

18     Mr. Pierce, feel free to use one of your peremptories, but I

19     will qualify him.

20         THE COURTROOM DEPUTY:  Your Honor, Juror No. 0213.

21         THE COURT:  Good morning, ma'am.

22         PROSPECTIVE JUROR 0213:  Good morning.

23         THE COURT:  Feel free to slip your mask off, if

24     you'd like.

25         You are Ms. Edelstein?

```
 1                  PROSPECTIVE JUROR:  Yes.

 2                  THE COURT:  Okay.  All right.  It says here you're

 3       an education technology salesperson with something called

 4       Ellucian.

 5                  PROSPECTIVE JUROR 0213:  Correct.

 6                  THE COURT:  Tell us what that is.

 7                  PROSPECTIVE JUROR 0213:  So I sell software to

 8       higher education universities.

 9                  THE COURT:  All right.  In any particular areas?

10                  PROSPECTIVE JUROR 0213:  So our bread and butter

11       is an ERP, so electronic resource planning solutions; so

12       like the main stuff, and then we sell all of the add-ons, so

13       anything from a global solution or a document solution to a

14       travel and expense solution, across the board.

15                  THE COURT:  Got it.  And do you have a significant

16       other?

17                  PROSPECTIVE JUROR 0213:  No.

18                  THE COURT:  You answered yes to a number of my

19       questions, 19 and 20.

20                  You have followed the news about January 6th and

21       you watched some of the House Select Committee hearings; is

22       that right?

23                  PROSPECTIVE JUROR 0213:  Correct.

24                  THE COURT:  Any takeaways from watching those

25       hearings or following the coverage about January 6th
```

1    generally, just briefly?

2             PROSPECTIVE JUROR 0213:  It was and still is

3    pretty shocking to see.

4             THE COURT:  Uh-huh.

5             PROSPECTIVE JUROR 0213:  Not anything I would ever

6    have participated in.

7             THE COURT:  And regardless of what you may think

8    about the events generally, do you think you would be able

9    to assess the evidence against this young man based just on

10   that evidence and not what you may view about January 6th as

11   a whole?

12            PROSPECTIVE JUROR 0213:  Yes.  I think I can

13   separate my feelings and opinions from facts.

14            THE COURT:  Okay.  You know folks who have worked

15   or do work in law enforcement?

16            PROSPECTIVE JUROR 0213:  Not -- like desk job law

17   enforcement, I guess I'd say.

18            So my best friend from home, who I grew up next

19   door to and am still very close with, she is like a crime

20   analyst for -- started in D.C. and is now with the federal

21   government, and her husband does something similar with the

22   ATF.

23            THE COURT:  Okay.  Do you know what agency your

24   friend works for?

25            PROSPECTIVE JUROR 0213:  I don't know exactly.  I

```
1    know she recently moved to a new role.

2              I want to say maybe the DOD, but I'm not -- I'm

3    not sure.

4              THE COURT:  Okay.  Have you ever discussed January

5    6th with her?

6              PROSPECTIVE JUROR 0213:  Probably.  Not recently,

7    but likely closer to the date it occurred.

8              THE COURT:  Do you remember the tenor of the

9    discussions?  Did she have -- did she express any strong

10   feelings about it?

11             PROSPECTIVE JUROR 0213:  We have similar

12   viewpoints, so it was probably around the shock of the whole

13   situation.

14             THE COURT:  Okay.  And you say she was a friend

15   from back home.  Where is home?

16             PROSPECTIVE JUROR 0213:  Annapolis, Maryland.

17             THE COURT:  Got it.

18             Counsel?

19             MR. DALKE:  No questions, Ms. Edelstein.  Thank

20   you.

21             PROSPECTIVE JUROR 0213:  Thank you.

22             MR. PIERCE:  Good morning.

23             PROSPECTIVE JUROR 0213:  Good morning.

24             MR. PIERCE:  Just quickly.  You described sort of

25   viewing January 6th as shocking.  Could you just elaborate
```

1    on your views in that regard with respect to January 6th?

2            PROSPECTIVE JUROR 0213:  Nothing I ever, I guess,

3    expected to see, the Capitol building overrun.

4            I went to college in D.C., and my first month here

5    9/11 happened, so that was fairly shocking.  It kind of felt

6    the same way where it's hard to really put words to when you

7    see something that is -- there's kind of, you know, a point

8    in history where there's kind of a before and after.

9            MR. PIERCE:  And just last quick question.  In

10   light of your views, would you feel comfortable if you were

11   in Mr. Alberts's shoes having you as a juror in terms of

12   being able to be fair and impartial?

13           PROSPECTIVE JUROR 0213:  Yeah, I think I can

14   separate my feelings from facts and law procedure.  So just

15   because I don't like something or don't agree with something

16   doesn't mean that I can't accept or understand the -- again,

17   the formal process and law pieces around it.

18           MR. PIERCE:  And so if the evidence was such, as

19   applied to the judge's instructions, that you reach a

20   conclusion that he should be not guilty, you could issue

21   that judgment?

22           PROSPECTIVE JUROR 0213:  If that's what is proven.

23           MR. PIERCE:  Okay.  Thank you.

24           THE COURT:  Okay.  Thank you, ma'am.  You can step

25   down.

```
1              Any challenge?
2              MR. DALKE:  Not from the government, no, Your
3      Honor.
4              MR. PIERCE:  Not from the defense, Your Honor.
5              THE COURT:  213 is qualified.
6              THE COURTROOM DEPUTY:  0821.
7              PROSPECTIVE JUROR 0821:  Good morning.
8              THE COURT:  Okay.  Good morning, ma'am.  How are
9      you?
10             PROSPECTIVE JUROR 0821:  All right.
11             THE COURT:  You can slip your mask off, if you'd
12     like.
13             PROSPECTIVE JUROR 0821:  Okay.
14             THE COURT:  You are Ms. Stevenson; is that right?
15             PROSPECTIVE JUROR 0821:  Yes.
16             THE COURT:  I don't have an occupation for you.
17     Are you retired?
18             PROSPECTIVE JUROR 0821:  Yes.
19             THE COURT:  And where did you last work, ma'am?
20             PROSPECTIVE JUROR 0821:  Marshall Heights.
21             THE COURT:  Marshall Heights?
22             PROSPECTIVE JUROR 0821:  Yes, community
23     development, helping people with housing orientation.
24             THE COURT:  Okay.  And do you have a significant
25     other, ma'am?  Are you married?
```

1          PROSPECTIVE JUROR 0821:  Yes, I am.

2          THE COURT:  What does your husband do?

3          PROSPECTIVE JUROR 0821:  Truck driver.

4          THE COURT:  Okay.  You answered -- you wrote down

5     the answers to -- I think the questions you answered yes to,

6     you answered yes to No. 1, which is you might have a health

7     issue that --

8          PROSPECTIVE JUROR 0821:  Well, I have lupus.

9     Sometimes it bothers me.  You know, tiredness and

10    sleepiness.

11         THE COURT:  Okay.  So based on the schedule that I

12    laid out -- 15-minute break in the morning, hour and a half

13    lunch, 15-minute break in the afternoon -- would you have

14    trouble, you think, sitting there and devoting your full

15    attention to the case?

16         PROSPECTIVE JUROR 0821:  Uh-huh.

17         THE COURT:  You think so?

18         PROSPECTIVE JUROR 0821:  Yes.

19         THE COURT:  All right.  So you would have concerns

20    about serving?

