```
1                     IN THE UNITED STATES DISTRICT COURT
                         FOR THE DISTRICT OF COLUMBIA
2
        - - - - - - - - - - - - - - x
3       THE UNITED STATES OF AMERICA,
                                              Criminal Action No.
4                     Plaintiff,             1:21-cr-00026-CRC-1
                                              Tuesday, April 18, 2023
5       vs.                                   9:10 a.m.
                                              *MORNING SESSION*
6       CHRISTOPHER ALBERTS,

7                     Defendant.
        - - - - - - - - - - - - - - x
8

9       _____

10                        TRANSCRIPT OF JURY TRIAL
             HELD BEFORE THE HONORABLE CHRISTOPHER R. COOPER
11                        UNITED STATES DISTRICT JUDGE
        _____
12
        APPEARANCES:

13      For the United States:        JORDAN ANDREW KONIG, ESQ.
                                      U.S. DEPARTMENT OF JUSTICE
14                                    P.O. Box 55
                                      Ben Franklin Station
15                                    Washington, DC 20044
                                      (202) 305-7917
16                                    jordan.a.konig@usdoj.gov

17                                    SAMUEL DALKE, ESQ.
                                      DOJ-USAO
18                                    228 Walnut Street, Suite 220
                                      Harrisburg, PA 17101
19                                    (717) 221-4453
                                      samuel.s.dalke@usdoj.gov

20                                    SHALIN NOHRIA, ESQ.
                                      UNITED STATES ATTORNEY'S OFFICE
21                                    601 D Street NW
                                      Suite Office 6.713
22                                    Washington, DC 20001
                                      (202) 344-5763
23                                    shalin.nohria@usdoj.gov

24

25      (CONTINUED ON NEXT PAGE)
```

1    APPEARANCES (CONTINUED):

2    For the Defendant:              **JOHN M. PIERCE, ESQ.**
                                     **ROGER ROOTS, ESQ.**
3                                    **JOHN PIERCE LAW P.C.**
                                     21550 Oxnard Street
4                                    Suite 3rd Floor OMB #172
                                     Woodland Hills, CA 91367
5                                    (213) 400-0725
                                     jpierce@johnpiercelaw.com
6                                    rroots@johnpiercelaw.com

7
     Court Reporter:                 Lisa A. Moreira, RDR, CRR
8                                    Official Court Reporter
                                     U.S. Courthouse, Room 6718
9                                    333 Constitution Avenue, NW
                                     Washington, DC  20001
10                                   (202) 354-3187

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                        I N D E X

 2
     WITNESS                                              PAGE
 3
     JONATHAN DAVID SUMRALL
 4       (By Mr. Roots)....................................1011
         (By Mr. Konig)...................................1030
 5       (By Mr. Roots)....................................1065

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                    P R O C E E D I N G S

2              THE COURTROOM DEPUTY:  Your Honor, we're on the

3      record for Criminal Case 21-26, *United States of America vs.*

4      *Christopher Alberts.*

5              THE COURT:  All right.  Good morning, everybody.

6              Do you want to enter your appearances just for the

7      record?  You don't have to name everybody.

8              MR. KONIG:  Good morning, Your Honor; Jordan Konig

9      for the United States.

10             THE COURT:  Okay.  Very well.

11             MR. PIERCE:  Good morning, Your Honor; John

12     Pierce on behalf of defendant Christopher Alberts, along

13     with Mr. Roger Roots.

14             THE COURT:  All right.  Good morning, everyone.

15     So I guess we left off yesterday with Mr. Sumrall's

16     testimony, or at least the prospect of it.  Is that correct?

17             MR. ROOTS:  Yes.

18             Okay.  Now, the government is, in my opinion,

19     intimidating witnesses and threatening witnesses baselessly.

20     Now they're saying that a person who just goes within the

21     red boundaries might face prosecution.  The red boundaries

22     are these conceptual boundaries that the government is

23     asserting are some restricted zone.

24             Mr. Sumrall will be a witness to the fact that

25     there was not sufficient signage.  It was a chaotic time.

```
1    Thousands of people were going within what the government
2    calls the restricted area.
3              THE COURT:  I understand the proffer of his
4    testimony.  Is this Mr. Sumrall in the audience?
5              MR. ROOTS:  Yes, it is.
6              THE COURT:  Mr. Sumrall, would you mind coming and
7    taking the stand, please.
8              Good morning, sir.
9              THE WITNESS:  Good morning.
10             THE COURT:  How are you?
11             THE WITNESS:  I'm good.
12             THE COURT:  Nice to meet you.  Where are you
13   joining us from?
14             THE WITNESS:  From Dallas, Texas.
15             THE COURT:  Cowboys fan?
16             THE WITNESS:  Yeah.  Well, I used to be, you know,
17   back before it got all political.
18             THE COURT:  Everything's political, it seems.
19             THE WITNESS:  It seems like it.  They politicalize
20   everything.
21             THE COURT:  All right.  You've been proposed to be
22   a witness in this case.  I understand that you may have been
23   on Capitol grounds on January 6th.
24             THE WITNESS:  I may have.
25             THE COURT:  Obviously folks have been prosecuted
```

1    in these cases for unauthorized entry on to Capitol

2    buildings and grounds.  Some people have pled guilty to that

3    offense.  Some have gone to trial and been convicted of that

4    offense.

5              No one is accusing you of anything, but I do have

6    an obligation to inform you of your Fifth Amendment rights

7    not to incriminate yourself in any crime.  All right?

8              THE WITNESS:  Okay.

9              THE COURT:  And have you discussed your decision

10   to testify notwithstanding that potential criminal liability

11   with your counsel?  And is your counsel in the courtroom?

12             THE WITNESS:  Yes.

13             THE COURT:  And having discussed it with your

14   counsel, are you comfortable proceeding as a witness in this

15   case?

16             THE WITNESS:  Yes, I am.

17             THE COURT:  All right.

18             Anything else, Mr. Konig?

19             MR. KONIG:  No, Your Honor.

20             THE COURT:  Okay.  You can step down.

21             And will he be the first witness?

22             MR. ROOTS:  Yes.

23             THE COURT:  All right.  Well, you can --

24             MR. ROOTS:  Mr. Pattis wants to know if he can be

25   excused.

```
 1                    THE COURT:  Yes, sir.

 2                    MR. PATTIS:  Thank you, sir.

 3                    THE COURT:  Nice to meet you.

 4                    MR. ROOTS:  Yes, he'll be our first witness.

 5            Steven Hill is in the building.  We would like to

 6       beg one more time for him to be a witness.

 7                    THE COURT:  Let's take that up after this witness.

 8                    Well, actually, let's do it outside the presence

 9       of the jury.

10            So any reason why this witness can't be in the

11       courtroom when we have the next conversation?

12                    Okay.  Go ahead, Mr. Roots.

13                    MR. ROOTS:  Mr. Hill is someone who has observed

14       thousands -- like Mr. Sumrall, you can call him an overview

15       witness; someone who has viewed hundreds, thousands of

16       hours, carefully examined things.  Not just for this case,

17       but other January 6th cases.  He -- obviously he's a use-of-

18       force expert, which is not what he would be -- he would not

19       be giving expertise in this matter.  But he would be giving

20       his overview of what the videos show, and he would be able

21       to zoom in on things.

22                    And also, he would -- he can attest to certain

23       things that Mr. Sumrall, in terms of the signage and the

24       crowds' apparent understanding --

25                    THE COURT:  Was Mr. Hill present that day?
```

1      MR. ROOTS:  He was not.

2      THE COURT:  Okay.

3      MR. ROOTS:  But one aspect of this whole question

4  of whether you're authorized or not authorized or whether

5  something is restricted or not is the confusion about that

6  question given that if you're behind a crowd, you see a

7  crowd of -- in front of you that appears to -- appears to be

8  acting as if they are authorized.  You don't know if there's

9  been negotiation by others ahead of you, which throws a

10  wrench into the government's claim.

11      The government, I guess, is claiming that it's

12  strict liability; that merely going into an area that the

13  government doesn't want you to go is somehow, you know --

14  violates these statutes.

15      Both I think Mr. Sumrall and Mr. Hill are -- can

16  attest, after viewing all the -- so many hours of this

17  footage that there was confusion about what the crowd was

18  restricted or authorized to do.

19      And this goes directly to Mr. Alberts as well.

20      THE COURT:  All right.  Mr. Konig?

21      MR. KONIG:  Your Honor --

22      THE COURT:  Come to the podium.  Thanks.

23      MR. KONIG:  As the Court has stated a number of

24  times, that's within the knowledge of this jury.  A fact

25  witness has been admitted and likely will be admitted in

1    support of that defense, so some individual either opining

2    or watching videos and describing whether someone would be

3    likely to see something or know something is just not

4    appropriate for trial testimony.

5             THE COURT:  Okay.  The Court will adhere to its

6    prior ruling.  Mr. Sumrall may testify as a fact witness

7    based on what he saw that day to the extent it is relevant

8    to the issues in this case involving Mr. Alberts at the

9    places and times that we've been discussing in this trial.

10            I will again reiterate that this is not about

11   generally what happened on January 6th or the behavior of

12   officers or what other people did or experienced.  This is

13   about what Mr. Alberts experienced.  And if there is

14   percipient witness testimony that's relevant about that,

15   then I'm happy to hear it.  Okay?

16            MR. KONIG:  Does that rule also --

17            THE COURT:  And I will also reiterate what I said

18   at the end of the day yesterday, that we have -- we've seen

19   lots of video evidence of the relevant events, about his

20   approach, about what he saw, about what he experienced.  I

21   let the defense play the -- you know, the fellow receiving

22   CPR.  I let the defense show the jury the fellow being

23   pushed off the railing.

24            You know, I think I've tried to give the defense

25   every opportunity to, you know, show the jury the full scene

1    of what Mr. Alberts experienced that day; and to the extent

2    that it affected his intent to commit the crimes charged, I

3    think the jury has a pretty good sense of that.  And you are

4    obviously able to argue what inferences the jury should draw

5    from all of that evidence in closing.

6              MR. KONIG:  Your Honor, the Court's ruling as to

7    Mr. Sumrall, does that also apply to the proposed testimony

8    of Mr. Hill?

9              THE COURT:  The Court will not hear from Mr. Hill.

10             MR. KONIG:  Okay.  And, Your Honor, may we ask if

11   there are any other witnesses after Mr. Sumrall, if Mr. Hill

12   is not testifying?

13             MR. ROOTS:  We'll have to just say probably not.

14   We're -- Mr. Konig gave us an email address of the D.C.

15   Capitol Police with regard to asking about subpoenaing

16   Capitol Police officers.  We were initiating an attempt to

17   get the agent -- the officer named C. Atkinson who was in

18   that exchange with Mr. Alberts.  Apparently that liaison at

19   the Capitol Police said no, it's too far -- they need more

20   advance warning, not just one day.  We let them know on

21   Friday, by the way, so it's now five days later.

22             But also I would say that there's that other --

23   the captain of the Capitol Police with all those badges and

24   medals on her chest took the stand and just lied on the

25   stand.  We were not prepared for that.  She said that no one

1    ever moves barricades.

2            We have evidence that she must have been aware of

3    that even on the very first radio calls of that day that

4    they were -- there was radio traffic amongst the Capitol

5    Police saying, "Hey, joggers moved the barricades.  Can

6    someone go and move the barricades back?"

7            So she just lied on the stand, and we're not able

8    to get her.  I would like to get her on the stand and ask

9    her some follow-up questions, but at this point, given these

10   restraints, I don't think we can.

11           THE COURT:  All right.  Well, you had an

12   opportunity to cross her.  She obviously doesn't inspect the

13   barricades 24/7.  And so if you want to point that out to

14   the jury, you certainly can.  And it's sort of a collateral

15   point at this stage whether at some point at some time a

16   jogger may have moved a barricade.  Okay?

17           MR. ROOTS:  So with that, no, we don't have anyone

18   other than Mr. Sumrall.

19           THE COURT:  Very well.  All right.

20           So what I would probably do is, when we finish up

21   with Mr. Sumrall, the defense will rest.

22           The government, Mr. Konig, will rest or will call

23   a rebuttal case?

24           MR. KONIG:  We'll likely rest subject to the

25   testimony.

```
1              THE COURT:  Okay.  I distributed sort of the
2    latest proposed version of the jury instructions.  We'll
3    take a break after the end of the testimony to give the
4    jury -- give you guys an opportunity to review the jury
5    instructions.  I'll then sort of go over some of them and
6    let you know what we added and what we took out.  And there
7    are a couple of issues I want to discuss with you all.
8              And I know I got a proposed self-defense
9    instruction from the defense earlier this morning.  Does the
10   government have anything on that?
11             MR. DALKE:  Your Honor, I do think we'd like to be
12   heard on that issue.
13             THE COURT:  All right.  Why don't we wait until we
14   wrap up with the evidence.
15             MR. DALKE:  And we do have a written instruction.
16   We just don't think it applies at all, but...
17             THE COURT:  Okay.  They should be all here.
18             (Pause)
19             (Jury enters courtroom)
20             THE COURT:  All right.  Welcome back, ladies and
21   gentlemen.  Everyone have a good night?
22             All right.  Mr. Roots, I believe.
23             MR. ROOTS:  Thank you.  The defense calls
24   Mr. David Sumrall.
25             THE COURT:  Okay.  Sir, if you could stand up and
```

1    raise your right hand to be sworn in by the courtroom

2    deputy.

3                    JONATHAN DAVID SUMRALL, Sworn

4                         DIRECT EXAMINATION

5    BY MR. ROOTS:

6    Q.  Mr. Sumrall, will you please state your full name and

7    spell it for the court reporter.

8    A.  Jonathan David Sumrall.  That's J-O-N-A-T-H-A-N,

9    D-A-V-I-D, S-U-M-R-A-L-L.

10   Q.  And where are you from, Mr. Sumrall?

11   A.  Dallas, Texas.

12   Q.  And what do you do there in Dallas, Texas?

13   A.  I was a carpenter.

14   Q.  And do you have any other hobbies or side gigs?

15   A.  I have a little ministry called StopHate.com.

16   Q.  And what does that do?

17   A.  It's actually an acronym.  It stands for start turning

18   off prejudice, heal attitudes through education.  It's an

19   awareness program that encourages community communication

20   and trying to get over the division that's facing the

21   country.

22   Q.  And is there a role of blogging?  Website?  Anything?

23   A.  Yes, it's -- I don't know if it would be considered a

24   news site, but we cover a lot of current events, especially

25   the January 6th topic.  We have a lot of documentaries and

1    articles and videos and evidence, basically, on StopHate.com

2    that is accessible to the public.  So everything we ever

3    find about January 6th, we post it for the world to see.

4    Q.  And just so we're clear, you're not claiming you're some

5    dispassionate or neutral or unbiased observer.  You would --

6    what side would you generally be on in these questions?

7    A.   Independent.  I mean, I voted for Trump, but I've never

8    worn a Trump hat or a Trump shirt.  I'm not a political guy

9    like that.

10          I understand the division of politics, and I try

11   to kind of stay away from that.

12   Q.  You don't claim to be a neutral journalist?

13   A.  No, no.  I'm not.  I'm just a truth-seeker as far as I

14   try not to let my opinion get in the way of what we find,

15   you know, evidence-wise.  I try to be as neutral as

16   possible.

17          But I'm definitely a conservative and a Christian,

18   and there are certain, I guess, morals and standards that go

19   along with that, in my opinion.

20   Q.  Have you or your organization gotten any notoriety or

21   been on national television or anything?

22   A.  A little bit.  I was on Tucker Carlson a couple of weeks

23   ago talking about *The American Gulag Chronicles* book,

24   *Letters From Prison.*  That is a collection of the letters

25   from the guys that are in D.C. and other jails around the

1    country.  And I was fortunate enough to get an interview to

2    get some publicity for that book.

3    Q.  Just a quick question.  When or why did you -- when did

4    you start the Stop Hate organization?

5    A.  Back in 1992 during the LA riots.  I saw the video of

6    Rodney King and the police, and then the acquittal and the

7    riots.  And my wife was pregnant with my son at the time,

8    and I thought, you know:  How can we bring a kid into a

9    world like this?

10             You can't throw money at the problem.  You can't

11   put the fires out.  You can't break up the fight.  But we

12   thought maybe prevention would help, you know, keep

13   something like that from happening.  And 31 years later, it

14   seems like it's getting worse.

15   Q.  Now, you said you focus on January 6th.  Why do you

16   focus on January 6th?

17   A.  I was there.  I had several friends that went along.  We

18   went to document history.  I've thrown or held or hosted

19   rallies around the country.  I've dealt with BLM and Antifa.

20   I did the Stop the Steal rallies in Texas before January 6th

21   and did not want to go.

22             I was tired.  I was spent, and my friends kept

23   saying, "You kind of need to go.  You need to document.  You

24   know more, you know, about Antifa and BLM."  I've done this

25   for a long time.

```
 1              So at the last couple of days before, I contacted
 2     a few friends and said, "If y'all want to go, let's go."
 3              And we spread out in the crowd when we got there
 4     so we could film different areas and capture what we could
 5     as far as documenting the history of the day.
 6     Q.  If I could ask, have you had any visits by the FBI
 7     yourself about these --
 8     A.  They have been to my house at least four times.  I've
 9     interviewed with them twice.  They kind of intimidated my
10     daughter and my mother-in-law.
11              They came two other times.  Each one of them
12     answered the door.  They would not identify themselves.
13     They asked blatantly, "Who are you, and who are you with?"
14              MR. KONIG:  Your Honor, at this point I'd move to
15     strike.
16              THE COURT:  Sustained.
17              The jury will disregard the last statements about
18     the FBI.
19              THE WITNESS:  Okay.
20     Q.  Okay.  Let's just -- let's just go to January 6th.
21              When did you arrive for the January 6th events?
22     A.  We stayed north of D.C.  We got there the night before
23     and drove -- took the train in that morning pretty early.
24     We were going to meet at the Washington Monument at 8:00 --
25     kind of like everybody was going to do -- there at the
```

1    Ellipse so that we could see the speech.

2    Q.  And what time did you -- is there anything worthy that

3    you should note about the night before?

4    A.  No.  We didn't participate in any events or anything.

5    We got to the hotel, checked in, and stayed there until the

6    next morning.

7    Q.  I want to ask about the permitted -- the permitted

8    protest events.

9    A.  Uh-huh.

10            MR. KONIG:  Objection; foundation.

11            THE COURT:  Go to the phone, Counsel.

12            (The following is a bench conference

13             held outside the hearing of the jury)

14            THE COURT:  Mr. Konig?

15            MR. KONIG:  I think this is an attempt to bring in

16   information about permits that -- for rallies that were back

17   on the east side of the Capitol that the defendant did not

18   attend, did not go to, to my knowledge did not know about.

19   It's irrelevant to the claims and defenses in this case, and

20   it would be to -- it would tend to confuse the jury.

21            Alternatively, if he's trying to get into the

22   permitting process, that's kind of irrelevant to the issues

23   in this case.

24            THE COURT:  Mr. Roots, where are you going?

25            MR. ROOTS:  I believe he did know about these

1    permits and, in fact, was going to permitted events as part

2    of what he was doing there.  And I believe he was going back

3    and forth.

4              THE COURT:  All right.  I think you can ask him

5    was he aware of various -- were there permitted events and

6    whether he attended any of those permitted events.

7              I don't want you to get into the permitting

8    process and how hard it is to get a permit or whether they

9    were rescinding permits or anything like that.  Okay?

10   That's definitely irrelevant.

11             (This is the end of the bench conference)

12   BY MR. ROOTS:

13   Q.  So had you heard that there were different rallies going

14   on?

15   A.  Absolutely.

16             MR. KONIG:  Objection to hearsay.

17             THE COURT:  Sustained.

18   Q.  Were you aware going to Washington that there were

19   different rallies --

20   A.  Yes.

21   Q.  -- planned?

22   A.  Yes.

23   Q.  And, of course, what was the biggest one?

24   A.  Stop the Steal rallies.  And then Trump kind of hijacked

25   it and made it the Trump rally.

```
1    Q.  And that was the biggest one?

2    A.  Uh-huh.

3    Q.  But you went there to -- were there other rallies you

4    went there to attend?

5    A.  The Stop the Steal rallies, yes, which I helped organize

6    in Texas before I was aware that there would be the

7    carryover to D.C.

8    Q.  And to your understanding, were those permitted events?

9    A.  Absolutely.

10   Q.  Were those near the Capitol?

11   A.  Yes.  They were absolutely on Capitol grounds, several

12   different sections.

13   Q.  You said you were helping organize one.

14   A.  Yes.

15   Q.  Which one was that?

16   A.  The ones in Texas are the ones that I helped organize,

17   yes.

18   Q.  What about on January 6th?

19   A.  No.

20   Q.  Okay.

21   A.  Just an attendee.

22   Q.  As you -- let me just -- so did you attend any of these

23   earlier -- or did you attend any of these on January 6th?

24   A.  No.

25   Q.  The Trump speech?
```

1    A.  Yes.  I was at the Ellipse, but the other -- we never

2    made it to any other events after the Ellipse, I'm sorry.

3    Q.  And after Trump spoke, what did you do?

4    A.  We left before he finished speaking.  We couldn't see

5    him from where we were.

6            We tried to watch on YouTube.  Couldn't get a good

7    signal, very hit and miss.

8            So we went on down to the Capitol.  We heard

9    people saying they were going down, so we wanted to go early

10   and possibly film the whole crowd as it was coming en masse,

11   get some good shots.

12   Q.  What was the reason you couldn't get close to watch

13   Trump speak?

14   A.  There were thousands and thousands of people.  The way

15   the Ellipse is set up, we were kind of on the edge and

16   couldn't see through the trees and screens.  It was amazing.

17   A lot of people.

18   Q.  And as you approached the Capitol, if you recall, do you

19   recall seeing any signs?

20   A.  Along the path, or when we got there?

21   Q.  As you approached the Capitol.

22   A.  No, not along the path.  When we got to the very front,

23   there were some small signs on the bike racks.

24           We were probably one of the first few hundred

25   people that arrived at the Peace Monument.  So it was very

 1    empty compared to how it got later in the day.  We were some

 2    of the first ones there.  So there is video of some of the

 3    signage on those first fences.

 4    Q.  Did you take video?

 5    A.  Yes.

 6              MR. ROOTS:  I'd like to pull up 232.  That would

 7    be Alberts 232.

 8              Is this in evidence?

 9              THE COURTROOM DEPUTY:  No.

10              MR. ROOTS:  Okay.

11    Q.  Mr. Sumrall, do you see the video on your screen?

12    A.  Yes.

13    Q.  Does that look like your perspective at the time?

14    A.  Yes.  That's my video.

15    Q.  What time of the --

16              MR. ROOTS:  I move to admit this video as -- this

17    will be Alberts 232.

18              MR. KONIG:  No objection.

19              THE COURT:  So moved.

20              MR. ROOTS:  I would move to publish it for the

21    jury.

22    Q.  Okay.  What time of the day is this?

23    A.  It's before 1:00.  It's approximately 12:30.

24              I can check the time stamps on my phone, if you

25    need me to.

```
1    Q.  And you were filming this yourself?

2    A.  Yes.  That's my video.

3              MR. ROOTS:  I'd like to just roll this a little

4    bit.

5              (Video playing)

6              MR. ROOTS:  We can stop there.  Is that the end of

7    it?

8    Q.  Okay.  Did you see any signs in that video that

9    indicated there were restricted areas or anything?

10   A.  If you study it really close, you can see some way up on

11   the lawn that go across the grass.  They can't be read from

12   where we were, but you can see little white pieces of paper

13   across the fence, all the way across.

14   Q.  Now, have you ever met someone named Christopher

15   Alberts?

16   A.  Yes.

17   Q.  Could you spot him in the courtroom?

18   A.  Yes.  There he is.

19   Q.  Had you ever met him before January 6th?

20   A.  No.

21   Q.  You have met him after?

22   A.  Yes.

23   Q.  Do you know if he was in that footage that you just

24   showed?

25   A.  He is.
```

1    Q.  Were you able to point him out though?

2    A.  No.

3    Q.  Were you able to point him out?

4    A.  I have not.  I have not.

5    Q.  He would have been in the crowd somewhere in front of

6    you?

7    A.  Absolutely.

8            MR. ROOTS:  I would like to pull up 233, Alberts

9    233.

10   Q.  We can go ahead -- actually, does this look like the

11   video that you took?

12   A.  This is my video, too.

13           MR. ROOTS:  Your Honor, I would like to move for

14   admission of Alberts 233.

15           MR. KONIG:  I'd just ask for a little more

16   foundation.  I don't anticipate objecting.

17   Q.  You were there, right there, filming this?

18   A.  Yes.  This is just inside the gate where Mr. Alberts has

19   just walked through just before this happened.

20   Q.  Okay.  And what time of day?

21   A.  Just after 11:55 was the -- I mean, 12:55 was the gate

22   break, so this was approximately 20 minutes after that.

23   Q.  Okay.

24           MR. ROOTS:  We'd move for admission of Alberts

25   233.

1          THE COURT:  Any objection?

2          MR. KONIG:  Your Honor, if it is, indeed, 20

3    minutes after the breach, we would object as irrelevant.  It

4    would not be where he was at the time based on the testimony

5    in this case.

6          MR. ROOTS:  I could ask a follow-up.

7          THE COURT:  Raise that on cross.  I'll let it in.

8    Go ahead.

9          MR. ROOTS:  I can ask a follow-up question.

10          THE COURT:  It's in.  Go ahead.

11          MR. ROOTS:  I'd like to publish and play this a

12    little bit for the jury.

13          (Video playing)

14          MR. ROOTS:  Okay.  We can stop.

15    Q.  Based on that and your recollection, what was the

16    atmosphere there among the crowd?

17    A.  It was almost celebratory.  It was a -- it wasn't angry

18    at that point yet, let's say.

19    Q.  Would you call it festive?

20    A.  Yes.

21    Q.  Did you see any violence among the crowd?

22    A.  No.

23    Q.  Would you call it a riot?

24    A.  No.

25          THE COURT:  Mr. Roots, do you want to put a time

1    frame on that so that the jury is clear?

2    Q.  Let's get the time and the place.  What time of day was

3    this?

4    A.  Around 1:15-ish.

5    Q.  And this was on what location?

6    A.  On the west side, just inside the Peace Monument on the

7    sidewalk before the stair of risers that you had to go over.

8    Q.  And so this would be off the street.  This would be away

9    from the street?

10   A.  Yes.  This is already on Capitol grounds.

11   Q.  Would you say -- what did you think -- what were you

12   thinking about, if it was a restricted area of any kind?

13              MR. KONIG:  Objection to relevance.

14              THE COURT:  Overruled.

15   A.  Can you rephrase that?

16   Q.  Was there -- what were you thinking with regard to

17   whether you had authority to be where you were?

18   A.  It appeared to me from where we stood that the people

19   went to the front line where the five policemen were on the

20   sidewalk.  There was interaction, and then the crowd was

21   released into the property.  It seemed as if there had been

22   negotiations between the policemen.

23              There wasn't an altercation.  It wasn't physical

24   from what we could see from where we stood.  So everyone in

25   the back of the crowd thought it was okay.  As like Black

1    Friday, everybody just went on -- they didn't run, but they

2    walked onto the grounds.

3    Q.  And if I could ask, how tall are you?

4    A.  About 6'3".

5    Q.  So you're a taller-than-average person?

6    A.  Yes.

7    Q.  But you were able to see above the heads of people in

8    the front?

9    A.  Yes.

10   Q.  If I could just ask, did it appear that the crowd was

11   following any strategy or plan of any kind?

12   A.  Absolutely not.  I mean, I think it's obvious from the

13   videos; people wandering around just wondering where they're

14   going and what they're doing.

15   Q.  Okay.  And have you come to study and find out where

16   Mr. Christopher Alberts was around this time?

17   A.  Did I study where he was?

18   Q.  Yes.  Were you aware of where he was?

19   A.  Now I am.  I wasn't that day, of course.  But, yeah,

20   we've studied as to what his location was.

21          It's actually just beyond the guitarist's head

22   about, what, 150 more yards forward.

23   Q.  Now, what did you know about the permitted protests

24   around there?

25   A.  Just that there were several.  We didn't know which one

1    we would land on.  We were going to try to see a couple of

2    different ones.  That's why we kind of went down early to

3    try to get a lay of the land to see where everything was set

4    up, but we didn't see any stages when we got there.

5    Q.  Did you see any boundary lines between areas?

6    A.  No.

7    Q.  Any fencing separating rally areas?

8    A.  The only fence that we saw was across the center of the

9    yard.  Like I said, halfway up the sidewalk to the Capitol

10   that was one construction fence, the plastic mesh that was

11   stretched out across.

12           But like I said, you couldn't read it from where

13   we were.  You couldn't tell if it just said construction

14   area or what.  You know, it was just pieces of paper

15   basically on something far away.

16   Q.  And let me just ask.  Were there both pro-Trump and

17   anti-Trump protests?

18   A.  Yes.

19   Q.  And any fencing between them?

20   A.  No.

21   Q.  Did you eventually see any violence?

22   A.  Yes, in the form of flash bang grenade --

23           MR. KONIG:  Objection, Your Honor.

24           THE COURT:  Excuse me?  I'm sorry?

25           MR. KONIG:  Objection, Your Honor.

```
 1                THE COURT:  What's the objection?

 2                MR. KONIG:  I believe this is going to get into

 3      areas that are not -- foundation has not been laid that he

 4      was near Mr. Alberts.

 5                THE COURT:  Sustained.

 6                MR. ROOTS:  I'd like to pull up that map.  I think

 7      it's 254.

 8                Is this in evidence?

 9                THE COURTROOM DEPUTY:  No.

10      Q.  Are you familiar with this map?

11      A.  Yes.

12      Q.  And what does this map show?

13                MR. KONIG:  Your Honor, this may be appropriate

14      for the phones.

15                THE COURT:  Yes.

16                (The following is a bench conference

17                 held outside the hearing of the jury)

18                THE COURT:  All right.  Mr. Roots, what is this,

19      and where are you going with it?

20                MR. ROOTS:  Well, this is the map of the permit

21      zone area, and I believe the government has put on another

22      map that's almost identical to this.

23                THE COURT:  The government's map was the official

24      Capitol grounds map, not permitted areas.  But what's

25      the relevance?  Does he -- what are you going to ask him
```

1    about?

2              And were there permitted rallies within the

3    restricted perimeter that day?  I have not heard that at

4    all.

5              MR. KONIG:  Your Honor, I can speak to that.

6              THE COURT:  Yes.

7              MR. KONIG:  The testimony from I believe it was

8    Captain Baboulis was that there were permits for the areas

9    on there.  I believe they were 9 and 10, which she showed in

10   her testimony.  I believe she might have said also 8.

11             Maybe it was 8 and 9.  My co-counsel says it's 8

12   and 9.

13             THE COURT:  That's on the east side?

14             MR. KONIG:  That's on the east side.  There were

15   no rallies permitted anywhere else that day.

16             This is a map from November of 2012, and this

17   witness from Dallas, Texas, just simply does not have the

18   foundation to discuss permitting at the Capitol building.

19             THE COURT:  All right.  I'll sustain it.  Move

20   on.

21             (This is the end of the bench conference)

22             MR. ROOTS:  Okay.  I guess what we'll do is

23   substitute our map with the map that's already in evidence,

24   which is number...?  It's already in evidence.  Do you guys

25   know which number that is?

```
 1                    THE COURT:  It's up.

 2                    MR. ROOTS:  Oh, there it is.

 3                    THE COURT:  Government 805.

 4                    MR. ROOTS:  That's Government 805.  Thank you.

 5     BY MR. ROOTS:

 6     Q.  Mr. Sumrall, do you see this map in front of you?

 7     A.  Yes.

 8     Q.  I'd like to direct your attention -- first of all, I

 9     believe you can write on that screen and put arrows and

10     things on it.

11     A.  Okay.

12     Q.  Would you just put your arrow of the direction that you

13     had come from.

14     A.  Okay.  (Witness complies)

15     Q.  Okay.  And down there by the -- where you begin, that

16     line -- let me just look at this and see what it says.

17                    MR. ROOTS:  Could we zoom up to that a little bit,

18     that area?  And maybe eliminate the line?

19     Q.  I just want to see what that says.

20     A.  Pennsylvania Avenue.

21     Q.  Okay.  So that's the Pennsylvania Avenue area?

22     A.  Yes.

23     Q.  Let me ask, sir.  You had come right through there --

24     A.  Yes.

25     Q.  -- on your way in?
```

```
 1            Are you aware that that's where Mr. Alberts was
 2   ultimately arrested?
 3   A.  Yes.
 4   Q.  What can you tell the jury about police presence there
 5   when you came through?
 6   A.  Like I said, I was one of the first couple of hundred
 7   people probably.  There were no police telling us where to
 8   go, what to do, anything.  There was no markers.  There were
 9   no barricades on the roads or anything leading up to the
10   Peace Monument.  No police presence whatsoever.
11            We saw police back on the street as we were
12   walking that way.  But as we got closer, there was less.
13   Q.  No police were coming out stopping truck deliveries to
14   the Labor building?
15            MR. KONIG:  Objection; leading.
16            THE COURT:  Sustained.
17   Q.  Did you hear any announcements saying "Restricted Area"
18   or anything?
19   A.  Not one.
20   Q.  Did you hear any orders to disperse?
21   A.  Never.
22            MR. ROOTS:  I'd like to thank you so much.  No
23   further questions.
24            THE COURT:  Thank you.
25            Mr. Konig.
```

```
 1                          CROSS-EXAMINATION

 2    BY MR. KONIG:

 3    Q.  Good morning, Mr. Sumrall.

 4    A.  Good morning.

 5    Q.  I'm going to actually start in the middle because it's

 6    still connected.

 7              MR. KONIG:  Could I ask you to play Defense 232

 8    that was just admitted.

 9              MS. STEVENS:  Oh, is that me?

10              MR. KONIG:  Yes, thank you.

11              MS. STEVENS:  Sorry.

12    Q.  And just before you start playing it, Mr. Sumrall, right

13    here I'm circling.  Do you see those individuals who are

14    standing there?

15    A.  Yes.

16    Q.  And those were police officers?

17    A.  Yes.

18    Q.  And in front of those police officers were some

19    barricades?

20    A.  Yes.

21    Q.  And then back here those -- that's some snow fencing?

22    A.  Yes.  That's the ones across the yard in the middle that

23    I was referring to.

24    Q.  And it had some signs on it that said "Area Closed"?

25    A.  I couldn't read them from where we were.
```

1          If you can read them in that picture.

2    Q.  All right.

3          MR. KONIG:  And could you play that.

4          (Video playing)

5          MR. KONIG:  I'm going to ask you to pause right

6    there.

7          And if you give me just one more second.  Thank

8    you.

9    Q.  This area.  I'll ask you to look at it when it replays,

10   but it appears that there are some signs hanging from those

11   bicycle racks as well?

12   A.  It's hard to tell.  Is that the fence that's halfway up

13   the yard like the other side?

14   Q.  It's the fence right before that Pennsylvania walkway

15   after the Peace Monument.

16   A.  The first barricade?

17   Q.  The first barricade.

18   A.  Yes.

19   Q.  And you saw some signs on that as well?

20   A.  We did not so much.  If you notice in the video, there

21   were already people standing against the fence.  So, I mean,

22   the signage was pretty much blocked by bodies.  You couldn't

23   see much as far as...

24          Now, the next fence that was unmanned, you could

25   see the signs.  But like I said, they were halfway through

1     the yard.  We couldn't really read them from there.

2              MR. KONIG:  And then I'm going to ask you, if you

3     could, to play -- to just go to Defense 233 at 16 seconds.

4     Q.  All right.  And where I've circled there, does that

5     appear to be bicycle rack?

6     A.  It does.

7     Q.  And you saw that bicycle rack on January 6th?

8     A.  Yes.  They were everywhere.

9     Q.  And these two videos --

10    A.  Uh-huh.

11    Q.  -- actually, the first video, Exhibit 232, when you got

12    there prior to 12:57 p.m. on January 6, 2021, it didn't

13    appear to you that the Capitol was open to visitors,

14    correct?

15    A.  That was the confusion.  We heard there were permits on

16    the yard.  We were trying to gain access and see why it was

17    locked.

18    Q.  But it appeared to be locked?

19    A.  Maybe at that point.

20    Q.  At that point.  At the point before Peace Circle was

21    breached --

22    A.  Like people were waiting for the entry time.

23    Q.  -- it appeared to be locked?

24    A.  Yeah.

25    Q.  And the only people back behind those barriers were

1    police officers?

2    A.  Yes, all five.

3              MR. KONIG:  All right.  Thank you.  You can take

4    it down.

5    Q.  All right.  Mr. Sumrall, you said that your primary

6    profession is a carpenter?

7    A.  Yes.

8    Q.  And you have -- I think you used the term "hobby

9    ministry"?

