**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**
**Case No.:  21-CR-026 (CRC)**

UNITED STATES OF AMERICA,
        Plaintiff,
    v.                                  Case No.  21-cr-026 (CRC)
CHRISTOPHER MICHAEL ALBERTS
        Defendant.
               _____/

## ALBERTS OBJECTIONS TO PRESENTENCE REPORT

COMES NOW, Defendant, CHRISTOPHER   MICHAEL   ALBERTS,

(hereinafter, "Defendant" or "Alberts"), by and through undersigned counsel, with

these objections to the PreSentence Report (PSR).

      The Report is filled with unfounded, imaginary, exaggerated claims, double

counting of enhancements, and bias in favor of the prosecution as described below.

The PSR converts 5-year-max crimes into 8-year-max and even 20-year-max

crimes, then double counts enhancements and then attaches additional

enhancements pulled from the imagination of federal prosecutors in order to

benefit the Department of Justice.  Alberts objects not only to the PSR but to the

pro-government bias of the U.S. probation office in January 6 cases.

      Alberts submits that the U.S. Probation office appears to be working with

the Department of Justice in these cases, in order to maximize sentences.  It is not a

neutral agency as its mandate requires.

**A continuing objection to all use of the probation office to assist prosecutors in building arguments in favor of increased punishment.**

Counsel for Alberts also formally object to certain practices of the U.S. Probation Office in pre-sentence interviews, including the practice of asking defendants about past drug use (which is more-than-potentially incriminating) and asking defendants whether they are vaccinated (violative of medical privacy).

The burden is always on the prosecution to establish any aggravating facts for sentencing; the probation office is acting as an arm of the prosecution when its inquiries draw out information to be used <u>against</u> defendants for the benefit of the prosecution at sentencing (under the guise of seeking to "know the whole person" as an arm of the judicial branch).

When challenged, probation officers claim they ask vaccination questions to help the Bureau of Prisons evaluate the health needs of defendants.  But such an inquiry is wholly within the province of the Bureau of Prisons' classification process.  Any such answers *can only be used at sentencing to punish* defendants who give answers which are frowned upon by Probation Officers or the Court.

The same goes for questions regarding past drug use. Alberts is not accused of any drug offenses.  Any answers indicating past illegal drug use can only be used to add additional punishment (or worse, to trigger law enforcement inquiry or prosecution!).

Defendant also objects to any notion that lack of "cooperation" with such probation office inquiries constitutes obstructive behavior.  Probation officers are acting as an unconstitutional arm of the prosecution when they help prosecutors build arguments for increased punishment against defendants. Defendants who decline to help prosecutors argue for higher sentences are not engaged in obstruction; rather, *the probation office is engaging in obstruction* of the law when its officers go beyond their required neutrality and help build arguments for higher sentences on behalf of federal prosecutors.

Under the law probation officers are to help and assist defendants with their rehabilitation needs and help them obtain treatment, educational opportunities, medical care, training, and employment assistance.  <u>Probation officers are not an arm of federal law enforcement</u>. https://www.uscourts.gov/sites/default/files/charter_for_excellence.pdf (Charter and mission of probation officers). A primary mission of the U.S. Probation Office is to bring about long-term positive change in individuals under supervision. https://www.uscourts.gov/services-forms/probation-and-pretrial-services/probation-and-pretrial-services-mission

**The PSR Report repeats factual narratives drawn straight from the imaginations of federal prosecutors, and then double-counts enhancements in favor of federal prosecutors.**

1. After Alberts has already been convicted of crimes which are <u>statutorily enhanced</u> with language such as 'while possessing a firearm,' and "on account of the performance of official duties during such person's term of service,"  the Probation Office seeks additional enhancements for possession of a firearm, or having an "official victim." These offenses are already made more severe and enhanced, even by the plain language of the statutes (e.g., 'disorderly conduct in an unauthorized area while possessing a firearm' is a ten-year enhancement of an offense that would otherwise be a misdemeanor. 'Assaulting officers' is already an enhanced version of simple assault of non-officers, which is a misdemeanor).

