# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,

        Plaintiff,

v.                                    Case No.  1:21-cr-026 (CRC)

CHRISTOPHER MICHAEL ALBERTS
                    Defendant.
_____/


## CHRISTOPHER ALBERTS SENTENCING MEMORANDUM


Christopher Alberts is a veteran, first responder, tow truck driver, and mechanic from Maryland.  At present, Alberts works in the area of traffic safety and road construction support. He has a clean criminal record and had never previously had any major trouble with the law.  Mr. Alberts is widely respected by those who know him as a vital helper, a producer, a problem solver, and a contributor to the lives around him.

For the reasons set forth herein, Alberts requests that this Court sentence Alberts **to 6 months incarceration, followed by three years supervised release, pursuant to the U.S. Sentencing Guidelines.**

### INTRODUCTION

Like millions of Americans, Alberts followed the 2020 presidential election closely on election night. Alberts was working that night as a tow truck driver; and he even stopped by his local Republican Party headquarters to watch national news regarding the election counting. Like so many others, Alberts went to bed on election night knowing that President Trump—

whom he supported—held a comfortable lead over Joe Biden. But Alberts woke the next day to find that suspicious ballot processing in a small number of swing states, in some cases where the public had been barred from monitoring, had transformed the election into a victory for Joe Biden.

Polls showed that Alberts was in the majority in believing that there were serious election improprieties. Alberts continued to follow news about election counting revelations and legal challenges. Alberts drove to Washington, D.C. on the morning of January 6 to attend and participate in the Trump rally organized by supporters of the President.

Having only a brief moment to glance at the Government's Sentencing Memorandum counsel nevertheless notes that the Government claims Alberts "made his intention clear when he left the 'Stop the Steal' rally well before its end to go to the Capitol Grounds." In fact, why people do things seems crystal clear to the Government but not to anyone else. One of our team then living in Virginia documented how it was almost impossible to understand what Donald Trump was saying at the Ellipse on January 6 because of strong winds and two banks of speakers out of sync. See:  **https://www.youtube.com/watch?v=MjBx58tQagU** Therefore, he saw thousands of people leaving the Ellipse long before Trump finished speaking because they couldn't understand what he was saying. The Government in disregard of Rule of Evidence 106 takes everyone's statements out of context. Alberts flatly denies the claims on page 2 and requests consistent with the U.S. Sentencing Guidelines about disputed facts that the Court review the actual recordings which do not say what the Government imagines.

**ALBERTS' EQUIPMENT, DEFENSIVE GEAR, AND PREPARATION.**

Although the government makes a great deal of the protective gear and body armor worn by Alberts on January 6, it is important to put Alberts' preparations in context.

The U.S. Sentencing Guidelines warn in The U.S. Sentencing Commission, Guidelines Manual, Annotated 2021 Chapter 6 - Sentencing Procedures, Plea Agreements, And Crime Victims' Rights explains:[1]

> Commentary
>
> Although lengthy sentencing hearings seldom should be necessary, ***disputes about sentencing factors must be resolved with care***. When a dispute exists about any factor important to the sentencing determination, ***the court must ensure that the parties have an adequate opportunity to present relevant information.*** Written statements of counsel or affidavits of witnesses may be adequate under many circumstances. <u>See, e.g.</u>, *United States v. Ibanez*, 924 F.2d 427 (2d Cir. 1991). ***An evidentiary hearing may sometimes be the only reliable way to resolve disputed issues***. <u>See, e.g.</u>, *United States v. Jimenez Martinez*, 83 F.3d 488, 494-95 (1st Cir. 1996) (finding error in district court's denial of defendant's motion for evidentiary hearing given questionable reliability of affidavit on which the district court relied at sentencing); <u>United States v. Roberts</u>, 14 F.3d 502, 521(10th Cir. 1993) (remanding because district court did not hold evidentiary hearing to address defendants' objections to drug quantity determination or make requisite findings of fact regarding drug quantity); <u>see also</u>, *United States v. Fatico*, 603 F.2d 1053, 1057 n.9 (2d Cir. 1979), <u>cert. denied</u>, 444 U.S. 1073 (1980). The sentencing court must determine the appropriate procedure in light of the nature of the dispute, its relevance to the sentencing determination, and applicable case law.
>
> In determining the relevant facts, sentencing judges are not restricted to information that would be admissible at trial. <u>See</u> 18 U.S.C. § § 3661; *see also United States v. Watts,* 519 U.S. 148, 154 (1997) (holding that lower evidentiary standard at sentencing permits sentencing court's consideration of acquitted conduct); *Witte v. United States*, 515 U.S. 389, 399-401 (1995) (noting that sentencing courts have traditionally considered wide range of information without the procedural protections of a criminal trial, including information concerning criminal conduct

---

[1]   **https://www.ussc.gov/guidelines/2021-guidelines-manual/annotated-2021-chapter-6**

that may be the subject of a subsequent prosecution); *Nichols v. United States*, 511 U.S. 738, 747-48 (1994) (noting that district courts have traditionally considered defendant's prior criminal conduct even when the conduct did not result in a conviction). Any information may be considered, so long as it has sufficient indicia of reliability to support its probable accuracy. *Watts*, 519 U.S. at 157; Nichols, 511 U.S. at 748; *United States v. Zuleta-Alvarez*, 922 F.2d 33 (1st Cir. 1990), <u>cert. denied</u>, 500 U.S. 927 (1991); *United States v. Beaulieu*, 893 F.2d 1177 (10th Cir.), <u>cert. denied</u>, 497 U.S. 1038 (1990). Reliable hearsay evidence may be considered. *United States v. Petty*, 982 F.2d 1365 (9th Cir. 1993), <u>cert. denied</u>, 510 U.S. 1040 (1994); *United States v. Sciarrino*, 884 F.2d 95 (3d Cir.), <u>cert. denied</u>, 493 U.S. 997 (1989). Out-of-court declarations by an unidentified informant may be considered where there is good cause for the non-disclosure of the informant's identity and there is sufficient corroboration by other means. <u>United States v. Rogers</u>, 1 F.3d 341 (5th Cir. 1993); *see also United States v. Young*, 981 F.2d 180 (5th Cir.), <u>cert. denied</u>, 508 U.S. 980 (1993); *United States v. Fatico*, 579 F.2d 707, 713 (2d Cir. 1978), <u>cert. denied</u>, 444 U.S. 1073 (1980). Unreliable allegations shall not be considered. *United States v. Ortiz,* 993 F.2d 204 (10th Cir. 1993).