21         PROSPECTIVE JUROR 0821:  Yes.

22         THE COURT:  All right.  You can step down, ma'am.

23         PROSPECTIVE JUROR 0821:  Okay.

24         THE COURT:  Thanks.

25         PROSPECTIVE JUROR 0821:  Thank you.

```
1              THE COURT:  1572?  Is that next?

2              I'm sorry, the Court will strike 821 for cause

3      based on hardship, medical issues.

4              THE COURTROOM DEPUTY:  Your Honor, Juror 1572.

5              THE COURT:  Good morning, ma'am.

6              PROSPECTIVE JUROR 1572:  Good morning.

7              THE COURT:  How are you?  You're Ms. Borsos.

8              PROSPECTIVE JUROR 1572:  I am.

9              THE COURT:  Okay.  Feel free to slip your mask

10     off.

11             PROSPECTIVE JUROR 1572:  Okay.

12             THE COURT:  And you are a lawyer with the IRS; is

13     that right?

14             PROSPECTIVE JUROR 1572:  I am.

15             THE COURT:  And what do you do generally?

16             PROSPECTIVE JUROR 1572:  I work on regulatory

17     guidance, and I assist on technical international tax

18     matters for corporations under audit.

19             THE COURT:  Okay.  And did you practice somewhere

20     else before you joined the IRS?

21             PROSPECTIVE JUROR 1572:  I did.  I worked at

22     Caplin & Drysdale.  It's a law firm here in D.C.

23             THE COURT:  So you're a tax specialist?

24             PROSPECTIVE JUROR 1572:  I am.

25             THE COURT:  Where did you go to law school?
```

```
 1                    PROSPECTIVE JUROR 1572:  I went to NYU.

 2                    THE COURT:  Do you have a significant other?

 3                    PROSPECTIVE JUROR 1572:  I do.

 4                    THE COURT:  And what do they do?

 5                    PROSPECTIVE JUROR 1572:  He's also a lawyer.

 6                    THE COURT:  Whereabouts?

 7                    PROSPECTIVE JUROR 1572:  He works at the

 8      Department of Education.

 9                    THE COURT:  Does he litigate?

10                    PROSPECTIVE JUROR 1572:  No.  He works on

11      oversight.

12                    THE COURT:  You answered yes to a number of my

13      questions, including Question 41, which is the catch-all

14      question.  Why don't we start there.

15                    Is there something that I didn't ask that might

16      make it difficult for you to serve as a juror?

17                    PROSPECTIVE JUROR 1572:  There were just some

18      items I thought that could be -- my husband's a political

19      appointee at the Department of Education, and he worked on

20      both impeachments of Donald Trump when he was at the House

21      Judiciary Committee.  And I also recently did a detail in

22      the Biden White House for tax vetting, doing tax vetting in

23      the Office of Presidential Personnel.

24                    THE COURT:  All right.  So obviously Donald Trump

25      is not on trial.  The results of the 2020 election are --
```

```
 1                    PROSPECTIVE JUROR 1572:  Fair point.
 2                    THE COURT:  -- not on trial.  So I guess the
 3      question is, could you put those affiliations aside and give
 4      this young man a fair trial up or down based on the evidence
 5      presented in the case?  And be honest with me.
 6                    PROSPECTIVE JUROR 1572:  I think so, yes.  I think
 7      so.
 8                    THE COURT:  You're pretty sure?
 9                    PROSPECTIVE JUROR 1572:  Yeah.
10                    THE COURT:  Okay.  You live or you work near the
11      Capitol?
12                    PROSPECTIVE JUROR 1572:  Yes.
13                    THE COURT:  Which one?
14                    PROSPECTIVE JUROR:  And I also live on Capitol
15      Hill, and I work -- I live near the Capitol.  I work
16      downtown so...
17                    THE COURT:  Got it.  And were you home on January
18      6th?
19                    PROSPECTIVE JUROR 1572:  I was not.
20                    THE COURT:  Did your home suffer any property
21      damage?
22                    PROSPECTIVE JUROR 1572:  No.
23                    THE COURT:  And you've followed coverage of
24      January 6th, and you watched some of those House Select
25      Committee hearings?
```

```
 1              PROSPECTIVE JUROR 1572:  Yes.

 2              THE COURT:  And I guess the same question.  You

 3    know, obviously people have feelings about January 6th, many

 4    of them strong.  Could you put those aside and serve as a

 5    fair and impartial juror in the case?

 6              PROSPECTIVE JUROR 1572:  I think so, yeah.

 7              THE COURT:  So I sense a little hesitation.  Tell

 8    me about that.

 9              PROSPECTIVE JUROR 1572:  I think it depends on the

10    types of charges that -- and the types of arguments.  I

11    think I've thought about it quite a bit, so I do have

12    personal feelings, and because, you know -- because I live

13    close to the Capitol and, you know, I was not there because

14    we were, you know, worried about what would happen that day.

15              THE COURT:  Okay.  So let me ask it this way.  If

16    you were sitting in Mr. Alberts's chair, would you be

17    comfortable with you being a juror?

18              PROSPECTIVE JUROR 1572:  I'm not sure.

19              THE COURT:  All right.

20              PROSPECTIVE JUROR 1572:  I don't know how to

21    answer that one.

22              THE COURT:  You can step down.

23              PROSPECTIVE JUROR 1572:  Okay.  Thanks.

24              THE COURT:  All right.  The Court will strike 1572

25    for cause based on her views about January 6th and her
```

 1    political affiliations, which I was not confident that she

 2    could truly put aside.

 3              So we already struck 364 because she works at the

 4    U.S. Attorney's Office.  Okay, so 364 is off the list.  So

 5    791 is next.

 6              791?

 7              THE COURTROOM DEPUTY:  Yes.

 8              THE COURT:  Hold on.

 9              THE COURTROOM DEPUTY:  Your Honor, Juror No. 0791.

10              THE COURT:  Okay.  Good morning, ma'am.

11              PROSPECTIVE JUROR 0791:  Good morning.

12              THE COURT:  How are you?

13              PROSPECTIVE JUROR 0791:  Well, thank you.

14              THE COURT:  You can slip your mask off, if you

15    would.

16              You're Ms. Barnett?

17              PROSPECTIVE JUROR 0791:  That's correct.

18              THE COURT:  Okay.  And are you retired, ma'am?

19              PROSPECTIVE JUROR 0791:  Yes.

20              THE COURT:  And where did you last work before you

21    retired?

22              PROSPECTIVE JUROR 0791:  Capitol Hill Day School.

23              THE COURT:  Okay.  So I take it you were a

24    teacher?

25              PROSPECTIVE JUROR 0791:  I worked in the office.

1           THE COURT:  Okay.  Do you have a significant

2      other?

3           PROSPECTIVE JUROR 0791:  Not at the moment.

4           THE COURT:  Is he deceased?

5           PROSPECTIVE JUROR 0791:  My husband is deceased.

6           THE COURT:  Okay.  And what did he do?

7           PROSPECTIVE JUROR 0791:  He was an attorney in the

8      Department of Justice.

9           THE COURT:  In what area?

10          PROSPECTIVE JUROR 0791:  The civil rights

11     division.

12          THE COURT:  Okay.  Did he do criminal civil rights

13     or civil, if you know?

14          PROSPECTIVE JUROR 0791:  Civil.

15          THE COURT:  Okay.  And when did he pass away?

16          PROSPECTIVE JUROR 0791:  1987.

17          THE COURT:  Okay.

18          All right.  You answered yes to a number of my

19     questions.  You live or work near Capitol Hill; is that

20     right?

21          PROSPECTIVE JUROR 0791:  That's right.  I live on

22     Capitol Hill.

23          THE COURT:  Okay.  Were you home that day?

24          PROSPECTIVE JUROR 0791:  Yes.

25          THE COURT:  Did you personally observe any of the

```
1    events that took place at the Capitol or on the grounds?
2    Not on television, but --
3              PROSPECTIVE JUROR 0791:  No.
4              THE COURT:  No.  Did your home suffer any property
5    damage at all?
6              PROSPECTIVE JUROR 0791:  No.
7              THE COURT:  You have obviously followed January
8    6th on the news.
9              PROSPECTIVE JUROR 0791:  That's right.
10             THE COURT:  And you watched some of those House
11   hearings.
12             Any general takeaways from the coverage or the
13   hearings about January 6th in general?
14             PROSPECTIVE JUROR 0791:  Yes.
15             THE COURT:  Okay.  Could you share them briefly
16   with us?  And speak into the microphone so everyone can hear
17   you.
18             PROSPECTIVE JUROR 0791:  Yes.  I was horrified and
19   outraged and frightened.
20             THE COURT:  Okay.  So obviously people have
21   opinions about January 6th.  Many people have very strong
22   opinions about what happened generally.  Lots of folks came
23   to D.C. that day from different places for different
24   reasons.  Some have been charged with crimes; others have
25   not been.
```

1          And the question in this case is not -- we're not

2     here to litigate January 6th generally but the charges --

3     the specific charges against one person based on the

4     evidence.