10   A.  Ministry, yeah.

11   Q.  And do you have any legal training other than --

12             THE COURT REPORTER:  I need you to answer.

13   A.  No.

14             THE WITNESS:  I hadn't answered yet.

15   Q.  Your website StopHate.com, that's been essentially fully

16   dedicated to January 6th since January 6, 2021, correct?

17   A.  Not fully, but mostly.

18   Q.  I mean --

19   A.  There are still other articles about other topics in the

20   media section, so it's not just a January 6th site.

21   Q.  Could you estimate for the jury about how much of

22   StopHate.com is dedicated to January 6, 2021, since January

23   6, 2021?

24   A.  Since the incident, probably over 90 percent.

25   Q.  And is it fair to characterize it as kind of a one-stop

1   shop for information and advocacy on behalf of people who

2   are accused of crimes on January 6th?

3   A.  In a way, yes.

4   Q.  And that includes prayer?

5   A.  Yes.

6   Q.  It includes letter writing?

7   A.  Yes.

8   Q.  It includes articles and research?

9   A.  Yes.

10  Q.  Have you actually been designated as a defense

11  investigator in certain January 6th cases?

12  A.  Yes.

13  Q.  And I think you said that you were on Tucker Carlson

14  relatively recently.

15  A.  Yeah.

16  Q.  And he called it your cause, right?

17  A.  Yes.

18  Q.  Is that a fair characterization?  Is January 6th your

19  cause?

20  A.  Yes.

21  Q.  Okay.  And you also solicit donations through your

22  website?  You provide links to donation pages?

23  A.  Yes.  Could you be specific and say that it's not

24  donations to me though?

25  Q.  That's fair.

1     A.  Okay.  Thank you.

2              MR. KONIG:  And I'm going to ask Ms. Kozaczuk to

3     pull up a demonstrative.

4              We're not going to seek to admit this into

5     evidence, but we'd like to show it to the witness and then

6     eventually possibly the jury.

7     Q.  And do you recognize what this is?

8     A.  Yes.

9     Q.  Is this the page on StopHate.com dedicated to

10    fundraisers?

11    A.  I can't tell.  The Department of Defense -- yes, that's

12    the GiveSendGo links for the defendants.

13    Q.  Okay.

14             MR. KONIG:  And I'm going to ask Ms. Kozaczuk to

15    quickly just scroll from the top to the bottom just so the

16    witness can see it.

17             (Pause)

18    Q.  And does this appear to be a fair and accurate PDF of

19    what somebody would find if they went on to StopHate.com

20    slash, I don't know, fundraisers or whatever --

21    A.  SHDOD for that one, yes.

22    Q.  Okay.  SHDOD.

23             MR. KONIG:  And I'd ask permission to publish for

24    the jury.

25             MR. ROOTS:  No objection.

```
1              THE COURT:  So moved.
2              MR. KONIG:  And I'm going to ask Ms. Kozaczuk to
3    just scroll down from the top to the bottom.
4              And while she's scrolling --
5              THE COURT:  Just to be clear, this is not in
6    evidence?
7              MR. KONIG:  This is not in evidence.
8              I can move for its admission, but I don't think
9    it's necessary, unless the Court does.
10   Q.  While Ms. Kozaczuk is scrolling down --
11             MR. ROOTS:  What number is this?
12             MR. KONIG:  We've not admitted it into evidence.
13   Q.  This links to 188 separate fundraising pages?
14   A.  If you say so.  I haven't counted.
15   Q.  17 rows of four individuals?
16   A.  Okay.
17   Q.  And some of those pages are, I guess, set up to fund
18   more than one person accused of crimes on January 6th?
19   A.  They're individual GiveSendGo links to their --
20   Q.  If there are three members of a family --
21   A.  Yes.  Sometimes people group their stuff together, I
22   think.
23   Q.  Okay.  And the people who you link to, it includes
24   people who were accused of things that are commonly known as
25   petty misdemeanors?
```

```
1    A.  Sure.

2    Q.  And people who are accused of much more serious crimes?

3    A.  Sure.

4    Q.  It includes Dominic Pezzola, correct?

5    A.  Yes, uh-huh, and journalists.

6          MR. KONIG:  I'm going to ask Ms. Kozaczuk --

7    Q.  And it also links to Guy Reffitt?

8    A.  Yes.

9          MR. KONIG:  I'm going to ask Ms. Kozaczuk to go to

10   Exhibit 801 at three minutes and 12 seconds.

11         All right.  You can just play it from there,

12   Ms. Kozaczuk.

13            (Video playing)

14   Q.  Have you seen this video before?

15   A.  Yes.

16   Q.  This is the first breach of the Senate Wing Door area of

17   the Capitol building?

18   A.  Yes.

19   Q.  It's about 2:13 p.m.?

20         MR. ROOTS:  Your Honor, we object.  I don't know

21   the relevance of this.

22         THE COURT:  Overruled.

23         MR. ROOTS:  Also, we object it's beyond the scope

24   of direct examination.

25         MR. KONIG:  Ms. Kozaczuk, can you pause it in just
```

1    one second.

2              THE COURT:  Goes to bias.

3              MR. KONIG:  And you can stop there.

4    Q.  Is that Dominic Pezzola?

5    A.  It looks like him.

6    Q.  And he's holding a police shield there?

7    A.  I believe so.

8              MR. KONIG:  You can take it down.  Thank you.

9    Q.  You also link to a fundraising page for somebody named

10   James McGrew?

11   A.  Yes.

12   Q.  And you're aware that James McGrew has admitted to using

13   a wooden hand railing with a metal bracket at the end and

14   throwing it into a tunnel full of uniformed police officers?

15   A.  I'm not aware that he -- but if you say so.

16   Q.  And you host a fundraising page for Mr. Alberts,

17   correct?

18   A.  Yes.

19   Q.  You also, through Stop Hate, host --

20             MR. KONIG:  You can take that down.

21   Q.  -- host a podcast?

22   A.  Yes.

23   Q.  And it's called Discussion Island?

24   A.  Yes.

25   Q.  And that podcast is dedicated to January 6th?

1   A.  No, but there's a lot of January 6th interviews on

2   there.  We've had senators and congressmen, everybody.  It's

3   a --

4   Q.  But you would agree with the characterization it's

5   primarily related to January 6th since January 6th?

6   A.  Yes.

7   Q.  And I counted 89 podcasts since July of 2021.  Does that

8   sound about accurate?

9   A.  It sounds about right.

10  Q.  Approximately one hour each?

11  A.  Basically, yeah.

12  Q.  And you've also appeared on other podcasts about January

13  6th, correct?

14  A.  Tons.

15  Q.  Something like 65 other podcasts?

16  A.  Is that all?

17  Q.  You think it's more?

18  A.  I thought it was over a hundred, but yeah.

19  Q.  Okay.  And you stated on direct that on January 6th you

20  were in the District of Columbia?

21  A.  Yes.

22  Q.  And you went to Capitol grounds?

23  A.  Yes.

24  Q.  And you were essentially, at least during the breach of

25  the Peace Circle, right in the place near Mr. Alberts?

1    A.   Yes.

2    Q.   And your own -- what you saw when you were there near

3    Mr. Alberts, you saw the rioters push through the first gate

4    and then the second gate?

5    A.   No.   We couldn't see the gates from where I was

6    standing.   We could just see the tops of their heads and

7    shoulders.

8         I am tall so I could see the police standing

9    there.   I could see what looked like negotiation between the

10   people.   And then it just opened up.   We never saw the gates

11   until after I studied the videos.

12   Q.   So you're saying you didn't see them push through the

13   first gate and the second gate?

14   A.   No.

15   Q.   And you also saw a cop be pushed down near that time?

16   A.   No, I could not see that.

17   Q.   And you believe that that was something like a

18   nonviolent assault that you --

19   A.   I do believe that was a nonviolent assault.

20              MR. ROOTS:   Your Honor, he said he didn't see it.

21              MR. KONIG:   Okay.   He said he didn't see it.

22   Q.   Your Discussion Island podcast, did you interview

23   Mr. Alberts on December 24th of 2021?

24   A.   I did.

25              MR. KONIG:   I'm going to ask Ms. Kozaczuk to pull

1    up that podcast and play it from 18 minutes and 52 seconds

2    to 19 minutes and eight seconds.

3    Q.  That's you?

4    A.  Yes.

5              MR. KONIG:  All right.  You can play it.

6              (Video playing)

7              MR. KONIG:  Okay.

8    Q.  And did you also -- was there also an individual who was

9    associated with StopHate.com who was near where you were on

10   January 6th of 2021 and videotaped the Peace Circle at about

11   that time, 12:57?

12   A.  Yes.

13   Q.  Somebody named -- is it Daniel Goodwyn?

14   A.  No.

15   Q.  Who was it?

16   A.  David Snow.

17   Q.  Yes.

18   A.  Daniel Goodwyn is my other employee, but I never saw him

19   that day.

20   Q.  Okay.

21   A.  He went on the tower and filmed.  He was arrested.  He

22   was talked about in the impeachment trials by name.

23              MR. KONIG:  And I'm going to ask Ms. Kozaczuk to

24   bring up --

25   Q.  Did Mr. Snow videotape his time there, and did you post

1  it under something that's called "Stop Hate on the

2  Ground" --

3  A.  No.

4  Q.  -- on your media part of your website?

5       MR. KONIG:  Ms. Kozaczuk, can you pull up where it

6  says "Stop Hate," the fundraiser pages.

7  Q.  Under "SHDOD," is there a media section?

8  A.  It should be just the Department of Defense with some

9  links at the bottom to other organizations.

10  Q.  Is there a section that links to all the podcasts you've

11  done and the podcasts that you've been --

12  A.  That would be under connect -- or no, "Content and

13  Media" I think is all my interviews.

14  Q.  And there's also kind of at the bottom of that a section

15  that posts maybe three or four videos that just the headline

16  is January 6, 2021?

17  A.  Okay.

18  Q.  And they were taken, my understanding -- correct me if

19  I'm wrong -- either by you or Mr. Snow or Mr. Goodwyn?

20  A.  Probably so.  I need to see the ones you're talking

21  about.  I'm not even familiar with what you're talking

22  about.

23       MR. KONIG:  Ms. Kozaczuk, could you bring up

24  that -- what we referred to as Stop Hate on the Ground 3?

25       And could you put that to 49 seconds.

```
 1                    I don't think this is the one.  I think it might
 2       be No. 2.  Sorry about that.
 3       Q.   Okay.  So do you recognize that person?
 4       A.   That is Michael Hodak.
 5       Q.   Oh, okay.  How do you spell his last name?
 6       A.   H-O-D-A-K.
 7       Q.   And is he a person who was videotaping for Stop Hate on
 8       the Ground on January 6th?
 9       A.   We actually met him that day on the way down to the
10       thing, and he was filming, and we became friends.  He had
11       spoken to someone else on the team on Facebook or something.
12       I got his video from that, yes.
13       Q.   Okay.  And were you near him when he was videotaping
14       this?
15       A.   We were pretty close at that time.
16       Q.   Okay.  And you post this on -- it actually is visible,
17       you post this on StopHate.com?
18       A.   Uh-huh.
19       Q.   And does this fairly and accurately represent --
20                    MR. KONIG:  Let me ask Ms. Kozaczuk to play just a
21       little bit.
22                    You can start it there.
23                    (Video playing)
24                    MR. KONIG:  This is not in evidence, so we
25       shouldn't have it published.
```

```
 1              THE COURT:  Do you want to move it?
 2              MR. KONIG:  I do.  I was trying to lay a bit more
 3     foundation for it, but I can.
 4              The government moves for admission --
 5              THE COURT:  Any objection, Mr. Roots?
 6              MR. ROOTS:  Objection; irrelevant.  We haven't
 7     heard that Mr. Alberts has anything to do with this.
 8              THE COURT:  So moved.  We'll admit it.
 9              MR. KONIG:  And this will be Government's 324.
10              THE COURT:  And, I'm sorry, this was played near
11     where you were filming that day?
12              THE WITNESS:  Yes.
13              THE COURT:  And it relates to the things that you
14     testified to in your direct?
15              THE WITNESS:  I would say yes.
16              MR. KONIG:  All right.  I'm going to ask
17     Ms. Kozaczuk to play from 49 seconds pausing at three
18     minutes and 17 seconds.
19              And start just by pausing, Ms. Kozaczuk, because
20     I'll have just one quick question.
21     Q.  Okay.  So right here, is this the view that you had when
22     you were at the Capitol prior -- just prior to 12:57 on
23     January 6, 2021?
24     A.  Yes.
25     Q.  And those are the officers and the bicycle racks there
```

1    that you were talking about earlier?

2    A.  Yes.

3    Q.  And the view this way, is that the view of the path that

4    eventually you took toward -- closer in toward the Capitol

5    building?

6    A.  Yes.

7            MR. KONIG:  Okay.  Please play this to 3:17.

8            (Video playing)

9            MR. ROOTS:  Your Honor, we would object on hearsay

10   grounds, if it's offered for the truth of the matter

11   asserted with any of this.

12           THE COURT:  It's not being offered for the truth.

13   Overruled.

14           (Video playing)

15   Q.  Would you agree with me that the jury has just seen the

16   breach of a first barrier and is about to see the breach of

17   a second barrier?

18   A.  I would.  But bear in mind I didn't move forward when

19   they did, so I'm 30 yards behind them still.

20   Q.  And right before Ms. Kozaczuk paused, those were police

21   officers standing behind those barriers?

22   A.  Yes.

23           MR. KONIG:  Okay.  Ms. Kozaczuk, could you play

24   this to six minutes.

25           (Video playing)

1    Q.   And, Mr. Sumrall, you'll agree with me that we have just

2    seen a third line of bike rack barriers?

3    A.   Yes.

4    Q.   And behind those bike rack barriers were more officers?

5    A.   The same officers, I believe.  I think they moved back

6    from station to station at this time.

7    Q.   They were uniformed officers --

8    A.   Yes.

9    Q.   -- that were behind each station --

10   A.   Yes.

11   Q.   -- of those three sets of barriers?

12   A.   Uh-huh, yes.

13   Q.   And, Mr. Sumrall, your purpose for going on January 6th

14   was to stop the steal?

15   A.   No.

16   Q.   So do you remember that same Discussion Island episode

17   where you were interviewing Mr. Alberts on December 24,

18   2021?

19   A.   Yes.

20   Q.   And do you remember telling him, in fact, "We did go to

21   stop the steal"?

22   A.   Do you understand what it's like to talk for a crowd?

23   Q.   So you did say, "We did go to stop the steal"?

24   A.   "We," being the collect -- the people went to challenge

25   the election.

1     Now, there were many different reasons.  Some

2     people went because of the COVID, the masking, the

3     different --

4     Q.  But the question before you, sir, is did you say, "We

5     did go to stop the steal"?

6     A.  Sure.

7     Q.  And you didn't go into the Capitol building on January

8     6th?

9     A.  No.

10    Q.  Do you know other people who went into the Capitol and

11    have been charged?

12    A.  Yes.

13    Q.  Okay.  And who are those people?

14    A.  Daniel Goodwyn, one of the journalists that works for

15    me.  Shawn Witzemann, another journalist that works for me.

16    Q.  Shawn Witzemann hasn't been charged?

17    A.  Yes, he's been charged.

18    Q.  The question, sir, is:  Do you know people who went into

19    the Capitol building on January 6th who haven't been charged

20    with crimes?

21    A.  Yes.

22    Q.  And please name them.

23    A.  Taylor Hanson.

24    Q.  Okay.  Who else?

25          MR. ROOTS:  Objection; irrelevant.

```
 1                    MR. KONIG:  It goes to the witness's credibility,
 2      Your Honor.  It also goes to his bias.
 3                    THE COURT:  Go to the phones.
 4                    (The following is a bench conference
 5                     held outside the hearing of the jury)
 6                    THE COURT:  All right.  You're asking him to name
 7      people who he knows that went in that have not been charged?
 8                    MR. KONIG:  Yes, people who he knows who may be
 9      accused of breaking the law that he knows.
10                    It goes to his credibility.  It's pretty well-
11      established that --
12                    THE COURT:  Why does it go to his credibility?
13                    MR. KONIG:  Him being willing to name the people
14      who have committed crimes.
15                    MR. ROOTS:  Your Honor, these are crimes invented
16      in the government.  This is all an interpretation of the law
17      by the government.
18                    THE COURT:  That's besides the point.
19                    MR. ROOTS:  Your Honor, I would just add that --
20                    THE COURT:  Hold on.  Hold on, Mr. Roots.
21                    I'm somewhat uncomfortable with compelling this
22      man to be a witness against folks who he knows who committed
23      crimes that day under the guise of credibility.
24                    I mean, the credibility point is if he does not
25      name them, he's somehow uncredible?
```

1          MR. KONIG:  Well, this is obviously not compelled

2     speech.  He's testifying voluntarily.

3          But he -- but it goes to his bias.  It goes to his

4     credibility.

5          I mean, if he's -- if he's willing to testify

6     truthfully --

7          MR. ROOTS:  Your Honor, he is not claiming to be

8     unbiased.

9          THE COURT:  I'll allow it.  You put him up,

10    Mr. Roots, and he's under oath, and he volunteered to be

11    here notwithstanding the admonitions that the Court gave him

12    this morning, and so you could have anticipated this.  All

13    right?

14         MR. ROOTS:  We object to this.  It's just using a

15    witness to be the FBI.  So they're going to be investigators

16    now?

17         THE COURT:  He took the stand.

18         (This is the end of the bench conference)

19    BY MR. KONIG:

20    Q.  So my question was:  Please name individuals who you

21    know who went into the Capitol building on January 6th who

22    have not been charged with crimes.

23    A.  I don't think it's my job to dox people.

24         MR. KONIG:  Your Honor, I'm going to ask you to

25    instruct the witness to answer the question.

```
 1                    MR. ROOTS:  Objection, Your Honor.

 2                    THE COURT:  To the extent you know.

 3                    I'll tell you what, let's take a break.

 4                    Ladies and gentlemen, we're going to take a five-

 5          minute break and come back.  We're going to resolve this one

 6          issue and then finish up.  Okay?

 7                    (Jury exits courtroom)

 8                    THE COURT:  All right.  Sir, if you could step

 9          down, and if we could put him in a witness room.  Okay?

10                    THE DEFENDANT:  I just want to go to the bathroom

11          while they duke out what they're going to duke out.  I trust

12          my attorneys to --

13                    THE COURT:  Why don't you go to the bathroom and

14          come back.

15                    THE DEFENDANT:  Yes, Your Honor.

16                    THE COURT:  You should be here.  You should be

17          here.

18                    And don't run.  Don't run.

19                    Let's wait for him.

20                    MR. KONIG:  Okay.

21                    (Pause)

22                    MR. ROOTS:  Your Honor, since this is my

23          objection, can I speak first?

24                    THE COURT:  We're going to wait for your client to

25          come back.  Okay?
```

```
 1              (Pause)
 2              THE DEFENDANT:  Thank you, Your Honor.
 3              THE COURT:  All right.  So, first of all,
 4    Mr. Konig, this is -- proper or not, it is unorthodox, and I
 5    would have appreciated a heads up.
 6              MR. KONIG:  I apologize, Your Honor.  My -- I
 7    have a friend who is a tax fraud prosecutor who it's
 8    apparently very common in his federal practice to ask
 9    similar questions in tax fraud prosecutions of the
10    individuals who are testifying about others they know who
11    have -- who have not -- who do not pay their taxes.
12              In a case that he sent, which I still don't have,
13    the case name --
14              THE COURT:  Under the same -- let's stop.
15              All right.  We have a defense witness who
16    voluntarily testified, who's admonished about his own Fifth
17    Amendment privilege and his own potential criminal exposure,
18    and did not testify on direct as to any other potential
19    perpetrators of crimes that day that is asked on cross to
20    identify people who he knows who may have committed crimes
21    who have not been charged.  And the basis is credibility?
22              MR. KONIG:  Yes, Your Honor.
23              THE COURT:  Now, explain to me how his answer to
24    that question one way or the other or refusal to answer that
25    question goes to his credibility, meaning whether he was
```

1    truthful on direct.

2              MR. KONIG:  I think it goes to his credibility in

3    that the jury can weigh whether his testimony on direct

4    should be credited if he's unwilling to answer truthfully

5    the questions that are propounded to him.

6              THE COURT:  Because he is declining to identify

7    people who have committed crimes?

8              MR. KONIG:  Yes, Your Honor.  And the case

9    citations are *United States vs. Birk*, B-I-R-K, District of

10   Colorado, Judge Blackburn; and *United States vs. Waller*,

11   W-A-L-L-E-R.

12             THE COURT:  Do you have cites for those?  *Birk*?

13             MR. KONIG:  I don't.  I can ask for them.

14             THE COURT:  All right.  *U.S. vs. Waller*, W-A-L-L-

15   E-R?

16             MR. KONIG:  Yes, District of Nevada, Judge Mahan,

17   M-A-H-A-N.

18             THE COURT:  And the judge in *Birk*?

19             MR. KONIG:  The judge?  I believe it was

20   Blackburn.  Yes.

21             THE COURT:  Okay.  So the only way that it would

22   affect his credibility is if he were to refuse to answer.

23   And why would that make him less credible -- his direct

24   testimony less credible than not?

25             MR. KONIG:  I think his refusal to testify

1    truthfully reflects poorly on his ability to testify

2    truthfully.

3            THE COURT:  Okay.  Mr. Roots.

4            Mr. Dalke, do you want to add anything?  This is a

5    fairly unique situation.

6            MR. KONIG:  Mr. Dalke just whispered to me that it

7    also is relevant to his bias in this case.  His ties to the

8    January 6th community makes him unwilling or unable to

9    testify in a way that would reflect poorly on a January 6th

10   defendant or a prospective January 6th defendant.

11           THE COURT:  Mr. Roots.

12           MR. ROOTS:  This is so outrageous.

13           I can only begin to say that this is not aimed at

14   bias or credibility.  Mr. Sumrall does not even -- does not

15   claim to be unbiased.  He is clearly a voice for the

16   downtrodden, the January 6th defendants.  He's a voice for

17   that community.

18           This is aimed at humiliating him, embarrassing

19   him, making him out people that he knows, turning him into a

20   cheese-eating rat and a snitch on the stand to snitch other

21   people out.  This is aimed at humiliation and destruction of

22   him.  He doesn't claim to be biased.

23           This is not cross-examination.  This is not

24   impeachment.  It's doing nothing more than pretending that

25   they're the FBI and doing an FBI investigation of a witness

1    about other people not even related to this case.

2         This is absolutely outrageous.  It violates the

3    Sixth Amendment.

4         Mr. Alberts has a Sixth Amendment right to have

5    witnesses for his defense to come and testify in his defense

6    without them being intimidated and threatened by the most

7    powerful government that ever lived so that they -- and by

8    the way, this is all based on the government's theory that

9    these conceptual imaginary red lines represent a, quote,

10   crime.  Again, we can test that.  There is case law.

11   *Jeanette Rankin* --

12        THE COURT:  Counsel, the question is whether they

13   went into the building.  Okay?  He didn't ask about any red

14   line.

15        Mr. Konig, I'll give you an opportunity to

16   respond.

17        MR. KONIG:  Your Honor, to streamline proceedings,

18   it would be sufficient for the government if he states that

19   he refuses to answer the question.

20        And I will ask him another question as to whether

21   he knows of crimes somewhere else.  And if he answers that

22   he refuses to identify those people, I will move on.

23        THE COURT:  All right.  Let's bring him back.

24        I'm going to instruct the jury unless he wants to

25   answer -- and I'm not going to make him answer -- that he

1    has respectfully declined to identify anybody else.

2              Is that fair, Mr. Roots?

3              MR. ROOTS:  Yes.  And this is a huge First

4    Amendment violation.  This violation -- the First Amendment

5    right of people to show up and petition the government for

6    redress of grievances.

7              THE COURT:  Very well.  Let's bring him back.

8              MR. ROOTS:  And it's beyond the scope.

9              THE COURT:  All right.  Welcome back, Mr. Sumrall.

10   Sorry for the delay.

11             Is it fair to say that you would prefer not to

12   answer the last question that was posed to you?

13             THE WITNESS:  Yes.

14             Is it about my expertise?

15             THE COURT:  No.  That's all you need to say.

16             THE WITNESS:  Okay.

17             THE COURT:  All right.  Let's bring the jury back.

18             MR. KONIG:  Your Honor, while they're coming in, I

19   do have one other question that is similar that I think the

20   instruction would be appropriate for or whatever, if that's

21   okay with the Court.

22             THE COURT:  Why don't we go to the phones quick.

23             (Jury enters courtroom)

24             THE COURT:  All right.  Welcome back.  I believe

25   we resolved the issue, just one moment.

```
 1                   (The following is a bench conference
 2                    held outside the hearing of the jury)
 3                   MR. KONIG:  The other question would be:  Has
 4      anyone admitted to you that they committed an assault on
 5      January 6, 2021?
 6                   THE COURT:  And what's the relevance?
 7                   MR. KONIG:  Same reason as --
 8                   THE COURT:  I'm going to exclude that.
 9                   MR. KONIG:  Okay.
10                   THE COURT:  Okay?
11                   MR. KONIG:  Thank you, Your Honor.
12                   (This is the end of the bench conference)
13                   THE COURT:  All right.  Ladies and gentlemen,
14      before the break Mr. Konig asked the witness whether he knew
15      people who had gone into the Capitol and had not been
16      charged with crimes.
17                   I am going to permit the witness to decline to
18      answer that question.  Okay?  So we'll move on.
19      BY MR. KONIG:
20      Q.  Mr. Sumrall, your relationship with Mr. Alberts, that
21      began sort of as a result of your advocacy?
22      A.  Yes.
23      Q.  And but now, you know, more than two years later, you
24      see him as a friend and a brother?
25      A.  Yes.
```

1    Q.  And you do fundraising for Mr. Alberts, or you link to

2    his fundraising?

3    A.  For everyone, yes.

4    Q.  And you actually have a Twitter page, too, right?

5    A.  Yes.

6    Q.  And it's @helpstophate?

7    A.  Yes.

8    Q.  And you have Tweeted or reTweeted since April 4th eleven

9    times about Mr. Alberts's case?

10   A.  I wouldn't know.  I don't run that solely by myself.  We

11   have several people that post content to that.

12   Q.  But you wouldn't disagree with it?

13   A.  I wouldn't disagree with it, no.

14   Q.  Eleven times?

15   A.  We try to keep it even so everyone should have had

16   eleven times since then.  We just go through the circle.

17   Q.  And it's actually been ten times since this trial began?

18   A.  Maybe on Twitter, yes.  Because it's an active trial,

19   yes.

20   Q.  And we've talked about your Discussion Island podcast.

21   You've interviewed Mr. Alberts two times?

22   A.  Yes.

23   Q.  And you interviewed him about January 6th?

24   A.  Yes.

25   Q.  And he admitted in his interview that he was on the

1    northwest steps staircase?

2    A.  Yes.

3    Q.  And he admitted that he was pepper sprayed?

4    A.  Yes.

5    Q.  And he said, "That pepper spray didn't end up doing much

6    because I was wearing my gas mask"?

7    A.  Yes.

8    Q.  And he said that he was wearing his gas mask, and I

9    quote, "because I knew that shit was coming eventually"?

10   A.  Yes.

11          MR. ROOTS:  Objection; cumulative.

12          THE COURT:  Overruled.

13   Q.  You also talked about people pushing riot cops around

14   1:00 to 1:20, right?

15   A.  I would have to refresh my memory.  It's been quite a

16   while.

17   Q.  When discussing -- did you discuss riot cops, and

18   Mr. Alberts told you that they were pushed because people

19   were angry that day?

20   A.  Maybe so.

21   Q.  Okay.  And did Mr. Alberts then say, "I get it.  You're

22   not supposed to do that, but resisting tyranny is one of our

23   God -- that is exactly what the Constitution was made for"?

24   A.  Exactly.

25   Q.  And, in fact, you responded similar to that.  You said,

1     "We have to.  It's our job."

2     A.  It's our job.

3     Q.  And Mr. Alberts replied to you, "It's necessary to

4     resist tyranny in its many shapes and forms"?

5     A.  Yes.

6     Q.  And Mr. Alberts told you about his reasons for going to

7     the Capitol on January 6th, correct?

8     A.  I don't know.

9     Q.  He told you that enough was enough; is that right?

10    A.  Okay.

11    Q.  And he told you that he stood on his morals on January

12    6, 2021?

13    A.  Good.

14    Q.  Did he tell you that?

15    A.  I imagine so, if you're saying he did.  I can't -- like

16    I said, it's been a while.  I don't go back and watch the

17    interviews.  I don't have time.

18    Q.  And he told you that he couldn't take it anymore.  "You

19    got to eventually draw a line in the sand."

20            And he drew his, and it got stepped on; and he

21    drew his and it got stepped on, and it got stepped on, and

22    then finally that day he said, "Enough is enough, and that's

23    why I went down there."

24    A.  Yes.

25    Q.  Your own view of January 6th.  "It was a huge set-up"?

1    A.   Yes.   I think it was unprecedented.

2    Q.   Your view, you've said, "It was a huge set-up," correct?

3    A.   Yes, yes.

4    Q.   And you did see it as a takeover of the Capitol?

5    A.   No.

6    Q.   Did you have a podcast on January 8th of 2021 with

7    somebody named Mark Sutherland?

8    A.   Probably.

9    Q.   And you called it "Texan and Brit"?

10   A.   Yes.

11   Q.   He's, I guess, British?

12   A.   He's from the U.K., yes.   He lives there.

13   Q.   Did you tell him:   "Now think about this.   In two hours

14   the people took the Capitol of the United States with no

15   weapons"?

16   A.   That's right.

17   Q.   Okay.   And you also saw January 6th as a warning,

18   correct?

19   A.   Uh-huh, yes.

20   Q.   If the courts don't do it and the system doesn't do it,

21   the protesters might not remain peaceful next time?

22   A.   Yes.

23   Q.   And also your view is that "If the protesters can do

24   that in two hours with no weapons, they really don't want to

25   piss us off"?

1    A.  Exactly.

2    Q.  And you think that it's a clarion call?

3    A.  No.

4              THE COURT REPORTER:  A what call?

5              MR. KONIG:  A clarion call.

6    A.  I'm not sure I understand what a clarion call is.

7    Q.  We need to take our world back and our country back?

8    A.  No.  I think we need to stand up for our rights and make

9    sure that they're met.  It's not about --

10   Q.  Did you say on that podcast:  "Because that's what needs

11   to happen.  We need to take our world back, our country

12   back, our government back from these tyrants.  They treat us

13   like sheep.  They don't listen to us, and they don't

14   represent us"?

15   A.  That's all true.

16   Q.  And you said it?

17   A.  Yes.  It's true.

18   Q.  And do you also believe that the protesters on January

19   6th, their back was against the wall, and you don't want to

20   corner a wild animal?

21   A.  Yes.

22   Q.  So finally, prosecutions for alleged crimes committed on

23   January 6th.  You don't believe that you or anyone else

24   there did anything wrong?

25   A.  I never said that.

1    Q.  Isn't it your position that "We didn't do anything

2    wrong.  I can say that for 99 percent of the people there"?

3    A.  Yes, that is true.

4    Q.  And that is your view.  You don't believe anyone not in

5    law enforcement should be prosecuted for the conduct on

6    January 6th?

7    A.  I never said that.

8    Q.  Okay.

9    A.  I have said that if you committed a crime, you deserve

10   the penalty for that crime.

11   Q.  99 percent of people charged shouldn't have been

12   prosecuted?

13   A.  I agree with that.

14   Q.  Okay.  And that includes all the people involved with

15   those 188 fundraisers?

16   A.  No, by any means.  That's a far stretch.  No.

17            There are people on that list that are guilty.

18   Q.  Okay.

19   A.  But they are accused.  They haven't been -- so that's

20   the justice --

21   Q.  99 percent of the people?

22   A.  A lot of these people just trespassed, and there have

23   been, as usual, charges added on over and above to get that

24   little plea.

25   Q.  But that's the first -- I mean, you testified before,

```
 1    right --
 2    A.  No.
 3    Q.  -- it didn't really matter whether there are people who
 4    just trespassed or there are people who did much, much more
 5    serious crimes, you link to their fundraising pages?
 6    A.  I always link -- innocent until proven guilty.
 7    Q.  So the answer is yes.  So the answer is yes, sir?
 8    A.  Yes.  Innocent until proven guilty.
 9    Q.  So finally, your view on what happens next.
10              Divine justice and vengeance, correct?
11    A.  No.
12    Q.  Did you not say on the December 24, 2021, podcast with
13    Mr. Alberts that "there's going to be divine justice and
14    vengeance for what's going on for the January 6th patriots"?
15    A.  "Divine" meaning God, not man.
16    Q.  Divine justice?
17    A.  Divine.  Not me.
18    Q.  You just get the rewards?
19    A.  I don't care about that.  That's not my place either.
20    Q.  Mr. Alberts, you told him, "We just get to reap the
21    rewards of it"?
22    A.  "We," the people.
23    Q.  "Our people get out of jail"?
24    A.  Yes, hopefully.
25    Q.  "The bad people are put into jail"?
```

```
 1    A.   Hopefully so.

 2    Q.   And that includes the FBI?

 3    A.   It could, if they acted improperly.

 4    Q.   That includes prosecutors?

 5    A.   If they act immorally.

 6    Q.   That includes judges?

 7    A.   It could.

 8    Q.   And lawsuits commence?

 9    A.   Absolutely.  Please.

10    Q.   And suing people who have slandered all your good names?

11    A.   Wouldn't you?

12    Q.   Called you horrible things, jeopardized your

13    livelihoods, caused pain and suffering, emotional distress?

14    A.   Absolutely.

15    Q.   Loss of standing in the community, slander, libel, and

16    defamation?

17    A.   Yes.

18    Q.   These are all the things they'll have to pay for?

19    A.   Yes.

20              MR. KONIG:  I pass the witness, Your Honor.

21              MR. ROOTS:  Thank you, Mr. Sumrall.

22              I'd like to play Alberts 232 again, which we've

23    seen.

24              MR. KONIG:  To the extent it's cumulative, I would

25    object.
```

```
 1                    MR. ROOTS:  This is redirect of their cross on

 2       this very video.

 3                    THE COURT:  Overruled.

 4                    MR. ROOTS:  Let's play this, if we can.

 5                        REDIRECT EXAMINATION

 6       BY MR. ROOTS:

 7       Q.  Now, during this, as it was playing previously,

 8       Mr. Konig pointed you to some law enforcement officers.  Do

 9       you recall that?

10       A.  Yes.

11       Q.  Are the law enforcement officers the focus, really, of

12       this video?

13       A.  No.

14                    MR. KONIG:  Objection.

15       Q.  Were you focusing on law enforcement?

16       A.  No.

17                    (Video playing)

18       Q.  You're familiar with December 12th?

19       A.  Yes.

20       Q.  The Stop the Steal rally on December 12th?

21       A.  In D.C.?

22       Q.  In D.C.

23       A.  Yes.

24       Q.  Were you in attendance?

25       A.  No.
```

```
 1                    MR. KONIG:  Objection; outside the scope, and
 2      relevance.
 3                    THE COURT:  Sustained.
 4      Q.  Have you seen video of the U.S. Capitol at other times
 5      during big rallies?
 6                    MR. KONIG:  Objection to relevance.
 7                    THE COURT:  Sustained.
 8      Q.  Are you familiar with your state capitol in Austin,
 9      Texas?
10                    MR. KONIG:  Objection to relevance.
11                    THE COURT:  Sustained.
12      Q.  Well, in that video that we're watching there, does this
13      look like what would normally be a police presence at a
14      rally of this size?
15                    MR. KONIG:  Objection to relevance.
16                    THE COURT:  I'll allow that.
17      A.  I would expect more police.
18      Q.  And you're familiar -- are you aware that at other times
19      there has been?
20      A.  Yes.  Over 2020, several incidences, they seemed to be
21      short of police there.
22                    MR. KONIG:  Objection to relevance.
23                    THE COURT:  Sustained.
24      Q.  Just focusing on this video that you took.
25      A.  Uh-huh.
```

```
 1    Q.   Does the paltry sum of law enforcement --
 2              MR. KONIG:   Objection; leading.
 3              THE COURT:   Sustained.
 4    Q.   What could you discern about the restrictedness of that
 5    setting from the number of officers there?
 6    A.   It seemed like they were massively outnumbered.  There
 7    were probably 5,000 people against five policemen.  It
 8    didn't seem like a good ratio for the cops.
 9    Q.   And if they were -- if there was a restricted area, do
10    you think there would be more cops?
11    A.   Absolutely.
12    Q.   Now, you are a journalist with media credentials,
13    correct?
14    A.   Yes.
15    Q.   You saw that the prosecution pulled up your -- one page
16    from your StopHate.com?
17    A.   Yes.
18              MR. ROOTS:   I would like to move that into
19    evidence, if we can, for the jury.
20              MR. KONIG:   No objection.
21              THE COURT:   So moved.
22              MR. ROOTS:   And that would be -- what would be the
23    number?
24              MR. KONIG:   I don't know on your numbering system.
25              MR. ROOTS:   Let's call it Alberts 232.1.
```

1    Q.  Let me ask:  Is this a money maker for you?

2    A.  Not for me personally, no.

3    Q.  Is this a money maker for your organization?

4    A.  No.

5    Q.  It raises money for each -- each -- well, each one of

6    those defendants has a GiveSendGo link?