2. The Probation Office's newly invented claim that Alberts gave "false testimony" at trial is conveniently alleged in the PSR for the first time.  No one on the prosecution team, or the Court, suggested Alberts "perjured himself" for testifying that he saw no "closed" signs as he entered the Capitol grounds.  In fact, Alberts' testimony was verified and <u>corroborated</u> by witness Dave Sumrall who not only testified to the same assessment but provided video illustrating the lack of signage or barricades at the Peace Monument breach area.  The government did not put on any rebuttal witnesses in any effort to expose Alberts' testimony as inaccurate.

3. The same goes for "preparation" enhancements.  Alberts' uncontested testimony at trial indicated that Alberts' body armor, first aid kit, gas mask, firearm and other items were in preparation for possible <u>defense against attacks by antifa or by other counterdemonstrators</u>—not preparation for the commission of any crimes.  Prosecutors were free to cross-examine Alberts on the purposes if they thought such cross-examination questions might expose Alberts in some manner.  The record is, in fact, devoid of any evidence of planning to commit any crimes by Alberts.[1]

Alberts was convicted of a 5-year-max felony, "civil disorder" and an assault charge alleging physical contact, an 8-year-max felony, and some firearm-possession-enhanced offenses.  Alberts has a spotless criminal history, and a record of awards and military accommodations and service to his community.  Alberts should be in a 1 to 2-year prison sentence range; not a 5 to 6-1/2-year range. Yet the Probation Office is proposing that Alberts' guideline range is <u>higher even than the statutory maximums allowed by Congress</u>.

**The PSR is filled with false statement after false statement after false statement.**

---

[1] The application of a "planning" enhancement in this case would establish a horrendous precedent.  Perhaps most of the Trump supporters who came to D.C. on Jan. 6, 2021 engaged in "planning" such as purchasing hotel stays or airfare, packing jackets, bags or backpacks, and/or bringing lunch money, food, or snacks.  Those, like Alberts, who "planned" on being amidst protests or demonstrations—as protected by the 1st amendment—commonly packed protective gear, goggles, protective masks, padding, armor or other protective gear.  This was not planning to commit crimes.

Alberts' objections to the factual assertions of the PSR begin with

**paragraph 20,** which appears to be almost wholly copied from the claims of the

government.  "To reach that location, defendant Alberts passed through various

barriers, including snow fencing, bike rack barricades, the Olmstead Wall, and

lines of police officers."  Although prosecution witness Boubulis did testify that

such obstacles existed on Jan. 6—before protestors arrived—defense witness Dave

Sumrall <u>corroborated Alberts' account</u> that all of those barriers and obstacles were

down, removed, pushed aside or gone completely by the time Alberts passed

through those areas.  Alberts certainly never encountered "the Olmstead Wall" or

"lines of police officers" (at least not until later in the day as Alberts made his way

out of Capitol grounds.)

Significantly, witness Sumrall testified (and filmed) that it appeared from his

perspective (hundreds of people behind those in front) that protestors at the front

had *negotiated* with officers and *had obtained permission* to enter Capitol grounds.

(Alberts passed through the same areas amidst crowds several moments before

Sumrall but significantly back from the front.)

The probation office also seeks to bolster prosecutors' sentencing claims by

taking Alberts' recorded statements out of context. "We'll get them soon." "you've

got the wrong motherfucker, you see that right there?" (while pointing to military

patches on his body armor), and other remarks can be read as Alberts' assessments

regarding antifa, anti-American activists, or conceptual-only tyrants rather than real-world officials with names or official positions.  Under any 1st amendment analysis, Alberts' many statements criticizing government constitute political speech and are not true threats in any way.

**Objection to paragraph 21**."At 1:54 p.m., he [Alberts] was the first rioter to go hands-on with a USCP officer on the Steps. Defendant Alberts then brandished a large wooden pallet, grappled with a USCP officer to retain control of the pallet, and used it as a makeshift battering ram as he charged the USCP officers at the top of the steps, and attempted to break through their position."