*Id. (Bolded and italicized emphases added).*

Nevertheless, the Department of Justice imagines what various Defendants mean or intend. The Government tells us what we are thinking, what we mean, what we intend. But that is not the law. If the Court is going to entertain these assertions, the Court must examine the truth or falsehood of those assertions, even to the extent of an evidentiary hearing if necessary. We believe, however, that the Court could simply disregard disputed facts or factors and proceed to sentencing on what is clear and undisputed.

In 2020, there had been a prior "Stop the Steal" rally in Washington, D.C. on December 12 in which several attendees had been violently stabbed by Antifa rioters. Washington, D.C. was widely known as a location which was violently hostile to Trump and Trump supporters. U.S. Senator Rand Paul had been violently attacked by Antifa rioters while leaving a White House ceremony organized by Trump. Trump supporters in D.C. had been killed and hospitalized due to violent attacks while visiting the nation's Capitol.

Trump was beloved by many, but detested by the majority of Washington's population. Trump's entire 4-year residency in Washington—from the very moment of Trump's inauguration in 2017—had been typified by violent threats and street assaults aimed at Trump and Trump supporters.

As Alberts testified at trial, he wore body armor, protective gear, and a concealed handgun to D.C. to protect himself and others from the type of violent attacks by rioters that had occurred on prior occasions. Alberts brought a gas mask and a first aid kit.

From 2014 if not earlier in the "Battle in Seattle" on the streets against the World Trade Organization in 1999 through the Summer and Fall of 2020, anarchists, Left-wing rioters, and violent arsonists and street thugs played out a civil war of violence on America's city streets. These were often explicitly called to obstruct an official proceeding in violation of 18 U.S.C. 1512(c)(2), including attempt to disrupt the inauguration of President-Elect Donald Trump:



**ALBERTS HISTORY OF PROTECTING AND RESCUING OTHERS**

Significantly, Christopher Alberts has saved several people's lives, even after returning

from his military service. Alberts was certified in CPR at the age of 8. As a young kid, Alberts

spent much of his time at the firehouse amid rescue squads with his parents. In high school,

Alberts took the first ever offered high school class to be a certified EMT.

During Alberts' time in EMT class Alberts was an active member of the fire department.

One of his most haunting calls was a call for a head wound which was a gunshot injury. A

husband had been drinking got in a fight with his wife and decided to take a shotgun and shot her in the face. Alberts was the first to arrive on the scene, where the patient was still alive and choking on her own blood.  Alberts quickly called to get police on scene and have all medical expedited. Alberts performed CPR for 30 minutes to try to keep the woman alive.

As a volunteer First Responder, Christopher Albers has lost 3 adult lives and 1 child.  In the cases of two of the adults and the child, Alberts provided CPR for over 45 minutes in route to the hospital.

However, there are several people who literally owe their lives to Christopher Alberts. On May 25, 2017, while on a family vacation in Santa Cruz, California, Alberts' fiancee's cousin's baby had gotten hold of a small toy from other kids. She was choking and had become blue in the face.  As soon as this was discovered, Alberts quickly jumped in and performed the Heimlich maneuver and was able to free the object causing the airway restriction. Today Rose is a healthy and active little girl full of life and a joy to be around.

In mid-summer July/August 2019, Alberts' fiancé and he were on a beach swimming, when Alberts noticed two young boys had been pulled away by the ocean. The older brother (approx. 6-7 years old) was trying to save the younger brother (approx. 4-5 years old) and they were nearly drowning because the little brother was pulling the older brother down in a state of panic. Without a second thought Alberts quickly swam out and safely got them back to shore. Their parents were unaware and preoccupied on the beach. Once Alberts swam them back he was able to get them to the lifeguards to ensure they were both ok.

July 24, 2020, on a trip to a casino for his birthday Alberts witnessed a woman suffer a heart attack after hitting the jackpot.  Alberts jumped in to offer medical support with chest compressions and rescue breathing. The woman laid there lifeless before Alberts was able to

jump in as the casino staff struggled waiting for the paramedics to get there.  Alberts jumped in knowing every minute counts in these situations. The paramedics thanked Alberts for his efforts, and were able to administer life saving drugs. The woman thanked Alberts—the best Birthday gift he ever received.

On December 24, 2021, on the night of his engagement, Alberts' fiancé and he were on their way home. Alberts noticed a family of five distressed on highway 95. Their car had broken down on their way to visit family for Christmas. The vehicle was stuck in the far right lane of the highway in a construction zone. Being a high traffic area the husband could not safely maneuver the vehicle to a safe shoulder alone. The wife and children were standing closely to the busy highway as the area was restricted due to the construction zone. Alberts pulled over and helped push the vehicle to a safe parking area beyond the jersey barriers while his fiancé followed along with the hazard lights of his vehicle.

In the fall of 2022, Christopher Alberts and Melissa were out running errands in town when there was a multi-vehicle accident at an intersection. As Alberts pulled up to the scene of the accident he noticed there was a man lying next to his vehicle unable to move. The car was igniting in flames, as Alberts' fiancé ran to the closest store to get a fire extinguisher while Alberts checked that the man had a pulse and was coherent. Although typically In his training Alberts would not opt to move him as he had possible neck and back injuries from the impact; but the car fire was getting bigger by the second. Alberts had to move the man to safety. Alberts administered c-spine support and carefully moved him to the grassy area far enough away from the burning vehicle to keep him safe. As Alberts got the man to safety paramedics arrived on scene and thanked him.

**ALBERTS' FIRST AID AND ASSISTANCE TO OTHERS ON JANUARY 6.**

Alberts has said he felt spiritually called to be in Washington, D.C. on January 6th. On January 6th, Alberts' intentions were the same as at other times in his life.  Alberts offered medical help multiple times throughout the day.

Alberts' first interaction was with Benjamin Phillips. Phillips had a heart attack and was lying on the ground. Alberts offered his help as the officers were only administering chest compressions.  For Phillips to have any chance he needed CPR, including rescue breathing. Alberts was told rescue breaths were not being administered due to Covid-19. Alberts communicated he had a rescue breathing face mask and could help until he could get paramedics to Phillips. Alberts was told to stand back and keep the crowd back. Alberts complied as seen on video evidence and noted in the interaction with C. Atkinson. At this time they were able to remove Philips via a make-shift gurney.