5          And be honest with me.  You know, do you think you

6     could put aside what you may think about the events

7     generally and give this fellow a fair trial up or down based

8     just on the evidence?

9          PROSPECTIVE JUROR 0791:  Yes, I do.

10          THE COURT:  Okay.  And why do you say that?

11          PROSPECTIVE JUROR 0791:  Because I'm a fair-minded

12     person.

13          THE COURT:  All right.  You or someone close to

14     you has served as a witness in a judicial proceeding

15     previously?

16          PROSPECTIVE JUROR 0791:  I have.

17          THE COURT:  Okay.  Tell us about that.

18          PROSPECTIVE JUROR 0791:  I was a character witness

19     in an assault case.

20          THE COURT:  And how long ago was that?

21          PROSPECTIVE JUROR 0791:  15 years or more.

22          THE COURT:  Okay.  And did anything about that

23     experience lead you not to want to get involved in another

24     case?

25          PROSPECTIVE JUROR 0791:  No.

```
 1                   THE COURT:  Okay.  You know people who have worked
 2          in Congress?
 3                   PROSPECTIVE JUROR 0791:  Yes.
 4                   THE COURT:  Tell us about that.
 5                   PROSPECTIVE JUROR 0791:  My sister worked there
 6          for many years, and I have neighbors who have worked there.
 7                   THE COURT:  Okay.  Taking your sister first, how
 8          long ago did she work in the Congress?
 9                   PROSPECTIVE JUROR 0791:  More than 15 years.
10                   THE COURT:  Okay.  And do you remember who she
11          worked for?
12                   PROSPECTIVE JUROR 0791:  Yes.
13                   THE COURT:  Who was that?
14                   PROSPECTIVE JUROR 0791:  She worked for two
15          congressmen from North Carolina, Ike Andrews and Nick
16          Galifianakis.
17                   THE COURT:  Okay.  And how about your other
18          friends?  Did any of them work with Congress on January 6th?
19                   PROSPECTIVE JUROR 0791:  Acquaintances did.
20                   THE COURT:  Okay.  Were any of them present in the
21          building on January 6th?
22                   PROSPECTIVE JUROR 0791:  Not that I know of.
23                   THE COURT:  Okay.  Have you spoken with any of
24          them about their experiences on the 6th?
25                   PROSPECTIVE JUROR 0791:  No.
```

```
 1              THE COURT:  Okay.  Counsel?

 2              I'm sorry, you have prior jury service as well,

 3     right?

 4              PROSPECTIVE JUROR 0791:  Yes.

 5              THE COURT:  Yes.  It's hard to live in D.C. --

 6              PROSPECTIVE JUROR 0791:  That's right.

 7              THE COURT:  -- for that long without having been

 8     called.

 9              Do you recall any particular ones that you've

10     served on?

11              PROSPECTIVE JUROR 0791:  The last petit jury I

12     served on was a possession of marijuana case with intent to

13     distribute, as far as I remember.

14              THE COURT:  All right.  And did the jury reach a

15     verdict in that case?

16              PROSPECTIVE JUROR 0791:  Yes.

17              THE COURT:  And what was the verdict?

18              PROSPECTIVE JUROR 0791:  Guilty.

19              THE COURT:  Did you serve as foreperson of that

20     jury, by any chance?

21              PROSPECTIVE JUROR 0791:  I did not.

22              THE COURT:  Any others you recall?

23              PROSPECTIVE JUROR 0791:  No.

24              THE COURT:  Okay.

25              PROSPECTIVE JUROR 0791:  I've served on two grand
```

1   juries as well but...

2          THE COURT:  I take it nothing about those prior

3   experiences make you not want to be on another jury?

4          PROSPECTIVE JUROR 0791:  No.  I think it's

5   important to do.

6          THE COURT:  Okay.  Counsel?

7          MR. DALKE:  Good morning, Ms. Barnett.  Just one

8   question.

9          You mentioned testifying as a character witness

10  previously.  Was there anything about that case or about the

11  person you were testifying on behalf of as a character

12  witness, was there anything about that that left you with a

13  negative impression about how your friend or colleague or

14  that person was treated?

15         PROSPECTIVE JUROR 0791:  No.

16         MR. DALKE:  I appreciate it.  Thank you.

17         MR. PIERCE:  Good morning, ma'am.

18         PROSPECTIVE JUROR 0791:  Good morning.

19         MR. PIERCE:  You stated that your reaction to

20  January 6th was, you know, one of horror, outrage, and you

21  were frightened, I think you put it.  And I was just hoping

22  you could explain why that was your reaction.  Like what

23  about it on January 6th led to that reaction?

24         PROSPECTIVE JUROR 0791:  I live in the

25  neighborhood of the Capitol and frequently am there

1    exercising or doing recreational things with family.  And I

2    was horrified for the building itself to be the subject of

3    destruction in the way that it was.

4            I was frightened by the people who were there

5    because I didn't know what they were capable of.

6            And I was outraged because I thought our country

7    deserved better than that.

8            MR. PIERCE:  Thank you for that answer.

9            And just another quick question.  I heard you say

10   that you feel like you could be fair.  I appreciate that.

11   Despite your feelings, I heard you say you think you can be

12   fair, and I appreciate that.

13           PROSPECTIVE JUROR 0791:  I do.

14           MR. PIERCE:  Just putting yourself in the

15   defendant's shoes, would you feel comfortable if you were a

16   juror on the case in light of those views, you know, that

17   you could, in fact, be fair and impartial?

18           PROSPECTIVE JUROR 0791:  Yes.  As I understood the

19   charges read by the judge, I thought yes, I could be fair

20   about this.

21           MR. PIERCE:  Okay.  All right.  Thank you very

22   much.

23           THE COURT:  All right.  Thank you, ma'am.  You can

24   step down.

25           PROSPECTIVE JUROR 0791:  Thank you.

```
1              THE COURT:  Any challenge?
2              MR. DALKE:  Not from the government, no, Your
3    Honor.
4              MR. PIERCE:  We would challenge her on cause just
5    in the -- you know, the nature of sort of the visceral
6    reaction, you know, the adjectives she used about her
7    feelings about January 6th.
8              THE COURT:  Okay.  Overruled.  791 is qualified.
9              All right.  I think we're at 34.  Let's get one
10   more.  Okay?
11             THE COURTROOM DEPUTY:  Your Honor, Juror No. 0180.
12             THE COURT:  Good morning, ma'am.
13             PROSPECTIVE JUROR 0180:  Good morning.
14             THE COURT:  How are you?
15             PROSPECTIVE JUROR 0180:  Good.
16             THE COURT:  Good.  You can slip your mask off.
17   You are Ms. Bauer?
18             PROSPECTIVE JUROR 0180:  Yes.
19             THE COURT:  All right.  You're an accountant with
20   Aramark.  How long have you been with Aramark?
21             PROSPECTIVE JUROR 0180:  Like 12 years.
22             THE COURT:  Do you have a significant other?
23             PROSPECTIVE JUROR 0180:  Not currently.
24             THE COURT:  Okay.  So Aramark has a lot of federal
25   contracts, if I'm not mistaken.
```

```
1              PROSPECTIVE JUROR 0180:  I believe they do, yes.

2              THE COURT:  Okay.  Do you work on any of the

3     federal contracts?

4              PROSPECTIVE JUROR 0180:  No.

5              THE COURT:  No?  Okay.

6              You answered yes to several questions.  You

7     followed the coverage of January 6th, and you say that you

8     or some close friend or family member may have been

9     particularly affected by January 6th.  Tell me about that

10    answer first.

11             PROSPECTIVE JUROR 0180:  Yes.  My ex, who we just

12    broke up, of seven years is an MPD officer.  She was not

13    there that day, but her unit was.

14             THE COURT:  Okay.  And have you -- did you speak

15    with her?  Obviously you spoke with her about --

16             PROSPECTIVE JUROR 0180:  Yes.  We were still

17    together at the time, so yes, we were very involved in

18    watching everything like -- we knew a lot of people who were

19    impacted by it personally.

20             THE COURT:  Okay.  So I guess the bottom line

21    question is:  Is that a little too close to home for you, or

22    do you think that you could be an impartial arbiter of the

23    evidence for and against this person regardless of the

24    general experience of MPD?

25             PROSPECTIVE JUROR 0180:  I believe I could be
```

1    impartial.