7    A.  It actually goes directly to them.  We don't even touch

8    the money.

9    Q.  Do you make money or lose money on this listing?

10   A.  I lose a lot of money.

11   Q.  Have you ever contended that you're unbiased about all

12   these things?

13   A.  Not completely.

14   Q.  Let me ask you about some of those individual

15   defendants, some of those January 6th defendants on your

16   website.

17           MR. KONIG:  I'll object to the extent it's

18   irrelevant.

19           MR. ROOTS:  It goes directly to their cross.

20           THE COURT:  Let's see where you're going.

21   Q.  Dominic Pezzola --

22   A.  Yes, sir.

23   Q.  -- has a link.  Has he been convicted of any crime?

24   A.  Not that I'm aware of.

25           MR. KONIG:  Objection; 403.

```
 1              THE COURT:  Overruled.
 2   Q.  Does everyone deserve a defense in America?
 3   A.  Absolutely.
 4   Q.  Why do you think it's important for defendants to raise
 5   money for their legal defenses?
 6   A.  Because it's expensive.
 7   Q.  Now, in that video of your podcast that was played, you
 8   said something like -- you talked about an officer pushed
 9   down at the gate.  Do you recall that?
10   A.  Yes.
11   Q.  Just to be clear, you did not see that on January 6th?
12   A.  Not from where I was standing, no.  I saw it after the
13   fact on video.
14   Q.  Okay.  And you learned about it later?
15   A.  Yes.
16              MR. KONIG:  Objection to leading.
17              THE COURT:  Overruled.
18   Q.  The officer had fallen down at the first gate --
19   A.  Yes.
20   Q.  -- or been pushed or -- during that, such as it was?
21   A.  Yes.
22   Q.  And you learned about that later?
23              MR. KONIG:  Objection to leading, asked and
24   answered; and also this witness said he's not a --
25              THE COURT:  Sustained on the leading.
```

1           MR. KONIG:  -- personal witness on this.

2           THE COURT:  Sustained on the leading.

3           MR. ROOTS:  Okay.

4    Q.  And then the prosecutor played a video of Mr. Hodak.  Do

5    you recall that?

6    A.  Yes.

7    Q.  Was that the perspective where you were -- was

8    Mr. Hodak's perspective there your perspective?

9    A.  In the beginning of the video.  But as they moved

10   forward, we stayed behind.

11   Q.  You also -- at some speech or something the prosecutor

12   showed or mentioned, you said the words "we went to stop the

13   steal."

14   A.  Yes.

15   Q.  Do you recall that question?

16   A.  Yes.

17   Q.  When you said "we," was that meaning you, or was that

18   meaning like "we" the fans of the football team or the

19   group?

20   A.  I was speaking about the public.  My team went to

21   document history.  So we didn't go to stop the steal.

22          We went to witness the Stop the Steal people and

23   the mask people and the lockdown people and the jobs people

24   and -- there were a lot of different protesters for a lot of

25   different reasons there that day.

1    Q.  Similar question about when you said "takeover of the

2    Capitol."  Is taking over the Capitol really taking over the

3    Capitol?

4    A.  No.

5    Q.  So the two hours or two and a half hours when protesters

6    occupied the Capitol, they didn't really take over the

7    Capitol?

8            MR. KONIG:  Objection to leading.

9            THE COURT:  Sustained.

10   Q.  Would you say that their political views --

11           MR. KONIG:  Objection --

12   Q.  -- ultimately prevailed?

13           MR. KONIG:  -- to relevance.

14           THE COURT:  Rephrase, Counsel.

15   Q.  Well, the protesters that day, to the extent they took

16   over the Capitol, that means they occupied the hallways and

17   parts of the building --

18   A.  Yes.

19   Q.  -- for a short time?

20   A.  Yes.

21   Q.  Now, you were asked about whether you thought it was a

22   set-up.  Why did you feel that January 6th was a set-up?

23   A.  I've been to multiple events before and seen police

24   presence, seen Antifa and BLM as counterprotesters.

25           MR. KONIG:  Objection as to relevance and also

```
 1    beyond the -- really the purpose of this witness.
 2              MR. ROOTS:  They opened the door.
 3              THE COURT:  Sustained.
 4              MR. ROOTS:  Could we play Alberts 292.
 5              (Video playing)
 6    Q.  Do you recall this video?
 7    A.  Yes.
 8    Q.  Is this your video?
 9    A.  No.
10    Q.  Were you in this area?
11    A.  No.
12    Q.  Does this look like a fair and accurate depiction of
13    events -- some events on January 6th?
14    A.  Yes.
15              MR. ROOTS:  Your Honor, we move for admission.
16              MR. KONIG:  Your Honor, we object.  I mean, this
17    is -- now we're in --
18              THE COURT:  Go to the phones.
19              (The following is a bench conference
20               held outside the hearing of the jury)
21              THE COURT:  Okay.  I'm sorry, I missed the
22    foundation.  Did he say he took this?
23              MR. ROOTS:  He did not say he took it.  I can
24    build more foundation, but it's of that same general time
25    and period.
```

```
 1              THE COURT:  All right.  Mr. Konig?

 2              MR. KONIG:  It wasn't clear that he did say that

 3    or that he was there.  But also, I mean, we're now

 4    introducing evidence in rebuttal that, you know, we don't

 5    have an opportunity to recross him on, and I'm not even sure

 6    what this purports to show.

 7              THE COURT:  What's the point, and how does it go

 8    to the cross?

 9              MR. ROOTS:  Well, this actually has a witness that

10    says the words "they set this up for us," so it was the

11    absolute -- it just goes to their credibility and what this

12    witness has said.

13              THE COURT:  I'll disallow it.  Sustained.

14              (This is the end of the bench conference)

15    BY MR. ROOTS:

16    Q.  You're aware of all the people who have been charged and

17    prosecuted for January 6th?

18    A.  Yes, sir.

19    Q.  Do you feel they've been set up in some ways?

20    A.  Yes, sir.

21              MR. ROOTS:  No further questions.  Thank you.

22              THE COURT:  Very well.  Sir, thank you very much

23    for your testimony.  You can step down.  Don't discuss your

24    testimony with anyone in this case until the end of the

25    case.
```

```
 1                THE WITNESS:  All right.

 2                THE COURT:  Have a good trip back.

 3                THE WITNESS:  Yes, sir.  Thank you.

 4                THE COURT:  All right.  Mr. Pierce?

 5                MR. PIERCE:  The defense will rest, Your Honor.

 6                THE COURT:  Okay.  Mr. Konig?

 7                MR. KONIG:  The government does not intend to call

 8      any witness, so we rest in rebuttal.

 9                THE COURT:  Okay.  So ladies and gentlemen, the

10      defense has rested, and the government has rested.  So that

11      concludes the evidentiary portion of the case.

12                The next phase will be jury selections.  It's

13      going to take a little bit of time for us to finalize the --

14                MR. ROOTS:  Instructions.  I think you said

15      "selections."

16                THE COURT:  I'm sorry, jury instructions.  Thank

17      you, Mr. Roots.  We're not going to hit rewind.

18                It will take a little bit of time for us to

19      finalize the jury instructions.  They have to be tweaked

20      based on the evidence that has now been presented.

21                Why don't we take until noon, and hopefully we

22      will have come to ground on the instructions by then, in

23      which case I will read them before lunch.  If not, we will

24      let you know at noon and give you further instructions.  All

25      right?
```

```
 1            So we're going to take a break until noon.  Feel

 2    free to -- Ms. Jenkins, can they walk -- they can walk

 3    outside the building, if they like?

 4            THE COURTROOM DEPUTY:  Yes, Your Honor.

 5            THE COURT:  So be back in the jury room by noon.

 6    Okay?

 7            Thank you very much.  No discussions about the

 8    case.  No research about the case.

 9            (Jury exits courtroom)

10            THE COURT:  All right.  Have a seat.

11            All right.  Why don't we start with the self-

12    defense and defense of others, Mr. Dalke, if you're ready to

13    be heard on that; and then we can move to everything else.

14            MR. DALKE:  So just in the self-defense and where

15    the government would start is we previously did file a

16    motion on this.  It was Docket 106.  It was the government's

17    motion in limine.  It's still the government's position --

18    and we briefed the law and the issues related to that.

19            THE COURT:  Okay.  Hold on.  Let me just -- let me

20    just...

21            And I'm going to ask my counsel to come up to the

22    witness stand because she's more familiar with the logistics

23    of the instructions.

24            MR. ROOTS:  All this time I thought she was a U.S.

25    Marshal.
```

1          THE COURT:  She's an infiltrator.

2          Okay.  Go ahead.  I think I'm with you.

3          MR. DALKE:  And I just wanted to point that out.

4    And we can cover the points here on the record, but I didn't

5    want you to think we hadn't addressed the issue already.

6          THE COURT:  No, I understand.  It was addressed in

7    the context of a motion in limine.  Now that all the

8    evidence is in, the question is is there enough in evidence

9    to support an instruction.

10          MR. DALKE:  So there's two fundamental principles

11    I want to start out with before we even get to whether the

12    defense has put on enough to raise it, and those two points

13    are as follows:

14          First, the defendant cannot claim self-defense if

15    he was the aggressor or if he provoked the conflict upon

16    himself.  And that's the *Waters v. Lockett* decision from the

17    D.C. Circuit 2018 that I believe we cited in the briefing.

18    So that's principle number one.  It just doesn't apply,

19    period, if he was the aggressor or if he provoked the

20    conflict itself relating to the specific assault, which is

21    the 1:54 time when the defendant grabs the officer and then

22    proceeds with the pallet.

23          The second kind of underlying fundamental

24    principle is that you don't have self-defense, in the

25    government's view, when you assault a federal law

1    enforcement officer.  So self-defense, as a matter of law,

2    does not apply to resisting arrest or performances of duty

3    by law enforcement officers; and we cite two decisions in

4    our brief.  The *U.S. vs. Drapeau* from the Eighth Circuit as

5    well as *U.S. vs. Branch.*

6            THE COURT:  Sorry, the first one was...?

7            MR. DALKE:  D-R-A-P-E-A-U.

8            THE COURT:  Got it.

9            MR. DALKE:  Drapeau maybe.  644 F. 3d 646 from the

10   Eighth Circuit, pincite 654.

11           And the quote from there is an individual -- this

12   is a direct quote, "An individual is not justified in using

13   force for the purpose of resisting arrest or other

14   performance of duty by a law enforcement officer within the

15   scope of his official duties."

16           And the *Branch* decision has a similar quote.

17           But the concept is that we don't think -- as a

18   preliminary matter with these two fundamental tenets of when

19   self-defense even comes into play, that it wouldn't be in

20   play here because the evidence in the record does show that

21   he's the aggressor, that he provoked this specific

22   advancement, and putting hands on.

23           And, second, he can't, as a matter of law, get

24   this instruction under these circumstances because he was

25   subject to arrest.  He was committing multiple violations of

 1     law at the time he was on those steps, and he was

 2     interfering with the performance of law enforcement.  And

 3     there's no evidence in the record that those officers, you

 4     know, weren't discharging their duties.

 5              So I just wanted that as the backdrop before we

 6     get --

 7              THE COURT:  Sure.  Let's start with the first

 8     point.

 9              I mean, my understanding is that the standard for

10     an instruction is whether there is at least some evidence --

11     I mean, you may think the evidence tilts in your favor as to

12     whether he was the aggressor or not, but, you know, to get

13     an instruction on that isn't the standard whether there is

14     some evidence?  Right?

15              And here -- I will hear from Mr. Roots, but I'm

16     sure the argument will be that he only started advancing

17     after he was himself hit with nonlethal or observed others

18     he was around having been hit with nonlethal rounds.

19              And so if there's a factual question about that,

20     that's a jury question, and there should be an instruction

21     on it.

22              MR. DALKE:  I guess what I'm trying to get at is

23     with these fundamental underlying opinions, before we even

24     get to that --

25              THE COURT:  Well, let's talk about that first, and

 1   then if it's totally out because it's a law enforcement

 2   officer, that's a different question.

 3             MR. DALKE:  That's what I'm saying.  The rules in

 4   the Red Book apply to assault, right?

 5             THE COURT:  Sure.

 6             MR. DALKE:  You're in Superior Court.

 7             THE COURT:  Sure.

 8             MR. DALKE:  Two civilians, you get an assault.  I

 9   get the situation.

10             That's not the situation we have here, so I think

11   there is a question of whether we even get to Step B.

12             THE COURT:  All right.  Let's take it in your

13   order then.

14             Judge Mehta gave an instruction in the *Webster*

15   case.  Did that involve a law enforcement officer?

16             MR. DALKE:  It did, Your Honor.

17             THE COURT:  So he was -- that was wrong?

18             MR. DALKE:  I think in the position of the

19   government, that's not the instruction that we would -- we

20   don't think those instructions should be given.

21             THE COURT:  Okay.

22             MR. DALKE:  I wasn't involved in the Mehta case.

23             THE COURT:  Do you know if the government proposed

24   that instruction or whether the government objected to it?

25             MR. DALKE:  I'm not sure of the origins of it.  It

1    is the same instruction that we would be submitting; that if

2    the Court was going to go that way, essentially that's what

3    we would be submitting.

4              THE COURT:  Okay.  So the legal question is, as a

5    matter of law, if the evidence shows that the officers were

6    performing their duties, there is no self-defense

7    instruction under any circumstances?

8              MR. DALKE:  Because the individual's not justified

9    in using force under either resisting arrest or performance

10   of a duty by a law enforcement officer within the scope of

11   his duties.  That's the first step.

12             THE COURT:  Okay.

13             MR. DALKE:  And I don't think they've presented

14   any evidence contrary to that.

15             THE COURT:  Okay.

16             MR. DALKE:  So then you get to the second step --

17             THE COURT:  What if the force -- and I'm just

18   thinking out loud here.  What if the force by the police or

19   the federal officials in this case was arguably excessive

20   and a jury could make that finding?  Is there a self-defense

21   claim or right to self-defense in that situation?

22             MR. DALKE:  I think that would go to whether it

23   was within or outside the scope of their duties.

24             THE COURT:  Okay.

25             MR. DALKE:  I mean, we're starting to get into the

1    kind of tail end of that kind of preliminary question.

2         THE COURT:  So it's always within the scope of

3    their duties to use reasonable force?

4         MR. DALKE:  Reasonable force.  And if you're

5    getting beyond that, then I think you're outside the scope.

6         I think when we get to whether or not it's legally

7    permitted for him to argue self-defense in this case, to --

8    it then comes to the question of what's the standard to

9    raise that.  And the -- I do think I've read the *Webster*

10   instructions, and those would be where we're headed.

11        I guess the question is even to get to giving that

12   instruction to the jury that was given in *Webster*, you know,

13   he has to show through his own testimony, through the

14   evidence, a standard which I don't think he's met that prima

15   facie case.  Right?  So it is essentially that where a

16   person reasonably believes that he or another is in

17   immediate danger of unlawful bodily harm from an adversary

18   and the use of force is necessary to avoid the danger.  And

19   so that's what he must demonstrate.

20        And we cite the *United States vs. Slatten*

21   decision, again, from the District of Columbia from 2018.

22   There is also the *United States vs. Middleton*, which is an

23   11th Circuit Decision, as well as Judge Mehta in *Webster*.  I

24   believe there's also the *Biggs* decision in the Ninth Circuit

25   that we cited as well.

1          But it's clear from all these decisions, they just

2     don't say self-defense and you give it.  There's got to be a

3     showing to meet that burden, if it even applies.  So that's

4     where we're at.

5          THE COURT:  And which of those -- which parts of

6     that showing do you contend have not been met here?

7          MR. DALKE:  I don't think there's a reasonable

8     belief, I don't think there's an immediate danger, and I

9     don't think force is necessary to avoid the danger.  So

10     those will be the three that there hasn't been a showing

11     about.

12          The first is the defendant was not in immediate

13     danger of unlawful bodily harm, nor were the others around

14     him.  There's no evidence of injuries that have been

15     presented in this case.  The only evidence of a rioter being

16     injured around that time was Guy Reffitt, the guy in the

17     blue jacket who was sprayed.

18          THE COURT:  He showed his injuries in the

19     photographs of the bruises, right, the defendant's injuries?

20          MR. DALKE:  You mean from the photographs

21     themselves?

22          THE COURT:  Yes.  And he testified he was injured.

23          MR. DALKE:  And my counsel reminds me, those

24     injuries -- and I believe -- if I recall the testimony

25     correctly, were all after he advances up, gets hit with the

1    baton.  I mean, that's the first contact.  Right?

2          He doesn't have contact with law enforcement

3    before he moves up those steps.  He wasn't -- he couldn't

4    have been shot with the PepperBalls because he's weaving his

5    way up through the crowd.

6          He gets up there.  He takes the pallet; he moves

7    up; they have the interaction.  And that's when he

8    testified, "This is when they hit me with the baton, and

9    this is when they shot me in the groin area or in the leg

10   area," when he was on that front line committing the

11   assault.  So I don't think there's evidence of injuries.

12         I do think, when we talk about defense of others,

13   the case I want to talk about and the thing that we've got

14   to get into is that only comes into play if others had the

15   right to self-defense.  Right?  He doesn't just get to put a

16   blanket around everyone around him and say, "Well, I'm going

17   to defend you all."  It has to go that they had to have a

18   reasonable belief that they were in immediate danger of

19   unlawful bodily harm and that force was needed.

20         There's the *Fersner* decision, F-E-R-S-N-E-R,

21   involving the United States from D.C. in 1984, and the quote

22   was, "The trial court correctly observed that the right to

23   use force in defense of a third person is predicated upon

24   that other person's right to self-defense."

25         And here the evidence that's been shown is Guy

1    Reffitt repeatedly ignored those warnings that were on

2    video, you know, and law enforcement didn't continue to use

3    any force as to Guy Reffitt after he was sprayed.  And

4    there's no evidence of anything.  He gets sprayed.  He lies

5    down.  He continues to wave, but they're not -- there's no

6    video of them shooting him.  There's no video of, you know,

7    any use of force.

8             So to say that he could take up arms and assault

9    the officers to protect Guy Reffitt, there's no evidence of

10   that in the record.

11            The second one is the immediate danger.  Again,

12   he's fully suited up.  The evidence of -- there is no

13   evidence that he was in immediate danger.  I think from his

14   own words, you know, it was, you know -- I forget the exact

15   quote.  I don't have it for you.  But it was something to

16   the effect of, you know, "Try that on me."

17            He's got the body armor.  He's got the gas mask.

18   I think he testified at one point he took the gas mask off

19   and then he was sidelined.

20            But in that moment before the assault is all that

21   matters, and I don't think there's been a showing of that.

22            And I don't think there's been a showing -- and

23   this is where maybe it all comes down -- that force was

24   necessary to avoid the danger, and they have to show that

25   force was necessary to avoid the danger.  That moving up

1    those steps, that putting the hands on the officer, to

2    moving forward with the pallet was necessary.  And it's not

3    necessary.  I mean, there's no -- he's four or five steps

4    above the next rioter.

5            Guy Reffitt sat down, and he wasn't shot anymore.

6    When Alberts came back down after confronting those

7    officers, he wasn't shot anymore.  Right?  It was when he

8    was moving up as the aggressor that they responded.

9            You know, I do think there was testimony from the

10   defendant of people ducking in and out under the

11   scaffolding, was his own words, "ducking in and out."  You

12   know, "ducking under."

13           He made his way up pretty easy, kind of weaving

14   through the mob.  He certainly could have made his way back

15   down.

16           Again, to say that force was necessary and to put

17   that question to the jury, they haven't -- and that's just

18   to get it before the jury.  I don't think they've met that.

19           I think he -- there is evidence -- what is in the

20   evidence is that he ignored the warnings, that he escalated.

21           I think, as we also talked, there's evidence that

22   at the time of this incident he was breaking the law, which

23   goes to, you know, that underlying principle that use of

24   force is not justified when they're resisting arrest or --

25   and he certainly could have been arrested there.  He's

1   subject to arrest.

2            And, again, all the evidence that the Court has

3   seen and even from the defendant's own words is that he

4   advanced; he moved forward; he moved forward and upward; he

5   proceeded up those steps.  There's nothing about the

6   retreat.

7            It would be one thing if you say he stood there,

8   and the law enforcement officers came down, and then there

9   was a fight or a grapple.  He advanced on those officers.

10           So I just don't think, for those reasons, both the

11  underpinnings as well as the actual facts as applied to this

12  case, the defendant has -- one, is not entitled to it; and,

13  two, even if they were entitled to it under the

14  circumstance, haven't met the preliminary showing for that

15  issue to even reach the jury.

16           THE COURT:  Okay.  And if you could state as best

17  you can what the standard is for that preliminary showing.

18  Any evidence?  Scintilla of evidence?  Prima facie case?

19           When I go back and decide whether there's enough

20  in evidence -- assuming you're not right as a matter of law

21  with respect to a federal law enforcement officer.

22           MR. DALKE:  I think they have to make a showing, a

23  prima facie case.  They have to make some type of

24  demonstration, and that's what we don't think is made here.

25           THE COURT:  So something less than a

 1    preponderance, but just some prima facie showing?

 2            MR. DALKE:  I mean, it has to be a real showing.

 3    It can't be --

 4            THE COURT:  Sure.

 5            MR. DALKE:  -- speculative, hypothetical.  Like

 6    it's got to be -- and it has to be consistent with the

 7    evidence that's in there.

 8            THE COURT:  Of course.

 9            MR. DALKE:  I think if it's clearly -- the videos

10    confront -- you know, Mr. Alberts got up and for a day

11    testified about all those things, but it's not consistent

12    necessarily with the videos shown.  So I don't think just

13    saying "Well, he testified about it" is sufficient where,

14    when he testifies, it's belied by the video evidence of the

15    same time frame.

16            So I don't think that gets him there just to say,

17    "Well, he listened to all the testimony throughout the week,

18    and then he said otherwise."  That doesn't get it.  It needs

19    to be a little bit more.

20            THE COURT:  Okay.

21            All right.  Mr. Roots?  Mr. Pierce?

22            MR. ROOTS:  I think --

23            THE COURT:  Hold on one second.  I'm having

24    trouble getting what I'm looking for.

25            (Pause)

1          THE COURT:  Okay.

2          MR. PIERCE:  Excuse me, Your Honor.  We really

3    haven't had a break with everybody so far to use the

4    restroom, and I --

5          THE COURT:  Sure.  Why don't we take a ten-minute

6    break.

7          MR. PIERCE:  Thank you so much.

8          (Recess taken)

9          THE COURT:  All right.  I am not going to give a

10   self-defense or defense of others instruction.  I went back

11   and read the cases cited by the government, *Drapeau* from the

12   Eighth Circuit and *Branch* from the Fifth Circuit.

13         Obviously the application of self-defense in the

14   context of law enforcement officers performing their lawful

15   duties, which it's clear these officers were, is a different

16   sort of analytical issue than self-defense in regular

17   assault cases not involving law enforcement.

18         Quoting from the *Drapeau* case, "An individual is

19   not justified in using force for the purpose of resisting

20   arrest or in other performance of duty by a law enforcement

21   officer within the scope of his official duties."

22         In order to, I believe, establish the right to an

23   instruction or to justify an instruction, there must be

24   sufficient evidence from which a reasonable juror might

25   infer that either the defendant did not know the identity of

1    the law enforcement officer -- here there's testimony that

2    the defendant obviously knew that the people at the top of

3    the stairs were law enforcement officers -- or that the law

4    enforcement officer's use of force viewed from the

5    perspective of a reasonable officer at the scene was

6    objectively unreasonable under the circumstances.

7            Based on the evidence presented, the Court finds

8    that no reasonable juror that could conclude that the use of

9    nonlethal pepper spray, tear gas, and plastic projectiles to

10   protect rioters from scaling the stairs to eventually breach

11   the Capitol who, from the perspective of the officers, were

12   unauthorized to be there under all the circumstances

13   reflected in the video and given the uses of those forms of

14   lethal -- of nonlethal force testified to by Officer

15   Kerkhoff, the Court does not think that there is sufficient

16   evidence to justify a self-or-others defense instruction to

17   a charge of assault against a law enforcement officer.  And

18   that is especially so given that there is no evidence of any

19   injuries resulting from that use of nonlethal force other

20   than the superficial injuries that Mr. -- that the defendant

21   has testified to.

22           So we won't give a self-defense instruction.

23   Obviously your objections are noted for the record for any

24   appellate review.

25           Okay.  We distributed the latest version of the

1    instructions that we have come up with.  I'm just going to

2    go through these.

3         Do you have them in front of you, Counsel?

4         MR. DALKE:  Yes, Your Honor.

5         THE COURT:  All right.  And look through them, if

6    you haven't already.  If there are any, you know, typos or

7    misstatements or anything that you see or instructions that,

8    you know, are sort of the non-substantive instructions that

9    have been omitted or any that are in there that shouldn't be

10   in there, please let me know.

11        We included a "Character of Defendant" instruction

12   at Instruction No. 19 because we heard character evidence.

13        On Instruction No. 20, the civil disorder

14   instruction, Mr. Konig or Mr. Dalke, the -- it says Count 1

15   of the indictment charges the defendant with committing or

16   attempting to commit, yet there was no attempt instruction

17   proposed by the government, I don't believe.

18        In the past I have included a definition of

19   "attempt" in the instructions.  Should that have been in

20   there?

21        MR. DALKE:  I think probably not in this case,

22   Your Honor.

23        THE COURT:  Okay.

24        MR. DALKE:  We were just taking it from the prior

25   one.

1          THE COURT:  So you won't be proceeding on an

2     attempt theory?

3          It doesn't strike me as an attempt case.

4          MR. DALKE:  I don't think the evidence shows the

5     attempt.  The reason I hesitate is because I do think an

6     attempt is included in every charge whether or not it's laid

7     out in the indictment.

8          THE COURT:  The question is whether you instruct

9     them on the definition of "attempt."  It takes more time.

10    It can be confusing if you're not proceeding on an attempt

11    theory.

12         MR. DALKE:  As to Count 1, we don't have a problem

13    taking it out.  I do think attempt as to Count 2 does

14    matter.

15         So I guess to get to the end of the issue, I do

16    think we are asking for the Court to instruct on attempt

17    because you could have attempted assault.  So I do think it

18    has some relevance or bearing, at least as to one of the

19    counts.  So if we're going to instruct as to 1, they can

20    just refer back to Count 1 in the later ones.

21         But specifically as to Count 1, Your Honor's

22    correct.  That's not our theory of Count 1.

23         THE COURT:  All right.  Well, then, moving to

24    Count 2 --

25         MR. ROOTS:  Your Honor, could I discuss some of

1      the stuff up above, that count up above?

2            THE COURT:  Sure.  You can stay there.  You can

3      stay there.

4            MR. ROOTS:  Okay.  On Page 3, I just make it a

5      point of always objecting to Instruction 9.  I know this is

6      sort of boilerplate, and it's a model instruction.

7            Burden of proof, at the very last sentence on that

8      page, Page 3, it says, "If you find that the government has

9      proven beyond a reasonable doubt every element of an offense

10     with which Mr. Alberts is charged, it is your duty to find

11     him guilty of that offense."

12           Again, I recognize that is a model instruction,

13     but I make a point of objecting.  It should not say "it is

14     your duty."  It should say "you may find him guilty."

15     Because obviously there's a grand history of this.  The jury

16     is required to acquit if the government fails to prove its

17     burden of proof, but never is the jury required to convict.

18     Never under any circumstances.

19           THE COURT:  So I've gone through this instruction

20     with other defendants.  The Federal Public Defender Service

21     here certainly makes a similar point that you make, and

22     this, frankly, is sort of a middle ground.

23           You know, I tend to tell my juries that if the

24     government hasn't proved its case, they "must."  But if the

25     jury finds that the government has proved its case, it has a

1    duty, and I think we tell the jury that they do have a duty

2    to follow the instructions.

3              It's less strong than "must."  It recognizes the

4    point that you are making, but it doesn't go so far as to

5    say "may" or, you know, "can, if it likes," or, you know,

6    "can, if it agrees with the law," or any of the other sort

7    of arguments for jury nullification.

8              So we've addressed this before, and I think that

9    this is an appropriate middle ground.  Okay?  Your

10   objection's noted.

11             MR. ROOTS:  Okay.  Now, on Instruction No. 14 on

12   Page 6, similar -- similar argument there.  The very first

13   sentence says, "In determining whether the government has

14   proved the charges against the defendant beyond a reasonable

15   doubt, you must consider the testimony of all the

16   witnesses."

17             I think the jury is not required -- this is -- it

18   should be -- it should say "you should" -- or "you may

19   consider it."  I would even -- I would have no objection

20   with the word "should."  But I think the jury has the

21   prerogative to reject utterly the testimony of a particular

22   witness.

23             THE COURT:  It just says you must consider it.

24   You can reject it, and I think the jury will understand

25   that.  So we'll keep that instruction.

1          MR. ROOTS:  Okay.  I think that's all we had for

2     those preliminary ones.

3          THE COURT:  Okay.  So getting back to Count 2 --

4          MR. ROOTS:  If I could make a little point about

5     Count 1?

6          THE COURT:  Sure.

7          MR. ROOTS:  We would object to -- there's two

8     points that suggest that Mr. Alberts can be convicted based

9     on things he didn't personally have -- that he was not

10    involved in; and that is this idea that a civil disorder can

11    occur that he didn't have a role in and that he could be

12    convicted of other people's civil disorder.  I think the law

13    is that individually he must have done something to create

14    the civil disorder.

15         And the second point involves the commerce, the

16    same point about the commerce.  Mr. Alberts must have had

17    something to do with impact on commerce.

18         THE COURT:  Okay.  The Court will overrule both of

19    those objections.  I think the law is clear that the

20    defendant himself does not necessarily have to engage in

21    civil disorder so long as the officers involved were

22    performing their duties incident to a civil disorder.

23         I didn't write the statute, Mr. Roots.

24         And the same for the commerce point.

25         Okay.  Going to Count 2.  It says, "charges the

1    defendant with forcibly assaulting," et cetera, but doesn't

2    say "attempt."  If we're going to instruct on attempt,

3    should we include the word "attempt" in that first sentence

4    somehow?

5            MR. DALKE:  So under the definitions, when it

6    defines "assault," it defines it as including intentional

7    attempt and kind of has it in there a little bit.

8            It is a shorter instruction than the full-blown

9    "attempt" instruction that sometimes is used for other

10   charges, such as the 231 or 1512.

11           I've seen it this way in other cases.  I think

12   it's fine.  I have no opposition to a full "attempt"

13   instruction either, if that's the Court's preference.

14           THE COURT:  The government is fine with this

15   instruction?

16           MR. DALKE:  Yes, Your Honor.

17           THE COURT:  Okay.

18           MR. ROOTS:  We have a little bit of an objection

19   toward the end of this --

20           THE COURT:  Okay.

21           MR. ROOTS:  -- Count 2.  And that is, "You're

22   instructed that these officers are officers of the U.S.

23   Capitol Police and that it was part of their official duties

24   to protect the U.S. Capitol complex and detain individuals

25   who lacked authorization to enter the restricted area around

1     the complex."

2              I think all that language should be removed, and

3     it should just say --

4              THE COURT:  I'm sorry.  Mr. Roots, what page are

5     you on, just so I'm following you?

6              MR. ROOTS:  Page 13.  Page 13.

7              THE COURT:  13, okay.

8              MR. ROOTS:  And this would be the very bottom of

9     the assault instruction, No. 21.

10              Obviously we contest that the green grass around

11     the Capitol is this restricted area that -- we offered a

12     proposed -- we objected in our proposed instruction, and

13     it's on file.  And we do not believe that they had authority

14     to arrest anyone or detain anyone who just entered the

15     restricted area.

16              Obviously there's that line of cases, the *Jeanette*

17     *Rankin Brigade* line, that says that the Capitol grounds are

18     relatively assumed and presumed to be open -- a public

19     forum.  So we don't believe that they could just arrest

20     people for being there.

21              THE COURT:  Well, that case is inapposite, and --

22              MR. ROOTS:  Well, I also would just say this

23     language doesn't need to be here for this purpose.  We don't

24     contest that those officers were performing official duties.

25     But that language that says they had duties, and they had

1    the authority to detain individuals, blah, blah, blah, who

2    had all this, I don't think that language --

3          THE COURT:  Can we just say that the -- "you are

4    instructed that Officers X, Y, and Z were performing their

5    official duties at the Capitol on January 6, 2021?"

6          MR. ROOTS:  Yes.  We don't contest that.

7          THE COURT:  Okay.

8          MR. DALKE:  Your Honor, the government wouldn't

9    oppose dropping the --

10         THE COURT:  Got it.

11         MR. DALKE:  -- end of that language.

12         We did -- there was one -- it's not really a typo,

13   but one small type of correction that we would also propose.

14         THE COURT:  So let's just handle the first change

15   first.

16         I will instruct that "You are instructed that the

17   officers were performing their official duties at the U.S.

18   Capitol complex on January 6, 2021," period, and delete

19   everything else.

20         MR. ROOTS:  Actually, Your Honor, now that I think

21   about it, we also are contesting, you know, for the record,

22   the lack of a self-defense jury instruction.  And our

23   argument that we have is that excessive force is not part of

24   their official duties.

25         So if it could just be worded something like it

1    was part of the official duty of such officers to protect

2    the U.S. Capitol complex on January 6th and detain people

3    for crimes, something like that.

4              THE COURT:  Any objection to that?

5              MR. DALKE:  I think we're starting to meddle -- it

6    made more sense to me that at the end of January 6, 2021,

7    just to put a period.  Defense had a problem with the rest

8    of it.

9              But to start adding in -- so it would read, "You

10   are instructed that the officers," and it lists it out, you

11   know, "are officers and it was part of their official duties

12   of such officers to protect the U.S. Capitol complex on

13   January 6, 2021," period.

14             THE COURT:  Got it.

15             MR. DALKE:  Then it's not necessary to show --

16             MR. ROOTS:  That would be fine with us.

17             THE COURT:  I think that works.  Okay.

18             MR. DALKE:  The one inconsistency that I wanted to

19   note for this one, I think Officer Sherman is correctly

20   listed on Page 11.  But then when the officers are listed

21   again on Page 13, his name is not in there for the second

22   time.  So just having his name consistent across both --

23             THE COURT:  Okay.

24             MR. DALKE:  He was one of the officers who was

25   mentioned by name.

 1          And at the same time I think we should drop

 2     "Inspector Amy Hyman."  I'm not sure she was one of the

 3     names listed through the testimony, although she was there.

 4     I just don't think that there's -- she's in the record.

 5          THE COURT:  All right.  We'll add Sherman and drop

 6     Hyman.

 7          MR. DALKE:  And then the one last on this point

 8     was that the fifth element on Page 12 where it's talking

 9     about another felony.

10          THE COURT:  Yes.

11          MR. DALKE:  It references the offense charged in

12     Count 1, which is certainly a felony.  Counts 3 and 4 are

13     also felonies, although they have also lesser included, or

14     if you look at it inverse, it's a misdemeanor that gets to a

15     felony with the enhancement of having a firearm carried.

16          It seems like it might be appropriate to have

17     Counts 3 and 4 listed with Count 1, but I'm not trying to

18     overly complicate this.

19          MR. ROOTS:  And it gets overly complicated because

20     obviously we're making a Second Amendment point, and this

21     might be up on appeal, and so we are -- so we will be

22     arguing that even if it doesn't go to the jury for the

23     jury's consideration, it's a -- it is a -- the possession of

24     gun stuff is a real challenge for us.