Suffice it to say this statement is not supported by evidence or testimony at trial.  Alberts testified that he held up a wooden pallet to stop the rubber bullets and/or other projectiles being fired upon him and others by officers.  He did not use the pallet as a "battering ram," but rather as a defensive shield.  The momentary contacts between the pallet and officers were hardly forceful, and resulted in no injuries whatsoever.  And, in fact, Alberts afterward stepped downward after the officers' firing of projectiles quelled.  It was only upon officers on the landing responding to *other protestors* that Alberts was able to stand briefly on the platform.  After which Alberts <u>followed</u> a large crowd of dozens up the stairs to the upper west terrace *as officers stepped aside.*

**Objection to paragraph 22.** "Hundreds of other rioters followed him and forced their way into the Capitol Building through the Senate Parliamentarian and Senate Wing doors that were at the location of defendant Alberts's breach of the Upper West Terrace."

Alberts did not "breach" the Upper West Terrace. The evidence and testimony show he followed other demonstrators up the steps to the Terrace. Alberts never went inside the Capitol although he easily could have.

**Objection to paragraph 23.** "As others invaded the Capitol Building, defendant Alberts was temporarily sidelined by the OC spray used by the USCP Officers." The false suggestion here is that Alberts did not go into the building because he was "temporarily sidelined by" OC spray. The evidence is clear and uncontested that Alberts could have easily gone into the building but chose not to for his own reasons. One of his reasons was that he believed he might not have a right to possess a firearm inside the building, although he understood the law (as the Supreme Court has recently stated) to be that he had a constitutional right to possess a firearm in non-sensitive public areas outside the building.

> *"At one point, he berated a line of MPD officers . . . [and] called them "domestic terrorists" and "treasonous, communist motherfuckers" before indicating that if they stepped aside, defendant Alberts and the other patriots would "wipe them[1] all out" in a matter of days."*

Here, probation officer Hana Field knowingly falsely states that Alberts was speaking of MPD officers when he said if they stepped aside, he and other patriots would "wipe them all out" in a matter of days."  This is a naked example of the unconstitutional pro-prosecution bias exhibited by Officer Field and the U.S. Probation Office.  Officer Field attaches a bracketed "[1]" reference to a footnote indicating she has incompletely lifted the paragraph from the writings of federal prosecutors. (No footnote is actually attached.)

In fact, Officer Field knows from the context that Alberts was speaking rhetorically in reference to Antifa and other elements in American society which Alberts believed were tearing the fabric of the country apart at the time.  (Alberts was obviously speaking to MPD officers as allies; not as enemies.)  Ms. Field knows this.  Alberts testified to this in some detail, without any rebuttal by the government.  (In fact, Alberts' explanation is obviously true from all context— including remarks before and after.)

**Objection to paragraph 24.** It is utterly irrelevant, even if true, that "Around 4:40 p.m., defendant Alberts urinated on a wall of the US Capitol Grounds."  Note that there is also bodycam footage of several MPD officers urinating and even spitting on marble walls and railings of the Capitol Grounds on Jan. 6.  For example, MPD Sergeant Thau (a high-ranking officer who has loudly cried on television cameras about Jan. 6 being a heart-breaking attack on sacred

institutions) is seen on his own bodycam footage urinating on the Capitol's sacred Upper West Terrace on Jan. 6. https://johnpiercelaw-hq.slack.com/archives/D03Q70APEC9/p1687106674875289  Discovery shows numerous other officers spitting on the sacred Capitol, and scattering trash around the Capitol on Jan. 6.

The Capitol Police organized, met, and authored a detailed plan prior to Jan. 6 ("CDU Operational Plan" (Jan. 5, 2021)).  The plan "anticipated that a march will likely progress into the Capitol Grounds from the Northwest. . ." But although Capitol Police planned for large numbers of protestors on Capitol Grounds, they failed to provide sufficient porta-johns or restroom availability for the anticipated numbers of people.[2]  Of course, this evidence has little relevance to Alberts' sentencing, and defense objects.

**Objection to paragraph 25.** "As the other rioters threw various objects at the officers, including a chair and bike rack, defendant Alberts joined in and threw a bottle at the police line. Defendant Alberts later shined his flashlight into the faces of officers before retrieving a bullhorn and berating officers."

---

[2] Our firm is representing other Jan. 6 defendants who literally asked and obtained permission to go inside the Capitol to use restrooms on Jan. 6—only to find themselves criminally prosecuted for 'unlawful entry and remaining' a year later.