Alberts' second interaction was with Michael Dickinson on the North side of the building. When Alberts noticed he was holding his face and was covered in blood, Alberts went to see if he was ok and if he could help. Alberts realized he had his lip blown off and rendered medical aide to try and stop the bleeding.

Alberts' third interaction was shortly after he was arrested and later to be identified as Officer Brian Sicknick. Shortly after being detained, Alberts noticed Officer Sicknick in distress. Alberts noticed his signs and symptoms were consistent with those of a stroke. Alberts asked the officers detaining him to allow him to render aid or get Sicknick medical help. Alberts was told to worry about myself.  Sadly Sicknick passed away on January 7th, 2020.

No doubt the Government has building surveillance and other video of all of these incidents and cannot dispute them.

**ALBERTS' GENERALLY PEACEFUL CONDUCT  ON JANUARY 6.**

Alberts spent several hours around the U.S. Capitol Grounds on the afternoon of January 6, 2021.  At no time did he threaten anyone with any deadly or dangerous weapon.  Alberts was prepared to defend himself and/or others if needed.  But he conspicuously threatened no one and actually saved or offered to save (if he had been allowed) several people outside the Capitol that day.  As he was leaving, however, a police officer claimed to see a bulge in Alberts' clothing, from behind.  Again as Alberts was leaving the Capitol Grounds, the police officer jumped him from behind and wrestled Alberts to the ground.  Not seeing who was attacking Alberts or why, Alberts instinctively struggled for a moment.  He was then charged with having a gun but also – because he was jumped from behind by an officer – assaulting the officer who attacked Alberts from behind.

Aside from the inevitable appeal expected, where the District of Columbia will have yet another session with the U.S. Supreme Court over the meaning of the phrase "shall not be infringed," the facts here on sentencing are clear:  Alberts had a gun for his own self-defense which he never touched, withdrew from a hiding place, displayed to anyone, or made any use of.  Happily not being attacked by the Antifa and other street thugs who committed violence from 1999 through 2020, Alberts never had any need to defend himself as it turned out.

The U.S. Supreme Court may or may not have more to say about this, but for sentencing purposes the dark implications offered are without merit.  A person having a gun for hours on Capitol Grounds who never removes it, touches it, brandishes it, accesses it, etc., not even while heading away from the Capitol to leave at the end of the day is clearly intending it only for self-defense.  Even with the FBI's mind-reading machine, the facts must be understood within the least sinister interpretation.  Any attorney would have advised against bringing any weapon and

perhaps given even more cautious advice.  The Capitol might have posted signs that weapons are not allowed on the Grounds.  But even in evaluating the convictions that were handed down, a dark and sinister interpretation would be to go well beyond the known facts, incorrectly.

The Government asserts that a police officer tried to violently wrest a wooden shipping pallet out of Alberts' hands and that Alberts resisted the attempt, and then pushed the pallet toward officers.  Yet if this confrontation were accurate, somehow Alberts never resorted to any weapon he had.  Strange.

## SUMMARY OF SENTENCING GUIDELINES POINTS AND FACTORS

As stated in Paragraph 7 on page 6,

> On November 10, 2021, a federal grand jury in the United States District Court for the District of Columbia returned a ten-count Second Superseding Indictment charging defendant Christopher Michael Alberts with
>
> Civil Disorder, in violation of 18 USC §111(a) (Count One); Assaulting, Resisting, or Impeding Certain Officers, in violation of 18 USC §111(a)(1) (Count Two);
>
> Entering and Remaining in a Restricted Building or Grounds with a Deadly or Dangerous Weapon, in violation of 18 USC §§1752(a)(1) and (b)(1)(A) (Count Three);
>
> Disorderly and Disruptive Conduct in a Restricted Building or Grounds with a Deadly or Dangerous Weapon, in violation of 18 USC §§1752(a)(2) and (b)(1)(A) (Count Four);
>
> Engaging in Physical Violence in a Restricted Building or Grounds, in violation of 18 USC §1752(a)(4) (Count Five);
>
> Unlawful Possession of a Firearm on Capitol Grounds or Buildings, in violation of 40 USC §5104(e)(1)(A)(i) (Count Six);
>
> Disorderly Conduct in a Capitol Building, in violation of 40 USC §5104(e)(2)(D) (Count Seven);
>
> Act of Physical Violence in the Captiol Grounds or Buildings, in

violation of 40 USC §5104(e)(2)(F) (Count Eight);

Carrying a Pistol without a License [Outside Home or Place of Business], in violation of 22 DCC §4504(a) (Count Nine); and

Possession of a Large Capacity Ammunition Feeding Device, in violation of 22 DCC §2506.01(b) (Count Ten)

## JURY TRIAL AND CONVICTIONS

Alberts went to trial before a jury starting on April 11, 2023, through April 19, 2023.

The jury returned a verdict of guilty on Counts 1, 2, 3, 4, 5, 6, 7, 8, and 9 on April 19, 2023.

## SENTENCING RECOMMENDATIONS OF PRESENTENCE INVESTIGATION REPORT BY THE PROBATION OFFICE

The Sentencing Guidelines and governing precedents require that different legal counts addressing the same offense or conduct must be grouped together.

Here, the PSR proposed **GROUP I** consisting of a violation of 18 U.S.C. 111(a)(1) which the PSR proposed to be governed by USSG 2A2.2(a) regarding assault.

However, this is in error.  18 U.S.C. 111(a)(1) – very unhelpfully – covers a wide spectrum of dissimilar behavior.  The Government did not ask for a special verdict to determine which of the prongs the jury was finding guilt for:

(a)IN GENERAL.—Whoever—
(1) forcibly assaults, resists, opposes, impedes, intimidates, or interferes with any person designated in section 1114 of this title while engaged in or on account of the performance of official duties; or

Therefore, because the jury was not asked to identify which of the various prongs or species of 18 U.S.C. 111(a) it found the Defendant to have committed, we do not know if Alberts was found guilty of:

- Forcibly assaulting

12

- Forcibly resisting

- Forcibly opposing

- Forcibly impeding

- Forcibly intimidating

> or

- ***Forcibly interfering with***

Officers of the United States Government.

Given the lack of a jury finding, the Court must assume for sentencing the least offense necessary to the conviction which is ***merely "interfering with" officers*** to the extent that they were identified as officers of the U.S. Government or assisting Federal officers.