2            THE COURT:  Okay.  I called off a number of MPD

3    officers who may be witnesses or may be referred to in the

4    case.  Did any of those names --

5            PROSPECTIVE JUROR 0180:  I did not recognize any

6    of those names.

7            THE COURT:  Okay.  Either you or a close friend or

8    family member has served as a witness in a proceeding

9    before.  Tell me about that.

10           PROSPECTIVE JUROR 0180:  Yes, she -- as an

11   officer, she would be a witness in lots of cases.

12           THE COURT:  Okay.  And you know folks who work in

13   law enforcement.  Other than your former partner, anyone

14   else?

15           PROSPECTIVE JUROR 0180:  I have a lot of friends

16   who are military and law enforcement officers.

17           THE COURT:  Did you serve in the military?

18           PROSPECTIVE JUROR 0180:  I did not, no.

19           THE COURT:  Okay.  Counsel?

20           MR. DALKE:  No questions.  Thank you.

21           MR. PIERCE:  Good morning.

22           PROSPECTIVE JUROR 0180:  Good morning.

23           MR. PIERCE:  Just a quick follow-up.

24           You mentioned -- I think you said that yourself

25   and your former significant other knew various people that

1    were impacted by January 6th.

2          PROSPECTIVE JUROR 0180:  Yes.  She had co-workers

3    that were there that day, and we -- yeah, we knew a couple

4    of people who, like yeah, were just involved with that; have

5    been witnesses in other cases and stuff, too.  But nobody in

6    this case.

7          MR. PIERCE:  Were any of those folks injured on

8    January 6th?

9          PROSPECTIVE JUROR 0180:  Yes.  Her sergeant was

10   injured that day.

11         MR. PIERCE:  I don't need too much detail, but it

12   was a serious injury?

13         PROSPECTIVE JUROR 0180:  No.

14         MR. PIERCE:  Okay.

15         Okay.  Thank you.

16         THE COURT:  Okay, ma'am.  You can step down.

17         PROSPECTIVE JUROR 0180:  Thanks.

18         THE COURT:  Okay.  Any challenge?

19         MR. DALKE:  Not from the government, no, Your

20   Honor.

21         MR. PIERCE:  Not from the defense, Your Honor.

22         THE COURT:  Okay.  180 will be qualified.

23         So by my count, if we strike 449, Ms. Blacksheare,

24   who has the court appointment on Friday, that leaves us with

25   35, which is three more than we need.

1          MR. DALKE:  I think it would leave us with 34,

2     Your Honor, if we strike Ms. Blacksheare, but I still think

3     we're good.

4          THE COURT:  Yes, we're good.  As long as those 34

5     are still here.

6          Ms. Jenkins, why don't we go ahead and bring

7     everybody back.

8          I'll dismiss the ones that we did not voir dire,

9     and then you'll exercise your strikes against the first 32.

10          MR. DALKE:  And for clarification, have we

11     formally dismissed for hardship cause Tracie Blacksheare,

12     449?

13          THE COURT:  Yes.

14          MR. DALKE:  Thank you, Your Honor.

15          THE COURT:  So it's going to take a minute for her

16     to line everybody up.

17          Just to go over the procedures again.  So there

18     are 32 who are in play.  The first 32 qualify on the list.

19     We have two extras just in case someone drops out over the

20     next hour.  We'll seat the first 14 in the box.  All right?

21     Two of those people will be in the two alternate seats.  All

22     right?  We'll have everyone stand up and say -- we'll do a

23     roll call when they come in so you can put names to numbers

24     again.  All right?

25          Once everyone is seated, I will dismiss those that

1    we have not questioned.  The rest will remain.  We'll give

2    you peremptory cause sheets.  The defense has ten.  The

3    government has six.  Fill those out simultaneously.

4            Once each side has filled them out, you will

5    exchange to see which jurors the other side has stricken.

6    All right?

7            You should exercise your strikes against either

8    the box, excluding the two alternate seats, or the gallery.

9    All right?  So you can strike anybody you like, but don't

10   strike the ones in the two alternate seats.  Understood?

11           MR. PIERCE:  Yes, Your Honor.  I think I have

12   that.  So when we exchange, if we want to use all of them,

13   we list them all at that time?

14           THE COURT:  Yes.  You can use up to ten.

15           MR. PIERCE:  Okay.

16           THE COURT:  All right.  But I don't do rounds.

17   All right?  It's all at once.  It's called the Arizona

18   method.  So all of the strikes against the regular jurors

19   will be exercised at one time.

20           MR. PIERCE:  And if there are matching strikes on

21   each list?

22           THE COURT:  You don't get any more.

23           MR. PIERCE:  You don't get any more?

24           THE COURT:  That juror will be struck.

25           MR. PIERCE:  So the ten we put down the first time

1      would be the ten that's --

2              THE COURT:  That's right.

3              And then we will do the musical chairs.  We will

4      replace any strikes that have been exercised against the

5      sitting jurors with the next unstruck juror in line.

6              MR. PIERCE:  And a final question.  Then with

7      respect to the alternates, if they come into play, then --

8              THE COURT:  Right.  Then we will -- after we

9      exercise the ten and six and do the musical chairs, we'll

10     have another round, and you can choose to strike -- you have

11     one strike against either of the alternate seats, or if you

12     want to block the government from seating someone in an

13     alternate seat, you can strike -- you can use your one

14     strike against a remaining unstruck juror in the gallery.

15             MR. PIERCE:  So that's one.  You get one?

16             THE COURT:  Yes, one each.

17             MR. PIERCE:  Okay.  Thank you, Your Honor.

18             THE COURT:  All right.

19             So sharpen your pencils, and review your notes.

20     We'll give you about ten minutes to look them over once they

21     come back, but hopefully you all have been keeping track of

22     folks that you want to strike so that we don't take up too

23     much time.  All right?

24             So we'll take a brief recess while Ms. Jenkins

25     assemble the jurors.

```
 1              (Recess taken)
 2         THE COURT:  Good morning, Mr. Roots.
 3         MR. ROOTS:  Good morning, Your Honor.  I just want
 4    to say I've been given leave by Judge Kelly in that other
 5    trial to be here for I believe the duration.  There may come
 6    moments when -- I believe I can be here almost all the time
 7    from now on.
 8         THE COURT:  Okay.  Very well.
 9         MR. ROOTS:  I do want to say, we were -- I have
10    been -- you know, my colleagues have kept me apprised of all
11    of the things yesterday.  There was one issue about a
12    potential juror who indicated they were -- they knew you
13    socially, and we looked up some case law on that.  Mostly
14    state case law, not federal.
15         There is some case law that suggested if it's a
16    close relationship to a judge, that that could be reversible
17    error; so I feel like we would be remiss if we didn't ask
18    maybe a follow-up question or two.
19         THE COURT:  Sure.  I have -- I believe you're
20    speaking of, just so the record is clear --
21         MR. ROOTS:  It might be 390.
22         MR. KONIG:  Your Honor, it's 390.
23         THE COURT:  -- 390.  I have met her maybe two or
24    three times at social engagements.  We are not close
25    friends.  I asked her the questions about whether her
```

1    acquaintanceship would influence her at all, and I was

2    satisfied that her answers indicated that it would not.

3          Obviously feel free to use one of your

4    peremptories on her, but we are -- I would certainly not

5    characterize her as a close friend.  Okay?

6          MR. ROOTS:  Okay.  Thank you, Your Honor.

7          THE COURTROOM DEPUTY:  Are you ready?

8          THE COURT:  We're ready.

9          THE COURTROOM DEPUTY:  All right.  Your Honor, the

10   jury panel.