25          THE COURT:  I'll add 3 and 4.

```
 1              MR. DALKE:  And --
 2              THE COURT:  On this point, on this count, I find
 3    it somewhat confusing because the first element is the
 4    defendant assaulted, resisted, opposed, plus all those other
 5    things.  Right?
 6              But when you get down to the fifth element, it
 7    says the defendant made physical contact with and assaulted
 8    a person.
 9              And so regardless of whether the jury finds that
10    the government proved the fifth element by resistance,
11    opposition, impedance, et cetera, it all comes back to
12    assault.
13              MR. DALKE:  I do think that's confusing.  I'm just
14    looking at it now.
15              I don't know if we just want to list out the six
16    words again.
17              THE COURT:  But is it -- but can you physically or
18    forcibly impede without an assault?  It's just a weird
19    construction, you know?
20              MR. DALKE:  I mean, maybe it should read:  Fifth,
21    the defendant made physical and forcible contact with a
22    person who is an officer.  So you're just taking out the
23    "assault" in the fifth because it's already in there in the
24    first.
25              THE COURT:  Physical and forcible.
```

```
 1              Mr. Roots, any view on that?

 2              MR. ROOTS:  Just the word "assault" sounds like

 3    common-type language.

 4              I don't know.  I really don't have a strong

 5    opinion on it.

 6              THE COURT:  Where is this instruction from?  I

 7    think we took this from the government's proposal, if I'm

 8    not mistaken.

 9              MR. ROOTS:  Obviously this statute's been upheld

10    many times, but the word "intimidated" is one of those First

11    Amendment, you know, true threats kind of.  It implicates

12    First Amendment, so we would say that's unconstitutional.

13              THE COURT:  Well, let's stick with my question

14    first before we get to any objection to other words.

15              MR. DALKE:  So, Your Honor, we're looking for -- I

16    do have Webster in front of me.  I'm not sure if that's the

17    exact one that it comes from.

18              On the fifth element in Webster, it said, "Fifth,

19    the defendant made physical contact with a person who was

20    assisting officers of the United States who were then

21    engaged in the performance of their official duties

22    proactive with the intent to commit another felony."  So

23    they don't have "assault" in there in Webster.

24              Now there I think it was the fifth because it was

25    probably an MPD officer as opposed to the Capitol Police.
```

1   Here it is a Capitol Police officer so we don't need

2   "assisting the officers" because Capitol Police are the

3   officers of the United States.

4           But I think, to be consistent with at least what

5   was charged in *Webster*, you would not have "assault" in the

6   fifth element.  You'd just have the list of all of the words

7   in the first element, which is consistent with the language

8   directly from the statute.

9           (Pause)

10          THE COURT:  I guess my concern is the first

11  sentence of the instruction says "forcibly assaulting,

12  resisting, opposing," et cetera.  But it also requires

13  physical contact --

14          MR. ROOTS:  Yes --

15          THE COURT:  -- which is what the -- that's sort of

16  the gravamen of the "forcibly" adverb.  That's what makes it

17  forcible, is the physical contact?

18          MR. ROOTS:  In the definitions, the word "assault"

19  is defined pretty well for us, that it requires an intent

20  for bodily harm.  All right?

21          But then the other terms in the definitions, the

22  next page, Page 13, the terms "resist, oppose, impede,

23  intimidate, and interfere with" carry their everyday

24  ordinary meanings.  We'll just go ahead and make a First

25  Amendment objection to those words.

1           Now, "assault" -- we agree that "assault"

2      requires intent to bodily injure and force.  But these other

3      things -- and I know this statute's been upheld.  It's

4      probably one of the oldest statutes in the criminal code.

5      But First Amendment-wise, these terms like "intimidating,"

6      that can't be the law, forcibly intimidating someone.

7           True threats, you know, there's that huge line of

8      cases.

9           So I'll just say right now we want "assaulting" to

10     be the only one of those words; and if those others are in

11     there, we would object on First Amendment grounds.

12          THE COURT:  Okay.  So I'll overrule that

13     objection.

14          So the question for the government is what to do

15     with the fifth element.

16          MR. DALKE:  Yes, so -- and I just pulled up some

17     of the cases to try to answer Your Honor's question and get

18     us there.

19          So Section 111 does require all of the actions to

20     be done forcibly.  There's no question.  The government

21     agrees to that.

22          However, the amount of force only needs to be

23     minimal.  And there's no particular level of force that's

24     required to prove the offense.  Right?  So some quantum of

25     force or threat of force in committing the offense gets us

1    there.

2             So if you're looking at No. 5, I think we can

3    either rely on the forcibleness, which is listed early on,

4    or if you're coming down -- because that would be the second

5    element.  Right?

6             So the first is the defendant did one of these six

7    things.  The second is he did any one of those with force.

8    So it's covered.  I mean, that's the second element.

9             So I don't think you need to repeat it again at

10   the fifth, because I think by the time you get to the fifth,

11   it's just -- there's also physical contact.

12             THE COURT:  But you need physical contact?

13             MR. DALKE:  You do.

14             THE COURT:  Okay.

15             MR. DALKE:  So you need physical contact.  I just

16   think it's already listed.  I don't know if it gets us to

17   list it again.  And so it's the government's mistake in --

18             THE COURT:  Why don't we just say:  Fifth, the

19   defendant made physical contact with a person who was an

20   officer and employee.

21             MR. DALKE:  And that's what was instructed in

22   *Webster*, yes, Your Honor.

23             THE COURT:  Okay.  That's what I'll do.

24             MR. ROOTS:  Now, did I hear you right, Your Honor,

25   that that last sentence for purposes of this element,

1    "another felony" refers to the offense charged in Count 1?

2    You're adding Counts 3 and 4?

3              THE COURT:  Yes, I am.

4              MR. ROOTS:  Again, we have this Second

5    Amendment --

6              THE COURT:  I understand.  Your objection's noted.

7              MR. ROOTS:  And I did say something about whether

8    or not it goes to the jury.  I want to clarify that in my --

9    that in our opinion, it is an issue of fact for the jury in

10   terms of whether it was a sensitive place to possess arms or

11   not.

12             THE COURT:  Yes, I'm going to rule on those two

13   that you submitted in a minute.

14             All right.  I think that brings us to anything in

15   Count 3.

16             MR. ROOTS:  Yes, we have that.  Obviously the

17   last -- the first sentence there, it ends with words "which

18   is a violation of federal law."

19             Again, we note our objection that that's not

20   federal law; that the Second Amendment actually is federal

21   law.

22             THE COURT:  Very well.  Your objection's noted.

23             Anything else on the government's side in Count 3?

24             MR. DALKE:  On Count 3, the only thing would be,

25   again, just consistency.  I think it's -- the statute says

1      "use or carry."  The government's only presented on "carry,"

2      and some places, I think on Page 14, it just says "while

3      carrying," "includes carrying."  But then I think in the

4      initial sentence on Page 13 and then in the third element,

5      it's "use or carry."

6              I think it's cleaner just to say "carry" because

7      that's consistent with the evidence, the government's

8      theory, and all those preceding, just to have it consistent.

9              THE COURT:  I agree with that.

10             MR. DALKE:  But other than that, nothing as to

11     Count 3.

12             THE COURT:  So I see the "carry" in Line 2 in

13     which of the elements?

14             MR. DALKE:  The third element is the other place I

15     noticed it.

16             THE COURT:  Yes.

17             Count 4.

18             MR. DALKE:  So it would just be the same with

19     Count 4, as the "use or carry."  So I think it would just be

20     in the second line.  And that was the only place in Count 4

21     I saw that.

22             THE COURT:  Got it.

23             All right.  I also -- we removed in the first

24     element -- I think the statute says "in proximity to."

25     we removed "in proximity to," because I don't think there's

1    a -- the government's theory is that he was on the grounds,

2    not in proximity to the grounds.  And I'm not sure if "in

3    proximity" would pass muster anyway.  I mean, what if he's

4    two blocks?  What does "in proximity" mean?

5              MR. ROOTS:  And we would just note, we filed some

6    proposed jury instructions, and we object to this whole idea

7    of the vice president being described as temporarily

8    visiting, when, in fact, it's his daily job site.  He's not

9    temporarily visiting there.  He's there every day as his

10   job.

11             MR. KONIG:  Your Honor, that was never actually

12   filed, so I'd ask the Court to make just a brief ruling on

13   that, if the Court's inclined to follow every other court in

14   this district and deny that.

15             THE COURT:  I'll overrule that objection.

16             MR. ROOTS:  Can I ask, Mr. Konig, when you say it

17   was never filed, what do you mean it was never filed?  I

18   thought it was filed.

19             MR. KONIG:  To my knowledge, there was no motion

20   to dismiss based on a challenge to the "temporarily

21   visiting" language in this case.

22             MR. ROOTS:  We did file proposed jury

23   instructions.

24             THE COURT:  Well, that's a matter of record.

25   Either it's filed or it's not.  I don't know sitting here.

1              MR. ROOTS:  Just another question.  As these jury

2     instructions are being read to the jury, does Your Honor

3     expect us to individually object with each --

4              THE COURT:  No, no, that's the purpose of this.

5              MR. ROOTS:  Okay.  So when we state our

6     objections --

7              THE COURT:  Yes, your objections are noted for the

8     record --

9              MR. ROOTS:  Thank you.

10             THE COURT:  -- and preserved.

11             All right.  Count 5, Instruction No. 24.  The

12    government's proposal included "engaging in physical

13    violence in a restricted building with a deadly or dangerous

14    weapon or firearm."  But I don't think --

15             MR. DALKE:  That was just a mistake, Your Honor.

16             THE COURT:  That was a mistake?  Okay.  So we've

17    taken that out.

18             MR. DALKE:  And we have no problem taking out the

19    word "threat" under the first definition either.

20             THE COURT:  Yes.  And that was my next question.

21             Count 6.  All right, in the element we included

22    "knowingly carried," which I think is the law.

23             MR. DALKE:  So just to be heard on that briefly?

24             THE COURT:  Yes.

25             MR. DALKE:  This was the one instruction that we

1    switched following I think it was Judge Kelly's decision in

2    *Ibrahim* on that issue.  It was the case that I think we cite

3    in our instructions.

4           We do believe that Judge Kelly was correct on that

5    issue, that there is no "knowingly" element --

6           THE COURT:  It's strict liability.

7           MR. DALKE:  As to that count only, yes.

8           THE COURT:  I don't think I've -- I have not read

9    that.  What's the -- what's the name of the decision?

10   *Ibrahim*?

11          MR. DALKE:  That's the decision, yes.  And I've

12   got the cite.  It's 21-cr-496.  I believe it was a decision

13   from March 3, 2023, so it's just been a little over a month.

14          I know there are --

15          THE COURT:  Any contrary decisions in this

16   circuit?

17          MR. DALKE:  Not that I'm aware of, Your Honor.

18          THE COURT:  All right.  We'll have to take a look

19   at that.

20          I mean, in every other gun possession case I've

21   ever had, it's always a defense -- you know, if the guy put

22   on a jacket and didn't know the gun was in the pocket, you

23   know, it's his -- it's a defense.

24          What was the basis of Judge Kelly's ruling to the

25   contrary?

```
 1              MR. KONIG:  Your Honor, I can actually email the

 2     Court and the parties the transcript of that ruling, which I

 3     received shortly before we amended our proposed

 4     instructions, if that would be helpful.

 5              THE COURT:  Sure.

 6              MR. KONIG:  It's 34 pages.  I don't know that all

 7     of them relate to that issue.

 8              THE COURT:  That would be very helpful.  He ruled

 9     from the bench?  There's no written ruling?

10              MR. KONIG:  Yes.  And I'll just send it to

11     Ms. Higgins.

12              THE COURT:  Has this been charged in any other

13     January 6th case?  *Reffitt*?  Was it charged in *Reffitt*?

14              MR. DALKE:  I don't believe it was, Your Honor.

15              THE COURT:  It would be helpful to see an

16     instruction from another court in this district on that

17     count.

18              MR. DALKE:  I'll check *Reffitt* during the break,

19     Your Honor.

20              THE COURT:  Okay.  What's the statute say?  That's

21     always a good place to start.  Hold on.

22              MR. ROOTS:  And if I haven't already made it

23     clear, we would add a Second Amendment objection to all

24     these firearm counts.

25              THE COURT:  You've made that clear.
```

```
 1              MR. DALKE:  Your Honor, and in an effort to move

 2     along these proceedings without, you know, being

 3     problematic, I think specific to the facts of this case and

 4     not wanting to use it to influence other cases, we'd be

 5     happy to go with the "knowing" as to this case.

 6              I just don't want to bind the government as to

 7     future -- it's a case decision -- case-basis-specific

 8     decision that's being made by the government in saying I

 9     think we could go with "knowingly."

10              However, I do think Judge Kelly has gone the other

11     way on that issue.

12              THE COURT:  That's a prudent cause of action.

13              So having included "knowingly," we will include a

14     definition of "knowingly."

15              The government's proposal also included, I think

16     probably inadvertently, a definition of "willfully."  Is

17     that required?

18              MR. DALKE:  One minute, Your Honor.

19              I do think it's required under 5104(e)(1)(B), the

20     statute requires the defendant to have acted willfully.

21              THE COURT:  But that is Count 7.  This is Count 6.

22              MR. DALKE:  In that case, it's an editing mistake,

23     Your Honor.

24              THE COURT:  Okay.  I think that's probably what it

25     is.
```

```
 1              MR. ROOTS:  We would just say, we want "willfully"
 2      to be in there.
 3              THE COURT:  I don't think "willfully" is an
 4      element.
 5              And "willfully" is also in Count 8.  Mr. Dalke,
 6      that's an element?
 7              MR. DALKE:  I believe in Count 7 and Count 8, so
 8      we just ask the Court move the definition of "willfully"
 9      from Count 6 to Count 7.
10              THE COURT:  Got it.
11              MR. DALKE:  And then Count 8 can refer back to
12      Count 7.
13              THE COURT:  Got it.
14              Okay.  On the unanimity instruction, we've -- in
15      prior cases where folks have suggested a special instruction
16      on unanimity if the government's theory on Count 1 I guess
17      here, the -- or Count 2, the assaulting, resisting, impeding
18      count is based on two different actions.
19              I take it that the government's theory on Count 2
20      is just encompassed by what happened at the top of the
21      stairs?
22              MR. DALKE:  That's correct, Your Honor, in that,
23      whatever, two-minute, approximately, time span.
24              THE COURT:  Okay.  And not the throwing of the
25      bottle or any other assault, alleged assault?
```

1           MR. DALKE:  As to Count 2, that is correct.  The

2     Count 2 assault is only as to the top of the stairs.

3           THE COURT:  So I don't need to instruct that they

4     must be unanimous as to which act constituted the resistance

5     or assault?

6           MR. DALKE:  Correct.

7           THE COURT:  All right.  I think that's all I had.

8           Anything else?

9           Okay.  On --

10          MR. ROOTS:  We'll just -- we'd like to add that we

11    stand on all of the -- both of our written or oral

12    objections.

13          MR. DALKE:  And, Your Honor, I was remiss in one

14    point.  I think my colleague has caught something that

15    missed my attention.  So it does require going back, but

16    it's just one discrete issue.

17          THE COURT:  Going back...?

18          MR. DALKE:  I think it's to Count 2.

19          THE COURT:  Okay.

20          MR. NOHRIA:  Thank you, Your Honor.  The

21    government would be requesting the instruction that "injury"

22    means any physical injury, however small, including a

23    touching offensive to a person of reasonable sensibility.

24          MR. ROOTS:  We object to that.  I think there's a

25    lot of history on the assault.  It's one of the most

```
1    litigated concepts in the common law.  And a mere touching

2    cannot be assault except for sexual assault.  And there's a

3    pickpocketing -- there are some kind of assaults where a

4    mere touching can be an assault, but not in a 111(a)(1).

5    This has to be forcible assault with intent to injure.

6              THE COURT:  Why do we need a definition for

7    "injury"?

8              MR. NOHRIA:  Your Honor, given defense counsel's

9    assertions that the level of bodily injury might be at

10   issue, and that the intent for the injury, as long as the

11   defendant intended the offensive touching, regardless of the

12   extent of the injury that results, that would be enough to

13   meet the elements of 111(a).

14             And Courts have found that definition under

15   111(a).  The government would cite to *United States vs.*

16   *Acosta-Sierra.*  That's from the Ninth Circuit, and it says,

17   "Because Section 111(a) does not define 'assault,' we've

18   adopted the common law definition of 'assault' either, one,

19   a willful intent to inflict injury upon the person of

20   another; or, two, a threat to inflict injury upon the person

21   of another which, when coupled with the present ability,

22   causes a reasonable apprehension of immediate bodily harm."

23             MR. ROOTS:  Well, they're talking about the

24   intent --

25             THE COURT:  Are you going to argue that the
```

1 officers did not suffer serious injuries or only minor

2 injuries?

3   I mean, if you're going to put the extent of the

4 injury at issue, then, you know, we should probably tell the

5 jury what "injury" means.  If you're not going to make that

6 argument, then we probably don't need an instruction.

7   MR. ROOTS:  In order to be convicted, it has to be

8 proven by a reasonable doubt that Mr. Alberts had the intent

9 to commit injury, and that cannot be some touching.  It

10 cannot be some hair follicle moved.  It has to be actual

11 somewhat serious injury.

12   Or, I mean, assault can be committed in several

13 ways.  It can be committed with injuries, but there's no

14 showing of injuries here.

15   Here it's about the intent, and it has to be

16 intent to cause injury.  And there's a lot of law that says

17 it needs to be something more than just a touching.

18   THE COURT:  All right.  I'm not going to include a

19 definition.  If the jury is struggling with that, then

20 they'll send out a note, and we may revisit the issue.

21   MR. NOHRIA:  Understood, Your Honor.

22   THE COURT:  Let them figure out for themselves

23 what an injury is.  All right?

24   MR. DALKE:  Your Honor, before we break, I know at

25 the outset of the case we had some guideposts for openings.

1    We're now approaching closings.  I don't know if we're going

2    to speak with Your Honor again before closing.  I think it

3    might be prudent now or if we're going to break for lunch to

4    have two or three minutes.

5         I think some of the concerns arise out of

6    defense's arguments right now about Second Amendment, which

7    I think have been squarely rejected.  It seems like they're

8    going to be arguing that.  It seems like they're going to be

9    arguing potentially self-defense notwithstanding the Court's

10   rulings.

11        I think there needs to be -- the government would

12   be requesting, given what's gone on in this trial, some

13   guideposts so we have a cleaner presentation to the jury

14   hopefully.

15        THE COURT:  Okay.  First of all, Ms. Jenkins, why

16   don't we let the jury go to lunch because we're probably

17   going to break for lunch ourselves before we instruct.  So,

18   Ms. Jenkins, if you can just let them know to be back at

19   1:30.

20        THE COURTROOM DEPUTY:  Okay, Your Honor.

21        THE COURT:  All right.  And, Mr. Roots, you did

22   file proposed First Amendment and Second Amendment

23   instructions.  The Court will not give those.

24        With respect to the First Amendment, the defendant

25   is not being charged with a speech.  He's being charged with

1    specific conduct.  None of the statutes that he has been

2    charged under have been held to violate First Amendment;

3    and, moreover, the government can place reasonable time,

4    place, and manner restrictions on First Amendment activity.

5            With respect to the Second Amendment, whether a

6    place is a sensitive place is a matter of law under the D.C.

7    Circuit's ruling in *U.S. vs. Class*, which the Court is bound

8    by.  The circuit upheld 1504(e) against an as-applied

9    challenge involving a firearm recovered under very similar

10   circumstances and in the same type of place as that here.

11           So the Court is bound by that ruling, but your

12   objection is noted for the record.

13           MR. ROOTS:  Well, in this case it does -- actually

14   it would help us if we had some guidelines about what we can

15   say on closing argument.

16           Can we say that Mr. Alberts, in his own mind,

17   believed he had the right to possess firearms?

18           MR. DALKE:  Your Honor, I think it's jury

19   nullification in the defense's case.  It's not an element in

20   any of the instructions we just went into.  It's not part of

21   it.  It's not part of this case.

22           THE COURT:  All right.  Let me think about that

23   one.  I mean, my -- let me noodle over that one.

24           Anything else?

25           MR. ROOTS:  And the same would go with the First

1    Amendment.  I think we could -- I think we should be able to

2    say that Mr. Alberts was there to have his voice heard, as

3    he testified.  I'm hoping we can at least say things like

4    that during the closing.

5           MR. DALKE:  I mean, certainly having his voice

6    heard is no problem.  There's ample evidence of that.

7           I think it's going the step further -- which

8    defense has tried to go a couple of times, and the Court has

9    shut him down -- as invoking the cloth of the first or

10   Second Amendment protections, which, you know, he didn't

11   have given the conduct he did at the place he did it at the

12   time he did it.

13          THE COURT:  All right.  I'll give you some

14   guidance after the break.  Let us finalize the instructions.

15          We'll have the jury come back at 1:30.  I'll give

16   you some guidelines on cross -- excuse me, on closings, and

17   then we will instruct and move right into closings.

18          We're going to limit them to an hour combined for

19   the government and an hour for the defense.  And we should

20   be able to wrap that up this afternoon.

21          Anything else?

22          All right.  We're adjourned.

23          (Lunch recess taken at 12:20 p.m.)

24

25

1        <u>**CERTIFICATE OF OFFICIAL COURT REPORTER**</u>

2

3              I, LISA A. MOREIRA, RDR, CRR, do hereby

4     certify that the above and foregoing constitutes a true and

5     accurate transcript of my stenographic notes and is a full,

6     true and complete transcript of the proceedings to the best

7     of my ability.

8          Dated this 18th day of April, 2023.

9

10                                   /s/Lisa A. Moreira, RDR, CRR
                                    Official Court Reporter
11                                   United States Courthouse
                                    Room 6718
12                                   333 Constitution Avenue, NW
                                    Washington, DC 20001
13

14

15

16

17

18

19

20

21

22

23

24

25

# #

**#172** [1] - 1000:4

# '

**'assault** [1] - 1114:17
**'assault'** [1] - 1114:18

# /

**/s/Lisa** - 1119:10

# 1

**1** [11] - 1090:14,
1091:12, 1091:19,
1091:20, 1091:21,
1091:22, 1094:5,
1099:12, 1099:17,
1105:1, 1112:16
**10** [1] - 1027:9
**106** [1] - 1075:16
**11** [1] - 1098:20
**111** [1] - 1103:19
**111(a** [1] - 1114:17
**111(a)** [2] - 1114:13,
1114:15
**111(a)(1)** [1] - 1114:4
**11:55** [1] - 1021:21
**11th** [1] - 1081:23
**12** [2] - 1037:10,
1099:8
**12:20** [1] - 1118:23
**12:30** [1] - 1019:23
**12:55** [1] - 1021:21
**12:57** [1] - 1032:12,
1041:11, 1044:22
**12th** [2] - 1065:18,
1065:20
**13** [6] - 1096:6,
1096:7, 1098:21,
1102:22, 1106:4
**14** [2] - 1093:11,
1106:2
**150** [1] - 1024:22
**1504(e** [1] - 1117:8
**1512** [1] - 1095:10
**16** [1] - 1032:3
**17** [2] - 1036:15,
1044:18
**17101** [1] - 999:18
**18** [2] - 999:4, 1041:1
**188** [2] - 1036:13,
1062:15
**18th** [1] - 1119:8
**19** [2] - 1041:2,
1090:12
**1984** [1] - 1083:21
**1992** [1] - 1013:5
**1:00** [2] - 1019:23,

**1058:14
1:15-ish** [1] - 1023:4
**1:20** [1] - 1058:14
**1:21-cr-00026-CRC-1**
[1] - 999:4
**1:30** [2] - 1116:19,
1118:15
**1:54** [1] - 1076:21

# 2

**2** [12] - 1043:2,
1091:13, 1091:24,
1094:3, 1094:25,
1095:21, 1106:12,
1112:17, 1112:19,
1113:1, 1113:2,
1113:18
**20** [3] - 1021:22,
1022:2, 1090:13
**20001** [3] - 999:22,
1000:9, 1119:13
**20044** [1] - 999:14
**2012** [1] - 1027:16
**2018** [2] - 1076:17,
1081:21
**202** [3] - 999:15,
999:22, 1000:10
**2020** [1] - 1066:20
**2021** [18] - 1032:12,
1033:16, 1033:22,
1033:23, 1039:7,
1040:23, 1041:10,
1042:16, 1044:23,
1046:18, 1056:5,
1059:12, 1060:6,
1063:12, 1097:5,
1097:18, 1098:6,
1098:13
**2023** [3] - 999:4,
1109:13, 1119:8
**21** [1] - 1096:9
**21-26** [1] - 1002:3
**21-cr-496** [1] - 1109:12
**213** [1] - 1000:5
**21550** [1] - 1000:3
**220** [1] - 999:17
**221-4453** [1] - 999:18
**228** [1] - 999:17
**231** [1] - 1095:10
**232** [6] - 1019:6,
1019:7, 1019:17,
1030:7, 1032:11,
1064:22
**232.1** [1] - 1067:25
**233** [5] - 1021:8,
1021:9, 1021:14,
1021:25, 1032:3
**24** [3] - 1046:17,
1063:12, 1108:11

**24/7** [1] - 1009:13
**24th** [1] - 1040:23
**254** [1] - 1026:7
**292** [1] - 1072:4
**2:13** [1] - 1037:19

# 3

**3** [12] - 1042:24,
1092:4, 1092:8,
1099:12, 1099:17,
1099:25, 1105:2,
1105:15, 1105:23,
1105:24, 1106:11,
1109:13
**30** [1] - 1045:19
**305-7917** [1] - 999:15
**31** [1] - 1013:13
**324** [1] - 1044:9
**333** [2] - 1000:9,
1119:12
**34** [1] - 1110:6
**344-5763** [1] - 999:22
**354-3187** [1] - 1000:10
**3:17** [1] - 1045:7
**3d** [1] - 1077:9
**3rd** [1] - 1000:4

# 4

**4** [7] - 1099:12,
1099:17, 1099:25,
1105:2, 1106:17,
1106:19, 1106:20
**400-0725** [1] - 1000:5
**403** [1] - 1068:25
**49** [2] - 1042:25,
1044:17
**4th** [1] - 1057:8

# 5

**5** [2] - 1104:2, 1108:11
**5,000** [1] - 1067:7
**5104(e)(1)(B** [1] -
1111:19
**52** [1] - 1041:1
**55** [1] - 999:13

# 6

**6** [16] - 1032:12,
1033:16, 1033:22,
1033:23, 1042:16,
1044:23, 1056:5,
1059:12, 1093:12,
1097:5, 1097:18,
1098:6, 1098:13,
1108:21, 1111:21,
1112:9
**6'3"** [1] - 1024:4

**6.713** [1] - 999:21
**601** [1] - 999:21
**644** [1] - 1077:9
**646** [1] - 1077:9
**65** [1] - 1039:15
**654** [1] - 1077:10
**6718** [2] - 1000:8,
1119:12
**6th** [51] - 1003:23,
1005:17, 1007:11,
1011:25, 1012:3,
1013:15, 1013:16,
1013:20, 1014:20,
1014:21, 1017:18,
1017:23, 1020:19,
1032:7, 1033:16,
1033:20, 1034:2,
1034:11, 1034:18,
1036:18, 1038:25,
1039:1, 1039:5,
1039:13, 1039:19,
1041:10, 1043:8,
1046:13, 1047:8,
1047:19, 1049:21,
1053:8, 1053:9,
1053:10, 1053:16,
1057:23, 1059:7,
1059:25, 1060:17,
1061:19, 1061:23,
1062:6, 1063:14,
1068:15, 1069:11,
1071:22, 1072:13,
1073:17, 1098:2,
1110:13

# 7

**7** [4] - 1111:21,
1112:7, 1112:9,
1112:12
**717** [1] - 999:18

# 8

**8** [6] - 1027:10,
1027:11, 1112:5,
1112:7, 1112:11
**801** [1] - 1037:10
**805** [2] - 1028:3,
1028:4
**89** [1] - 1039:7
**8:00** [1] - 1014:24
**8th** [1] - 1060:6

# 9

**9** [4] - 1027:9,
1027:11, 1027:12,
1092:5
**90** [1] - 1033:24
**91367** [1] - 1000:4

**99** [3] - 1062:2,
1062:11, 1062:21
**9:10** [1] - 999:5

# A

**a.m** [1] - 999:5
**ability** [3] - 1053:1,
1114:21, 1119:7
**able** [8] - 1005:20,
1008:4, 1009:7,
1021:1, 1021:3,
1024:7, 1118:1,
1118:20
**absolute** [1] - 1073:11
**absolutely** [10] -
1016:15, 1017:9,
1017:11, 1021:7,
1024:12, 1054:2,
1064:9, 1064:14,
1067:11, 1069:3
**access** [1] - 1032:16
**accessible** [1] -
1012:2
**accurate** [4] - 1035:18,
1039:8, 1072:12,
1119:5
**accurately** [1] -
1043:19
**accused** [6] - 1034:2,
1036:18, 1036:24,
1037:2, 1048:9,
1062:19
**accusing** [1] - 1004:5
**Acosta** [1] - 1114:16
**Acosta-Sierra** [1] -
1114:16
**acquit** [1] - 1092:16
**acquittal** [1] - 1013:6
**acronym** [1] - 1011:17
**act** [2] - 1064:5,
1113:4
**acted** [2] - 1064:3,
1111:20
**acting** [1] - 1006:8
**action** [1] - 1111:12
**Action** [1] - 999:3
**actions** [2] - 1103:19,
1112:18
**active** [1] - 1057:18
**activity** [1] - 1117:4
**actual** [2] - 1086:11,
1115:10
**add** [6] - 1048:19,
1053:4, 1099:5,
1099:25, 1110:23,
1113:10
**added** [3] - 1010:6,
1062:23
**adding** [1] - 1098:9,

1105:2
**address** [1] - 1008:14
**addressed** [3] -
1076:5, 1076:6,
1093:8
**adhere** [1] - 1007:5
**adjourned** [1] -
1118:22
**admission** [5] -
1021:14, 1021:24,
1036:8, 1044:4,
1072:15
**admit** [3] - 1019:16,
1035:4, 1044:8
**admitted** [8] -
1006:25, 1030:8,
1036:12, 1038:12,
1056:4, 1057:25,
1058:3
**admonished** [1] -
1051:16
**admonitions** [1] -
1049:11
**adopted** [1] - 1114:18
**advance** [1] - 1008:20
**advanced** [2] - 1086:4,
1086:9
**advancement** [1] -
1077:22
**advances** [1] -
1082:25
**advancing** [1] -
1078:16
**adverb** [1] - 1102:16
**adversary** [1] -
1081:17
**advocacy** [2] - 1034:1,
1056:21
**affect** [1] - 1052:22
**affected** [1] - 1008:2
**afternoon** [1] -
1118:20
**agent** [1] - 1008:17
**aggressor** [5] -
1076:15, 1076:19,
1077:21, 1078:12,
1085:8
**ago** [1] - 1012:23
**agree** [6] - 1039:4,
1045:15, 1046:1,
1062:13, 1103:1,
1106:9
**agrees** [2] - 1093:6,
1103:21
**ahead** [7] - 1005:12,
1006:9, 1021:10,
1022:8, 1022:10,
1076:2, 1102:24
**aimed** [3] - 1053:13,
1053:18, 1053:21

1088:16
**ANDREW** [1] - 999:12
**angry** [2] - 1022:17,
1058:19
**animal** [1] - 1061:20
**announcements** [1] -
1029:17
**answer** [14] - 1033:12,
1049:25, 1051:23,
1051:24, 1052:4,
1052:22, 1054:19,
1054:25, 1055:12,
1056:18, 1063:7,
1103:17
**answered** [3] -
1014:12, 1033:14,
1069:24
**answers** [1] - 1054:21
**anti** [1] - 1025:17
**anti-Trump** [1] -
1025:17
**anticipate** [1] -
1021:16
**anticipated** [1] -
1049:12
**Antifa** [3] - 1013:19,
1013:24, 1071:24
**anyway** [1] - 1107:3
**apologize** [1] - 1051:6
**apparent** [1] - 1005:24
**appeal** [1] - 1099:21
**appear** [4] - 1024:10,
1032:5, 1032:13,
1035:18
**APPEARANCES** [2] -
999:11, 1000:1
**appearances** [1] -
1002:6
**appeared** [4] -
1023:18, 1032:18,
1032:23, 1039:12
**appellate** [1] - 1089:24
**application** [1] -
1088:13
**applied** [2] - 1086:11,
1117:8
**applies** [2] - 1010:16,
1082:3
**apply** [4] - 1008:7,
1076:18, 1077:2,
1079:4
**appreciated** [1] -
1051:5
**apprehension** [1] -
1114:22
**approach** [1] -
1007:20
**approached** [2] -
1018:18, 1018:21
**approaching** [1] -

1116:1
**appropriate** [5] -
1007:4, 1026:13,
1055:20, 1093:9,
1099:16
**April** [3] - 999:4,
1057:8, 1119:8
**Area** [1] - 1030:24
**area** [17] - 1003:2,
1006:12, 1023:12,
1025:14, 1026:21,
1028:18, 1028:21,
1029:17, 1031:9,
1037:16, 1067:9,
1072:10, 1083:9,
1083:10, 1095:25,
1096:11, 1096:15
**areas** [7] - 1014:4,
1020:9, 1025:5,
1025:7, 1026:3,
1026:24, 1027:8
**arguably** [1] - 1080:19
**argue** [3] - 1008:4,
1081:7, 1114:25
**arguing** [3] - 1099:22,
1116:8, 1116:9
**argument** [5] -
1078:16, 1093:12,
1097:23, 1115:6,
1117:15
**arguments** [2] -
1093:7, 1116:6
**arise** [1] - 1116:5
**armor** [1] - 1084:17
**arms** [2] - 1084:8,
1105:10
**arrest** [9] - 1077:2,
1077:13, 1077:25,
1080:9, 1085:24,
1086:1, 1088:20,
1096:14, 1096:19
**arrested** [3] - 1029:2,
1041:21, 1085:25
**arrive** [1] - 1014:21
**arrived** [1] - 1018:25
**arrow** [1] - 1028:12
**arrows** [1] - 1028:9
**articles** [3] - 1012:1,
1033:19, 1034:8
**as-applied** [1] - 1117:8
**as..** [1] - 1031:23
**aspect** [1] - 1006:3
**assault** [34] - 1040:18,
1040:19, 1056:4,
1076:20, 1076:25,
1079:4, 1079:8,
1083:11, 1084:8,
1084:20, 1088:17,
1089:17, 1091:17,
1095:6, 1096:9,

1100:12, 1100:18,
1100:23, 1101:2,
1101:23, 1102:5,
1102:18, 1103:1,
1112:25, 1113:2,
1113:5, 1113:25,
1114:2, 1114:4,
1114:5, 1115:12
**assaulted** [2] - 1100:4,
1100:7
**assaulting** [4] -
1095:1, 1102:11,
1103:9, 1112:17
**assaults** [1] - 1114:3
**asserted** [1] - 1045:11
**asserting** [1] -
1002:23
**assertions** [1] -
1114:9
**assisting** [2] -
1101:20, 1102:2
**associated** [1] -
1041:9
**assumed** [1] - 1096:18
**assuming** [1] -
1086:20
**Atkinson** [1] - 1008:17
**atmosphere** [1] -
1022:16
**attempt** [18] - 1008:16,
1015:15, 1090:16,
1090:19, 1091:2,
1091:3, 1091:5,
1091:6, 1091:9,
1091:10, 1091:13,
1091:16, 1095:2,
1095:3, 1095:7,
1095:9, 1095:12
**attempted** [1] -
1091:17
**attempting** [1] -
1090:16
**attend** [4] - 1015:18,
1017:4, 1017:22,
1017:23
**attendance** [1] -
1065:24
**attended** [1] - 1016:6
**attendee** [1] - 1017:21
**attention** [2] - 1028:8,
1113:15
**attest** [2] - 1005:22,
1006:16
**attitudes** [1] - 1011:18
**ATTORNEY'S** [1] -
999:20
**attorneys** [1] -
1050:12
**audience** [1] - 1003:4
**Austin** [1] - 1066:8

**Alberts** [44] - 1002:4,
1002:12, 1006:19,
1007:8, 1007:13,
1008:1, 1008:18,
1019:7, 1019:17,
1020:15, 1021:8,
1021:14, 1021:18,
1021:24, 1024:16,
1026:4, 1029:1,
1038:16, 1039:25,
1040:3, 1040:23,
1044:7, 1046:17,
1054:4, 1056:20,
1057:1, 1057:21,
1058:18, 1058:21,
1059:3, 1059:6,
1063:13, 1063:20,
1064:22, 1067:25,
1072:4, 1085:6,
1087:10, 1092:10,
1094:8, 1094:16,
1115:8, 1117:16,
1118:2
**ALBERTS** [1] - 999:6
**Alberts's** [1] - 1057:9
**alleged** [2] - 1061:22,
1112:25
**allow** [2] - 1049:9,
1066:16
**almost** [2] - 1022:17,
1026:22
**altercation** [1] -
1023:23
**alternatively** [1] -
1015:21
**amazing** [1] - 1018:16
**amended** [1] - 1110:3
**Amendment** [24] -
1004:6, 1051:17,
1054:3, 1054:4,
1055:4, 1099:20,
1101:11, 1101:12,
1102:25, 1103:5,
1103:11, 1105:5,
1105:20, 1110:23,
1116:6, 1116:22,
1116:24, 1117:2,
1117:4, 1117:5,
1118:1, 1118:10
**Amendment-wise** [1] -
1103:5
**America** [2] - 1002:3,
1069:2
**AMERICA** [1] - 999:3
**American** [1] -
1012:23
**amount** [1] - 1103:22
**ample** [1] - 1118:6
**Amy** [1] - 1099:2
**analytical** [1] -