The evidence at trial showed Alberts tossed a plastic water bottle in a direction where some officers were standing.  The plastic bottle harmlessly bounced off either the ground or an officer shield.  Alberts <u>was given</u> a bullhorn by another demonstrator who expressed the opinion that Alberts had good things to say.  Afterward, Alberts expounded on various philosophical and/or political points.

OBJECTION TO <u>THE ENTIRETY</u> OF THE SUGGESTION THAT ALBERTS GAVE "FALSE TESTIMONY" AT TRIAL.

**Paragraphs 28 through 34** indicate the Probation Office's wholesale lifting, adoption, and acceptance of prosecutors' baseless claims that Alberts gave "false testimony" at trial.  (Elsewhere the Probation Office adds the government's proposed enhancements for this alleged false testimony.)

Given the seriousness of such an allegation, one would think the probation office has identified at least one clear, provable, demonstrable, statement of fact by Alberts which was clearly falsified by some other piece of evidence of higher quality (e.g., fingerprints, obviously-contradictory video, imagery or other facts described by multiple witnesses.)  But the PSR points only to nuanced disagreements of assessments of Alberts compared with those of some government witness, or even to Alberts' subjective reasons or statements of explanation.

**<u>Each of the probation office's six claims of "false testimony" fails upon scrutiny.</u>**

**#1) (paragraph 28):** "Defendant Alberts testified that on his journey to the US Capitol Building, he did not encounter any police officer, fence, or warning that the area was restricted. The defendant testified that he did not know the building was restricted. However, a USCP Captain testified that it would have been impossible for defendant Alberts to not have come across at least one of those barriers or to be completely unaware that the area was restricted, given that defendant Alberts reached the West Terrace by approximately 1:04 p.m., and the evidence at trial established that, by that time, numerous barriers, snow fencing, and police officers stood between defendant Alberts and the Capitol.

As discussed above, Alberts' testimony in this regard was largely corroborated by Dave Sumrall as well as extensive imagery and video.  It is significant that Alberts' personal conversations and encounters with cops on January 6 are recorded on bodycams.  At no time was any officer recorded saying that Alberts was in an unauthorized area or that Alberts was trespassing.

**#2) (paragraph 29):** Here the PSR simply lays out its own explanation for Alberts' equipment and gear and then accuses Alberts of testifying falsely because Alberts' explanations differed. This case is like the DC Circuit's assessment in *United States v. Kirkland*, 107 F.3d 923 (D.C. Cir. 1997), where inconsistent testimony was not a "typical courtroom swearing contest," but rather turned on varying "perception and recall." 73 F.3d at 1148. Alberts said he brought and wore

protective gear and equipment on Jan. 6 because he perceived a high likelihood of being attacked by anti-Trump demonstrators such as what had occurred on December 12, 2020. There had indeed been such attacks against Trump supporters on that date. And there was uncontradicted evidence that Alberts did indeed protect people—including officers—on Jan. 6. Alberts helped officers keep an avenue clear for possible ambulance access to a heart attack victim. In fact, Alberts used his medical kit to give aid to a protestor whose lip had been shot off by a rubber bullet on Jan. 6. (Prosecutors objected to this at trial because they argued it occurred after Alberts' conflicts on the stairway.)

Although a critic can judge Alberts harshly in retrospect, at the time, Alberts knew that DC Antifa demonstrators had attacked and even stabbed Trump supporters at a previous rally, and that tear gas, pepper spray, or other irritants might likely be deployed. Alberts has a tradition and training in first aid and field medical assistance; so he brought a medical kit as well. And Alberts testified— without contradiction—that he kept his backpack packed year-round with certain objects such as bungee cords. This was true testimony, not "false testimony."

**#3) (paragraph 30.)** The defendant testified that he was unable to understand or decipher the verbal commands and hand gestures from law enforcement officers who attempted to get defendant Alberts to move down the West Terrace stairwell. However, "[A]t trial," claims the government, "officers

demonstrated their hand gestures, and those hand gestures were obvious and unambiguous," in supposed contradiction to Alberts' testimony that messages and signals were confusing or contradictory.