The PSR also recites in paragraph 58 "Specific Offense Characteristics" to propose a 2 point enhancement which are erroneous and in any event indistinguishable from the base offense. The PSR alleges that Alberts got dressed.  It does not allege that Alberts planned *the crime* or any group committing a crime.  It alleges that Alberts merely got himself dressed for the event. The evidence is clear that Alberts "knew that shit was coming eventually" referring to violent clashes with Antifa and other left-wing street thugs that had attacked every conservative gathering since 2014.  The PSR's attempt to turn preparations not to be stabbed by ANTIFA or other thugs is not supported by anything in the evidence and is not planning the crime.  Recall that the jury was not asked to decide this implicitly or explicitly and the jury verdict does not depend upon the resolution of any such factual dispute.  No enhancement should be added.

The PSR also recites in Paragraph 59 more "Specific Offense Characteristics" which are precisely the same as the base offense.  The evidence of the base offense is the same as the factors asserted to support a proposed 4 point enhancement.  No enhancement should be added.

This is not a circumstance where the base offense could have different flavors, some more serious than others. The recitations of Paragraph 59 are exactly the same as the offense charged and proven by the evidence at trial (setting aside obviously Defendant's possible questions of sufficient evidence on appeal for these present purposes of sentencing). These additional points cannot be justified by certain kinds of violations of the same statute that are less serious than what was presented at trial.

The PSR also recites in Paragraph 60, a "Victim Related Adjustment" proposing an enhancement of 6 points. However, again, the "Victim Related Adjustment" is identical to the base offense. There is nothing to distinguish the conduct or factors for the proposed enhancement from the base offense under 18 U.S.C. 111(a).

Therefore, the correct points for **GROUP I** could be no more than

10 points for the base offense for forcibly interfering with a federal officer

0 points for Specific Offense Characteristics which are the same as the base offense and merely double counting.

0 points for an Official Victim because that is precisely the base offense and could only be double counting. The offense of 18 U.S.C. 111(a) does not have different types or species applying either to official victims or non-official victims. Any violation of 18 U.S.C. 111(a) is by its nature always against an official victim.

0 points for Specific Offense Characteristics for using a wooden pallet found by happenstance on the Capitol Grounds to push back against officers attempting to take it away from him, which is identical to the base offense.

0 points for Obstruction of Justice unless at a minimum the Government can

formally charge Alberts with the requisite elements in a relatively formal

process as required and the infringement on fundamental constitutional rights

is ignored.

**TOTAL POINTS FOR GROUP I:   10 points**

Secondly, the PSR proposed **<u>GROUP II</u>** consisting of a violation of 18 U.S.C. 1752(a)(1)

as enhanced by (b)(1)(A) for bringing a deadly or dangerous weapon into a restricted building or

grounds.  The PSR correctly begins by citing that the correct sentencing category analogy is 4

points under USSG 2B2.3 for trespass.

Note (b)(1)(A) is already the enhancement to 18 U.S.C. 1752(a)(1) for having a weapon.

From there, the PSR seems to go off the rails.  The correct analysis would at most be a 2

point enhancement under USSG 2B2.3(b)(2) "If a dangerous weapon (including a firearm) was

possessed, increase by **2** levels."

There is no evidence to sustain the attempt at the cross-reference under USSG 2B2.3(c).

The evidence showed that Alberts entered an area which he denied knowing to be restricted, and

thereupon the Government showed evidence that he tangled with police officers.  But there is no

evidence to support the assumption that Alberts entered a restricted grounds for the purpose of

assaulting police officers.  Not even the Government's unguided interpretation of Albert's

statements indicate any intention with regard to police officers – as contrasted with perhaps the

proceedings in Congress.  Again, the evidence even as recited by the PSR makes clear that the

"shit [he knew] was coming eventually" had nothing to do with police officers, but was explicitly

in reference to left-wing counter-demonstrators.

Furthermore, if USSG 2B2.3(c) did apply to the intent to commit [another] felony, it

would be the exact same felony as charged under 18 U.S.C. 111(a) and would be

indistinguishable from **GROUP I.**

Once again, as stated above, there is no evidence of more than minimal planning of *the crime* as opposed to planning himself in getting dressed.  There was no evidence that Alberts was able to overwhelm officers or planned to do so.

On the contrary, Alberts brought a gun to defend himself against left-ist counter-demonstrators yet never drew or brandished that gun.  The Government would have us conclude from the record that Alberts planned to attack police officers, brought a gun for the purpose, yet never used it or showed it and instead picked up a wooden shipping pallet.  Even evidence sufficient for the jury to convict does not touch on these topics asserted now for sentencing.

The facts show that Alberts did not enter the area or bring a gun to commit another felony, because when presented by the most likely scenario for using that gun, he did not do so.

Perhaps one might wonder about this.  But once the Government tries to stretch a wooden pallet found by happenstance into being counted as a dangerous weapon, there is little room left to enhance sentencing for Alberts carrying a gun that he never used or brandishsed.  It might be more logical to question the interpretation of a wooden pallet as a dangerous weapon and to deal only with the gun.  But that is not the way the case has been set up or what the Guidelines say.

The Government will assert that it proved that Alberts approached the Capitol because of the election proceedings there.  But that is not the question.  The question is whether Alberts entered a restricted area because he really just wanted to fight with police.

The facts show that Alberts as found by the jury picked up an object (pallet) which was on the Grounds by happenstance, which he could not possibly have anticipated being present.

Therefore, the correct points for **GROUP II** could be no more than

      4 points for the base offense for the analogy of trespass

2 points as an enhancement under USSG 2B2.3(b)(2) "If a dangerous weapon

(including a firearm) was possessed, increase by **2** levels.

0 points for a cross reference under USSG 2B2.3(c) that "If the offense was

committed with the intent to commit a felony offense."  Although the

Government alleges and apparently the jury found (to the extent we know the

factual findings of the jury strictly necessary to the verdict) that Alberts

_BOTH_ entered a restricted area with a weapon, _AND ALSO_ then interfered

with police, there is no indication that Alberts did the first _WITH THE_

_PURPOSE OF_ doing the second.  The recitation of facts and the evidence are

consistent with an unplanned discovery of a wooden pallet nobody would

have expected to find, that the police tried to take it away from Alberts,

Alberts resisted having the pallet taken away from him, and then pushed at

officers with it.  This does not support the enhancement of  USSG 2B2.3(c).

0 points for Specific Offense Characteristics for using a wooden pallet found by

happenstance on the Capitol Grounds to push back against officers

attempting to take it away from him, which is identical to the base offense.

0 points for Obstruction of Justice unless at a minimum the Government can

formally charge Alberts with the requisite elements in a relatively formal

process as required and the infringement on fundamental constitutional

rights is ignored.