11          (Venire enters courtroom)

12          THE COURT:  All right.  Please be seated,

13   everybody.

14          Welcome back.  Thank you for your patience.  Thank

15   you for coming back this morning.

16          The first thing I want to do is if you are on my

17   left side of the courtroom, your right side of the

18   courtroom, we're going to excuse you.  If you could check

19   back in with the jury office for further instructions.

20          As I said yesterday, picking a jury is more of an

21   art than a science, and we try to estimate the number of

22   folks that we need.  I know that we didn't get to a handful

23   of you for individual questioning, but we always need a few

24   more folks than we ultimately have to use.  So thank you

25   very much for your service, and if you could check back with

1      the jury office, you're now excused.  Okay?  Thank you.

2                 (Remaining venire exits courtroom)

3                 THE COURT:  Okay.  For the rest of you, this is

4      the phase of jury selection that I call musical chairs.  And

5      the attorneys have been taking some notes, and they're going

6      to spend some time consulting amongst themselves, and we're

7      going to wind up replacing some of the folks here with some

8      of the folks in the audience.

9                 And so they're going to need a few minutes just to

10     consult their notes and for us to make sure that we're

11     putting people in the right chairs.  So just be a little bit

12     more patient, and just chill out for a minute.  Okay?

13                 (Pause)

14                 THE COURT:  I'm sorry, ladies and gentlemen,

15     since we've done this over a day, what I like to do is a

16     roll call just so lawyers can put names to jury numbers.  So

17     Ms. Jenkins is going to do a relatively slow roll call and

18     ask each of you to stand up so that we know who's associated

19     with which number.  Okay?

20                 THE COURTROOM DEPUTY:  0064, 1146, 0637, 1715 --

21     1-7-1-5 -- 0298, 0819, 2165, 1556, 0232, 0415, 0726, 1713.

22                 PROSPECTIVE JUROR:  1731?

23                 THE COURTROOM DEPUTY:  Yes, 1731.  0741, 1569.

24                 MR. PIERCE:  Could you please just repeat four and

25     five.  I'm not sure if I've got them transposed.  I have

1    1715 before --

2              THE COURTROOM DEPUTY:  I'm sorry, Counsel?

3              MR. PIERCE:  I'm sorry, I think I might have got

4    four and five just interchanged so I just want to confirm.

5    Four was 1715, and five was 0217?

6              THE COURTROOM DEPUTY:  Yes -- no, 0298.

7              MR. PIERCE:  0298.  Okay.  Thank you.

8              THE COURTROOM DEPUTY:  1196, 0390, 1037, 1690,

9    0027, 1486, 0719, 0971, 2129, 1513, 1550, 0775, 1243, 1180,

10   0402, 1595, 0551, 0213, 0791, and 0180.

11             Your Honor, this is the qualified panel.

12             THE COURT:  Okay.

13             (Pause)

14             THE COURTROOM DEPUTY:  As I call your juror

15   number, if you could please stand and take a seat in the

16   left of the gallery.  The next number I will call, if you

17   can take that vacant seat.

18             Juror No. 0064, please stand and take a seat in

19   the gallery to the left.  Thank you.

20             Juror No. 1037, if you can take that seat.

21             Juror No. 2165.  Juror No. 2165, please stand.

22   2165.  That's okay.  I understand.  If you can please take a

23   seat in the gallery.

24             Juror No. 0027, if you can take that seat.

25             Juror No. 1556, please stand.  You can take a seat

```
 1    in the gallery.  Juror No. 0971, if you can take that seat.
 2              Juror No. 0232, please stand.  And Juror No. 2129,
 3    if you can take that seat.
 4              Juror No. 0726, please stand.  And Juror 1513, if
 5    you can take that seat.
 6              Juror No. 1731, please stand.  Juror No. 0775, you
 7    can take that seat.
 8              Juror 1569, if you can remain standing.  And Juror
 9    No. 1243, if you can take that seat.
10              THE COURT:  All right.  Ladies and gentlemen, just
11    bear with us for a few more minutes.
12              (Pause)
13              THE COURTROOM DEPUTY:  Juror No. 1715, please
14    stand and take a seat in the gallery.  Juror No. 1180, if
15    you can please take that seat.
16              Juror No. 0819, please stand.  You can take a seat
17    in the gallery.  And Juror No. 0402, you can take that seat.
18              THE COURT:  Counsel, go to the phones.
19              (The following is a bench conference
20               held outside the hearing of the jury)
21              THE COURT:  All right.  This is your jury.  Are
22    you satisfied?
23              MR. DALKE:  Yes, Your Honor.
24              MR. PIERCE:  Yes, Your Honor.
25              THE COURT:  Okay.
```

1          (This is the end of the bench conference)

2          THE COURT:  All right.  Ladies and gentlemen, if

3     you are still in the gallery, you are excused.  Thank you

4     very much for your service and for your patience.  Please

5     check into the jury office.

6          Okay.  Ladies and gentlemen, as you may have

7     guessed, you are our jury.  If you could all please stand

8     and raise your right hand.

9          (Jury sworn)

10         THE COURT:  Okay.  Before we get started with

11    opening statements in the case, I'm going to give you a few

12    preliminary instructions just about, you know, how the trial

13    will proceed and some of the rules that we'll be following

14    during the trial.  These instructions should not replace the

15    detailed legal instructions that I will give you at the end

16    of the case.

17         The first instruction is that they're not there

18    now, but when the opening statements start, each of you will

19    be given a notebook.  Some jurors find it useful to take

20    notes.  Others find it distracting.  It is entirely up to

21    you whether to take notes or not.

22         If you do choose to take notes, feel free to write

23    down anything that you like.  The notebooks will be locked

24    in the courtroom or the jury room at night, and they will be

25    destroyed at the end of the trial, so no one will ever know

 1    what you write in your notebooks other than you.

 2            Another thing you may have noticed is that there

 3    are 14 of you, but only 12 of you will deliberate at the end

 4    of the case.  There are two of you who are alternates, and

 5    the alternate seats were selected at random at the beginning

 6    of trial.  So it's not necessarily Seats 1 or 2 or 13 and

 7    14; it's two of your seats.

 8            And I will not disclose who the alternates are

 9    until the end of the evidence and closing arguments and the

10    jury begins deliberations.  So because any seat could be an

11    alternate, you should presume that you will be a

12    deliberating juror and devote full attention to the case.

13            As I told you yesterday, this is a criminal case

14    that began with an indictment.  In summary, an indictment

15    charges the defendant in this case, Christopher Alberts,

16    with nine separate crimes arising from his alleged conduct

17    at the U.S. Capitol on January 6th.

18            You will receive detailed instructions at the end

19    of the case about the law that applies to each one of the

20    counts of the indictment.  In brief, however, the charges

21    include obstructing a police officer engaged in duty during

22    a civil disorder; assaulting federal law enforcement

23    officers; entering and remaining in a restricted building or

24    grounds with a deadly or dangerous weapon; disorderly or

25    disruptive conduct in a restricted building or grounds with

1    a deadly or dangerous weapon; disorderly conduct in a

2    Capitol building; engaging in physical violence in a

3    restricted building or grounds or on Capitol grounds;

4    unlawful possession of a firearm on Capitol grounds; and

5    carrying a pistol without a license.

6        At the end of the trial, you will have to decide

7    whether or not the evidence presented has convinced you

8    beyond a reasonable doubt that the defendant committed any

9    of the offenses with which he is charged in the indictment.

10       To prove the offenses, the government must prove

11   beyond a reasonable doubt each of the elements of the

12   charged offense.  And, again, I will instruct you on the

13   specific elements of each charge at the end of the

14   presentation of evidence.

15       As I said yesterday, you should understand that

16   the indictment that I just summarized is not evidence.  It

17   is just a formal way of charging a person with a crime in

18   order to bring the case to trial.  You must not think of the

19   indictment as evidence of the guilt of the defendant just

20   because he has been indicted.

21       At the end of the trial, you will have to decide

22   whether the government has proven each element of each one

23   of the nine charges beyond a reasonable doubt.