**authority** [3] -
1023:17, 1096:13,
1097:1
**authorization** [1] -
1095:25
**authorized** [4] -
1006:4, 1006:8,
1006:18
**Avenue** [4] - 1000:9,
1028:20, 1028:21,
1119:12
**average** [1] - 1024:5
**avoid** [4] - 1081:18,
1082:9, 1084:24,
1084:25
**aware** [12] - 1009:2,
1016:5, 1016:18,
1017:6, 1024:18,
1029:1, 1038:12,
1038:15, 1066:18,
1068:24, 1073:16,
1109:17
**awareness** [1] -
1011:19

# B

**Baboulis** [1] - 1027:8
**back..** [1] - 1113:17
**backdrop** [1] - 1078:5
**bad** [1] - 1063:25
**badges** [1] - 1008:23
**bang** [1] - 1025:22
**barricade** [3] -
1009:16, 1031:16,
1031:17
**barricades** [6] -
1009:1, 1009:5,
1009:6, 1009:13,
1029:9, 1030:19
**barrier** [2] - 1045:16,
1045:17
**barriers** [5] - 1032:25,
1045:21, 1046:2,
1046:4, 1046:11
**based** [9] - 1007:7,
1022:4, 1022:15,
1054:8, 1074:20,
1089:7, 1094:8,
1107:20, 1112:18
**baselessly** [1] -
1002:19
**basis** [3] - 1051:21,
1109:24, 1111:7
**bathroom** [2] -
1050:10, 1050:13
**baton** [2] - 1083:1,
1083:8
**bear** [1] - 1045:18
**bearing** [1] - 1091:18

**became** [1] - 1043:10
**BEFORE** [1] - 999:10
**beg** [1] - 1005:6
**began** [2] - 1056:21,
1057:17
**begin** [2] - 1028:15,
1053:13
**beginning** [1] - 1070:9
**behalf** [2] - 1002:12,
1034:1
**behavior** [1] - 1007:11
**behind** [7] - 1006:6,
1032:25, 1045:19,
1045:21, 1046:4,
1046:9, 1070:10
**belied** [1] - 1087:14
**belief** [2] - 1082:8,
1083:18
**believes** [1] - 1081:16
**Ben** [1] - 999:14
**bench** [11] - 1015:12,
1016:11, 1026:16,
1027:21, 1048:4,
1049:18, 1056:1,
1056:12, 1072:19,
1073:14, 1110:9
**best** [2] - 1086:16,
1119:6
**between** [4] - 1023:22,
1025:5, 1025:19,
1040:9
**beyond** [7] - 1024:21,
1037:23, 1055:8,
1072:1, 1081:5,
1092:9, 1093:14
**bias** [5] - 1038:2,
1048:2, 1049:3,
1053:7, 1053:14
**biased** [1] - 1053:22
**bicycle** [4] - 1031:11,
1032:5, 1032:7,
1044:25
**big** [1] - 1066:5
**biggest** [2] - 1016:23,
1017:1
**Biggs** [1] - 1081:24
**bike** [3] - 1018:23,
1046:2, 1046:4
**bind** [1] - 1111:6
**Birk** [3] - 1052:9,
1052:12, 1052:18
**BIRK** [1] - 1052:9
**bit** [11] - 1012:22,
1020:4, 1022:12,
1028:17, 1043:21,
1044:2, 1074:13,
1074:18, 1087:19,
1095:7, 1095:18
**Black** [1] - 1023:25
**Blackburn** [2] -

1052:10, 1052:20
**blah** [3] - 1097:1
**blanket** [1] - 1083:16
**blatantly** [1] - 1014:13
**BLM** [3] - 1013:19,
1013:24, 1071:24
**blocked** [1] - 1031:22
**blocks** [1] - 1107:4
**blogging** [1] - 1011:22
**blown** [1] - 1095:8
**blue** [1] - 1082:17
**bodies** [1] - 1031:22
**bodily** [7] - 1081:17,
1082:13, 1083:19,
1102:20, 1103:2,
1114:9, 1114:22
**body** [1] - 1084:17
**boilerplate** [1] -
1092:6
**Book** [1] - 1079:4
**book** [2] - 1012:23,
1013:2
**bottle** [1] - 1112:25
**bottom** [5] - 1035:15,
1036:3, 1042:9,
1042:14, 1096:8
**bound** [2] - 1117:7,
1117:11
**boundaries** [3] -
1002:21, 1002:22
**boundary** [1] - 1025:5
**Box** [1] - 999:13
**bracket** [1] - 1038:13
**Branch** [1] - 1077:5
**branch** [2] - 1077:16,
1088:12
**breach** [6] - 1022:3,
1037:16, 1039:24,
1045:16, 1089:10
**breached** [1] -
1032:21
**break** [14] - 1010:3,
1013:11, 1021:22,
1050:3, 1050:5,
1056:14, 1075:1,
1083:3, 1088:6,
1110:18, 1115:24,
1116:3, 1116:17,
1118:14
**breaking** [2] - 1048:9,
1085:22
**brief** [2] - 1077:4,
1107:12
**briefed** [1] - 1075:18
**briefing** [1] - 1076:17
**briefly** [1] - 1108:23
**brigade** [1] - 1096:17
**bring** [7] - 1013:8,
1015:15, 1041:24,
1042:23, 1054:23,

1055:7, 1055:17
**brings** [1] - 1105:14
**Brit** [1] - 1060:9
**British** [1] - 1060:11
**brother** [1] - 1056:24
**bruises** [1] - 1082:19
**build** [1] - 1072:24
**building** [12] - 1005:5,
1027:18, 1029:14,
1037:17, 1045:5,
1047:7, 1047:19,
1049:21, 1054:13,
1071:17, 1075:3,
1108:13
**buildings** [1] - 1004:2
**burden** [3] - 1082:3,
1092:7, 1092:17
**but..** [1] - 1010:16
**BY** [8] - 1011:5,
1016:12, 1028:5,
1030:2, 1049:19,
1056:19, 1065:6,
1073:15

# C

**CA** [1] - 1000:4
**cannot** [4] - 1076:14,
1114:2, 1115:9,
1115:10
**capitol** [1] - 1066:8
**Capitol** [49] - 1003:23,
1004:1, 1008:15,
1008:16, 1008:19,
1008:23, 1009:4,
1015:17, 1017:10,
1017:11, 1018:8,
1018:18, 1018:21,
1023:10, 1025:9,
1026:24, 1027:18,
1032:13, 1037:17,
1039:22, 1044:22,
1045:4, 1047:7,
1047:10, 1047:19,
1049:21, 1056:15,
1059:7, 1060:4,
1060:14, 1066:4,
1071:2, 1071:3,
1071:6, 1071:7,
1071:16, 1089:11,
1095:23, 1095:24,
1096:11, 1096:17,
1097:5, 1097:18,
1098:2, 1098:12,
1101:25, 1102:1,
1102:2
**Captain** [1] - 1027:8
**captain** [1] - 1008:23
**capture** [1] - 1014:4
**care** [1] - 1063:19

**carefully** [1] - 1005:16
**Carlson** [2] - 1012:22,
1034:13
**carpenter** [2] -
1011:13, 1033:6
**carried** [2] - 1099:15,
1108:22
**carry** [7] - 1102:23,
1106:1, 1106:5,
1106:6, 1106:12,
1106:19
**carrying** [2] - 1106:3
**carryover** [1] - 1017:7
**case** [50] - 1003:22,
1004:15, 1005:16,
1007:8, 1009:23,
1015:19, 1015:23,
1022:5, 1051:12,
1051:13, 1052:8,
1053:7, 1054:1,
1054:10, 1057:9,
1073:24, 1073:25,
1074:1, 1074:23,
1075:8, 1079:15,
1079:22, 1080:19,
1081:7, 1081:15,
1082:15, 1083:13,
1086:12, 1086:18,
1086:23, 1088:18,
1090:21, 1091:3,
1092:24, 1092:25,
1096:21, 1107:21,
1109:2, 1109:20,
1110:13, 1111:3,
1111:5, 1111:7,
1111:22, 1115:25,
1117:13, 1117:19,
1117:21
**Case** [1] - 1002:3
**case-basis-specific**
[1] - 1111:7
**cases** [11] - 1004:1,
1005:17, 1034:11,
1088:11, 1088:17,
1095:11, 1096:16,
1103:8, 1103:17,
1111:4, 1112:15
**caught** [1] - 1113:14
**caused** [1] - 1064:13
**causes** [1] - 1114:22
**celebratory** [1] -
1022:17
**center** [1] - 1025:8
**certain** [3] - 1005:22,
1012:18, 1034:11
**certainly** [6] - 1009:14,
1085:14, 1085:25,
1092:21, 1099:12,
1118:5
**CERTIFICATE** [1] -

1119:1
**certify** [1] - 1119:4
**cetera** [3] - 1095:1, 1100:11, 1102:12
**challenge** [4] - 1046:24, 1099:24, 1107:20, 1117:9
**change** [1] - 1097:14
**chaotic** [1] - 1002:25
**Character** [1] - 1090:11
**character** [1] - 1090:12
**characterization** [2] - 1034:18, 1039:4
**characterize** [1] - 1033:25
**charge** [2] - 1089:17, 1091:6
**charged** [20] - 1008:2, 1047:11, 1047:16, 1047:17, 1047:19, 1048:7, 1049:22, 1051:21, 1056:16, 1062:11, 1073:16, 1092:10, 1099:11, 1102:5, 1105:1, 1110:12, 1110:13, 1116:25, 1117:2
**charges** [5] - 1062:23, 1090:15, 1093:14, 1094:25, 1095:10
**check** [2] - 1019:24, 1110:18
**checked** [1] - 1015:5
**cheese** [1] - 1053:20
**cheese-eating** [1] - 1053:20
**chest** [1] - 1008:24
**Christian** [1] - 1012:17
**CHRISTOPHER** [2] - 999:6, 999:10
**Christopher** [4] - 1002:4, 1002:12, 1020:14, 1024:16
**chronicles** [1] - 1012:23
**Circle** [3] - 1032:20, 1039:25, 1041:10
**circle** [1] - 1057:16
**circled** [1] - 1032:4
**circling** [1] - 1030:13
**circuit** [5] - 1076:17, 1077:4, 1081:23, 1109:16, 1117:8
**Circuit** [5] - 1077:10, 1081:24, 1088:12, 1114:16
**Circuit's** [1] - 1117:7
**circumstance** [1] -

1086:14
**circumstances** [6] - 1077:24, 1080:7, 1089:6, 1089:12, 1092:18, 1117:10
**citations** [1] - 1052:9
**cite** [5] - 1077:3, 1081:20, 1109:2, 1109:12, 1114:15
**cited** [3] - 1076:17, 1081:25, 1088:11
**cites** [1] - 1052:12
**civil** [6] - 1090:13, 1094:10, 1094:12, 1094:14, 1094:21, 1094:22
**civilians** [1] - 1079:8
**claim** [6] - 1006:10, 1012:12, 1053:15, 1053:22, 1076:14, 1080:21
**claiming** [3] - 1006:11, 1012:4, 1049:7
**claims** [1] - 1015:19
**clarify** [1] - 1105:8
**clarion** [3] - 1061:2, 1061:5, 1061:6
**class** [1] - 1117:7
**cleaner** [2] - 1106:6, 1116:13
**clear** [10] - 1012:4, 1023:1, 1036:5, 1069:11, 1073:2, 1082:1, 1088:15, 1094:19, 1110:23, 1110:25
**clearly** [2] - 1053:15, 1087:9
**client** [1] - 1050:24
**close** [3] - 1018:12, 1020:10, 1043:15
**Closed** [1] - 1030:24
**closer** [2] - 1029:12, 1045:4
**closing** [4] - 1008:5, 1116:2, 1117:15, 1118:4
**closings** [3] - 1116:1, 1118:16, 1118:17
**cloth** [1] - 1118:9
**co** [1] - 1027:11
**co-counsel** [1] - 1027:11
**code** [1] - 1103:4
**collateral** [1] - 1009:14
**colleague** [1] - 1113:14
**collect** [1] - 1046:24
**collection** [1] - 1012:24

**Colorado** [1] - 1052:10
**Columbia** [2] - 1039:20, 1081:21
**COLUMBIA** [1] - 999:1
**combined** [1] - 1118:18
**comfortable** [1] - 1004:14
**coming** [6] - 1003:6, 1018:10, 1029:13, 1055:18, 1058:9, 1104:4
**commence** [1] - 1064:8
**commerce** [4] - 1094:15, 1094:16, 1094:17, 1094:24
**commit** [4] - 1008:2, 1090:16, 1101:22, 1115:9
**committed** [9] - 1048:14, 1048:22, 1051:20, 1052:7, 1056:4, 1061:22, 1062:9, 1115:12, 1115:13
**committing** [4] - 1077:25, 1083:10, 1090:15, 1103:25
**common** [4] - 1051:8, 1101:3, 1114:1, 1114:18
**common-type** [1] - 1101:3
**commonly** [1] - 1036:24
**communication** [1] - 1011:19
**community** [4] - 1011:19, 1053:8, 1053:17, 1064:15
**compared** [1] - 1019:1
**compelled** [1] - 1049:1
**compelling** [1] - 1048:21
**complete** [1] - 1119:6
**completely** [1] - 1068:13
**complex** [5] - 1095:24, 1096:1, 1097:18, 1098:2, 1098:12
**complicate** [1] - 1099:18
**complicated** [1] - 1099:19
**complies** [1] - 1028:14
**concept** [1] - 1077:17
**concepts** [1] - 1114:1
**conceptual** [2] - 1002:22, 1054:9

**concern** [1] - 1102:10
**concerns** [1] - 1116:5
**conclude** [1] - 1089:8
**concludes** [1] - 1074:11
**conduct** [3] - 1062:5, 1117:1, 1118:11
**conference** [10] - 1015:12, 1016:11, 1026:16, 1027:21, 1048:4, 1049:18, 1056:1, 1056:12, 1072:19, 1073:14
**conflict** [2] - 1076:15, 1076:20
**confront** [1] - 1087:10
**confronting** [1] - 1085:6
**confuse** [1] - 1015:20
**confusing** [3] - 1091:10, 1100:3, 1100:13
**confusion** [3] - 1006:5, 1006:17, 1032:15
**congressmen** [1] - 1039:2
**connect** [1] - 1042:12
**connected** [1] - 1030:6
**conservative** [1] - 1012:17
**consider** [3] - 1093:15, 1093:19, 1093:23
**consideration** [1] - 1099:23
**considered** [1] - 1011:23
**consistency** [1] - 1105:25
**consistent** [7] - 1087:6, 1087:11, 1098:22, 1102:4, 1102:7, 1106:7, 1106:8
**constituted** [1] - 1113:4
**constitutes** [1] - 1119:4
**Constitution** [3] - 1000:9, 1058:23, 1119:12
**construction** [3] - 1025:10, 1025:13, 1100:19
**contact** [11] - 1083:1, 1083:2, 1100:7, 1100:21, 1101:19, 1102:13, 1102:17,

1104:11, 1104:12, 1104:15, 1104:19
**contacted** [1] - 1014:1
**contend** [1] - 1082:6
**contended** [1] - 1068:11
**content** [2] - 1042:12, 1057:11
**contest** [3] - 1096:10, 1096:24, 1097:6
**contesting** [1] - 1097:21
**context** [2] - 1076:7, 1088:14
**continue** [1] - 1084:2
**CONTINUED** [2] - 999:25, 1000:1
**continues** [1] - 1084:5
**contrary** [3] - 1080:14, 1109:15, 1109:25
**conversation** [1] - 1005:11
**convict** [1] - 1092:17
**convicted** [5] - 1004:3, 1068:23, 1094:8, 1094:12, 1115:7
**COOPER** [1] - 999:10
**cop** [1] - 1040:15
**cops** [4] - 1058:13, 1058:17, 1067:8, 1067:10
**corner** [1] - 1061:20
**correct** [17] - 1002:16, 1032:14, 1033:16, 1037:4, 1038:17, 1039:13, 1042:18, 1059:7, 1060:2, 1060:18, 1063:10, 1067:13, 1091:22, 1109:4, 1112:22, 1113:1, 1113:6
**correction** [1] - 1097:13
**correctly** [3] - 1082:25, 1083:22, 1098:19
**Counsel** [3] - 1015:11, 1071:14, 1090:3
**counsel** [7] - 1004:11, 1004:14, 1027:11, 1054:12, 1075:21, 1082:23
**counsel's** [1] - 1114:8
**Count** [33] - 1090:14, 1091:12, 1091:13, 1091:20, 1091:21, 1091:22, 1091:24, 1094:3, 1094:5, 1094:25, 1095:21, 1099:12, 1105:1,

1105:15, 1105:23, 1105:24, 1106:11, 1106:17, 1106:19, 1106:20, 1108:11, 1108:21, 1111:21, 1112:5, 1112:7, 1112:9, 1112:11, 1112:16, 1112:17, 1112:19, 1113:1, 1113:2, 1113:18

**count** [10] - 1092:1, 1099:17, 1100:2, 1109:7, 1110:17, 1111:21, 1112:7, 1112:9, 1112:12, 1112:18

**counted** [2] - 1036:14, 1039:7

**counterprotesters** [1] - 1071:24

**country** [5] - 1011:21, 1013:1, 1013:19, 1061:7, 1061:11

**Counts** [1] - 1105:2

**counts** [4] - 1091:19, 1099:12, 1099:17, 1110:24

**couple** [6] - 1010:7, 1012:22, 1014:1, 1025:1, 1029:6, 1118:8

**coupled** [1] - 1114:21

**course** [3] - 1016:23, 1024:19, 1087:8

**court** [4] - 1011:7, 1083:22, 1107:13, 1110:16

**COURT** [252] - 999:1, 1002:5, 1002:10, 1002:14, 1003:3, 1003:6, 1003:10, 1003:12, 1003:15, 1003:18, 1003:21, 1003:25, 1004:9, 1004:13, 1004:17, 1004:20, 1004:23, 1005:1, 1005:3, 1005:7, 1005:25, 1006:2, 1006:20, 1006:22, 1007:5, 1007:17, 1008:9, 1009:11, 1009:19, 1010:1, 1010:13, 1010:17, 1010:20, 1010:25, 1014:16, 1015:11, 1015:14, 1015:24, 1016:4, 1016:17, 1019:19, 1022:1, 1022:7, 1022:10, 1022:25,

1023:14, 1025:24, 1026:1, 1026:5, 1026:15, 1026:18, 1026:23, 1027:6, 1027:13, 1027:19, 1028:1, 1028:3, 1029:16, 1029:24, 1033:12, 1036:1, 1036:5, 1037:22, 1038:2, 1044:1, 1044:5, 1044:8, 1044:10, 1044:13, 1045:12, 1048:3, 1048:6, 1048:12, 1048:18, 1048:20, 1049:9, 1049:17, 1050:2, 1050:8, 1050:13, 1050:16, 1050:24, 1051:3, 1051:14, 1051:23, 1052:6, 1052:12, 1052:14, 1052:18, 1052:21, 1053:3, 1053:11, 1054:12, 1054:23, 1055:7, 1055:9, 1055:15, 1055:17, 1055:22, 1055:24, 1056:6, 1056:8, 1056:10, 1056:13, 1058:12, 1061:4, 1065:3, 1066:3, 1066:7, 1066:11, 1066:16, 1066:23, 1067:3, 1067:21, 1068:20, 1069:1, 1069:17, 1069:25, 1070:2, 1071:9, 1071:14, 1072:3, 1072:18, 1072:21, 1073:1, 1073:7, 1073:13, 1073:22, 1074:2, 1074:4, 1074:6, 1074:9, 1074:16, 1075:5, 1075:10, 1075:19, 1076:1, 1076:6, 1077:6, 1077:8, 1078:7, 1078:25, 1079:5, 1079:7, 1079:12, 1079:17, 1079:21, 1079:23, 1080:4, 1080:12, 1080:15, 1080:17, 1080:24, 1081:2, 1082:5, 1082:18, 1082:22, 1086:16, 1086:25, 1087:4, 1087:8, 1087:20, 1087:23, 1088:1, 1088:5, 1088:9, 1090:5,

1090:23, 1091:1, 1091:8, 1091:23, 1092:2, 1092:19, 1093:23, 1094:3, 1094:6, 1094:18, 1095:14, 1095:17, 1095:20, 1096:4, 1096:7, 1096:21, 1097:3, 1097:7, 1097:10, 1097:14, 1098:4, 1098:14, 1098:17, 1098:23, 1099:5, 1099:10, 1099:25, 1100:2, 1100:17, 1100:25, 1101:6, 1101:13, 1102:10, 1102:15, 1103:12, 1104:12, 1104:14, 1104:18, 1104:23, 1105:3, 1105:6, 1105:12, 1105:22, 1106:9, 1106:12, 1106:16, 1106:22, 1107:15, 1107:24, 1108:4, 1108:7, 1108:10, 1108:16, 1108:20, 1108:24, 1109:6, 1109:8, 1109:15, 1109:18, 1110:5, 1110:8, 1110:12, 1110:15, 1110:20, 1110:25, 1111:12, 1111:21, 1111:24, 1112:3, 1112:10, 1112:13, 1112:24, 1113:3, 1113:7, 1113:17, 1113:19, 1114:6, 1114:25, 1115:18, 1115:22, 1116:15, 1116:21, 1117:22, 1118:13, 1119:1

**Court** [23] - 1000:7, 1000:8, 1006:23, 1007:5, 1008:9, 1036:9, 1049:11, 1055:21, 1079:6, 1080:2, 1086:2, 1089:7, 1089:15, 1091:16, 1094:18, 1107:12, 1110:12, 1112:8, 1116:23, 1117:7, 1117:11, 1118:8, 1119:11

**Court's** [4] - 1008:6, 1095:13, 1107:13, 1116:9

**Courthouse** [2] - 1000:8, 1119:11

**courtroom** [8] -

1004:11, 1005:11, 1010:19, 1011:1, 1020:17, 1050:7, 1055:23, 1075:9

**COURTROOM** [5] - 1002:2, 1019:9, 1026:9, 1075:4, 1116:20

**courts** [1] - 1060:20

**Courts** [1] - 1114:14

**cover** [2] - 1011:24, 1076:4

**covered** [1] - 1104:8

**COVID** [1] - 1047:2

**cowboys** [1] - 1003:15

**CPR** [1] - 1007:22

**create** [1] - 1094:13

**credentials** [1] - 1067:12

**credibility** [12] - 1048:1, 1048:10, 1048:12, 1048:23, 1048:24, 1049:4, 1051:21, 1051:25, 1052:2, 1052:22, 1053:14, 1073:11

**credible** [2] - 1052:23, 1052:24

**credited** [1] - 1052:4

**crime** [5] - 1004:7, 1054:10, 1062:9, 1062:10, 1068:23

**crimes** [17] - 1008:2, 1034:2, 1036:18, 1037:2, 1047:20, 1048:14, 1048:15, 1048:23, 1049:22, 1051:19, 1051:20, 1052:7, 1054:21, 1056:16, 1061:22, 1063:5, 1098:3

**criminal** [3] - 1004:10, 1051:17, 1103:4

**Criminal** [2] - 999:3, 1002:3

**CROSS** [1] - 1030:1

**cross** [8] - 1009:12, 1022:7, 1051:19, 1053:23, 1065:1, 1068:19, 1073:8, 1118:16

**cross-examination** [1] - 1053:23

**CROSS-EXAMINATION** [1] - 1030:1

**crowd** [13] - 1006:6, 1006:7, 1006:17, 1014:3, 1018:10, 1021:5, 1022:16,

1022:21, 1023:20, 1023:25, 1024:10, 1046:22, 1083:5

**crowds'** [1] - 1005:24

**CRR** [3] - 1000:7, 1119:3, 1119:10

**cumulative** [2] - 1058:11, 1064:24

**current** [1] - 1011:24

## D

**D-R-A-P-E-A-U** [1] - 1077:7

**D.C** [9] - 1008:14, 1012:25, 1014:22, 1017:7, 1065:21, 1065:22, 1076:17, 1083:21, 1117:6

**daily** [1] - 1107:8

**DALKE** [78] - 999:16, 1010:11, 1010:15, 1075:14, 1076:3, 1076:10, 1077:7, 1077:9, 1078:22, 1079:3, 1079:6, 1079:8, 1079:16, 1079:18, 1079:22, 1079:25, 1080:8, 1080:13, 1080:16, 1080:22, 1080:25, 1081:4, 1082:7, 1082:20, 1082:23, 1086:22, 1087:2, 1087:5, 1087:9, 1090:4, 1090:21, 1090:24, 1091:4, 1091:12, 1095:5, 1095:16, 1097:8, 1097:11, 1098:5, 1098:15, 1098:18, 1098:24, 1099:7, 1099:11, 1100:1, 1100:13, 1100:20, 1101:15, 1103:16, 1104:13, 1104:15, 1104:21, 1105:24, 1106:10, 1106:14, 1106:18, 1108:15, 1108:18, 1108:23, 1108:25, 1109:7, 1109:11, 1109:17, 1110:14, 1110:18, 1111:1, 1111:18, 1111:22, 1112:7, 1112:11, 1112:22, 1113:1, 1113:6, 1113:13, 1113:18, 1115:24, 1117:18, 1118:5

**Dalke** [5] - 1053:4,

1053:6, 1075:12, 1090:14, 1112:5
**Dallas** [4] - 1003:14, 1011:11, 1011:12, 1027:17
**danger** [10] - 1081:17, 1081:18, 1082:8, 1082:9, 1082:13, 1083:18, 1084:11, 1084:13, 1084:24, 1084:25
**dangerous** [1] - 1108:13
**Daniel** [3] - 1041:13, 1041:18, 1047:14
**Dated** [1] - 1119:8
**daughter** [1] - 1014:10
**DAVID** [3] - 1001:3, 1011:3, 1011:9
**David** [3] - 1010:24, 1011:8, 1041:16
**days** [2] - 1008:21, 1014:1
**DC** [4] - 999:14, 999:22, 1000:9, 1119:13
**deadly** [1] - 1108:13
**dealt** [1] - 1013:19
**December** [5] - 1040:23, 1046:17, 1063:12, 1065:18, 1065:20
**decide** [1] - 1086:19
**decision** [13] - 1004:9, 1076:16, 1077:16, 1081:21, 1081:23, 1081:24, 1083:20, 1109:1, 1109:9, 1109:11, 1109:12, 1111:7, 1111:8
**decisions** [3] - 1077:3, 1082:1, 1109:15
**decline** [1] - 1056:17
**declined** [1] - 1055:1
**declining** [1] - 1052:6
**dedicated** [4] - 1033:16, 1033:22, 1035:9, 1038:25
**defamation** [1] - 1064:16
**defend** [1] - 1083:17
**DEFENDANT** [3] - 1050:10, 1050:15, 1051:2
**defendant** [25] - 1002:12, 1015:17, 1053:10, 1076:14, 1076:21, 1082:12, 1085:10, 1086:12, 1088:25, 1089:2,

1089:20, 1090:15, 1093:14, 1094:20, 1095:1, 1100:4, 1100:7, 1100:21, 1101:19, 1104:6, 1104:19, 1111:20, 1114:11, 1116:24
**Defendant** [3] - 999:7, 1000:2, 1090:11
**defendant's** [2] - 1082:19, 1086:3
**defendants** [7] - 1035:12, 1053:16, 1068:6, 1068:15, 1069:4, 1092:20
**Defender** [1] - 1092:20
**defense** [46] - 1007:1, 1007:21, 1007:22, 1007:24, 1009:21, 1010:8, 1010:9, 1010:23, 1034:10, 1051:15, 1054:5, 1069:2, 1074:5, 1074:10, 1075:12, 1075:14, 1076:12, 1076:14, 1076:24, 1077:1, 1077:19, 1080:6, 1080:20, 1080:21, 1081:7, 1082:2, 1083:12, 1083:15, 1083:23, 1083:24, 1088:10, 1088:13, 1088:16, 1089:16, 1089:22, 1097:22, 1098:7, 1109:21, 1109:23, 1114:8, 1116:9, 1118:8, 1118:19
**Defense** [4] - 1030:7, 1032:3, 1035:11, 1042:8
**defense's** [2] - 1116:6, 1117:19
**defenses** [2] - 1015:19, 1069:5
**define** [1] - 1114:17
**defined** [1] - 1102:19
**defines** [2] - 1095:6
**definitely** [2] - 1012:17, 1016:10
**definition** [10] - 1090:18, 1091:9, 1108:19, 1111:14, 1111:16, 1112:8, 1114:6, 1114:14, 1114:18, 1115:19
**definitions** [3] - 1095:5, 1102:18, 1102:21
**delay** [1] - 1055:10

**delete** [1] - 1097:18
**deliveries** [1] - 1029:13
**demonstrate** [1] - 1081:19
**demonstration** [1] - 1086:24
**demonstrative** [1] - 1035:3
**deny** [1] - 1107:14
**DEPARTMENT** [1] - 999:13
**Department** [2] - 1035:11, 1042:8
**depiction** [1] - 1072:12
**deputy** [1] - 1011:2
**DEPUTY** [5] - 1002:2, 1019:9, 1026:9, 1075:4, 1116:20
**described** [1] - 1107:7
**describing** [1] - 1007:2
**deserve** [2] - 1062:9, 1069:2
**designated** [1] - 1034:10
**destruction** [1] - 1053:21
**detain** [4] - 1095:24, 1096:14, 1097:1, 1098:2
**determining** [1] - 1093:13
**different** [12] - 1014:4, 1016:13, 1016:19, 1017:12, 1025:2, 1047:1, 1047:3, 1070:24, 1070:25, 1079:2, 1088:15, 1112:18
**DIRECT** [1] - 1011:4
**direct** [9] - 1028:8, 1037:24, 1039:19, 1044:14, 1051:18, 1052:1, 1052:3, 1052:23, 1077:12
**direction** [1] - 1028:12
**directly** [4] - 1006:19, 1068:7, 1068:19, 1102:8
**disagree** [2] - 1057:12, 1057:13
**disallow** [1] - 1073:13
**discern** [1] - 1067:4
**discharging** [1] - 1078:4
**discrete** [1] - 1113:16
**discuss** [5] - 1010:7, 1027:18, 1058:17,

1073:23, 1091:25
**discussed** [2] - 1004:9, 1004:13
**discussing** [2] - 1007:9, 1058:17
**Discussion** [4] - 1038:23, 1040:22, 1046:16, 1057:20
**discussions** [1] - 1075:7
**dismiss** [1] - 1107:20
**disorder** [6] - 1090:13, 1094:10, 1094:12, 1094:14, 1094:21, 1094:22
**dispassionate** [1] - 1012:5
**disperse** [1] - 1029:20
**disregard** [1] - 1014:17
**distress** [1] - 1064:13
**distributed** [2] - 1010:1, 1089:25
**district** [2] - 1107:14, 1110:16
**DISTRICT** [3] - 999:1, 999:1, 999:10
**District** [4] - 1039:20, 1052:9, 1052:16, 1081:21
**divine** [5] - 1063:10, 1063:13, 1063:15, 1063:16, 1063:17
**division** [2] - 1011:20, 1012:10
**Docket** [1] - 1075:16
**document** [3] - 1013:18, 1013:23, 1070:21
**documentaries** [1] - 1011:25
**documenting** [1] - 1014:5
**DOJ** [1] - 999:17
**DOJ-USAO** [1] - 999:17
**Dominic** [3] - 1037:4, 1038:4, 1068:21
**donation** [1] - 1034:22
**donations** [2] - 1034:21, 1034:24
**done** [4] - 1013:24, 1042:11, 1094:13, 1103:20
**Door** [1] - 1037:16
**door** [2] - 1014:12, 1072:2
**doubt** [3] - 1092:9, 1093:15, 1115:8
**down** [26] - 1004:20,

1018:8, 1018:9, 1025:2, 1028:15, 1033:4, 1036:3, 1036:10, 1038:8, 1038:20, 1040:15, 1043:9, 1050:9, 1059:23, 1069:9, 1069:18, 1073:23, 1084:5, 1084:23, 1085:5, 1085:6, 1085:15, 1086:8, 1100:6, 1104:4, 1118:9
**downtrodden** [1] - 1053:16
**dox** [1] - 1049:23
**Drapeau** [4] - 1077:4, 1077:9, 1088:11, 1088:18
**draw** [2] - 1008:4, 1059:19
**drew** [2] - 1059:20, 1059:21
**drop** [2] - 1099:1, 1099:5
**dropping** [1] - 1097:9
**drove** [1] - 1014:23
**ducking** [3] - 1085:10, 1085:11, 1085:12
**duke** [2] - 1050:11
**during** [7] - 1013:5, 1039:24, 1065:7, 1066:5, 1069:20, 1110:18, 1118:4
**duties** [17] - 1077:15, 1078:4, 1080:6, 1080:11, 1080:23, 1081:3, 1088:15, 1088:21, 1094:22, 1095:23, 1096:24, 1096:25, 1097:5, 1097:17, 1097:24, 1098:11, 1101:21
**duty** [9] - 1077:2, 1077:14, 1080:10, 1088:20, 1092:10, 1092:14, 1093:1, 1098:1

---

## E

**early** [4] - 1014:23, 1018:9, 1025:2, 1104:3
**east** [3] - 1015:17, 1027:13, 1027:14
**easy** [1] - 1085:13
**eating** [1] - 1053:20
**edge** [1] - 1018:15
**editing** [1] - 1111:22

**education** [1] - 1011:18
**effect** [1] - 1084:16
**effort** [1] - 1111:1
**eight** [1] - 1041:2
**Eighth** [3] - 1077:4, 1077:10, 1088:12
**either** [10] - 1007:1, 1042:19, 1063:19, 1080:9, 1088:25, 1095:13, 1104:3, 1107:25, 1108:19, 1114:18
**election** [1] - 1046:25
**element** [20] - 1092:9, 1099:8, 1100:3, 1100:6, 1100:10, 1101:18, 1102:6, 1102:7, 1103:15, 1104:5, 1104:8, 1104:25, 1106:4, 1106:14, 1106:24, 1108:21, 1109:5, 1112:4, 1112:6, 1117:19
**elements** [2] - 1106:13, 1114:13
**eleven** [3] - 1057:8, 1057:14, 1057:16
**eliminate** [1] - 1028:18
**Ellipse** [4] - 1015:1, 1018:1, 1018:2, 1018:15
**email** [2] - 1008:14, 1110:1
**embarrassing** [1] - 1053:18
**emotional** [1] - 1064:13
**employee** [2] - 1041:18, 1104:20
**empty** [1] - 1019:1
**en** [1] - 1018:10
**encompassed** [1] - 1112:20
**encourages** [1] - 1011:19
**end** [10] - 1007:18, 1010:3, 1016:11, 1020:6, 1027:21, 1038:13, 1049:18, 1056:12, 1058:5, 1073:14, 1073:24, 1081:1, 1091:15, 1095:19, 1097:11, 1098:6
**ends** [1] - 1105:17
**enforcement** [23] - 1062:5, 1065:8, 1065:11, 1065:15,

1067:1, 1077:1, 1077:3, 1077:14, 1078:2, 1079:1, 1079:15, 1080:10, 1083:2, 1084:2, 1086:8, 1086:21, 1088:14, 1088:17, 1088:20, 1089:1, 1089:3, 1089:4, 1089:17
**engage** [1] - 1094:20
**engaged** [1] - 1101:21
**engaging** [1] - 1108:12
**enhancement** [1] - 1099:15
**enter** [2] - 1002:6, 1095:25
**entered** [1] - 1096:14
**enters** [2] - 1010:19, 1055:23
**entitled** [2] - 1086:12, 1086:13
**entry** [1] - 1004:1, 1032:22
**episode** [1] - 1046:16
**ER** [1] - 1052:15
**escalated** [1] - 1085:20
**especially** [2] - 1011:24, 1089:18
**ESQ** [5] - 999:12, 999:16, 999:20, 1000:2, 1000:2
**essentially** [4] - 1033:15, 1039:24, 1080:2, 1081:15
**establish** [1] - 1088:22
**established** [1] - 1048:11
**estimate** [1] - 1033:21
**et** [3] - 1095:1, 1100:11, 1102:12
**events** [13] - 1007:19, 1011:24, 1014:21, 1015:4, 1015:8, 1016:1, 1016:5, 1016:6, 1017:8, 1018:2, 1071:23, 1072:13
**eventually** [6] - 1025:21, 1035:6, 1045:4, 1058:9, 1059:19, 1089:10
**everyday** [1] - 1102:23
**everywhere** [1] - 1032:8
**evidence** [53] - 1007:19, 1008:5, 1009:2, 1010:14,