But in fact there were many hand signals and gestures from all sides on Jan. 6, and the evidence showed that officers themselves at times waved to people below to come up the stairs. Alberts' hearing difficulties are well documented and medically diagnosed. And Alberts' vision problems on Jan. 6 were also established.

**#4) (paragraph 31):** (a mere disagreement regarding Alberts' motivation for moving up or down on a stairway.) If the probation office disagrees with Alberts' stated motivations, it fails to show any contradictory statements by Alberts produced by the prosecution at trial.

**#5) (paragraph 32):** Disagreement regarding the precise nature of Alberts' handling of a wooden pallet. Video evidence corroborates Alberts' version and contradicts the government's interpretation. If Alberts had wanted to use the pallet as a "battering ram" as described in the PSR, Alberts would have deployed the sharp end or edges of the pallet as a weapon. The videos plainly evince Alberts holding the pallet in a vertical position, consistent with a shield and with Alberts' testimony—not the claims of prosecutors/probation.

**#6) (paragraph 33):** (mere imperfect continuity of Albert's testimony about his reasons for waving at people.)  The PSR seeks to establish a preposterous rule that defendants may never newly recollect, clarify, or mention additional thoughts while on the witness stand, lest they risk getting an enhancement for "false testimony."

**The probation officer invents new proposition of law; that if a court denies a defendant a self-defense jury instruction, the defendant's testimony that he acted in self defense or defense of others is by definition, "false testimony."**

**#7) (paragraph 34):** "Upon consideration of the evidence presented at trial, the Court ruled that no reasonable juror could have found that defendant Alberts was reasonably acting in defense of others when he assaulted the officers at the top of the stairwell during the lawful performance of their duties."  This is the basis for the PSR's claim of "false testimony" in paragraph 34.  Of course this cannot be the law.

**Objection to paragraph 37 "Adjustment for Obstruction of Justice."** As described above, this adjustment fails by any standard, including even the standards found in the Guidelines themselves.  The USSG's Application Notes preclude the obstruction enhancement in this case. Application Note 2 states that "**This provision is not intended to punish a defendant for the exercise of a constitutional right.** . . . the court should be cognizant that inaccurate testimony or

statements sometimes may result from confusion, mistake, or faulty memory and, thus, not all inaccurate testimony or statements necessarily reflect a willful attempt to obstruct justice."

Similarly, the DC Circuit, in *United States v. Montague*, 40 F.3d 1251, 1253 (D.C. Cir. 1994), read the commentary's admonition, that "such testimony or statements should be evaluated in a light most favorable to the defendant," as requiring a standard higher than the usual preponderance standard. *Id*. This requirement may have reflected the Commission's concern that "in the absence of a heightened standard of proof on perjury, defendants might be leery about testifying in their own defense lest they face a charge of perjury whenever convicted." *United States v. Dozier*, 162 F.3d 120 (D.C. Cir. 1998).

OBJECTIONS TO BASELINE SCORES IN PARAGRAPHS 48 THROUGH 56

Alberts also objects to the scoring and proposed enhancements found in **paragraphs 48 through 56.** In **paragraph 48**, the probation office states "The guideline for **Count 1** is found in USSG §2X5.1 of the guidelines. That section provides that if the offense is a felony for which no guideline expressly has been promulgated, apply the most analogous offense guideline. In this case, the most analogous offense guideline is USSG §2A2.4." (Note that this applies 13 points.) (10 (obstructing or impeding officers) + 3 (if the offense involved physical contact

and/or a weapon).) "[H]owever, the cross reference at USSG §2A2.4(c)(1) notes that if the conduct constituted aggravated assault, apply USSG §2A2.2.4.

Thus, the probation office seeks to convert "resisting officers during a civil disorder" (a 5-year-maximum felony) into 'aggravated assault on law enforcement with a deadly weapon' (a 20-year-max felony).  This would be laughable if it weren't so wrong.  Congress' enactment of Section 231 was designed and intended to apply to those who resist officers during riot situations.  <u>There are other statutes</u> that apply to crimes of assault against law enforcement officers; and Alberts *was in fact convicted under those statutes* in Count 2.