**TOTAL POINTS FOR GROUP iI:   6 points**

**COMBINED POINTS:   10 points**

## COUNT 9:  LAWS OF THE DISTRICT OF COLUMBIA?

Under Paragraph 76-77, the PSR recites that Count 9 for "Carrying a Pistol without a license" under 22 DCC 4504(a) is classified as a Group M8 Offense under the Sentencing Guidelines of the District of Columbia.  However, this is not discussed further.  It would appear that the Probation Officer is intending or at least raising the question of whether this federal court should separately sentence Alberts for a violation of the laws of the District of Columbia.  The DC Guidelines[2] would seem to apportion no minimum sentence and a maximum of 5 years sentence for this offense, with a $12,500 fine, and 3 years supervised release.  But it is not clear what recommendations would apply within that range.

Of course, Alberts objects to the constitutionality of punishing his possession of a pistol even without a license and/or concealed and after numerous Supreme Court decisions which certain cities and states simply continue to ignore he claims that the restrictions violate the decisions of the Supreme Court and the "right to keep and bear arms" which "shall not be infringed."  Alberts contends that he may not be sentenced or punished pursuant to the decision of *New York State Rifle & Pistol Association, Inc. v. Bruen*, 597 U.S. ___ (2022).

However, the question first arises whether D.C. or federal law and the jurisdiction of courts would apply to the events on the Grounds of the U.S. Capitol.

And of course the violation asserted under Count 9 is the same as the enhancement addressed under GROUP II above, that under USSG 2B2.3(b)(2) "If a dangerous weapon (including a firearm) was possessed, increase by **2** levels.

Therefore, a further question for Count 9 is whether there is any distinction that would justify two penalties for the same conduct or whether that is double-counting.

---

[2]

https://scdc.dc.gov/sites/default/files/dc/sites/scdc/page_content/attachments/2021%20Guidelines%20Manual.pdf

**CRIMINAL HISTORY**

Despite reporting some charges and traffic infractions, the PSR assigns 0 points for criminal history.

**ENHANCEMENT FOR OBSTRUCTION OF JUSTICE PLAINLY UNCONSTITUTIONAL AND IMPROPER**

A mistake that is widespread is still a mistake.  Defendant's counsel recognizes that there are widespread precedents for the proposition that if a Defendant merely loses at trial, therefore he is presumed to have committed uncharged and unproven perjury because the jury found differently, and that perjury is then presumed to be an uncharged and unproven count of obstruction of justice.  Counsel explicitly calls for the over-turning of such unconstitutional precedents and a good faith expansion of the governing law to comport with the U.S. Constitution's right to trial by jury, and the right of a defendant to testify in his own defense and that no one be deprived of their life or liberty but by due process of law.

The proposition that the right to testify does not include the right to testify falsely is incompatible with the treatment by the Supreme Court of other fundamental constitutional rights. The chilling and restraining effect upon the right to testify in one's own defense is an unacceptable burden upon the rights of due process and the right to trial by jury.

There have been far too many convictions over-turned even years after the fact to pretend that every conviction is necessarily correct.  The idea that if a defendant takes the chance of trusting in a jury who then makes the wrong decision can justify an enhancement belies that massive experience and laws concerning "actual innocence" despite a conviction.

Counsel notes that in those precedents affirming a district court sentencing the question is

19

apparently always deemed to have been waived, rather than considered and accepted.  Therefore, with all respect to the trial courts, counsel is obligated to register proper objection and call upon the Judiciary to correct this error.

There is nothing to separate this bizarre concept from merely adding the "obstruction of justice" enhancement to 100% of all criminal convictions other than plea deals, thus corrupting the Guidelines themselves.  Even if a defendant chose not to testify, would not withholding testimony (even though a constitutional right) not come within the Government's concept of obstruction of justice by not testifying the way the Government wants the Defendant to testify?

This law firm has caught and exposed law enforcement officers lying on the witness stand, such as one officer who accused Kenneth Joe Thomas of cutting a tarpaulin of the reviewing stand on the Capitol terrace but then admitted it was the officer who actually cut the tarpaulin when shown a video of himself (the officer) cutting it.  If the Government will not prosecute actual perjury on one side, can it merely assert by proclamation perjury only against Defendants without any formal charges or proceedings?

However, even without reaching the constitutional infirmity of such an enhancement, it does not apply here in counsel's opinion:

> Of course, not every accused who testifies at trial and is convicted will incur an enhanced sentence under § 3C1.1 for committing perjury. As we have just observed, an accused may give inaccurate testimony due to confusion, mistake or faulty memory. In other instances, an accused may testify to matters such as lack of capacity, insanity, duress or self-defense. Her testimony may be truthful, but the jury may nonetheless find the testimony insufficient to excuse criminal liability or prove lack of intent. For these reasons, if a defendant objects to a sentence enhancement resulting from her trial testimony, a district court must review the evidence and make independent findings necessary to establish a willful impediment to or obstruction of justice, or an attempt to do the same, under the perjury definition we have set out. See U.S.S.G. § 6A1.3 (Nov.1989); Fed.Rule Crim.Proc. 32(c)(3)(D). See also Burns v. United States, 501 U.S. ----, ----, 111 S.Ct. 2182, ----, 115

L.Ed.2d 123 (1991). When doing so, it is preferable for a district court to address each element of the alleged perjury in a separate and clear finding.

*United States v. Dunnigan*, 507 U.S. 87, 113 S.Ct. 1111, 122 L.Ed.2d 445 (1993)

> To protect a defendant's right to testify at trial, a district court considering an obstruction-of-justice enhancement based on a defendant's trial testimony "first . . . must identify those particular portions of the defendant's testimony that it considers to be perjurious, and second, . . . must either make specific findings for each element of perjury or at least make a finding that encompasses all of the factual predicates for a finding of perjury." *United States v. Roberts,* 919 F.3d 980, 990 (6th Cir. 2019) (citation omitted). The district court did that here several times over when it reviewed Norton's testimony about his distribution of methamphetamine to Greene, his sale of the firearm to Greene, and his refusal to acknowledge his own voice on the audio recording of that transaction...