24       Also, as I said yesterday, the defendant is

25   presumed to be innocent.  That presumption remains

1    throughout trial unless and until he is proven guilty beyond

2    a reasonable doubt.  That burden always rests with the

3    government.

4          If the government proves each offense beyond a

5    reasonable doubt, it is your duty to find the defendant

6    guilty of that offense.  But if you find the government has

7    not proved one or more elements of a particular offense, you

8    must find the defendant not guilty of that offense.

9          You will hear me refer throughout the trial to

10   either the government or the defense.

11         When I refer to the government, that simply means

12   the prosecution team or one of the members of the team who

13   you met yesterday.

14         When I refer to the defense, that simply means the

15   defendant or a member of the defense team.

16         The trial will proceed in four stages.  The first

17   stage will be opening statements:  first the government, and

18   then the defendant, if he wishes, will give an opening

19   statement.  The opening statement of lawyers are not

20   evidence.  They are simply intended to give you a road map

21   or a preview of what each side anticipates the evidence will

22   show.

23         Following opening statements, we will proceed to

24   the presentation of evidence.  first, the government's case-

25   in-chief; the government will call witnesses.  There will be

1     a direct examination, a cross-examination by the defense,

2     and then a brief redirect examination by the government.

3          After the government's case, it will then be the

4     defendant's case-in-chief.  If the defendant chooses to put

5     on a case, it will proceed in the same order as the

6     government's case:  a direct examination, a cross-

7     examination, and a redirect.

8          And then the government may choose to bring a

9     brief rebuttal case following the defense case.

10         The third stage will be instructions on the law.

11    Those are those detailed legal instructions that I referred

12    to before.

13         And then finally, there will be closing arguments

14    in the same order:  the government, the defense, and then a

15    brief rebuttal argument by the government.

16         So with respect to our respective

17    responsibilities, my job is to run a fair and efficient

18    trial, to rule on legal questions that will arise during the

19    trial, and to instruct you on the law.

20         It is your sworn duty to accept the law as I

21    instruct.  You and only you are the ultimate deciders of the

22    facts in this case.  You will weigh the evidence, and you

23    will judge the credibility and the believability of the

24    witnesses that we hear from.

25         Occasionally, one side will object to a question

1    or the introduction of a particular piece of evidence.  If I

2    sustain an objection, that means the question must be

3    withdrawn; and you must not speculate as to what the answer

4    to the question would have been.

5            If the answer has already been given and one side

6    moves to strike the answer, and I strike the answer, you are

7    to disregard what the answer was.

8            If I overrule an objection, that simply means that

9    the question may stand, and you may consider the answer to

10   the question.

11           As I said yesterday, please don't discuss the case

12   with anyone, including your fellow jurors.  You will be able

13   to discuss the case with your fellow jurors only when

14   deliberations begin.

15           Also, as I said yesterday, avoid reading anything

16   or doing any independent research on the Internet or through

17   social media about this case.

18           If you do happen to read something or are exposed

19   to any information outside the courtroom about the case,

20   simply tell Ms. Jenkins or tell one of the Marshals, and

21   we'll figure out a way to deal with it.

22           The second is true with respect to contacts with

23   the media.  If anyone from the media or from one side or the

24   other were to approach you and to engage you in

25   conversations about the case, please report that to us.

1    Okay?

2              It's a small courthouse.  You will likely run into

3    members of court staff or members of the defense team or the

4    prosecution team.  If they ignore you and don't say "good

5    morning," they're not being impolite; they're just following

6    my instructions to not engage in any communications with

7    you.  All right?

8              Ms. Moreira here is our court reporter.  She will

9    be taking down everything that is said throughout the trial.

10   But when you return for your deliberations, you will not

11   have a transcript with you.  You will only have your

12   memories and any notes, if you choose to take them.  All

13   right?

14             So with that, why don't we take a brief break

15   so that the government can get set up to deliver its

16   opening statement, and we can get you those notebooks.  And

17   Ms. Jenkins can escort you back to the jury room where you

18   will be spending a fair amount of time over the next few

19   days.  All right?

20             We'll take a short recess.

21             (Jury exits courtroom)

22             THE COURT:  All right.  Who will be giving the

23   government's opening?

24             MR. DALKE:  I will, Your Honor.

25             THE COURT:  It's Dalke, not "Dal-key," correct?

```
1              MR. DALKE:  Yes, Your Honor; Sam Dalke.  The E is
2       silent, Your Honor.
3              THE COURT:  The E is silent.  I thought I was
4       right.
5              MR. DALKE:  Yes, Your Honor.
6              THE COURT:  All right.  We'll just take about five
7       minutes.
8              (Recess taken)
9              MR. DALKE:  Your Honor, I think there may be one
10      defense objection that we were notified about as to one of
11      the slides that we have.  I think we can address that now.
12             THE COURT:  Sure.  Have a seat, everybody.
13             MR. ROOTS:  Thank you, Your Honor.
14             Yes, there was just an objection to the first
15      slide that the government's going to offer.  The first
16      slide is this -- I think it gives a misleading impression
17      that Mr. Alberts was in a location near the first breach,
18      which he was not.
19             And so it's basically an image of the Capitol
20      building, and in the foreground is maybe the first breach,
21      the fence that was breached.  And, you know, I think they're
22      using it as introduction, but it does give a false
23      impression that Mr. Alberts was involved in the first
24      breach, which he was not.
25             THE COURT:  Well, this is what the government
```

1    anticipates the evidence will show.  You can certainly

2    correct any misimpression by introducing evidence to the

3    contrary.  Why wouldn't that cure the matter?

4              MR. ROOTS:  Well, potentially it's not anything

5    that Mr. Alberts witnessed.

6              THE COURT:  All right.  Mr. Dalke.

7              MR. DALKE:  Your Honor, it's the picture on the

8    first slide there, the bottom one.

9              THE COURT:  So Slide No. 3?

10             MR. DALKE:  Yes, Your Honor.

11             THE COURT:  Okay.

12             MR. DALKE:  And it's a picture outside the Peace

13   Circle.  Based on the CCTV video footage, it matches up with

14   that.

15             I don't think there's any question to

16   authenticity.  This exhibit has been used in numerous other

17   January 6th trials.

18             Captain Baboulis will enter this as well as video

19   footage from that same area.  It's part of the compilation

20   video that we play.

21             Also --

22             THE COURT:  Are you going to argue that he entered

23   in a particular location depicted on this photo?

24             MR. DALKE:  He was in that -- based on the CCTV

25   video, he would have been in the area around that same time

1      and came from the Capitol from that same direction.  He is

2      not depicted in that particular photo.

3              And, again, this photo in front of this jury for

4      opening will be a matter of seconds.

5              THE COURT:  Okay.  I'll overrule your objection.

6      Here you go.

7              So, Mr. Dalke, about 15 or 20 minutes?

8              MR. DALKE:  Yes, Your Honor.  Correct.

9              (Pause)

10             (Jury enters courtroom)

11             THE COURT:  All right.  Please be seated,

12     everybody.

13             Mr. Dalke, the floor is yours.

14             MR. DALKE:  On January 6, 2021, tens of thousands

15     of rioters descended on the United States Capitol.  They

16     pushed past police lines, and they marched on democracy.

17             Inside the Capitol that day, Congress was at work.

18     A joint session had been called to certify the election for

19     the next president to transfer the power to the new

20     administration following Joseph Biden's electoral win.

21             This is just two months after that presidential

22     election, and the senators and congressional representatives

23     were all present in the Capitol that day, along with Vice

24     President Mike Pence, who was there to oversee that process.

25             While that was going on inside the Capitol,

1    outside the Capitol was a different story.  Outside the

2    Capitol was utter chaos.  A siege was underway.  And the

3    defendant in this case, the defendant, Chris Alberts, was

4    squarely in the middle of that chaos, and at times, he was

5    even at the very front lines using a wooden pallet as a

6    battering ram to puncture the police line with a violent mob

7    at his heels.