1012:1, 1012:15, 1019:8, 1026:8, 1027:23, 1027:24, 1035:5, 1036:6, 1036:7, 1036:12, 1043:24, 1067:19, 1073:4, 1074:20, 1076:8, 1077:20, 1078:3, 1078:10, 1078:11, 1078:14, 1080:5, 1080:14, 1081:14, 1082:14, 1082:15, 1083:11, 1083:25, 1084:4, 1084:9, 1084:12, 1084:13, 1085:19, 1085:20, 1085:21, 1086:2, 1086:18, 1086:20, 1087:7, 1087:14, 1088:24, 1089:7, 1089:16, 1089:18, 1090:12, 1091:4, 1106:7, 1118:6
**evidence-wise** [1] - 1012:15
**evidentiary** [1] - 1074:11
**exact** [2] - 1084:14, 1101:17
**exactly** [3] - 1058:23, 1058:24, 1061:1
**EXAMINATION** [3] - 1011:4, 1030:1, 1065:5
**examination** [2] - 1037:24, 1053:23
**examined** [1] - 1005:16
**except** [1] - 1114:2
**excessive** [2] - 1080:19, 1097:23
**exchange** [1] - 1008:18
**exclude** [1] - 1056:8
**excuse** [3] - 1025:24, 1088:2, 1118:16
**excused** [1] - 1004:25
**Exhibit** [2] - 1032:11, 1037:10
**exits** [2] - 1050:7, 1075:9
**expect** [2] - 1066:17, 1108:3
**expensive** [1] - 1069:6
**experienced** [4] - 1007:12, 1007:13, 1007:20, 1008:1
**expert** [1] - 1005:18
**expertise** [2] -

1005:19, 1055:14
**explain** [1] - 1051:23
**exposure** [1] - 1051:17
**extent** [8] - 1007:7, 1008:1, 1050:2, 1064:24, 1068:17, 1071:15, 1114:12, 1115:3

# F

**face** [1] - 1002:21
**Facebook** [1] - 1043:11
**facie** [4] - 1081:15, 1086:18, 1086:23, 1087:1
**facing** [1] - 1011:20
**fact** [9] - 1002:24, 1006:24, 1007:6, 1016:1, 1046:20, 1058:25, 1069:13, 1105:9, 1107:8
**facts** [2] - 1086:11, 1111:3
**factual** [1] - 1078:19
**fails** [1] - 1092:16
**fair** [7] - 1033:25, 1034:18, 1034:25, 1035:18, 1055:2, 1055:11, 1072:12
**fairly** [2] - 1043:19, 1053:5
**fallen** [1] - 1069:18
**familiar** [6] - 1026:10, 1042:21, 1065:18, 1066:8, 1066:18, 1075:22
**family** [1] - 1036:20
**fan** [1] - 1003:15
**fans** [1] - 1070:18
**far** [8] - 1008:19, 1012:13, 1014:5, 1025:15, 1031:23, 1062:16, 1088:3, 1093:4
**favor** [1] - 1078:11
**FBI** [6] - 1014:6, 1014:18, 1049:15, 1053:25, 1064:2
**Federal** [1] - 1092:20
**federal** [7] - 1051:8, 1076:25, 1080:19, 1086:21, 1105:18, 1105:20
**fellow** [2] - 1007:21, 1007:22
**felonies** [1] - 1099:13
**felony** [5] - 1099:9,

1099:12, 1099:15, 1101:22, 1105:1
**fence** [7] - 1020:13, 1025:8, 1025:10, 1031:12, 1031:14, 1031:21, 1031:24
**fences** [1] - 1019:3
**fencing** [3] - 1025:7, 1025:19, 1030:21
**Fersner** [1] - 1083:20
**FERSNER** [1] - 1083:20
**festive** [1] - 1022:19
**few** [2] - 1014:2, 1018:24
**fifth** [13] - 1099:8, 1100:6, 1100:10, 1100:20, 1100:23, 1101:18, 1101:24, 1102:6, 1103:15, 1104:10, 1104:18
**Fifth** [3] - 1004:6, 1051:16, 1088:12
**fight** [2] - 1013:11, 1086:9
**figure** [1] - 1115:22
**file** [4] - 1075:15, 1096:13, 1107:22, 1116:22
**filed** [6] - 1107:5, 1107:12, 1107:17, 1107:18, 1107:25
**film** [2] - 1014:4, 1018:10
**filmed** [1] - 1041:21
**filming** [4] - 1020:1, 1021:17, 1043:10, 1044:11
**finalize** [3] - 1074:13, 1074:19, 1118:14
**finally** [3] - 1059:22, 1061:22, 1063:9
**fine** [3] - 1095:12, 1095:14, 1098:16
**finish** [2] - 1009:20, 1050:6
**finished** [1] - 1018:4
**firearm** [4] - 1099:15, 1108:14, 1110:24, 1117:9
**firearms** [1] - 1117:17
**fires** [1] - 1013:11
**First** [12] - 1055:3, 1055:4, 1101:10, 1101:12, 1102:24, 1103:5, 1103:11, 1116:22, 1116:24, 1117:2, 1117:4, 1117:25
**first** [41] - 1004:21,

1005:4, 1009:3,
1018:24, 1019:2,
1019:3, 1028:8,
1029:6, 1031:16,
1031:17, 1032:11,
1037:16, 1040:3,
1040:13, 1045:16,
1050:23, 1051:3,
1062:25, 1069:18,
1076:14, 1077:6,
1078:7, 1078:25,
1080:11, 1082:12,
1083:1, 1093:12,
1095:3, 1097:14,
1097:15, 1100:3,
1100:24, 1101:14,
1102:7, 1102:10,
1104:6, 1105:17,
1106:23, 1108:19,
1116:15, 1118:9
**five** [6] - 1008:21,
1023:19, 1033:2,
1050:4, 1067:7,
1085:3
**flash** [1] - 1025:22
**Floor** [1] - 1000:4
**focus** [3] - 1013:15,
1013:16, 1065:11
**focusing** [2] -
1065:15, 1066:24
**folks** [3] - 1003:25,
1048:22, 1112:15
**follicle** [1] - 1115:10
**follow** [5] - 1009:9,
1022:6, 1022:9,
1093:2, 1107:13
**follow-up** [3] - 1009:9,
1022:6, 1022:9
**following** [8] -
1015:12, 1024:11,
1026:16, 1048:4,
1056:1, 1072:19,
1096:5, 1109:1
**follows** [1] - 1076:13
**footage** [2] - 1006:17,
1020:23
**football** [1] - 1070:18
**FOR** [1] - 999:1
**force** [28] - 1005:18,
1077:13, 1080:9,
1080:17, 1080:18,
1081:3, 1081:4,
1081:18, 1082:9,
1083:19, 1083:23,
1084:3, 1084:7,
1084:23, 1084:25,
1085:16, 1085:24,
1088:19, 1089:4,
1089:14, 1089:19,
1097:23, 1103:2,

1103:22, 1103:23,
1103:25, 1104:7
**forcible** [4] - 1100:21,
1100:25, 1102:17,
1114:5
**forcibleness** [1] -
1104:3
**forcibly** [6] - 1095:1,
1100:18, 1102:11,
1102:16, 1103:6,
1103:20
**foregoing** [1] - 1119:4
**forget** [1] - 1084:14
**form** [1] - 1025:22
**forms** [2] - 1059:4,
1089:13
**forth** [1] - 1016:3
**fortunate** [1] - 1013:1
**forum** [1] - 1096:19
**forward** [6] - 1024:22,
1045:18, 1070:10,
1085:2, 1086:4
**foundation** [7] -
1015:10, 1021:16,
1026:3, 1027:18,
1044:3, 1072:22,
1072:24
**four** [4] - 1014:8,
1036:15, 1042:15,
1085:3
**frame** [2] - 1023:1,
1087:15
**Franklin** [1] - 999:14
**frankly** [1] - 1092:22
**fraud** [2] - 1051:7,
1051:9
**free** [1] - 1075:2
**Friday** [2] - 1008:21,
1024:1
**friend** [2] - 1051:7,
1056:24
**friends** [4] - 1013:17,
1013:22, 1014:2,
1043:10
**front** [10] - 1006:7,
1018:22, 1021:5,
1023:19, 1024:8,
1028:6, 1030:18,
1083:10, 1090:3,
1101:16
**full** [6] - 1007:25,
1011:6, 1038:14,
1095:8, 1095:12,
1119:5
**full-blown** [1] - 1095:8
**fully** [3] - 1033:15,
1033:17, 1084:12
**fund** [1] - 1036:17
**fundamental** [4] -
1076:10, 1076:23,

1077:18, 1078:23
**fundraiser** [1] - 1042:6
**fundraisers** [3] -
1035:10, 1035:20,
1062:15
**fundraising** [6] -
1036:13, 1038:9,
1038:16, 1057:1,
1057:2, 1063:5
**future** [1] - 1111:7

## G

**gain** [1] - 1032:16
**gas** [5] - 1058:6,
1058:8, 1084:17,
1084:18, 1089:9
**gate** [8] - 1021:18,
1021:21, 1040:3,
1040:4, 1040:13,
1069:9, 1069:18
**gates** [2] - 1040:5,
1040:10
**general** [1] - 1072:24
**generally** [2] -
1007:11, 1012:6
**gentlemen** [4] -
1010:21, 1050:4,
1056:13, 1074:9
**gigs** [1] - 1011:14
**given** [9] - 1006:6,
1009:9, 1079:20,
1081:12, 1089:13,
1089:18, 1114:8,
1116:12, 1118:11
**givesendgo** [3] -
1035:12, 1036:19,
1068:9
**God** [2] - 1058:23,
1063:15
**Goodwyn** [4] -
1041:13, 1041:18,
1042:19, 1047:14
**government** [41] -
1002:18, 1002:22,
1003:1, 1006:11,
1006:13, 1009:22,
1010:10, 1026:21,
1028:3, 1044:4,
1048:16, 1048:17,
1054:7, 1054:18,
1055:5, 1061:12,
1074:7, 1074:10,
1075:15, 1079:19,
1079:23, 1079:24,
1088:11, 1090:17,
1092:8, 1092:16,
1092:24, 1092:25,
1093:13, 1095:14,
1097:8, 1100:10,
1103:14, 1103:20,

1111:6, 1111:8,
1113:21, 1114:15,
1116:11, 1117:3,
1118:19
**Government** [1] -
1028:4
**government's** [16] -
1006:10, 1026:23,
1054:8, 1075:16,
1075:17, 1076:25,
1101:7, 1104:17,
1105:23, 1106:1,
1106:7, 1107:1,
1108:12, 1111:15,
1112:16, 1112:19
**Government's** [1] -
1044:9
**grabs** [1] - 1076:21
**grand** [1] - 1092:15
**grapple** [1] - 1086:9
**grass** [2] - 1020:11,
1096:10
**gravamen** [1] -
1102:16
**green** [1] - 1096:10
**grenade** [1] - 1025:22
**grievances** [1] -
1055:6
**groin** [1] - 1083:9
**Ground** [3] - 1042:2,
1042:24, 1043:8
**ground** [3] - 1074:22,
1092:22, 1093:9
**grounds** [12] -
1003:23, 1004:2,
1017:11, 1023:10,
1024:2, 1026:24,
1039:22, 1045:10,
1096:17, 1103:11,
1107:1, 1107:2
**group** [2] - 1036:21,
1070:19
**guess** [11] - 1002:15,
1006:11, 1012:18,
1027:22, 1036:17,
1060:11, 1078:22,
1081:11, 1091:15,
1102:10, 1112:16
**guidance** [1] - 1118:12
**guidelines** [2] -
1117:14, 1118:16
**guideposts** [2] -
1115:25, 1116:13
**guilty** [6] - 1004:2,
1062:17, 1063:6,
1063:8, 1092:11,
1092:14
**guise** [1] - 1048:23
**guitarist's** [1] -
1024:21

**gulag** [1] - 1012:23
**gun** [3] - 1099:24,
1109:20, 1109:22
**guy** [2] - 1012:8,
1082:16, 1109:21
**Guy** [6] - 1037:7,
1082:16, 1083:25,
1084:3, 1084:9,
1085:5
**guys** [3] - 1010:4,
1012:25, 1027:24

## H

**H-O-D-A-K** [1] -
1043:6
**hair** [1] - 1115:10
**half** [1] - 1071:5
**halfway** [2] - 1025:9,
1031:12, 1031:25
**hallways** [1] - 1071:16
**hand** [2] - 1011:1,
1038:13
**handle** [1] - 1097:14
**hands** [2] - 1077:22,
1085:1
**hanging** [1] - 1031:10
**Hanson** [1] - 1047:23
**happy** [2] - 1007:15,
1111:5
**hard** [2] - 1016:8,
1031:12
**harm** [5] - 1081:17,
1082:13, 1083:19,
1102:20, 1114:22
**Harrisburg** [1] -
999:18
**hat** [1] - 1012:8
**Hate** [4] - 1038:19,
1042:1, 1042:24,
1043:7
**hate** [2] - 1013:4,
1042:6
**head** [1] - 1024:21
**headed** [1] - 1081:10
**headline** [1] - 1042:15
**heads** [3] - 1024:7,
1040:6, 1051:5
**heal** [1] - 1011:18
**hear** [6] - 1007:15,
1008:9, 1029:17,
1029:20, 1078:15,
1104:24
**heard** [11] - 1010:12,
1016:13, 1018:8,
1027:3, 1032:15,
1044:7, 1075:13,
1090:12, 1108:23,
1118:2, 1118:6
**hearing** [5] - 1015:13,

1026:17, 1048:5,
1056:2, 1072:20
**hearsay** [2] - 1016:16,
1045:9
**held** [7] - 1013:18,
1015:13, 1026:17,
1048:5, 1056:2,
1072:20, 1117:2
**HELD** [1] - 999:10
**help** [2] - 1013:12,
1117:14
**helped** [1] - 1017:5,
1017:16
**helpful** [3] - 1110:4,
1110:8, 1110:15
**helping** [1] - 1017:13
**helpstophate** [1] -
1057:6
**hereby** [1] - 1119:3
**hesitate** [1] - 1091:5
**Higgins** [1] - 1110:11
**hijacked** [1] - 1016:24
**hill** [7] - 1005:5,
1005:13, 1005:25,
1006:15, 1008:8,
1008:9, 1008:11
**Hills** [1] - 1000:4
**himself** [3] - 1076:16,
1078:17, 1094:20
**history** [5] - 1013:18,
1014:5, 1070:21,
1092:15, 1113:25
**hit** [6] - 1018:7,
1074:17, 1078:17,
1078:18, 1082:25,
1083:8
**hobbies** [1] - 1011:14
**hobby** [1] - 1033:8
**Hodak** [2] - 1043:4,
1070:4
**Hodak's** [1] - 1070:8
**hold** [5] - 1048:20,
1075:19, 1087:23,
1110:21
**holding** [1] - 1038:6
**Honor** [68] - 1002:2,
1002:8, 1002:11,
1004:19, 1006:21,
1008:6, 1008:10,
1010:11, 1014:14,
1021:13, 1022:2,
1025:23, 1025:25,
1026:13, 1027:5,
1037:20, 1040:20,
1045:9, 1048:2,
1048:15, 1048:19,
1049:7, 1049:24,
1050:1, 1050:15,
1050:22, 1051:2,
1051:6, 1051:22,

1052:8, 1054:17,
1055:18, 1056:11,
1064:20, 1072:15,
1072:16, 1074:5,
1075:4, 1079:16,
1088:2, 1090:4,
1090:22, 1091:25,
1095:16, 1097:8,
1097:20, 1101:15,
1104:22, 1104:24,
1107:11, 1108:2,
1108:15, 1109:17,
1110:1, 1110:14,
1110:19, 1111:1,
1111:18, 1111:23,
1112:22, 1113:13,
1113:20, 1114:8,
1115:21, 1115:24,
1116:2, 1116:20,
1117:18
**Honor's** [2] - 1091:21,
1103:17
**HONORABLE** [1] -
999:10
**hopefully** [4] -
1063:24, 1064:1,
1074:21, 1116:14
**hoping** [1] - 1118:3
**horrible** [1] - 1064:12
**host** [2] - 1038:16,
1038:19, 1038:21
**hosted** [1] - 1013:18
**hotel** [1] - 1015:5
**hour** [3] - 1039:10,
1118:18, 1118:19
**hours** [6] - 1005:16,
1006:16, 1060:13,
1060:24, 1071:5
**house** [4] - 1014:8
**huge** [4] - 1055:3,
1059:25, 1060:2,
1103:7
**humiliating** [1] -
1053:18
**humiliation** [1] -
1053:21
**hundred** [3] - 1018:24,
1029:6, 1039:18
**hundreds** [1] -
1005:15
**Hyman** [2] - 1099:2,
1099:6
**hypothetical** [1] -
1087:5

---

**I**

**Ibrahim** [2] - 1109:2,
1109:10
**idea** [2] - 1094:10,

1107:6
**identical** [1] - 1026:22
**identify** [5] - 1014:12,
1051:20, 1052:6,
1054:22, 1055:1
**identity** [1] - 1088:25
**ignored** [2] - 1084:1,
1085:20
**imaginary** [1] - 1054:9
**imagine** [1] - 1059:15
**immediate** [7] -
1081:17, 1082:8,
1082:12, 1083:18,
1084:11, 1084:13,
1114:22
**immorally** [1] - 1064:5
**impact** [1] - 1094:17
**impeachment** [2] -
1041:22, 1053:24
**impedance** [1] -
1100:11
**impede** [2] - 1100:18,
1102:22
**impeding** [1] -
1112:17
**implicates** [1] -
1101:11
**important** [1] - 1069:4
**improperly** [1] -
1064:3
**IN** [1] - 999:1
**inadvertently** [1] -
1111:16
**inapposite** [1] -
1096:21
**incidences** [1] -
1066:20
**incident** [3] - 1033:24,
1085:22, 1094:22
**inclined** [1] - 1107:13
**include** [3] - 1095:3,
1111:13, 1115:18
**included** [8] - 1090:11,
1090:18, 1091:6,
1099:13, 1108:12,
1108:21, 1111:13,
1111:15
**includes** [10] - 1034:4,
1034:6, 1034:8,
1036:23, 1037:4,
1062:14, 1064:2,
1064:4, 1064:6,
1106:3
**including** [2] - 1095:6,
1113:22
**inconsistency** [1] -
1098:18
**incriminate** [1] -
1004:7
**indeed** [1] - 1022:2

**independent** [1] -
1012:7
**indicated** [1] - 1020:9
**indictment** [2] -
1090:15, 1091:7
**individual** [7] - 1007:1,
1036:19, 1041:8,
1068:14, 1077:11,
1077:12, 1088:18
**individual's** [1] -
1080:8
**individually** [2] -
1094:13, 1108:3
**individuals** [6] -
1030:13, 1036:15,
1049:20, 1051:10,
1095:24, 1097:1
**infer** [1] - 1088:25
**inferences** [1] -
1008:4
**infiltrator** [1] - 1076:1
**inflict** [2] - 1114:19,
1114:20
**influence** [1] - 1111:4
**inform** [1] - 1004:6
**information** [2] -
1015:16, 1034:1
**initial** [1] - 1106:4
**initiating** [1] - 1008:16
**injure** [2] - 1103:2,
1114:5
**injured** [1] - 1082:16,
1082:22
**injuries** [11] - 1082:14,
1082:18, 1082:19,
1082:24, 1083:11,
1089:19, 1089:20,
1115:1, 1115:2,
1115:13, 1115:14
**injury** [14] - 1113:21,
1113:22, 1114:7,
1114:9, 1114:10,
1114:12, 1114:19,
1114:20, 1115:4,
1115:5, 1115:9,
1115:11, 1115:16,
1115:23
**innocent** [2] - 1063:6,
1063:8
**inside** [2] - 1021:18,
1023:6
**inspect** [1] - 1009:12
**inspector** [1] - 1099:2
**instruct** [10] - 1049:25,
1054:24, 1091:8,
1091:16, 1091:19,
1095:2, 1097:16,
1113:3, 1116:17,
1118:17
**instructed** [5] -

1095:22, 1097:4,
1097:16, 1098:10,
1104:21
**Instruction** [5] -
1090:12, 1090:13,
1092:5, 1093:11,
1108:11
**instruction** [41] -
1010:9, 1010:15,
1055:20, 1076:9,
1077:24, 1078:10,
1078:13, 1078:20,
1079:14, 1079:19,
1079:24, 1080:1,
1080:7, 1081:12,
1088:10, 1088:23,
1089:16, 1089:22,
1090:11, 1090:14,
1090:16, 1092:6,
1092:12, 1092:19,
1093:25, 1095:8,
1095:9, 1095:13,
1095:15, 1096:9,
1096:12, 1097:22,
1101:6, 1102:11,
1108:25, 1110:16,
1112:14, 1112:15,
1113:21, 1115:6
**instructions** [23] -
1010:2, 1010:5,
1074:14, 1074:16,
1074:19, 1074:22,
1074:24, 1075:23,
1079:20, 1081:10,
1090:1, 1090:7,
1090:8, 1090:19,
1093:2, 1107:6,
1107:23, 1108:2,
1109:3, 1110:4,
1116:23, 1117:20,
1118:14
**intend** [1] - 1074:7
**intended** [1] - 1114:11
**intent** [11] - 1008:2,
1101:22, 1102:19,
1103:2, 1114:5,
1114:10, 1114:19,
1114:24, 1115:8,
1115:15, 1115:16
**intentional** [1] -
1095:6
**interaction** [2] -
1023:20, 1083:7
**interfere** [1] - 1102:23
**interfering** [1] - 1078:2
**interpretation** [1] -
1048:16
**interview** [3] - 1013:1,
1040:22, 1057:25
**interviewed** [3] -

1014:9, 1057:21, 1057:23
**interviewing** [1] - 1046:17
**interviews** [3] - 1039:1, 1042:13, 1059:17
**intimidate** [1] - 1102:23
**intimidated** [3] - 1014:9, 1054:6, 1101:10
**intimidating** [3] - 1002:19, 1103:5, 1103:6
**introducing** [1] - 1073:4
**invented** [1] - 1048:15
**inverse** [1] - 1099:14
**investigation** [1] - 1053:25
**investigator** [1] - 1034:11
**investigators** [1] - 1049:15
**invoking** [1] - 1118:9
**involve** [1] - 1079:15
**involved** [4] - 1062:14, 1079:22, 1094:10, 1094:21
**involves** [1] - 1094:15
**involving** [4] - 1007:8, 1083:21, 1088:17, 1117:9
**irrelevant** [7] - 1015:19, 1015:22, 1016:10, 1022:3, 1044:6, 1047:25, 1068:18
**Island** [4] - 1038:23, 1040:22, 1046:16, 1057:20
**issue** [16] - 1010:12, 1050:6, 1055:25, 1076:5, 1086:15, 1088:16, 1091:15, 1105:9, 1109:2, 1109:5, 1110:7, 1111:11, 1113:16, 1114:10, 1115:4, 1115:20
**issues** [4] - 1007:8, 1010:7, 1015:22, 1075:18
**itself** [1] - 1076:20

**J**

**jacket** [2] - 1082:17, 1109:22

**jail** [2] - 1063:23, 1063:25
**jails** [1] - 1012:25
**James** [2] - 1038:10, 1038:12
**January** [64] - 1003:23, 1005:17, 1007:11, 1011:25, 1012:3, 1013:15, 1013:16, 1013:20, 1014:20, 1014:21, 1017:18, 1017:23, 1020:19, 1032:7, 1032:12, 1033:16, 1033:20, 1033:22, 1034:2, 1034:11, 1034:18, 1036:18, 1038:25, 1039:1, 1039:5, 1039:12, 1039:19, 1041:10, 1042:16, 1043:8, 1044:23, 1046:13, 1047:7, 1047:19, 1049:21, 1053:8, 1053:9, 1053:10, 1053:16, 1056:5, 1057:23, 1059:7, 1059:11, 1059:25, 1060:6, 1060:17, 1061:18, 1061:23, 1062:6, 1063:14, 1068:15, 1069:11, 1071:22, 1072:13, 1073:17, 1097:5, 1097:18, 1098:2, 1098:6, 1098:13, 1110:13
**Jeanette** [2] - 1054:11, 1096:16
**Jenkins** [3] - 1075:2, 1116:15, 1116:18
**jeopardized** [1] - 1064:12
**job** [5] - 1049:23, 1059:1, 1059:2, 1107:8, 1107:10
**jobs** [1] - 1070:23
**jogger** [1] - 1009:16
**joggers** [1] - 1009:5
**John** [1] - 1002:11
**JOHN** [2] - 1000:2, 1000:3
**joining** [1] - 1003:13
**Jonathan** [1] - 1011:8
**JONATHAN** [3] - 1001:3, 1011:3, 1011:8
**Jordan** [1] - 1002:8
**JORDAN** [1] - 999:12
**jordan.a.konig@**

**usdoj.gov** [1] - 999:15
**journalist** [3] - 1012:12, 1047:15, 1067:12
**journalists** [2] - 1037:5, 1047:14
**jpierce@ johnpiercelaw.com** [1] - 1000:5
**Judge** [8] - 1052:10, 1052:16, 1079:14, 1081:23, 1109:1, 1109:4, 1109:24, 1111:10
**JUDGE** [1] - 999:10
**judge** [2] - 1052:18, 1052:19
**judges** [1] - 1064:6
**July** [1] - 1039:7
**juries** [1] - 1092:23
**juror** [2] - 1088:24, 1089:8
**jury** [66] - 1005:9, 1006:24, 1007:22, 1007:25, 1008:3, 1008:4, 1009:14, 1010:2, 1010:4, 1010:19, 1014:17, 1015:13, 1015:20, 1019:21, 1022:12, 1023:1, 1026:17, 1029:4, 1033:21, 1035:6, 1035:24, 1045:15, 1048:5, 1050:7, 1052:3, 1054:24, 1055:17, 1055:23, 1056:2, 1067:19, 1072:20, 1074:12, 1074:16, 1074:19, 1075:5, 1075:9, 1078:20, 1080:20, 1081:12, 1085:17, 1085:18, 1086:15, 1092:15, 1092:17, 1092:25, 1093:1, 1093:7, 1093:17, 1093:20, 1093:24, 1097:22, 1099:22, 1100:9, 1105:8, 1105:9, 1107:6, 1107:22, 1108:1, 1108:2, 1115:5, 1115:19, 1116:13, 1116:16, 1117:18, 1118:15
**JURY** [1] - 999:9
**jury's** [1] - 1099:23
**just..** [1] - 1075:20
**justice** [4] - 1062:20,

1063:10, 1063:13, 1063:16
**JUSTICE** [1] - 999:13
**justified** [4] - 1077:12, 1080:8, 1085:24, 1088:19
**justify** [1] - 1088:23, 1089:16

**K**

**keep** [3] - 1013:12, 1057:15, 1093:25
**Kelly** [2] - 1109:4, 1111:10
**Kelly's** [2] - 1109:1, 1109:24
**kept** [1] - 1013:22
**Kerkhoff** [1] - 1089:15
**kid** [1] - 1013:8
**kind** [19] - 1012:11, 1013:23, 1014:9, 1014:25, 1015:22, 1016:24, 1018:15, 1023:12, 1024:11, 1025:2, 1033:25, 1042:14, 1076:23, 1081:1, 1085:13, 1095:7, 1101:11, 1114:3
**king** [1] - 1013:6
**knowing** [1] - 1111:5
**knowingly** [5] - 1108:22, 1109:5, 1111:9, 1111:13, 1111:14
**knowledge** [3] - 1006:24, 1015:18, 1107:19
**known** [1] - 1036:24
**knows** [7] - 1048:7, 1048:8, 1048:9, 1048:22, 1051:20, 1053:19, 1054:21
**KONIG** [110] - 999:12, 1002:8, 1004:19, 1006:21, 1006:23, 1007:16, 1008:6, 1008:10, 1009:24, 1014:14, 1015:10, 1015:15, 1016:16, 1019:18, 1021:15, 1022:2, 1023:13, 1025:23, 1025:25, 1026:2, 1026:13, 1027:5, 1027:7, 1027:14, 1029:15, 1030:2, 1030:7, 1030:10, 1031:3, 1031:5, 1032:2, 1033:3, 1035:2,

1035:14, 1035:23, 1036:2, 1036:7, 1036:12, 1037:6, 1037:9, 1037:25, 1038:3, 1038:8, 1038:20, 1040:21, 1040:25, 1041:5, 1041:7, 1041:23, 1042:5, 1042:23, 1043:20, 1043:24, 1044:2, 1044:9, 1044:16, 1045:7, 1045:23, 1048:1, 1048:8, 1048:13, 1049:1, 1049:19, 1049:24, 1050:20, 1051:6, 1051:22, 1052:2, 1052:8, 1052:13, 1052:16, 1052:19, 1052:25, 1053:6, 1054:17, 1055:18, 1056:3, 1056:7, 1056:9, 1056:11, 1056:19, 1061:5, 1064:20, 1064:24, 1065:14, 1066:1, 1066:6, 1066:10, 1066:15, 1066:22, 1067:2, 1067:20, 1067:24, 1068:17, 1068:25, 1069:16, 1069:23, 1070:1, 1071:8, 1071:11, 1071:13, 1071:25, 1072:16, 1073:2, 1074:7, 1107:11, 1107:19, 1110:1, 1110:6, 1110:10
**Konig** [15] - 1002:8, 1004:18, 1006:20, 1008:14, 1009:22, 1015:14, 1029:25, 1051:4, 1054:15, 1064:5, 1065:8, 1073:1, 1074:6, 1090:14, 1107:16
**Konig**........................ ..............**1030** [1] - 1001:4
**Kozaczuk** [17] - 1035:2, 1035:14, 1036:2, 1036:10, 1037:6, 1037:9, 1037:12, 1037:25, 1040:25, 1041:23, 1042:5, 1042:23, 1043:20, 1044:17, 1044:19, 1045:20, 1045:23

# L

**LA** [1] - 1013:5
**labor** [1] - 1029:14
**lack** [1] - 1097:22
**lacked** [1] - 1095:25
**ladies** [4] - 1010:20, 1050:4, 1056:13, 1074:9
**laid** [2] - 1026:3, 1091:6
**land** [2] - 1025:1, 1025:3
**language** [8] - 1096:2, 1096:23, 1096:25, 1097:2, 1097:11, 1101:3, 1102:7, 1107:21
**last** [8] - 1014:1, 1014:17, 1043:5, 1055:12, 1092:7, 1099:7, 1104:25, 1105:17
**latest** [2] - 1010:2, 1089:25
**LAW** [1] - 1000:3
**law** [46] - 1014:10, 1048:9, 1048:16, 1054:10, 1062:5, 1065:8, 1065:11, 1065:15, 1067:1, 1075:18, 1076:25, 1077:1, 1077:3, 1077:14, 1077:23, 1078:1, 1078:2, 1079:1, 1079:15, 1080:5, 1080:10, 1083:2, 1084:2, 1085:22, 1086:8, 1086:20, 1086:21, 1088:14, 1088:17, 1088:20, 1089:1, 1089:3, 1089:17, 1093:6, 1094:12, 1094:19, 1103:6, 1105:18, 1105:20, 1105:21, 1108:22, 1114:1, 1114:18, 1115:16, 1117:6
**lawful** [1] - 1088:14
**lawn** [1] - 1020:11
**lawsuits** [1] - 1064:8
**lay** [2] - 1025:3, 1044:2
**leading** [8] - 1029:9, 1029:15, 1067:2, 1069:16, 1069:23, 1069:25, 1070:2, 1071:8
**learned** [2] - 1069:14,

1069:22
**least** [7] - 1002:16, 1014:8, 1039:24, 1078:10, 1091:18, 1102:4, 1118:3
**left** [2] - 1002:15, 1018:4
**leg** [1] - 1083:9
**legal** [3] - 1033:11, 1069:5, 1080:4
**legally** [1] - 1081:6
**less** [5] - 1029:12, 1052:23, 1052:24, 1086:25, 1093:3
**lesser** [1] - 1099:13
**lethal** [1] - 1089:14
**letter** [1] - 1034:6
**Letters** [1] - 1012:24
**letters** [1] - 1012:24
**level** [2] - 1103:23, 1114:9
**liability** [1] - 1004:10, 1006:12, 1109:6
**liaison** [1] - 1008:18
**libel** [1] - 1064:15
**lied** [2] - 1008:24, 1009:7
**lies** [1] - 1084:4
**likely** [3] - 1006:25, 1007:3, 1009:24
**limine** [2] - 1075:17, 1076:7
**limit** [1] - 1118:18
**line** [11] - 1023:19, 1028:16, 1028:18, 1046:2, 1054:14, 1059:19, 1083:10, 1096:16, 1096:17, 1103:7, 1106:20
**Line** [1] - 1106:12
**lines** [2] - 1025:5, 1054:9
**link** [7] - 1036:23, 1038:9, 1057:1, 1063:5, 1063:6, 1068:6, 1068:23
**links** [7] - 1034:22, 1035:12, 1036:13, 1036:19, 1037:7, 1042:9, 1042:10
**Lisa** [1] - 1000:7
**LISA** [1] - 1119:3
**list** [4] - 1062:17, 1100:15, 1102:6, 1104:17
**listed** [6] - 1098:20, 1099:3, 1099:17, 1104:3, 1104:16
**listen** [1] - 1061:13
**listened** [1] - 1087:17

**listing** [1] - 1068:9
**lists** [1] - 1098:10
**litigated** [1] - 1114:1
**lived** [1] - 1054:7
**livelihoods** [1] - 1064:13
**lives** [1] - 1060:12
**location** [2] - 1023:5, 1024:20
**lockdown** [1] - 1070:23
**locked** [3] - 1032:17, 1032:18, 1032:23
**Lockett** [1] - 1076:16
**logistics** [1] - 1075:22
**look** [9] - 1019:13, 1021:10, 1028:16, 1031:9, 1066:13, 1072:12, 1090:5, 1099:14, 1109:18
**looked** [1] - 1040:9
**looking** [4] - 1087:24, 1100:14, 1101:15, 1104:2
**looks** [1] - 1038:5
**lose** [2] - 1068:9, 1068:10
**loss** [1] - 1064:15
**loud** [1] - 1080:18
**lunch** [4] - 1074:23, 1116:3, 1116:16, 1116:17
**Lunch** [1] - 1118:23

# M

**M-A-H-A-N** [1] - 1052:17
**Mahan** [1] - 1052:16
**maker** [2] - 1068:1, 1068:3
**man** [2] - 1048:22, 1063:15
**manner** [1] - 1117:4
**map** [11] - 1026:6, 1026:10, 1026:12, 1026:20, 1026:22, 1026:23, 1026:24, 1027:16, 1027:23, 1028:6
**March** [1] - 1109:13
**Mark** [1] - 1060:7
**markers** [1] - 1029:8
**Marshal** [1] - 1075:25
**mask** [5] - 1058:6, 1058:8, 1070:23, 1084:17, 1084:18
**masking** [1] - 1047:2
**masse** [1] - 1018:10
**massively** [1] - 1067:6

**matter** [11] - 1005:19, 1045:10, 1063:3, 1077:1, 1077:18, 1077:23, 1080:5, 1086:20, 1091:14, 1107:24, 1117:6
**matters** [1] - 1084:21
**McGrew** [2] - 1038:10, 1038:12
**mean** [27] - 1012:7, 1021:21, 1024:12, 1031:21, 1033:18, 1048:24, 1049:5, 1062:25, 1072:16, 1073:3, 1078:9, 1078:11, 1080:25, 1082:20, 1083:1, 1085:3, 1087:2, 1100:20, 1104:8, 1107:3, 1107:4, 1107:17, 1109:20, 1115:3, 1115:12, 1117:23, 1118:5
**meaning** [4] - 1051:25, 1063:15, 1070:17, 1070:18
**meanings** [1] - 1102:24
**means** [4] - 1062:16, 1071:16, 1113:22, 1115:5
**medals** [1] - 1008:24
**meddle** [1] - 1098:5
**media** [5] - 1033:20, 1042:4, 1042:7, 1042:13, 1067:12
**meet** [5] - 1003:12, 1005:3, 1014:24, 1082:3, 1114:13
**Mehta** [3] - 1079:14, 1079:22, 1081:23
**members** [1] - 1036:20
**memory** [1] - 1058:15
**mentioned** [2] - 1070:12, 1098:25
**mere** [2] - 1114:1, 1114:4
**merely** [1] - 1006:12
**mesh** [1] - 1025:10
**met** [9] - 1020:14, 1020:19, 1020:21, 1043:9, 1061:9, 1081:14, 1082:6, 1085:18, 1086:14
**metal** [1] - 1038:13
**Michael** [1] - 1043:4
**middle** [4] - 1030:5, 1030:22, 1092:22, 1093:9