Alberts objects.  The proper baseline for Count 1 is USSG §2A2.4.  (13 points.) (10 (obstructing or impeding officers) + 3 (if the offense involved physical contact and/or a weapon)). If the government thought it could convict Alberts of aggravated assault on police with a deadly weapon it should have charged Alberts under §111(b); not §231.[3]

**Count One ('Opposing Officers during a Civil Disorder'), <u>already enhances</u> and factors for officers being resisted.  So the government's attempt to enhance Albert's conviction due to the "official victim" status of the officers is impermissible double counting.**

---

[3] At the state levels there are hundreds of court decisions distinguishing "resisting arrest"-type crimes from "assaulting officer"-type crimes.  The distinction is well established in criminal law.  Section 231 is plainly a "resisting"-type crime, not an "assault"-type crime.

In its zeal to help the prosecution, the probation office applies U.S.S.G. §3A1.2(b) – the "Official Victim" enhancement, to add an additional six (+6) level enhancement "if the victim was a government officer or employee, Alberts's criminal action was motivated by the victim's status, and the applicable base offense level Guideline is from Chapter Two, Part A (Offenses Against the Person)."

But off course the case law, the application notes, and the plain text of the enhancement make clear that this enhancement does not apply in this instance. *United States v. Campbell*, 967 F.2d 20, 23-24 (2d Cir. 1992) for the proposition that double counting occurs when courts consider the same factor in setting the initial Guidelines range and in choosing to depart from that range; and *United States v. Lincoln*, 956 F.2d 1465, 1471 (8th Cir. 1992) for finding double counting "when one instance ... of a defendant's conduct forms the basis for a conviction ... and is also employed to adjust one or more other sentences").

18 U.S.C. Section 231 is a specifically directed statute aimed at criminalizing those who oppose and resist law enforcement officers during a civil disorder. The official-victim enhancement "is designed to protect government officers in the performance of their official duties." *United States v. Watts*, 798 F.3d 650, 655 (7th Cir. 2015) (Posner, J.). The legislative history and plain language of Section 231 show that the statute *is itself an enhancement* due to the

"official victim" status of law enforcement officers.  Alberts cannot be double-punished in such a way that stacks enhancements upon him.

**COUNT 2:** THE PSR UNLAWFULLY CONVERTS A CONVICTION FOR 18 U.S.C. § 111(a) INTO A CONVICTION FOR §111(b)

Similarly, the PSR applies the baseline score for §111(b) (aggravated assault with a deadly weapon on law enforcement) to a conviction under §111(a) (assault on law enforcement).  If the government thought it could convict Alberts of §111(b) (which brings a potential 20-year prison term) it should have charged Alberts accordingly.  It is totally improper for the Probation Office to help the government bring about a sentence applying to a 20-year felony in a case where conviction was for only an 8-year felony.

Note that the plain language of 18 U.S.C. §111(a)(1) is already enhanced due to the official victim status of law enforcement officers ("while engaged in or on account of the performance of official duties. . .")

For this reason, Alberts objects to **paragraph 49 ("**The guideline for **Count 2** is USSG §2A2.2.").

Alberts also objects to **paragraph 50**. ("The guideline for **Count 3** [Entering and Remaining in a Restricted Building or Grounds with a Deadly Firearm] is USSG §2B2.3; however, that section provides that if the offense was committed with the intent to commit a felony offense, USSG §2X1.1 is applied").

Note that this is already an enhanced misdemeanor.  The misdemeanor (entering and remaining in a restricted building) has a base offense level of 4 (trespassing).  The conviction is then enhanced significantly, however, because Alberts possessed a firearm (up to 10 years imprisonment).  This requires a baseline score of 6 (4 (trespassing) + 2 (while possessing a firearm)).

**Alberts also objects to paragraph 51** ("The guideline for **Count 4** is USSG §2A2.4; however, the cross reference at USSG §2A2.4(c)(1) notes that if the conduct constituted aggravated assault, apply USSG §2A2.6").  Once again, the PSR seeks to turn a nonviolent crime into a violent crime—and then enhance it as an aggravated crime with a deadly weapon!  Just as in Count 3, Count 4 without enhancements is a mere misdemeanor, but enhanced due to firearm possession (up to 10 years in prison). " Disorderly and Disruptive Conduct in a Restricted Building or Grounds with a Deadly or Dangerous Weapon or Firearm" is hardly aggravated assault on police officers with a deadly weapon.