*United States v. Lynn Richard Norton* (Record Nos, Nos. 22-5293, 22-5299, June 28, 2023):

> The district court held that, because Norton committed perjury at trial, U.S.S.G. § 3C1.1's obstruction-of-justice enhancement applied. The government bore the burden of proving the applicability of this enhancement. *United States v. Iossifov*, 45 F.4th 899, 923 (6th Cir. 2022). Although we generally review legal conclusions de novo and factual findings for clear error, see, e.g., *United States v. Pirosko*, 787 F.3d 358, 372 (6th Cir. 2015), we have "sent mixed messages" on how to "review the application of th[is] guideline to the facts"; sometimes we apply a de novo review of the district court's application, for others we turn to the more deferential clear-error standard, and at times we pick something in between, *United States v. Thomas,* 933 F.3d 605, 608 (6th Cir. 2019) (collecting cases).

Id.

Therefore, a mere assertion by the PSR in no way satisfies the requirements for such an enhancement even if the enhancement were not – in counsel's opinion notwithstanding past precedents – unconstitutional. This Court in the case at bar would need a formal hearing to address all the elements of the uncharged perjury and the requirements for treating it as obstruction of justice. Even if the proceeding is short of the formality of a trial, a mere unsworn statement by the PSR is clearly inadequate to the task.

Counsel recommends the easiest way to address this is to ignore the belated, thin, and threadbare assertion of an enhancement entirely.  If the Government does not have the stomach for actually charging and proving perjury, the Court should not entertain the topic either.

The proposed enhancement for obstruction of justice by perjury under paragraphs 62 (Group I) and 67 (Group II) of 2 points in each Group should be denied.


## ALBERTS QUALIFIES FOR DOWNWARD DEPARTURE UNDER §5K2.20 - ABERRANT BEHAVIOR POLICY STATEMENT

Under §5K2.20(b), a defendant qualifies for downward departure if his crime constituted a "single criminal transaction" which "represents a marked deviation by the defendant from an otherwise law-abiding life."  In this case, Christopher Alberts was an upstanding, law-abiding pillar of his community prior to January 6, 2021.  Alberts was a decorated combat veteran. Alberts was a first responder and protector.

The Policy Statement announced at § 5K2.20 echoes the reality that no one should be judged by just one day of his life.

> (c) Prohibitions Based on the Presence of Certain Circumstances.—The court may not depart downward pursuant to this policy statement if any of the following circumstances are present:
> (1) The offense involved serious bodily injury or death.
> (2) The defendant discharged a firearm or otherwise used a firearm or a dangerous weapon.
> (3) The instant offense of conviction is a serious drug trafficking offense.
> (4) The defendant has either of the following: (A) more than one criminal history point, as determined under Chapter Four (Criminal History and Criminal Livelihood) before application of subsection (b) of §4A1.3 (Departures Based on Inadequacy of Criminal History Category); or (B) a prior federal or state felony conviction, or any other significant prior criminal behavior, regardless of whether the conviction or significant prior criminal behavior is countable under Chapter Four.

**ALBERTS QUALIFIES FOR DOWNWARD DEPARTURE DUE TO
DIMINISHED MENTAL CAPACITY**

A downward departure may be warranted if (1) the defendant committed the offense
while suffering from a significantly reduced mental capacity; and (2) the significantly reduced
mental capacity contributed substantially to the commission of the offense. Similarly, if a
departure is warranted under this policy statement, the extent of the departure should reflect the
extent to which the reduced mental capacity contributed to the commission of the offense.

Alberts' diminished capacity was not due to any voluntary use of drugs or other
intoxicants.

It is significant that (1) Alberts is an Iraqi War veteran with certain military-related
injuries, which include (2) severely diminished hearing capability.  When Alberts first arrived in
Washington, D.C. on January 6, he helped and assisted others in identifying threats at the Ellipse.
Alberts walked with crowds of protestors

"Significantly reduced mental capacity" means the defendant, although convicted, has a
significantly impaired ability to (A) understand the wrongfulness of the behavior comprising the
offense or to exercise the power of reason; or (B) control behavior that the defendant knows is
wrongful.


**THE COURT MAY NOT CONSIDER  CROWD LIABILITY**

A few hundred people out of the crowd of 10,000 committed violence against people and
things, battled with police, injured about 140 police officers, damaged federal property at the
Capitol, and some even tried to break through the doors to the Senate and House chambers.

However, here, in this case, the security camera video – that is, the Government's own
evidence – shows with unmistakable clarity and precision that most of those who intruded into

the U.S. Capitol building clearly had no plans whatsoever, no sense of direction, no

commonality, etc. [3]

Crowds do not do things.  Individuals do things.  Crowds do not.

> This is where things fall apart. Although both Governor DeSantis and
> Sheriff Williams argue that the phrase "willfully participate" is
> commonly understood, neither party offers an actual definition. Is it
> enough to stand passively near violence? What if you continue protesting
> when violence erupts? What if that protest merely involves standing with
> a sign while others fight around you? Does it depend on whether your
> sign expresses a message that is pro- or anti-law enforcement? What
> about filming the violence? What if you are in the process of leaving the
> disturbance and give a rioter a bottle of water to wash tear gas from their
> eyes?

> The Governor would have this Court pencil in an exception for a person
> who merely "attend[s]" a violent demonstration but does not actively
> engage in violence or conduct that poses an imminent risk of injury or
> property damage. ECF No. 99 at 13. But the Governor offers no
> explanation or construction that limits when mere attendance becomes
> participation, except that a person must "intend to commit violence." Id.
> But this ignores the plain text of the statute, which separates a person
> from an assembly of three or more persons sharing that intent. See *infra*.

*See, The Dream Defenders, et al., v. Ron DeSantis, 21-cv-191, ECF No. 137 (N.D. Fla. Sept. 9, 2021), (Mark E. Walker, Chief United States District Judge),* Page 53 *(injunction against anti-riot law in part because the legislation appeared to criminalize the defendant's protest activities even if he did not participate in the violent acts of others),* attached as **Exhibit**. And continuing:

> If this Court does not enjoin the statute's enforcement, ***the lawless***
> ***actions of a few rogue individuals could effectively criminalize the***
> ***protected speech of hundreds, if not thousands, of law-abiding***
> ***Floridians***. This violates the First Amendment. See, e.g., *Bible Believers*
> *v. Wayne Cnty.*, Mich., 805 F.3d 228, 252 (6th Cir. 2015). Florida's
> interest in preventing public violence is beyond question, but when that
> interest collides with rights guaranteed by the First Amendment, the
> "government may regulate in the area only with narrow specificity."
> *Button*, 371 U.S. at 433. Otherwise, those rights, which "are delicate and
> vulnerable, as well as supremely precious in our society," may be

---

[3]     *See,* Capitol Security camera video, produced by USAO as 7029 USCS 02 Rotunda Door
Interior-2021-01-06_15h15min01s000ms.mp4 from USCP OPR Report 21-007, Exhibit 6 CCTV
Recordings, from production DT_DocID: USCP-003-00000167, produced 11/18/2021, in Global
Production DOJCB_008

suffocated. Id. Section 870.01(2), through its ambiguity, chills speech and eviscerates that essential breathing space. The law is overbroad.[27]

Accordingly, I conclude that Plaintiffs have established a substantial likelihood of success on the merits as to their overbreadth claim.