8            See, the defendant came to the Capitol on January

9    6th prepared for battle.  He had a radio transceiver with a

10   microphone, a charger, earpiece.  He had on body armor with

11   metal plates inserted in the front and in the back.  He had

12   a backpack with medical and meal kits, binoculars,

13   flashlight, bungee cords; he had a knife in his pocket.  He

14   had other bags and supplies with him that day.  Around 1:20

15   p.m., he dons a gas mask.

16           You're also going to hear about what he was

17   carrying on his hip.  See, he had a nine millimeter firearm

18   that he brought to the Capitol on January 6th with two

19   magazines.  One in the gun, one on the hip.  Two magazines.

20   25 rounds of ammunition, and a bullet in the chamber.

21   You're going to see these items presented through evidence,

22   passed through the jury.

23           You'll see that the defendant brought the battle

24   with him to the Capitol on January 6th, and you're also

25   going to hear evidence that he knew what he was doing.  On

1    his own cell phone -- on his own cell phone -- there's a

2    video marching towards the Capitol stating, "Taking over the

3    Capitol, Patriots.  Let's go."

4          The defendant was among the earliest of the

5    rioters on the Capitol grounds on January 6th.  These

6    grounds weren't open.  They were closed to the public.  In

7    fact, there were extra restrictions in place on January 6th

8    due to the joint session of Congress and the presence of

9    Vice President Mike Pence on the Capitol grounds.  And

10   you're going to hear testimony and see video that the mob

11   ultimately went up these steps and overran the Capitol on

12   January 6th.

13         But before that breach of the Capitol, before

14   Congress had been halted, before those senators and

15   congressmen had been evacuated was the defendant, Chris

16   Alberts, who paved the way forward for that insurrection.

17         By 1:04 p.m., the defendant had moved past

18   multiple layers of barriers and positioned himself near the

19   front.

20         By 1:20 p.m., he donned that gas mask.  And he

21   waves at the crowd.  He yells at those officers.  And then

22   he presses forward, and he presses upward.  Up those steps.

23         And by 1:48 p.m., the time of this photo that

24   you're seeing here today, the thousands at his back, he's

25   right there on the front moving up those steps just as that

1    day is turning ugly and violent.

2              And we're going to take you a little bit closer,

3    closer in on those steps, because when the defendant is at

4    that front, based on the video and the testimony, he

5    accelerates, escalates the situation.

6              He physically grabs a United States Capitol Police

7    officer.  And he's at this elevated position on these steps.

8    It's almost like you're on stage.  The crowd below watching,

9    responding to what's happening.  It's a battle moving up

10   those steps to the Capitol.

11             It's in that moment the defendant picks up a large

12   wooden pallet.  He picks up that pallet, and he presses it

13   into the officers like a battering ram, attempting to

14   puncture that police line with blunt force.

15             Moving in even further to that landing, this

16   landing -- you're going to hear testimony; you're going to

17   see the videos; you're going to see the photos -- was a

18   critical point in the events of January 6th.

19             You're going to hear the radio calls from the

20   officers calling for support to that specific location where

21   the police were attempting to hold this line to protect the

22   Capitol, because the steps directly above this -- see that

23   urn there, directly above it -- those steps went right to

24   the doors of the Capitol.  And from the testimony that

25   you're going to hear, there's just a handful of officers

1     there and those thousands of rioters.

2              Those officers weren't in riot gear, as they were

3     in other places, and they were trying to stop the advance of

4     that crowd at that little bottleneck.  All right?

5              Where you have the big scaffolding, small, narrow,

6     you've got the crowd bottlenecked trying to keep those

7     floodgates.  And they're going to testify about they

8     firsthand witnessed the violence, the chaos, the anger, the

9     objects thrown at them, the insults hurled at them, the mob

10    moving closer and closer; how they were in fear of their own

11    safety that day; fearing for their safety as the defendant

12    advanced with this gas mask, with this body armor, with his

13    pallet.

14             You're going to hear testimony about those

15    officers.  They gave commands to stop.  They gave commands

16    to step back.  They gave warnings before trying to use OC

17    spray or pepper balls to try to disperse the crowd.

18             But for over 20 minutes -- 20 minutes -- the

19    defendant is on those steps, step by step, inching his way

20    forward through trench warfare trying to invade this landing

21    and take that Capitol.

22             You see, the evidence is going to show in this

23    case the defendant didn't use his body armor, the wooden

24    pallet, the gas mask for protection.  He used those items to

25    make himself immune from law enforcement and to advance

1      forward on those police lines.

2              Among the evidence that you're going to see,

3      again, is the defendant physically assaulting an officer.

4      In fact, he was the first rioter at this location, the first

5      rioter at that landing or near that landing to go hands-on.

6              You're going to see he was also the first rioter

7      to reach that police landing, to make contact with that

8      police line.  And you're going to see from the video and the

9      photos, he wasn't pushed forward.  He wasn't shoved forward.

10     There's feet -- feet -- between the defendant and the next

11     rioter behind him.  He's voluntarily leading the charge,

12     advancing forward with purpose.

13             And behind him you're going to see evidence -- and

14     you can't forget this -- that behind him are thousands upon

15     thousands at his back, cheering him on as he's up on that

16     stage advancing up those steps.

17             You see, the evidence is going to show the

18     defendant didn't find himself at the forefront of the mob

19     battling United States Capitol Police by accident.  In

20     invading this landing, the defendant knew exactly what he

21     was doing.

22             "Taking over the Capitol, Patriots.  Let's go."

23             In the next week you're going to see a fair amount

24     of video, and I'm going to show you just one video here

25     today in opening.  And in this video -- it's of that

1    landing; and you can see that urn, that landing going up

2    those steps.  And I want you to watch right below that

3    yellow flag and above the man in the blue jacket who is on

4    the banister.  And see the police line at the top of those

5    steps?  But it's that area between that yellow flag and the

6    person in the blue jacket.  And you're going to see an

7    individual with a camo backpack, and you're going to hear

8    evidence that that was the defendant.

9         I want you to hear the crowd responding to what

10   the defendant does as he grabs the officers and advances up

11   those steps.

12        (Video playing)

13        MR. DALKE:  The defendant's initial attack was at

14   1:54 p.m.  It didn't work.  He wasn't able to open the

15   floodgates at that point.  He wasn't able to puncture that

16   line.

17        But he kept the pressure there with the others for

18   over 20 minutes, at times waving for the other rioters below

19   to join him on those steps.

20        And finally around 2:10 p.m. law enforcement

21   became overmatched and the crush of the mob at that point

22   punctured through; and at that time the defendant was still

23   among the leading force.  He was among the first 15 to 20

24   rioters to make that landing and to go up those steps.

25        And once that path had been bulldozed by the

1    defendant and others, he again turns, and, again -- see that

2    same urn at that landing?  So this is just steps above where

3    that police line used to be once it was overrun.  The

4    defendant again turns as he's running up those steps, waving

5    the rioters behind to follow him.

6         It took the defendant 22 minutes to make it up a

7    flight of steps.  For the rioters behind him, it took a

8    matter of seconds.

9         Once that landing was taken, the Capitol was

10   overrun.  This picture is just taken 30 minutes after the

11   defendant picked up that pallet; 16 minutes after he

12   punctures through that police line and rushes up those

13   steps.

14        This is the scene right after that.  Following the

15   defendant's charge, thousands upon thousands of rioters

16   streamed up those same steps for the next two hours, direct

17   access to the Capitol because of the overtaking of that

18   landing.

19        And after reaching the Capitol, the defendant

20   didn't go inside.  He'd been temporarily sidelined by that

21   chemical spray, by the battle fatigue.  But the deed was

22   done.

23        The defendant was sidelined, but those behind him

24   who were fresh, who had been following at his heels, they

25   went inside.  And by the time the defendant had recovered,

1    the Capitol had fallen.  Congress had been halted.  The vice

2    president and senators and the congressmen had been

3    evacuated.

4              This defendant still didn't leave.  He stayed on

5    that Upper West Terrace for hours and occupied it.  And he

6    told officers why.

7              He calls officers treasonists, domestic

8    terrorists, because, "You all are stopping us from doing

9    what's right."

10             In his own words:  "It's your duty to overthrow

11   that government and reinstate a new government."