**Middleton** [1] - 1081:22
**might** [9] - 1002:21, 1027:10, 1043:1, 1060:21, 1088:24, 1099:16, 1099:21, 1114:9, 1116:3
**mind** [3] - 1003:6, 1045:18, 1117:16
**minimal** [1] - 1103:23
**ministry** [3] - 1011:15, 1033:9, 1033:10
**minor** [1] - 1115:1
**minute** [5] - 1050:5, 1088:5, 1105:13, 1111:18, 1112:23
**minutes** [8] - 1021:22, 1022:3, 1037:10, 1041:1, 1041:2, 1044:18, 1045:24, 1116:4
**misdemeanor** [1] - 1099:14
**misdemeanors** [1] - 1036:25
**miss** [1] - 1018:7
**missed** [2] - 1072:21, 1113:15
**misstatements** [1] - 1090:7
**mistake** [4] - 1104:17, 1108:15, 1108:16, 1111:22
**mistaken** [1] - 1101:8
**mob** [1] - 1085:14
**model** [2] - 1092:6, 1092:12
**moment** [2] - 1055:25, 1084:20
**money** [9] - 1013:10, 1068:1, 1068:3, 1068:5, 1068:8, 1068:9, 1068:10, 1069:5
**month** [1] - 1109:13
**Monument** [5] - 1014:24, 1018:25, 1023:6, 1029:10, 1031:15
**morals** [2] - 1012:18, 1059:11
**Moreira** [2] - 1000:7, 1119:10
**MOREIRA** [1] - 1119:3
**moreover** [1] - 1117:3
**MORNING** [1] - 999:5
**morning** [12] - 1002:5, 1002:8, 1002:11, 1002:14, 1003:8, 1003:9, 1010:9,

1014:23, 1015:6, 1030:3, 1030:4, 1049:12
**most** [2] - 1054:6, 1113:25
**mostly** [1] - 1033:17
**mother** [1] - 1014:10
**mother-in-law** [1] - 1014:10
**motion** [4] - 1075:16, 1075:17, 1076:7, 1107:19
**move** [18] - 1009:6, 1014:14, 1019:16, 1019:20, 1021:13, 1021:24, 1027:19, 1036:8, 1044:1, 1045:18, 1054:22, 1056:18, 1067:18, 1072:15, 1075:13, 1111:1, 1112:8, 1118:17
**moved** [11] - 1009:5, 1009:16, 1019:19, 1036:1, 1044:8, 1046:5, 1067:21, 1070:9, 1086:4, 1115:10
**moves** [4] - 1009:1, 1044:4, 1083:3, 1083:6
**moving** [4] - 1084:25, 1085:2, 1085:8, 1091:23
**MPD** [1] - 1101:25
**MR** [303] - 1002:8, 1002:11, 1002:17, 1003:5, 1004:19, 1004:22, 1004:24, 1005:2, 1005:4, 1005:13, 1006:1, 1006:3, 1006:21, 1006:23, 1007:16, 1008:6, 1008:10, 1008:13, 1009:17, 1009:24, 1010:11, 1010:15, 1010:23, 1011:5, 1014:14, 1015:10, 1015:15, 1015:25, 1016:12, 1016:16, 1019:6, 1019:10, 1019:16, 1019:18, 1019:20, 1020:3, 1020:6, 1021:8, 1021:13, 1021:15, 1021:24, 1022:2, 1022:6, 1022:9, 1022:11, 1022:14, 1023:13, 1025:23, 1025:25,

1026:2, 1026:6, 1026:13, 1026:20, 1027:5, 1027:7, 1027:14, 1027:22, 1028:2, 1028:4, 1028:5, 1028:17, 1029:15, 1029:22, 1030:2, 1030:7, 1030:10, 1031:3, 1031:5, 1032:2, 1033:3, 1035:2, 1035:14, 1035:23, 1035:25, 1036:2, 1036:7, 1036:11, 1036:12, 1037:6, 1037:9, 1037:20, 1037:23, 1037:25, 1038:3, 1038:8, 1038:20, 1040:20, 1040:21, 1040:25, 1041:5, 1041:7, 1041:23, 1042:5, 1042:23, 1043:20, 1043:24, 1044:2, 1044:6, 1044:9, 1044:16, 1045:7, 1045:9, 1045:23, 1047:25, 1048:1, 1048:8, 1048:13, 1048:15, 1048:19, 1049:1, 1049:7, 1049:14, 1049:19, 1049:24, 1050:1, 1050:20, 1050:22, 1051:6, 1051:22, 1052:2, 1052:8, 1052:13, 1052:16, 1052:19, 1052:25, 1053:6, 1053:12, 1054:17, 1055:3, 1055:8, 1055:18, 1056:3, 1056:7, 1056:9, 1056:11, 1056:19, 1058:11, 1061:5, 1064:20, 1064:21, 1064:24, 1065:1, 1065:4, 1065:6, 1065:14, 1066:1, 1066:6, 1066:10, 1066:15, 1066:22, 1067:2, 1067:18, 1067:20, 1067:22, 1067:24, 1067:25, 1068:17, 1068:19, 1068:25, 1069:16, 1069:23, 1070:1, 1070:3, 1071:8, 1071:11, 1071:13, 1071:25, 1072:2, 1072:4, 1072:15, 1072:16,

1072:23, 1073:2, 1073:9, 1073:15, 1073:21, 1074:5, 1074:7, 1074:14, 1075:14, 1075:24, 1076:3, 1076:10, 1077:7, 1077:9, 1078:22, 1079:3, 1079:6, 1079:8, 1079:16, 1079:18, 1079:22, 1079:25, 1080:8, 1080:13, 1080:16, 1080:22, 1080:25, 1081:4, 1082:7, 1082:20, 1082:23, 1086:22, 1087:2, 1087:5, 1087:9, 1087:22, 1088:2, 1088:7, 1090:4, 1090:21, 1090:24, 1091:4, 1091:12, 1091:25, 1092:4, 1093:11, 1094:1, 1094:4, 1094:7, 1095:5, 1095:16, 1095:18, 1095:21, 1096:6, 1096:8, 1096:22, 1097:6, 1097:8, 1097:11, 1097:20, 1098:5, 1098:15, 1098:16, 1098:18, 1098:24, 1099:7, 1099:11, 1099:19, 1100:1, 1100:13, 1100:20, 1101:2, 1101:9, 1101:15, 1102:14, 1102:18, 1103:16, 1104:13, 1104:15, 1104:21, 1104:24, 1105:4, 1105:7, 1105:16, 1105:24, 1106:10, 1106:14, 1106:18, 1107:5, 1107:11, 1107:16, 1107:19, 1107:22, 1108:1, 1108:5, 1108:9, 1108:15, 1108:18, 1108:23, 1108:25, 1109:7, 1109:11, 1109:17, 1110:1, 1110:6, 1110:10, 1110:14, 1110:18, 1110:22, 1111:1, 1111:18, 1111:22, 1112:1, 1112:7, 1112:11, 1112:22, 1113:1, 1113:6, 1113:10, 1113:13, 1113:18, 1113:20,

1113:24, 1114:8, 1114:23, 1115:7, 1115:21, 1115:24, 1117:13, 1117:18, 1117:25, 1118:5
**MS** [2] - 1030:9, 1030:11
**multiple** [2] - 1071:23, 1077:25
**must** [10] - 1009:2, 1081:19, 1088:23, 1092:24, 1093:3, 1093:15, 1093:23, 1094:13, 1094:16, 1113:4
**muster** [1] - 1107:3

**N**

**name** [14] - 1002:7, 1011:6, 1041:22, 1043:5, 1047:22, 1048:6, 1048:13, 1048:25, 1049:20, 1051:13, 1098:21, 1098:22, 1098:25, 1109:9
**named** [5] - 1008:17, 1020:14, 1038:9, 1041:13, 1060:7
**names** [2] - 1064:10, 1099:3
**national** [1] - 1012:21
**near** [8] - 1017:10, 1026:4, 1039:25, 1040:2, 1040:15, 1041:9, 1043:13, 1044:10
**necessarily** [2] - 1087:12, 1094:20
**necessary** [10] - 1036:9, 1059:3, 1081:18, 1082:9, 1084:24, 1084:25, 1085:2, 1085:3, 1085:16, 1098:15
**need** [18] - 1008:19, 1013:23, 1019:25, 1033:12, 1042:20, 1055:15, 1061:7, 1061:8, 1061:11, 1096:23, 1102:1, 1104:9, 1104:12, 1104:15, 1113:3, 1114:6, 1115:6
**needed** [1] - 1083:19
**needs** [5] - 1061:10, 1087:18, 1103:22, 1115:17, 1116:11
**negotiation** [2] - 1006:9, 1040:9

**negotiations** [1] - 1023:22
**neutral** [3] - 1012:5, 1012:12, 1012:15
**Nevada** [1] - 1052:16
**never** [12] - 1017:2, 1018:1, 1029:21, 1040:10, 1041:18, 1061:25, 1062:7, 1092:17, 1092:18, 1107:11, 1107:17
**news** [1] - 1011:24
**next** [9] - 1005:11, 1015:6, 1031:24, 1060:21, 1063:9, 1074:12, 1085:4, 1102:22, 1108:20
**NEXT** [1] - 999:25
**nice** [2] - 1003:12, 1005:3
**night** [3] - 1010:21, 1014:22, 1015:3
**Ninth** [1] - 1081:24, 1114:16
**NOHRIA** [4] - 999:20, 1113:20, 1114:8, 1115:21
**non** [1] - 1090:8
**non-substantive** [1] - 1090:8
**none** [1] - 1117:1
**nonlethal** [5] - 1078:17, 1078:18, 1089:9, 1089:14, 1089:19
**nonviolent** [2] - 1040:18, 1040:19
**noodle** [1] - 1117:23
**noon** [4] - 1074:21, 1074:24, 1075:1, 1075:5
**normally** [1] - 1066:13
**north** [1] - 1014:22
**northwest** [1] - 1058:1
**note** [5] - 1015:3, 1098:19, 1105:19, 1107:5, 1115:20
**noted** [6] - 1089:23, 1093:10, 1105:6, 1105:22, 1108:7, 1117:12
**notes** [1] - 1119:5
**nothing** [3] - 1053:24, 1086:5, 1106:10
**notice** [1] - 1031:20
**noticed** [1] - 1106:15
**notoriety** [1] - 1012:20
**notwithstanding** [3] - 1004:10, 1049:11, 1116:9

**November** [1] - 1027:16
**nullification** [2] - 1093:7, 1117:19
**number** [6] - 1006:23, 1027:25, 1036:11, 1067:5, 1067:23, 1076:18
**number..** [1] - 1027:24
**numbering** [1] - 1067:24
**NW** [3] - 999:21, 1000:9, 1119:12

# O

**oath** [1] - 1049:10
**object** [13] - 1022:3, 1037:20, 1037:23, 1045:9, 1049:14, 1064:25, 1068:17, 1072:16, 1094:7, 1103:11, 1107:6, 1108:3, 1113:24
**objected** [2] - 1079:24, 1096:12
**objecting** [3] - 1021:16, 1092:5, 1092:13
**objection** [40] - 1015:10, 1016:16, 1019:18, 1022:1, 1023:13, 1025:23, 1025:25, 1026:1, 1029:15, 1035:25, 1044:5, 1044:6, 1047:25, 1050:1, 1050:23, 1058:11, 1065:14, 1066:1, 1066:6, 1066:10, 1066:15, 1066:22, 1067:2, 1067:20, 1068:25, 1069:16, 1069:23, 1071:8, 1071:11, 1071:25, 1093:19, 1095:18, 1098:4, 1101:14, 1102:25, 1103:13, 1105:19, 1107:15, 1110:23, 1117:12
**objection's** [3] - 1093:10, 1105:6, 1105:22
**objections** [5] - 1089:23, 1094:19, 1108:6, 1108:7, 1113:12
**objectively** [1] - 1089:6
**obligation** [1] - 1004:6
**observed** [3] -

1005:13, 1078:17, 1083:22
**observer** [1] - 1012:5
**obvious** [1] - 1024:12
**obviously** [14] - 1003:25, 1005:17, 1008:4, 1009:12, 1049:1, 1088:13, 1089:2, 1089:23, 1092:15, 1096:10, 1096:16, 1099:20, 1101:9, 1105:16
**occupied** [2] - 1071:6, 1071:16
**occur** [1] - 1094:11
**OF** [5] - 999:1, 999:3, 999:9, 999:13, 1119:1
**offense** [8] - 1004:3, 1004:4, 1092:9, 1092:11, 1099:11, 1103:24, 1103:25, 1105:1
**offensive** [2] - 1113:23, 1114:11
**offered** [3] - 1045:10, 1045:12, 1096:11
**OFFICE** [1] - 999:20
**Office** [1] - 999:21
**officer** [21] - 1008:17, 1069:8, 1069:18, 1076:21, 1077:1, 1077:14, 1079:2, 1079:15, 1080:10, 1085:1, 1086:21, 1088:21, 1089:1, 1089:5, 1089:14, 1089:17, 1098:19, 1100:22, 1101:25, 1102:1, 1104:20
**officer's** [1] - 1089:4
**Officers** [1] - 1097:4
**officers** [40] - 1007:12, 1008:16, 1030:16, 1030:18, 1033:1, 1038:14, 1044:25, 1045:21, 1046:4, 1046:5, 1046:7, 1065:8, 1065:11, 1067:5, 1077:3, 1078:3, 1080:5, 1084:9, 1085:7, 1086:8, 1086:9, 1088:14, 1088:15, 1089:3, 1089:11, 1094:21, 1095:22, 1096:24, 1097:17, 1098:1, 1098:10, 1098:11, 1098:12, 1098:20, 1098:24,

1101:20, 1102:2, 1102:3, 1115:1
**official** [12] - 1026:23, 1077:15, 1088:21, 1095:23, 1096:24, 1097:5, 1097:17, 1097:24, 1098:1, 1098:11, 1101:21, 1119:11
**Official** [1] - 1000:8
**OFFICIAL** [1] - 1119:1
**officials** [1] - 1080:19
**oldest** [1] - 1103:4
**OMB** [1] - 1000:4
**omitted** [1] - 1090:9
**ON** [1] - 999:25
**one** [61] - 1004:5, 1005:6, 1006:3, 1008:20, 1008:25, 1014:11, 1016:23, 1017:1, 1017:13, 1017:15, 1018:24, 1024:25, 1025:10, 1029:6, 1029:19, 1031:7, 1033:25, 1035:21, 1036:18, 1038:1, 1039:10, 1043:1, 1044:20, 1047:14, 1050:5, 1051:24, 1055:19, 1055:25, 1058:22, 1067:15, 1068:5, 1076:18, 1077:6, 1084:11, 1084:18, 1086:7, 1086:12, 1087:23, 1090:25, 1091:18, 1097:12, 1097:13, 1098:18, 1098:19, 1098:24, 1099:2, 1099:7, 1101:10, 1101:17, 1103:4, 1103:10, 1104:6, 1104:7, 1108:25, 1111:18, 1113:13, 1113:16, 1113:25, 1114:18, 1117:23
**one-stop** [1] - 1033:25
**ones** [8] - 1017:16, 1019:2, 1025:2, 1030:22, 1042:20, 1091:20, 1094:2
**open** [2] - 1032:13, 1096:18
**opened** [2] - 1040:10, 1072:2
**openings** [1] - 1115:25
**opining** [1] - 1007:1
**opinion** [5] - 1002:18,

1012:14, 1012:19, 1101:5, 1105:9
**opinions** [1] - 1078:23
**opportunity** [5] - 1007:25, 1009:12, 1010:4, 1054:15, 1073:5
**oppose** [2] - 1097:9, 1102:22
**opposed** [2] - 1100:4, 1101:25
**opposing** [1] - 1102:12
**opposition** [2] - 1095:12, 1100:11
**oral** [1] - 1113:11
**order** [3] - 1079:13, 1088:22, 1115:7
**orders** [1] - 1029:20
**ordinary** [1] - 1102:24
**organization** [3] - 1012:20, 1013:4, 1068:3
**organizations** [1] - 1042:9
**organize** [3] - 1017:5, 1017:13, 1017:16
**origins** [1] - 1079:25
**otherwise** [1] - 1087:18
**ourselves** [1] - 1116:17
**outnumbered** [1] - 1067:6
**outrageous** [2] - 1053:12, 1054:2
**outset** [1] - 1115:25
**outside** [10] - 1005:8, 1015:13, 1026:17, 1048:5, 1056:2, 1066:1, 1072:20, 1075:3, 1080:23, 1081:5
**overly** [2] - 1099:18, 1099:19
**overrule** [3] - 1094:18, 1103:12, 1107:15
**overruled** [7] - 1023:14, 1037:22, 1045:13, 1058:12, 1065:3, 1069:1, 1069:17
**overview** [2] - 1005:14, 1005:20
**own** [9] - 1040:2, 1051:16, 1051:17, 1059:25, 1081:13, 1084:14, 1085:11, 1086:3, 1117:16
**Oxnard** [1] - 1000:3

# P

**P.C** [1] - 1000:3
**p.m** [3] - 1032:12, 1037:19, 1118:23
**P.O** [1] - 999:13
**PA** [1] - 999:18
**page** [8] - 1035:9, 1038:9, 1038:16, 1057:4, 1067:15, 1092:8, 1096:4, 1102:22
**Page** [1] - 1092:4, 1092:8, 1093:12, 1096:6, 1098:20, 1098:21, 1099:8, 1102:22, 1106:2, 1106:4
**PAGE** [2] - 999:25, 1001:2
**pages** [6] - 1034:22, 1036:13, 1036:17, 1042:6, 1063:5, 1110:6
**pain** [1] - 1064:13
**pallet** [1] - 1076:22, 1083:6, 1085:2
**paltry** [1] - 1067:1
**paper** [2] - 1020:12, 1025:14
**part** [8] - 1016:1, 1042:4, 1095:23, 1097:23, 1098:1, 1098:11, 1117:20, 1117:21
**participate** [1] - 1015:4
**particular** [2] - 1093:21, 1103:23
**parties** [1] - 1110:2
**parts** [2] - 1071:17, 1082:5
**pass** [2] - 1064:20, 1107:3
**past** [1] - 1090:18
**path** [3] - 1018:20, 1018:22, 1045:3
**patriots** [1] - 1063:14
**Pattis** [1] - 1004:24
**PATTIS** [1] - 1005:2
**Pause** [6] - 1010:18, 1035:17, 1050:21, 1051:1, 1087:25, 1102:9
**pause** [2] - 1031:5, 1037:25
**paused** [1] - 1045:20
**pausing** [2] - 1044:17, 1044:19
**pay** [2] - 1051:11,

1064:18
**PDF** [1] - 1035:18
**Peace** [7] - 1018:25,
1023:6, 1029:10,
1031:15, 1032:20,
1039:25, 1041:10
**peaceful** [1] - 1060:21
**penalty** [1] - 1062:10
**Pennsylvania** [3] -
1028:20, 1028:21,
1031:14
**people** [63] - 1003:1,
1004:2, 1007:12,
1018:9, 1018:14,
1018:17, 1018:25,
1023:18, 1024:7,
1024:13, 1029:7,
1031:21, 1032:22,
1032:25, 1034:1,
1036:21, 1036:23,
1036:24, 1037:2,
1040:10, 1046:24,
1047:2, 1047:10,
1047:13, 1047:18,
1048:7, 1048:8,
1048:13, 1049:23,
1051:20, 1052:7,
1053:19, 1053:21,
1054:1, 1054:22,
1055:5, 1056:15,
1057:11, 1058:13,
1058:18, 1060:14,
1062:2, 1062:11,
1062:14, 1062:17,
1062:21, 1062:22,
1063:3, 1063:4,
1063:22, 1063:23,
1063:25, 1064:10,
1067:7, 1070:22,
1070:23, 1073:16,
1085:10, 1089:2,
1096:20, 1098:2
**people's** [1] - 1094:12
**pepper** [3] - 1058:3,
1058:5, 1089:9
**PepperBalls** [1] -
1083:4
**percent** [4] - 1033:24,
1062:2, 1062:11,
1062:21
**percipient** [1] -
1007:14
**performance** [5] -
1077:14, 1078:2,
1080:9, 1088:20,
1101:21
**performances** [1] -
1077:2
**performing** [6] -
1080:6, 1088:14,

1094:22, 1096:24,
1097:4, 1097:17
**perimeter** [1] - 1027:3
**period** [5] - 1072:25,
1076:19, 1097:18,
1098:7, 1098:13
**permission** [1] -
1035:23
**permit** [3] - 1016:8,
1026:20, 1056:17
**permits** [5] - 1015:16,
1016:1, 1016:9,
1027:8, 1032:15
**permitted** [11] -
1015:7, 1016:1,
1016:5, 1016:6,
1017:8, 1024:23,
1026:24, 1027:2,
1027:15, 1081:7
**permitting** [3] -
1015:22, 1016:7,
1027:18
**perpetrators** [1] -
1051:19
**person** [14] - 1002:20,
1024:5, 1036:18,
1043:3, 1043:7,
1081:16, 1083:23,
1100:8, 1100:22,
1101:19, 1104:19,
1113:23, 1114:19,
1114:20
**person's** [1] - 1083:24
**personal** [1] - 1070:1
**personally** [2] -
1068:2, 1094:9
**perspective** [6] -
1019:13, 1070:7,
1070:8, 1089:5,
1089:11
**petition** [1] - 1055:5
**petty** [1] - 1036:25
**Pezzola** [3] - 1037:4,
1038:4, 1068:21
**phase** [1] - 1074:12
**phone** [2] - 1015:11,
1019:24
**phones** [4] - 1026:14,
1048:3, 1055:22,
1072:18
**photographs** [2] -
1082:19, 1082:20
**physical** [13] -
1023:23, 1100:7,
1100:21, 1100:25,
1101:19, 1102:13,
1102:17, 1104:11,
1104:12, 1104:15,
1104:19, 1108:12,
1113:22

**physically** [1] -
1100:17
**pickpocketing** [1] -
1114:3
**picture** [1] - 1031:1
**pieces** [2] - 1020:12,
1025:14
**Pierce** [1] - 1002:12
**PIERCE** [6] - 1000:2,
1000:3, 1002:11,
1074:5, 1088:2,
1088:7
**pierce** [2] - 1074:4,
1087:21
**pincite** [1] - 1077:10
**piss** [1] - 1060:25
**place** [13] - 1023:2,
1039:25, 1063:19,
1105:10, 1106:14,
1106:20, 1110:21,
1117:3, 1117:4,
1117:6, 1117:10,
1118:11
**places** [2] - 1007:9,
1106:2
**Plaintiff** [1] - 999:4
**plan** [1] - 1024:11
**planned** [1] - 1016:21
**plastic** [2] - 1025:10,
1089:9
**play** [18] - 1007:21,
1022:11, 1030:7,
1031:3, 1032:3,
1037:11, 1041:1,
1041:5, 1043:20,
1044:17, 1045:7,
1045:23, 1064:22,
1065:4, 1072:4,
1077:19, 1077:20,
1083:14
**played** [3] - 1044:10,
1069:7, 1070:4
**playing** [13] - 1020:5,
1022:13, 1030:12,
1031:4, 1037:13,
1041:6, 1043:23,
1045:8, 1045:14,
1045:25, 1065:7,
1065:17, 1072:5
**plea** [1] - 1062:24
**pled** [1] - 1004:2
**plus** [1] - 1100:4
**pocket** [1] - 1109:22
**podcast** [9] - 1038:21,
1038:25, 1040:22,
1041:1, 1057:20,
1060:6, 1061:10,
1063:12, 1069:7
**podcasts** [5] - 1039:7,
1039:12, 1039:15,

1042:10, 1042:11
**podium** [1] - 1006:22
**point** [29] - 1009:9,
1009:13, 1009:15,
1014:14, 1021:1,
1021:3, 1022:18,
1032:19, 1032:20,
1048:18, 1048:24,
1073:7, 1076:3,
1078:8, 1084:18,
1092:5, 1092:13,
1092:21, 1093:4,
1094:4, 1094:15,
1094:16, 1094:24,
1099:7, 1099:20,
1100:2, 1113:14
**pointed** [1] - 1065:8
**points** [3] - 1076:4,
1076:12, 1094:8
**Police** [9] - 1008:15,
1008:16, 1008:19,
1008:23, 1009:5,
1095:23, 1101:25,
1102:1, 1102:2
**police** [18] - 1013:6,
1029:4, 1029:7,
1029:10, 1029:11,
1029:13, 1030:16,
1030:18, 1033:1,
1038:6, 1038:14,
1040:8, 1045:20,
1066:13, 1066:17,
1066:21, 1071:23,
1080:18
**policemen** [3] -
1023:19, 1023:22,
1067:7
**political** [4] - 1003:17,
1003:18, 1012:8,
1071:10
**politicalize** [1] -
1003:19
**politics** [1] - 1012:10
**poorly** [2] - 1053:1,
1053:9
**portion** [1] - 1074:11
**posed** [1] - 1055:12
**position** [3] - 1062:1,
1075:17, 1079:18
**possess** [2] - 1105:10,
1117:17
**possession** [2] -
1099:23, 1109:20
**possible** [1] - 1012:16
**possibly** [2] - 1018:10,
1035:6
**post** [5] - 1012:3,
1041:25, 1043:16,
1043:17, 1057:11
**posts** [1] - 1042:15

**potential** [3] -
1004:10, 1051:17,
1051:18
**potentially** [1] -
1116:9
**powerful** [1] - 1054:7
**practice** [1] - 1051:8
**prayer** [1] - 1034:4
**preceding** [1] - 1106:8
**predicated** [1] -
1083:23
**prefer** [1] - 1055:11
**preference** [1] -
1095:13
**pregnant** [1] - 1013:7
**prejudice** [1] -
1011:18
**preliminary** [5] -
1077:18, 1081:1,
1086:14, 1086:17,
1094:2
**prepared** [1] - 1008:25
**preponderance** [1] -
1087:1
**prerogative** [1] -
1093:21
**presence** [5] - 1005:8,
1029:4, 1029:10,
1066:13, 1071:24
**present** [2] - 1005:25,
1114:21
**presentation** [1] -
1116:13
**presented** [5] -
1074:20, 1080:13,
1082:15, 1089:7,
1106:1
**preserved** [1] -
1108:10
**president** [1] - 1107:7
**presumed** [1] -
1096:18
**pretending** [1] -
1053:24
**pretty** [7] - 1008:3,
1014:23, 1031:22,
1043:15, 1048:10,
1085:13, 1102:19
**prevailed** [1] - 1071:12
**prevention** [1] -
1013:12
**previously** [2] -
1065:7, 1075:15
**prima** [4] - 1081:14,
1086:18, 1086:23,
1087:1
**primarily** [1] - 1039:5
**primary** [1] - 1033:5
**principle** [3] -
1076:18, 1076:24,

1085:23
**principles** [1] - 1076:10
**Prison** [1] - 1012:24
**privilege** [1] - 1051:17
**pro** [1] - 1025:16
**pro-Trump** [1] - 1025:16
**proactive** [1] - 1101:22
**problem** [5] - 1013:10, 1091:12, 1098:7, 1108:18, 1118:6
**problematic** [1] - 1111:3
**proceeded** [1] - 1086:5
**proceeding** [3] - 1004:14, 1091:1, 1091:10
**proceedings** [3] - 1054:17, 1111:2, 1119:6
**proceeds** [1] - 1076:7
**process** [2] - 1015:22, 1016:8
**profession** [1] - 1033:6
**proffer** [1] - 1003:3
**program** [1] - 1011:19
**projectiles** [1] - 1089:9
**proof** [2] - 1092:7, 1092:17
**proper** [1] - 1051:4
**property** [1] - 1023:21
**proposal** [3] - 1101:7, 1108:12, 1111:15
**propose** [1] - 1097:13
**proposed** [12] - 1003:21, 1008:7, 1010:2, 1010:8, 1079:23, 1090:17, 1096:12, 1107:6, 1107:22, 1110:3, 1116:22
**propounded** [1] - 1052:5
**prosecuted** [4] - 1003:25, 1062:5, 1062:12, 1073:17
**prosecution** [2] - 1002:21, 1067:15
**prosecutions** [2] - 1051:9, 1061:22
**prosecutor** [3] - 1051:7, 1070:4, 1070:11
**prosecutors** [1] -

1064:4
**prospect** [1] - 1002:16
**prospective** [1] - 1053:10
**protect** [5] - 1084:9, 1089:10, 1095:24, 1098:1, 1098:12
**protections** [1] - 1118:10
**protest** [1] - 1015:8
**protesters** [6] - 1060:21, 1060:23, 1061:18, 1070:24, 1071:5, 1071:15
**protests** [2] - 1024:23, 1025:17
**prove** [2] - 1092:16, 1103:24
**proved** [4] - 1092:24, 1092:25, 1093:14, 1100:10
**proven** [4] - 1063:6, 1063:8, 1092:9, 1115:8
**provide** [1] - 1034:22
**provoked** [3] - 1076:15, 1076:19, 1077:21
**proximity** [5] - 1106:24, 1106:25, 1107:2, 1107:3, 1107:4
**prudent** [2] - 1111:12, 1116:3
**public** [3] - 1012:2, 1070:20, 1096:18
**Public** [1] - 1092:20
**publicity** [1] - 1013:2
**publish** [3] - 1019:20, 1022:11, 1035:23
**published** [1] - 1043:25
**pull** [6] - 1019:6, 1021:8, 1026:6, 1035:3, 1040:25, 1042:5
**pulled** [2] - 1067:15, 1103:16
**purports** [1] - 1073:6
**purpose** [6] - 1046:13, 1072:1, 1077:13, 1088:19, 1096:23, 1108:4
**purposes** [1] - 1104:25
**push** [2] - 1040:3, 1040:12
**pushed** [5] - 1007:23, 1040:15, 1058:18, 1069:8, 1069:20

**pushing** [1] - 1058:13
**put** [15] - 1013:11, 1022:25, 1026:21, 1028:9, 1028:12, 1042:25, 1049:9, 1050:9, 1063:25, 1076:12, 1083:15, 1085:16, 1098:7, 1109:21, 1115:3
**putting** [2] - 1077:22, 1085:1

## Q

**quantum** [1] - 1103:24
**questions** [6] - 1009:9, 1012:6, 1029:23, 1051:9, 1052:5, 1073:21
**quick** [3] - 1013:3, 1044:20, 1055:22
**quickly** [1] - 1035:15
**quite** [1] - 1058:15
**quote** [7] - 1054:9, 1058:9, 1077:11, 1077:12, 1077:16, 1083:21, 1084:15
**quoting** [1] - 1088:18

## R

**rack** [4] - 1032:5, 1032:7, 1046:2, 1046:4
**racks** [3] - 1018:23, 1031:11, 1044:25
**radio** [2] - 1009:3, 1009:4
**railing** [2] - 1007:23, 1038:13
**raise** [5] - 1011:1, 1022:7, 1069:4, 1076:12, 1081:9
**raises** [1] - 1068:5
**rallies** [11] - 1013:19, 1013:20, 1015:16, 1016:13, 1016:19, 1016:24, 1017:3, 1017:5, 1027:2, 1027:15, 1066:5
**rally** [4] - 1016:25, 1025:7, 1065:20, 1066:14
**Rankin** [2] - 1054:11, 1096:17
**rat** [1] - 1053:20
**ratio** [1] - 1067:8
**RDR** [3] - 1000:7, 1119:3, 1119:10
**reach** [1] - 1086:15
**read** [12] - 1020:11,

1025:12, 1030:25, 1031:1, 1032:1, 1074:23, 1081:9, 1088:11, 1098:9, 1100:20, 1108:2, 1109:8
**ready** [1] - 1075:12
**real** [2] - 1087:2, 1099:24
**really** [11] - 1020:10, 1032:1, 1060:24, 1063:3, 1065:11, 1071:2, 1071:6, 1072:1, 1088:2, 1097:12, 1101:4
**reap** [1] - 1063:20
**reason** [4] - 1005:10, 1018:12, 1056:7, 1091:5
**reasonable** [13] - 1081:3, 1081:4, 1082:7, 1083:18, 1088:24, 1089:5, 1089:8, 1092:9, 1093:14, 1113:23, 1114:22, 1115:8, 1117:3
**reasonably** [1] - 1081:16
**reasons** [4] - 1047:1, 1059:6, 1070:25, 1086:10
**rebuttal** [3] - 1009:23, 1073:4, 1074:8
**received** [1] - 1110:3
**receiving** [1] - 1007:21
**recently** [1] - 1034:14
**recess** [1] - 1118:23
**Recess** [1] - 1088:8
**recognize** [3] - 1035:7, 1043:3, 1092:12
**recognizes** [1] - 1093:3
**recollection** [1] - 1022:15
**record** [12] - 1002:3, 1002:7, 1076:4, 1077:20, 1078:3, 1084:10, 1089:23, 1097:21, 1099:4, 1107:24, 1108:8, 1117:12
**recovered** [1] - 1117:9
**recross** [1] - 1073:5
**Red** [1] - 1079:4
**red** [4] - 1002:21, 1054:9, 1054:13
**redirect** [1] - 1065:1
**REDIRECT** [1] - 1065:5

**redress** [1] - 1055:6
**refer** [2] - 1091:20, 1112:11
**references** [1] - 1099:11
**referred** [1] - 1042:24
**referring** [1] - 1030:23
**refers** [1] - 1105:1
**Reffitt** [9] - 1037:7, 1082:16, 1084:1, 1084:3, 1084:9, 1085:5, 1110:13, 1110:18
**reflect** [1] - 1053:9
**reflected** [1] - 1089:13
**reflects** [1] - 1053:1
**refresh** [1] - 1058:15
**refusal** [2] - 1051:24, 1052:25
**refuse** [1] - 1052:22
**refuses** [2] - 1054:19, 1054:22
**regard** [2] - 1008:15, 1023:16
**regardless** [2] - 1100:9, 1114:11
**regular** [1] - 1088:16
**reiterate** [2] - 1007:10, 1007:17
**reject** [2] - 1093:21, 1093:24
**rejected** [1] - 1116:7
**relate** [1] - 1110:7
**related** [3] - 1039:5, 1054:1, 1075:18
**relates** [1] - 1044:13
**relating** [1] - 1076:20
**relationship** [1] - 1056:20
**relatively** [2] - 1034:14, 1096:18
**released** [1] - 1023:21
**relevance** [12] - 1023:13, 1026:25, 1037:21, 1056:6, 1066:2, 1066:6, 1066:10, 1066:15, 1066:22, 1071:13, 1071:25, 1091:18
**relevant** [4] - 1007:7, 1007:14, 1007:19, 1053:7
**rely** [1] - 1104:3
**remain** [1] - 1060:21
**remember** [2] - 1046:16, 1046:20
**reminds** [1] - 1082:23
**remiss** [1] - 1113:13
**removed** [3] - 1096:2, 1106:23, 1106:25

**repeat** [1] - 1104:9
**repeatedly** [1] - 1084:1
**rephrase** [2] - 1023:15, 1071:14
**replays** [1] - 1031:9
**replied** [1] - 1059:3
**reporter** [1] - 1011:7
**Reporter** [3] - 1000:7, 1000:8, 1119:11
**REPORTER** [3] - 1033:12, 1061:4, 1119:1
**represent** [2] - 1043:19, 1054:9, 1061:14
**requesting** [2] - 1113:21, 1116:12
**require** [2] - 1103:19, 1113:15
**required** [6] - 1092:16, 1092:17, 1093:17, 1103:24, 1111:17, 1111:19
**requires** [4] - 1102:12, 1102:19, 1103:2, 1111:20
**rescinding** [1] - 1016:9
**research** [2] - 1034:8, 1075:8
**resist** [2] - 1059:4, 1102:22
**resistance** [2] - 1100:10, 1113:4
**resisted** [1] - 1100:4
**resisting** [8] - 1058:22, 1077:2, 1077:13, 1080:9, 1085:24, 1088:19, 1102:12, 1112:17
**resolve** [1] - 1050:5
**resolved** [1] - 1055:25
**respect** [2] - 1086:21, 1116:24, 1117:5
**respectfully** [1] - 1055:1
**respond** [1] - 1054:16
**responded** [2] - 1058:25, 1085:8
**rest** [6] - 1009:21, 1009:22, 1009:24, 1074:5, 1074:8, 1098:7
**rested** [2] - 1074:10
**restraints** [1] - 1009:10
**restricted** [13] - 1002:23, 1003:2, 1006:5, 1006:18, 1020:9, 1023:12,