**Alberts objects to 52.** ("The guideline for Count 5 is USSG §2A2.2."). The jury convicted Alberts of "Engaging in Physical Violence in a Restricted Building or Grounds"; but the PSR places Alberts back in the most extreme category imaginable—a baseline score belonging to aggravated assault with a deadly weapon on law enforcement!.

**Alberts objects to paragraph 53** ("The guideline for Count 6 is USSG §2K2.5; however, that section provides that if the defendant used or possessed any firearm or dangerous weapon in connection with the commission or attempted commission of another offense, USSG §2X1.1 is applied in respect to that other offense,"

Here Probation Officer Field concocts out of the whole cloth a notion that Alberts' possession of a firearm on Capitol Grounds was "in connection with the commission" of "civil disorder,"—taking Alberts' base offense level from 6 to 14, based on no evidence whatsoever; just speculation.  The jury never found, nor even considered such a notion.  Based on the same logic, Ms. Field could say Alberts' possession of a firearm on Capitol Grounds was "in connection with the commission of" murder, treason, or kidnapping and place Alberts in a life-imprisonment range.  This is not how the Sentencing Guidelines work.

**Alberts objects to paragraph 57.**  The base level is 13, not 14.  Alberts was prosecuted and convicted of 18 U.S.C. §111(a), not §111(b). The applicable base level is §2A2.3, not 2A2.2.  The government was free to prosecute Alberts under §111(b) if it thought it was an appropriate charge; but the government cannot use the sentencing phase to bootstrap such a claim after trial.

**Objection to paragraph 58.** "Because the assault involved more than minimal planning (specifically—defendant Alberts brought various items with him . . ." As discussed above, Alberts' numerous items of gear, armor, equipment, and sidearm were solely for defensive purposes; not in preparation for any crime or crimes. No evidence at trial suggested otherwise.

**Objection to paragraph 59.** "Because a dangerous weapon was otherwise used (specifically—the wood pallet used as a battering makeshift battering ram as the defendant charged the USCP officers at the top of the steps, and attempted to break through their position), four levels are added." There is no evidence Alberts used the wooden pallet as anything but a shield. If he had intended to use it as a "battering ram" or weapon, he would have used the edge of the pallet, not its shield-like flat side. The government did not charge Alberts with aggravated assault with a deadly or dangerous weapon (18 U.S.C. §111(b)). Nor did the jury convict Alberts of such a charge.

**Objection to 60**. "Because the victim was a government officer," Officer Field seeks to add an additional 6 points. But 18 U.S.C. §111(a) is already enhanced ("while engaged in or on account of the performance of official duties. . ."). This is improper double-counting. "Double counting occurs when one part of the Guidelines is applied to increase a defendant's punishment on account of a kind of harm that has already been fully accounted for by application of another part of

the Guidelines." *United States v. Hedger*, 354 F.3d 792, 793 (8th Cir.2004) (citations and quotation marks omitted).

The Sentencing Commission significantly amended Application Note 4 on November 1, 2000, "to avoid the duplicative punishment that results when sentences are increased under both the statutes and the guidelines for substantially the same harm." *Id*.; *United States v. Haines*, 32 F.3d 290, 293 (7th Cir. 1994) ("Impermissible double counting occurs when a district court imposes two or more upward adjustments within the guidelines range, when both are premised on the same conduct."); *United States v. Flinn*, 18 F.3d 826, 829 (10th Cir. 1994) ("Impermissible double counting ... occurs when the same conduct on the part of the defendant is used to support separate increases under separate enhancement provisions which necessarily overlap . . . and serve identical purposes."); *United States v. Werlinger*, 894 F.2d 1015, 1018 (8th Cir. 1990) ("[T]he Sentencing Commission did not intend for multiple Guidelines sections to be construed so as to impose cumulative punishment for the same conduct.").[4]