Id., at Page 77 (emphases added).

Collectivist punishment is not permitted nor constitutional within U.S. criminal law.  Not only is collective punishment outlawed by the Geneva Convention but it is unconstitutional under due process and the Fifth Amendment.  Despite the persistent arguments of the U.S. Attorney's Office, no person under the U.S. Constitution may be convicted or sentenced for what other people did.

## DEFENDANT OBJECTS TO CRIMINALIZATION OF HIS POLITICAL SPEECH AND VIEWS

The Government continues its tendency to present political opinions or protected speech as evidence that the Defendant is a criminal.  The Government passes this off as tangentially related to proving the elements of a crime, but spills over quite extensively into pure free speech issues.

Despite what might be hypothetically true in some other case, the accusations of Alberts' expression of free speech here are simply not – in fact – necessary to nor supportive of finding guilt of any non-speech crime.  They are mentioned as being part of proof of the crime, but Defendant responds that they are actually not.

## COURT MAY NOT CONSIDER FACTS DISPUTED OR CRIMES NOT CHARGED

The Court should not sentence Defendant in consideration of other, additional crimes for which he has not been found guilty and argue facts not proven and legal conclusions not agreed

to by the Court.

**AVOIDING UNDUE DISPARITIES IN SENTENCING:  AVOIDING DISPARITIES IN SENTENCING BY CONSIDERING ONLY JANUARY 6 RELATED CRIMES**

In pursuit of the U.S. Sentencing Guidelines' primary purpose of minimizing disparities in sentencing, the Court should not consider only January 6 cases.  The Court must minimize disparities among all cases from the same charge, not merely among January 6 prosecutions. That would produce the opposite result of the U.S. Sentencing Guidelines' very purpose.

The Probation Office, DoJ, USAO, and the Court must compare every January 6 sentencing not merely to other January 6 cases but to all cases under which a Defendant is sentenced for the same criminal charge, here 18 U.S.C. 111(a) – present in all of the examples cited.  The relevant comparison is not a self-referential loop of only January 6 cases.  Sentencing consistent only with January 6 cases but highly discordant of other cases would not fulfill the purposes of the U.S. Sentencing Reform Act of 1984.

In 2011, rioters entered and physically occupied the Wisconsin State legislature, followed by months of disruptive protests mostly outside but also inside the Capitol building of Wisconsin.[4]  Those who sought to obstruct official proceedings to prevent the passage of legislation they disapproved of were mostly not arrested or given minor fines or probation.  As in every such non-January 6 case, there is no dispute about the goals or organizing which were proudly and openly admitted in Wisconsin.

---

[4]      "Thousands storm Capitol as GOP takes action," <u>Wisconsin State Journal</u>, March 10, 2011, updated February 19, 2015, ("Thousands of protesters rushed to the state Capitol Wednesday night, forcing their way through doors, crawling through windows and jamming corridors"), accessible at:  **https://madison.com/wsj/news/local/govt-and-politics/thousands-storm-capitol-as-gop-takes-action/article_260247e0-4ac4-11e0-bfa9-001cc4c03286.html**

In 2023, State legislatures in Florida, Montana, Tennessee were physically disrupted by protestors against Republican legislation, but the DoJ has taken no action to defend these official proceedings.

In September 2018, opponents of Judge Brett Kavanaugh's nomination to the U.S. Supreme Court openly and publicly organized and advertised their plans to obstruct an official proceeding in violation of 18 U.S.C. 1512(c)(2) by shutting down the U.S. Senate Judiciary Committee's hearings and confirmation of Kavanaugh to become a Supreme Court Justice. Where the Department of Justice merely suspects and speculates about January 6 Defendants, anti-Kavanaugh rioters openly admitted it. Protestors celebrated on line occupying and taking over the Hart Senate Office Building. The 2018 demonstrators proudly admitted their conspiracy to obstruct congressional proceedings: [5]

> "It's sort of a coordinated dance, **but the performers are an organized group of protesters** and a dozen or so uniformed Capitol Police officers. And the stage is this week's Senate confirmation hearings for Supreme Court nominee Brett Kavanaugh." One by one, the protesters, many wearing T-shirts reading 'I am what's at stake,' interrupt the proceedings by shouting slogans like 'You're making a mockery of democracy!' or 'Senators: Do your jobs and stop this hearing!' The police then warn that further disruption will result in arrests. Minutes later, the person shouts again and is hustled out a side door…**the protesters are part of a nationwide campaign to disrupt the confirmation process**."

*Id. (Emphasis added).*

The few of those Left-wing insurrectionists arrested [6] were released on a $35 to $50 bail

---

[5]     Note that the statute of limitations will not expire until September 26, 2023, and the USAO could prosecute these rioters using a consistent standard as to January 6, 2021.

[6]     Emily Birnbaum, "Over 200 protesters arrested during Kavanaugh hearings," The Hill, September 6, 2018, accessible at:  **https://thehill.com/homenews/senate/405500-212-protesters-total-arrested-during-kavanaugh-hearings**;

after 5 hours which became their sole punishment in most cases after their cases were dropped. [7]

*See,* **https://twitter.com/womensmarch/status/1047935356673437697** (hear the extreme noise of the alarms and crowd disrupting the Hart Building in the video).  See

**https://www.facebook.com/watch/?v=2314502548791821**



*Erin Franczak and Katherine Tully-McManus,  "'**I See You, Senators':** **Kavanaugh Protesters Pour Into the Capitol:**  Supporters of Christine Blasey Ford **sing, raise fists, invoke regression analysis,"** Roll Call, September 27, 2018, accessible at:  **https://rollcall.com/2018/09/27/i-** **see-you-senators-kavanaugh-protesters-pour-into-the-capitol/**  And: Sophie Tatum, "More than 300 protesters arrested as Kavanaugh demonstrations pack Capitol Hill," October 5, 2018, accessible at: **https://www.cnn.com/2018/10/04/politics/kavanaugh-protests-us-** **capitol***

---

[7]      Ashraf Khalil, "Protesters continue to interrupt Kavanaugh hearings," Associated Press, 09/06/2018, accessible at:  **https://apnews.com/article/3f4ddaec0ee946fe817329b065af3408; accessed Nov** **6, 2021;** *emphasis added.*



During that riot, Sen. Schumer led a crowd at the closed doors of the U.S. Supreme Court at which rioters banged on the doors of the U.S. Supreme Court.  Sen. Chuck Schumer openly threatened Justices of the U.S. Supreme Court,

> "'I want to tell you Gorsuch, I want to tell you Kavanaugh - you have released the whirlwind, and you will pay the price. You won't know what hit you if you go forward with these awful decisions,'  Schumer told the cheering crowd.  Schumer's public threats against the U.S.