12             And in the defendant's words, "You all wanted the

13   war.  You asked for it.  You all got it."

14             And his words, "Trump wins war.  Biden wins war.

15   It's that simple."

16             That's his words, the defendant's words.  "War."

17             The evidence in this case will show he dressed for

18   war.  He brought the war to the Capitol.  He inflicted the

19   war on those officers.

20             You're also going to hear testimony and see

21   evidence of the Capitol grounds and the restricted perimeter

22   that was in place on the Capitol grounds on January 6th.

23   This is the heightened security due to the certification,

24   the joint session of Congress at work, and the vice

25   president's presence at the Capitol.  This area was not open

1       to the public.  In fact, there is fencing and barricades and

2       signs and officers all along this area that's been depicted

3       in the red line as well as at multiple points inside this

4       restricted perimeter.

5               You're going to hear evidence about two stops that

6       have been marked on this map.  The yellow spot is where that

7       assault happened on those steps going up to the Capitol, and

8       the red dot is the defendant's arrest, nearly six hours

9       later, 7:22 p.m.

10              And although his arrest was outside that

11      restricted perimeter, it's still on United States Capitol

12      grounds.

13              And you're going to see a second map.  I've added

14      those same two dots.  And you're going to hear testimony

15      about, again, his arrest -- or sorry, the assault on those

16      steps, the yellow one, and then his arrest on the Capitol

17      grounds.  Right?  Everything in this map, you're going to

18      hear testimony, that's colored is jurisdiction of the

19      Capitol Police.  It is the grounds of the United States

20      Capitol.

21              For hours the defendant persisted in a civil

22      disorder.  Day had turned to night.  A curfew had been

23      issued.  Most others left.  But there the defendant remained

24      barking out orders at police and insults, remaining on

25      restricted and then Capitol grounds until an officer noticed

1    a bulge, a bulge on his right hip.  And after a baton tap,

2    that bulge turned out to be the loaded firearm with a bullet

3    in the chamber.

4           The defendant was arrested.  He had no license to

5    carry a firearm in D.C., and he was not permitted to have a

6    firearm on Capitol grounds.  His arrest happened at 7:22.

7           It wasn't until after 8:00 p.m. that night, after

8    8:00 p.m., after the rioters had been cleared from the

9    Capitol grounds, after those grounds had been secured, did

10   the vice president and the senators and the congressmen and

11   women come back to the Capitol to finish their work and

12   ultimately certify the results of the presidential election

13   after midnight, 3:00 a.m., 4:00 a.m.

14          The evidence in this case will show the

15   defendant's actions on January 6th were simply not lawful.

16   Where others turned back deterred by barricades, by gas, by

17   walls, by officers, by warnings, by doors, the defendant

18   never hesitated.  He rallied the rioters to the Capitol then

19   up those stairs.  He ignored the warnings.  He fought

20   through tear gas to confront police.

21          He battled in those trenches up those steps, inch

22   by inch.  He rallied to the front line.  He used blunt force

23   to physically assault the police, and then berate them

24   verbally.  And he occupied that West Front for hours on the

25   restricted and then on the Capitol grounds until he was

1    ultimately arrested with the firearm.

2              The evidence in this case will show that the

3    defendant wasn't involved in that siege for a couple of

4    minutes, or even for a few hours.  He was there on those

5    Capitol grounds for over six hours.

6              If you hopped in a car or a bus and started

7    driving, it will take you to Cleveland, Ohio, or South

8    Carolina, or Tennessee.  Six hours he was at that Capitol.

9              And for his conduct under those six hours he's

10   been charged with nine counts.  And the judge at the end of

11   the case will instruct you on the law and the elements for

12   each count.  And you're going to take those instructions,

13   and you're going to take your common sense and go to the

14   jury deliberation room and talk about this.

15             The first count, the defendant obstructed or

16   interfered with officers during a civil disorder.

17             The second, that the defendant assaulted,

18   resisted, or interfered with officers relating to those

19   northwest steps where he goes -- physically grabs, goes

20   hands-on, uses that pallet.

21             Counts 3 through 8 all involve charges relating to

22   either being on those restricted grounds or the Capitol

23   grounds, and being on either the restricted or the Capitol

24   grounds while having a firearm, holstered firearm, or

25   inflicting violence or disorderly conduct or being part of

1      it.

2              And his ninth and final count was carrying a

3      pistol on his hip in D.C. without a license.

4              And at the close of this case, the government's

5      going to stand back before you.  We're going to ask for a

6      guilty verdict on all nine counts.  We're going to ask for a

7      guilty verdict because, based on the evidence that you will

8      see and the testimony that you will hear in this case, a

9      guilty verdict is the only reasonable verdict.

10             Thank you.

11             THE COURT:  Thank you, Mr. Dalke.

12             Mr. Pierce.

13             Do you need a lapel mic, or are you going to

14     stand?

15             MR. PIERCE:  No, Your Honor.  I'm going to be very

16     brief.  I can use the microphone here.

17             THE COURT:  Okay.

18             MR. PIERCE:  I'm going to be extremely brief right

19     now.  I'm only going to use up about a minute, minute and a

20     half of your time.

21             Chris Alberts is a decorated Army veteran who

22     served in the Iraq war.  He loves this country.  He is

23     passionate about exercising his rights, and he is an

24     instinctive protector of other people no matter who they

25     are.

1          He is going to take the stand in this trial.  He

2     is going to testify in detail about every single relevant

3     fact.  He's going to talk about every relevant video, every

4     relevant document, every relevant picture, and every

5     relevant action that he took that day.  He welcomes his day

6     in court.

7          At the end of this case, we are going to argue to

8     you as to why the evidence shows, consistent with the

9     instructions that the judge will give you, as to why this

10    man should be acquitted.

11         Thank you.

12         THE COURT:  Thank you, Mr. Pierce.

13         All right.  Ladies and gentlemen, that concludes

14    the parties' opening statements.  We're going to take our

15    lunch break.  We will usually give you anywhere from an hour

16    and hour and 15 minutes for lunch, so why don't we plan to

17    reconvene at about 1:40.  All right?  Just reconvene in the

18    juror room.

19         A couple of things.  First of all, very important,

20    now that we're into the case, to remind you, no discussions

21    about the case, including amongst yourselves, and no

22    research about the case.

23         Also, I noticed that all of you are wearing masks.

24    This will be your first test deliberation when you get back

25    to the jury room.  If all of you unanimously conclude that

1   you don't need to wear masks or you would prefer not to wear

2   masks, that would be fine for you all not to wear them.  But

3   because you all are not here voluntarily -- you've been

4   summoned to be here -- and people, I know, have different

5   views on wearing masks at this stage of the COVID pandemic,

6   if any one of you would prefer that everyone wear a mask,

7   we're going to enforce that rule as well.  Okay?  Fair

8   enough?

9           All right.  We will see you back at 1:40.

10          And you can go out for lunch, if you like.  You

11  can eat in the cafeteria.  As you probably know, there are a

12  number of choices, you know, nearby.

13          Tomorrow morning, when you come in, we'll have

14  breakfast for you.

15          Right, Ms. Jenkins?  Okay.

16          But lunch is not provided in the jury room.

17  You'll have to go out for your lunch.  All right?

18          We'll see you back at 1:40.

19          (Jury exits courtroom)

20          THE COURT:  All right.  Have a good lunch.

21          (Lunch recess taken at 12:26 p.m.)

22

23

24

25

1          <u>**CERTIFICATE OF OFFICIAL COURT REPORTER**</u>

2

3               I, LISA A. MOREIRA, RDR, CRR, do hereby

4     certify that the above and foregoing constitutes a true and

5     accurate transcript of my stenographic notes and is a full,

6     true and complete transcript of the proceedings to the best

7     of my ability.

8          Dated this 12th day of April, 2023.

9

10                                    /s/Lisa A. Moreira, RDR, CRR
                                      Official Court Reporter
11                                    United States Courthouse
                                      Room 6718
12                                    333 Constitution Avenue, NW
13                                    Washington, DC 20001

14

15

16

17

18

19

20

21

22

23

24

25