1027:3, 1029:17, 1067:9, 1095:25, 1096:11, 1096:15, 1108:13
**restrictedness** [1] - 1067:4
**restrictions** [1] - 1117:4
**restroom** [1] - 1088:4
**result** [1] - 1056:21
**resulting** [1] - 1089:19
**results** [1] - 1114:12
**retreat** [1] - 1086:6
**reTweeted** [1] - 1057:8
**review** [2] - 1010:4, 1089:24
**revisit** [1] - 1115:20
**rewards** [2] - 1063:18, 1063:21
**rewind** [1] - 1074:17
**rights** [2] - 1004:6, 1061:8
**riot** [3] - 1022:23, 1058:13, 1058:17
**rioter** [2] - 1082:15, 1085:4
**rioters** [2] - 1040:3, 1089:10
**riots** [2] - 1013:5, 1013:7
**risers** [1] - 1023:7
**roads** [1] - 1029:9
**Rodney** [1] - 1013:6
**Roger** [1] - 1002:13
**ROGER** [1] - 1000:2
**role** [2] - 1011:22, 1094:11
**roll** [1] - 1020:3
**room** [2] - 1050:9, 1075:5
**Room** [2] - 1000:8, 1119:12
**Roots** [19] - 1002:13, 1005:12, 1010:22, 1015:24, 1022:25, 1026:18, 1044:5, 1048:20, 1049:10, 1053:3, 1053:11, 1055:2, 1074:17, 1078:15, 1087:21, 1094:23, 1096:4, 1101:1, 1116:21
**ROOTS** [110] - 1000:2, 1002:17, 1003:15, 1004:22, 1004:24, 1005:4, 1005:13, 1006:1, 1006:3, 1008:13, 1009:17, 1010:23, 1011:5, 1015:25, 1016:12,

1019:6, 1019:10, 1019:16, 1019:20, 1020:3, 1020:6, 1021:8, 1021:13, 1021:24, 1022:6, 1022:9, 1022:11, 1022:14, 1026:6, 1026:20, 1027:22, 1028:2, 1028:4, 1028:5, 1028:17, 1029:22, 1035:25, 1036:11, 1037:20, 1037:23, 1040:20, 1044:6, 1045:9, 1047:25, 1048:15, 1048:19, 1049:7, 1049:14, 1050:1, 1050:22, 1053:12, 1055:3, 1055:8, 1058:11, 1064:21, 1065:1, 1065:4, 1065:6, 1067:18, 1067:22, 1067:25, 1068:19, 1070:3, 1072:2, 1072:4, 1072:15, 1072:23, 1073:9, 1073:15, 1073:21, 1074:14, 1075:24, 1087:22, 1091:25, 1092:4, 1093:11, 1094:1, 1094:4, 1094:7, 1095:18, 1095:21, 1096:6, 1096:8, 1096:22, 1097:6, 1097:20, 1098:16, 1099:19, 1101:2, 1101:9, 1102:14, 1102:18, 1104:24, 1105:4, 1105:7, 1105:16, 1107:5, 1107:16, 1107:22, 1108:1, 1108:5, 1108:9, 1110:22, 1112:1, 1113:10, 1113:24, 1114:23, 1115:7, 1117:13, 1117:25
**Roots)........................
..............1011** [1] -
1001:4
**Roots)........................
..............1065** [1] -
1001:5
**rounds** [1] - 1078:18
**rows** [1] - 1036:15
**rroots@
johnpiercelaw.com** [1] - 1000:6
**rule** [2] - 1007:16,

1105:12
**ruled** [1] - 1110:8
**rules** [1] - 1079:3
**ruling** [8] - 1007:6, 1008:6, 1107:12, 1109:24, 1110:2, 1110:9, 1117:7, 1117:11
**rulings** [1] - 1116:10
**run** [4] - 1024:1, 1050:18, 1057:10

**S**

**S-U-M-R-A-L-L** [1] - 1011:9
**SAMUEL** [1] - 999:16
**samuel.s.dalke@
usdoj.gov** [1] - 999:19
**sand** [1] - 1059:19
**sat** [1] - 1085:5
**saw** [16] - 1007:7, 1007:20, 1013:5, 1025:8, 1029:11, 1031:19, 1032:7, 1040:2, 1040:3, 1040:10, 1040:15, 1041:18, 1060:17, 1067:15, 1069:12, 1106:21
**scaffolding** [1] - 1085:11
**scaling** [1] - 1089:10
**scene** [2] - 1007:25, 1089:5
**scintilla** [1] - 1086:18
**scope** [9] - 1037:23, 1055:8, 1066:1, 1077:15, 1080:10, 1080:23, 1081:2, 1081:5, 1088:21
**screen** [2] - 1019:11, 1028:9
**screens** [1] - 1018:16
**scroll** [2] - 1035:15, 1036:3
**scrolling** [2] - 1036:4, 1036:10
**seat** [1] - 1075:10
**Second** [8] - 1099:20, 1105:4, 1105:20, 1110:23, 1116:6, 1116:22, 1117:5, 1118:10
**second** [16] - 1031:7, 1038:1, 1040:4, 1040:13, 1045:17, 1076:23, 1077:23, 1080:16, 1084:11,

1087:23, 1094:15, 1098:21, 1104:4, 1104:7, 1104:8, 1106:20
**seconds** [7] - 1032:3, 1037:10, 1041:1, 1041:2, 1042:25, 1044:17, 1044:18
**Section** [2] - 1103:19, 1114:17
**section** [4] - 1033:20, 1042:7, 1042:10, 1042:14
**sections** [1] - 1017:12
**see** [43] - 1006:6, 1007:3, 1012:3, 1015:1, 1018:4, 1018:16, 1019:11, 1020:8, 1020:10, 1020:12, 1022:21, 1023:24, 1024:7, 1025:1, 1025:3, 1025:4, 1025:5, 1025:21, 1028:6, 1028:16, 1028:19, 1030:13, 1031:23, 1031:25, 1032:16, 1035:16, 1040:5, 1040:6, 1040:8, 1040:9, 1040:12, 1040:16, 1040:20, 1040:21, 1042:20, 1045:16, 1056:24, 1060:4, 1068:20, 1069:11, 1090:7, 1106:12, 1110:15
**seeing** [1] - 1018:19
**seek** [1] - 1035:4
**seeker** [1] - 1012:13
**seem** [1] - 1067:8
**selections** [2] - 1074:12, 1074:15
**self** [21] - 1010:8, 1075:11, 1075:14, 1076:14, 1076:24, 1077:1, 1077:19, 1080:6, 1080:20, 1080:21, 1081:7, 1082:2, 1083:15, 1083:24, 1088:10, 1088:13, 1088:16, 1089:16, 1089:22, 1097:22, 1116:9
**self-defense** [19] - 1010:8, 1075:14, 1076:14, 1076:24, 1077:1, 1077:19, 1080:6, 1080:20, 1080:21, 1081:7, 1082:2, 1083:15,

1083:24, 1088:10,
1088:13, 1088:16,
1089:22, 1097:22,
1116:9
**self-or-others** [1] -
1089:16
**Senate** [1] - 1037:16
**senators** [1] - 1039:2
**send** [2] - 1110:10,
1115:20
**sense** [2] - 1008:3,
1098:6
**sensibility** [1] -
1113:23
**sensitive** [2] -
1105:10, 1117:6
**sent** [1] - 1051:12
**sentence** [7] - 1092:7,
1093:13, 1095:3,
1102:11, 1104:25,
1105:17, 1106:4
**separate** [1] - 1036:13
**separating** [1] -
1025:7
**serious** [4] - 1037:2,
1063:5, 1115:1,
1115:11
**service** [1] - 1092:20
**SESSION** [1] - 999:5
**set** [9] - 1018:15,
1025:3, 1036:17,
1059:25, 1060:2,
1071:22, 1073:10,
1073:19
**set-up** [4] - 1059:25,
1060:2, 1071:22
**sets** [1] - 1046:11
**setting** [1] - 1067:5
**several** [6] - 1013:17,
1017:11, 1024:25,
1057:11, 1066:20,
1115:12
**sexual** [1] - 1114:2
**SHALIN** [1] - 999:20
**shalin.nohria@usdoj
.gov** [1] - 999:23
**shapes** [1] - 1059:4
**Shawn** [2] - 1047:15,
1047:16
**SHDOD** [3] - 1035:21,
1035:22, 1042:7
**sheep** [1] - 1061:13
**Sherman** [2] -
1098:19, 1099:5
**shield** [1] - 1038:6
**shirt** [1] - 1012:8
**shit** [1] - 1058:9
**shooting** [1] - 1084:6
**shop** [1] - 1034:1
**short** [2] - 1066:21,

1071:19
**shorter** [1] - 1095:8
**shortly** [1] - 1110:3
**shot** [4] - 1083:4,
1083:9, 1085:5,
1085:7
**shots** [1] - 1018:11
**shoulders** [1] - 1040:7
**show** [11] - 1005:20,
1007:22, 1007:25,
1026:12, 1035:5,
1055:5, 1073:6,
1077:20, 1081:13,
1084:24, 1098:15
**showed** [4] - 1020:24,
1027:9, 1070:12,
1082:18
**showing** [11] - 1082:3,
1082:6, 1082:10,
1084:21, 1084:22,
1086:14, 1086:17,
1086:22, 1087:1,
1087:2, 1115:14
**shown** [2] - 1083:25,
1087:12
**shows** [2] - 1080:5,
1091:4
**shut** [1] - 1118:9
**side** [8] - 1011:14,
1012:6, 1015:17,
1023:6, 1027:13,
1027:14, 1031:13,
1105:23
**sidelined** [1] - 1084:19
**sidewalk** [3] - 1023:7,
1023:20, 1025:9
**Sierra** [1] - 1114:16
**signage** [4] - 1002:25,
1005:23, 1019:3,
1031:22
**signal** [1] - 1018:7
**signs** [7] - 1018:19,
1018:23, 1020:8,
1030:24, 1031:10,
1031:19, 1031:25
**similar** [6] - 1051:9,
1055:19, 1058:25,
1071:1, 1077:16,
1092:21, 1093:12,
1117:9
**simply** [1] - 1027:17
**site** [3] - 1011:24,
1033:20, 1107:8
**sitting** [1] - 1107:25
**situation** [4] - 1053:5,
1079:9, 1079:10,
1080:21
**six** [3] - 1045:24,
1100:15, 1104:6
**Sixth** [2] - 1054:3,

1054:4
**size** [1] - 1066:14
**slander** [1] - 1064:15
**slandered** [1] -
1064:10
**slash** [1] - 1035:20
**Slatten** [1] - 1081:20
**small** [3] - 1018:23,
1097:13, 1113:22
**snitch** [2] - 1053:20
**Snow** [1] - 1041:16
**snow** [3] - 1030:21,
1041:25, 1042:19
**solely** [1] - 1057:10
**solicit** [1] - 1034:21
**someone** [7] -
1005:13, 1005:15,
1007:2, 1009:6,
1020:14, 1043:11,
1103:6
**sometimes** [2] -
1036:21, 1095:9
**somewhat** [3] -
1048:21, 1100:3,
1115:11
**somewhere** [2] -
1021:5, 1054:21
**son** [1] - 1013:7
**sorry** [10] - 1018:2,
1025:24, 1030:11,
1043:2, 1044:10,
1055:10, 1072:21,
1074:16, 1077:6,
1096:4
**sort** [10] - 1009:14,
1010:1, 1010:5,
1056:21, 1088:16,
1090:8, 1092:6,
1092:22, 1093:6,
1102:15
**sound** [1] - 1039:8
**sounds** [2] - 1039:9,
1101:2
**span** [1] - 1112:23
**speaking** [2] - 1018:4,
1070:20
**special** [1] - 1112:15
**specific** [6] - 1034:23,
1076:20, 1077:21,
1111:3, 1111:7,
1117:1
**specifically** [1] -
1091:21
**speculative** [1] -
1087:5
**speech** [5] - 1015:1,
1017:25, 1049:2,
1070:11, 1116:25
**spell** [2] - 1011:7,
1043:5

**spent** [1] - 1013:22
**spoken** [1] - 1043:11
**spot** [1] - 1020:17
**spray** [2] - 1058:5,
1089:9
**sprayed** [4] - 1058:3,
1082:17, 1084:3,
1084:4
**spread** [1] - 1014:3
**squarely** [1] - 1116:7
**stage** [1] - 1009:15
**stages** [1] - 1025:4
**stair** [1] - 1023:7
**staircase** [1] - 1058:1
**stairs** [4] - 1089:3,
1089:10, 1112:21,
1113:2
**stamps** [1] - 1019:24
**stand** [11] - 1003:7,
1008:24, 1008:25,
1009:7, 1009:8,
1010:25, 1049:17,
1053:20, 1061:8,
1075:22, 1113:11
**standard** [5] - 1078:9,
1078:13, 1081:8,
1081:14, 1086:17
**standards** [1] -
1012:18
**standing** [7] -
1030:14, 1031:21,
1040:6, 1040:8,
1045:21, 1064:15,
1069:12
**stands** [1] - 1011:17
**start** [12] - 1011:17,
1013:4, 1030:5,
1030:12, 1043:22,
1044:19, 1075:11,
1075:15, 1076:11,
1078:7, 1098:9,
1110:21
**started** [1] - 1078:16
**starting** [2] - 1080:25,
1098:5
**state** [4] - 1011:6,
1066:8, 1086:16,
1108:5
**statements** [1] -
1014:17
**states** [1] - 1054:18
**STATES** [4] - 999:1,
999:3, 999:10,
999:20
**States** [13] - 999:12,
1002:3, 1002:9,
1052:9, 1052:10,
1060:14, 1081:20,
1081:22, 1083:21,
1101:20, 1102:3,

1114:15, 1119:11
**station** [3] - 1046:6,
1046:9
**Station** [1] - 999:14
**statute** [6] - 1094:23,
1102:8, 1105:25,
1106:24, 1110:20,
1111:20
**statute's** [2] - 1101:9,
1103:3
**statutes** [3] - 1006:14,
1103:4, 1117:1
**stay** [3] - 1012:11,
1092:2, 1092:3
**stayed** [3] - 1014:22,
1015:5, 1070:10
**steal** [6] - 1046:14,
1046:21, 1046:23,
1047:5, 1070:13,
1070:21
**Steal** [5] - 1013:20,
1016:24, 1017:5,
1065:20, 1070:22
**stenographic** [1] -
1119:5
**Step** [1] - 1079:11
**step** [6] - 1004:20,
1050:8, 1073:23,
1080:11, 1080:16,
1118:7
**stepped** [2] - 1059:20,
1059:21
**steps** [6] - 1058:1,
1078:1, 1083:3,
1085:1, 1085:3,
1086:5
**Steven** [1] - 1005:5
**STEVENS** [2] - 1030:9,
1030:11
**stick** [1] - 1101:13
**still** [5] - 1030:6,
1033:19, 1045:19,
1051:12, 1075:17
**stood** [4] - 1023:18,
1023:24, 1059:11,
1086:7
**Stop** [9] - 1013:20,
1016:24, 1017:5,
1038:19, 1042:1,
1042:24, 1043:7,
1065:20, 1070:22
**stop** [13] - 1013:4,
1020:6, 1022:14,
1033:25, 1038:3,
1042:6, 1046:14,
1046:21, 1046:23,
1047:5, 1051:14,
1070:12, 1070:21
**StopHate.com** [9] -
1011:15, 1012:1,

1033:15, 1033:22, 1035:9, 1035:19, 1041:9, 1043:17, 1067:16
**stopping** [1] - 1029:13
**strategy** [1] - 1024:11
**streamline** [1] - 1054:17
**Street** [3] - 999:17, 999:21, 1000:3
**street** [3] - 1023:8, 1023:9, 1029:11
**stretch** [1] - 1062:16
**stretched** [1] - 1025:11
**strict** [2] - 1006:12, 1109:6
**strike** [2] - 1014:15, 1091:3
**strong** [2] - 1093:3, 1101:4
**struggling** [1] - 1115:19
**studied** [2] - 1024:20, 1040:11
**study** [3] - 1020:10, 1024:15, 1024:17
**stuff** [3] - 1036:21, 1092:1, 1099:24
**subject** [3] - 1009:24, 1077:25, 1086:1
**submitted** [1] - 1105:13
**submitting** [2] - 1080:1, 1080:3
**subpoenaing** [1] - 1008:15
**substantive** [1] - 1090:8
**substitute** [1] - 1027:23
**suffer** [1] - 1115:1
**suffering** [1] - 1064:13
**sufficient** [5] - 1002:25, 1054:18, 1087:13, 1088:24, 1089:15
**suggest** [1] - 1094:8
**suggested** [1] - 1112:15
**suing** [1] - 1064:10
**Suite** [3] - 999:17, 999:21, 1000:4
**suited** [1] - 1084:12
**sum** [1] - 1067:1
**Sumrall** [26] - 1002:24, 1003:4, 1003:6, 1005:14, 1005:23, 1006:15, 1007:6, 1008:7, 1008:11,

1009:18, 1009:21, 1010:24, 1011:6, 1011:8, 1011:10, 1019:11, 1028:6, 1030:3, 1030:12, 1033:5, 1046:1, 1046:13, 1053:14, 1055:9, 1056:20, 1064:21
**SUMRALL** [2] - 1001:3, 1011:3
**Sumrall's** [1] - 1002:15
**superficial** [1] - 1089:20
**Superior** [1] - 1079:6
**support** [2] - 1007:1, 1076:9
**supposed** [1] - 1058:22
**sustain** [1] - 1027:19
**sustained** [14] - 1014:16, 1016:17, 1026:5, 1029:16, 1066:3, 1066:7, 1066:11, 1066:23, 1067:3, 1069:25, 1070:2, 1071:9, 1072:3, 1073:13
**Sutherland** [1] - 1060:7
**switched** [1] - 1109:1
**Sworn** [1] - 1011:3
**sworn** [1] - 1011:1
**system** [2] - 1060:20, 1067:24

**T**

**tail** [1] - 1081:1
**takeover** [2] - 1060:4, 1071:1
**tall** [2] - 1024:3, 1040:8
**taller** [1] - 1024:5
**taller-than-average** [1] - 1024:5
**tax** [2] - 1051:7, 1051:9
**taxes** [1] - 1051:11
**Taylor** [1] - 1047:23
**team** [3] - 1043:11, 1070:18, 1070:20
**tear** [1] - 1089:9
**television** [1] - 1012:21
**temporarily** [3] - 1107:7, 1107:9, 1107:20
**ten** [2] - 1057:17,

1088:5
**ten-minute** [1] - 1088:5
**tend** [2] - 1015:20, 1092:23
**tenets** [1] - 1077:18
**term** [1] - 1033:8
**terms** [5] - 1005:23, 1102:21, 1102:22, 1103:5, 1105:10
**test** [1] - 1054:10
**testified** [11] - 1044:14, 1051:16, 1062:25, 1082:22, 1083:8, 1084:18, 1087:11, 1087:13, 1089:14, 1089:21, 1118:3
**testifies** [1] - 1087:14
**testify** [8] - 1004:10, 1007:6, 1049:6, 1051:18, 1052:25, 1053:1, 1053:9, 1054:5
**testifying** [3] - 1008:12, 1049:2, 1051:10
**testimony** [22] - 1002:16, 1003:4, 1007:4, 1007:14, 1008:7, 1009:25, 1010:3, 1022:4, 1027:7, 1027:10, 1052:3, 1052:24, 1073:23, 1073:24, 1081:13, 1082:24, 1085:9, 1087:17, 1089:1, 1093:15, 1093:21, 1099:3
**Texan** [1] - 1060:9
**Texas** [8] - 1003:14, 1011:11, 1011:12, 1013:20, 1017:6, 1017:16, 1027:17, 1066:9
**THE** [278] - 999:1, 999:1, 999:10, 1002:2, 1002:5, 1002:10, 1002:14, 1003:3, 1003:6, 1003:9, 1003:10, 1003:11, 1003:12, 1003:14, 1003:15, 1003:16, 1003:18, 1003:19, 1003:21, 1003:24, 1003:25, 1004:8, 1004:9, 1004:12, 1004:13, 1004:16, 1004:17, 1004:20, 1004:23,

1005:1, 1005:3, 1005:7, 1005:25, 1006:2, 1006:20, 1006:22, 1007:5, 1007:17, 1008:9, 1009:11, 1009:19, 1010:1, 1010:13, 1010:17, 1010:20, 1010:25, 1014:16, 1014:19, 1015:11, 1015:14, 1015:24, 1016:4, 1016:17, 1019:9, 1019:19, 1022:1, 1022:7, 1022:10, 1022:25, 1023:14, 1025:24, 1026:1, 1026:5, 1026:9, 1026:15, 1026:18, 1026:23, 1027:6, 1027:13, 1027:19, 1028:1, 1028:3, 1029:16, 1029:24, 1033:12, 1033:14, 1036:1, 1036:5, 1037:22, 1038:2, 1044:1, 1044:5, 1044:8, 1044:10, 1044:12, 1044:13, 1044:15, 1045:12, 1048:3, 1048:6, 1048:12, 1048:18, 1048:20, 1049:9, 1049:17, 1050:2, 1050:8, 1050:10, 1050:13, 1050:15, 1050:16, 1050:24, 1051:2, 1051:3, 1051:14, 1051:23, 1052:6, 1052:12, 1052:14, 1052:18, 1052:21, 1053:3, 1053:11, 1054:12, 1054:23, 1055:7, 1055:9, 1055:13, 1055:15, 1055:16, 1055:17, 1055:22, 1055:24, 1056:6, 1056:8, 1056:10, 1056:13, 1058:12, 1061:4, 1065:3, 1066:3, 1066:7, 1066:11, 1066:16, 1066:23, 1067:3, 1067:21, 1068:20, 1069:1, 1069:17, 1069:25, 1070:2, 1071:9, 1071:14, 1072:3, 1072:18, 1072:21, 1073:1, 1073:7, 1073:13, 1073:22,

1074:1, 1074:2, 1074:3, 1074:4, 1074:6, 1074:9, 1074:16, 1075:4, 1075:5, 1075:10, 1075:19, 1076:1, 1076:6, 1077:6, 1077:8, 1078:7, 1078:25, 1079:5, 1079:7, 1079:12, 1079:17, 1079:21, 1079:23, 1080:4, 1080:12, 1080:15, 1080:17, 1080:24, 1081:2, 1082:5, 1082:18, 1082:22, 1086:16, 1086:25, 1087:4, 1087:8, 1087:20, 1087:23, 1088:1, 1088:5, 1088:9, 1090:5, 1090:23, 1091:1, 1091:8, 1091:23, 1092:2, 1092:19, 1093:23, 1094:3, 1094:6, 1094:18, 1095:14, 1095:17, 1095:20, 1096:4, 1096:7, 1096:21, 1097:3, 1097:7, 1097:10, 1097:14, 1098:4, 1098:14, 1098:17, 1098:23, 1099:5, 1099:10, 1099:25, 1100:2, 1100:17, 1100:25, 1101:6, 1101:13, 1102:10, 1102:15, 1103:12, 1104:12, 1104:14, 1104:18, 1104:23, 1105:3, 1105:6, 1105:12, 1105:22, 1106:9, 1106:12, 1106:16, 1106:22, 1107:15, 1107:24, 1108:4, 1108:7, 1108:10, 1108:16, 1108:20, 1108:24, 1109:6, 1109:8, 1109:15, 1109:18, 1110:5, 1110:8, 1110:12, 1110:15, 1110:20, 1110:25, 1111:12, 1111:21, 1111:24, 1112:3, 1112:10, 1112:13, 1112:24, 1113:3, 1113:7, 1113:17, 1113:19, 1114:6, 1114:25, 1115:18, 1115:22,

1116:15, 1116:20,
1116:21, 1117:22,
1118:13
**themselves** [3] -
1014:12, 1082:21,
1115:22
**theory** [8] - 1054:8,
1091:2, 1091:11,
1091:22, 1106:8,
1107:1, 1112:16,
1112:19
**they've** [3] - 1073:19,
1080:13, 1085:18
**thinking** [3] - 1023:12,
1023:16, 1080:18
**third** [4] - 1046:2,
1083:23, 1106:4,
1106:14
**thousands** [5] -
1003:1, 1005:14,
1005:15, 1018:14
**threat** [3] - 1103:25,
1108:19, 1114:20
**threatened** [1] -
1054:6
**threatening** [1] -
1002:19
**threats** [2] - 1101:11,
1103:7
**three** [7] - 1036:20,
1037:10, 1042:15,
1044:17, 1046:11,
1082:10, 1116:4
**throughout** [1] -
1087:17
**throw** [1] - 1013:10
**throwing** [2] -
1038:14, 1112:24
**thrown** [1] - 1013:18
**throws** [1] - 1006:9
**ties** [1] - 1053:7
**tilts** [1] - 1078:11
**tired** [1] - 1013:22
**together** [1] - 1036:21
**tons** [1] - 1039:14
**took** [13] - 1008:24,
1010:6, 1014:23,
1021:11, 1045:4,
1049:17, 1060:14,
1066:24, 1071:15,
1072:22, 1072:23,
1084:18, 1101:7
**top** [5] - 1035:15,
1036:3, 1089:2,
1112:20, 1113:2
**topic** [1] - 1011:25
**topics** [1] - 1033:19
**tops** [1] - 1040:6
**totally** [1] - 1079:1
**touch** [1] - 1068:7

**touching** [6] -
1113:23, 1114:1,
1114:4, 1114:11,
1115:9, 1115:17
**toward** [3] - 1045:4,
1095:19
**tower** [1] - 1041:21
**traffic** [1] - 1009:4
**train** [1] - 1014:23
**training** [1] - 1033:11
**transcript** [3] - 1110:2,
1119:5, 1119:6
**TRANSCRIPT** [1] -
999:9
**treat** [1] - 1061:12
**trees** [1] - 1018:16
**trespassed** [2] -
1062:22, 1063:4
**trial** [7] - 1004:3,
1007:4, 1007:9,
1057:17, 1057:18,
1083:22, 1116:12
**TRIAL** [1] - 999:9
**trials** [1] - 1041:22
**tried** [3] - 1007:24,
1018:6, 1118:8
**trip** [1] - 1074:2
**trouble** [1] - 1087:24
**truck** [1] - 1029:13
**true** [7] - 1061:15,
1061:17, 1062:3,
1101:11, 1103:7,
1119:4, 1119:6
**Trump** [10] - 1012:7,
1012:8, 1016:24,
1016:25, 1017:25,
1018:3, 1018:13,
1025:16, 1025:17
**trust** [1] - 1050:11
**truth** [3] - 1012:13,
1045:10, 1045:12
**truth-seeker** [1] -
1012:13
**truthful** [1] - 1052:1
**truthfully** [4] - 1049:6,
1052:4, 1053:1,
1053:2
**try** [8] - 1012:10,
1012:14, 1012:15,
1025:1, 1025:3,
1057:15, 1084:16,
1103:17
**trying** [6] - 1011:20,
1015:21, 1032:16,
1044:2, 1078:22,
1099:17
**Tucker** [2] - 1012:22,
1034:13
**Tuesday** [1] - 999:4
**tunnel** [1] - 1038:14

**turning** [2] - 1011:17,
1053:19
**tweaked** [1] - 1074:19
**Tweeted** [1] - 1057:8
**twice** [1] - 1014:9
**Twitter** [2] - 1057:4,
1057:18
**two** [21] - 1014:11,
1032:9, 1056:23,
1057:21, 1060:13,
1060:24, 1071:5,
1076:10, 1076:12,
1077:3, 1077:18,
1079:8, 1086:13,
1094:7, 1105:12,
1107:4, 1112:18,
1112:23, 1114:20,
1116:4
**two-minute** [1] -
1112:23
**type** [4] - 1086:23,
1097:13, 1101:3,
1117:10
**typo** [1] - 1097:12
**typos** [1] - 1090:6
**tyranny** [2] - 1058:22,
1059:4
**tyrants** [1] - 1061:12

## U

**U.K** [1] - 1060:12
**U.S** [13] - 999:13,
1000:8, 1052:14,
1066:4, 1075:24,
1077:4, 1077:5,
1095:22, 1095:24,
1097:17, 1098:2,
1098:12, 1117:7
**ultimately** [2] - 1029:2,
1071:12
**unable** [1] - 1053:8
**unanimity** [2] -
1112:14, 1112:16
**unanimous** [1] -
1113:4
**unauthorized** [2] -
1004:1, 1089:12
**unbiased** [4] - 1012:5,
1049:8, 1053:15,
1068:11
**uncomfortable** [1] -
1048:21
**unconstitutional** [1] -
1101:12
**uncredible** [1] -
1048:25
**under** [22] - 1042:1,
1042:7, 1042:12,
1048:23, 1049:10,

1051:14, 1077:24,
1080:7, 1080:9,
1085:10, 1085:12,
1086:13, 1089:6,
1089:12, 1092:18,
1095:5, 1108:19,
1111:19, 1114:14,
1117:2, 1117:6,
1117:9
**underlying** [3] -
1076:23, 1078:23,
1085:23
**underpinnings** [1] -
1086:11
**understood** [1] -
1115:21
**uniformed** [2] -
1038:14, 1046:7
**unique** [1] - 1053:5
**UNITED** [4] - 999:1,
999:3, 999:10,
999:20
**United** [13] - 999:12,
1002:3, 1002:9,
1052:9, 1052:10,
1060:14, 1081:20,
1081:22, 1083:21,
1101:20, 1102:3,
1114:15, 1119:11
**unlawful** [3] - 1081:17,
1082:13, 1083:19
**unless** [2] - 1036:9,
1054:24
**unmanned** [1] -
1031:24
**unorthodox** [1] -
1051:4
**unprecedented** [1] -
1060:1
**unreasonable** [1] -
1089:6
**unwilling** [2] - 1052:4,
1053:8
**up** [58] - 1005:7,
1009:9, 1009:20,
1010:14, 1010:25,
1013:11, 1018:15,
1019:6, 1020:10,
1021:8, 1022:6,
1022:9, 1025:4,
1025:9, 1026:6,
1028:1, 1028:17,
1029:9, 1031:12,
1035:3, 1036:17,
1040:10, 1041:1,
1041:24, 1042:5,
1042:23, 1049:9,
1050:6, 1051:5,
1055:5, 1058:5,
1059:25, 1060:2,

1061:8, 1067:15,
1071:22, 1073:10,
1073:19, 1075:21,
1082:25, 1083:3,
1083:5, 1083:6,
1083:7, 1084:8,
1084:12, 1084:25,
1085:8, 1085:13,
1086:5, 1087:10,
1090:1, 1092:1,
1099:21, 1103:16,
1118:20
**upheld** [3] - 1101:9,
1103:3, 1117:8
**upward** [1] - 1086:4
**USAO** [1] - 999:17
**use-of** [1] - 1005:17
**uses** [1] - 1089:13
**usual** [1] - 1062:23
**utterly** [1] - 1093:21

## V

**various** [1] - 1016:5
**vengeance** [2] -
1063:10, 1063:14
**version** [2] - 1010:2,
1089:25
**vice** [1] - 1107:7
**Video** [11] - 1020:5,
1022:13, 1031:4,
1037:13, 1041:6,
1043:23, 1045:8,
1045:14, 1045:25,
1065:17, 1072:5
**video** [31] - 1007:19,
1013:5, 1019:2,
1019:4, 1019:11,
1019:14, 1019:16,
1020:2, 1020:8,
1021:11, 1021:12,
1031:20, 1032:11,
1037:14, 1043:12,
1065:2, 1065:12,
1066:4, 1066:12,
1066:24, 1069:7,
1069:13, 1070:4,
1070:9, 1072:6,
1072:8, 1084:2,
1084:6, 1087:14,
1089:13
**videos** [9] - 1005:20,
1007:2, 1012:1,
1024:13, 1032:9,
1040:11, 1042:15,
1087:9, 1087:12
**videotape** [1] -
1041:25
**videotaped** [1] -
1041:10
**videotaping** [2] -

1043:7, 1043:13
**view** [10] - 1044:21,
1045:3, 1059:25,
1060:2, 1060:23,
1062:4, 1063:9,
1076:25, 1101:1
**viewed** [2] - 1005:15,
1089:4
**viewing** [1] - 1006:16
**views** [1] - 1071:10
**violate** [1] - 1117:2
**violates** [2] - 1006:14,
1054:2
**violation** [3] - 1055:4,
1105:18
**violations** [1] -
1077:25
**violence** [3] - 1022:21,
1025:21, 1108:13
**visible** [1] - 1043:16
**visiting** [3] - 1107:8,
1107:9, 1107:21
**visitors** [1] - 1032:13
**visits** [1] - 1014:6
**voice** [4] - 1053:15,
1053:16, 1118:2,
1118:5
**voluntarily** [2] -
1049:2, 1051:16
**volunteered** [1] -
1049:10
**voted** [1] - 1012:7
**vs** [11] - 999:5, 1002:3,
1052:9, 1052:10,
1052:14, 1077:4,
1077:5, 1081:20,
1081:22, 1114:15,
1117:7

## W

**W-A-L-L-E-R** [1] -
1052:11
**wait** [3] - 1010:13,
1050:19, 1050:24
**waiting** [1] - 1032:22
**walk** [2] - 1075:2
**walked** [2] - 1021:19,
1024:2
**walking** [1] - 1029:12
**walkway** [1] - 1031:14
**wall** [1] - 1061:19
**WALL** [1] - 1052:14
**waller** [1] - 1052:10
**Waller** [1] - 1052:14
**Walnut** [1] - 999:17
**wandering** [1] -
1024:13
**wants** [2] - 1004:24,
1054:24

**warning** [2] - 1008:20,
1060:17
**warnings** [2] - 1084:1,
1085:20
**was..** [1] - 1077:6
**Washington** [6] -
999:14, 999:22,
1000:9, 1014:24,
1016:18, 1119:13
**watch** [3] - 1018:6,
1018:12, 1059:16
**watching** [2] - 1007:2,
1066:12
**waters** [1] - 1076:16
**wave** [1] - 1084:5
**ways** [2] - 1073:19,
1115:13
**weapon** [1] - 1108:14
**weapons** [2] -
1060:15, 1060:24
**wearing** [2] - 1058:6,
1058:8
**weaving** [2] - 1083:4,
1085:13
**website** [5] - 1011:22,
1033:15, 1034:22,
1042:4, 1068:16
**Webster** [9] - 1079:14,
1081:9, 1081:12,
1081:23, 1101:16,
1101:18, 1101:23,
1102:5, 1104:22
**week** [1] - 1087:17
**weeks** [1] - 1012:22
**weigh** [1] - 1052:3
**weird** [1] - 1100:18
**welcome** [3] -
1010:20, 1055:9,
1055:24
**west** [1] - 1023:6
**whatsoever** [1] -
1029:10
**whispered** [1] - 1053:6
**white** [1] - 1020:12
**whole** [3] - 1006:3,
1018:10, 1107:6
**wife** [1] - 1013:7
**wild** [1] - 1061:20
**willful** [1] - 1114:19
**willfully** [6] - 1111:16,
1111:20, 1112:1,
1112:3, 1112:5,
1112:8
**willing** [2] - 1048:13,
1049:5
**Wing** [1] - 1037:16
**wise** [2] - 1012:15,
1103:5
**WITNESS** [18] -
1001:2, 1003:9,

1003:11, 1003:14,
1003:16, 1003:19,
1003:24, 1004:8,
1004:12, 1004:16,
1014:19, 1033:14,
1044:12, 1044:15,
1055:13, 1055:16,
1074:1, 1074:3
**witness** [33] - 1002:24,
1003:22, 1004:14,
1004:21, 1005:4,
1005:6, 1005:7,
1005:10, 1005:15,
1006:25, 1007:6,
1007:14, 1027:17,
1035:5, 1035:16,
1048:22, 1049:15,
1049:25, 1050:9,
1051:15, 1053:25,
1056:14, 1056:17,
1064:20, 1069:24,
1070:1, 1070:22,
1072:1, 1073:9,
1073:12, 1074:8,
1075:22, 1093:22
**Witness** [1] - 1028:14
**witness's** [1] - 1048:1
**witnesses** [5] -
1002:19, 1008:11,
1054:5, 1093:16
**Witzemann** [2] -
1047:15, 1047:16
**wondering** [1] -
1024:13
**wooden** [1] - 1038:13
**Woodland** [1] - 1000:4
**word** [6] - 1093:20,
1095:3, 1101:2,
1101:10, 1102:18,
1108:19
**worded** [1] - 1097:25
**words** [11] - 1070:12,
1073:10, 1084:14,
1085:11, 1086:3,
1100:16, 1101:14,
1102:6, 1102:25,
1103:10, 1105:17
**works** [3] - 1047:14,
1047:15, 1098:17
**world** [4] - 1012:3,
1013:9, 1061:7,
1061:11
**worn** [1] - 1012:8
**worse** [1] - 1013:14
**worthy** [1] - 1015:2
**wrap** [2] - 1010:14,
1118:20
**wrench** [1] - 1006:10
**write** [2] - 1028:9,
1094:23

**writing** [1] - 1034:6
**written** [3] - 1010:15,
1110:9, 1113:11

## Y

**y'all** [1] - 1014:2
**yard** [5] - 1025:9,
1030:22, 1031:13,
1032:1, 1032:16
**yards** [2] - 1024:22,
1045:19
**years** [2] - 1013:13,
1056:23
**yesterday** [2] -
1002:15, 1007:18
**yourself** [3] - 1004:7,
1014:7, 1020:1
**YouTube** [1] - 1018:6

## Z

**zone** [2] - 1002:23,
1026:21
**zoom** [2] - 1005:21,
1028:17