---

[4] Thus although enhancements for weapon possession may apply to convictions for substantive crimes, e.g., United States v. Foster, 902 F.3d 654 (7th Cir. 2018) (§ 2B3.1(b)(2)(F) enhancement for bomb threat during armed bank robbery); United States v. Aquino, 242 F.3d 859 (9th Cir.), cert. denied, 533 U.S. 963 (2001) and United States v. Knobloch, 131 F.3d 366 (3dCir. 1997) (§ 2D1.1(b)(1) enhancements for possessing a firearm during a drug offense); United States v. Brown, 332 F.3d 1341 (11th Cir. 2003), United States v. Smith, 196 F.3d 676 (6th Cir. 1999) (enhancements for using a firearm in committing another felony offense), the enhancement cannot apply to weapon possession convictions.

The stated purpose of Application Note 4 is to avoid duplicative punishment, known as double counting in the Guidelines universe. "[A] court impermissibly double counts when precisely the same aspect of a defendant's conduct factors into his sentence in two separate ways." United States v. Bryant, 913 F.3d 783, 787 (8th Cir. 2019). The Seventh Circuit, in *United States v. Bell*, 598 FJd 366 (7th Cir. 2010), explained that impermissible "double counting occurs when the same conduct justifies two upward adjustments under the Sentencing Guidelines or the same underlying facts that establish an element of the base offense are used to justify an upward enhancement." 598 F.3d at 372.

**Objection to paragraph 62**. "Adjustment for Obstruction of Justice."  As outlined above, each and every claim that Alberts testified falsely rests on the Probation officer's view of what Alberts should have said, or what the Probation officer thinks Alberts' interpretation should have been.

**Objection to 63.** "Adjusted Offense Level (Subtotal): 28." The true score is 13 (10 (obstructing or impeding officers) + 3 (if the offense involved physical contact and/or a weapon). §2A2.4.

**Objection to 64.** "Base Offense Level: The guideline for a violation of 18 USC § 1752(a)(2) is USSG §2B2.3."  The true base level is 4 (trespassing) +2 (possession of a firearm during) = 6.  (This is the actual crime Alberts was

convicted of.)[5] The PSR, however, embarks on a tale of adventure and fantasy and concludes without any trial evidence that "because the offense was committed with the intent to commit a felony offense. The base offense level is 14."   The actual base offense level is:   6.

**Objection to 65.** "the assault involved more than minimal planning."  Of course this grouping is not based around an "assault" but rather the mere possession of a gun in a restricted area.  In any case, the gear, weapon, and armor brought by Alberts on Jan. 6 has been discussed above.  These items were not brought for purposes of crime.

**Objection to 67.** "Adjustment for Obstruction of Justice." As already described above, this notion is disposed of by case law, the plain text of the Guidelines, and the actual facts shown at trial.

**Objection to paragraph 68**. "Adjusted Offense Level (Subtotal): 28."  The true level is    6.

**Objection to paragraphs 69-75.**  As shown above, Alberts' adjusted offense level, and total offense level is:   6.

---

[5] Note that trespassing is, by definition, being in a restricted area.  So a 2-point enhancement for being in a restricted area is inapplicable.

Alberts has <u>no</u> objections to **paragraphs 76 through 151.**  Alberts has zero

criminal history points, and no ability to pay any fines.

**Objection to 152**. As stated above, Alberts' total base offense level is 13.

Therefore Alberts is in the Zone C, (12 to 18 months incarceration).

**Objection to 183**. "Pursuant to 42 USC § 14135a(a)-(d) and 22 DCC

§4151(a)(1), for all felony offenses, the defendant shall submit to the collection

and use of DNA identification information while incarcerated in the Bureau of

Prisons, or at the direction of the U.S. Probation Office."  Defendant believes this

is unconstitutional in that it violates due process, the 5th amendment and the 4th

amendment.  No one can be compelled to submit to any self-incriminatory

procedure.  This is especially true in the absence of a valid warrant based on

probable cause.

RESPECTFULLY SUBMITTED,

/s/Roger Roots

Attorney for Christopher Michael Alberts


CERTIFICATE OF SERVICE

I hereby certify that on 6/21/2023 I uploaded this document to the Court's
electronic filing system, thereby serving all parties of record.

/s/ Roger Roots, esq.