Supreme Court drew a rare public rebuke from U.S. Supreme Court
Chief Justice John Roberts." [8]

In May to June 2020, rioters and insurrectionists attacked the White House from their

rallying point at Lafayette Square.[9]   America's international enemies and friends watched as the

U.S. Government and its worldwide military power were paralyzed by anarchist rioters.  These

rioters obstructed official proceedings at the White House in violation of 18 U.S.C. 1512(c)(2)

interfering with and impeding the world-wide military chain of command of the U.S.

Government.  Not only were charges dropped against those arrested but rioters sued the District

of Columbia and won millions of dollars. [10]

In January 2017, rioters burned police cars, limousines, stores, and the like professing

their plans to prevent President Donald Trump from assuming the office of the President.

Hundreds were arrested but then released with most charges dropped.



---

[8]        https://www.reuters.com/article/us-usa-court-abortion-scene/u-s-chief-justice-
slams-schumer-for-dangerous-comment-on-justices-in-abortion-case-idUSKBN20R2KX
[9]        Melissa Barnhart, , "Historic St. John's Church near White House torched by rioters," Christian Post, June
1, 2020, accessible at:  https://www.christianpost.com/news/historic-st-johns-episcopal-church-
set-on-fire.html
[10]        See:  Aila Slisco, "Government Settles Civil Cases With Protesters Injured at Lafayette Square,"
NEWSWEEK, April 13, 2022, accessible at:  https://www.newsweek.com/government-settles-civil-
cases-protesters-injured-lafayette-square-1697820

**Washington (CNN)** — Six police officers were injured and 217 protesters arrested Friday after a morning of peaceful protests and coordinated disruptions of Donald Trump's inauguration ceremony *gave way to ugly street clashes in downtown Washington.*

*At least two DC police officers and one other person were taken to the hospital after run-ins with protesters*, DC Fire Spokesman Vito Maggiolo told CNN. Acting DC Police Chief Peter Newsham said the officers' injuries were considered minor and not life threatening.

Bursts of chaos erupted on 12th and K streets as black-clad "antifascist" protesters ***smashed storefronts and bus stops, hammered out the windows of a limousine and eventually launched rocks at a phalanx of police lined up in an eastbound crosswalk.*** Officers responded by launching smoke and flash-bang devices, which could be heard from blocks away, into the street to disperse the crowds.

Gregory Krieg, "**Police injured, more than 200 arrested at Trump inauguration protests in DC**," CNN, Updated January 21, 2017, accessible at: **https://www.cnn.com/2017/01/19/politics/trump-inauguration-protests-womens-march** *(Emphases added.)*



*Also see* Phil McCausland, Emmanuelle Saliba, Euronews, Erik Ortiz and Corky Siemaszko, "**More Than 200 Arrested in D.C. Protests on Inauguration Day: 217 people were arrested and six police officers suffered minor injuries after some protesters set fires and smashed windows in the nation's capital**," NBC News, January 21, 2017, accessible at: **https://www.nbcnews.com/storyline/inauguration-2017/washington-faces-more-anti-trump-protests-after-day-rage-n709946**

But then: "**GOVERNMENT DROPS CHARGES AGAINST ALL**

**INAUGURATION PROTESTERS**," NBC News, July 6, 2018, accessible

at: **https://www.nbcnews.com/news/us-news/government-drops-charges-**

**against-all-inauguration-protesters-n889531**

Therefore, it is an error now for the U.S. Probation Office, Department of Justice, and/or U.S. Attorney's Office to compare the sentencing of January 6 Defendants only to other January 6 cases. This arbitrary analysis is precisely in conflict with the U.S. Sentencing Guidelines' reason for existing. Picking only other January 6 cases as the framework undermines the goal of minimizing disparity.

This Court must minimize disparity among all types of cases, not aggravate and inflame disparity by selective punishment of only January 6 cases as an echo chamber.

Dated:  July 12, 2023                            RESPECTFULLY SUBMITTED
                                                **CHRISTOPHER MCHAEL ALBERTS,**
                                                        *By Counsel*


                                                _____/s/__John M. Pierce_____
                                                John M. Pierce, Esq.
                                                John Pierce Law Firm
                                                21550 Oxnard Street
                                                3rd Floor, PMB #172
                                                Woodland Hills, CA 91367
                                                Tel: (213) 400-0725
                                                Email: *jpierce@johnpiercelaw.com*
                                                Attorney for Defendant


                                                _____/s/__ Roger Roots_____
                                                Roger Roots, Esq.
                                                John Pierce Law Firm
                                                21550 Oxnard Street
                                                3rd Floor, PMB #172
                                                Woodland Hills, CA 91367
                                                Tel: (213) 400-0725
                                                Email: **rroots@johnpiercelaw.com**
                                                Attorney for Defendant

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document is being filed on this July 12, 2023, with the Clerk of the Court by using the U.S. District Court for the District of Columbia's CM/ECF system, which will send an electronic copy of to the following CM/ECF participants.  From my review of the PACER account for this case the following attorneys are enrolled to receive notice and a copy through the ECF system.

MATTHEW M. GRAVES
United States Attorney

Shalin Nohria, Esq.
Assistant U.S. Attorney
United States Attorney's Office
For the District of Columbia
601 D. Street, NW
Washington, DC 20530
Telephone:  (202) 252-7215
E-mail:  **Shalin.Nohria@usdoj.gov**

Jordan Konig, Esq.
Trial Attorney
U.S. Department of Justice
**Jordan.A.Konig@usdoj.gov**

_____/s/__ Roger Roots_____
Roger Roots, Esq.